**No. 26-10936**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-105003; File No. 4-698

## OPPOSED MOTION FOR STAY

J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

## CERTIFICATE OF INTERESTED PERSONS

1.  **24X National Exchange LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

2.  **American Securities Association**, Petitioner.

3.  **Borse Dubai Limited**, Owner of 10% or Greater Interest in Nasdaq, Inc.

4.  **BOX Exchange LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

5.  **Boyle, Gregory M.**, Jenner & Block LLP, counsel for Proposed Intervenor Consolidated Audit Trail, LLC.

6.  **Cboe BYX Exchange, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

7.  **Cboe BZX Exchange, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

8.  **Cboe C2 Exchange, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

9.  **Cboe EDGA Exchange, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

10. **Cboe EDGX Exchange, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

11. **Cboe Exchange, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

12. **Cboe Global Markets, Inc. (BATS: CBOE)**, Indirect Owner of 10% or Greater Interest in Proposed Intervenor Consolidated Audit Trail, LLC, and Direct or Indirect Parent Company of Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe

EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.

13.  **Citadel Securities GP LLC**, parent company of Citadel Securities LLC.

14.  **Citadel Securities LLC**, Petitioner.

15.  **Connolly, J. Michael**, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

16.  **Consolidated Audit Trail, LLC**, Proposed Intervenor.

17.  **Deuthsch, Elizabeth B.**, Jenner & Block LLP, counsel for Proposed Intervenor Consolidated Audit Trail, LLC.

18.  **Dinkel, Christopher S.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

19.  **Financial Industry Regulatory Authority, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

20.  **Francisco, Noel J.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

21.  **Gershengorn, Ian Heath**, Jenner & Block LLP, counsel for Proposed Intervenor Consolidated Audit Trail, LLC.

22.  **Intercontinental Exchange, Inc. (NYSE: ICE)**, Indirect Owner of 10% or Greater Interest in Proposed Intervenor Consolidated Audit Trail, LLC, and Indirect Parent Company of New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc., and NYSE Texas, Inc.

23.  **International Securities Exchange Holdings, Inc.**, Parent Company of Nasdaq GEMX, LLC, Nasdaq ISE, LLC, and Nasdaq MRX, LLC.

24.  **Investor AB (Nasdaq Stockhold: INVE B)**, Owner of 10% or Greater Interest in Nasdaq, Inc.

25. **Investors Exchange LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

26. **Long-Term Stock Exchange, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

27. **Lucas, Brinton**, Jones Day, counsel for Petitioner Citadel Securities LLC.

28. **Marshall, Jonathan J.**, Jenner & Block LLP, Counsel for Proposed Intervenor Consolidated Audit Trail, LLC.

29. **Matro, Daniel**, counsel for Respondent United States Securities and Exchange Commission.

30. **MEMX LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

31. **Miami International Holdings, Inc. (NYSE: MIAX)**, Indirect Owner of 10% or Greater Interest in Proposed Intervenor Consolidated Audit Trail, LLC, and Indirect Parent Company of Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, and MIAX Sapphire, LLC.

32. **Miami International Securities Exchange LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

33. **MIAX Emerald, LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

34. **MIAX PEARL, LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

35. **MIAX Sapphire, LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

36. **Montgomery, Sophia W.**, Jenner & Block LLP, Counsel for Proposed Intervenor Consolidated Audit Trail, LLC.

37. **Nasdaq GEMX, LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

38. **Nasdaq, Inc. (Nasdaq: NDAQ)**, Parent Company of Nasdaq PHLX LLC, Nasdaq Texas, LLC, and The Nasdaq Stock Market LLC.

39. **Nasdaq ISE, LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

40. **Nasdaq MRX, LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

41. **Nasdaq PHLX LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

42. **Nasdaq Texas, LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

43. **New York Stock Exchange LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

44. **NYSE American LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

45. **NYSE Arca, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

46. **NYSE National, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

47. **NYSE Texas, Inc.**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

48. **Phillips, David**, Jones Day, counsel for Petitioner Citadel Securities LLC.

49. **Rabbitt, Brian C.**, Jones Day, counsel for Petitioner Citadel Securities LLC.

50. **Templin, Hannah**, Jones Day, counsel for Petitioner Citadel Securities LLC.

51. **The Nasdaq Stock Market LLC**, Member of Proposed Intervenor Consolidated Audit Trail, LLC.

52. **The Vanguard Group, Inc.**, Owner of 10% or Greater Interest in Cboe Global Markets, Inc., and Owner of 10% or Greater Interest in Nasdaq, Inc.

53. **United States Securities and Exchange Commission**, Respondent.

54. **Warnke, Anne S.**, Jenner & Block LLP, Counsel for Proposed Intervenor Consolidated Audit Trail, LLC.

Dated: April 2, 2026

/s/ *J. Michael Connolly*
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Respectfully submitted,

/s/ *Noel J. Francisco*
Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the undersigned counsel hereby certify that the ASA is a nonprofit trade association that represents the wealth management and capital markets interests of regional financial services firms. ASA members are small and regional financial services companies who advise Americans how to create and preserve wealth; provide Main Street businesses with access to capital and advisory services; raise capital for schools, hospitals, cities, and states; and work with institutional investors to increase investment returns. Counsel further certify that no parent corporation, and no publicly held corporation, has a 10% or greater ownership interest in the ASA.

Petitioner Citadel Securities LLC is an indirect subsidiary of Citadel Securities GP LLC. Counsel further certify that no publicly held corporation has a 10% or greater ownership interest in Citadel Securities GP LLC.

Dated: April 2, 2026

Respectfully submitted,

_/s/ J. Michael Connolly_
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

_Counsel for Petitioner_
_American Securities Association_

_/s/ Noel J. Francisco_
Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

_Counsel for Petitioner_
_Citadel Securities LLC_

## TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS ..........................................C-1

CORPORATE DISCLOSURE STATEMENT .........................................C-6

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ................................................................................. 1

BACKGROUND.................................................................................... 5

ARGUMENT ...................................................................................... 10

I.     PETITIONERS ARE LIKELY TO SUCCEED ON THE
MERITS. ................................................................................... 10

     A.    The CAT, and thus the Order, exceed the SEC's authority........ 10

     B.    The Order's "allocation" of costs violates the APA................... 15

     C.    The Order's assumption about SRO funding violates the
APA. .................................................................................. 17

II.    THE EQUITIES OVERWHELMINGLY FAVOR A STAY. ........... 19

     A.    A stay is necessary to protect petitioners from irreparable
harm.................................................................................. 19

     B.    A stay will cause no cognizable harm to the SEC or others. ...... 21

CONCLUSION.................................................................................... 23

CERTIFICATE OF COMPLIANCE...........................................Certificate 1

CERTIFICATE OF ELECTRONIC SUBMISSION ....................Certificate 2

CERTIFICATE OF SERVICE ..................................................Certificate 3

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alabama Ass'n of Realtors v. HHS*,
   594 U.S. 758 (2021) ................................................................. 21

*All. For Fair Bd. Recruitment v. SEC*,
   125 F.4th 159 (5th Cir. 2024) (en banc) ................................13-14

*American Secs. Ass'n v. SEC*,
   147 F.4th 1264 (11th Cir. 2025)............................. 1, 3, 6-7, 15-21

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ................................................................. 11

*LabMD, Inc. v. FTC*,
   678 F. App'x 816 (11th Cir. 2016) ........................................... 10

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
   32 F.4th 1363 (11th Cir. 2022)................................................. 10

*Learning Res., Inc. v. Trump*,
   146 S. Ct. 628 (2026) .............................................................. 13

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ................................................................ 13

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ................................................................ 18

*NIH v. Am. Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025)............................................................. 21

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................ 21

*NRDC v. EPA*,
   755 F.3d 1010 (D.C. Cir. 2014) ................................................................. 14

*Ohio v. EPA*,
   603 U.S. 279 (2024) ................................................................................... 10

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ..................................................................................... 19

*Utility Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ................................................................................... 11

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ................................................................................... 12

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................... 21

**STATUTES**

15 U.S.C. § 78f ............................................................................................ 17

15 U.S.C. § 78k-1 ...................................................................................11, 13

15 U.S.C. § 78o-3 ........................................................................................ 17

**OTHER AUTHORITIES**

17 C.F.R. § 242.613 ..................................................................................... 18

77 Fed. Reg. 45722 (2012) ............................................................................ 5

81 Fed. Reg. 30614 (2016) ............................................................................ 5

81 Fed. Reg. 84696 (2016) ........................................................... 5, 11-12, 17

85 Fed. Reg. 31322 (2020) .......................................................................... 16

88 Fed. Reg. 17086 (2023) ............................................................................ 5

88 Fed. Reg. 62628 (2023) ............................................................. 1, 6, 10, 16

90 Fed. Reg. 44910 (2025) ................................................................... 8

91 Fed. Reg. 2164 (2026) ................................................................... 12

91 Fed. Reg. 13410 (2026) ......................................... 1-4, 8-12, 14-17, 19-21

91 Fed. Reg. 16284 (2026) ................................................................. 22

CAT Fee Alert 2026-1 ...................................................................9, 19

CAT NMS Plan (Mar. 16, 2026)................................................... 18

Fed. R. App. P. 18 ........................................................................... 9

Hearing Before the Comm. on Fin. Servs. (Sept. 24, 2024) .......................... 21

Peirce & Uyeda, *Dissenting Statement on Electronic Submission of Certain Materials Under the Securities Exchange Act of 1934 and Amendments Regarding the FOCUS Report* (Dec. 16, 2024) .................2, 11, 13

USASpending .................................................................................. 12

## INTRODUCTION

Last summer, this Court vacated a 2023 order of the Securities and Exchange Commission (Commission or SEC), 88 Fed. Reg. 62628 (2023) (2023 Order), that established the funding model for an unprecedented government surveillance system known as the Consolidated Audit Trail (CAT). *American Secs. Ass'n v. SEC*, 147 F.4th 1264 (11th Cir. 2025) (*ASA*). From the CAT's inception, everyone understood that the financial-industry self-regulatory organizations (SROs) that operate it "would be responsible for some 'allocation of the costs.'" *Id.* at 1275. The 2023 Order nevertheless allowed the SROs "to pass through 100% of their CAT costs" to their broker-dealer members with "no reasoned justification." *Id.* at 1274-75. That order was not stayed, and the SROs leveraged it to irrevocably seize over $300 million from broker-dealers (and their investor customers) before its vacatur.

Now, history is poised to repeat itself. Less than seven months after this Court's decision, the SEC has adopted a new CAT funding order it admits is "substantively identical." 91 Fed. Reg. 13410, 13415 (2026) (2026 Order or Order) (Ex. A). And because that Order will expire less than two years from now, the SROs have every incentive to use it to collect as much as possible, as soon as possible. A stay is therefore necessary to prevent the SROs from again plundering broker-dealers to the tune of nine figures per year.

1

This relief is amply warranted. To start, petitioners are likely to prevail on the merits of their petition to vacate the 2026 Order. The 2026 Order lets the SROs saddle broker-dealers with 100% of CAT's costs without even defending the lawfulness of this multibillion-dollar surveillance system, which falls far outside the SEC's power. To the contrary, the SEC "takes seriously" the "fundamental concern[]" that the CAT "exceeds the Commission's statutory authority," so much that it is presently engaged in a "comprehensive reassessment" of this massive database. Order 13456.

That is not surprising: Two of the SEC's three Commissioners have described the CAT as something "one would expect to find in a dystopian surveillance state"—"an omnibus surveillance system that tracks every investment move of its citizens" yet "operates outside the direct oversight or authorization of Congress."[1] What is surprising is that the Commission has decided that broker-dealers must spend hundreds of millions to fund the system for two years while it figures out what to do. The Order's failure to engage with that foundational issue is unreasonable.

---

[1] Peirce & Uyeda, *Dissenting Statement on Electronic Submission of Certain Materials Under the Securities Exchange Act of 1934 and Amendments Regarding the FOCUS Report* (Dec. 16, 2024) (Dissent), https://tinyurl.com/2p9wk9cu.

That is just one of the Order's many fatal flaws. Like its predecessor, the 2026 Order purports to "allocate" CAT costs between the SROs and broker-dealers, yet inexplicably still allows the SROs "to pass through all of their CAT costs." *ASA*, 147 F.4th at 1274. It does so by prohibiting the SROs from "directly" passing their CAT costs onto broker-dealers in the form of "a new fee," but permitting them to "indirectly" do so by "increasing existing fees." Order 13413. The Administrative Procedure Act (APA)—not to mention this Court's decision—demands more than such empty wordplay.

Perhaps even worse, the 2026 Order rests on SRO coercion rather than SEC reason. Because the SROs have "caution[ed]" they may not fund the CAT absent a new funding order, the Commission says *broker-dealers* must "ensure" it remains funded to avoid a "destabilizing" scenario. Order 13412. But that threat—the impetus for the 2026 Order itself—is a paper tiger. As the SEC told this Court last time, the lack of an operative funding order would "require the SROs to continue bearing 100% of CAT's costs." 23-13396 Doc. 120 (23-13396 Opp.) at 3. That is because the SEC-approved plan governing the CAT obligates them to operate it regardless of whether there is a funding regime in place. The 2026 Order therefore rests on a mistake of law. For these and other reasons, the SEC's latest Order will likely meet the same fate as its 2023 predecessor.

3

Absent a stay, however, petitioners will suffer irreparable harm before vacatur. Even by the SEC's conservative calculations, the 2026 Order will force broker-dealers to pay between $297.8 and $446.7 million before it sunsets in March 2028. Order 13465-66. Given that it took over 23 months to fully litigate the challenge to the 2023 Order, it is likely that most, if not all, of that money will be gone before this case is resolved. At that point, it will be gone forever: The SROs will claim immunity in court, and the SEC will not make things right, as confirmed by its decree that the SROs may keep over $300 million in spoils they seized the last time around.

By contrast, a stay will cause no cognizable harm to the SEC or the public. Because the SROs must keep the CAT running without a funding order, a stay would just preserve a status quo that has largely been in place since 2016. In any event, the CAT can continue operating without another dime until at least August 2026, as the SROs are currently drawing on a massive reserve of fees collected under the since-vacated 2023 Order. Order 13442. Thus, a stay would primarily prevent the SROs from stockpiling *additional* broker-dealer funds to spend later. There is no good reason to deny that modest relief.[2]

---

[2] If the SEC is truly concerned about any risk of a gap in broker-dealer funding between August 2026 and this Court's decision, it can always move for expedited briefing, which petitioners would not oppose.

## BACKGROUND

1.      In 2012, the SEC ordered the SROs to develop the CAT—a massive, unprecedented surveillance system that would allow the Commission to track every trade and investor in the U.S. securities markets. 77 Fed. Reg. 45722 (2012). The SROs—today, the 26 for-profit national securities exchanges and the non-profit FINRA—returned to the SEC in 2015 with a plan for this new database. 81 Fed. Reg. 30614 (2016). In parallel, the SROs proposed the creation of a company, now known as CAT LLC, through which they would run the CAT. *Id.* at 30616. Each SRO owns a share of the company and is represented on its operating committee. *Id.* Broker-dealers and their investor customers, by contrast, have no role in the company, nor any meaningful input on the CAT's design, implementation, operation, budget, costs, or funding. *Id.* at 30621.

In 2016, the SEC approved the SROs' plan for the CAT (Plan) and deputized the company to run it. 81 Fed. Reg. 84696 (2016). Neither the Plan nor the SEC's 2016 order, however, settled how the CAT would be funded. Instead, the SEC and the SROs punted, explaining that the "allocation" of CAT costs between the "Participants" (the SROs) and the "Industry Members" (broker-dealers) would be sorted out later. *Id.* at 84793, 84795. With no funding model, CAT LLC covered the CAT's startup and operating costs through loans from its member SROs from 2016 until 2024. *See, e.g.*, 88 Fed. Reg. 17086, 17112 (2023).

**2.**    In September 2023, however, the SEC approved the 2023 Order, which established a funding model for the CAT as an amendment to the Plan. 88 Fed. Reg. at 62628. This order purported to fund the CAT through a tax on every share traded in the U.S. equities and options markets. *Id.* at 62629-30. Separate taxes (dubbed "fees") were to be applied to (1) reimburse the SROs for the nearly $1 billion spent to build the CAT and (2) to cover the CAT's budget each year going forward. *Id.*

In theory, the 2023 Order provided that the tax on each trade would be split into thirds: two-thirds were to be borne by the broker-dealers that handled a trade, while the remaining third was to be payable by the SRO on which a trade was executed. *Id.* at 62630. But the 2023 Order also allowed the SROs to pass "their CAT fees onto their members in full," meaning broker-dealers (and their investor customers) could "bear 100%" of costs. *Id.* at 62684 n.1135. In approving this scheme, the Commission claimed that it would review the SROs' biannual CAT fee filings setting the specific per-transaction fee rate to ensure they were based on "reasonably budgeted CAT costs." *Id.* at 62637.

**3.**    Petitioners challenged the 2023 Order in this Court, contending that the CAT itself falls outside the SEC's statutory authority and that the 2023 Order violated the APA in multiple respects. *ASA*, 147 F.4th at 1269.

6

While that challenge was pending, the SROs began to submit fee filings to the SEC to extract funds from broker-dealers for CAT costs. 23-13396 Opp. 7-8. As expected, the largest SRO—FINRA—submitted an additional fee filing to pass through 100% of costs supposedly allocated to it. *Id.* at 8-9.

When the Commission failed to promptly suspend these filings, petitioners sought a judicial stay. 23-13396 Doc. 112-1 at 9. The SEC opposed, contending that petitioners faced no "irreparable harm" because it could make broker-dealers whole on the back-end by "adjusting future fee filings" or other "regulatory initiatives." 23-13396 Opp. 3. The Commission also contended that a stay would be inequitable because the lack of an operative funding model would "*require* the SROs to continue bearing 100% of CAT's costs." *Id.* (emphasis added). This Court denied the stay motion by a 2-1 vote. 23-13396 Doc. 134.

4.      In July 2025, this Court vacated the 2023 Order, but stayed its judgment for 60 days. *ASA*, 147 F.4th at 1280. The Court found it unnecessary to decide whether the CAT itself is authorized, holding instead that the 2023 Order was arbitrary under the APA. *Id.* at 1273-74. Among other things, the SEC had failed to justify allowing the SROs to pass through their own portion of CAT fees, which would saddle broker-dealers (and investors) with all the CAT's costs while giving them no meaningful role in its design, implementation, operation, or budget. *Id.* at 1274-77.

A little over a month later, the SROs proposed a new funding model that was "identical" to the 2023 Order save for a promise "not to establish a new fee for passing through" each SRO's CAT costs. 90 Fed. Reg. 44910, 44912 (2025). Based on that proposal, the SROs sought to extend this Court's stay, which the Court promptly denied. 23-13396 Docs. 158-1, 162-1.

With the 2023 Order gone, the SROs finally were forced to stop collecting CAT fees from broker-dealers at the end of 2025. Order 13411 n.26. By that time, however, the damage was done: the SROs had taken over $300 million from broker-dealers (including over $56 million from Citadel Securities) in reliance on the unlawful 2023 Order. Berger Decl., Ex. C, ¶ 10.

**5.** To fund its operations in 2026, CAT LLC turned to the $119 million-plus budget surplus it had amassed by collecting fees under the unlawful order. Order 13442-44; *see* Iacovella Decl., Ex. B, ¶ 13; Berger Decl. ¶ 11. CAT LLC continues to rely on that reserve to fund its operations, a reserve which will last at least until August 2026. Order 13442.

In March 2026, the SEC approved the SROs' new funding model proposed last year, although it provided that the model would expire on March 31, 2028. Order 13412. The Commission stated it would be "premature" to create a "new, permanent funding model" because it was currently conducting "a comprehensive review of the CAT" itself. Order 13411-12. The SEC nevertheless

concluded that it needed an "interim funding model" in order "to ensure" the CAT's "continued existence and funding during" its review process because the SROs had "caution[ed]" that they may not "'loan funds'" to keep the CAT in "'operation'" "'once the operational reserve is exhausted.'" Order 13412.

Given this Court's decision, the SEC had no choice but to prohibit the SROs from engaging in "the simple filing of a *new* fee to directly pass through CAT costs" to broker-dealers. Order 13413 (emphasis added). But in a transparent end-run around this Court's ruling, the Commission authorized the SROs to "recover their share of costs from" broker-dealers "indirectly by increasing existing fees." *Id.*

Because the entire point of the 2026 Order is to allow the SROs to immediately begin collecting hundreds of millions in CAT fees from broker-dealers before it sunsets in March 2028, petitioners have no choice but to seek a stay. Order 13412. Given that purpose—and the SEC's refusal to suspend fee filings under the identical 2023 Order—there is no prospect the Commission will stay this stopgap funding measure or suspend impending immediately effective fee filings submitted under it. *See supra* at 7; Fed. R. App. P. 18(a)(2)(A)(i). Petitioners therefore are seeking a stay now to avoid burdening this Court with emergency filings when the SROs' demands first come due in July. CAT Fee Alert 2026-1 at 2, https://perma.cc/5MNC-SQE9. The SEC opposes this motion.

**ARGUMENT**

When evaluating a stay request, this Court asks: "(1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies." *Ohio v. EPA*, 603 U.S. 279, 291 (2024). But when the "balance of equities weighs heavily in favor of granting the stay," this Court will "relax the likely-to-succeed-on-the-merits requirement." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (cleaned up). In that context, it is enough that "'a serious legal question is presented.'" *LabMD, Inc. v. FTC*, 678 F. App'x 816, 819 (11th Cir. 2016). Petitioners satisfy either formulation of the test.

## I. PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS.

### A. The CAT, and thus the Order, exceed the SEC's authority.

1. To start, the 2026 Order is invalid because it forces broker-dealers to fund a surveillance system that is itself unlawful. *See* 23-13396 Doc. 49 (2023 Br.) at 16-20; 23-13396 Doc. 102 (2023 Reply) at 5-11. The SEC concedes there is no "express authorization for CAT by Congress," 88 Fed. Reg. at 62673, and claims to "take[] seriously" the "concern[]" that the CAT could fall outside "its statutory authority," Order 13456. That concession is understandable, as the Commission's only cited authority for the 2026 Order is a 1975 statute allowing

the SEC "to facilitate the establishment of a national market system" by requiring the SROs "to act jointly" in "regulating" that "system." 15 U.S.C. § 78k-1; *see* Order 13410 n.3, 13481; 81 Fed. Reg. at 84726.

That concession is also fatal, for Congress must "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Known as the "major questions doctrine," that rule requires "a clear statement" from Congress before courts will conclude it "entrusted … an agency" with resolving such an issue. *Biden v. Nebraska*, 600 U.S. 477, 503, 506 (2023) (cleaned up). Thus, if the CAT is a matter of deep political and economic significance, the SEC's conceded lack of clear authority for it confirms that this system is unlawful. It is.

The CAT's *political* significance is undeniable, as underscored by the many *amici*—including a former attorney general, nearly half the States, Members of Congress, and various civil-liberties and industry organizations—who urged this Court to put an end to the SEC's power grab. *See* 23-13396 Docs. 51, 61, 65, 67, 69, 74, 75, 90, 91, & 135. Indeed, a majority of the Commission itself has described this "omnibus surveillance system" as something out of "a dystopian surveillance state." Dissent, *supra.* That is not hyperbole: This first-of-its-kind database, which accumulates almost 800 billion records *per day*, collects and stores the trading history of all Americans who trade equities or options for the

11

SEC's immediate access. Order 13474. As Congressmen and Commissioners alike have observed, that is a profound threat to liberty and privacy. 2023 Br. 16-20; 2023 Reply 6-7. Even in the wake of recent SEC measures, every American transacting on the U.S. securities markets is tagged with an ID number, and the Commission may access associated personal identifying information through the SROs and broker-dealers. 91 Fed. Reg. 2164, 2168, 2173-74 (2026).

The CAT's *economic* significance is likewise undeniable. Even under the Commission's conservative 2016 estimates, broker-dealers have had to spend roughly $1.5 billion each year to comply with the system's data-reporting requirements. 81 Fed. Reg. at 84860. These costs aside, the CAT's development and operation has required over $1 billion to date. Order 13464. And the SEC thinks the CAT will need around $150 million every year while the 2026 Order is in effect, a sum eclipsing the budgets of many federal agencies. Order 13466; *see* USASpending, https://www.usaspending.gov/agency. This multibillion-dollar tab puts the CAT in the heartland of major programs requiring express congressional authorization. *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 774 n.6 (2022) (Kagan, J., dissenting) (noting "$5-$8 billion" in "'compliance costs'").

The CAT is also suspect because of *how* it is funded. Rather than rely on congressional appropriations, the 2026 Order, like its predecessor, relies on a "'tax[]'" on securities "'transactions.'" Order 13430. Through this approach, the

SEC has ensured that the CAT remains "essentially funded by the public" but "outside the direct oversight or authorization of Congress," as a majority of Commissioners have admitted. Dissent, *supra*.

That should set off alarm bells. As the government has "concede[d]," the SEC "cannot tax the trading of securities, even though it is expressly authorized to 'regulate'" that activity. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 643 (2026). And it is quite unlikely that Congress hid such an extraordinary delegation in § 78k-1. Rather, "had Congress intended to convey the distinct and extraordinary power to impose" taxes on securities trades, "it would have done so expressly." *Id.* at 642. Even the SEC concedes that it has not.

2.    Major questions doctrine aside, construing § 78k-1 to authorize the CAT is not "the best" reading of that statute under ordinary "interpretive tools." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). In directing the SEC "to facilitate the establishment of a national market system"—including through the SROs—Congress said nothing about the establishment of a national *surveillance* system. 15 U.S.C. § 78k-1(a)(2). Rather, the statutory "objectives" defining the "national market system," *id.*; *see id.* § 78k-1(a)(1), show that the SEC was authorized to take measures to *increase trade efficiency*, that is, to "reduce the transaction costs associated with executing a securities trade—*e.g.*, by lowering broker commissions or bid-ask spreads," *All. For Fair Bd. Recruitment v. SEC*, 125

13

F.4th 159, 177 (5th Cir. 2024) (en banc); *see id.* at 173-74. The CAT and the 2026 Order, by contrast, only *decrease* trade efficiency by imposing a new tax on them. Order 13467-69.

3.     At a minimum, the APA compelled the SEC to address the concern that the CAT itself is unlawful. The Commission's "statutory authority" to establish the CAT was "a 'key assumption'" the SEC had to "'justify'" to issue the 2026 Order. *NRDC v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014). If the CAT itself is unlawful, the SEC has no business forcing broker-dealers to pay for it.

The Commission, however, never actually disagreed with petitioners' objection that the CAT "exceeds [its] statutory authority." Order 13456. To the contrary, it took these "concerns" "seriously" and promised they would "inform" its "comprehensive reassessment." *Id.* But having conceded that the CAT at best is perched on a thin limb, it was incumbent on the SEC to offer a reasonable explanation why it should still exist, and why broker-dealers should still fund it—even temporarily. Instead, the Commission put its head in the sand and announced that it was not "revisiting the decision to establish" the CAT in approving a "temporary funding model." *Id.* In failing to justify a key assumption underlying the 2026 Order, the SEC ran afoul of the APA.

14

### B.    The Order's "allocation" of costs violates the APA.

The CAT's unlawfulness aside, the 2026 Order's faux "allocation" of CAT costs is no more defensible than its predecessor's. By allowing the SROs to "indirectly" pass through their purported share of CAT costs "by increasing existing fees," the SEC simply ignores this Court's prior ruling and repackages the unexplained change of position from prior CAT orders this Court identified. Order 13413. Whether implemented through imposing new fees or increasing existing ones, a "shift from a *mandate* that both self-regulatory organizations and broker-dealers fund the CAT to an *allowance* for self-regulatory organizations to pass through 100% of their CAT costs constitutes a major CAT policy change." *ASA*, 147 F.4th at 1274. Yet rather than "'display awareness that it is changing position'" and offer "good reasons" for its new approach, the SEC made three arguments why there has been no change at all. *Id.* at 1275. Each fails.

*First*, the SEC asserted that the Plan's longstanding "cost-sharing premise" applied only to "the *initial* allocation of costs" between the SROs and broker-dealers, leaving each SRO free "to indirectly pass through its share of CAT costs" through other means. Order 13413 & n.47. But this Court considered the same language from the prior SEC orders that the 2026 Order cites and explained that the "language permitting [SROs] to recover their CAT costs from

members" consistently "was used in conjunction with the understanding" that they "were to *share* the costs." *ASA*, 147 F.4th at 1275; *see* 2023 Reply 14.

*Second*, the Commission insisted that the Plan does not "regulate the business decisions" SROs or broker-dealers "may make to finance" CAT costs, Order 13413, and that "it would be inequitable" to prevent "only" the SROs "from attempting to recover their costs" when broker-dealers can pass their costs on to investors, Order 13422. But that reasoning—already raised and necessarily rejected in *ASA*, 23-13396 Doc. 96 at 26—rests on a false equivalence. SROs and broker-dealers alike are free to make "business decisions" to recover CAT costs from their customers; what the Plan governs is the ability of SROs to impose those costs through *mandatory regulatory fees*—a point the SEC previously recognized. *See* 88 Fed. Reg. at 62682 (explaining "the allocation of CAT fees" is distinct from whether broker-dealers "pass through their CAT fees to their customers"). And on that front, the Commission *has* previously blocked the SROs from recovering CAT costs—through any fee increase—unless they met specific deadlines. 85 Fed. Reg. 31322, 31331, 31348-49 (2020).

*Third*, the Commission claimed the fee "filing process" would protect broker-dealers from inequitable pass-throughs. Order 13413, 13423. But this Court

16

rejected that argument too, explaining that the SEC's "*post hoc* review of fee filings is insufficient" for many reasons. *ASA*, 147 F.4th at 1276. The intervening months have not improved it.

### C.    The Order's assumption about SRO funding violates the APA.

Finally, the 2026 Order rests on a legal error—namely, the premise that the SROs may cease funding the CAT in the absence of a funding order. Noting the SROs had "caution[ed] that it 'should not be assumed'" that they "'will voluntarily agree to loan funds'" to fund the CAT "'once the operational reserve is exhausted,'" the SEC adopted the Order because "a defined funding source is needed to ensure [the CAT's] continued existence and funding" and to avoid "a potentially destabilizing" scenario. Order 13412; *see* Order 13444 & n.659. In other words, the SROs threatened to stop funding the CAT, so the SEC ordered broker-dealers to pay instead.

That was error because the CAT has had a "defined funding source" from the beginning: the SROs, who are legally required to fund it whether or not a funding order is in place. The Exchange Act demands that the SROs "carry out the purposes of the Exchange Act, the rules and regulations thereunder, and the rules of the exchange or association." 81 Fed. Reg. at 84794 n.1736 (citing 15 U.S.C. §§ 78f(b)(1), 78o-3(b)(2)). At least according to the SEC, those rules include the Plan and the regulations implementing it. *See id.*; *but see supra* Pt. I.A.

17

And those in turn require the SROs to "maintain the CAT" and "fund" that "maintenance." Recitals, Plan (Mar. 16, 2026), https://perma.cc/5XJ9-H5RX; 17 C.F.R. § 242.613(a)(1)(vii)(D). The Plan therefore imposes a host of duties on CAT LLC without regard to whether any funding model is in effect. *See, e.g.*, Plan § 6.3 (imposing reporting requirements); Plan § 6.7 (imposing implementation deadlines); Plan § 11.1 (requiring annual budget that includes "costs of developing and operating the CAT for the upcoming year").

In fact, the SEC relied on this framework to successfully oppose a stay of the 2023 Order. Less than two years ago, the Commission told this Court that "granting a stay" of that order "would 'substantially injure'" the SROs because it would "[r]equir[e]" them "to continue shouldering the entirety of CAT's costs." 23-13396 Opp. 20; *see id.* at 3, 19; *supra* at 7. Having defeated a stay based on these representations, the SEC is estopped from changing its position. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

The regulatory framework explains why the SROs funded the CAT from 2016 to 2024 when broker-dealers were not required to do so. It also explains why this Court vacated the 2023 Order on the premise that doing so would "minimally affect the status quo," as "[t]he CAT has operated without a funding order since 2016 and will presumably continue to do so." *ASA*, 147 F.4th at 1279. And it explains why this Court then rejected the SROs' request for an extended

18

stay of the vacatur based on the same threat to defund the CAT. *See* 23-13396 at Doc. 158-1 at 11 (warning that "a gap between funding models… may result in a lack of funding of the CAT altogether").

The Commission thus fundamentally "misconceived the law" by overlooking that the SROs are required to fund the CAT. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). At the very least, "shift[ing]" to a new position that the SROs may choose not to fund the CAT "constitutes a major CAT policy change." *ASA*, 147 F.4th at 1274. Yet here, too, the Order gives no indication that the SEC was even "aware[]" that it was "'changing position,'" let alone that there were "'good reasons for the new policy.'" *Id.* at 1275.

## II.    THE EQUITIES OVERWHELMINGLY FAVOR A STAY.

### A.    A stay is necessary to protect petitioners from irreparable harm.

The equities are not close. Without a stay, broker-dealers (and their customers) will be forced to transfer hundreds of millions of dollars to the SROs before the 2026 Order expires in March 2028. Order 13465-66. Indeed, the SROs raced to collect as much as they could from broker-dealers in the brief period the 2023 Order was in effect, and even after this Court held it to be unlawful. With the 2026 Order in hand, they have declared their intent to do so again. CAT Fee Alert 2026-1 at 2, https://perma.cc/5MNC-SQE9.

That money will not be returned, even if the 2026 Order is later held unlawful. As this Court observed, the SROs "'are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions,'" so the unlawful collection of CAT fees would likely leave "broker-dealers … without a remedy." *ASA*, 147 F.4th at 1279. Recognizing as much, the SROs have retained a reserve of more than $119 million in surplus fees that they collected under the unlawful 2023 Order.

Nor can broker-dealers rely on the Commission to make them whole. In successfully opposing a stay of the 2023 Order, the SEC promised this Court that there was no "risk of irreparable harm" to petitioners because "any overpayment of fees under" the 2023 Order "could be addressed by adjusting future fee filings" or through "future regulatory initiatives." 23-13396 Opp. 3; *see id.* at 18-19. Yet when petitioners asked the Commission to account for the over $300 million in fees collected from broker-dealers under the unlawful 2023 Order in its latest funding model, the SEC refused. According to the SEC, it did "not believe that it is necessary or appropriate to … address CAT fees already collected by the SROs" merely because they took the money "prior to the Eleventh Circuit's vacatur." Order 13347.

Denying a stay would invite history to repeat itself—at even greater cost. The over $300 million the SROs grabbed under the 2023 Order falls at the low

20

end of what the Commission conservatively predicts they will take under the 2026 Order—namely, between $297.8 million and $446.7 million, depending on pass-throughs. Order 13465-66. The denial of a stay would therefore at minimum place petitioners "at risk of irreparable harm by depriving them of [funds] with no guarantee of eventual recovery." *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021); *see also, e.g.*, *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2648 (2025); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584-85 (1952).

### B.     A stay will cause no cognizable harm to the SEC or others.

On the other hand, a stay would harm neither the SEC nor the public. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (final two factors "merge when the Government is the opposing party"). Because the SROs are required to fund and operate the CAT even "without a funding order," a stay "will minimally affect the status quo" and lead to no "disruptive consequences.'" *ASA*, 147 F.4th at 1279. And even if the SROs were to defy their legal obligations and defund the CAT, one of the SEC's current Commissioners has agreed with Congress that the Commission can "identify and stop market manipulation without CAT," which helps explain why the SEC is now comprehensively reviewing whether it needs the system at all. Oversight of the SEC: Hearing Before the Comm. on Fin. Servs. at 2:18:51-2:19:03 (Sept. 24, 2024), https://tinyurl.com/5y8pt2k2.

Even the SROs will not face any imminent injury. CAT LLC has enough money on hand to fund the CAT into August 2026, and the reserve may last even longer now that the SEC has adopted additional cost-saving measures. 91 Fed. Reg. 16284, 16317-18 (2026). Thus, the primary effect of a stay will be that the SROs cannot amass a new reserve of unlawfully collected fees to use when the 2026 Order is finally set aside. That should carry no weight in the equitable balance.

In any event, the SROs cannot complain about being held to their obligation to fund the CAT in the absence of a funding order. If the SROs were concerned about that longstanding arrangement, they could have sued the SEC at any time, as they, unlike petitioners, were funding the CAT from the get-go. *Supra* at 5. Instead, the SROs played along, likely because they assumed that the SEC would one day allow them to pass through all of their costs to broker-dealers. Whatever modest effect a loss on that gamble may have on the for-profit SROs' multibillion-dollar bottom lines, it is no reason for requiring broker-dealers to pay now, before this Court can review the Order.

## CONCLUSION

This Court should stay the 2026 Order.

Dated: April 2, 2026

Respectfully submitted,

*/s/ J. Michael Connolly*
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

*/s/ Noel J. Francisco*
Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

23

## CERTIFICATE OF COMPLIANCE

I certify that this Motion complies with (1) the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,199 words, excluding any parts exempted by Rule 27(a)(2)(B); and (2) the typeface and type-style requirements of Rule 27(d)(1)(E) because it has been prepared in 14-point Calisto MT (a proportionally spaced typeface) using Microsoft Word.

Dated: April 2, 2026                    Respectfully submitted,

*/s/ J. Michael Connolly*                   */s/ Noel J. Francisco*

*Counsel of Record for Petitioner*          *Counsel of Record for Petitioner*
*American Securities Association*           *Citadel Securities LLC*

Certificate 1

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: April 2, 2026                    Respectfully submitted,

/s/ J. Michael Connolly                 /s/ Noel J. Francisco

Counsel of Record for Petitioner        Counsel of Record for Petitioner
American Securities Association          Citadel Securities LLC

Certificate 2

## CERTIFICATE OF SERVICE

I certify that on April 2, 2026, the foregoing Motion was electronically filed with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 2, 2026                          Respectfully submitted,

*/s/ J. Michael Connolly*                     */s/ Noel J. Francisco*

*Counsel of Record for Petitioner*            *Counsel of Record for Petitioner*
*American Securities Association*             *Citadel Securities LLC*

Certificate 3