No. 26-10936

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION;
CITADEL SECURITIES LLC,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent*,

CONSOLIDATED AUDIT TRAIL, LLC; THE NASDAQ STOCK
MARKET, LLC; ET AL.,
*Intervenors*.

On Petition for Review of an Order of the Securities and Exchange Commission

**SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO
PETITIONERS' MOTION FOR STAY**

J. RUSSELL MCGRANAHAN
General Counsel

TRACEY A. HARDIN
Associate General Counsel

DANIEL E. MATRO
Senior Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)
matrod@sec.gov

*American Securities Association et al. v. United States Securities and Exchange Commission*,
No. 26-10936

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rule 26.1-1, the undersigned counsel for Respondent Securities and Exchange

Commission hereby certifies that the following listed persons and entities have an

interest in the outcome of this case:

1) 24X National Exchange LLC, member of Intervenor Consolidated Audit Trail, LLC.

2) American Securities Association, Petitioner.

3) ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

4) Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, and Nasdaq Texas, LLC.

5) Borse Dubai Limited, owner of 10% or greater interest in Nasdaq, Inc..

6) BOX Exchange LLC, member of Intervenor Consolidated Audit Trail, LLC.

7) Berman, Ari M., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

8) Boyle, Gregory, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

9) Cboe BYX Exchange, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

10) Cboe BZX Exchange, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

11) Cboe C2 Exchange, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

*American Securities Association et al. v. United States Securities and Exchange Commission*,
No. 26-10936

12) Cboe EDGA Exchange, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

13) Cboe EDGX Exchange, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

14) Cboe Exchange, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

15) Cboe Global Markets, Inc. (BATS: CBOE), indirect owner of 10% or greater interest in Intervenor Consolidated Audit Trail, LLC, and direct or indirect parent company of Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

16) Citadel Securities GP LLC, parent company of Petitioner Citadel Securities LLC.

17) Citadel Securities LLC, Petitioner.

18) Connolly, J. Michael, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

19) Consolidated Audit Trail, LLC, Intervenor.

20) Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

21) Deutsch, Elizabeth, B., Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

22) Dinkel, Christopher S., Jones Day, counsel for Petitioner Citadel Securities LLC.

23) Financial Industry Regulatory Authority, Inc., member of Intervenor Consolidated Audit Trail, LLC.

24) Francisco, Noel J., Jones Day, counsel for Petitioner Citadel Securities LLC.

25) Hardin, Tracey A., counsel for Respondent Securities and Exchange Commission.

26) Gershengorn, Ian Heath, Jenner & Block LLP, counsel for Intervenor

Consolidated Audit Trail, LLC.

27) Greenwalt, Paul, III, ArentFox Schiff, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

28) Heckendorn, J. Maxwell, ArentFox Schiff, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

29) Intercontinental Exchange, Inc. (NYSE: ICE), indirect owner of 10% or greater interest in Intervenor Consolidated Audit Trail, LLC, and indirect parent company of New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc., and NYSE Texas, Inc.

30) International Securities Exchange Holdings, Inc., parent company of Nasdaq GEMX LLC, Nasdaq ISE LLC, and Nasdaq MRX LLC.

31) Investor AB (Nasdaq Stockholm: INVE B), owner of 10% or greater of Nasdaq, Inc.

32) Investors' Exchange, LLC, member of Intervenor Consolidated Audit Trail, LLC.

33) Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

34) Jones Day, counsel for Petitioner Citadel Securities LLC.

35) Kastenberg, Stephen J., Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, and Nasdaq Texas, LLC.

36) Lantieri III, Paul, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, and Nasdaq Texas, LLC.

37) Long-Term Stock Exchange, Inc., member of Intervenor Consolidated Audit Trail, LLC.

38) Lucas, Brinton, Jones Day, counsel for Petitioner Citadel Securities LLC.

39) MacLean, Matthew J., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

40) Madigan, Sarah M., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

41) Matro, Daniel E., counsel for Respondent Securities and Exchange Commission.

42) Marshall, Jonathan J., Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

43) McGranahan, J. Russell, counsel for Respondent Securities and Exchange Commission.

44) MEMX LLC, member of Intervenor Consolidated Audit Trail, LLC.

45) Miami International Holdings, Inc. (NYSE: MIAX), indirect wwner of 10% or greater interest in Intervenor Consolidated Audit Trail, LLC, and indirect parent company of Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, and MIAX Sapphire, LLC.

46) Miami International Securities Exchange LLC, member of Intervenor Consolidated Audit Trail, LLC.

47) MIAX Emerald, LLC, member of Intervenor Consolidated Audit Trail, LLC.

48) MIAX PEARL, LLC, member of Intervenor Consolidated Audit Trail, LLC.

49) MIAX Sapphire, LLC, member of Intervenor Consolidated Audit Trail, LLC.

50) Molzberger, Michael, ArentFox Schiff, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

51) Montgomery, Sophia W., Jenner & Block LLP, Counsel for Intervenor Consolidated Audit Trail, LLC.

52) Nasdaq GEMX, LLC, Intervenor and member of Intervenor

Consolidated Audit Trail, LLC.

53) Nasdaq, Inc. (Nasdaq: NDAQ), parent company of Nasdaq PHLX LLC, Nasdaq Texas, LLC, and The Nasdaq Stock Market LLC.

54) Nasdaq ISE, LLC, Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

55) Nasdaq MRX, LLC, Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

56) Nasdaq PHLX LLC, Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

57) Nasdaq Texas, LLC, Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

58) New York Stock Exchange LLC, Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

59) NYSE American LLC, Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

60) NYSE Arca, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

61) NYSE National, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

62) NYSE Texas, Inc., Intervenor and member of Intervenor Consolidated Audit Trail, LLC.

63) Oliwenstein, David, Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

64) Phillips, David, Jones Day, counsel for Petitioner Citadel Securities LLC.

65) Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

66) Rabbitt, Brian C., Jones Day, counsel for Petitioner Citadel Securities LLC.

67) Templin, Hannah, Jones Day, counsel for Petitioner Citadel Securities LLC.

*American Securities Association et al. v. United States Securities and Exchange Commission,*
No. 26-10936

68) The Nasdaq Stock Market LLC, member of Intervenor Consolidated Audit Trail, LLC.

69) The Vanguard Group, Inc., owner of 10% or greater interest in Cboe Global Markets, Inc., and owner of 10% or greater interest in Nasdaq, Inc.

70) United States Securities and Exchange Commission, Respondent.

71) Warnke, Anne S., Jenner & Block LLP, Counsel for Intervenor Consolidated Audit Trail, LLC.

/s/ Daniel E. Matro

Daniel E. Matro
Securities and Exchange Commission
100 F Street N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)
matrod@sec.gov

Dated: April 27, 2026

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................ C-1

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION.................................................................................................. 1

BACKGROUND.................................................................................................... 5

ARGUMENT ...................................................................................................... 11

I.     Petitioners' stay motion is procedurally improper.................................. 11

II.    Petitioners are unlikely to succeed on the merits .................................. 12

       A.     Petitioners' APA arguments are meritless.................................... 12

       B.     Petitioners' authority challenge is time-barred and meritless................... 17

III.   Petitioners fail to demonstrate irreparable harm  ................................... 20

IV.    The remaining equities do not favor a stay ........................................... 21

CONCLUSION .................................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Case**                                                                                 **Page(s)**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ..................................................................... 11

*Am. Sec. Ass'n v. SEC*,
  147 F.4th 1264 (11th Cir. 2025) .................................... 2, 3, 5, 8, 9, 10, 13, 14, 20, 21

*Bayless v. Martine*,
  430 F.2d 873 (5th Cir. 1970) ........................................................................ 12

*Biden v. Missouri*,
  595 U.S. 87 (2022) ..................................................................................... 18

*Consumers' Rsch. v. FCC*,
  67 F.4th 773 (6th Cir. 2023) ........................................................................ 17

*Consumers' Rsch. v. FCC*,
  88 F.4th 917 (11th Cir. 2023) ...................................................................... 17

*Env't Def. Fund, Inc. v. EPA*,
  716 F.2d 915 (D.C. Cir. 1983) ..................................................................... 11

*Florida v. Dep't of Health & Hum. Servs.*,
  19 F.4th 1271 (11th Cir. 2021) ................................................................ 11, 20

*Hispanic Affairs Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ..................................................................... 16

*Mayfield v. U.S. Dep't of Labor*,
  117 F.4th 611 (5th Cir. 2024) ...................................................................... 20

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................... 11

*Ohio v. EPA*,
  603 U.S. 279 (2024) .................................................................................... 22

*Touche Ross & Co. v. Redington*,
  442 U.S. 560 (1979) .................................................................................... 18

*Touchston v. McDermott*,
  234 F.3d 1130 (11th Cir. 2000) (en banc) ..................................................... 22

ii

*Wash. Metro. Area Transit Com. v. Holiday Tours, Inc.,*
   559 F.2d 841 (D.C. Cir. 1977) ................................................................ 12

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ................................................................................ 19

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

   Section 11A(a)(1), 15 U.S.C. 78k-1(a)(1)................................................ 18, 19

   Section 11A(a)(2), 15 U.S.C. 78k-1(a)(2)................................................ 18, 19

   Section 11A(a)(3), 15 U.S.C. 78k-1(a)(3)................................................ 19

   Section 11A(a)(3)(B), 15 U.S.C. 78k-1(a)(3)(B) ..................................... 19

   Section 17(a), 15 U.S.C. 78q(a) .............................................................. 18

   Section 17(b), 15 U.S.C. 78q(b) .............................................................. 18

   Section 19(b), 15 U.S.C. 78s(b) .............................................................. 8

   Section 25(a)(1), 15 U.S.C. 78y(a)(1) ..................................................... 17

   Section 25(b)(1), 15 U.S.C. 78y(b)(1) ..................................................... 17

   Section 25(c)(2), 15 U.S.C. 78y(c)(2) ..................................................... 11

**Rules and Regulations**

17 C.F.R. 201.700(b)(3)(i) ............................................................................. 8

17 C.F.R. 242.613 ..................................................................................... 5, 6, 18

Fed. R. App. P. 18(a)(1) ............................................................................. 11, 12

Fed. R. App. P. 18(a)(2)(A)(i) ...................................................................... 11

## Commission Releases

77 Fed. Reg. 45722 (2012) ............................................................................ 5-6

81 Fed. Reg. 84696 (2016) ...................................................................... 1, 6, 16

84 Fed. Reg. 48458 (2019) ............................................................................ 14

88 Fed. Reg. 62628 (2023) ........................................... 2, 7, 8, 9, 10, 11, 14, 20

91 Fed. Reg. 13410 (2026) .................................... 1-4, 7, 10-15, 17, 18, 20-22

91 Fed. Reg. 16284 (2026) ............................................................................. 7

91 Fed. Reg. 20945 (2026) ............................................................................. 7

91 Fed. Reg. 2164 (2026) ......................................................................... 7, 22

## Other Authorities

CAT Fee Alert 2026-1 .................................................................................. 21

Letter from ASA to V. Countryman (Oct. 18, 2019) ..................................... 6

Letter from Citadel Securities to V. Countryman (Nov. 30, 2020) ............... 6

S. Rep. No. 94-75 (1975). ............................................................................ 19

## INTRODUCTION

Petitioners seek a stay of a Securities and Exchange Commission order that temporarily modifies the funding model of the Consolidated Audit Trail (CAT) while the Commission engages in a comprehensive review of that system.  91 Fed. Reg. 13410 (2026) (2026 Order or Order).  But petitioners do not come close to justifying that extraordinary relief.  Their failure to first seek a stay from the Commission alone warrants denial of the motion.  Moreover, they fail to meet any of the stay factors.

For decades, the self-regulatory organizations (SROs) that the Commission oversees maintained audit trails tracking trades and orders on their markets.  In a 2012 rule, the Commission directed the SROs to develop a joint plan to integrate those fragmented data sources into a single, consolidated audit trail to facilitate regulation of the nation's increasingly complex and interconnected securities markets.  After the Commission approved rules governing the CAT—codified in the CAT NMS Plan (the Plan)—in 2016, the SROs built the CAT, broker-dealers developed systems to report to it, and the primary pre-existing audit trail was retired.

Both the 2012 rule and the 2016 approval order provide that the costs to build and operate the CAT are to be shared by the SROs and their broker-dealer members. The 2016 order provided for a fixed fee system but left the percentage allocation of costs between SROs and broker-dealers to subsequent rule filings implementing specific fees.  The SROs' filings under the original funding model were not approved,

1

and they fronted the CAT's costs (over $700 million) until the Commission, in a 2023 order, approved a revised funding model proposed by the SROs (the 2023 Order). Under that model, historical and prospective CAT costs were allocated through transaction fees on executed share volume, divided evenly between the buyer's executing broker, the seller's executing broker, and the SRO in the transaction.

This Court vacated the 2023 Order last year. *Am. Sec. Ass'n v. SEC*, 147 F.4th 1264 (11th Cir. 2025) (*ASA*). In *ASA*, petitioners did not challenge—and the Court did not take issue with—the allocation of two-thirds of the CAT's past and ongoing costs to broker-dealers using this executed share model. Rather, the Court held that the Commission did not sufficiently explain why it left open the possibility that the SROs could charge fees directly passing their one-third share through to their broker-dealer members in full. *Id.* at 1274. Finding the remedy a "close" call, the Court declined to remand without vacatur because it could not "confidently" say that the Commission would not change the funding model's "parameters" after considering the effects of "allowing the possibility for 100% pass-through." *Id.* at 1279.

The 2026 Order answers that question. It approves use of the 2023 Order's unchallenged two-thirds/one-third allocation model for two years while the Commission engages in a comprehensive review of the CAT. But unlike the 2023 Order, it prohibits the SROs from establishing new fees directly passing through their share. The Commission carefully considered but reasonably declined to prohibit

2

other, indirect pass-through mechanisms.  Although the Commission made clear that

it was making no determination that any future indirect pass-through would be

permissible, unlike in 2023, it considered "the effects of potential broker-dealer only

funding" in assessing whether to approve the funding model.  *Id.* at 1275.

Petitioners are unlikely to succeed on the merits of their challenge to the 2026

Order.  Their Administrative Procedure Act (APA) claims mischaracterize or

disregard the Commission's thoroughly reasoned analysis.  And the statutory deadline

on their claim that the CAT "is itself unlawful" (Mot. 10) expired years ago.  The 2026

Order did not restart the clock, and even if it had, the Commission acted within its

authority under the Securities Exchange Act of 1934.

Nor do petitioners face a substantial risk of irreparable harm.  Their contrary

theories erroneously assume they will not have to share in any previously incurred

CAT costs if they prevail here.  But since its approval, the Plan has "require[d]"

broker-dealers to pay a portion of those costs.  *ASA*, 147 F.4th at 1275.  Even if the

Court were to agree with any of petitioners' APA objections, and the (unchallenged)

allocation were to change on remand, any overpayment could be addressed by

adjusting future fees.  And even if the Commission were to more substantially alter

the CAT or its funding structure, or if the Court were to hold that the CAT exceeds

the Commission's authority, regulatory immunity—if it applied at all—would not

stand in the way of a regulatory initiative to fairly allocate past CAT expenditures.

3

The equities also weigh against a stay.  Petitioners ask this Court to relieve broker-dealers of even the two-thirds share of CAT costs they have never challenged as unreasonable—expecting the SROs to bear 100% of the burden contrary to the CAT's long-understood cost-sharing structure, potentially undermining the stability of the sole cross-market surveillance system currently available to regulators.  But they could have challenged the decision to create the CAT, and to require broker-dealers to fund a portion of its costs, when the Commission made those decisions in 2012 and 2016.  Instead, they waited until it was time for them to contribute, content to reap the CAT's market security benefits while the SROs spent millions implementing it and retiring alternative systems.

The Commission's ongoing consideration of the privacy, data security, cost, and other concerns that have been raised during the CAT's implementation provides no support for a stay.  The Commission has recently approved the removal of personally identifiable information from the CAT, taken measures to significantly reduce its budget, and solicited public comment on further reforms.  But the CAT remains a critical tool on which the SROs and the Commission currently rely in performing their regulatory functions, and the 2026 Order lawfully and equitably secures its funding while the Commission conducts its comprehensive reassessment. The stay motion should be denied.

## BACKGROUND

**1.** *Development of the CAT.*  The Exchange Act assigns the SROs—26 national securities exchanges and the Financial Industry Regulatory Authority (FINRA)—frontline responsibility to regulate their markets and members, subject to Commission oversight.  *ASA*, 147 F.4th at 1270.  Before CAT, the SROs and the Commission relied on trade and order data obtained from multiple audit trails and other sources.  77 Fed. Reg. 45722, 45727-30 (2012).  By 2010, a broad consensus had formed that this fragmented regulatory data infrastructure was "outdated and inadequate to effectively oversee a complex, dispersed, and highly automated national market system."  *Id.* at 45723.

The Commission thus adopted Rule 613 in 2012, directing the SROs to jointly file a National Market System (NMS) plan to create, implement, and maintain a consolidated audit trail integrating data previously available from disparate sources into a single database.  *Id.* at 45722.  The Commission explained that a consolidated audit trail would "substantially enhance the ability of the SROs and the Commission to oversee today's securities markets and fulfill their responsibilities under the federal securities laws."  *Id.* at 45726.  The Commission recognized that, as with other audit trails and self-regulatory activities, the SROs "may seek to recover some or all" of the costs to build and operate the CAT from their broker-dealer members.  *Id.* at 45794-

95.  No commenter questioned the Commission's authority to adopt Rule 613 and nobody sought judicial review.

The Commission unanimously approved the SROs' proposed Plan in November 2016, concluding that it would "significantly improve regulatory efforts by the SROs and the Commission" and "strengthen the integrity and efficiency of the markets."  81 Fed. Reg. 84696, 84727 (2016).  The participating SROs (the Participants) jointly operate the CAT through Consolidated Audit Trail, LLC (CAT LLC).  *Id.* at 84699.  The Plan originally required CAT costs to be split between the Participants and their broker-dealer members (Industry Members) through a fixed tier fee system.  *Id.* at 84793-95.  But it left the percentage allocation to each group to be determined by the Participants in subsequent rule filings implementing the fees.  *Id.* at 84710-11 & n.309, 84795.

Neither petitioners nor anyone else questioned the Commission's authority to approve the Plan or sought judicial review.  In fact, as late as 2019, petitioner ASA reaffirmed its support for "a market-wide surveillance system that allows the SEC to properly oversee markets, take action against wrongdoers, and protect investors."  Letter to V. Countryman at 1 (Oct. 28, 2019), http://tinyurl.com/2p92w5db.  And in 2020, petitioner Citadel Securities "fully support[ed] the need for a robust CAT as the Commission described when it adopted Rule 613 in 2012."  Letter to V. Countryman, Att. 1 at 1 (Nov. 30, 2020), http://tinyurl.com/cmhe3crb.

6

Following approval of the Plan in 2016, the Participants developed the CAT and Industry Members revamped their systems to comply with it.  23-13396 Doc. 96 (23-13396 SEC Br.) at 19.  The CAT has been operational since 2020, and it processes hundreds of billions of records per day.  *Id.* at 19.  The primary pre-CAT audit trail system was retired in 2021, and the SROs and the Commission now rely on the CAT to conduct market oversight.  *Id.*; Order 13412.

The CAT's implementation has been significantly more costly than anticipated and other concerns have been raised, including about privacy and data security.  In response, the Commission recently approved Plan amendments ending the collection and storage of personally identifiable information in the CAT, 91 Fed. Reg. 2183 (2026), and has taken actions that have reduced the CAT's annual budget by over $100 million, Order 13422-23; 91 Fed. Reg. 16284 (2026).  The Commission also recently solicited public comment in support of a comprehensive review of the CAT. 91 Fed. Reg. 20945 (2026).

**2.** *Funding of the CAT.*  Between 2017 and 2023, the Participants submitted several unsuccessful filings to implement CAT fees.  Over that time, the Participants fronted over $700 million to build and operate the system.  23-13396 SEC Br. 20.

**a.  The 2023 Order.**  In September 2023, the Commission approved amendments to the Plan's funding model proposed by the SROs.  88 Fed. Reg. 62628 (2023).  The 2023 Order funded historical and prospective CAT costs through

transaction fees on executed share volume, divided evenly between the executing broker for the buyer, the executing broker for the seller, and the Participant in the transaction.  *Id.* at 62630.  Fee rates were calculated twice a year based on reasonably projected costs and executed share volume.  *Id.* at 62650-51.

Before assessing any CAT fees under the 2023 Order, the Participants were required to submit fee filings pursuant to Section 19(b) of the Exchange Act.  *Id.* at 62658, 62660.  Such fees take effect "upon filing," but they are subject to notice and comment and the Commission may, within 60 days, temporarily suspend their effectiveness and institute proceedings to determine whether the fee filings are consistent with the Act's requirements.  15 U.S.C. 78s(b).  The Participants bear the burden of demonstrating that their fees meet those requirements.  17 C.F.R. 201.700(b)(3)(i).

**b.  The *ASA* Decision.**  Petitioners sought review of the 2023 Order in this Court, arguing that the CAT itself exceeds the Commission's authority and that the order violated the APA.  *ASA*, 147 F.4th at 1269.  While the litigation was pending, the Participants submitted fee filings to recover Industry Members' share of certain historical and prospective CAT costs.  FINRA, a non-profit entity funded by its members, submitted additional fee filings to recover its own share.  23-13396 Doc. 120 (23-13396 SEC Opp.) at 7-9.  After the Commission suspended the first round of

filings, the Participants withdrew them and submitted modified filings that addressed commenters' concerns.  *Id.*

Petitioners then asked this Court for a stay.  23-13396 Doc. 112-1.  There, as here, petitioners argued that a stay was necessary to prevent the expenditure of significant sums of allegedly irretrievable CAT fees and would cause no cognizable harm.  *Id.* at 10-12.  This Court denied the motion.  23-13396 Doc. 134.

In July 2025, the Court vacated the 2023 Order.  It focused not on the two-thirds share of costs allocated to broker-dealers—which petitioners did not challenge—but on the Commission's treatment of the Participants' one-third share.  The Court concluded that the Commission "did not explain or justify its decision to allow" the Participants to charge fees directly passing their share through to broker-dealers in full.  *ASA*, 147 F.4th at 1274.  In particular, the Commission failed to reconcile that decision with the Plan's requirement that there be some "allocation of the costs" to the Participants and failed to "consider the effects of potential broker-dealer-only funding."  *Id.* at 1275.  The Court also found the Commission's economic analysis deficient because it did not account for "the actual costs of the CAT" or the possibility of 100% pass-through.  *Id.* at 1269.  The Court did not reach the timeliness or merits of petitioners' statutory challenge.  *Id.* at 1274.

The Court declined to remand without vacatur because it could not "confidently" say that the Commission would not change the order's "basic

9

parameters" after considering the pass-through issue.  *Id.* at 1279.  Recognizing that vacatur would "leave[] the CAT without a mechanism for the equitable allocation of costs between [Participants] and broker-dealers," however, the Court stayed its judgment for 60 days to "afford the Commission an opportunity to . . . reconsider the allocation of" CAT costs "in accordance with [its] opinion."  *Id.* at 1280.

    **c.  The 2026 Order.**  In March 2026, the Commission approved a new funding model for an interim period ending March 31, 2028, explaining the value of ensuring certainty in the CAT's funding while the Commission undertakes its comprehensive review.  Order 13412.  Like the 2023 Order, the 2026 Order splits CAT costs evenly among the buyer's executing broker, the seller's executing broker, and the Participant in the transaction.  *Id.*  But the 2026 Order prohibits each Participant from "establish[ing] a new fee for passing through to its members the CAT fee charged to such Participant."  Order 13412-13.

    The Order explains that prohibiting indirect forms of pass-through, as petitioners urged, would be impractical, inequitable, and unnecessary to control CAT costs.  Order 13413, 13422-23, 13441.  While it makes no determination that any future indirect pass-through attempt would be permissible, the Order "considers 'the effects of potential broker-dealer only funding' of CAT for the next two years," as *ASA* required.  Order 13413, 13422-23, 13441, 13465-70.  And its economic analysis accounts for the CAT's actual costs and budget trajectory.  Order 13458-65.

## ARGUMENT

"A stay is not a matter of right, even if irreparable injury might result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quotation omitted). Petitioners must "clearly establish[]" "(1) a substantial likelihood that [they] will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury to [themselves] unless the injunction is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021) (cleaned up). "Failure to show any of the four factors is fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Petitioners' motion should be denied because they failed to first seek a stay from the Commission and do not satisfy any of the stay factors.

## I. Petitioners' stay motion is procedurally improper.

Petitioners' stay motion is procedurally barred because they failed to "move first before the agency for a stay pending review." Fed. R. App. P. 18(a)(1); *see also* 15 U.S.C. 78y(c)(2). Because the "filing of an administrative petition for stay is a prerequisite to filing a judicial petition," *Env't. Def. Fund, Inc. v. EPA*, 716 F.2d 915, 921 n.10 (D.C. Cir. 1983), the motion can be denied on this ground alone.

Petitioners argue (Mot. 9) that the Commission's non-suspension of certain fee filings under the 2023 Order and approval of the 2026 Order show that seeking a stay from the Commission was "impracticable." Fed. R. App. P. 18(a)(2)(A)(i). But a

decision regarding different regulatory filings two years ago did not predetermine the outcome here. And the point of Rule 18 is to allow the agency to decide whether to grant some form of relief in the first instance. If taking the challenged action were sufficient to show impracticability, a party would never have to follow that rule. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844-45 (D.C. Cir. 1977); *Bayless v. Martine*, 430 F.2d 873, 879 n.4 (5th Cir. 1970).

## II.    Petitioners are unlikely to succeed on the merits.

Even if it were procedurally proper, the stay motion should be denied because petitioners are unlikely to succeed on the merits.

### A.    Petitioners' APA arguments are meritless.

The 2026 Order reasonably addresses the issue of pass-through, reasonably explains the decision to approve an interim funding model, and reasonably responds to comments questioning the CAT's lawfulness.

1. Petitioners' only objection to the 2026 Order's allocation of costs is that the Order does not prohibit Participants from seeking to recover their one-third share "indirectly" by, for example, "increasing existing fees" or reducing rebates. Order 13413, 13467. But the possibility of later indirect pass-through has no bearing on, and cannot justify a stay of, the Order's unchallenged two-thirds allocation to Industry Members. And even if it could, the Commission reasonably explained and

12

"consider[ed] the effects of [its] choice" not to prohibit indirect pass-through, which is all *ASA* (and the APA) require. *ASA*, 147 F.4th at 1275-77.

As the Commission explained, the Plan "governs the *initial* allocation of costs between Participants and Industry Members." Order 13413. The Order prohibits Participants from "effectively altering" that allocation by "directly passing their share through to Industry Members." *Id.* In doing so, it ensures the Participants incur CAT costs as part of their "overall regulatory and business expenses." *Id.* But the Plan does not "regulate the business decisions individual Participants or Industry Members may make to finance" such expenses. *Id.* "Like every business, the Participants need to recover their costs to remain viable." Order 13467. It would be "inequitable" to prevent them "from attempting to recover their costs when the Plan contains no restriction on the ability of Industry Members to pass through their share to others, particularly given that . . . the Participants would be required to establish that increases in any other fees are reasonable, equitable, and not unfairly discriminatory in the rule filing process." Order 13422. Moreover, it would be "difficult to effectively amend the CAT NMS Plan . . . to prevent a Participant from ever indirectly passing through any CAT costs." Order 13422.

Contrary to petitioners' assertion, this explanation is consistent with the Court's ruling in *ASA*. The order there "allow[ed]" the Participants to establish new fees directly "pass[ing] their CAT fees onto their members in full." 147 F.4th at 1272,

13

1274 n.1.  The Court thus had no occasion to consider whether increases in any "regulatory fees" (Mot. 16), including the transaction, market data, and other member fees through which the Participants finance their business and regulatory expenses, would be inconsistent with the Plan.  Order 13467, 13477.  And while the Court concluded that "*post hoc* review of fee filings [was] insufficient" to justify the 2023 Order's "fail[ure] to consider the effects of potential broker-dealer only funding," including on cost-control incentives, 147 F.4th at 1275-76, the 2026 Order considers those effects at length.  Order 13413, 13422-23, 13441, 13465-70.

Nor is the Order's treatment of pass-through inconsistent with prior Commission statements or actions.  *Contra* Mot. 16.  The 2023 Order's observation that broker-dealers may "pass through their CAT fees to their customers" regardless of the Plan's "allocation of CAT fees" among Participants and broker-dealers says nothing about the permissibility of indirect cost-recovery.  88 Fed. Reg. at 62682.  And previous limits on the Participants' recovery of CAT fees did not apply to "any fee increase."  Mot. 16.  The initiative petitioners reference specifically recognized that individual Participants might seek to increase other fees to recoup costs they were prohibited from recovering directly.  *See* 84 Fed. Reg. 48458, 48484, 48485 (2019) ("The Participants could attempt to shift [such] costs to Industry Members through changes to their broader fee structures," such as "through relatively higher prices to transact on exchanges for broker-dealers.").

14

2.  Petitioners' contention that the 2026 Order rests on a legal error is equally meritless.  The Order does not address whether it would be lawful for the Participants to "cease funding the CAT."  Mot. 17.  Rather, the Order reasonably concludes that failing to adopt a temporary funding model would be "potentially destabilizing" and "inconsistent with the CAT NMS Plan's [cost-sharing] premise," and that "splitting the costs of the CAT evenly among the buyer, seller, and market regulator in transactions reportable to the CAT" is a "reasonable approach to allocating the costs of CAT during the interim period."  Order 13412.

Petitioners assert that the Participants are the CAT's "defined funding source" because they have a statutory obligation to implement the Plan.  But the Plan the Participants are responsible for implementing specifically contemplates that they will charge their broker-dealer members fees to fund a portion of their costs.  Order 13413.  The Commission reasonably determined that the executed share model's two-thirds/one-third allocation of costs between broker-dealers and Participants was more likely to ensure the CAT's "financial stability" than relying on Participant-only funding.  Order 13413, 13444.  Particularly given that petitioners do not contest the reasonableness of that allocation, any disagreement over what constitutes a "defined funding source" is irrelevant.

3.  Petitioners' argument that the Commission's statutory authority to establish the CAT was a "key assumption" the 2026 Order fails to justify fares no better.

15

Mot. 14.  The D.C. Circuit has held that challenges to the "key assumptions"

underlying a new regulation cannot be forfeited by a failure of commenters to object

during the comment period.  *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389 (D.C.

Cir. 2018).  But the question of when a new agency action can be challenged on the

ground that an old regulation exceeded the agency's authority is distinct, and is

governed by different doctrines.  Only if the new action "reopen[s]" or "reappl[ies]"

the regulation is the authority for that regulation a necessary premise that can be

challenged after the statute of repose has expired.  23-13396 SEC Br. 42-43.

Here, that did not happen.  The Plan approved in 2016 provided for broker-

dealers to share in the CAT's costs through CAT fees to be implemented in

subsequent fee filings.  81 Fed. Reg. at 84794.  In this proceeding, the Participants

proposed to modify how CAT fees are determined and to specify the percentage split

between broker-dealers and Participants in the Plan itself (rather that in each fee

filing).  The Commission's determination that this proposal met the regulatory

standard for approval did not reopen or reapply its earlier decisions to approve the

CAT and require broker-dealers to share its costs.  *See infra* 17-18.  And the

submission of comments challenging the Commission's authority cannot reopen them

either.  23-13396 SEC Br. 42-43.

The Commission reasonably responded to those comments by both reiterating

that it was "not reconsidering or revisiting the decision to establish" the CAT in the

16

2026 Order and pointing to its previous defense of its authority.  Order 13456.  The Commission did not say it agreed with the statutory objections, which "are inconsistent with current judicial precedent."  *Id.*  Rather, the Commission said it "takes seriously" the "fundamental concerns"—*i.e.*, philosophical and policy concerns—that "animated" the comments and will consider them "in the context of" its comprehensive review.  *Id.*

**B.    Petitioners' authority challenge is time-barred and meritless.**

Petitioners fail to directly address the threshold reason their authority challenge is unlikely to succeed:  the 60-day statutory clock to challenge the rule mandating the CAT (in 2012) or the order approving the Plan (in 2016) expired years ago.  15 U.S.C. 78y(a)(1), (b)(1).

To the extent petitioners continue to rely on *Consumers' Research v. FCC*, 88 F.4th 917 (11th Cir. 2023), *see* 23-13396 Doc. 102 at 4, that decision is plainly inapposite.  The challengers there argued that the process for determining the amount of an FCC regulatory fee, as prescribed in a longstanding regulation, was unlawful.  88 F.4th at 921.  The Court held that the challenged order—which both determined specific fee amounts owed by the challengers under that regulation and triggered the issuance of invoices imposing the fees—"reapplie[d]" the regulation to the challengers, thereby restarting the 60-day statutory clock.  *Id.* at 921-23; *see also Consumers' Rsch. v. FCC*, 67 F.4th 773, 786 (6th Cir. 2023).

The 2026 Order, by contrast, does not reapply Rule 613 or the Plan to petitioners by calculating or imposing any fees.  It merely amends the Plan's general framework for allocating CAT costs; no payment obligation arises unless and until the Participants submit, and the Commission approves (or declines to suspend), subsequent fee filings.

In any event, the CAT "fits neatly within the language" of the Exchange Act. *Biden v. Missouri*, 595 U.S. 87, 93 (2022).  Under Section 17 of the Act, the Commission may require that broker-dealers and SROs "make," "keep," and "furnish" trade and order data, and may "examin[e]" that data as it "deems necessary or appropriate."  15 U.S.C. 78q(a)-(b); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979) (Section 17(a) ensures Commission access to "the necessary information to oversee compliance with and enforce the various" securities laws). Section 17 thus authorizes the Commission to mandate that broker-dealers report the trade and order data that the CAT collects, just as they were required to report such data to pre-CAT audit trails.  23-13396 SEC Br. 44-45.

And Section 11A of the Act authorizes the Commission to require that the SROs jointly operate a consolidated audit trail.  In that provision, Congress directed the Commission to "use its authority" under the Act—including Section 17—to "facilitate the establishment of a national market system" linking securities markets nationwide.  15 U.S.C. 78k-1(a)(2).  Recognizing that this might create challenges

requiring coordinated SRO action, Congress granted the Commission authority to "require [SROs] to act jointly" when such joint action pertains to "matters as to which [SROs] share authority under [the Act]" in "regulating" the national market system and "carr[ies] out" Congress's "objectives" in "establish[ing]" that system. *Id.* 78k-1(a)(2)-(3); *see* S. Rep. No. 94-75 at 2-3, 8-9 (1975).

The CAT meets those conditions. The SROs' "share[d] authority" encompasses obtaining trade and order data from broker-dealers, as they have done for decades. 15 U.S.C. 78k-1(a)(3)(B). And the CAT is intended to "preserve[] and strengthen[]" the securities markets and assure "economically efficient" trading, "fair competition," and "availability . . . of [trading] information," *id.* 78k-1(a)(1), all of which depend on protecting markets from fraud, manipulation, and other illegal trading activity.

To avoid that straightforward conclusion, petitioners invoke the major questions doctrine. Mot. 11-13. But consolidating data that broker-dealers had long been required to collect, to address a widely acknowledged regulatory gap arising from the development of the national market system, pursuant to authority specifically intended to address such gaps, did not represent a "transformative expansion in [the Commission's] regulatory authority." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). Moreover, unlike prior major questions cases, the CAT had broad market support at the time it was approved, and while its costs have grown significantly, it does not

19

"involve[] hundreds of billions of dollars of impact." *Mayfield v. U.S. Dep't of Labor*, 117 F.4th 611, 616-17 (5th Cir. 2024). And after recent amendments, the Commission has no greater access to personally identifiable information than it did before the CAT. *Contra* Mot. 12.

## III.    Petitioners fail to demonstrate irreparable harm.

Petitioners' theory of irreparable harm rests on the erroneous premise that broker-dealers would not be responsible for sharing any CAT costs incurred during this lawsuit if they prevail. But the Plan "require[s]" that a portion of those costs be allocated to broker-dealers. *ASA*, 147 F.4th at 1275. Petitioners fail to demonstrate that they face a "substantial likelihood" of injury that "cannot be undone" through future fee adjustments. *Florida*, 19 F.4th at 1311 (quotation omitted).

If the 2026 Order were vacated based on any of petitioners' APA claims, and the Commission were to approve a new funding model with the same, unchallenged allocation (as occurred after vacatur of the 2023 Order), no adjustments would be necessary because petitioners would have suffered no harm. 23-13396 Opp. at 18. If the Commission were to alter the allocation, fees under the new model could be adjusted to account for any overpayment. The Participants' use of the operational reserve collected pursuant to the 2023 Order confirms the feasibility of this remedy. Order 13442. That reserve, which includes surplus fees paid by broker-dealers, is now being used to offset a significant portion of the initial fees that broker-dealers will be

charged under the 2026 Order.  CAT Fee Alert 2026-1 at 2-3, https://perma.cc/ 5MNC-SQE9.

And even if there were no future CAT fees to adjust—due to policy choices by the Commission or a ruling that the CAT is unlawful—petitioners still have not demonstrated irreparable harm.  Any costs accumulated in the meantime will have been incurred pursuant to a Plan that mandates their allocation to both Participants and broker-dealers.  Regulatory immunity, if applicable at all, would not prevent the Commission from addressing any overpayment through a regulatory initiative to fairly allocate those past expenditures.

## IV.    The remaining equities do not favor a stay.

Even if there were some chance CAT expenditures might be unrecoverable, a stay would not eliminate that risk.  It would just force the Participants to bear the risk (and all the costs) alone.  That would be a profoundly inequitable outcome.

Petitioners claim that a stay would cause no harm because the Participants are statutorily required to carry out their responsibilities under the Plan.  Mot. 21-22.  But the statute does not require SROs to self-fund their regulatory functions—both the statute and the Plan expressly permit the Participants to recover a portion of their costs from their broker-dealer members.  *ASA*, 147 F.4th at 1274-75; Order 13413. And as the Commission explained, beyond the statutory and regulatory presumption of cost-recovery, counting on Participant-only funding risks undermining the

21

"financial stability" of a "critical regulatory tool"—thereby harming the public interest.  Order 13412, 13444; *see also* 91 Fed. Reg. 2164, 2174 (2026) (regulators "rely" on the CAT to "understand market disruptions and identify illegal manipulations and other trading abuses").  Petitioners offer no basis to override this reasoned judgment.

By shifting all costs and any risk of unrecoverable expenditures entirely onto the Participants, a stay would also "substantially injure . . . other parties interested in th[is] proceeding[]."  *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see also Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000) (en banc).  That there may be sufficient reserves to fund the CAT for another few months (Mot. 22) does not render the potential injury to Participants thereafter any less inequitable.  And petitioners themselves contributed to the magnitude of that injury.  They could have brought their statutory challenge in 2012 or 2016, before the Participants spent hundreds of millions to develop the CAT, retire the primary pre-existing audit trail, and integrate CAT data into their market surveillance systems.  Petitioners have benefited for years from the CAT's enhanced market oversight, and there is no equitable basis to shield them from their share of its costs.

\*    \*    \*

While a stay is unwarranted, the Commission supports expedited briefing and argument.  Doc. 41 (Apr. 23, 2026).

22

## CONCLUSION

Petitioners' motion for stay should be denied.

Dated:  April 27, 2026

Respectfully submitted,

/s/ Daniel E. Matro

J. RUSSELL MCGRANAHAN
General Counsel

DANIEL E. MATRO
Senior Appellate Counsel

TRACEY A. HARDIN
Associate General Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-8248 (Matro)
matrod@sec.gov

23

## CERTIFICATE OF COMPLIANCE

I certify that this opposition complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,193 words, excluding the parts exempted by Fed. R. App. P. 27(a)(2)(B) and 32(f).

I also certify that this opposition complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) because it has been prepared in a proportionally spaced typeface—Garamond, 14 point—using Microsoft Word.

/s/ *Daniel E. Matro*

April 27, 2026                                                    Daniel E. Matro

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, I electronically filed the foregoing opposition with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system, which will send notice to all the parties.

/s/ *Daniel E. Matro*
Daniel E. Matro

April 27, 2026