**C.A. No. 26-10936**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

---

On Petition for Review of an Order of the
United States Securities and Exchange Commission
SEC Release No. 34-105003

---

### INTERVENOR CONSOLIDATED AUDIT TRAIL, LLC'S
### OPPOSITION TO PETITIONERS' MOTION FOR STAY

---

Gregory M. Boyle
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 527-0484

Ian Heath Gershengorn
  *Counsel of Record*
Elizabeth B. Deutsch
Jonathan J. Marshall
Sophia W. Montgomery
Anne S. Warnke
JENNER & BLOCK LLP
1099 New York Avenue, NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

*American Securities Ass'n, et al. v. United States SEC*, No. 26-10936

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Undersigned counsel represents Intervenor Consolidated Audit Trail, LLC.

Pursuant to Eleventh Circuit Rule 26.1-1 through -3 and Federal Rule of Appellate

Procedure 26.1, undersigned counsel hereby certifies that, to the best of his

knowledge, the following persons and entities have an interest in this case:

1. 24X National Exchange LLC, *Member of Intervenor Consolidated Audit Trail, LLC*;

2. American Securities Association, *Petitioner*;

3. ArentFox Schiff LLP, *Counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*;

4. Ballard Spahr LLP, *Counsel for Intervenors The Nasdaq Stock Market, LLC, Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX, LLC, and Nasdaq Texas, LLC*;

5. Berman, Ari M., *Counsel for Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc, and NYSE Texas, Inc.*;

6. Borse Dubai Limited, *Owner of 10% or Greater Interest in Nasdaq, Inc.*;

7. BOX Exchange LLC, *Member of Intervenor Consolidated Audit Trail, LLC*;

8. Boyle, Gregory M., *Counsel for Intervenor Consolidated Audit Trail, LLC*;

9. Cboe BYX Exchange, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

10. Cboe BZX Exchange, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

*American Securities Ass'n, et al. v. United States SEC*, No. 26-10936

11. Cboe C2 Exchange, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

12. Cboe EDGA Exchange, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

13. Cboe EDGX Exchange, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

14. Cboe Exchange, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

15. Cboe Global Markets, Inc. (BATS: CBOE), *Indirect Owner of 10% or Greater Interest in Intervenor Consolidated Audit Trail, LLC, and Direct or Indirect Parent Company of Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*;

16. Citadel Securities GP LLC, *Parent Company of Petitioner*;

17. Citadel Securities LLC, *Petitioner*;

18. Connolly, J. Michael, *Counsel of Record for Petitioner American Securities Association*;

19. Consolidated Audit Trail, LLC, *Intervenor*;

20. Consovoy McCarthy PLLC, *Counsel for Petitioner American Securities Association*;

21. Deutsch, Elizabeth B., *Counsel for Intervenor Consolidated Audit Trail, LLC*;

22. Dinkel, Christopher S., *Counsel for Petitioner Citadel Securities LLC*;

23. Financial Industry Regulatory Authority, Inc., *Member of Intervenor Consolidated Audit Trail, LLC*;

24. Francisco, Noel J., *Counsel of Record for Petitioner Citadel Securities LLC*;

*American Securities Ass'n, et al. v. United States SEC*, No. 26-10936

25. Gershengorn, Ian Heath, *Counsel of Record for Intervenor Consolidated Audit Trail, LLC*;

26. Greenwalt III, Paul E., *Counsel of Record for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*;

27. Hardin, Tracey A., *Counsel for Respondent United States Securities and Exchange Commission*;

28. Heckendorn, J. Maxwell, *Counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*;

29. Intercontinental Exchange, Inc. (NYSE: ICE), *Indirect Owner of 10% or Greater Interest in Intervenor Consolidated Audit Trail, LLC, and Indirect Parent Company of New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc., and NYSE Texas, Inc.*;

30. International Securities Exchange Holdings, Inc., *Parent Company of Nasdaq GEMX, LLC, Nasdaq ISE, LLC, and Nasdaq MRX, LLC*;

31. Investor AB (Nasdaq Stockholm: INVE B), *Owner of 10% or Greater Interest in Nasdaq, Inc.*;

32. Investors Exchange LLC, *Member of Intervenor Consolidated Audit Trail, LLC*;

33. Jenner & Block LLP, *Counsel for Intervenor Consolidated Audit Trail, LLC*;

34. Jones Day, *Counsel for Petitioner Citadel Securities LLC*;

35. Kastenberg, Stephen J., *Counsel for Intervenors The Nasdaq Stock Market, LLC, Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX, LLC, and Nasdaq Texas, LLC*;

36. Lantieri III, Paul, *Counsel of Record for Intervenors The Nasdaq Stock Market, LLC, Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX, LLC, and Nasdaq Texas, LLC*;

*American Securities Ass'n, et al. v. United States SEC*, No. 26-10936

37. Long-Term Stock Exchange, Inc., *Member of Intervenor Consolidated Audit Trail, LLC*;

38. Lucas, Brinton, *Counsel for Petitioner Citadel Securities LLC*;

39. Maclean, Matthew J., *Counsel for Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc, and NYSE Texas, Inc.*;

40. Madigan, Sarah M., *Counsel for Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc, and NYSE Texas, Inc.*;

41. Marshall, Jonathan J., *Counsel for Intervenor Consolidated Audit Trail, LLC*;

42. Matro, Daniel E., *Counsel of Record for Respondent United States Securities and Exchange Commission*;

43. McGranahan, J. Russell, *Counsel for Respondent United States Securities and Exchange Commission*;

44. MEMX LLC, *Member of Intervenor Consolidated Audit Trail, LLC*;

45. Miami International Holdings, Inc. (NYSE: MIAX), *Indirect Owner of 10% or Greater Interest in Intervenor Consolidated Audit Trail, LLC, and Indirect Parent Company of Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, and MIAX Sapphire, LLC*;

46. Miami International Securities Exchange LLC, *Member of Intervenor Consolidated Audit Trail, LLC*;

47. MIAX Emerald, LLC, *Member of Intervenor Consolidated Audit Trail, LLC*;

48. MIAX PEARL, LLC, *Member of Intervenor Consolidated Audit Trail, LLC*;

49. MIAX Sapphire, LLC, *Member of Intervenor Consolidated Audit Trail, LLC*;

*American Securities Ass'n, et al. v. United States SEC*, No. 26-10936

50.  Molzberger, Michael K., *Counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.*;

51.  Montgomery, Sophia W., *Counsel for Intervenor Consolidated Audit Trail, LLC*;

52.  Nasdaq GEMX, LLC, *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

53.  Nasdaq, Inc. (Nasdaq: NDAQ), *Parent Company of Nasdaq PHLX LLC, Nasdaq Texas, LLC, and The Nasdaq Stock Market LLC*;

54.  Nasdaq ISE, LLC, *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

55.  Nasdaq MRX, LLC, *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

56.  Nasdaq PHLX LLC, *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

57.  Nasdaq Texas, LLC, *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

58.  New York Stock Exchange LLC, *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

59.  NYSE American LLC, *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

60.  NYSE Arca, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

61.  NYSE National, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

62.  NYSE Texas, Inc., *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

*American Securities Ass'n, et al. v. United States SEC*, No. 26-10936

63. Oliwenstein, David, *Counsel for Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc, and NYSE Texas, Inc.*;

64. Phillips, David, *Counsel for Petitioner Citadel Securities LLC*;

65. Pillsbury Winthrop Shaw Pittman LLP, *Counsel for Intervenors New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc, and NYSE Texas, Inc.*;

66. Rabbitt, Brian C., *Counsel for Petitioner Citadel Securities LLC*;

67. Templin, Hannah, *Counsel for Petitioner Citadel Securities LLC*;

68. The Nasdaq Stock Market LLC, *Intervenor and Member of Intervenor Consolidated Audit Trail, LLC*;

69. The Vanguard Group, Inc., *Owner of 10% or Greater Interest in Cboe Global Markets, Inc., and Owner of 10% or Greater Interest in Nasdaq, Inc.*;

70. United States Securities and Exchange Commission, *Respondent*;

71. Warnke, Anne S., *Counsel for Intervenor Consolidated Audit Trail, LLC*.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through -3, undersigned counsel for Intervenor Consolidated Audit Trail, LLC, hereby certifies that Consolidated Audit Trail, LLC, has no parent corporation, and that the following four publicly held companies have an indirect ownership interest in Consolidated Audit Trail, LLC, of 10% or more: Cboe Global Markets, Inc. (BATS: CBOE); Intercontinental Exchange, Inc. (NYSE: ICE); Nasdaq, Inc. (Nasdaq: NDAQ); and Miami International Holdings, Inc. (NYSE: MIAX).

*American Securities Ass'n, et al. v. United States SEC*, No. 26-10936

Date:  April 27, 2026            <u>*/s/ Ian Heath Gershengorn*</u>
                                Ian Heath Gershengorn

                                *Counsel of Record for Intervenor*
                                *Consolidated Audit Trail, LLC*

CIP-7 of 7

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT ............................................. CIP-1

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 4

ARGUMENT ....................................................................................................... 9

I.      Petitioners Are Not Likely to Succeed on the Merits ................................. 10

II.     Petitioners Have No Irreparable Harm ....................................................... 14

III.    The Equities Do Not Support a Stay ........................................................... 16

CONCLUSION ................................................................................................... 23

CERTIFICATE OF COMPLIANCE ................................................................... 24

CERTIFICATE OF SERVICE ............................................................................ 25

i

# TABLE OF AUTHORITIES

**CASES**

*American Securities Ass'n v. United States SEC,*
147 F.4th 1264 (11th Cir. 2025)......................................5, 7, 10, 12, 15, 16, 17, 21

*Davidson v. Gensler*, No. 24-cv-197, 2024 WL 4926665
(W.D. Tex. Oct. 24, 2024) ...........................................................22

*Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312
(11th Cir. 2019) ..........................................................................10

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ................................10

*Florida v. Department of Health & Human Services*, 19 F.4th 1271
(11th Cir. 2021).....................................................................14, 16

*Nken v. Holder*, 556 U.S. 418 (2009)....................................................9

*Northeastern Florida Chapter of the Ass'n of General Contractors of
America v. City of Jacksonville*, 896 F.2d 1283 (11th Cir. 1990).................14

*Siegel v. LePore*, 234 F.3d 1173 (11th Cir. 2000)..............................................14

*Virginian Railway Co. v. United States*, 272 U.S. 658 (1926)............................9

**STATUTES**

15 U.S.C. § 78f(b)(4) .............................................................................11

15 U.S.C. § 78f(b)(5) .............................................................................11

15 U.S.C. § 78o-3(b)(5) .........................................................................11

15 U.S.C. § 78o-3(b)(6) .........................................................................11

**REGULATIONS**

17 C.F.R. § 242.613(a)(1)(vii)(D).......................................................14

17 C.F.R. § 242.613(a)(1)(ix)................................................................5

## OTHER AUTHORITIES

CAT Fee Alert 2026-1 (Apr. 1, 2026),
   https://www.catnmsplan.com/sites/default/files/2026-04
   /04.01.26-CAT-Fee-Alert-2026-1.pdf.............................................................8

CAT Fee Alert 2026-2 (Apr. 1, 2026),
   https://www.catnmsplan.com/sites/default/files/2026-04
   /04.01.26-CAT-Fee-Alert-2026-2.pdf.............................................................8

Concept Release on Consolidated Audit Trail and Other Audit
   Trails and Data Sources, Exchange Act Release No. 105,251,
   91 Fed. Reg. 20,945 (Apr. 20, 2026) ...............................................16, 20, 22

Consolidated Audit Trail, Exchange Act Release No. 67,457,
   77 Fed. Reg. 45,722 (Aug. 1, 2012).......................................................4, 5, 17

DeLesDernier, J. Matthew, SEC, Letter to Stephen John Berger,
   Citadel Sec. LLC (Feb. 18, 2026), https://www.sec.gov/files/rules
   /petitions/2026/4-878_rulemaking-petition-letter.pdf..................................15

Intervenor Consolidated Audit Trail, LLC's Opposition to Petitioners'
   Motion for Stay & Injunctive Relief, *American Securities Ass'n v.
   United States SEC*, 147 F.4th 1264 (11th Cir. 2025)
   (No. 23-13396), ECF No. 119..........................................................................6

Limited Liability Company Agreement of Consolidated Audit Trail,
   LLC: A Delaware Limited Liability Company (CAT NMS Plan)
   (Apr. 1, 2026), https://www.catnmsplan.com/sites/default/files
   /2026-04/LLC_Agreement_of_Consolidated_Audit_Trail_LLC-as-
   of-4.1.26_0.pdf.................................................................................................3

Lin, Tom C.W., *The New Investor*, 60 UCLA L. Rev. 678 (2013)........................4

Nasdaq Stock Market LLC (Form 19b-4) (Aug. 15, 2024),
   https://listingcenter.nasdaq.com/assets/rulebook/nasdaq/filings
   /SR-NASDAQ-2024-047.pdf..........................................................................20

Opposed Time-Sensitive Motion for Stay & Injunctive Relief,
   *American Securities Ass'n v. United States SEC*, 147 F.4th 1264
   (11th Cir. 2025) (No. 23-13396), ECF No. 112-1 ...................................6, 17

Order Approving an Amendment to the National Market System Plan
    Governing the Consolidated Audit Trail, as Modified by the
    Commission, Regarding Implementation of a Revised Funding
    Model, Exchange Act Release No. 105,003, 91 Fed. Reg. 13,410
    (Mar. 19, 2026) ...............................................................................7, 8, 11,
                                                                                    12, 13, 22

Order Approving an Amendment to the National Market System Plan
    Governing the Consolidated Audit Trail; Notice,
    Exchange Act Release No. 98,290, 88 Fed. Reg. 62,628
    (Sept. 12, 2023) ....................................................................................5, 6, 20

Order Approving the National Market System Plan Governing the
    Consolidated Audit Trail, Exchange Act Release No. 79,318,
    81 Fed. Reg. 84,696 (Nov. 23, 2016)..............................................4, 5, 17, 20

Securities & Exchange Commission's Opposition to Petitioners'
    Motion for Stay & Injunctive Relief, *American Securities Ass'n v.
    United States SEC*, 147 F.4th 1264 (11th Cir. 2025)
    (No. 23-13396), ECF No. 120............................................................6, 14, 15

Seligson, Paula & Katherine Doherty, *Citadel Securities on Track for
    Record Trading Revenue This Year*, Bloomberg
    (Dec. 1, 2025), https://www.bloomberg.com/news/articles
    /2025-12-01/citadel-securities-trading-revenue-jumps-9-amid-
    competition.................................................................................................19

U.S. Securities & Exchange Commission, Press Release, SEC
    Proposes Consolidated Audit Trail System to Better Track Market
    Trades (May 26, 2010), https://www.sec. gov/news/press/2010
    /2010-86.htm ...............................................................................................4

iv

**INTRODUCTION**

This case involves a temporary two-year plan to fund a decade-old market oversight tool—the consolidated audit trail (CAT)—designed to run on fees paid by both national securities self-regulatory organizations (SROs) and broker-dealers. Petitioners, an individual broker-dealer and a trade association, seek a stay to avoid paying and to stick the SROs with the bill. But petitioners cannot carry their burden to establish that the equities favor saving their money and spending *even more* of the SROs', who have already funded the lion's share of the CAT in reliance on the SEC's repeated promise that they would be repaid. In any event, petitioners' obligation to pay a small share of fees for a short period is not irreparable injury because any overpayments can be offset by lowering future fees. This Court does not need to take our word for it: the anticipated fees that petitioners challenge are just 2.9% of earlier fees to offset higher-than-anticipated fee collections in 2025 that resulted in elevated reserve funds. Back in 2024, petitioners challenged the CAT's prior funding model and sought a stay, making many of the same arguments they rehash today. This Court denied that stay and should do so again.

Petitioners' stay request—like their last failed motion—does not meet the test for the extraordinary relief they seek. On the merits, the SEC fully addressed the concerns articulated by this Court's earlier decision vacating the prior funding model on narrow grounds. The current model continues to allocate the CAT's costs equally

among the primary parties to a transaction: one-third each to the SRO, the buy-side broker-dealer, and the sell-side broker-dealer. Petitioners did not before and do not here challenge that framework.

The present model makes one key change to respond to this Court's prior decision: for the order's two-year lifespan, it prevents SROs from seeking to pass through their one-third share directly to broker-dealers in the form of more CAT-related fees. Petitioners now complain that the SEC had to go further and take the unprecedented step of barring the SROs from making *other* business decisions to indirectly offset CAT costs' effect on their balance sheets. But the SEC explained why it did not—and could not—do so: as a legal and practical matter, the Commission has never purported to regulate SROs' or broker-dealers' business decisions to manage the downstream effects of regulatory obligations. The SEC also analyzed the impacts of any indirect pass-through on the industry and investors and found the effects to be inconsequential compared to existing transaction costs. Regardless, petitioners' argument cannot justify a stay. Quibbling about theoretical indirect pass-through of SROs' share of CAT costs does not call into question whether broker-dealers owe *their* share.

Lacking any genuine argument that the allocation of fees is unlawful, petitioners try two moonshots to halt the funding model altogether. Neither works. First, petitioners cannot establish a likelihood of success by pitching the same major-

questions argument this Court previously found insufficient to justify a stay. Second, petitioners present a selective cut-and-paste job that makes it sound like the SROs alone are required to fund the CAT in the absence of a funding model and that the SEC erred by assuming otherwise. That is wrong. The regulations state (in language petitioners studiously omit): "[N]o Participant shall be obligated to contribute capital or make loans to the Company." CAT NMS Plan § 3.8(a).[1] It is true that, to get the CAT up and running over a decade ago, the SROs extended a series of interest-free loans to the tune of $900 million. But they did so in reliance on the SEC's mandate that historical and going-forward costs would ultimately be shared by broker-dealers via fees.

On irreparable harm, what was true in 2024 is true today. Petitioners cannot establish irreparable harm because fees collected now can be offset by recalibrating future fees, as the present fee rates show.

The balance of the equities is a blowout. After the reserve runs dry, the CAT has no alternative funding. The notion that the SROs must extend more loans is both legally wrong and fundamentally inequitable. The SROs have already extended $900 million in interest-free loans and are still waiting to be repaid. Conservative estimates put the effective lost interest at $336 million and counting. The SROs will

---

[1] The current CAT NMS Plan is available at https://www.catnmsplan.com /sites/default/files/2026-04/LLC_Agreement_of_Consolidated_Audit_Trail_LLC-as-of-4.1.26_0.pdf.

3

never see that sum.  Petitioners do not establish that the equities support protecting their wallets and emptying the SROs'.

The public interest, too, strongly counsels against relief.  The entire point of the SEC's order is to provide interim fees because intervenor Consolidated Audit Trail, LLC (CAT LLC), has no other revenue with which to operate the CAT.  Any stay would cast the CAT's operational funding into doubt, jeopardize the investing public, and risk rendering the temporary funding model a dead letter.

This Court should once again deny petitioners' stay motion.

## BACKGROUND

A.  In 2010, the "Flash Crash" "destroy[ed] nearly $1 trillion in market value" in "a matter of minutes."  Tom C.W. Lin, *The New Investor*, 60 UCLA L. Rev. 678, 680-82 (2013).  In its wake, the SEC proposed the creation of a consolidated audit trail to "help regulators keep pace with new technology and trading patterns in the market" by allowing "more efficient access to data."  Press Release, SEC, SEC Proposes Consolidated Audit Trail System to Better Track Market Trades (May 26, 2010),  https://www.sec.gov/news/press/2010/2010-86.htm;  *see*  77 Fed. Reg. 45,722, 45,722-23 (Aug. 1, 2012) (2012 Rule).  In 2012, the SEC directed the SROs to propose a plan for the audit trail, and in 2016, the SEC approved their proposal. 81 Fed. Reg. 84,696, 84,793-94 (Nov. 23, 2016) (2016 Order).  Until that point, the SROs had operated their own patchwork of audit trails, often funded through fees

4

paid by broker-dealers.  The CAT's innovation was to bring those systems together to allow for enhanced oversight across markets.  As they brought the CAT online, the SROs began to retire their precursor audit trails at the SEC's directive.  *See* 17 C.F.R. § 242.613(a)(1)(ix).

B.  From the beginning, the SEC made clear that the costs of the CAT would be shared among "the SROs *and* their members," the broker-dealers.  2012 Rule 45,794-95 (emphasis added); *see* 2016 Order 84,710; *Am. Sec. Ass'n v. U.S. SEC*, 147 F.4th 1264, 1269 (11th Cir. 2025) (*ASA*).

But at that point CAT LLC had zero revenue.  Ex. A ¶ 35 (Walley Decl.).  To bridge the gap, the SROs extended interest-free loans for an initial period to bring the system online and get it running.  Those loans exceeded $900 million.  *Id.* ¶ 7.  The SROs wrote the loans in reliance on the SEC's commitment that broker-dealers would pay fees for ongoing costs (alongside the SROs) and would repay a portion of the SROs' loans to reflect the broker-dealers' share of historical costs.  *See* 2016 Order 84,793-95.

C.  In 2023, the SEC finally approved a funding model.  88 Fed. Reg. 62,628, 62,628 n.2 (Sept. 12, 2023) (2023 Order).  The 2023 Order provided that prospective CAT costs and certain historical costs would be funded by per-executed-equivalent-share transaction fees divided evenly among the SRO, the buy-side broker-dealer, and the sell-side broker-dealer.  *Id.* at 62,629.  CAT LLC was to evaluate and adjust

the fee rate twice annually based on reasonably projected expenditures and trading volumes. *Id.* at 62,637. If actual expenditures or volumes varied from projections, producing higher-than-expected collections, excess funds would go into CAT LLC's reserve and be accounted for the next time it evaluated fee rates. *Id.* at 62,657.

D. Petitioners challenged the 2023 Order in this Court. Having failed to sue over the creation of the CAT in 2012 or 2016 (when the SROs alone were funding the CAT with loans), petitioners suddenly sought to stay the 2023 Order to avoid contributing a cent. *See* No. 23-13396, ECF No. 112-1 (*ASA* Mot.). As the SEC and CAT LLC explained, petitioners had no irreparable harm because any fees later deemed unlawful could be offset by reducing future fees. No. 23-13396, ECF No. 119, at 4, 17 (CAT LLC *ASA* Opp.); *see* No. 23-13396, ECF No. 120, at 18 (SEC *ASA* Opp.). CAT LLC further demonstrated that the balance of the equities did not support petitioners, who "d[id] not provide any reason why it is remotely fair for the SROs (but not petitioners) to fund" the CAT. CAT LLC *ASA* Opp. 19. This Court denied the stay.

Thereafter, CAT LLC began collecting fees. Walley Decl. ¶ 23. CAT LLC steadily lowered rates to account for higher-than-anticipated collections, resulting from historically high trading volume and substantial cost-savings initiatives achieved midyear. *Id.* ¶¶ 24-32.

6

E.   In July 2025, this Court vacated the 2023 Order on narrow grounds.  *See ASA*, 147 F.4th at 1279.  The Court did not embrace petitioners' argument that the CAT is statutorily unauthorized.  *Id.* at 1273-74.  Nor did the Court doubt the basic fee framework for dividing CAT costs into one-third shares.  *Id.* at 1274.  Instead, the Court ruled that the 2023 Order was arbitrary and capricious because the SEC had not sufficiently explained the possibility that SROs might seek to charge additional CAT-related fees to pass their one-third share through to their broker-dealer members.  *Id.* at 1274-76.  The Court also found that the SEC's economic analysis did not adequately account for the CAT's budget increases relative to 2016 estimates.  *Id.* at 1274, 1277-78.

The Court stayed its judgment for sixty days following the issuance of the mandate to allow for continued collection of fees.  It explained that "the equities warrant[ed] a limited stay" because vacatur of the 2023 Order would leave "the CAT without a mechanism for the equitable allocation of costs between [SROs] and broker-dealers."  *Id.* at 1280.  CAT fees were assessed for trading activity during the period of the stay; no fees have been assessed since then.  *See* Walley Decl. ¶ 33.

F.   On March 16, 2026, the SEC issued a new interim funding model addressing this Court's concerns.  The model carries forward the same basic one-third-one-third-one-third fee allocation, updates the economic analysis, and bars new CAT-related fees by SROs passing through their one-third share to broker-dealers.  91

7

Fed. Reg. 13,410, 13,414, 13,421-25 (Mar. 19, 2026) (2026 Order).  The 2026 Order also explains why it would be impracticable and unprecedented for the SEC to attempt to regulate indirect means by which an SRO might attempt to make up CAT-related costs, such as increasing other fees or reducing rebates.  *Id.* at 13,413, 13,420-21.  In addition, the 2026 Order analyzes various economic scenarios to demonstrate the negligible impact of any indirect pass-through.  *Id.* at 13,467.

The 2026 Order has important limitations.  First, it is time limited, permitting the collection of CAT fees only for two years while the SEC undertakes a comprehensive review of the CAT.  *Id.* at 13,412.  Second, the 2026 Order provides that historical CAT fee rates must be calculated to recover historical costs over a minimum estimated period of two years.  *Id.* at 13,449 n.742.

G.  On April 1, 2026, CAT LLC issued fee alerts announcing its intent to establish CAT fees consistent with the 2026 Order; subject to applicable fee filings, these fees will apply beginning with May trading activity, with invoices out in June and bills due in July.  *See* CAT Fee Alert 2026-1 (Apr. 1, 2026), https://www.catnmsplan.com/sites/default/files/2026-04/04.01.26-CAT-Fee-Alert-2026-1.pdf; CAT Fee Alert 2026-2 (Apr. 1, 2026), https://www.catnmsplan.com/sites/default/files/2026-04/04.01.26-CAT-Fee-Alert-2026-2.pdf.  The anticipated prospective fee rate will be $0.000001 (one one-millionth of a cent) per executed equivalent share, and the historical fee rate is set at $0.000002 (two one-millionths).

These tiny rates—35 times lower than the first prospective rate set in 2024 and 6.5 times lower than the first historical rate—account for the facts that (i) as to prospective fees, CAT LLC collected in excess of expenditures in 2025 due to unanticipated cost savings and unprecedented trading volume; and (ii) as to historical fees, rates must be estimated to spread collection of historical costs over a period of at least two years. Walley Decl. ¶¶ 42-44.

CAT LLC has not been able to charge fees on trading activity since November 2025. *Id.* ¶ 33. As of this filing, CAT LLC has no revenue (other than modest interest on bank accounts); it has been operating by depleting its reserve. *Id.* ¶¶ 35-40. The upshot is that CAT LLC depends on the fees the 2026 Order authorizes to continue its operations. *Id.* ¶ 45.

## ARGUMENT

Petitioners tell this Court that because, in their view, the 2026 Order is unlawful, the equities demand they not pay a dime. But this Court rejected that position when petitioners sought to stay the 2023 Order making substantially the same arguments. This Court should again deny petitioners' motion.

Under no circumstances is there an automatic entitlement to a stay, which "is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Va. Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). Petitioners "must show more than the mere possibility of success

9

on the merits or of irreparable injury," and they must establish that the balance of the equities and public interest favor them. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019). Petitioners meet none of these criteria.

## I.    Petitioners Are Not Likely to Succeed on the Merits.

Petitioners assert three merits theories. None is a basis for emergency relief.

A. Petitioners' lone argument that the 2026 Order does not comply with this Court's prior decision involves the issue of pass-throughs. Doc. 20-1, at 15-17 (Mot.). In *ASA*, the parties debated whether the SEC was required to preemptively bar SROs from seeking to establish separate CAT-related fees passing through the SROs' one-third share. This Court held that the possibility of such additional fees charged by SROs represented a "change" from the one-third-one-third-one-third allocation and therefore required "a reasoned explanation." *ASA*, 147 F.4th at 1274-75 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)). After *ASA*, the 2026 Order prohibits any such pass-through fees for its duration. 2026 Order 13,422. That should end the pass-through issue.

Petitioners now claim that the SEC had to go further and prohibit SROs from making any other business decisions that might offset increased expenditures caused by CAT fees—*i.e.*, to prohibit "indirect" pass-through. But this Court in *ASA* never held that any pass-through was forbidden; instead, it held that the SEC had not adequately explained its choice not to prohibit direct pass-through. 147 F.4th at 1274-

75.  This time, the SEC prohibited direct pass-through and explained why it was not prohibiting—and could not prohibit—indirect pass-through.  "As both a legal and practical matter," the SEC said, it cannot and "has never purported to regulate the business decisions individual Participants or Industry Members may make to finance the costs they incur to comply with their regulatory obligations."  2026 Order 13,413.

This regulatory limit reflects a basic economic reality: as a business's expenses go up, its customers tend to pay more for existing products.  *Id.* at 13,467.  At the same time, the SROs generally compete with each other and so have incentives to keep their fees down.  The Exchange Act meanwhile requires that all SRO fees be equitably allocated, nondiscriminatory, and not unduly burdensome.  *See* 15 U.S.C. §§ 78f(b)(4)-(5), 78o-3(b)(5)-(6).  As the SEC's analysis suggests, it would be impossible to enforce an absolute prohibition on any trickle-down price effects remotely related to CAT or any other regulatory expenses.  2026 Order 13,467-68.  Would broker-dealers be free to challenge an SRO's increase to, say, its member fee or its reduction of a rebate as "indirectly" passing through some CAT-related costs?  *See id.* at 13,467 & n.981.  There would be no way to know whether such a price change related to the CAT, other regulatory requirements, rising technology costs, inflation, or anything else.

"[C]onsistent with the Eleventh Circuit's opinion," the SEC then undertook a full economic analysis of the effects of any indirect pass-through.  *Id.* at 13,413

(citing *ASA*, 147 F.4th at 1275).  That discussion analyzed multiple scenarios.  *Id.* at 13,467-70.  In particular, the SEC considered the possibility that broker-dealers may "pass on their CAT costs to their customers" until *all* "costs are ultimately borne by investors."  *Id.* at 13,467.  The SEC found that even if individual investors bore 100% of CAT costs, those costs would be spread over "7.4 million customer accounts" per week and would be "far less than the average transaction costs"—400 to 900 times smaller.  *Id.* at 13,468-69.

In short, the SEC explained the legal and practical limits of its order and examined the potential effects of indirect pass-through.  Neither *ASA* nor the APA requires more.

At minimum, petitioners' argument does not justify the stay they seek.  Petitioners do not challenge—and *ASA* did not doubt—the basic framework assigning broker-dealers one-third shares of CAT costs, so petitioners cannot establish a need to halt CAT fees effectuating that basic allocation under the 2026 Order.  At most, petitioners' argument would justify a stay of indirect pass-through, which they do not seek and, as discussed, is not practicable.

B.  So petitioners make two longshot arguments to try to rationalize relief.  Neither establishes a likelihood of success warranting a stay.  First, petitioners reprise their argument that the CAT program is unauthorized by the Exchange Act, so the 2026 Order, too, must be unlawful.  Mot. 10-14.  But petitioners cannot explain

why recycling this same argument justifies a stay today when it did not last time around. What's more, petitioners opted not to challenge the CAT's lawfulness back in 2012 or 2016 when the CAT's foundational orders were promulgated and the SEC made clear that funding would be shared. So petitioners can hardly claim that fees to fund the up-and-running CAT must be halted on an emergency basis because they suddenly have a problem with the entire system.

Second, petitioners argue that the SEC made a "legal error" by relying on the premise that the SROs would not fund the CAT in the absence of fees. Mot. 17; *see* Mot. 17-19. Petitioners claim that the SROs "are legally required to fund [the CAT] whether or not a funding order is in place." Mot. 17. The opposite is true. The CAT NMS Plan provides: "[N]o Participant shall be obligated to contribute capital or make loans to [CAT LLC]." CAT NMS Plan § 3.8(a). Instead, both "the Participants and the industry" are responsible for funding CAT through fees. 2026 Order 13,444.

Petitioners do not even acknowledge these provisions, instead performing cut-and-paste misdirection to suggest the regulations say the reverse. Mot. 17-18. Unpacking petitioners' citations reveals the truth. Petitioners' cited source for the proposition that the SROs must "maintain" the CAT (which petitioners suggest means "fund") actually tells the SROs "to submit a national market system *plan*" to "create, implement and maintain a consolidated audit trail." CAT NMS Plan recitals ¶ A

13

(emphasis added).  Petitioners' quotations suggesting that the SROs must "fund" the "maintenance" of the CAT come from a regulation that actually tells the SROs to include information about "the proposed allocation of … estimated costs … *between the* [*SROs*] *and* [*their members*]."   17 C.F.R.  § 242.613(a)(1)(vii)(D)  (emphasis added).  Petitioners' citation to the SEC's brief supposedly conceding that the SROs must pay actually recites—and rejects—petitioners' argument on this point.  SEC *ASA* Opp. 20.

In sum, petitioners cannot establish a likelihood of success on the merits that justifies the extraordinary relief they seek.

## II.    Petitioners Have No Irreparable Harm.

Petitioners likewise cannot make a "showing of irreparable harm or injury," the "sine qua non" of emergency relief.  *Siegel v. LePore*, 234 F.3d 1173, 1176 (11th Cir. 2000).  Nor can they show that any such injury is "actual and imminent," *id.*; "the possibility of an irreparable injury is not enough."  *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021).

First and fundamentally, the payment of fees by broker-dealers is not irreparable because any overpayment can be offset by adjusting future fee rates.  "An injury is 'irreparable' only if it cannot be undone through monetary remedies."  *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).  Again, petitioners do not challenge the basic

14

allocation framework or their share of fees, so there is no reason to think any course correction would be needed. Regardless, the SEC has repeatedly committed that it will address overpayments "by adjusting future fees." Letter from J. Matthew DeLesDernier, SEC, to Stephen John Berger, Citadel Sec. LLC, at 2 (Feb. 18, 2026), https://www.sec.gov/files/rules/petitions/2026/4-878_rulemaking-petition-letter.pdf (SEC Letter); *see* SEC *ASA* Opp. 18. Thus, even if this Court were to direct the SEC to change its approach, any fees collected in the interim could be put right via lower fees in the future.

The anticipated fee rates illustrate the point. As explained, CAT LLC collected fees in excess of expenditures in 2025 due to unprecedented trading volumes and midyear cost-saving adjustments. Walley Decl. ¶ 42. That "overpayment" by broker-dealers was perfectly reparable; it resulted in reduced rates in subsequent fee filings, which set prospective fees 35 times lower than initial rates. *See id.* For this reason, petitioners' references to regulatory immunity, Mot. 4, 20, are irrelevant. The SEC can adjust for any imbalances on the backend.[2]

To overcome this problem, petitioners speculate that perhaps the SEC will do away with joint funding or end the CAT altogether. But these hypotheticals cannot

---

[2] Petitioners complain that their fees were not offset after the 2023 Order's vacatur. Mot. 20. But there was no occasion for offsetting because this Court did not call into question the allocation of fees; to the contrary, it stayed its judgment to allow continued collection. *ASA*, 147 F.4th at 1280.

15

satisfy petitioners' "extremely high burden" of establishing that they "will suffer" their proffered harm. *Florida*, 19 F.4th at 1286, 1292. The SEC has already determined that its "comprehensive review" of the CAT does not presently warrant a departure from long-held funding principles. *See* 91 Fed. Reg. 20,945, 20,953 (Apr. 20, 2026) (Concept Release). And even if petitioners' wish came true and the CAT or its fees came to an end, the SEC would still need to fairly allocate sunk costs. There is zero reason to think the SEC would abandon its view—never challenged by petitioners or anyone else—that broker-dealers owe their thirds of what has been spent. For that reason, any scenario causing irreparable harm is pure conjecture.

## III. The Equities Do Not Support a Stay.

The equities are not even close. As this Court characterized "the equities" last time around, preventing fee collection would leave "the CAT without a mechanism for the equitable allocation of costs between [SROs] and broker-dealers." *ASA*, 147 F.4th at 1280. While petitioners would be required to part with their share of CAT costs today instead of tomorrow, CAT LLC and the public interest would be significantly harmed by any stay.

A. Begin with CAT LLC. CAT LLC has no revenue without fees besides modest interest on accounts. Walley Decl. ¶ 35. Freezing fees would raise fundamental questions about how the CAT would continue to operate.

16

In their prior stay motion, petitioners blithely asserted that the SROs could simply underwrite more loans to keep the CAT going. *ASA* Mot. 12-13. That line having failed, petitioners up the ante, now arguing that the SROs are *required* to extend loans. Mot. 21. But binding regulations say that "no Participant shall be obligated to contribute capital or make loans." CAT NMS Plan § 3.8(a). (Against that prohibition, petitioners claim that CAT LLC and the SROs forfeited their opportunity to argue that the SROs are not obligated to fund the CAT. But SROs have not "sued the SEC," Mot. 22, because the SEC has *never said* that the SROs must fund the CAT alone.)

More fundamentally, petitioners cannot explain why the equities favor saving their money and spending *even more* of the SROs'. When the SEC directed the creation of the CAT, it was clear this program would be jointly funded by the SROs and broker-dealers. *See* 2012 Rule 45,795; 2016 Order 84,710. The SROs extended a set of loans—interest-free—to get the CAT up and running. Walley Decl. ¶ 7. They did so because the SEC committed that the SROs could recoup the broker-dealers' share of historical costs and, going forward, the CAT would be funded through fees on SROs and broker-dealers. 2012 Rule 45,794-95; *see* 2016 Order 84,710; *ASA*, 147 F.4th at 1269.

Between 2016 and mid-July 2024, the SROs extended over $900 million in interest-free loans. Walley Decl. ¶ 7. So far, the SROs have sought reimbursement

17

for a modest portion ($212 million) and have still not been made whole for that sum. *Id.* ¶¶ 10, 44. Using conservative interest rates, the foregone compound interest associated with these loans is approximately $336 million and counting. *Id.* ¶ 11. That is money the SROs will never see.

Against this backdrop, petitioners have launched a scorched-earth campaign to avoid paying for the CAT. Petitioners appeared perfectly content to reap the CAT's market-protection benefits for many years; neither petitioners nor any other broker-dealer challenged the SEC orders directing the CAT's creation in 2012 or 2016, even though those orders made clear funding would be joint. Given the history, petitioners cannot seriously claim that the equities favor freezing their fractional fees and asking to squeeze more money from the SROs.

That CAT LLC's reserve is currently projected to be sufficient to fund operations through a portion of the second half of 2026 does not solve the problem. As for prospective fees, as petitioners note, "it took over 23 months to fully litigate the challenge to the 2023 Order." Mot. 4, 8. And though the parties have proposed expedited briefing, that is no guarantee this Court will rule before the reserve runs dry. If the reserve were to be exhausted, there is no alternative in place. Walley Decl. ¶ 45. Given that SROs are not "obligated to contribute capital or make loans" to CAT LLC, CAT NMS Plan § 3.8(a), there is no certainty what each of the twenty-seven SROs would decide to do.

18

As for historical fees, any stay would all but guarantee that CAT LLC will not be able to collect the full amount the SROs are due. The 2026 Order provides that historical CAT fee rates must be calculated to recover historical costs over at least a twenty-four-month period, so each month of any stay would likely put a portion of SROs' remaining loans out of bounds for reimbursement. The SROs would need to wait for yet another future funding model to recover. They have heard that one before.

On the other side of the ledger, petitioners' financial interest in a stay is modest. The anticipated per-share CAT fees are the lowest ever, measured at one one-millionth and two one-millionths of a penny per executed equivalent share, 2.9% (prospective) and 15.4% (historical) of prior rates. Walley Decl. ¶¶ 10, 23, 42, 44. Compare that to petitioner Citadel's $9.7 billion in 2024 net trading revenue. *See* Paula Seligson & Katherine Doherty, *Citadel Securities on Track for Record Trading Revenue This Year*, Bloomberg (Dec. 1, 2025), https://www.bloomberg.com/news/articles/2025-12-01/citadel-securities-trading-revenue-jumps-9-amid-competition.

And petitioners' interest in holding onto their fees is dubious. As discussed, petitioners have not challenged, and this Court in *ASA* never doubted, the basic allocation of CAT costs that the fees reflect. When it comes to petitioners' fees, the question is effectively whether they owe them today as prospective and historical

19

fees or tomorrow as *higher* historical fees.  *Cf.* SEC Letter 2 (explaining, in the context of reserve spending, that "CAT LLC would otherwise be able to collect from the SROs and broker-dealers to cover those costs later").  That cannot carry the equities.  What's more, this Court can limit any putative harm to petitioners by expediting briefing and argument.  Given that fees will not come due until July at the earliest, an expedited decision would reduce petitioners' financial interest to, at most, a few months of fees at infinitesimal rates.

With the equities stacked against them, petitioners resort to suggesting that CAT LLC has engaged in an unauthorized money grab.  But CAT LLC collected fees—paid by the SROs and broker-dealers alike—consistent with the 2023 Order and this Court's stay of its judgment, as the SEC has confirmed.  *See* Concept Release 20,954; SEC Letter 2.  Nor, contrary to petitioners' accusation, has CAT LLC over-collected fees to enrich the SROs.  Again, the SROs paid the fees alongside broker-dealers.  2023 Order 62,629.  And reserve funds have only ever gone—and will continue to go—toward operating the CAT.  *See* 2016 Order 84,881 (prohibiting SROs from "redistribut[ing]" any budget surplus "among" themselves).  The rates at which CAT LLC collected its fees were set in public filings, consistent with public budgets and public projections.  *See, e.g.*, Nasdaq Stock Market LLC (Form 19b-4) (Aug. 15, 2024), https://listingcenter.nasdaq.com /assets/rulebook/nasdaq/filings/SR-NASDAQ-2024-047.pdf.  Petitioners had the

opportunity to object to CAT LLC's rates, estimated budget, and trade-volume projections; they did not do so.

As those public filings show, present reserves resulted from higher-than-expected trading volumes and lower-than-budgeted expenditures. Walley Decl. ¶¶ 25, 31. While CAT Fee 2025-1 was in effect, CAT LLC reduced its 2025 operating budget by $21 million through cost-savings amendments and other efforts to bring down costs. *Id.* ¶¶ 31-32. At the same time, trading volume hit record highs; multiple days in 2025 saw over one *trillion* trading events. *Id.* ¶ 19. These variances created a budget surplus that CAT LLC has factored into its steadily decreasing fee rates.

At the end of the day, petitioners bear the burden to show that the equities favor them. But they cannot explain why their money is any greener than the SROs'.

B.   Freezing CAT LLC's sole revenue source would jeopardize the public interest. If CAT LLC cannot collect prospective fees—100% of which go toward the CAT's operational costs—there would be significant uncertainty about how to keep markets safe. The SROs retired legacy audit trails at the SEC's direction and in reliance on the CAT. *See* pp. 4-5, *supra*. In *ASA*, this Court suggested (without briefing on the point) that the CAT had previously "operated without a funding order … and will presumably continue to do so." 147 F.4th at 1279. But the reality is that there is no backup funding and no backup audit trail.

That is exactly why the SEC adopted a temporary funding model while it reconsiders the details of the CAT: the 2026 Order "ensur[es] the continued existence and funding of the CAT during this interim period" and "avoid[s] potential destabilization." Concept Release 20,953; *see* 2026 Order 13,412. A stay would undermine that judgment and potentially usher the precise harm the SEC sought to avoid. Ultimately, it would be the investing public that would stand to suffer without the CAT's essential market safeguards. *See Davidson v. Gensler*, No. 24-cv-197, 2024 WL 4926665, at *4 (W.D. Tex. Oct. 24, 2024) (denying preliminary injunction that would have "chaotic and disruptive" effect of halting the CAT's operation and recognizing "the lack of a replacement system for CAT and the public's dependency on [the] program"). This Court should not countenance that chaos.

## CONCLUSION

Petitioners' motion for a stay should be denied.

Respectfully submitted,

Date:  April 27, 2026

/s/ Ian Heath Gershengorn
Ian Heath Gershengorn
   *Counsel of Record*
Elizabeth B. Deutsch
Jonathan J. Marshall
Sophia W. Montgomery
Anne S. Warnke
JENNER & BLOCK LLP
1099 New York Avenue, NW,
  Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

Gregory M. Boyle
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 527-0484

*Counsel for Intervenor*
  *Consolidated Audit Trail, LLC*

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word limit set forth in Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rules of Appellate Procedure 27(a)(2)(B) and 32(f), this document contains **5,200** words.

I further certify that this document complies with the typeface and type-style requirements set forth in Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using 14-point Times New Roman font in Microsoft Office Word 365.

Date:  April 27, 2026                    _/s/ Ian Heath Gershengorn_____

Ian Heath Gershengorn

*Counsel of Record for Intervenor*
*Consolidated Audit Trail, LLC*

24

**CERTIFICATE OF SERVICE**

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system, which will send notice to all the parties.

Date:  April 27, 2026                    /s/ Ian Heath Gershengorn
                                          Ian Heath Gershengorn

                                          *Counsel of Record for Intervenor*
                                          *Consolidated Audit Trail, LLC*

25