**No. 26-10936**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

CONSOLIDATED AUDIT TRAIL LLC; THE NASDAQ STOCK MARKET, LLC, ET AL.,

*Intervenors.*

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-105003; File No. 4-698

## REPLY IN SUPPORT OF OPPOSED MOTION FOR STAY

J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ..................................................................................... 1

ARGUMENT ............................................................................................ 2

I.     PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS. ............................................................................................. 2

II.    THE EQUITIES OVERWHELMINGLY FAVOR A STAY. ............. 8

CONCLUSION........................................................................................ 12

CERTIFICATE OF COMPLIANCE ...........................................Certificate 1

CERTIFICATE OF ELECTRONIC SUBMISSION ...................Certificate 2

CERTIFICATE OF SERVICE ....................................................Certificate 3

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*American Secs. Ass'n v. SEC,*
   147 F.4th 1264 (11th Cir. 2025)................................................................5, 11

*Breeze Smoke, LLC v. FDA,*
   18 F.4th 499 (6th Cir. 2021) ..................................................................... 2

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006)................................................................ 10

*Commonwealth-Lord Jt. Venture v. Donovan,*
   724 F.2d 67 (7th Cir. 1983) ..................................................................... 2

*Consumers' Research v. FCC,*
   *88* F.4th 917 (11th Cir. 2023)................................................................. 4

*Nat'l Fuel Gas Supply Corp. v. FERC,*
   468 F.3d 831 (D.C. Cir. 2006)................................................................. 7

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.,*
   715 F.3d 1268 (11th Cir. 2013)................................................................ 8

*United States v. Askins & Miller Orthopaedics, P.A.,*
   924 F.3d 1348 (11th Cir. 2019)................................................................ 8

STATUTES

15 U.S.C. § 78k-1 ....................................................................................... 3

15 U.S.C. § 78q............................................................................................ 3, 4

OTHER AUTHORITIES

77 Fed. Reg. 45722 (2012) ....................................................................... 3, 4

ii

85 Fed. Reg. 31322 (2020) .............................................................. 6

91 Fed. Reg. 13410 (2026) (Order) ........................................... 5-7, 11

CAT LLC, CAT 2026 Budget (Mar. 31, 2026) ............................... 10

Peirce, *Cattywampus: Statement on the CAT Concept Release*
　　(Apr. 16, 2026) ....................................................................... 3

**INTRODUCTION**

The SEC and SROs try to make this case complex, but the problem is simple. The SROs took over $300,000,000 from broker-dealers under the 2023 Order before this Court vacated it. Yet rather than tell the SROs to hand the money back, as it suggested it would, the SEC rushed out a new Order virtually identical to the 2023 one. Relying on that Order, the SROs are again trying to grab hundreds of millions before this Court can act. It is déjà vu all over again.

The solution is equally simple: a brief stay to allow meaningful judicial review on the expedited schedule ordered by this Court. Doc. 47-2. In opposing this modest request, the Order's proponents admit the SROs have already built a multi-month buffer with broker-dealer money that could carry them through this litigation. They concede that if petitioners *lose*, the SROs can recoup any overage later. They do not seriously deny that if petitioners *win*, broker-dealer money taken now will not be returned—just like it was not returned last time. And they never contest that petitioners have raised serious merits issues; indeed, the SROs decline to defend the CAT's lawfulness.

Instead, the SEC and SROs oppose a stay simply to hedge against the "risk" of vacatur leaving the SROs with "unrecoverable expenditures." SEC.22. But that just proves why a stay is needed: If the regulators' scheme is likely to fall tomorrow, the regulated should not have to fund it today.

1

## ARGUMENT

### I.    PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS.

**A.**    The SEC leads with a technicality, faulting petitioners for not asking it for a stay "first." SEC.1. But such box-checking would have been "'impracticable'" here, SEC.11, for the SEC "can take months to consider" a "stay" while the Order "takes effect immediately," *Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 503 (6th Cir. 2021). With the SEC's tacit approval, the SROs are *already* assessing fees for trades this month, with bills due beginning in July. CAT.8. Letting the SEC use a stay request to run out the clock would deny petitioners relief.

Seeking an SEC stay also would have been "an exercise [in] futility." *Commonwealth-Lord Jt. Venture v. Donovan*, 724 F.2d 67, 68 (7th Cir. 1983). The Order's entire point is to make broker-dealers fund the CAT until the SEC finishes its "comprehensive review" in March 2028. SEC.10. For the SEC to stay the Order would therefore make no sense, which is why it opposes a stay now.

**B.1.**    The SEC does not deny the CAT is unlawful if the major questions doctrine applies. Mot.10-13. Instead, it tries to evade the doctrine based on the CAT's "support" when "it was approved." SEC.19. But agencies cannot usurp Congress so long as the public only catches on later, and the CAT's long-delayed implementation explains the timing of the uproar here. And SEC assurances notwithstanding (SEC.20), the CAT's threat to "liberty and privacy … remains

unchanged," as regulators can still use it to access "personally identifiable information … to stalk personal or political enemies." Peirce, *Cattywampus: Statement on the CAT Concept Release* (Apr. 16, 2026), https://www.tinyurl.com/3jeunhx9.

That leaves the SEC to mischaracterize the CAT as a modest "gap"-filler rather than "'transformative expansion.'" SEC.19. But the SEC always recognized the CAT was revolutionary: With it, the SEC will no longer have to make "requests" to individual SROs for "'narrowly focused enforcement investigations,'" for it will have "direct access" to a centralized database to track investors regardless of suspicion. 77 Fed. Reg. 45722, 45727 n.52, 45729 (2012). That is akin to a shift from the FBI asking local police to be on the lookout for the getaway vehicle to installing a GPS tracker on every car in America.

**2.**    Major questions aside, 15 U.S.C. § 78k-1 does not authorize the CAT. Mot.13-14. While the SEC says that provision permits anything that involves the "SROs' shared authority" and aims to "strengthen the securities markets," that could be said for virtually *any* SEC action, causing § 78k-1 to swallow up the SEC's various other specific grants of authority. SEC.19 (cleaned up).

Perhaps recognizing this, the SEC now leads (SEC.18) with a provision the Order never mentions—15 U.S.C. § 78q. But again, construing this statute to authorize the CAT would render other provisions superfluous—here, much of § 78q itself. For example, § 78q's command that broker-dealers keep specific

internal records for "prescribed periods" for "reasonable" examinations "from time to time," 15 U.S.C. § 78q(a), (b)(1), makes no sense if the SEC can instead enjoy "unfettered access" to a centralized database tracking all market activity, 77 Fed. Reg. at 45775. That is why the SEC has never relied on § 78q as a basis to create (as opposed to "inspect") the CAT until recent litigation. *Id.* at 45784.

3. With no textual hook, the SEC says this argument is "time-barred" unless the Order "'reapplied'" earlier orders creating the CAT. SEC.17 (brackets omitted). While the SEC insists the Order did not on the premise that it creates no "payment obligation," the Order has *already* led to "issuance of invoices imposing the fees," which the SEC has "decline[d] to suspend." SEC.17-18. In any event, *Consumers' Research v. FCC* held a challenge was timely even though the funding decision had "not yet been applied to" the challengers, but would only later be "used to determine the amount of individual contributions." 88 F.4th 917, 921-22 (11th Cir. 2023).

4. By the same token, the SEC cannot excuse its refusal to address the CAT's lawfulness by claiming the Order "did not … reapply" its earlier orders. SEC.16. Before the SEC could compel broker-dealers to fund the CAT today, it had to confirm the CAT was authorized to start. After all, the SEC cannot tax broker-dealers to support an illegal operation.

Nor can the SEC argue in the alternative that it reasonably dealt with this issue by "pointing to its previous defense." SEC.17. With a majority of Commissioners now admitting the CAT teeters on a wobbly perch, the SEC owed broker-dealers an explanation for why they still must fund it. It gave them a string-cite instead. Order 13456 n.880.

**C.**    On SRO pass-throughs, the SEC first claims this defect cannot justify staying the Order because petitioners have not challenged its "allocation" of CAT costs into thirds. SEC.12. But that "allocation" is meaningless if the SROs can offload their third onto broker-dealers—whether directly (by imposing a new fee) or indirectly (by increasing existing ones). That is why this Court rejected the same argument made in support of remanding the 2023 Order without vacatur. *See* 23-13396 Doc. 97 at 50-51. It had to vacate the entire order because "allowing" for a "100% pass-through" of CAT costs was "central" to its framework. *American Secs. Ass'n v. SEC*, 147 F.4th 1264, 1279 (11th Cir. 2025) (*ASA*).

That remains true. Indeed, the SEC continues its refusal to acknowledge that the largest SRO—FINRA—must pursue a "100% pass-through" as a non-profit, *id.*, meaning the 2026 Order's "two-thirds allocation" is illusory on its face, SEC.12. So in both effect and inadequate explanation, the Order here is the same as the one this Court vacated last July. Mot.15-17.

For their part, the SROs say a ban on indirect pass-throughs would be "impossible to enforce." CAT.11. But the SEC claims it can police "attempts" to "indirectly pass through" CAT costs through the "fee filing process," such as by requiring descriptions of "the reasons" for fee increases. Order 13441. If the SEC thinks it can stop indirect pass-throughs on the back-end, though, it must explain its refusal to forbid them on the front, especially as it did so in its prior pass-through ban linked to SRO deadlines. Mot.16.* In all events, the SROs are duty-bound as regulators to follow the law even when no one is watching.

**D.**    The Order's defenders likewise cannot defend its erroneous premise that the SROs need not pay for the CAT without a funding order. The SROs cannot even keep their story straight. On the merits, they claim *carte blanche* to stop bankrolling "the CAT in the absence of a funding model." CAT.3. But on the equities, they warn (as before) that a lack of an operative funding model would "empty[]" their "wallets." CAT.4; *see, e.g.*, 23-13396 Doc. 97 at 48; 23-13396 Doc. 119 at 4, 18-21. The SROs cannot have it both ways: If they are free to defund the CAT, a stay will not cost them a penny more.

---

* While the SEC suggests that earlier prohibition did not cover indirect pass-throughs, it cites only the *proposed* version's remark that SROs might "'attempt'" that maneuver, not get away with it. SEC.14. And far from blessing such schemes, the *final* order found that blowing the deadlines would "shift[]" "up to $120MM" onto the SROs, a conclusion that would make no sense if they could shift it right back through fee increases. 85 Fed. Reg. 31322, 31342 (2020).

In all events, the SROs are wrong on the merits, which is why they oppose a stay. While the Plan may not obligate them to "make loans to CAT LLC," CAT.13 (cleaned up), it does require them to "'maintain the CAT'" itself, Mot.18. And because that takes money, the SROs must find *some* way of bankrolling the CAT when no funding order is in effect. Indeed, the Plan aside, the "SROs are required to expend sufficient resources to support their surveillance functions," including on the CAT. 23-13396 Doc. 96 at 8 (cleaned up).

For its part, the SEC (today) does not deny the SROs are forbidden "to 'cease funding the CAT.'" SEC.15. Instead, it suggests their strongarming is not what drove its hasty roll-out of the Order. *Id.* But if that were true, why did the SEC rush an "interim" funding order to avoid a "destabilizing" scenario? Order 13412. Why did it say there was no "alternative" apart from broker-dealer fees "to make sure that CAT remains funded"? Order 13444. And why did it mention the SROs' threat at all? Order 13412.

The SEC has no answers. And even if it had *other* reasons for slapping together an interim order, when an agency offers "multiple rationales" (not "in the alternative") and one "is deficient," courts will "vacate" unless it is "certain" the order would have been adopted "even absent the flawed rationale." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006). No certainty exists here.

## II.    THE EQUITIES OVERWHELMINGLY FAVOR A STAY.

**A.**    On irreparable harm, no one disputes that without a stay, broker-dealers will lose hundreds of millions before the Order expires and the SROs will invoke "regulatory immunity" in refund suits. CAT.15. That makes this easy: "The threat of unrecoverable economic loss" due to a regulator's "immunity" is "irreparable harm." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (cleaned up).

To obscure this, the SEC speculates these nine-figure losses "could be" remediated through "future fee adjustments." SEC.20. But "it 'is not enough that there is a remedy at law'" if it is not "'as practical and as efficient'" as "'the remedy in equity.'" *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1359 (11th Cir. 2019). And forcing petitioners to bank on the possibility of hypothetical book-balancing tomorrow is not an "adequate" substitute for the protection of a stay today. *Id.* Otherwise, regulators could *always* evade a stay by promising a potential administrative fix later. That cannot be right, which is why the Order's defenders cannot identify a single decision finding a lack of irreparable harm based on a bureaucratic pipedream.

This case should not be the first. While the SEC flags potential "future fee adjustments," it admits there may be "no future CAT fees to adjust." SEC.20-21. So the SEC resorts to more speculation, claiming it could still adopt some

8

unspecified "regulatory initiative" to address any broker-dealer "overpayment." SEC.21. But if this Court holds that "the CAT is unlawful," *id.*, the SEC could not compel SROs to refund petitioners for having bankrolled that database in the meantime (and vice versa). Whatever the scope of the SEC's powers, it cannot spread around the costs of its misadventure by robbing Peter to pay Paul.

Even if the SEC *could* make broker-dealers whole, it is unlikely that it *would*. The SEC has never "committed" to compensating broker-dealers for losses under an unlawful order, CAT.15; it has only said it "could" do so. SEC Letter 2, *cited in* CAT.15. But we "have heard that one before." CAT.19. Notwithstanding its suggestion to this Court, the SEC let the SROs keep the $300,000,000-plus collected from broker-dealers—including through FINRA pass-throughs—under the 2023 Order. Mot.20.

Remarkably, the SEC says this episode just shows the "feasibility" of "fee adjustments" because a fraction of that money—the remaining "reserve"—will "offset" broker-dealers' first bills under the 2026 Order. SEC.20. But that does nothing to address the far greater sum of broker-dealer money the SROs have already spent. In any event, the $300,000,000-plus taken under the 2023 Order was *unlawfully collected*, just like the $446,000,000-plus set to be taken under the 2026 Order will be. Mot.20-21. In other words, the SEC's solution is to use some of what the SROs stole in the past to offset how much they will plunder now.

9

In calling that pirate's math a "remedy," the SEC assumes the fees under its funding orders were, are, and will be lawful. SEC.20. But as with standing, courts assessing "irreparable harm" must instead "assume[] … that the movant has demonstrated a likelihood that the non-movant's conduct violates the law." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).

**B.**     Because the SROs must keep the CAT running, a stay would harm neither the SEC nor the public. *Supra* at 6-7. Instead, it "would just force" the SROs "to bear" the CAT's "costs" for part of this case. SEC.21. Yet that will happen only after their "reserve" of unlawfully taken broker-dealer funds is "exhausted," which now will not occur until 2027. CAT.18; *see* CAT LLC, CAT 2026 Budget (Mar. 31, 2026), https://tinyurl.com/bzmewvur. And given the expedition of this case to allow argument this September, that period will be brief—if it exists at all. Doc. 47-2.

Thus, the only harm from a stay is the risk that the SROs will be unable to collect broker-dealer funds between when the reserve runs dry and this challenge ends. However this case comes out, that it is not a cognizable injury. If petitioners lose, the SROs will recoup the money later. CAT.20. And if petitioners win, the SROs would have had no right to the funds in the first place. Either way, the SROs cannot complain.

10

The SROs therefore blame their broker-dealer victims, pretending they were gulled into pouring millions into the CAT only because petitioners did not sue earlier. CAT.18. But had petitioners brought a similar challenge "in 2012 or 2016," *id.*, it would have been tossed as premature, as it took until 2023 for "a funding model" to be "finally approved," CAT.5. The SROs, by contrast, could have sued from the start, but instead spent seven years dickering over a funding model while running up a billion-dollar tab. Mot.22. Alternatively, they could have worked with the SEC to "reconsider the allocation" in the 2023 Order, *ASA*, 147 F.4th at 1280, rather than ram through a "substantively identical" funding model, Order 13415. Whatever the wisdom of those choices, they do not justify "squeez[ing] more money" from broker-dealers now. CAT.18.

## CONCLUSION

This Court should stay the Order.

Dated: May 11, 2026

Respectfully submitted,

/s/ J. Michael Connolly
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

/s/ Noel J. Francisco
Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

12

# CERTIFICATE OF COMPLIANCE

I certify that this Reply complies with (1) the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,596 words, excluding any parts exempted by Rule 27(a)(2)(B); and (2) the typeface and type-style requirements of Rule 27(d)(1)(E) because it has been prepared in 14-point Calisto MT (a proportionally spaced typeface) using Microsoft Word.

Dated: May 11, 2026

*/s/ J. Michael Connolly*

*Counsel of Record for Petitioner*
*American Securities Association*

Respectfully submitted,

*/s/ Noel J. Francisco*

*Counsel of Record for Petitioner*
*Citadel Securities LLC*

Certificate 1

## CERTIFICATE OF ELECTRONIC SUBMISSION

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: May 11, 2026

/s/ J. Michael Connolly

Counsel of Record for Petitioner
American Securities Association

Respectfully submitted,

/s/ Noel J. Francisco

Counsel of Record for Petitioner
Citadel Securities LLC

Certificate 2

# CERTIFICATE OF SERVICE

I certify that on May 11, 2026, the foregoing Reply was electronically filed with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 11, 2026                    Respectfully submitted,

_/s/ J. Michael Connolly_              _/s/ Noel J. Francisco_

*Counsel of Record for Petitioner*     *Counsel of Record for Petitioner*
*American Securities Association*       *Citadel Securities LLC*

Certificate 3