**No. 26-10936**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

CONSOLIDATED AUDIT TRAIL LLC; THE NASDAQ STOCK
MARKET, LLC, ET AL.,

*Intervenors*.

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-105003; File No. 4-698

## OPENING BRIEF OF PETITIONERS

J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, the undersigned counsel hereby certify that the American Securities Association (ASA) is a nonprofit trade association that represents the wealth management and capital markets interests of regional financial services firms. ASA members are small and regional financial services companies who advise Americans how to create and preserve wealth; provide Main Street businesses with access to capital and advisory services; raise capital for schools, hospitals, cities, and states; and work with institutional investors to increase investment returns. Counsel further certify that no parent corporation, and no publicly held corporation, has a 10% or greater ownership interest in the ASA.

Petitioner Citadel Securities LLC is an indirect subsidiary of Citadel Securities GP LLC. Counsel further certify that no publicly held corporation has a 10% or greater ownership interest in Citadel Securities GP LLC.

i

Dated: May 21, 2026

/s/ J. Michael Connolly
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Respectfully submitted,

/s/ Noel J. Francisco
Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

ii

## STATEMENT REGARDING ORAL ARGUMENT

This Court should hear oral argument. This case raises important questions about the validity of a significant order of the U.S. Securities and Exchange Commission (Commission or SEC) that threatens to impose billions of dollars in costs on the financial-services industry (and the investors it represents) to maintain a massive, unprecedented government surveillance system that will track every American who trades in the U.S. securities markets—all without the approval of, or any funding from, Congress. In 2025, this Court heard oral argument in petitioners' challenge to a substantively identical order, which it then vacated as unlawful. 23-13396 Doc. 150. Oral argument would substantially assist this Court in deciding whether this order should meet the same fate.

iii

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.................................................i

STATEMENT REGARDING ORAL ARGUMENT.................................iii

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT......................................................... 6

STATEMENT OF THE ISSUES ............................................................. 6

STATEMENT OF THE CASE............................................................... 7

STANDARD OF REVIEW .................................................................. 14

SUMMARY OF THE ARGUMENT....................................................... 15

ARGUMENT .................................................................................. 18

I.  THE ORDER EXCEEDS THE COMMISSION'S AUTHORITY. ....... 18

    A. The Order is unauthorized because the CAT exceeds the
       Commission's statutory authority. ...................................... 18

    B.  The Order is unauthorized because the SEC cannot tax
       broker-dealers to pay for the CAT regardless. ..................... 29

    C.  The Commission's timeliness objection fails...................... 32

II. THE ORDER IS ARBITRARY AND CAPRICIOUS.......................... 35

    A. The Order's treatment of the SEC's lack of statutory
       authority for the CAT violates the APA. ............................ 36

    B.  The Order's "allocation" of costs violates the APA........................... 38

    C.  The Order's refusal to remedy unlawfully collected
       fees violates the APA. ...................................................... 46

    D. The Order's erroneous assumption that SROs need not maintain
       the CAT in the absence of a funding model violates the APA. ........... 48

    E.  Vacatur is the proper remedy for the Order's APA violations. ............ 53

CONCLUSION................................................................................ 55

CERTIFICATE OF COMPLIANCE ...........................................Certificate 1

CERTIFICATE OF ELECTRONIC SUBMISSION ...................Certificate 2

CERTIFICATE OF SERVICE .................................................Certificate 3

iv

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*All. for Fair Bd. Recruitment v. SEC*,
125 F.4th 159 (5th Cir. 2024) (en banc).................................................26, 28

*All. for the Wild Rockies v. United States Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018)............................................................... 53

*\*Am. Secs. Ass'n v. SEC*,
147 F.4th 1264 (11th Cir. 2025)......................... 1, 6-7, 9, 11, 14, 31, 34-35,
38-39, 40-42, 44-45, 48, 52-53

*Biden v. Nebraska*,
600 U.S. 477 (2023) ...............................................................19, 24, 25, 29

*BP P.L.C. v. Mayor & City Council of Baltimore*,
593 U.S. 230 (2021) ............................................................................. 33

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ................................................................. 25

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
601 U.S. 416 (2024) ............................................................................. 29

*Consumers' Research v. FCC*,
88 F.4th 917 (11th Cir. 2023) ...........................................................33, 34

*Davidson v. Atkins*,
No. 24-cv-197 (W.D. Tex.) .................................................................... 23

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ............................................................................. 35

*Hewitt v. Commissioner*,
21 F.4th 1336 (11th Cir. 2021)............................................................... 36

*James B. Beam Distilling Co. v. Georgia*,
501 U.S. 529 (1991) ................................................................ 48

*\*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) ..........................................................24, 27, 29-31

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................ 25

*Morrison v. Olson*,
487 U.S. 654 (1988) ................................................................ 32

*Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................36, 43

*Nasdaq Stock Mkt. LLC v. SEC*,
38 F.4th 1126 (D.C. Cir. 2022)................................................ 28

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ................................................................ 52

*NFIB v. OSHA*,
595 U.S. 109 (2022) ................................................................ 25

*NRDC v. EPA*,
755 F.3d 1010 (D.C. Cir. 2014) .............................................. 36

*PHH Corp. v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016) .................................................53, 54

*PHH Corp. v. CFPB*,
881 F.3d 75 (D.C. Cir. 2018) (en banc).................................. 54

*Protect Our Communities Found. v. LaCounte*,
939 F.3d 1029 (9th Cir. 2019)................................................ 45

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)................................................................. 52

*Seila Law v. CFPB*,
   591 U.S. 197 (2020) ................................................................ 54

*Stone & Webster Constr., Inc. v. U.S. Dep't of Lab.*,
   684 F.3d 1127 (11th Cir. 2012) ............................................... 14

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ................................................................ 45

*U.S. Sugar Corp. v. EPA*,
   113 F.4th 984 (D.C. Cir. 2024) ............................................... 37

*United Airlines, Inc. v. TSA*,
   20 F.4th 57 (D.C. Cir. 2021) ................................................... 47

*Utility Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ................................................................ 19

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ................................................................ 24

*Xcel Energy Servs. Inc. v. FERC*,
   815 F.3d 947 (D.C. Cir. 2016) ................................................ 48

**STATUTES**

5 U.S.C. § 706 ............................................................................. 14

15 U.S.C. § 78c ........................................................................... 28

15 U.S.C. § 78k-1 ............................................... 18-19, 25-28, 30-31

15 U.S.C. § 78q ..................................................................... 27, 28

15 U.S.C. § 78s ............................................................................ 48

15 U.S.C. § 78y ................................................................ 6, 18, 32, 33

15 U.S.C. § 78ee ......................................................................... 30

**OTHER AUTHORITIES**

47 C.F.R. § 54.709 ............................................................................... 34

47 C.F.R. § 54.713 ............................................................................... 34

68 Fed. Reg. 27722 (2003) ................................................................... 50

69 Fed. Reg. 71256 (2004) ................................................................... 50

77 Fed. Reg. 45722 (2012) ......................................................... 7, 19, 27

81 Fed. Reg. 30614 (2016) ..................................................................... 8

81 Fed. Reg. 84696 (2016) ......................................................... 8, 9, 24, 50

82 Fed. Reg. 35005 (2017) ..................................................................... 9

85 Fed. Reg. 31322 (2020) ................................................................ 43, 44

88 Fed. Reg. 62628 (2023) ........................................... 1, 2, 10, 19, 37, 42

90 Fed. Reg. 44910 (2025) ................................................................... 11

91 Fed. Reg. 2164 (2026) ..................................................................... 21

91 Fed. Reg. 13410 (2026) .................................... 2-6, 12-14, 18, 20, 23-24, 29,
31, 33, 36-43, 45-50, 53

91 Fed. Reg. 25700 (2026) ................................................................... 20

Atkins, *Prepared Remarks Before SEC Speaks* (May 19, 2025) ........................... 22

CAT LLC, CAT 2026 Budget (Mar. 31, 2026) ............................................. 12

CAT LLC, Request for Exemption from FAM 4 Requirements
(May 22, 2023) ............................................................................... 44

CAT NMS Plan (May 11, 2026) ........................................................ 8, 44, 50

H.R. 2039 (2021) ............................................................................... 23

H.R. 4551 (2023) .................................................................................... 23

H.R. 4785 (2018) .................................................................................... 23

Inspector General, *Additional Oversight and Monitoring of the SEC's CAT Usage Is Needed* (Mar. 31, 2025) ........................................................ 23

Letter from ACLU (Dec. 16, 2019) ............................................................ 23

Letter from CAT LLC (May 22, 2023) ....................................................1, 20

Letter from the SEC (Feb. 18, 2026)............................................................ 46

Letter from Sen. Kennedy et al. (July 24, 2019) ........................................... 23

Oversight of the SEC: Hearing Before the Comm. on Fin. Servs. (Sept. 24, 2024) ............................................................................................. 23

Peirce, *Cattywampus: Statement on the CAT Concept Release* (Apr. 16, 2026) ................................................................................. 20, 21, 23

Peirce, *Statement in Response to Release No. 34-88890, File No. S7-13-19* (May 15, 2020) ............................................20, 21, 22, 23

Peirce & Uyeda, *Dissenting Statement on Electronic Submission of Certain Materials Under the Securities Exchange Act of 1934 and Amendments Regarding the FOCUS Report* (Dec. 16, 2024)............................ 3

USASpending................................................................................................. 24

Weinstein et al., *SEC Had a Fraught Cyber Record Before X Account Was Hacked*, Bloomberg Law (Jan. 11, 2024)........................................... 22

**INTRODUCTION**

This is the latest chapter in a long-running fight over whether the SEC can tax American investors to fund an unprecedented government surveillance system that watches their investing activities. Known as the Consolidated Audit Trail (CAT), this first-of-a-kind database tracks every trade and investor in the U.S. securities markets from cradle to grave. According to the financial self-regulatory organizations (SROs) tasked with running the CAT, "no other comparable system or database of this scale … and complexity exists anywhere in the world." Letter from CAT LLC 8-9 (May 22, 2023), https://perma.cc/UW4U-T73J.

Building and maintaining this big-data behemoth was always going to be costly, yet the price tag of the CAT soon exceeded the Commission's initial predictions by many multiples. But rather than seek authority and appropriations from Congress, the SEC colluded with the SROs to offload the massive bill onto broker-dealers and the investors they serve. In 2023, it issued an order funding the CAT through a new tax on every share traded in the U.S. equities and options markets. 88 Fed. Reg. 62628 (2023) (2023 Order). This Court vacated that order last July because it let the SROs "pass through 100% of their CAT costs" to their broker-dealer members yet provided "no reasoned justification" for that choice. *Am. Secs. Ass'n v. SEC*, 147 F.4th 1264, 1274-75 (11th Cir. 2025) (*ASA*).

1

Yet less than seven months later, the SROs pressured the Commission into rushing out a new CAT funding order that suffers from the same defects. Indeed, the SEC admits its latest order is "substantively identical" to the last one vacated by this Court. 91 Fed. Reg. 13410, 13415 (2026) (2026 Order or Order). The only difference is the SEC has now tried to paper over the flaws this Court found in the 2023 Order by prohibiting the SROs from "directly" passing their CAT costs onto broker-dealers in the form of "a new fee," while still letting them "indirectly" do so by "increasing existing fees." Order 13413. But this sleight of hand does not make the 2026 Order any more lawful than the last one. To the contrary, the Order here remains plagued by two overarching deficiencies.

*First*, the SEC lacked statutory authority to issue it. The Commission cannot tax broker-dealers to pay for a surveillance system that itself is unlawful, and Congress never gave the SEC the power to create the CAT. The Commission has conceded there is no "express authorization for CAT by Congress," 88 Fed. Reg. at 62673, yet that is what this unprecedented policy initiative needs to survive under the major questions doctrine. The Order nevertheless forces the investing public to bankroll a highly controversial, multibillion-dollar surveillance system without anything resembling a stable statutory foundation, let alone an express one. And even if Congress delegated its authority to *create* the CAT to the Commission, it did not cede its *taxing* power to the agency along with it.

2

*Second*, regardless of the Commission's authority for the CAT or its funding model, the Order violates the Administrative Procedure Act (APA) several times over. For one, it lets the SROs saddle broker-dealers with the CAT's costs without even trying to defend the lawfulness of that database or the taxes that fund it. To the contrary, the SEC professes to "take[] seriously" the "fundamental concern[]" that the CAT "exceeds the Commission's statutory authority," so much so that it is currently engaged in a "comprehensive reassessment" of this massive database. Order 13456.

That is not surprising: A majority of the SEC has described the CAT as a program "one would expect to find in a dystopian surveillance state"—"an omnibus surveillance system that tracks every investment move of its citizens" yet "operates outside the direct oversight or authorization of Congress."[1] What is surprising is that the Commission has decided broker-dealers must continue to spend hundreds of millions of dollars on that system while it figures out whether the framework was ever lawful in the first place. But in our legal system, the regulators cannot tax the regulated first and then decide whether they had authority to do so later.

---

[1] Peirce & Uyeda, *Dissenting Statement on Electronic Submission of Certain Materials Under the Securities Exchange Act of 1934 and Amendments Regarding the FOCUS Report* (Dec. 16, 2024), https://tinyurl.com/2p9wk9cu.

3

Questions of authority aside, the 2026 Order's decision to allow the SROs to offload all their CAT costs onto broker-dealers *indirectly* is no more justified than the 2023 Order's decision to allow them to do so *directly*. The effect of this pass-through permission slip is the same as the last one vacated by this Court—it renders any "allocation" of CAT costs between the SROs and their broker-dealer competitors a transparent charade. And the SEC's explanation for it is equally deficient. In fact, this Court considered—and rejected—virtually all of the justifications the Order offers for these pass-throughs the last time around.

Adding insult to injury, the Order fails to meaningfully address the fact that the SROs took over $300 million from broker-dealers under the 2023 Order before its vacatur. Rather than credit broker-dealers for that loss (as it previously suggested to this Court it would), or even prevent the same thing from happening again, the SEC brushed this problem aside with the *non sequitur* that the SROs took the money "prior to the Eleventh Circuit's vacatur." Order 13347. But this Court's decision meant the 2023 Order was *always* unlawful—including when the SROs wielded it to extract hundreds of millions of dollars from their broker-dealer competitors. Before the SROs can again plunder broker-dealers to the tune of nine-figures, the SEC at least owes the latter a better explanation for why that is fine. In failing to consider this important aspect of the problem, the Commission again defied the APA.

Finally, the 2026 Order rests on an erroneous and unexplained belief that the SROs are not legally obligated to fund the CAT. According to the Commission, the SROs "caution[ed]" the SEC not to "'assume[]'" they would fund the CAT going forward, which prompted the agency to slap together a new order decreeing that *broker-dealers* must "ensure" the CAT remains funded to avoid a "destabilizing" scenario. Order 13412. But the SROs' thinly-veiled threat—the impetus for the 2026 Order—is a paper tiger. And the SEC knows it. As it told this Court less than two years ago, the SROs' "funds will continue to be expended regardless of whether" an operative funding order exists. 23-13396 Doc. 120 at 3. That is because both the securities laws and the SEC-approved plan governing the CAT obligate the SROs to maintain (and therefore fund) the database whether or not a funding regime is in place. The Commission's belief that the SROs could now defund the CAT therefore rests on an error of law. At the very least, the SEC needed to explain its change in position on the SROs' duties, but here again, the Order provides none.

In short, the CAT remains unlawful, and the SEC's model to fund it remains unreasonable. This Court should set the 2026 Order aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under § 78y,[2] which permits persons harmed by Commission orders issued under the Exchange Act to petition for review in the applicable Court of Appeals within 60 days of the order's entry. *See ASA*, 147 F.4th at 1273. The Commission issued the order under review under the Exchange Act on March 16, 2026. Order 13410. Petitioners—the ASA and Citadel Securities LLC—filed a timely petition for review on March 24, 2026. Doc. 1-2.

Petitioners are harmed by the Order because it imposes the costs of the CAT on ASA's members and Citadel Securities. Doc. 20-3 ¶¶ 9-17; Doc. 20-4 ¶¶ 6-15. Venue is proper in this Circuit because "the principal place of business" of both ASA and Citadel Securities is in Florida. § 78y; Doc. 20-3 ¶ 5; Doc. 20-4 ¶ 4.

## STATEMENT OF THE ISSUES

1. Whether the Order should be set aside because it exceeds the Commission's statutory authority.

2. Whether the Order should be set aside because it violates the APA's requirement of reasoned decisionmaking.

---

[2] Unless otherwise noted, section symbols refer to chapter 15 of the U.S. Code.

**STATEMENT OF THE CASE**

1.     In the Exchange Act, Congress created a system of securities regulation where the Commission oversees the SROs—today, the 29 for-profit national securities exchanges and the non-profit Financial Industry Regulatory Authority (FINRA)—which in turn are tasked with "'the day-to-day regulation and administration of the United States' stock markets.'" *ASA*, 147 F.4th at 1270. To carry out these responsibilities, many of the SROs created their own individual audit trails to track the trades within their purview. 77 Fed. Reg. 45722, 45728 (2012). The SEC, however, lacked "direct access" to these "SRO audit trails" for its own enforcement purposes. *Id.* at 45729. Instead, it had to make requests in connection with "'narrowly focused enforcement investigations,'" *id.* at 45727 n.52, which generally limited its enforcement efforts to "investigations based on particularized suspicion of wrongdoing," *id.* at 45792.

2.     Things changed in 2012. That year, the Commission commanded the SROs to create a surveillance system known as the "consolidated audit trail" (or the CAT). *Id.* at 45722. Unlike prior SRO audit trails, the CAT was to aid the enforcement activities of the SEC, which would enjoy "unfettered access" to the database for the purposes of tracking every trade and investor in the U.S. securities markets. *Id.* at 45775.

In 2015, the SROs returned to the Commission with a plan to implement this new surveillance system. 81 Fed. Reg. 30614 (2016). In parallel, they proposed the creation of a company, now known as CAT LLC, through which they would run the CAT. *Id.* at 30616. Each SRO would own a share of the company and enjoy representation on its operating committee. *Id.* Broker-dealers and their investor customers, by contrast, would have no role in the company, nor any meaningful input on the CAT's design, implementation, operation, budget, costs, or funding. *Id.* at 30621. Instead, their participation would be limited to an advisory committee, a role that came with no voting rights or authority. *Id.* The following year, the Commission approved both the SROs' plan for the CAT (the Plan) and the establishment of the company that later became intervenor CAT LLC. 81 Fed. Reg. 84696 (2016); *see* CAT NMS Plan (Plan) (May 11, 2026), https://perma.cc/7RS6-7HN7 (current version of the Plan).

Neither the Plan nor the SEC's 2016 order, however, settled how the CAT would be funded. Instead, the SEC and the SROs punted, explaining that the "allocation" of CAT costs between the "Participants" (the SROs) and "Industry Members" (broker-dealers) would be sorted out later. *Id.* at 84793, 84795. The SEC thus would have to approve an amendment to the Plan creating a funding model before any allocation of CAT costs to broker-dealers could occur. *Id.*

8

With no funding model in place, CAT LLC covered the CAT's startup and operating costs through loans from its member SROs from 2016 until 2024. Doc. 43-2 ¶ 7. In the meantime, the CAT's costs spiraled beyond all expectations. When the SEC approved the Plan in 2016, it estimated it would take, at most, $65 million to build the CAT and another $55 million per year to operate it. 81 Fed. Reg. at 84801. Yet by the end of 2022, "$518 million had been spent to build the (incomplete) CAT—nearly eight times more than the top Commission estimate"—and its "operating costs had climbed to nearly $200 million per year—nearly four times greater than the high-end Commission estimate." *ASA*, 147 F.4th at 1273. And these were on top of broker-dealers' compliance costs: According to the SEC's estimates in 2016, broker-dealers would have to spend at least "$2.2 billion" on "one-time implementation costs" to get the CAT up and running and then "$1.5 billion" in "ongoing costs" each year thereafter to comply with the CAT's data-reporting requirements. 81 Fed. Reg. at 84862.

With the costs of the CAT ballooning ever larger, the SEC and SROs spent seven years haggling over a funding model. In 2017, the Commission "summarily abrogated" the SROs' first funding proposal after questioning whether its "allocation" of costs was "reasonable, equitable, and not unfairly discriminatory." 82 Fed. Reg. 35005, 35013 (2017). The next three proposals were withdrawn when it became clear they would meet a similar fate. *See ASA*, 147 F.4th at 1272.

**3.** The SROs finally found traction in September 2023, when the SEC issued an order establishing a funding model for the CAT as an amendment to the Plan. This 2023 Order purported to fund the CAT by taxing every share traded in the U.S. equities and options markets. 88 Fed. Reg. at 62629-30. Separate taxes (dubbed "fees") were to be applied to (1) reimburse the SROs for the hundreds of millions spent to build the CAT and (2) cover the CAT's multi-hundred-million-dollar budget each year going forward. *Id.* In approving this scheme, the SEC claimed it would review the SROs' biannual CAT fee filings setting the specific per-transaction fee rate to ensure they were based on "'reasonably budgeted CAT costs.'" *Id.* at 62637.

In theory, the 2023 Order provided that the tax on each trade would be split into thirds: two-thirds were to be borne by the broker-dealers that handled each side of a trade, while the remaining third was to be payable by the SRO on which a trade was executed. *Id.* at 62630. But the 2023 Order also allowed the SROs to pass "their CAT fees onto their members in full" in the form of their own mandatory broker-dealer fees, meaning broker-dealers (and their investor customers) could ultimately "bear 100%" of the CAT's costs despite having no meaningful role in its design, implementation, operation, or budget. *Id.* at 62684 n.1135.

**4.**     Petitioners challenged the 2023 Order in this Court, contending that the CAT and the 2023 Order fell outside the SEC's statutory authority and that the 2023 Order violated the APA. *ASA*, 147 F.4th at 1269. While that challenge was pending, the SROs began to submit fee filings to the SEC to exact funds from broker-dealers for CAT costs. 23-13396 Doc. 120 at 7-8. FINRA, the largest SRO, also submitted a fee filing to pass through 100% of costs allocated to it. *Id.* at 8-9. The SEC refused to suspend those filings, and this Court denied the stay of the 2023 Order by a 2-1 vote. 23-13396 Doc. 134.

In July 2025, this Court vacated the 2023 Order as arbitrary and capricious, but stayed its judgment for 60 days. *ASA*, 147 F.4th at 1280. Among other things, it held that the SEC had failed to justify its decision to allow the SROs to pass through their share of CAT costs, which could saddle broker-dealers (and investors) with 100% of the CAT's costs while giving them no real say in its design, implementation, operation, or budget. *Id.* at 1274-77.

Just over a month later, the SROs proposed a new funding model they admitted was "identical" to the 2023 Order save for a carefully hedged promise "not to establish a *new fee* for passing through" each SRO's CAT costs. 90 Fed. Reg. 44910, 44912 (2025) (emphasis added). Based on that proposal, the SROs sought to extend this Court's stay of its judgment, which the Court promptly denied. 23-13396 Docs. 158-1, 162-1.

11

5.    With the 2023 Order gone and the new funding model not yet approved, the SROs finally stopped collecting CAT fees from broker-dealers at the end of 2025. Order 13411 n.26. By that time, however, the damage was done: the SROs had taken over $300 million from broker-dealers (including over $56 million from Citadel Securities alone) under the authority of the unlawful 2023 Order. Doc. 20-4 ¶ 10.

To fund its operations in 2026 prior to the approval of another funding model, CAT LLC turned to the $119 million-plus reserve made up from the budget surplus it had amassed by collecting excess taxes from broker-dealers under the 2023 Order, including up until the final second before this Court's judgment took effect. Order 13442-44; *see* Doc. 20-3 ¶ 13; Doc. 20-4 ¶ 11. That reserve will fund CAT LLC's operations until at least 2027. CAT LLC, CAT 2026 Budget (Mar. 31, 2026), https://tinyurl.com/bzmewvur.

6.    In March 2026, the Commission approved the funding model the SROs proposed in the wake of this Court's July 2025 decision, with the tweak that the model would expire on March 31, 2028 (at least in the absence of subsequent SEC extension). Order 13412. According to the SEC, it would be "premature" to create "a new, permanent funding model" because it was currently conducting "a comprehensive review of the CAT" itself, including whether the CAT was lawful in the first place. Order 13411-12; *see* Order 13456.

12

The SEC nevertheless concluded it needed an "interim funding model" "to ensure" the CAT's "continued existence and funding during" its review process because the SROs had "caution[ed]" that they may not keep the CAT in "'operation'" "'once the operational reserve is exhausted.'" Order 13412. In approving this "temporary funding model," the SEC announced that it was "not reconsidering or revisiting the decision to establish" the CAT, and therefore it refused to address petitioners' objection that "the CAT … exceeds the Commission's statutory authority." Order 13456. But it claimed to take these concerns "seriously" and promised that "they will inform … its ongoing, comprehensive reassessment." *Id.* In the meantime, the Commission decreed that broker-dealers would have to continue paying for the CAT, and it refused to provide any remedy for the "fees already collected by the SROs" under the unlawful 2023 Order. Order 13447. In the SEC's view, those sums—which were collected "prior to the Eleventh Circuit's vacatur"—were simply "not at issue in this order." *Id.*

Finally, the SEC acknowledged that the Order was "substantively identical" to the 2023 Order this Court vacated last year, save for a new direct "pass-through prohibition." Order 13415. According to the Commission, "precluding the simple filing of a new fee to directly pass through CAT costs" responded to this Court's "concern" that the SROs could effectively avoid any "'allocation of the costs' of CAT among the Participants and Industry Members." Order 13413.

13

Yet in the next breath, the SEC expressly authorized the SROs to "recover their share of costs from" broker-dealers "indirectly by increasing existing fees." *Id.* And it all but acknowledged that FINRA, the largest SRO, would do so given its "need to recover" its "CAT Fees" in light of its "non-profit status." Order 13467 n.980. The upshot of FINRA's pass-throughs alone is that broker-dealers would bear at least "79 percent of CAT costs." Order 13467. And if the other SROs took the same path, broker-dealers (and investors) once again could be on the hook for "100 percent of CAT costs." *Id.*

With the Commission's acquiescence, the SROs are already using the 2026 Order to assess new CAT fees on broker-dealers for trades this May, with bills due beginning in July. Doc. 43-1 at 8. As of this filing, petitioners' motion for a stay of the 2026 Order remains pending. Doc. 20-1.

## STANDARD OF REVIEW

This Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see ASA*, 147 F.4th at 1273. It reviews an agency's legal conclusions *de novo. Stone & Webster Constr., Inc. v. U.S. Dep't of Lab.*, 684 F.3d 1127, 1132 (11th Cir. 2012).

## SUMMARY OF THE ARGUMENT

**I.**    The 2026 Order exceeds the Commission's statutory authority in two independent respects. *First*, Congress did not empower the SEC to establish the CAT, so the Commission cannot order broker-dealers to pay for it. Having conceded that Congress never gave it "express authorization for CAT," the SEC professes to find the power to create this massive surveillance enterprise in a general directive to facilitate a national market system. Even setting aside that this statute contains *no* authorization for the CAT, far more is needed given the extraordinary nature of the SEC's unprecedented, multibillion-dollar surveillance tool. Under the major questions doctrine, Congress must provide *express* authorization before the Commission can override the Exchange Act's self-regulatory framework to surveil, collect, and store sensitive information on hundreds of millions of American investors.

*Second*, even if Congress outsourced this major policy decision to the SEC, it did not hand over its power of the purse at the same time. Nothing in the Exchange Act's authorization to *regulate* a national market system includes the power to *tax* the American investing public. Whether one applies the major questions doctrine or ordinary principles of interpretation, something more is necessary for the SEC to fund its regulatory initiatives in a manner that renders them immune from congressional oversight via the appropriations process.

15

To be clear, petitioners are not asking this Court to set aside any of the SEC's prior directives establishing the CAT. Rather, they are seeking vacatur of the 2026 Order alone. While one of their *objections* to the Order is that it taxes broker-dealers to support an unauthorized database, their challenge to the *Order itself* is unquestionably timely.

**II.**    Statutory authority aside, the Order cannot survive under the APA due to four independent defects in the SEC's decisionmaking. *First*, the Commission's attempt to dodge the issue whether it had the power to issue the Order itself contravenes the APA, whatever the answer to that question may be. An agency cannot tax the regulated to support a regulatory initiative without at least assuring them—and itself—that the initiative is legal to begin with.

*Second*, the Order's fake "allocation" of CAT costs is no more defensible than the one rejected last July. Like the 2023 Order, the 2026 Order greenlights the SROs to offload all the costs of the CAT onto broker-dealers, making its two-thirds-one-third "allocation" a meaningless placeholder. And like the 2023 Order, the 2026 Order does not even acknowledge this is a massive change in SEC policy, much less offer a reasonable defense for it. The only difference is that the 2026 Order now forces the SROs to pass through these costs "indirectly" by "increasing existing fees," rather than "directly" by imposing "a new fee." The APA demands more than such empty wordplay.

*Third*, the 2026 Order fails to meaningfully grapple with the fallout from its unlawful 2023 predecessor. Acting under the auspices of the 2023 Order, the SROs took over $300 million from broker-dealers to fund the CAT. Yet despite previously assuring this Court that it could compensate broker-dealers for such illegal exactions, the Commission waved away a request for a refund on the erroneous suggestion that the 2023 Order was lawful until the second this Court's vacatur took effect. That response both overlooks a critical part of the problem before the SEC and rests on a fundamental misunderstanding of the law.

*Fourth*, the reason the SEC hurried out this error-laden funding model is a critical defect in its own right. According to the Commission, it had to resurrect the 2023 Order's vacated funding model for two more years because the SROs had threatened they would defund the CAT otherwise. But as the SEC (and SROs) have repeatedly asserted in the past, the SROs are required to maintain (and thus fund) the CAT regardless of whether a funding model is in place—which is why they did so from 2016 until 2024. In folding to the SROs' bluff now, the Commission engaged in a fundamental error of law, or at least an unexplained change in position.

Each of these defects calls for the same remedy as the last time—vacatur. And that default remedy is particularly appropriate here, as the SEC cannot cure the defects in its decisionmaking when the CAT and its taxes are unlawful.

17

## ARGUMENT

## I.    THE ORDER EXCEEDS THE COMMISSION'S AUTHORITY.

The SEC lacked statutory authority to issue the 2026 Order for two fundamental reasons. *First*, the Commission has no authority to force broker-dealers to fund a surveillance system that is itself unauthorized. *Second*, even if the CAT itself fell within the SEC's authority, the Commission has no power to tax broker-dealers to pay for that regime. And contrary to the SEC's prior assertion, nothing in § 78y precludes this Court from vacating the 2026 Order based on either of these fundamental flaws.

### A.    The Order is unauthorized because the CAT exceeds the Commission's statutory authority.

It is common ground that the Commission has no authority to tax broker-dealers to support an illegal operation. So if the CAT itself falls outside Congress's delegation of powers to the SEC, the Order necessarily does, too. And that is not a hard question: The Commission's textual hook for the CAT—a 1975 statute allowing the SEC "to facilitate the establishment of a national market system" by requiring the SROs "to act jointly" in "regulating" that "system"—does not authorize anything like the CAT under ordinary interpretive principles, let alone with the clarity required under the major questions doctrine. § 78k-1; *see* Order 13410 & n.3, 13481 & n.1139.

### 1.    The CAT's lack of clear congressional authorization is fatal under the major questions doctrine.

The SEC has conceded there is no "express authorization for CAT by Congress." 88 Fed. Reg. at 62673; 23-13396 Doc. 96 at 55. That concession is understandable, as nothing in § 78k-1 even mentions surveillance systems, let alone something like the CAT. That concession is also fatal, for the major questions doctrine requires "Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Given the conceded lack of "a clear statement" here, the only question is whether the CAT is a matter of deep political and economic importance. *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). It is.

**a.**    The CAT's *political* significance is undeniable. After all, a majority of the SEC has described this "omnibus surveillance system that tracks every investment move of its citizens" as something from out of "a dystopian state." Peirce & Uyeda, *supra*.

That is not hyperbole. Prior to the CAT's creation, the SEC lacked "direct access" to individual "SRO audit trails." 77 Fed. Reg. at 45729. Instead, the Commission had to make "requests" to the SROs for the information it needed. *Id.* The SEC's surveillance activities were therefore limited to "'narrowly focused enforcement investigations that generally relate to trading in individual securities.'" *Id.* at 45727 n.52.

Frustrated by having to rely on "investigations based on particularized suspicion of wrongdoing," *id.* at 45792, the SEC ordered the creation of the CAT to provide it with "unfettered access to" a "single centralized database" for its own "regulatory purposes," *id.* at 45775. That is akin to a shift from the FBI asking local police to be on the lookout for the getaway vehicle to installing a GPS tracker on every car in America.

The result was a database that remains "the first of its kind, both in substance and in scale." 91 Fed. Reg. 25700, 25719 (2026). The CAT, which now accumulates almost 800 billion records *per day*, collects and stores the trading history of every American who trades equities or options. Order 13474. According to the SROs, the CAT "is an unprecedented construct for the securities industry," with "no other comparable system or database of this scale … and complexity exist[ing] anywhere in the world." Letter from CAT LLC 8-9.

That new regime—built on the idea that "the government has the right to monitor every purchase and sale decision without suspicion of wrongdoing"—poses a serious threat to "liberty and privacy." Peirce, *Cattywampus: Statement on the CAT Concept Release* (Apr. 16, 2026), https://www.tinyurl.com/3jeunhx9. The CAT houses "voluminous amounts" of sensitive information "in a single place … accessible to thousands" at the SEC and SROs—contractors included—"who will be able to watch investors' every move in real time." Peirce, *Statement*

*in Response to Release No. 34-88890, File No. S7-13-19* (May 15, 2020) (2020 Statement), http://tinyurl.com/2h928jw4. In doing so, it offers "a window into a person's deepest thoughts and core values," as trades, "particularly when aggregated," can reveal support for, or opposition to, things such as "carbon emissions, dictatorial regimes, alcohol, tobacco, guns, pornography, discrimination, poor treatment of workers, abortion, the military," and so on. *Id.* Some investors boycott military contractors, for instance, while others invest in gun companies. *Id.* And the CAT lets the SEC track, collate, and study these choices over a person's lifetime.

Even in the wake of recent SEC measures to reduce the amount of information collected, every American transacting on the U.S. securities markets is tagged with an ID number, and the Commission may access associated personally identifiable information through the SROs and broker-dealers. 91 Fed. Reg. 2164, 2168, 2173-74 (2026). Thus, the "core reality remains unchanged"—"no matter how many procedural steps" someone must hurdle to "access the personally identifiable information linked to those trades,"  an "ill-intentioned regulator" at the SEC or SROs "with access to the data may be able to navigate those steps to stalk personal or political enemies." Peirce, *Cattywampus*, *supra*; *see id.* (noting that even with "[t]he introduction of the CCID as a substitute for social security numbers," "CCIDs are still linked to individual traders")

21

Even if each one of the thousands of SEC and SRO staff with access to this data could be trusted, the CAT comes with significant "cyber vulnerabilities"—a fact every Commissioner has recognized. Peirce & Uyeda, *supra*; *see* Atkins, *Prepared Remarks Before SEC Speaks* (May 19, 2025), https://tinyurl.com/4pez7he9. The trove of information contained in the CAT is inherently "an attractive target" for hackers and other malign actors, who will be able "to track investors' market moves" and thereby "misappropriate proprietary and confidential trading strategies." Peirce, 2020 Statement, *supra*. The CAT also remains particularly "vulnerable," as just "one security lapse involving only one of the CAT's thousands of users could compromise the entire database." *Id.*

And it is not as if the SEC has a particularly stellar record of cybersecurity. To the contrary, a recent inspector-general review found that the Commission remains woefully out of compliance with federal cybersecurity standards, making its networks dangerously susceptible to hackers—a problem vividly illustrated by the commandeering of the SEC's X account to spike the price of Bitcoin in 2024. Weinstein et al., *SEC Had a Fraught Cyber Record Before X Account Was Hacked*, Bloomberg Law (Jan. 11, 2024), http://tinyurl.com/235tfh95. Closer to home, another inspector-general report from last year determined that "the SEC could not proactively detect emails containing CAT data and prevent

22

them from leaving the agency." Office of the Inspector General, *Additional Oversight and Monitoring of the SEC's CAT Usage Is Needed* (Mar. 31, 2025), https://tinyurl.com/mpjwa9ca. All this means "unauthorized access to, or disclosure of, the information contained in the CAT is almost certainly just a matter of time." Peirce, 2020 Statement, *supra*.

Given these perils to privacy and liberty, the CAT is a "contentious" program, to say the least. Peirce, *Cattywampus*, *supra*. That is why a raft of *amici*—including a former attorney general, Members of Congress, and nearly half the States—urged this Court to put an end to it in reviewing the 2023 Order. *See* 23-13396 Docs. 51, 61, 65, 67, 69, 74, 75, 90, 91, & 135. That is why major civil-liberties and industry organizations ranging from the ACLU to the NCLA have criticized or challenged the CAT elsewhere.[3] That is why the CAT has been the subject of multiple committee hearings, proposed legislation, and direct legislator objections.[4] And that is why the SEC itself is engaging in a "comprehensive reassessment of the CAT" today, including whether it is lawful. Order 13456.

---

[3] *See, e.g.*, Dkt., *Davidson v. Atkins*, No. 24-cv-197 (W.D. Tex.); Letter from ACLU (Dec. 16, 2019), https://perma.cc/2V77-6ER7.

[4] S*ee, e.g.*, H.R. 4551 (2023); H.R. 2039 (2021); H.R. 4785 (2018); Oversight of the SEC: Hearing Before the Comm. on Fin. Servs. (Sept. 24, 2024), https://tinyurl.com/5y8pt2k2; Letter from Sen. Kennedy et al. (July 24, 2019), https://perma.cc/FF8H-CKDG.

Given these stakes, a bill proposing to create the CAT through legislation would obviously have triggered an "'earnest and profound debate'" both inside and outside "the halls of Congress." *Nebraska*, 600 U.S. at 503-04. And given our constitutional structure, "a reasonable interpreter would not expect Congress to pawn such a big-time policy call off to another branch." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 641 (2026) (plurality) (cleaned up).

**b.**      The CAT's *economic* significance is likewise undeniable. Even by the SEC's conservative 2016 estimates, broker-dealers have had to spend at least "$2.2 billion" on "one-time" start-up costs and "$1.5 billion" in "ongoing costs" each year thereafter to comply with the system's data-reporting requirements. 81 Fed. Reg. at 84859. These compliance costs aside, the CAT's development and operation have required over $1 billion to date. Order 13464. And the Commission thinks the CAT will need around $150 million every year while the 2026 Order is in effect, a sum eclipsing the annual budgets of many federal agencies. Order 13466; *see* USASpending, https://www.usaspending.gov/agency.

This multibillion-dollar tab puts the CAT in the heartland of major programs requiring express statutory authorization. The Clean Power Plan, for instance, would have imposed "billions of dollars in compliance costs," *West Virginia v. EPA*, 597 U.S. 697, 714 (2022)—specifically, "$5-$8 billion." *Id.* at 774 n.6 (Kagan, J., dissenting). The same was true for OSHA's vaccine mandate,

24

*NFIB v. OSHA*, 595 U.S. 109, 120 (2022)—there, "nearly $3 billion." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021). Under even the most conservative estimates, the costs of the CAT have outstripped even those enormous sums: By the SEC's own calculations, the CAT has saddled broker-dealers with over $17 billion in compliance costs since 2016, and that is on top of the hundreds of millions in fees unlawfully taken under the 2023 Order.

Thus, by virtually every metric—including "the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion"—the CAT qualifies as an exercise of power requiring an express delegation of authority. *Nebraska*, 600 U.S. at 501 (cleaned up). Because the SEC admits the Exchange Act offers no "'clear congressional authorization' for such a program," the CAT—and thus the Order—exceed the Commission's authority. *Id.* at 506.

### 2.    Ordinary interpretive tools confirm the CAT is unlawful.

Major questions doctrine aside, construing § 78k-1 to authorize the CAT is not "the best"—or even a plausible—reading of that statute under ordinary "interpretive tools." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). To the contrary, that interpretation is at odds with statutory text, history, and structure.

On text, § 78k-1 directs the SEC "to facilitate the establishment of a national market system for securities," § 78k-1(a)(2)—including by ordering the SROs "to act jointly with respect to matters as to which they share authority under this chapter in planning, developing, operating, or regulating a national market system." § 78k-1(a)(3)(B). But the Commission can do so only "in accordance with the findings and to carry out the objectives set forth in paragraph (1) of this subsection." § 78k-1(a)(2). In other words, § 78k-1(a)(1)'s findings and objectives limit what the SEC can do to establish "a national market system."

Nothing in § 78k-1(a)(1)'s description of a national *market* system, however, supports the establishment of a national *surveillance* system such as the CAT. Rather, its enumerated objectives are focused exclusively on facilitating "efficient and effective market operations," the "efficient execution of securities transactions," and the "linking" of "markets" to "foster efficiency, enhance competition, increase the information available to brokers, dealers, and investors," and aid "the best execution of [investors'] orders." § 78k-1(a)(1). The SEC's purview under § 78k-1 is therefore confined to measures that "reduce the transaction costs associated with executing a securities trade—*e.g.*, by lowering broker commissions or bid-ask spreads." *All. for Fair Bd. Recruitment v. SEC*, 125 F.4th 159, 177 (5th Cir. 2024) (en banc); *see id.* at 173-74. The CAT, by contrast, only *decreases* trade efficiency by making transactions more expensive.

History points in the same direction. Since its 1975 enactment, § 78k-1 has never been deployed to implement any sort of SEC surveillance project. Indeed, the Commission has yet to identify *any* use of § 78k-1 to create a single previous audit trail. The fact that the SEC has never "found such power" in § 78k-1 before "is strong evidence that it does not exist." *Learning Res.*, 146 S. Ct. at 643.

Structure nails the coffin shut. Reading the generalities in § 78k-1 to authorize the CAT would render much of the specific statutory scheme governing SEC access to trading information meaningless. Specifically, § 78q gives the SEC (and SROs) some ability to review broker-dealer records, but subjects that power to a variety of limits. For example, the Commission may require broker-dealers to "keep" specific internal records—but only for "prescribed periods." § 78q(a)(1). Those records may be subject to SEC review "at any time, or from time to time"—but only through "reasonable periodic, special, or other examinations." § 78q(b)(1). And an SRO may share a "report of examination" concerning one of its broker-dealers with another SRO upon "request"—but only if the broker-dealer is a "member of" (or "participant" in) both SROs. § 78q(d)(2). The CAT blows this all to bits. Section 78q's careful guardrails on the review of broker-dealer records make no sense in a world where both the SEC and SROs enjoy "unfettered access" to a centralized database tracking all market activity. 77 Fed. Reg. at 45775.

Indeed, the fallout for § 78q is just one example of the larger problem with the SEC's theory. According to the Commission, § 78k-1 authorizes the CAT because the database involves the "SROs' shared authority" and "is intended to preserve and strengthen the securities markets and assure economically efficient trading, fair competition, and availability of trading information." Doc. 42 at 19 (cleaned up). But the same could be said for virtually *any* SEC action, causing § 78k-1 to swallow up the Commission's various other specific grants of authority. After all, the "shared authority" of the SROs "includes" the power "'to protect investors and the public interest.'" *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1138 (D.C. Cir. 2022). And presumably everything the SEC does is at least *intended* for "the protection of investors" or to "promote efficiency, competition, and capital formation," given the Commission's statutory mandate to account for those goals. § 78c(f).

Adopting the SEC's reading would therefore turn § 78k-1 into a roving police power, leaving the nominally independent agency free to do whatever it wants to the U.S. securities markets so long as it press-gangs the SROs into service. That cannot be right. Instead, § 78k-1's mention of "the protection of investors" and "the public interest," § 78k-1(a)(1)(C), "must be interpreted in light of the more specific purposes Congress listed" elsewhere, none of which concern a securities surveillance state, *All. for Fair Bd. Recruitment*, 125 F.4th at 179.

**B.    The Order is unauthorized because the SEC cannot tax broker-dealers to pay for the CAT regardless.**

Even if the Commission had the power to create the CAT itself, it would still lack the authority to tax American investors to pay for that surveillance system. Nothing in the Exchange Act suggests—much less clearly states—that Congress delegated its taxing power to the SEC in this area.

All agree *Congress* may authorize "agencies to indefinitely fund" their regulatory activities through transaction taxes (or "transaction-based fees") "specified by law." *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 433 (2024). After all, so long as "Congress controls how funds" are raised and spent, it, rather than the Executive, retains "the power of the purse," thereby avoiding "the very unification of the sword and purse" the Framers feared. *Id.* at 437-38, 440.

Here, however, *the SEC* claims Congress gave *it* the power to fund the CAT through a "'tax'" on securities "'transactions'" that the SROs will impose on all broker-dealers—and, in turn, their investor customers. Order 13430. That is no small matter. Congress does not lightly grant agencies the "power to tax"—something Alexander Hamilton described as "'the most important of the authorities proposed to be conferred upon the Union.'" *Learning Res.*, 146 S. Ct. at 637-38. Instead, because the SEC's "purported delegation involves the core congressional power of the purse," the major questions doctrine applies "with particular force." *Id.* at 639 (plurality); *see Nebraska*, 600 U.S. at 505.

That makes sense. Regardless of whether one uses the major questions doctrine, it is obvious that if "Congress were to relinquish" that "'most complete and effectual weapon'" to "another branch, a 'reasonable interpreter' would expect it to do so 'clearly.'" *Learning Res.*, 146 S. Ct. at 639 (plurality); *see id.* at 642 (majority) ("[H]ad Congress intended to convey the distinct and extraordinary power to impose tariffs"—*i.e.*, taxes—"it would have done so expressly").

The securities laws confirm as much. In § 78ee, Congress *expressly* gave the SEC the power to recoup "appropriat[ed]" expenditures on its regulatory initiatives by "collect[ing] transaction fees," thereby keeping the Commission's budget (and its exactions on investors) under the watchful eye of the people's representatives. § 78ee(a).

Section 78k-1, by contrast, contains no such delegation. At most, it lets the SEC compel the SROs "to act jointly" in "regulating a national market system." § 78k-1(a)(3)(B). But as the government recently "concede[d]," "the Securities and Exchange Commission cannot tax the trading of securities, even though it is expressly authorized to 'regulate the trading of securities.'" *Learning Res.*, 146 S. Ct. at 643 (quoting § 78i(h)(1)) (ellipsis omitted). The Commission therefore cannot claim that in § 78k-1, "Congress hid a delegation of its birthright power to tax within the quotidian power to 'regulate.'" *Id.*

Because § 78k-1 is the only authority the 2026 Order invokes, that funding regime must fall. Order 13410 & n.3, 13481 & n.1139. That is true whether this Court applies the major questions doctrine (as there is no "'clear congressional authorization'" in § 78k-1 for the SEC's "extraordinary assertion of the power to impose" taxes), *Learning Res.*, 146 S. Ct. at 642 (plurality), or ordinary interpretive principles (as there is no "statute in which the power to regulate includes the power to tax"), *id.* at 643 (majority). For that independent reason, the Order is unlawful regardless of the CAT's validity.

And the stakes here extend far beyond dollars and cents. One reason the CAT—at least as it exists under the Order—is so "dystopian" is that it is "essentially funded by the public but operates outside the direct oversight or authorization of Congress." Peirce & Uyeda, *supra*. Rather than including CAT in its budget and obtaining an appropriation from Congress, the Commission used the Order to outsource the database's funding to the SROs so as to effectively immunize it from congressional appropriations or oversight. Due to this taxation-by-proxy, Congress cannot exercise any substantive control over the CAT through the appropriations process. And because these taxes will be borne largely, if not entirely, by broker-dealers (and investors) with no representation in the decisionmaking process, no alternative fiscal check will exist either. *ASA*, 147 F.4th at 1276.

Especially given the SEC's penchant for reading delegations of substantive authority for all they are worth, *see supra* Pt. I.A, it is critical that Congress retain its hold on the purse strings. If the SEC's approach prevails here, there will be nothing left to stop it from hijacking the SROs to carry out any aspect of its regulatory agenda—from cryptocurrencies to climate change—and then funding those schemes through unaccountable taxes on investors. This CAT "comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

## C.    The Commission's timeliness objection fails.

Given its lack of statutory authority here, the SEC has sought to evade judicial review entirely, claiming petitioners' "authority challenge is time-barred" because "the 60-day statutory clock to challenge the rule mandating CAT (in 2012) or the order approving the Plan (in 2016) expired years ago." Doc. 42 at 17 (citing § 78y). But petitioners are not seeking vacatur of those SEC actions. Rather, they are asking this Court to set aside *only the 2026 Order*, and no one can deny their challenge to that edict is timely. *Supra* at 6.

To be sure, one of the *reasons* this Court should vacate the Order is that the CAT itself is unlawful, such that the Order forcing broker-dealers to pay for this unauthorized regime is necessarily unlawful as well. But § 78y contains no time limits on the *arguments* that can be made in support of a timely challenge to a particular "order." § 78y(a)(1), (b)(1).

32

Rather, the only limit § 78y places on "[o]bjections" to an order is that this Court may not consider an "objection … unless it was urged before the Commission or there was reasonable ground for failure to do so"—a restriction plainly not at issue here. § 78y(c)(1); *see* Order 13456 (discussing "comments" contending that "the CAT … exceeds the Commission's statutory authority"). So as in other contexts, this Court's authority to review an "'order'" under § 78y permits "review of any issue fairly encompassed within it." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 241-42 (2021).

In any event, the SEC concedes that if the Order "'reapplied'" the earlier SEC actions creating the CAT, it "restart[ed] the 60-day statutory clock" to challenge those edicts. Doc. 42 at 17 (brackets omitted). That is exactly what the Order does, as *Consumers' Research v. FCC*, 88 F.4th 917 (11th Cir. 2023), shows. There, as here, the petitioners challenged an agency action (the "Contribution Factor") approving a funding proposal of a nominally private entity. *Id.* at 921. There, as here, the agency action "[t]hen" would be "used to determine the amount of individual contributions" the petitioners owed. *Id.* And there, as here, the agency then argued the petitioners' "true challenge" was "to the constitutionality of the entire statutory delegation scheme" rather than the "Contribution Factor specifically," such that they were "far beyond their 60-day jurisdictional limit." *Id.* at 922.

33

This Court disagreed, reasoning that "even if" it accepted the agency's portrayal of the challenge, the "'Contribution Factor re-applies the statutory delegation'" and therefore "'restarts the sixty day clock.'" *Id.* (brackets omitted). As it explained, "'limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity.'" *Id.* So too here: Petitioners are "'ultimately affected by'" the earlier SEC actions creating the CAT because they now must pay for that database. *Id.*

In an attempt to distinguish *Consumers' Research*, the SEC has insisted the Order itself "does not reapply" those prior actions because only "subsequent fee filings" will create a "payment obligation." Doc. 42 at 18. But that is incorrect. As in *Consumers' Research*, the Order "triggered the issuance of invoices imposing the fees"; indeed, the SROs began assessing broker-dealers for new CAT fees just a few weeks after the Order was approved. *Id.* at 17. And far from a "mere[]" tweak to "the Plan's general framework for allocating CAT costs," *id.* at 18, the Order answered the critical question left open since 2016—"the percentage that [SROs] and broker-dealers would pay." *ASA*, 147 F.4th at 1271. The Order is therefore materially indistinguishable from the Contribution Factor in *Consumers' Research*, which had "not yet been applied to" the petitioners, but would later be "used to determine the amount of individual contributions" in particular invoices. 88 F.4th at 921-22; *see* 47 C.F.R. §§ 54.709(a)(3), 54.713(b).

Nor does it matter that the Commission theoretically can "suspend" SRO "fee filings." Doc. 42 at 18. The SEC *has not* suspended any fee filings to date, as the whole point of the Order is to make broker-dealers pay for the CAT over the next two years while the Commission conducts its comprehensive review. More fundamentally, "the Commission's decision not to institute review proceedings of fee filings is immune from challenge," so this is the only chance for its authority here to "be subject to judicial review." *ASA*, 147 F.4th at 1276.

In all events, the SEC's timeliness objection has nothing to do with the Commission's statutory authority for the 2026 Order itself, as opposed to its authority for the CAT. *See supra* Pt. I.B. So even if this Court holds that petitioners cannot question the SEC's authority to create the CAT, they can at least ask where Congress gave the Commission the right to tax them to prop up that surveillance regime.

## II.    THE ORDER IS ARBITRARY AND CAPRICIOUS.

Even if the CAT were authorized, the Order would still be unlawful under the APA. In its haste to get the Order out, the Commission repeatedly departed from the bedrock administrative-law requirement that agency actions be both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

35

### A. The Order's treatment of the SEC's lack of statutory authority for the CAT violates the APA.

To start, whatever the *answer* to whether the CAT is lawful, the SEC had to at least address the *question*. To provide "'adequate reasons for its decisions,'" an "agency must rebut 'vital relevant' or significant comments." *Hewitt v. Commissioner*, 21 F.4th 1336, 1343 (11th Cir. 2021). Those include ones that "'challenge a fundamental premise underlying the proposed agency decision,'" such as the agency's authority to take that action. *Id.* at 1351. In fact, an agency must "'examine'" whether it "had statutory authority" even when "'no one objects,'" as that is "a 'key assumption'" it must "'justify'" "as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule.'" *NRDC v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014). To do otherwise would fail "to consider an important aspect of the problem." *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In the Order, however, the SEC never disagreed with commenters' objection "that the CAT … exceeds the Commission's statutory authority." Order 13456. To the contrary, it professed to "take[] seriously" these "fundamental concerns," and promised they would "inform" its "comprehensive reassessment of the CAT." *Id.* Yet despite acknowledging these serious questions, the SEC put its head in the sand and announced it was "not reconsidering or revisiting the decision to establish" the CAT in approving a "funding model." *Id.*

36

The APA requires more. Before the Commission could issue a new tax on broker-dealers to pay for the CAT, it had to provide a reasonable explanation why it should still exist, and why they should still fund it—even temporarily. In other words, the SEC had no choice but to "reconsider[] or revisit[]" its decision to create the CAT in issuing the 2026 Order. *Id.* That is why it did so in the nearly identical 2023 Order, which explained why the SEC thought "the creation of CAT falls within [its] authority under the Exchange Act." 88 Fed. Reg. at 62672; *see id.* at 62672-73. This time, though, the SEC gave these fundamental concerns the back of the hand—presumably in a futile attempt to avoid review of the CAT's legality. After all, had the Commission even "implicitly revisit[ed]" the authority issue, it would be further evidence that petitioners' challenge is timely under "the 'reopening' doctrine" in addition to the reasons above. *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 992 (D.C. Cir. 2024); *see supra* Pt. I.C.

To be sure, the SEC also noted it "has taken the position elsewhere" in litigation that these "objections are inconsistent with current judicial precedent." Order 13456 n.880. But given the Commission's claim that it was "not reconsidering or revisiting" the CAT's lawfulness, that conclusory remark cannot carry its burden to address the fundamental question here under the APA. Order 13456. Having chosen the path of the ostrich to attempt to avoid judicial review, the SEC cannot claim that it actually addressed the issue.

In any event, with a majority of Commissioners conceding the CAT is at best perched on a thin limb, the SEC owed broker-dealers an explanation for why they must pay for it. It gave them a string-cite instead. Order 13456 n.880.

### B. The Order's "allocation" of costs violates the APA.

The CAT's unlawfulness aside, the 2026 Order's faux "allocation" of CAT costs is no more defensible than its 2023 predecessor's. As this Court explained last July, the central defect in the 2023 Order's "allocation" was that it allowed the SROs "to pass through all of their CAT costs onto the broker-dealers" without any "justification" for this significant "'change'" in SEC positions. *ASA*, 147 F.4th at 1274-75. The same flaw persists in the "substantively identical" 2026 Order the SEC rushed out. Order 13415. In both effect and inadequate explanation, the Order here is the same as the one this Court vacated last year.

1.    Start with the Order's *effect*. Like the 2023 Order, the 2026 Order only pays lip service to "allocat[ing]" CAT costs "between the Participants and Industry Members." Order 13421. While the SEC this time barred the SROs from "directly passing through their one-third share of CAT fees through a new fee" to broker-dealers, it still allowed them to "pass[] through their share of CAT costs indirectly" "by increasing fees," such that the CAT could be maintained through "'broker-dealer only funding.'" Order 13413, 13422. Given that reality, the Order's ban on direct pass-throughs is meaningless.

Like the 2023 Order, the 2026 Order will have significant real-world consequences. The latest Order saddles FINRA—the largest of the SROs—with 40% of the SROs' share of CAT costs. Order 13431. But since FINRA is a non-profit, it depends "on regulatory fees from its members for funding." Order 13430. So everyone, the Commission included, knows that "CAT fees would be an expense that FINRA would need to recover in some manner." Order 13467 n.980. With the prohibition on direct pass-throughs in place, it therefore will be no surprise if FINRA pursues another way to accomplish "a 100% pass-through" of its 40% share—ensuring broker-dealers will be saddled with at least 79% of all CAT costs. *ASA*, 147 F.4th at 1279; *see* Order 13430, 13467.

While FINRA may be "the only nonprofit" among the SROs, the 2026 Order, like its predecessor, "does not limit the potential for 100% pass-through costs to FINRA" alone. *ASA*, 147 F.4th at 1279. Other SROs remain free to take the same tack, including ones that even today insist that the Commission cannot adopt even a "direct pass-through prohibition." Order 13422. The Order's two-thirds-one-third allocation is therefore illusory on its face, meaning broker-dealers (and investors) could again "'effectively bear 100% of the CAT allocation.'" *ASA*, 147 F.4th at 1272. The result is a world in which the SROs "govern the CAT and set its budget, but the broker-dealers may be on the hook for its entire cost." *Id.* at 1276.

And like the 2023 Order, the 2026 Order's "shift from a *mandate* that both [SROs] and broker-dealers fund the CAT to an *allowance* for [SROs] to pass through 100% of their CAT costs constitutes a major CAT policy change." *Id.* at 1274. As this Court explained last July, both "the 2023 Funding Order" and "[a]ll prior Commission CAT promulgations stated that [SROs] would be responsible for some 'allocation of the costs.'" *Id.* at 1274-75. While the 2026 Order continues to mouth those words, Order 13421, its "allowance for [SROs] to pass through 100% of their CAT costs … is inconsistent with" those prior directives' "requirement that both [SROs] and broker-dealers fund the CAT" *ASA*, 147 F.4th at 1275. It is therefore "internally inconsistent … and inconsistent" with prior SEC positions. *Id.* at 1274. "[T]he costs of the CAT" cannot in any sense "be allocated between the Participants and Industry Members" if the Participants do not have to actually bear any costs. Order 13421.

2.      The 2026 Order's *explanation* for that inconsistency is just as deficient as its predecessor's. In theory, the SEC could have admitted it was "'changing position'" and tried to offer "'good reasons for [its] new policy'" of broker-dealer-only funding. *ASA*, 147 F.4th at 1275. Instead, it insisted there had been no change at all. Order 13413. That is "no reasoned justification" the SEC's "about-face." *ASA*, 147 F.4th at 1275. Indeed, the SEC's four defenses for its pass-through regime are themselves textbook instances of arbitrary reasoning.

**a.**    The SEC first denied the existence of any shift in policy. In its telling, the Plan's "cost-sharing premise" applied only to "the *initial* allocation of costs" between SROs and broker-dealers, always leaving each SRO free to "indirectly pass through its share of CAT costs" through fee increases. Order 13413 & n.47. In other words, the scheme all along was for the SROs to "recover … the portion of [CAT] costs that the Plan allocates to them." Order 13413.

This Court rejected that revisionist history less than a year ago. Examining the same text from the prior directives the 2026 Order quotes, this Court explained that the "language permitting [SROs] to recover their CAT costs from members" was consistently "used in conjunction with the understanding" that they "were to *share* the costs." *ASA*, 147 F.4th at 1275. The SEC's misreading has moved from its brief in *ASA* to a footnote in the Order, but it is still wrong. *Compare* 23-13396 Doc. 96 at 25, *with* Order 13413 n.47.

**b.**    With past practice against it, the Commission added that it would be "inequitable to single out" the SROs and "prevent only them from attempting to recover their costs" because "the Plan contains no restriction on the ability" of broker-dealers to pass their CAT costs on to investors. Order 13422. But by that logic, the SEC should not even have prohibited *direct* SRO pass-throughs, as that too "single[s] out" the SROs for a special pass-through limitation that does not have an analogue for broker-dealers. *Id.*

41

Confirming the point, the Commission unsuccessfully tried to defend the 2023 Order on the same grounds, claiming that order's allocation-in-name-only was reasonable because broker-dealers "may be able to … pass[] their CAT fees through to their customers." 88 Fed. Reg. at 62637; *see* 23-13396 Doc. 96 at 26. This Court necessarily rejected that reasoning, as it found "no reasoned justification or explanation for the Commission's" decision to allow "broker-dealer-only funding" of the CAT. *ASA*, 147 F.4th at 1275. And it was right to do so. Both then and now, the SEC compares apples to oranges. The ability of some broker-dealers to recoup costs from *investors* says nothing about whether the allocation of CAT costs between *the SROs and broker-dealers* is permissible. And only the latter falls within the SEC's purview here.

The Commission itself made this point in the 2023 Order, explaining that the CAT funding model only "covers the allocation of CAT fees for operating the CAT among Participants and Industry Members and does not address whether Industry Members may pass through their CAT fees to their customers." 88 Fed. Reg. at 62682. That makes sense: Policing "the business decisions" of individual broker-dealers "to finance the costs they incur to comply with their regulatory obligations" is not part of the SEC's day job. Order 13413. Ensuring that there is a genuine "'allocation of the costs' of CAT among the Participants and Industry Members," by contrast, falls squarely within its wheelhouse. *Id.*

42

That is why the Order prohibits the SROs—but not broker-dealers—from "directly passing through" their "share of CAT costs"; otherwise, there would not be "an 'allocation of costs' of the CAT as contemplated by the Plan." *Id.* In other words, forbidding the SROs to offload their share of the CAT costs onto broker-dealers—whether directly or indirectly—is no more "inequitable" than allocating the costs of the CAT among the two groups in the first place.

**c.**    Turning from fairness to feasibility, the Order asserted that "as a practical matter," it would be "difficult to effectively amend" the Plan to prevent the SROs "from ever indirectly passing through any CAT costs." Order 13422. But the Commission could just add to the 2026 Order's prohibition on SRO pass-throughs via "a new fee," Order 13419, a similar prohibition on "increasing existing fees" to recover their share of the costs.

Confirming the point, the SEC *has* previously blocked the SROs from recovering historical CAT costs—through *any* fee increase, new or existing—unless they met specific CAT-implementation deadlines contained in the Plan, known as the "financial accountability milestones." 85 Fed. Reg. 31322, 31331, 31348-49 (2020). The Order never explained why the Commission could not take the same approach here.

43

To be sure, the Commission has since suggested that even those milestones might not prohibit indirect pass-throughs of CAT costs by increasing existing fees. Doc. 42 at 14. But that assertion—made in the context of a stay opposition rather than the Order—runs headlong "into a bedrock 'principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action.'" *ASA*, 147 F.4th at 1276.

In any event, that is not what the SEC previously said. Rather, the milestones "reduce[]" the amount of historical CAT fees the SROs "are entitled to collect"—all the way up to a "100%" reduction if certain deadlines are missed. Plan § 11.6(a)(ii)-(iii). Those requirements would be meaningless if the SROs could forfeit their entitlement to recover historical CAT fees by blowing those deadlines but then still seek full recovery simply by increasing existing regulatory fees. That is why the SEC calculated that the SROs' failure to satisfy the milestones would "shift[]" "up to $120MM" from broker-dealers to the SROs—a conclusion that would be incomprehensible if the SROs could shift those amounts right back through fee increases. 85 Fed. Reg. at 31342. And that is why the SROs have repeatedly sought exemptive relief from the milestones rather than just end-running them by increasing existing fees. *See, e.g.*, CAT LLC, Request for Exemption from FAM 4 Requirements (May 22, 2023), https://tinyurl.com/2ta6zsvt.

44

To the extent the SEC now suggests the SROs would just try to evade a prohibition on indirect pass-throughs of CAT costs by claiming that their fee increases were for other reasons, anticipated evasion of regulatory requirements is not reasoned decisionmaking under the APA. The Commission ignores that the SROs as regulators are duty-bound "to follow the law" even when no one is looking over their shoulder. *Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025). That is why the SROs are fighting so hard to defend the 2026 Order—they know a ban on indirect pass-throughs would have real teeth. And if the SEC cannot "sanction[] unlawful conduct by third parties," it cannot presume it either. *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1043 (9th Cir. 2019).

**d.**     Taking a different tack, the Order claims the Commission can police any SRO "attempts" to "indirectly pass through" CAT costs through the "fee filing process," such as by requiring descriptions of "the reasons" for SRO fee increases. Order 13441; *see* Order 13422 (similar). But the SEC's "*post hoc* review of fee filings" alone—*without* an upfront ban on SRO pass-throughs—remains "insufficient" for the reasons this Court gave last July. *ASA*, 147 F.4th at 1276. Among other things, (1) the "fees take effect immediately upon filing" unless the SEC suspends them; (2) the SEC's review of fee-filings does not focus on "cost allocation as a whole"; and (3) an SEC decision to allow a pass-through filing "will not be subject to judicial review." *Id.*

Thus, in suggesting the fee "filing process" by itself can protect broker-dealers, the Order just serves up a rewarmed version of an argument this Court rejected last summer. Order 13413, 13423. That misplaced reliance on the fee filing process does, however, create another internal inconsistency. The Order simultaneously maintains the SEC will both be (1) powerless to prevent the SROs from engaging in indirect pass-throughs, yet (2) able to check those pass-throughs in the fee-filing process. Order 13413, 13422-23. The SEC cannot have it both ways: If the Commission thinks it can stop indirect pass-throughs on the back-end, it must explain its refusal to forbid them on the front.

### C. The Order's refusal to remedy unlawfully collected fees violates the APA.

Compounding the problem with its sham "allocation," the SEC failed to consider another "important aspect of the problem" before it—the fact that the SROs had collected over $300 million in fees under the unlawful 2023 Order. *State Farm*, 463 U.S. at 43. Because those nine-figure sums should never have been taken in the first place, it was incumbent on the SEC to account for them in its "allocation" of CAT costs going forward. The Commission has essentially admitted as much. In denying a recent petition to "return" the leftover unspent money collected under the 2023 Order, the SEC promised to "consider" that "important" issue in addressing the SROs' proposed 2026 Order. Letter from the SEC 3 (Feb. 18, 2026), https://tinyurl.com/mrxsufjf; *see id.* at 1-2.

The Commission has made even stronger representations to this Court. In successfully opposing a stay of the 2023 Order, it told the Court that petitioners faced no "risk of irreparable harm" because "any overpayment of fees under" the 2023 Order "could be addressed" through "future regulatory initiatives." 23-13396 Doc. 120 at 3; *see id.* at 18-19; *see also* Doc. 42 at 21 (similar promise in opposition to stay of 2026 Order). Yet when petitioners asked the Commission to make things right in the 2026 Order, the SEC refused. Order 13447.

In doing so, the SEC committed yet another violation of the APA. In denying a request for a "refund" for improperly paid "fees," an agency must comply with "its ordinary burden" under the APA to "'articulate a satisfactory explanation' for its action." *United Airlines, Inc. v. TSA*, 20 F.4th 57, 63 (D.C. Cir. 2021). Yet here, the SEC barely gave petitioners the time of day. Instead, the Commission merely asserted that it "does not believe that it is necessary or appropriate" for the 2026 Order to "address CAT fees already collected by the SROs" because that collection occurred through prior SRO fee "filings" that "are not at issue in this order." Order 13447. But that is a *non sequitur*. As the SEC admitted, those filings (and the fees collected pursuant to them) rested on "the 2023 Funding Model Order," *id.*—a subject very much at issue in the "sub-stantively identical" 2026 Order. Order 13415 (addressing comments "regarding the 2023 Funding Model" given the orders' similarities).

47

While the SEC also observed that the fees were collected "prior to the Eleventh Circuit's vacatur" of the 2023 Order, that is yet another *non sequitur*. Order 13447. This Court's ruling last July did not render a previously lawful order unlawful, but rather confirmed that the 2023 Order is—and always was— a legal nullity. *See, e.g.*, *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 549 (1991) (Scalia, J., concurring in the judgment) (explaining "the judicial power" is limited to "discerning what the law *is*, rather than decreeing what it is today *changed to*"). The same goes for the SRO fee filings predicated on that order. *See* § 78s(b)(3)(C) (filing effective only "to the extent it is not inconsistent with … applicable Federal and State law"). Because the SEC's refusal to provide a refund ignored a critical aspect of the problem before it and rested on a fundamental misunderstanding of the law, the Order contravenes the APA. *See, e.g.*, *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 956 (D.C. Cir. 2016) (holding agency's refusal to provide refund based on legal error was arbitrary and capricious).

### D.    The Order's erroneous assumption that SROs need not maintain the CAT in the absence of a funding model violates the APA.

Finally, the *reason* why the SEC declined to actually "reconsider the allocation" in the 2023 Order is an error in its own right. *ASA*, 147 F.4th at 1280. Rather than take the hint from this Court, the SEC rammed through a "substantively identical" funding model proposed by the SROs just a month after this Court's decision because it wrongly thought it had no other choice. Order 13415.

48

Specifically, the SROs had "caution[ed]" the SEC "that it 'should not be assumed that any Participant will voluntarily agree to loan funds … once the operational reserve is exhausted,' and that, 'absent Commission action to approve a viable funding model … , there is significant uncertainty regarding the continued operation of the CAT." Order 13412. After quoting that threat, the SEC explained that the 2026 Order's "interim funding model" was therefore "needed to ensure" the CAT's "continued existence and funding during the period in which the Commission conducts its review." *Id.* To do otherwise, the SEC feared, would be "potentially destabilizing." *Id.* In other words, the SROs threatened to stop funding the CAT, so the Commission ordered broker-dealers to pay instead.

The SROs' use of the CAT as a hostage not only drove the hasty rollout of the Order, it also shaped its substance. In agreeing with the SROs that maintaining a "reserve" was necessary, the SEC again recited their warning "that there should be no presumption that every [SRO] will voluntarily agree to loan funds" once the reserve was gone. Order 13444. Emphasizing that "the CAT needs to have a stable funding source," the SEC concluded that it was not aware of "an alternative solution" apart from the "reserve" "to make sure that CAT remains funded and able to pay its bills." *Id.*; *see* Order 13445 (concluding that the "reserve" is needed "to ensure that future funding is secured").

But all this rested on an error of law, for the CAT has had a "defined funding source" from the beginning: the SROs, who are legally required to maintain it whether or not a funding order (or reserve) is in place. According to the SEC at least, the Exchange Act compels the SROs carry out the Plan. *See* 81 Fed. Reg. at 84794 n.1736 (citing §§ 78f(b)(1), 78*o*-3(b)(2)). And while the Plan may not obligate the SROs to "make loans to [CAT LLC]," it does require them to "maintain the CAT" itself. Plan, Recitals ¶ B; § 3.8(a). Because maintaining the CAT takes money, the SROs must find *some* way of bankrolling it when no funding order is in effect. Confirming the point, the Plan imposes a host of duties on the SROs regardless of whether any funding model exists. *See, e.g.*, Plan § 6.3 (reporting requirements); *id.* § 6.7 (implementation deadlines); *id.* § 11.1 (annual budget must include "costs of developing and operating the CAT").

Even apart from the Plan, the SROs must keep the CAT afloat in the absence of an operative funding model to comply with the securities laws. Under those statutes, the "SROs must surveil trading on any markets they operate," 69 Fed. Reg. 71256, 71259 (2004), and they "are required to expend sufficient resources … to support their surveillance functions," 68 Fed. Reg. 27722, 27722 (2003). That is why each SRO funded its own "audit trail" long before the CAT arrived. *Id.* Because the SROs "currently rely on CAT to carry out their market oversight functions," they have no choice but to keep it running. Order 13412.

50

In fact, the SEC and SROs relied on this framework to successfully oppose a stay of the 2023 Order. Less than two years ago, they each told this Court that a "stay" would effectively be "an injunction mandating that the [SROs] continue to bear" the CAT's "costs." 23-13396 Doc. 120 at 19; *see id.* at 3; 20; 23-13396 Doc. 119 at 18 ("There is nothing equitable about continuing indefinitely to force the SROs to shoulder … the CAT's costs"); *id.* at 4, 18-21.

The SROs took the same position in defending the 2023 Order on the merits. In contrast to their recent threat to the SEC, they asserted that "[t]he CAT must be funded, so the question is not *if* the CAT should be funded but *how*," and complained that so far they had "funded" the CAT "at the mandate of the Commission." 23-13396 Doc. 98 at 4-5. The SROs therefore urged this Court to uphold the 2023 Order so they could "allocat[e]" the "CAT costs that the Commission required [them] to incur" with their broker-dealer members. *Id.* at 27; *see id.* at 40 ("Participants incurred CAT costs as a result of the Commission-mandated creation and operation of the CAT."). And they warned that "[v]acating the 2023 Funding Order would mean that the SROs would continue to bear … the CAT's costs for potentially several more years." 23-13396 Doc. 97 at 48. Indeed, they and the Commission continue to take that position in opposing a stay of the 2026 Order today. Doc. 42 at 21-22; Doc. 43-1 at 4, 17.

All those assertions make sense only if the SROs had to maintain the CAT in the absence of a funding order. If they were free to defund the CAT, a stay or vacatur of the 2023 Order would not have cost them a penny more. Having defeated a stay based on these representations, they are estopped from changing their position now. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

All this explains why the SROs spent over $900 million on the CAT from 2016 to 2024 before the SEC had approved a funding model. Doc. 43-2 ¶ 7. It explains why this Court vacated the 2023 Order on the premise that doing so would "minimally affect the status quo," as "[t]he CAT has operated without a funding order since 2016 and will presumably continue to do so." *ASA*, 147 F.4th at 1279. And it explains why this Court then rejected the SROs' request for an extended stay of the vacatur based on the same threat to defund the CAT. *Compare* 23-13396 Doc. 162-1, *with* 23-13396 Doc. 158-1 at 11.

The SEC therefore fundamentally "misconceived the law" by ignoring that the SROs are required to maintain the CAT. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). At the very least, its new position that SROs may decline to maintain the CAT "constitutes a major CAT policy change." *ASA*, 147 F.4th at 1274. Yet here, too, the Order gives no hint the SEC was even "aware[]" that it was "'changing position.'" *Id.* at 1275. Instead, it shows that the SROs managed to bluff the SEC into rushing out a warmed-over version of the vacated 2023 Order.

### E.    Vacatur is the proper remedy for the Order's APA violations.

Given the Order's repeated departures from reasoned decisionmaking, vacatur is the only appropriate remedy. "Vacatur is the ordinary remedy for orders that violate the Administrative Procedure Act," *ASA*, 147 F.4th at 1274, and it is hard to imagine how the SEC could begin to "overcome the presumption of *vacatur*" here, *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1122 (9th Cir. 2018). To the contrary, it is impossible to "confidently say" that any of the SEC's errors here "did not 'incurably taint' its decision-making process." *ASA*, 147 F.4th at 1279. For example, the 2026 Order's sham allocation is "substantively identical" to the 2023 Order's—and just as inadequately explained. Order 13415. And the 2026 Order's remaining defects in decisionmaking are equally "central to" its framework. *ASA*, 147 F.4th at 1279. This Court therefore should vacate the 2026 Order, just as it did with its 2023 predecessor.

That is especially true because, as this Court's prior remedy reflects, the path of "'judicial minimalism'"—resolving this challenge "on administrative law grounds" without addressing questions of statutory authority—is available only if this Court vacates the 2026 Order outright. *Id.* at 1274. The D.C. Circuit's opinion by then-Judge Kavanaugh in *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016), proves the point. Faced with a challenge to a CFPB order on both statu-

tory and constitutional grounds, the D.C. Circuit concluded that "the constitutional issue cannot be avoided" because a victory for the petitioner solely "on the statutory issues" would result only in a "remand." *Id.* at 9 n.1. But if the petitioner were right "on its constitutional argument," the court "could not … remand to the CFPB for any further proceedings," for in that case, the CFPB "could not continue operating" absent "new legislation." *Id.*[5]

The same dynamic is at play here. If the CAT—or the Order funding it through taxes—falls outside the Commission's statutory authority, this Court "could not … remand to" the SEC "for any further proceedings," for the Commission "could not continue" taxing broker-dealers to support that database while it tries to address defects in its decisionmaking. *Id.* So unless this Court vacates the Order on administrative-law grounds, the statutory-authority issues here "cannot be avoided in any principled way." *Id.* However vast this Court's equitable powers are, they do not include compelling petitioners to indefinitely pay for a "dystopian" multibillion-dollar "surveillance system" that is "essentially funded by the public but operates outside the direct oversight or authorization of Congress." Peirce & Uyeda, *supra.*

---

[5] While the en banc D.C. Circuit reversed the panel on the merits of the constitutional issue—a holding that in turn was abrogated by *Seila Law v. CFPB*, 591 U.S. 197 (2020)—it "unanimously" agreed that the constitutional question was unavoidable. *PHH Corp. v. CFPB*, 881 F.3d 75, 83 (D.C. Cir. 2018) (en banc).

## CONCLUSION

This Court should vacate the 2026 Order.

Dated: May 21, 2026

Respectfully submitted,

/s/ J. Michael Connolly
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

/s/ Noel J. Francisco
Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

55

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with (1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,950 words, excluding any parts exempted by Rule 32(f); and (2) the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in 14-point Calisto MT (a proportionally spaced typeface) using Microsoft Word.

Dated: May 21, 2026                Respectfully submitted,

/s/ J. Michael Connolly            /s/ Noel J. Francisco

Counsel of Record for Petitioner    Counsel of Record for Petitioner
American Securities Association      Citadel Securities LLC

Certificate 1

**CERTIFICATE OF ELECTRONIC SUBMISSION**

I certify that: (1) any required privacy redactions have been made; (2) the electronic submission of this document is an exact copy of any corresponding paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: May 21, 2026                          Respectfully submitted,

/s/ *J. Michael Connolly*                     /s/ *Noel J. Francisco*

*Counsel of Record for Petitioner*            *Counsel of Record for Petitioner*
*American Securities Association*             *Citadel Securities LLC*

Certificate 2

## CERTIFICATE OF SERVICE

I certify that on May 21, 2026 the foregoing brief was electronically filed with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 21, 2026                     Respectfully submitted,

*/s/ J. Michael Connolly*               */s/ Noel J. Francisco*

*Counsel of Record for Petitioner*      *Counsel of Record for Petitioner*
*American Securities Association*       *Citadel Securities LLC*

Certificate 3