**No. 26-10936**

# United States Court of Appeals

### *for the*

# Eleventh Circuit

———————— •• ————————

AMERICAN SECURITIES ASSOCIATION and CITADEL SECURITIES LLC,

*Petitioners,*

– v. –

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

———————————————

PETITION FOR REVIEW OF AN ORDER OF THE SECURITIES AND
EXCHANGE COMMISSION RELEASE NO. 34-105003; FILE NO. 4-698

## BRIEF OF PTG MARKETS AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS

MICHAEL J. SHOWALTER
SHOWALTER PLLC
4040 Wilson Boulevard
Arlington, Virginia 22203
(614) 893-7596
michael@showalterpllc.com

*Counsel for Amicus Curiae
PTG Markets*

COUNSEL PRESS
A Proceed Service    (800) 4-APPEAL • (393173)
The Appellate Experts®

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2, the undersigned counsel certifies that, in addition to the persons and entities listed in the certificate of interested persons filed by the parties, the following persons and entities have an interest in the outcome of this appeal:

PTG Markets (Amicus Curiae);

Showalter, Michael J. (Counsel for Amicus Curiae PTG Markets);

Showalter PLLC (Counsel for Amicus Curiae PTG Markets).

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies that no parent corporation and no publicly held corporation has a 10% or greater ownership interest in PTG Markets.

By: */s/ Michael J. Showalter*
Michael J. Showalter

Dated: May 28, 2026

i

# TABLE OF CONTENTS

Statement of Interest of Amicus Curiae........................................................................1

Statement of the Issues.................................................................................................3

Statement of the Case...................................................................................................4

    A. The CAT NMS Plan .............................................................................................4

    B. The 2023 Funding Order and This Court's Vacatur..................................5

    C. The 2026 Order ..................................................................................................6

Summary of Argument..................................................................................................7

Argument.......................................................................................................................9

    I. The CAT and the 2026 Order Exceed the SEC's Statutory Authority ........9

        A. The major-questions doctrine forecloses the Commission's reading
           of Section 11A.................................................................................................9

        B. Other tools of statutory interpretation confirm that the SEC lacks
           authority for the CAT funding regime ..........................................14

    II. The 2026 Order Is Arbitrary and Capricious ..........................................16

        A. The Commission failed to conduct the economic analysis required
           by the APA, the Exchange Act, and Rule 613 ..............................16

        B. The Commission did not engage with the misaligned-incentive
           structure that produced the cost overruns of the past decade .......19

Conclusion .................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Am. Sec. Ass'n v. SEC*, 147 F.4th 1264 (11th Cir. 2025) ............2, 3, 6, 7, 15, 16, 19

*Bidi Vapor LLC v. FDA*, 47 F.4th 1191 (11th Cir. 2022)......................................20

*Biden v. Nebraska*, 600 U.S. 477 (2023) ......................................................8

*Bloomberg L.P. v. SEC*, 45 F.4th 462 (D.C. Cir. 2022) .........................................16

*Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) ............................18

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).......................10

*Graham Cnty. Soil & Water Conservation Dist. v. United States*, 559 U.S. 280 (2010) ...........................................................................................14

*Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026)..................................13

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .........................................8

*Michigan v. EPA*, 576 U.S. 743 (2015) .....................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983) ......17

*NetCoalition v. SEC*, 615 F.3d 525 (D.C. Cir. 2010) .................................................16

*N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020) ...............................15

*Ohio v. EPA*, 603 U.S. 279 (2024)................................................................9

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ...............................................10

*West Virginia v. EPA*, 597 U.S. 697 (2022) ...........................................9, 10, 12, 13

**Statutes**

15 U.S.C. § 78c(f) ......................................................................................17

15 U.S.C. § 78f(b)..................................................................................8, 14

15 U.S.C. § 78k-1..........................................................................8, 11, 12, 17

15 U.S.C. § 78w(a)(2)................................................................................15

**Rules**

Fed. R. App. P. 29(a)(4)(E)............................................................................1

**Other Authorities**

17 C.F.R. § 242.608 ....................................................................14, 17

17 C.F.R. § 242.613 .........................................................................4

81 Fed. Reg. 84696 (Nov. 23, 2016) .....................................4, 10, 14, 15

86 Fed. Reg. 44142 (Aug. 11, 2021) ..................................................12

88 Fed. Reg. 62628 (Sept. 12, 2023) ..............................................5, 11

91 Fed. Reg. 13410 (Mar. 19, 2026).......................... 2, 3, 4, 6, 7, 11, 12, 13, 16, 18

Br. for Futures Indus. Ass'n as Amicus Curiae Supp. Pet'rs, *Am. Sec. Ass'n v. SEC*, No. 23-13396 (11th Cir. Feb. 15, 2024), ECF No. 73-2 ....................................3

Br. for Resp't, *Nasdaq Stock Mkt. LLC v. SEC*, No. 21-1167 (D.C. Cir.) ..............12

Decl. of Stephen J. Berger, *Am. Sec. Ass'n v. SEC*, No. 26-10936 (11th Cir. Apr. 2, 2026), ECF No. 20-3....................................................................7

FIA, EPTA & PTG Announce New Organisational Structure, FIA (Oct. 2025)......1

Hester M. Peirce, Comm'r, U.S. Sec. & Exch. Comm'n, Statement on the CAT's Funding Model (Sept. 6, 2023)...........................................................19

Hester M. Peirce & Mark T. Uyeda, Comm'rs, U.S. Sec. & Exch. Comm'n, Dissenting Statement on Electronic Submission of Certain Materials Under the Securities Exchange Act of 1934 and Amendments Regarding the FOCUS Report (Dec. 16, 2024) ............................................................7, 10

Jay Clayton, Chairman, U.S. Sec. & Exch. Comm'n, Oversight of the U.S. Securities and Exchange Commission (Dec. 11, 2018) ....................................5

Letter from Joanna Mallers, Sec'y, PTG, to Vanessa Countryman, Sec'y, U.S. Sec. & Exch. Comm'n (Nov. 24, 2025) ....................................................3

## STATEMENT OF INTEREST OF AMICUS CURIAE

Amicus curiae PTG Markets is a nonprofit trade association whose members are principal trading firms, *i.e.*, broker-dealers and other professional traders that trade their own capital, rather than the capital of customers, on exchanges and other regulated markets.[1] PTG Markets' members engage in manual, automated, and hybrid methods of trading, and are active in a wide variety of asset classes, including equities, fixed income, foreign exchange, and commodities. They serve as a critical source of liquidity, allowing those who use the markets, including individual investors, to manage their risks and invest effectively. From 2010 through 2025, PTG operated as a division of the Futures Industry Association under the name "FIA Principal Traders Group." Effective January 1, 2026, PTG Markets became a standalone organization separate from the Futures Industry Association. *See* FIA, EPTA & PTG Announce New Organisational Structure, FIA (Oct. 16, 2025), tinyurl.com/ujkfubh7.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus represents that: (i) no party's counsel authored this brief in whole or in part; (ii) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (iii) no person—other than amicus, its members, or its counsel—contributed money intended to fund preparation or submission of this brief.

All internal citations, brackets, and quotation marks are omitted unless otherwise noted.

PTG Markets has a direct and substantial interest in this case. Its members are "Industry Members" within the meaning of the Consolidated Audit Trail National Market System Plan (the "Plan"), and they are the firms on which the Securities and Exchange Commission's 2026 CAT funding order falls—immediately and almost entirely. The order under review, like the 2023 order this Court vacated last summer, requires the self-regulatory organizations ("SROs") that operate the CAT to allocate the system's costs between themselves and Industry Members, and yet permits the SROs to recover their entire share "by increasing existing fees" charged to those same Industry Members. 91 Fed. Reg. 13410, 13413 (2026) (the "2026 Order"). The result is the same one this Court rejected last year: a regulatory regime in which Industry Members "bear 100%" of CAT's costs while the Participants set the budget. *Am. Sec. Ass'n v. SEC*, 147 F.4th 1264, 1274 (11th Cir. 2025).

PTG Markets' members are uniquely affected by that allocation. Because they trade their own capital and have no customer base, they cannot pass CAT costs through to retail or institutional clients. Whatever fraction of the system's expenses the SROs route to Industry Members, principal trading firms absorb directly—either by accepting reduced returns on their own trades or by reducing trading activity, which in turn reduces the liquidity and price-discovery functions those firms provide to public markets.

2

PTG's predecessor entity made these points to this Court in 2024, in a brief filed on behalf of FIA Principal Traders Group in support of Petitioners' successful challenge to the 2023 funding order. *See* Br. for Futures Indus. Ass'n as *Amicus Curiae* Supp. Pet'rs, *Am. Sec. Ass'n v. SEC*, No. 23-13396 (11th Cir. Feb. 15, 2024), ECF No. 73-2. PTG Markets also submitted a comment letter to the Commission addressing these issues during the rulemaking that produced the 2026 Order. *See* Letter from Joanna Mallers, Sec'y, PTG, to Vanessa Countryman, Sec'y, U.S. Sec. & Exch. Comm'n (Nov. 24, 2025), cited in 91 Fed. Reg. at 13412 n.32. PTG Markets returns now, in its standalone capacity, to address the materially identical defects in the SEC's 2026 replacement order.

## STATEMENT OF THE ISSUES

1. Whether the 2026 Order should be set aside because the Consolidated Audit Trail and the Order itself exceed the Commission's statutory authority.

2. Whether the 2026 Order should be set aside because its allocation of CAT costs violates the Securities Exchange Act of 1934 and the Administrative Procedure Act.

3. Whether the 2026 Order should be set aside because its economic analysis violates the Administrative Procedure Act.

**STATEMENT OF THE CASE**

**A. The CAT NMS Plan.**

The Commission adopted Rule 613 under the Exchange Act in August 2012 to "create a comprehensive consolidated audit trail that would allow regulators to efficiently and accurately track all activity throughout the U.S. markets in National Market System (NMS) securities." SEC Division of Trading and Markets, Rule 613 (Consolidated Audit Trail), tinyurl.com/yc3zcf48; *see also* 17 C.F.R. § 242.613. Rule 613 directed the SROs, also referred to as "Participants," to develop an NMS plan to govern the creation, implementation, and maintenance of the CAT. Then, in 2016, the Commission approved the CAT NMS Plan. *See* 81 Fed. Reg. 84696 (2016). The Plan set forth the details of the CAT's functioning and operation but left funding and the allocation of the costs of the CAT undetermined.

When the Commission first approved the CAT NMS Plan in November 2016, the Commission's economic analysis estimated that the CAT would cost $36.5 million to $55 million annually. 81 Fed. Reg. at 84801. The implementation of the CAT has proven the Commission's estimates to be highly inaccurate. The actual annual operating budget for CAT LLC has run several times the Commission's 2016 estimate, including a 2026 budget of $156.4 million. 91 Fed. Reg. at 13465. Despite many years and additional opportunities to consider the issue, the Commission has

4

refused to limit the costs of the CAT or to require Industry Members to be represented in setting them.

The escalation has been on the Commission's notice for years. CAT LLC awarded the construction contract to Thesys Technologies LLC in 2017, terminated that contract in mid-2019, and incurred over $100 million in sunk costs in the process. See Comment Letter from Citadel Securities, Inc. (July 14, 2023) at 8, tinyurl.com/3wreu25j. Then–SEC Chairman Jay Clayton publicly attributed the failure to "project governance and project management issues experienced by the SROs." Statement of Jay Clayton, Chairman, U.S. Sec. & Exch. Comm'n, *Oversight of the U.S. Securities and Exchange Commission* (Dec. 11, 2018), tinyurl.com/yjemsu3k. Annual CAT LLC operating costs were $103 million in 2020, $144 million in 2021, $179 million in 2022, and nearly $200 million in 2023—nearly four times the Commission's 2016 projection. *See* Exchange Act Release No. 34-99363 (January 17, 2024), at 9, 33, 42, 52, 65, 70, n.73. Total historical CAT costs had reached approximately $518 million by the end of 2022. 88 Fed. Reg. at 62662 n.749.

## B. The 2023 Funding Order and This Court's Vacatur.

In September 2023, the Commission filled the funding gap with the 2023 Order, which created a per-trade fee structure that, in theory, allocated two-thirds of each trade's CAT cost to broker-dealers and one-third to the SROs. *See* 88 Fed. Reg.

62628 (2023). In practice, the 2023 Order also permitted the SROs to pass their share through to broker-dealers, which is precisely the disposition the Commission has now adopted twice and that this Court has now had occasion to review twice.

In July 2025, this Court vacated the 2023 Order. The Court held that the SEC had "shift[ed] from a *mandate* that both self-regulatory organizations and broker-dealers fund the CAT to an *allowance* for self-regulatory organizations to pass through 100% of their CAT costs"—a shift the Court characterized as a "major CAT policy change"—without "'display[ing] awareness that it [was] changing position'" or offering "good reasons" for that change. *Am. Sec. Ass'n*, 147 F.4th at 1274–75. The Court vacated the 2023 Order as arbitrary under the Administrative Procedure Act. *Id.* at 1280.

**C. The 2026 Order.**

Less than seven months after this Court's vacatur, the Commission adopted the 2026 Order, which it concedes is "substantively identical" to the 2023 Order. 91 Fed. Reg. at 13415. The 2026 Order maintains the same nominal allocation between SROs and Industry Members and the same practical result. The Commission prohibited the SROs from filing "a new fee" to pass through CAT costs "directly." *Id.* at 13413. But on the very same page, the Commission authorized the SROs to "recover their share of costs from" broker-dealers "indirectly by increasing existing

6

fees." *Id.* The economic effect is the same as the 2023 Order: broker-dealers, including PTG Markets' members, could be made to fund the entire system.

The Commission projects that the 2026 Order will require Industry Members to pay between $297.8 million and $446.6 million before the Order sunsets in March 2028. *Id.* at 13465–66. Those figures land at the low end of what was actually collected under the 2023 Order before vacatur—over $300 million in less than two years, including over $56 million from a single broker-dealer. *See* Decl. of Stephen J. Berger ¶ 10, *Am. Sec. Ass'n v. SEC*, No. 26-10936 (11th Cir. Apr. 2, 2026), ECF No. 20-3. The funds support a system that, on the SEC's own description, processes 700 to 800 billion records per day. 91 Fed. Reg. at 13474. Two of the Commission's three present commissioners have characterized the apparatus as a "dystopian surveillance" regime. Hester M. Peirce & Mark T. Uyeda, Comm'rs, U.S. Sec. & Exch. Comm'n, Dissenting Statement on Electronic Submission of Certain Materials Under the Securities Exchange Act of 1934 and Amendments Regarding the FOCUS Report (Dec. 16, 2024), tinyurl.com/3m6t4czy.

## SUMMARY OF ARGUMENT

This Court should set aside the 2026 Order for three reasons. Each was sufficient to require vacatur of the 2023 Order; each remains so today; and each is even clearer now that this Court's decision in *American Securities Association v. SEC*, 147 F.4th 1264 (11th Cir. 2025), is on the books and the Commission has had

7

multiple opportunities to engage with the foundational defects in the CAT funding regime.

First, the CAT and the 2026 Order exceed the Commission's statutory authority. Congress did not authorize the SEC, in 15 U.S.C. § 78k-1 or anywhere else, to compel the SROs to build a national surveillance system processing 700 to 800 billion records per day, or to fund that system through a perpetual, multibillion-dollar exaction on the broker-dealer industry. Such a sweeping delegation requires a clear statement from Congress. *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). There is none. And under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), the SEC is confined to the "best reading" of Section 11A, *id.* at 400, which authorizes the SEC to "facilitate the establishment of a national market system for securities," 15 U.S.C. § 78k-1(a)(2). That charge does not, by any natural reading, encompass an authorization to capture, store, and surveil every securities transaction in the United States.

Second, the 2026 Order's allocation of CAT costs violates the Exchange Act and the APA. The 2026 Order authorizes the SROs to recover their assigned share of CAT costs by raising the very fees they charge broker-dealers and other Industry Members. That is not an "equitable allocation of reasonable dues, fees, and other charges," as Section 6(b)(4) of the Exchange Act requires. 15 U.S.C. § 78f(b)(4). It is the same de facto 100 percent pass-through this Court rejected last year, with new

labels. The 2026 Order's "direct"/"indirect" distinction is form, not substance: the dollars flow the same way under either label, and this Court has already condemned that move.

Third, the 2026 Order fails the APA's reasoned-decisionmaking requirement. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024). The Order rests on the same misaligned-incentive structure that produced the cost overruns of the past decade and that this Court already vacated as arbitrary. The Commission did not undertake any meaningful economic analysis of the consequences of its choice. Neither the Exchange Act nor Rule 613 permits an agency to dispose of an issue of this magnitude this way.

## ARGUMENT

### I. The CAT and the 2026 Order Exceed the SEC's Statutory Authority.

#### A. The major-questions doctrine forecloses the Commission's reading of Section 11A.

Congress did not clearly authorize the SEC to establish a national surveillance system, or to fund it through a perpetual, multibillion-dollar exaction on the broker-dealer industry. Both pieces of that conclusion follow from the major-questions doctrine, and either is enough to require vacatur.

The major-questions doctrine requires the agency receive "clear congressional authorization" for the claimed delegation when "the history and the breadth of the authority" asserted, combined with "the economic and political significance" of that

assertion, "provide reason[s] to hesitate" before accepting that Congress meant to confer it. *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022). That requirement is most obvious where, as here, an agency relies on a "vague" statutory provision to claim a "highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724. The doctrine reflects "common sense as to the manner in which Congress is likely to delegate." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Congress, the Supreme Court has explained, must "speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

The CAT fits comfortably within both prongs of the doctrine. Politically, the system is a national surveillance database that records 700 to 800 billion records per day, captures every American who trades equities or options, and tags each such trader with an identification number cross-referenced to personal information held at broker-dealers and SROs. A majority of the Commission's present commissioners describes that apparatus as something one would expect to find in "a dystopian surveillance state." Peirce & Uyeda Dissenting Statement, *supra*. Economically, the CAT is staggering: more than $1 billion in development costs, hundreds of millions of dollars in projected annual operating costs, and another $1.5 billion in annual industry compliance costs. 81 Fed. Reg. at 84860. The 2026 Order itself projects

10

between $297.8 million and $446.6 million in fees through March 2028. 91 Fed. Reg. at 13465–66.

Congress did not provide the "clear statement" required to authorize a program of that magnitude. As described above, the Exchange Act provision that the SEC invokes, Section 11A, describes the SEC's authority over exchanges. Section 11A directs the Commission to "use its authority under this chapter to facilitate the establishment of a national market system for securities." 15 U.S.C. § 78k-1(a)(2). The statute says nothing about data repositories or audit trails generally, or the CAT specifically—let alone the responsibility of Industry Members to fund CAT. The SEC's interpretation of Section 11A as allowing the Participants to pass on all of their allocated costs to Industry Members with no accountability therefore fails to conform with the statute's language and purposes.

The SEC has been candid that it cannot rely on express authorization and instead is relying on purported implied authorization. In the 2023 Order it relied on its belief that "[t]here is no reason to question" that Congress "would have intended" the Commission to "address . . . shortcomings" the Commission perceived. 88 Fed. Reg. 62628, 62673 (2023). Needless to say, a federal agency imagining what Congress "would have intended" had it seen the purported shortcomings the agency sees is not relying on express authorization. The Commission has reaffirmed that posture in the 2026 Order, stating only that it "take[s] seriously" concerns about the

11

CAT's structure while still declining to identify any clear statutory authorization. 91 Fed. Reg. at 13456. Indeed, the SEC has admitted that the joint-action language in Section 11A, which authorizes the Commission to "authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under this chapter in planning, developing, operating, or regulating a national market system," 15 U.S.C. § 78k-1(a)(3)(B), was designed merely to give antitrust immunity for actions taken under the section. *See* Br. for Resp't at 5, 36–37, *Nasdaq Stock Mkt. LLC v. SEC*, No. 21-1167 (D.C. Cir.); 86 Fed. Reg. 44142, 44157 n.242 (2021). Creating a massive regulatory surveillance system and foisting billions of dollars of costs in perpetuity on Industry Members is the exact kind of extraordinary use of regulatory authority and radical change in a statutory scheme that an agency cannot unilaterally undertake without "clear congressional authorization." *West Virginia*, 597 U.S. at 723.

A scheme that requires the SROs to collect data from every securities trade in the United States and operate a cloud-based surveillance repository, requires Industry Members to pay nearly all of the costs of that system, limits the Commission's role in approving and overseeing the budget, and purports to foreclose meaningful judicial review of the fees imposed is, quite simply, extraordinary. As the Supreme Court has explained, "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices," and

Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id*. Section 11A is precisely the kind of vague, general-purpose grant of authority that the major-questions doctrine forbids the Commission from reading as a license to construct, fund, and operate a perpetual industry-financed surveillance system.

The funding mechanism amplifies the problem. The 2026 Order continues to fund the CAT through what the Commission itself acknowledges is, in substance, a "tax[]" on securities transactions. 91 Fed. Reg. at 13430. As the Supreme Court recently confirmed, the SEC "cannot tax" conduct merely because it is empowered to "regulate," and any "distinct and extraordinary power to impose" such taxes must be conferred "expressly." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 632, 642 (2026). Section 11A confers no such power.

In *West Virginia v. EPA*, the Supreme Court explained how the major-questions doctrine addresses a "particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." 597 U.S. at 724. That "particular and recurring problem" is exactly what happened here. This Court should not countenance the SEC's reliance on oblique statutory language to justify creating the CAT and causing Industry Members to pay for all of its spiraling and unconstrained costs.

13

**B. Other tools of statutory interpretation confirm that the SEC lacks authority for the CAT funding regime.**

Even setting aside the major-questions doctrine, other tools of statutory interpretation point the same way. The Commission's reading of Section 11A as allowing the Participants to pass on all of their allocated costs to Industry Members with no accountability strays far from the statutory language and statutory purposes. And the Commission's reading also founders on adjacent provisions of the Exchange Act, which must be read together with Section 11A. *See Graham Cnty. Soil & Water Conservation Dist. v. United States*, 559 U.S. 280, 289 (2010) ("[s]tatutory language has meaning only in context").

Section 6(b)(4) requires that an exchange's rules provide for "the equitable allocation of reasonable dues, fees, and other charges." 15 U.S.C. § 78f(b)(4). That requirement is not optional: an exchange "shall not be registered as a national securities exchange" unless the Commission makes that finding. *Id.* § 78f(b). Rule 613 itself contemplates that CAT costs are to be allocated "between the plan sponsors and the members of the plan sponsors," not loaded onto Industry Members alone. 17 C.F.R. § 242.608(a)(4)(D); *see also* 81 Fed. Reg. at 84710. The 2026 Order, by allowing each SRO to recover its share of CAT costs from the very Industry Members who have no role in the CAT's budget, design, or operation, is neither equitable nor reasonable. It is a one-sided allocation that this Court already

14

condemned as a "major CAT policy change" the SEC failed to justify. *Am. Sec. Ass'n*, 147 F.4th at 1274.

The 2016 Order establishing the CAT, as approved by the Commission, similarly contemplated that CAT LLC would "establish an allocation of the Company's costs among Participants and Industry Members that is consistent with the Exchange Act," taking into account "distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources." 81 Fed. Reg. at 84710. The 2026 Order departs from that framework without engaging with the operational distinctions the Commission previously identified.

The 2026 Order also runs afoul of Section 23(a)(2), which prohibits the Commission from adopting any rule or regulation that "would impose a burden on competition not necessary or appropriate in furtherance of the purposes of [the Exchange Act]." 15 U.S.C. § 78w(a)(2). The Order's misaligned-incentive structure (SROs setting the budget while broker-dealers pay it) has already produced cost overruns, with annual CAT spending now several times the SEC's 2016 estimate. The D.C. Circuit has set aside SEC rules that imposed costs untethered to specific Exchange Act requirements. *See N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 553 (D.C. Cir. 2020). That is precisely the defect here.

15

The Commission's answer is the same one this Court has already rejected: that the Section 19(b) fee-filing process supplies a sufficient backstop. *See* 91 Fed. Reg. 13436; *Am. Sec. Ass'n*, 147 F.4th at 1276. The D.C. Circuit has repeatedly rejected that suggestion, including in the precise context of SRO data programs. As the D.C. Circuit has explained, by the time the SEC reviews a fee filing, the underlying costs have already been incurred and someone must pay them. *Bloomberg L.P. v. SEC*, 45 F.4th 462, 477 (D.C. Cir. 2022); *see also NetCoalition v. SEC*, 615 F.3d 525 (D.C. Cir. 2010). Indeed, the 2026 Order goes further still: it does not require the Commission to approve the CAT's annual budget; it does not require the Commission to pre-approve the fees the SROs charge Industry Members under the new pass-through; and it provides no mechanism by which Industry Members can obtain meaningful review of those fees. The Order thereby limits the Commission's role in approving and overseeing the system whose costs Industry Members are required to bear, and forecloses meaningful judicial review of the proposed rule changes that establish or change those costs.

## II. The 2026 Order Is Arbitrary and Capricious.

### A. The Commission failed to conduct the economic analysis required by the APA, the Exchange Act, and Rule 613.

Even if the Commission had the authority to adopt the 2026 Order, the Order would still fail the APA. An agency rule is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem," "offered an

16

explanation for its decision that runs counter to the evidence before the agency," or relied on a justification "so implausible" it cannot be ascribed to expertise or considered judgment. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The 2026 Order does each.

Cost was the central variable the Commission was required to confront. As Rule 613 itself requires, the SEC must consider efficiency, competition, and capital formation when amending the CAT NMS Plan; *see* 17 C.F.R. § 242.608(b); Section 3(f) of the Exchange Act independently instructs the Commission, when reviewing rules, to "consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation," 15 U.S.C. § 78c(f); and Section 11A requires the Commission to act "having due regard for the public interest, the protection of investors, and the maintenance of fair and orderly markets," 15 U.S.C. § 78k-1(a)(2). "[P]ublic interest" in this context is a "classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors," including cost. *Michigan v. EPA*, 576 U.S. 743, 752 (2015). The Commission's task was therefore to assess what the 2026 Order would cost market participants and what consequences those costs would carry for liquidity, price discovery, and market efficiency.

The Commission did not do that work. The 2026 Order's economic analysis culminates in the conclusory statement that the new model "will involve efficiency

17

gains along some dimensions but will likely also involve tradeoffs against other forms of efficiency." 91 Fed. Reg. at 13458. That is a non-answer to the question this Court directed the Commission to address in vacating the 2023 Order. The Order acknowledges that the new model "trades off incentives to inefficiently spend too much against incentives to inefficiently spend too little," *id.* at 13474, but it does not engage with the structural consequence of that tradeoff: SROs continue to set the budget while broker-dealers pay it, with no mechanism to cap or constrain the costs that have already grown by several times the Commission's 2016 projection. *Id.* at 13465–66. The Commission did not address whether costs of that magnitude— imposed on Industry Members who have no role in setting them—would alter trading patterns, reduce liquidity, or shift activity away from public exchanges. That is a paradigmatic failure of reasoned decisionmaking. *See Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).

The Commission could have accounted for problems relating to excessive costs by, for example, (i) setting a cap on the CAT's annual budgets; (ii) prohibiting the Participants from passing on a certain amount of their costs; or (iii) requiring that the budget and proposed fees be filed under Section 19(b)(2) and subject to notice and public comment, SEC approval, and judicial review. Instead, the Commission rested its analysis on a conclusory acknowledgment that the new model "trades off incentives to inefficiently spend too much against incentives to inefficiently spend

18

too little," 91 Fed. Reg. at 13474, while leaving in place the same misaligned-incentive structure this Court already vacated as arbitrary.

**B. The Commission did not engage with the misaligned-incentive structure that produced the cost overruns of the past decade.**

The 2026 Order also brushes aside, rather than engages with, the misaligned incentives at the heart of the CAT's budget process. As Commissioner Peirce has explained, "nobody with financial skin in the game will be among those setting or reviewing the budget" for the CAT—because the SROs run the system and the broker-dealers pay for it. Hester M. Peirce, Comm'r, U.S. Sec. & Exch. Comm'n, *Statement on the CAT's Funding Model* (Sept. 6, 2023), tinyurl.com/48eurtrp. That structure is the proximate cause of the cost overruns of the past decade; the Commission was on notice of it; and the 2026 Order does nothing to fix it. Industry Members have no seat on CAT LLC's operating committee, no vote on the budget, and no right to seek revision of mandated costs through any meaningful process. Yet they bear the bill.

Industry Members that trade their own capital, such as the members of PTG Markets, may be forced to (i) adjust their trading models, and (ii) engage in less trading overall, harming liquidity and price discovery marketwide. Yet the Commission failed to conduct economic analysis of these potential problems, even though they are the very effects this Court directed the Commission to consider in *American Securities Association. See Am. Sec. Ass'n*, 147 F.4th at 1276. The

arbitrary-and-capricious standard demands more. *See Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022).

## CONCLUSION

For the reasons stated above and in Petitioners' briefing, the Court should grant the petition and vacate the Order.

Dated: May 28, 2026

Respectfully submitted,

/s/ Michael J. Showalter
Michael J. Showalter
SHOWALTER PLLC
4040 Wilson Boulevard
Arlington, Virginia 22203
(614) 893-7596
michael@showalterpllc.com

*Counsel for Amicus Curiae PTG Markets*

20

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts exempted by Rule 32(f), it contains 4,458 words.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font in the body and 12-point font in footnotes.

Dated: May 28, 2026

/s/ Michael J. Showalter
Michael J. Showalter

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2026, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Michael J. Showalter
Michael J. Showalter