CASE NO. 26-10936

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,
*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*,

CONSOLIDATED AUDIT TRAIL, LLC; THE NASDAQ STOCK MARKET, LLC; ET AL.,
*Intervenors*.

On Petition for Review of an Order of the Securities and Exchange Commission,
Release No. 34-105003

## BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE* IN SUPPORT
## OF PETITIONERS AND AFFIRMANCE

Thomas A. Berry
*Counsel of Record*
Kimberly Coleman
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(443) 254-6330
tberry@cato.org

*Counsel for Amicus Curiae*

May 28, 2026

No. 26-10936, *American Securities Ass'n, et al. v. United States SEC*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule No. 26.1-2, *amicus* certifies that the following persons have an interest in the outcome:

1. Berry, Thomas, counsel for *amicus curiae*

2. Cato Institute, *amicus curiae*

3. Coleman, Kimberly, counsel for *amicus curiae*

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

Respectfully submitted,

Dated: May 28, 2026                    /s/ Thomas A. Berry

C-1 of 1

# TABLE OF CONTENTS

Page(s)

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT .................................................. i

TABLE OF AUTHORITIES ................................................................................ ii

INTEREST OF *AMICUS CURIAE* ......................................................................1

STATEMENT OF THE ISSUES ..........................................................................2

INTRODUCTION
 AND SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ......................................................................................................8

   I.   A NATIONAL FINANCIAL SURVEILLANCE SYSTEM IS A
      MAJOR QUESTION REQUIRING CLEAR CONGRESSIONAL
      AUTHORIZATION. .................................................................................8

   II.   THE CREATION OF THE CAT SYSTEM AND CAPTURE OF
      INVESTOR AND BROKER DATA IS STATE ACTION. ......................13

   III.   THE CAT SYSTEM RECORDS DO NOT SATISFY THE
      REQUIRED RECORDS TEST AND IMPLICATE THE FIFTH
      AMENDMENT. ......................................................................................15

   IV.   THE CAT SYSTEM IMPLICATES THE FOURTH
      AMENDMENT. ......................................................................................19

      A.   SEC Use of the CAT System Is a Search of Investors' and
         Brokers' Papers or Effects. ..........................................................19

      B.   The CAT System Records Do Not Fall Within the Third-Party
         Doctrine. ......................................................................................24

      C.   Searches of Investors' and Brokers' Papers or Effects Are
         Unreasonable. ..............................................................................25

CONCLUSION .................................................................................................27

CERTIFICATE OF COMPLIANCE ..................................................................29

CERTIFICATE OF SERVICE ..........................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biden v. Nebraska*, 600 U.S. 477 (2023) ........................................................... 8, 10

*Boyd v. United States*, 116 U.S. 616 (1886) ................................................................6

*California Bankers Assn. v. Shultz*, 416 U.S. 21 (1974)............................................23

*Carpenter v. United States*, 585 U.S. 296 (2018) ............... 20, 21, 22, 24, 25, 26, 27

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).........................8

*Fisher v. United States*, 425 U.S. 391 (1976) ...................................................... 16, 17

*Grosso v. United States*, 390 U.S. 62 (1968)..........................................................17

*In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d
    1335 (11th Cir. 2012)..........................................................................................17

*Kentucky v. King*, 563 U.S. 452 (2011) ..................................................................25

*Kyllo v. United States*, 533 U.S. 27 (2001).............................................................21

*Learning Res., Inc. v. Trump*, 224 L. Ed. 2d 51 (2026).................................... 8, 10

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......................................11

*Los Angeles v. Patel*, 576 U.S. 409 (2015)..............................................................23

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ...............................................13

*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 (2019) ...........................14

*Marchetti v. United States*, 390 U.S. 39 (1968)......................................................18

*People v. Seymour*, 536 P.3d 1260 (Colo. 2023)......................................................20

*Riley v. California*, 573 U.S. 373 (2014) ...................................................... 20, 26, 27

*Shapiro v. United States*, 335 U.S. 1 (1948)...................................................... 16, 17

*Smith v. Maryland*, 442 U.S. 735 (1979) ......................................................... 13, 24

*United States v. Di Re,* 332 U.S. 581 (1948) ...........................................................20

*United States v. Doe*, 465 U.S. 605 (1984).............................................................18

*United States v. Hubbell*, 530 U.S. 27 (2000)........................................................15

*United States v. Miller*, 425 U.S. 435 (1976) ................................................ 24, 25

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ........................................ 6, 8, 10

*Vernonia Sch. Dist. v. Acton*, 515 U.S. 646 (1995) ...................................................25

*West Virginia v. EPA*, 597 U.S. 697 (2022) ........................................ 8, 13

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .........................................7, 8

**Statutes**

15 U.S.C. § 78k-1.............................................................................. 10, 11

15 U.S.C. § 78q ............................................................................. 10, 11, 12

Act of March 3, 1863, ch. 76, 12 Stat. 737 .................................................20

Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97 ...................11

**Other Authorities**

121 CONG. REC. 698 (1975) .......................................................................12

*Agency Profiles*, USASPENDING.GOV ......................................................10

*Consolidated Audit Trail (CAT)*, FINRA .................................................9

FINRA, In re Instinet, Financial Industry Regulatory Authority Letter of Acceptance, Waiver, and Consent, No. 2020067139101 (Aug. 16, 2023) ...........4

GILES JACOB, A NEW LAW-DICTIONARY (6th ed. 1750) ........................................21

Hester Peirce, *This CAT Is a Dangerous Dog,* REALCLEARPOLICY (Oct. 9, 2019) .................................................................................2

Jennifer Schulp, *The SEC Is Starting a Massive Database of Every Stock Trade*, REASON, Feb. 7, 2023 ........................................................4, 9

Jeremy Hall, Comment, *Bailment Law as Part of a Property-Based Fourth Amendment Framework*, 28 GEO. MASON U. L. REV. 481 (2020) .......................20

Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 YALE L.J. 796 (2016) .................... 20, 21

N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (reprint 6th ed. 1989)..................................................................21

NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE (1975) ................ 11, 12

Orin S. Kerr, *Fourth Amendment Seizures of Computer Data*, 119 YALE
L.J. 700 (2010) ...................................................................................20

*Oversight of the Status of the Consolidated Audit Trail, Before the S.
Comm. on Banking, Hous., and Urb. Aff.*, 116th Cong.(Oct. 22, 2019).............5, 6

Samuel A. Alito Jr., *Documents and the Privilege against Self-
Incrimination*, 48 U. PITT. L. REV. 27 (1986)........................................... 16, 19, 20

T. CUNNINGHAM, A NEW AND COMPLETE LAW-DICTIONARY, OR, GENERAL
ABRIDGMENT OF THE LAW (1764) ...................................................21

THOMAS POTTS, A COMPENDIOUS LAW DICTIONARY (1803)..................................21

U.S. Sec. & Exch. Comm'n, *Enforcement Manual* 5-83 (2026) ...................... 15, 26

**Regulations**

17 C.F.R. § 240.17a-4 ...............................................................................3

17 C.F.R. § 242.613 ....................................................................... 4, 18

17 C.F.R. § 242.613(c)(3) .........................................................................5

17 C.F.R. § 242.613(f) ...............................................................................13

Consolidated Audit Trail, 77 Fed. Reg. 45722 (Aug. 1, 2012)
.............................................................. 3, 7, 15, 18, 22, 26

Joint Industry Plan; Order Approving an Amendment to the National
Market System Plan Governing the Consolidated Audit Trail; Notice, 88
Fed. Reg. 62628 (Sep. 12, 2023) ....................................................... 4, 7, 13, 14

Order Approving an Amendment to the National Market System Plan
Governing the Consolidated Audit Trail, as Modified by Amendment
Nos. 1 and 2 and by the Commission, Regarding the Customer and
Account Information System, 91 Fed. Reg. 2164 (Jan. 16, 2026)
.............................................................. 3, 7, 9, 11, 12, 14, 15, 22, 26

Order Approving an Amendment to the National Market System Plan
Governing the Consolidated Audit Trail, as Modified by the
Commission, Regarding Implementation of a Revised Funding Model, 91
Fed. Reg. 13410 (Mar. 19, 2026)........................................................ 5, 7, 9, 10

Order Approving an Amendment to the National Market System Plan
  Governing the Consolidated Audit Trail, as Modified by the
  Commission, To Further Reduce the Costs of the Consolidated Audit
  Trail, 91 Fed. Reg. 16284 (Apr. 1, 2026) ...........................................................10

Order Approving the National Market System Plan Governing the
  Consolidated Audit Trail, 81 Fed. Reg. 84696 (Nov. 23, 2016) ..................... 9, 10

## INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs.

Cato Institute scholars have published extensive research on securities regulation and constitutional law. The Securities and Exchange Commission's (SEC) Consolidated Audit Trail proceedings implement several public policies and regulations affecting securities brokers' businesses and rights, as well as impacting the rights of individual investors. This case interests the Cato Institute because it concerns the legality of a massive, unprecedented data collection and regulatory effort by the SEC that threatens individual liberty.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in any part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

**STATEMENT OF THE ISSUES**

Whether the Consolidated Audit Trail Order should be set aside because the Order is an agency decision of vast political and economic significance that exceeds the Securities and Exchange Commission's statutory authority.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In this "smart" and digitized world, nearly everything we do could be captured, stored, and made accessible to the government. The time we wake up (using our phone's alarm), the places we go (using our car's built-in GPS), the news stories we read, the snacks we purchase for our kids, the route of our daily run, how much we weigh, and even the temperature we prefer to keep our homes is routinely collected and stored by commercial companies. Normally, the government cannot access that information, absent a manual process like issuing a subpoena or obtaining a search warrant. The Securities and Exchange Commission's Consolidated Audit Trail (CAT) system threatens to change all of that,[2] and it gives government agencies a blueprint for pervasive and constant government surveillance: 1) require third-parties to collect and retain immense amounts of sensitive information about their customers, 2) offer no chance to opt out, and 3) demand access to the data on the theory that the government might need the information for law enforcement. Such a

---

[2] *See* Hester Peirce, *This CAT Is a Dangerous Dog,* REALCLEARPOLICY (Oct. 9, 2019), https://tinyurl.com/e63xc5jz.

system is a massive threat to privacy rights and our constitutional order and deserves this Court's attention.

For decades, the SEC has imposed limited records preservation requirements on investors, broker-dealers, and financial institutions. *See*, *e.g.*, 17 C.F.R. § 240.17a-4 (lists of communications, financial, and other records that brokers and dealers must preserve). But the CAT system represents a break from previous policies in that it is an automatic, national, and daily production order to brokers and others in the industry for vast amounts of personal and financial information which SEC regulators can use for "cross-market, cross-broker, and cross-account surveillance of a single customer's trading activity."[3] The CAT system represents a radically new form of surveillance that implicates both Fourth and Fifth Amendment rights.

The CAT system originated in July 2012, when the SEC published a rule requiring self-regulatory organizations (SROs) like the Financial Industry Regulatory Authority (FINRA) to jointly submit a "national market system plan" for creating and operating a Consolidated Audit Trail system. Consolidated Audit Trail, 77 Fed. Reg. 45722, 45808 (Aug. 1, 2012) (to be codified at 17 C.F.R. pt. 242). This

---

[3] Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by Amendment Nos. 1 and 2 and by the Commission, Regarding the Customer and Account Information System, 91 Fed. Reg. 2164, 2168, 2168 n.64 (Jan. 16, 2026) [hereinafter Information Order].

central data repository was designed to combine multiple previously separate systems, capturing billions of customer identifiers and financial "events" related to securities transactions, orders, and quotes, and making that information readily accessible to the government.[4] *See* 17 C.F.R. § 242.613.

Those plans further developed piecemeal over the next decade according to SEC prescriptions. The system that emerged from those dictates began capturing personal information about investors in March 2023, though it had already been capturing data about trades. *See* Jennifer Schulp, *The SEC Is Starting a Massive Database of Every Stock Trade*, REASON (Feb. 17, 2023).[5] In a September 2023 Order, the SEC proceeded with plans to fund this troubling surveillance system. Joint Industry Plan; Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail; Notice, 88 Fed. Reg. 62628, 62686 (Sep. 12, 2023) [hereinafter Joint Industry Plan].

---

[4] One broker-dealer was penalized for "late reporting issues in connection with at least 26 billion events from November 2020 through December 2022, which constitute approximately 8% of the firm's CAT reporting obligation for this period." FINRA, In re Instinet, Financial Industry Regulatory Authority Letter of Acceptance, Waiver, and Consent, No. 2020067139101, at 3 (Aug. 16, 2023) http://tinyurl.com/3ja8cf6x (settlement with Instinet LLC).

[5] Available at http://tinyurl.com/56vhex57.

4

This Court struck down this Order because it allowed SROs to pass their fees off to broker-dealers; however, in March 2026 the SEC again attempted to fund the CAT in a similar Order.[6]

According to the testimony of the president of FINRA CAT, LLC, the entity charged with building and maintaining the CAT, SEC rules require the system to "collect, process, and store a vast amount of data" for the purpose of "facilitate[ing] . . . more robust market surveillance."[7] The SEC ordered that these billions of "events" and personal records must be stored each and every day. 17 C.F.R. § 242.613(c)(3). The system is built so "that the market regulators—including the SEC, FINRA, and the national securities exchanges—can use it as intended to efficiently and accurately *track all activity in the US securities markets*."[8] A member of the CAT operating committee testified to Congress that regulators can query investors' trading behavior even in the absence of reasonable suspicion.[9]

---

[6] *See* Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by the Commission, Regarding Implementation of a Revised Funding Model, 91 Fed. Reg. 13410, 13411, 13414, 13420 (Mar. 19, 2026) [hereinafter 2026 Funding Order] ("The Executed Share Model is in most material respects identical to the funding model approved in the 2023 Funding Model Order").

[7] *Oversight of the Status of the Consolidated Audit Trail*, *Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 116th Cong., at 25–26 (Oct. 22, 2019) (statement of Shelly Bohlin, President and COO, FINRA CAT LLC).

[8] *Id.* at 26 (emphasis added).

[9] On why the CAT system will not require regulators to input a reason for database queries: "[F]rom a regulatory standpoint, you see abnormalities in trading and you

5

The constitutional implications of the CAT system are apparent and far-reaching. As the Supreme Court warned in *Boyd*, an early case evaluating the Fourth and Fifth Amendment implications of government seizure of private financial records:

> [I]llegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. *It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.*[10]

Courts should scrutinize the accumulating record demands of the SEC, and especially the order that funds the CAT system, in light of several Supreme Court decisions since 2012, when the SEC's CAT system plans were adopted. The Supreme Court explained in *Utility Air Regulatory Group* that in evaluating the authority of agencies, courts must "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted).

---

don't really know what you're looking for. . . . [Therefore] it is very difficult up front to put in a reason why" the query is made. *Id.* at 15 (statement of Michael Simon, Chair, CAT NMS Plan Operating Committee).

[10] *Boyd v. United States*, 116 U.S. 616, 635 (1886) (emphasis added).

Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Because of its significant surveillance and spending, the SEC must have clear authority from Congress to create the CAT. Yet, in the "Statutory Authority" section of its 2012 rule, the agency offered only a single sentence listing a few immaterial sections of the Securities Exchange Act.[11] The SEC signaled the major questions problem when it dispensed with the need to identify "express authorization for CAT by Congress." Joint Industry Plan, 88 Fed. Reg. at 62673.

Unsurprisingly, then, the Final Rule also contains no analysis about the nature and extent of the SEC's authority and lacks a single mention of the Fourth Amendment search and Fifth Amendment self-incrimination implications of mandating that regulated companies and brokers collect, store, and track customer-identifying information from millions of citizens—they cannot fairly be called "suspects"—on behalf of the government.[12] In subsequent Orders, the SEC repeatedly fails to adequately address the Constitutional implications.[13] Because Congress has not spoken clearly about the agency's authority to create this type of

---

[11] Consolidated Audit Trail, 77 Fed. Reg. at 45808.

[12] *See generally id.* at 45722.

[13] *See* Information Order, 91 Fed. Reg. at 2177; 2026 Funding Order, 91 Fed. Reg. at 13456.

surveillance system, this Court should set aside the recent Order funding the CAT system.

**ARGUMENT**

**I.    A NATIONAL FINANCIAL SURVEILLANCE SYSTEM IS A MAJOR QUESTION REQUIRING CLEAR CONGRESSIONAL AUTHORIZATION.**

"Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *Whitman*, 531 U.S. at 468). This idea, known as the major questions doctrine, is the logical response to "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724. Indeed, the Court expects "Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regul. Group*, 573 U.S. at 324 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). Significance is determined by "the breadth, history, and constitutional context of that asserted authority." *Learning Res., Inc. v. Trump*, 224 L. Ed. 2d 51, 71 (2026); *see Biden v. Nebraska*, 600 U.S. 477, 501–06 (2023); *see West Virginia*, 597 U.S. at 724–32 (considering the agency decision's impact on the energy market, the previous interpretation of the statute, and the congressional context).

Significant is the only way to describe the agency's decision here. The CAT is a novel automatic, national, and daily production order for investors' financial

8

information. It "collects and accurately identifies *every* order, cancellation, modification and trade execution for *all* exchange-listed equities and options across *all* U.S. markets." *Consolidated Audit Trail (CAT)*, FINRA (emphasis added).[14] Thus, the CAT may collect "about tens of billions of trades daily, making it quite possibly the largest database in the world." Schulp, *supra*. The SEC acquires brokers' and investors' personal and financial records without a warrant, and these records are held for years for later suspicion-less analysis and auditing by the government in ways that may implicate the Fourth Amendment and Fifth Amendment rights of Americans who trade or broker securities. It is a deviation from previous practice and one that may affect the trading behavior of tens of millions of Americans.

The cost of this collection is massive. As a result of the CAT, "broker-dealers will incur approximately $2.2 billion in implementation costs and $1.5 billion in ongoing data reporting costs."[15] The estimated cost for the CAT in 2025 is over $156 million,[16] and the projected expenses for 2026 are similar. 2026 Funding Order, 91 Fed. Reg. at 13423. The SEC doesn't deny the hefty price tag: "the CAT must

---

[14] Available at https://tinyurl.com/3shw3trn.

[15] Order Approving the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 84696, 84860 (Nov. 23, 2016).

[16] Information Order, 91 Fed. Reg. at 2184.

process and store extremely large and increasing data volumes, resulting in millions of dollars of ongoing costs."[17]

This massive spending threatens a key area of Congressional control, the "power of the purse." *Learning Res.*, 224 L. Ed. 2d at 64. In fact, its budget is higher than that of many agencies. *See Agency Profiles*, USASPENDING.GOV.[18] Nevertheless, it remains funded through a tax on securities transactions, not the congressional appropriations process. 2026 Funding Order, 91 Fed. Reg. at 13430.

The breadth, history, and constitutional context all suggest this decision is "'a question of deep "economic and political significance" that is central to [the] statutory scheme,' [so] we would not assume that Congress entrusted that task to an agency without a clear statement to that effect." *Biden*, 600 U.S. at 506 (quoting *Util. Air Regul. Group*, 573 U.S. at 324). No clear statement can be found here.

The CAT is supposedly authorized by two sections of the Securities Exchange Act, namely, 15 U.S.C. § 78k-1 and § 78q. The first permits the SEC "to facilitate the establishment of a national market system for securities." 15 U.S.C. § 78k-1(a)(2); Order Approving the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. at 84726; Information Order, 91 Fed. Reg.

---

[17] Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by the Commission, To Further Reduce the Costs of the Consolidated Audit Trail, 91 Fed. Reg. 16284, 16284 (Apr. 1, 2026).

[18] Available at https://tinyurl.com/y3w58usd.

at 2166. To do so, it can require self-regulatory organizations to "act jointly" to regulate "a national market system." 15 U.S.C. § 78k-1(a)(3)(B). The other requires broker-dealers and SROs to "make," "keep," and "furnish," records that "are subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by representatives of the Commission." 15 U.S.C. § 78q(a)–(b); Resp't Opp'n to Pet'r's Mot. for Stay 18.

The Securities Exchange Act, like all statutes, has "a single, best meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). Indeed, the Framers "anticipated that courts would often confront statutory ambiguities and expected that courts would resolve them by exercising independent legal judgment." *Id.* at 401. To do this, courts are to use "the traditional tools of statutory construction." *Id.* at 403. Courts traditionally "construe statutes as a reasonable reader would 'when the law was made'" because this approach "serves as an essential guardian of the due process promise of fair notice." *Id.* at 433–34.

The original meaning of the relevant sections does not support the creation of the CAT. *See* Securities Acts Amendments of 1975, Pub. L. No. 94-29 §§11A(a)(2), 14, 89 Stat. 97, 112, 137–38. First, § 78k-1 granted permission for a "national market system," 15 U.S.C. § 78k-1(a)(2), when national meant "involving an entire nation." *National*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE (1975). "Market," meant "[t]raffic in certain goods or services," *Market*, NEW WEBSTER'S

11

DICTIONARY OF THE ENGLISH LANGUAGE (1975), and "system" meant "a coordinated body of methods, or a complex scheme or plan of procedure." *System*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE (1975). Together, § 78k-1 permitted a plan for securities' traffic for the nation. Compare this with the SEC rule, which facilitates "market surveillance and research" and the "tracking of a specific order of a Customer throughout its entire lifecycle."[19] A plan for securities traffic and an invasive surveillance machine are two very different things. The original meaning of the text can only support the first.

Nor does § 78q save the SEC. It requires broker-dealers and SROs to "make," "keep," and "furnish," records for review. 15 U.S.C. § 78q(a)–(b). "Make" meant "manufacture or produce," "keep" meant "maintain," and "furnish" meant "equip." *Make*, *Keep*, *Furnish*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE (1975). None of these verbs mean "market surveillance and research."[20] The Securities Exchange Act's vague, decades-old provisions cannot authorize a system of this scope.

---

[19] Information Order, 91 Fed. Reg. at 2168, 2191.

[20] *Id.* at 2191. The actions of the SEC are unprecedented and unsupported by legislative history. When introducing the amendments in 1975, Senator Williams said, "It is well past time that a national system for the clearance and settlement of securities transactions should have been in place." 121 CONG. REC. 698 (1975). Unchecked tracking and market surveillance is too far a leap from "clearance and settlement." *See id.*

The SEC hammered the final nail in the coffin itself: it admitted there is no "express authorization for CAT by Congress." Joint Industry Plan, 88 Fed. Reg. at 62673. Without a clear congressional mandate, the Court should be wary of state action that threatens the Fourth and Fifth Amendments, *see* discussion *infra* Sections II, III, and IV, and "'hesitate before concluding that Congress' meant to confer such [vast] authority" to an agency. *See West Virginia*, 597 U.S. at 721.

## II. THE CREATION OF THE CAT SYSTEM AND CAPTURE OF INVESTOR AND BROKER DATA IS STATE ACTION.

For an investor or broker to assert a Fourth or Fifth Amendment violation, there needs to be state action directed against them. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982) ("As a matter of substantive constitutional law, the state action requirement reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'") (citation omitted); *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (noting "the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action.") (citations omitted). Though the investor and broker data collection here is being carried out by non-governmental actors, *see* 17 C.F.R. § 242.613(f), there is still state action. The Supreme Court has held that a private entity can qualify as a state actor in a few, limited circumstances: first, "when the private entity performs a traditional,

exclusive public function," second, "when the government compels the private entity to take a particular action," and third, "when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019).

Here, the private actors' collection, storage, and sharing of personal and financial data represents state action because the government requires the collection, storage, and sharing of investors' and brokers' data. The Commission is quite clear in its 2023 funding order that it is compelling the private SROs to act jointly.[21] Broker-dealers are to provide regulators with personal identifying information, including names, addresses, birth years, and customer types, upon request. Information Order, 91 Fed. Reg. at 2168, 2180. The data they collect is stored for many years and can be used for "analysis of CAT data" or "cross-market, cross-broker, and cross-account surveillance of a single customer's trading activity." *Id.* at 2166, 2168, 2181.

In short, the SROs' and brokers' data collection, storage, and sharing of investor and broker data via the CAT system, as well as penalties assessed for noncompliance, are compelled by the government and constitute state action.

---

[21] Joint Industry Plan, 88 Fed. Reg. at 62686 (citing sections of the Exchange Act that "authorize[] the Commission, by rule or order, to authorize or require the self-regulatory organizations to act jointly" as authority for the funding order).

14

### III. THE CAT SYSTEM RECORDS DO NOT SATISFY THE REQUIRED RECORDS TEST AND IMPLICATE THE FIFTH AMENDMENT.

The CAT system amounts to a daily production order to financial institutions and brokers, sweeping in new kinds of financial records from millions of stock-owning (and law-abiding) Americans for the purposes of law enforcement.[22] It is the SEC's longstanding policy that the agency will assist and share information with criminal prosecutors,[23] so it is reasonable to expect that the CAT system records will be used in criminal prosecutions of investors and brokers. Using the CAT system, regulators will be able to query at least six years' worth of market activity, linked to customers' unique identifiers.[24] These identifiers can easily be connected to investors' names, addresses, and birth years.[25] Since the mere production of records may be testimonial, *see, e.g.*, *United States v. Hubbell*, 530 U.S. 27, 36 (2000) ("[W]e have also made it clear that the act of producing documents in response to a subpoena may have a compelled testimonial aspect."), the CAT records mandates

---

[22] *See, e.g.*, Consolidated Audit Trail, 77 Fed. Reg. at 45772 ("With this information, regulators could more quickly initiate investigations, and more promptly take appropriate enforcement action.").

[23] U.S. Sec. & Exch. Comm'n, *Enforcement Manual* 5-83 (2026) ("Generally, sharing information with criminal prosecutors is permissible, even though the sharing of information is intended to, and does in fact, assist criminal prosecutors.").

[24] Information Order, 91 Fed. Reg. at 2174, 2181.

[25] *Id.* at 2166.

may violate investors' and brokers' Fifth Amendment right against self-incrimination.

It was understood at the time of the American Founding that the common law barred the compelled production of self-incriminatory documents, including the production of corporate records. *See, e.g.*, *Fisher v. United States*, 425 U.S. 391, 418 n.4 (1976) (Brennan, J., concurring) ("Without a doubt, the common-law privilege against self-incrimination in England extended to protection against the production of incriminating personal papers prior to the adoption of the United States Constitution."); Samuel A. Alito Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27, 65 (1986) ("English precedents at the time of the adoption of the fifth amendment extended the protection of the privilege against self-incrimination to corporate as well as individual records.").

However, that traditional understanding of the common law privilege was narrowed in modern Fifth Amendment jurisprudence. *See Fisher*, 425 U.S. 391. One prominent exception to the Fifth Amendment privilege against self-incrimination is the "required records" exception. *See Shapiro v. United States*, 335 U.S. 1, 32–33 (1948). In *Shapiro*, the Court affirmed a lower court's decision that compelling individuals to produce records by valid regulations does not violate the right against self-incrimination. *Id.*

16

However, the CAT system goes far beyond *Shapiro*, which was a 5-4 decision allowing a wartime price control office to obtain one month of invoices from a licensed commodity seller. *Id*. at 4. The majority opinion in *Shapiro* imposed a significant limitation: only records "customarily kept" were within the exception. *Id*. at 42. The Court reiterated this limitation in defining the required records exception 20 years later in *Grosso v. United States*:[26]

> first, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind that the regulated party has customarily kept; and third, the records themselves must have assumed "public aspects" that render them at least analogous to public documents.

Accordingly, the Supreme Court in *Fisher* held the production of tax documents by a taxpayer for the IRS was not testimonial only because "[t]he existence and location of the papers [were] a foregone conclusion." *Fisher*, 425 U.S. at 411; *see also In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1344 (11th Cir. 2012) (holding that records production is not testimonial when "the location, existence, and authenticity of the purported evidence is known with reasonable particularity").

The analysis is altogether different when the government demands production of new types of records or records it merely suspects (or hopes) the individual

---

[26] *Grosso v. United States*, 390 U.S. 62, 67–68 (1968).

17

possesses. As the Supreme Court explained in *Marchetti*, a government demand to "provide information, unrelated to any records which he may have maintained . . . is not significantly different from a demand that he provide oral testimony." *Marchetti v. United States*, 390 U.S. 39, 57 (1968).[27]

Much of the records and data collected by the CAT system fails to satisfy the required records exception because the SEC has ordered the creation of new records not "customarily kept" by brokers. The SEC is quite clear that many of these records are not customarily kept: the SEC demands brokers and SROs collect new types of investor data because previous data collection sources "lack[ed] key elements important to regulators" such as "the time of execution" and "the identity of the customer" in equity cleared reports, "the identity of the customers who originate orders," and "the fact that two sets of orders may have been originated by the same customer."[28] The SEC also requires brokers and others to record reportable events down to the millisecond, 17 C.F.R. § 242.613(d)(3), which is a record not kept by industry custom. The entire CAT system, because it merges and connects investors'

---

[27] The Court has also rejected, on Fifth Amendment grounds, the government's "broad-sweeping subpoenas" that "attempt[] to compensate for its lack of knowledge by requiring [someone] to become, in effect, the primary informant against himself." *United States v. Doe*, 465 U.S. 605, 613 n.12 (1984) (citation omitted) (quoting appellate court's affirmance of district court's findings).

[28] Consolidated Audit Trail, 77 Fed. Reg. at 45722.

and brokers' historical information together in a way that is not "customarily kept" by brokers or SROs, arguably falls outside the required records exception.

Investors and brokers, therefore, are required to produce testimonial records since their records production is responsive to government records demands, which are merely outsourced to the SROs. Since the agency does not immunize investors and brokers, nor allow them to refuse to provide the new types of information, the system may pose Fifth Amendment problems. As Justice Samuel Alito wrote when he was Deputy Assistant Attorney General, "the compulsory organization, filing, and creation of documents are acts that clearly are testimonial and may be self-incriminating."[29] Regarding such compulsory record keeping, future-Justice Alito added, "The individual should be free to refuse to create or organize records on fifth amendment grounds."[30] Government agencies cannot be allowed to mandate new "customs" of records collection and then use those "required customs" to evade Americans' Fifth Amendment rights.

## IV. THE CAT SYSTEM IMPLICATES THE FOURTH AMENDMENT.

### A. SEC Use of the CAT System Is a Search of Investors' and Brokers' Papers or Effects.

The Supreme Court notes "that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of

---

[29] Alito, *supra*, at 75.

[30] *Id*. at 76.

the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). "[A] central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (quoting *United States v. Di Re,* 332 U.S. 581, 595 (1948)).[31]

Investors and brokers may have a possessory and privacy interest in the digital records collected in CAT repositories.[32] Courts, therefore, must assess whether these records qualify as investors' or brokers' "papers" or "effects." What constitutes "effects" has not been clearly discerned by courts.[33] However, "effects" almost

---

[31] For much of this nation's history, therefore, the protection of citizens' personal papers and financial records was nearly absolute. The first federal law authorizing the search or seizure of books or records was not passed until March 1863. Act of March 3, 1863, ch. 76, 12 Stat. 737 (1863). Even the context for the passage of this law suggests the gravity of government seizure and search of Americans' records—it was a wartime measure to allow the U.S. government to investigate the conduct of men disloyal to the Union cause, passed, in fact, the same day as the Act suspending the writ of *habeas corpus*. *See* Alito, *supra*, at 31 n.7.

[32] *See, e.g.*, *People v. Seymour*, 536 P.3d 1260, 1273 (Colo. 2023) (holding, after analyzing Google's terms of service with its users, that Google users had a possessory interest in their digital records for the purposes of the Fourth Amendment); s*ee also* Jeremy Hall, Note, *Bailment Law as Part of a Property-Based Fourth Amendment Framework*, 28 GEO. MASON L. REV. 481 (2020); Orin S. Kerr, *Fourth Amendment Seizures of Computer Data*, 119 YALE L.J. 700, 710–14 (2010) (discussing that a seizure of digital property occurs when the government copies someone's data because it is the copying of the digital records that preserves it for future evidentiary use and therefore meaningfully interferes with the possessory interest of exclusive control).

[33] *See* Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 YALE L.J. 946, 948, 955 (2016).

certainly includes one's financial records. Founding-era legal dictionaries, for example, specifically contemplate and define one's financial records as one's "effects." *See Champertors*, 1 T. CUNNINGHAM, A NEW AND COMPLETE LAW-DICTIONARY, OR, GENERAL ABRIDGMENT OF THE LAW (1764) (quoting a directive of the Lord Commissioners providing rules for transfers and custody of "sum[s] of money, tallies, orders, bonds, deposites, securities, and other effects"); *Bankrupt*, GILES JACOB, A NEW LAW-DICTIONARY (6th ed. 1750) (noting that the Commissioners should assign "the Bankrupt's Effects" to those chosen by creditors); *Bankrupt*, THOMAS POTTS, A COMPENDIOUS LAW DICTIONARY (1803) (advising, for example, that a bankrupt person must "disclose and discover all his estate and effects, real and personal").[34]

If the digital records in the CAT system are investors' or brokers' papers or effects, it's likely a government "search" is occurring. A "search" means "to look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief." *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (quoting N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 66 (1828) (reprint 6th ed. 1989)). The government's acquisition of a person's voluminous digital records amounts to a search. *See Carpenter*, 585 U.S. at 316 (holding the "Government's acquisition of

---

[34] *See also id*. at 985.

the cell-site records was a search within the meaning of the Fourth Amendment"). The amount and breadth of the information acquired and analyzed by the government in *Carpenter* contributed to the Supreme Court's finding that a search had occurred in that case. *Id*. at 311. In *Carpenter*, the federal government acquired records containing 12,898 datapoints about an individual's location over a period of 127 days. *Id*. at 302.

Here, the government is clearly acquiring far more voluminous digital records in the CAT system. The CAT records contain tens of billions of datapoints about investors' financial dealings stretching over years. It maintains "the ability to track one Customer's market activity across multiple exchanges," and its personal ID numbers allow "for the tracking of a specific order of a Customer throughout its entire lifecycle" and "greatly facilitate[] the regulatory and surveillance efforts of the Participants and the Commission."[35] The SEC goes so far as to call its examination of CAT records "searches."[36] Courts should have little trouble, then, finding that the government conducts a search when it accesses and (in SEC

---

[35] Information Order, 91 Fed. Reg. at 2168, 2173–74.

[36] Consolidated Audit Trail, 77 Fed. Reg. at 45798 (illustrations of how the SEC will use the CAT system include "*searching* for trades with trade sizes above a certain threshold, *searching* for trades in securities with execution prices that change more than a certain percentage in a given period of time, and *searching* for orders that are canceled within a certain period of time") (emphasis added).

parlance) searches historical trading records that provide a comprehensive chronicle of investors' and brokers' past transactions.[37]

Finally, it's worth distinguishing the CAT system from the financial surveillance challenged in the *California Bankers* case. In *California Bankers*, the Supreme Court rejected depositors' Fourth Amendment challenge to new Bank Secrecy Act requirements that banks report "abnormally large transactions" to the government. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 67 (1974). However, the Court did not evaluate the merits of the Fourth Amendment issues because the depositors lacked standing to sue. *Id*. at 67–68. Further, it was significant to the Court that the "required records" in that case "would 'not be made automatically available for law enforcement purposes, [but could] only be obtained through existing legal process.'" *Id*. at 27 (quoting congressional reports) (citations omitted). *California Bankers*, therefore, has little application to the Final Rule and the CAT system, especially given the Court *dicta* in *California Bankers* expressing special skepticism about government rules requiring "automatic availability" of financial records.

---

[37] If the SEC believed in 2012 that the CAT system fell within the administrative search doctrine, the Supreme Court effectively foreclosed that possibility in a 2015 case. *See Los Angeles v. Patel*, 576 U.S. 409, 424 (2015) (limiting the doctrine to four specific industries and refusing to extend the doctrine to include hotels' customer records).

**B. The CAT System Records Do Not Fall Within the Third-Party Doctrine.**

Certain information that people turn over to commercial companies falls outside the protection of the Fourth Amendment. *See United States v. Miller*, 425 U.S. 435 (1976) (holding that a depositor had no legitimate expectation of privacy concerning certain financial records held by a bank). The Supreme Court has said that its *Miller* decision, which concerned financial records, stands for the principle that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith*, 442 U.S. at 743–44 (citing *Miller*, 425 U.S. at 442–44).

However, the Supreme Court has narrowed the third-party doctrine in recent years in ways that highlight that the CAT system is distinguishable from the circumstances in *Miller*. The CAT system data collection more closely resembles *Carpenter*, where the third-party exception did not apply, than *Miller*, where the third-party exception applied. The Court in *Carpenter* declined to extend *Miller*, *Smith*, and the "third-party doctrine" to a suspect's extensive digital (cellphone) records that were automatically transmitted to a third party. *Carpenter*, 585 U.S. at 311, 313 (majority denying that the third-party doctrine applied to the location records Carpenter transmitted to his phone company). In *Miller*, it was critical that "[a]ll of the documents obtained, including financial statements and deposit slips, contain only information *voluntarily conveyed to the banks* and exposed to their

24

employees in the ordinary course of business." *Miller*, 425 U.S. at 442 (emphasis added). In contrast, the Court said in *Carpenter*, "in no meaningful sense does the [cellphone] user voluntarily 'assume[] the risk' of turning over a comprehensive dossier of his physical movements" to a phone company. *Carpenter*, 585 U.S. at 315.

Likewise, here, as explained *supra* regarding state action, the brokers and the investors are not "voluntarily conveying" the customer identifiers and financial records to the government-accessible CAT repositories. The information in these repository records is mandated by the government, automatically and daily transmitted. *Miller* is inapposite.

## C. Searches of Investors' and Brokers' Papers or Effects Are Unreasonable.

The Supreme Court has said that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 653 (1995). In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. *See Kentucky v. King*, 563 U.S. 452, 459 (2011). The SEC is seeking to "discover

evidence of criminal wrongdoing" but has not explained which exception to the warrant requirement its searches of the CAT system records might fall under.[38]

Further, the Supreme Court has recognized in recent years that, in determining the reasonableness of digital records searches, the government's analogies to the pre-digital, "manual" era of government surveillance often do not apply. *See Riley*, 573 U.S. at 386; *Carpenter*, 585 U.S. at 312 ("[T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection . . . Whoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years."). In *Riley*, for instance, the Supreme Court prohibited the warrantless search of a digital storage device (a "flip phone"). In its decision, the Court rejected the government's extrapolation of legal precedents regarding traditional, often physical, records to digital records. *Riley*, 573 U.S. at 386 ("[W]hile *Robinson*'s categorical rule strikes the appropriate balance in the context of physical objects, neither of its rationales

---

[38] *See*, *e.g.*, Consolidated Audit Trail, 77 Fed. Reg. at 45772 ("With this information, regulators could more quickly initiate investigations, and more promptly take appropriate enforcement action."); Information Order, 91 Fed. Reg. at 2166, 2184 ("The [CAT Customer-ID] may then be used by the Participants' regulatory staff and Commission staff in queries and analysis of CAT data."). As explained *supra*, it is longstanding SEC policy to share information and coordinate with criminal prosecutors for criminal enforcement. *See* U.S. Sec. & Exch. Comm'n, *Enforcement Manual* 5-83 (2026).

has much force with respect to digital content on cell phones."). The Court, in fact, cited government searches of financial records as the troubling example of the invasive warrantless searches that would follow from the government's impermissible extrapolation from precedent: "The fact that someone could have tucked a paper bank statement in a pocket does not justify a search of every bank statement from the last five years." *Id*. at 400.

In *Riley* and *Carpenter*, the Court rejected warrantless inspections of a much smaller amount of personal data from people with a lesser privacy interest—suspects in police detention or named as an accomplice in a series of crimes—than what is contemplated here. *See id. at* 393; *Carpenter*, 585 U.S. at 301–02. The SEC, without a warrant and absent a showing of even reasonable suspicion, is acquiring and searching massive amounts of investors' and brokers' personal information and transactions stretching back years. Any agency mandating such an extensive and automatic data collection and surveillance system of millions of Americans should be expected to explain which exception to the Fourth Amendment's warrant requirement the agency is relying on.

## CONCLUSION

The SEC's Order funding the CAT system has significant political and economic implications, including possible violations of the Fourth and Fifth Amendment rights of brokers and investors, that could cause irreparable injury to

27

the public. Because Congress has not spoken clearly about the agency's authority to create an automatic, national, and daily production order to investors and financial institutions, this Court should set aside the Order funding the CAT system.

Respectfully submitted,

Thomas A. Berry
    *Counsel of Record*
Kimberly Coleman
CATO INSTITUTE
1000 Massachusetts Ave., NW
Washington, DC 20001
(443) 254-6330
tberry@cato.org

Dated: May 28, 2026

*Counsel for Amicus Curiae*

28

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,456 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman typeface.

<u>/s/ Thomas A. Berry</u>

Dated: May 28, 2026                    *Counsel for Amicus Curiae*

29

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on May 28, 2026, he electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the Eleventh Circuit using the CM/ECF system. The undersigned also certifies that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Thomas A. Berry

Dated: May 28, 2026                *Counsel for Amicus Curiae*

30