**No. 26-10936**

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

CONSOLIDATED AUDIT TRAIL LLC; THE NASDAQ STOCK
MARKET, LLC, ET AL.,

*Intervenors*.

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-105003; File No. 4-698

## APPENDIX
## VOLUME 1

J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner*
*American Securities Association*

Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner*
*Citadel Securities LLC*

# INDEX OF APPENDIX

**Tab**

**Volume 1**

Certified List Describing the Record in Proceedings Before the
Securities and Exchange Commission (Apr. 27, 2026) (A1-A5) ................ A

Notice of Filing of Amendment to the National Market System
Plan Governing the Consolidated Audit Trail Regarding CAT
Funding Model, Securities Exchange Act Release No. 103960
(Sept. 12, 2025), published at 90 Fed. Reg. 44,910
(Sept. 17, 2025) (A6-A45) ............................................................. B

Letter from Gentry Collins, CEO, The American Free Enterprise
Chamber of Commerce (Oct. 17, 2025) (A46-A52) ................................ C

Letter from Steffen N. Johnson, Wilson Sonsini Goodrich &
Rosati Professional Corporation on behalf of the Financial
Industry Regulatory Authority, Inc. (FINRA) (Oct. 17, 2025)
(A53-A69) .................................................................................. D

Letter from Stephen John Berger, Managing Director, Global
Head of Government and Regulatory Policy, Citadel Securities,
(Oct. 17, 2025) (A70-A83) ............................................................. E

Letter from Joseph P. Corcoran, Managing Director and Associate
General Counsel, and Katie Kolchin CFA, Managing Director,
Head of Equity & Options Market Structure, The Securities
Industry and Financial Markets Association (SIFMA),
(Oct. 21, 2025) (A84-A88) ............................................................. F

Letter from Christopher A. Iacovella, President & Chief Executive
Officer, American Securities Association
(Oct. 31, 2025) (A89-A94) ............................................................. G

Letter from Patrick Sexton, EVP, General Counsel & Corporate
Secretary, The Cboe Exchanges (CBOE)
(Oct. 31, 2025) (A95-A96) ............................................................. H

Letter from Joanna Mallers, Secretary, PTG (Nov. 24, 2025)
(A97-A100) ...................................................................................... I

Letter from Robert Walley, CAT NMS Plan Operating Committee
Chair, Consolidated Audit Trail, LLC (Dec. 18, 2025)
(A101-A125) ..................................................................................... J

Letter from Gerald O'Hara, Vice President & Assistant General
Counsel, and Katie Kolchin CFA, Managing Director, Head of
Equity & Options Market Structure, The Securities Industry
and Financial Markets Association (SIFMA)
(Dec. 19, 2025) (A126-A130) ...................................................... K

Letter from Robert Walley, CAT NMS Plan Operating Committee
Chair, Consolidated Audit Trail, LLC,
(Jan. 14, 2026) (A131-A136) ....................................................... L

Letter from Stephen John Berger, Managing Director, Global
Head of Government & Regulatory Policy, Citadel Securities,
(Jan. 30, 2026) (A137-A145) ...................................................... M

Letter from Steffen N. Johnson, Wilson Sonsini Goodrich &
Rosati Professional Corporation on behalf of the Financial
Industry Regulatory Authority, Inc.
(FINRA) (Jan. 30, 2026) (A146-A150) ...................................... N

Letter from Marcia E. Asquith, Corporate Secretary, EVP, Board
and External Relations, Financial Industry Regulatory
Authority, Inc. (FINRA) (Jan. 30, 2026) (A151-A154) ............................. O

Letter from Howard Meyerson, Managing Director, Financial
Information Forum (Feb. 10, 2026) (A155-A181)................................... P

Letter from Christopher A. Iacovella, President & Chief Executive
Officer, American Securities Association (Feb. 10, 2026)
(A182-A187) .................................................................................... Q

**Volume 2**

**Tab**

Order Approving an Amendment to the National Market System
   Plan Governing the Consolidated Audit Trail, as Modified by
   the Commission, Regarding Implementation of a Revised
   Funding Model, Securities Exchange Act Release No. 105003
   (Mar. 16, 2026), published at 91 Fed. Reg. 13,410
   (Mar. 19, 2026) (A188-A259) ............................................................... R

Certificate of Service

# TAB A

Certified List Describing the Record in Proceedings Before the
Securities and Exchange Commission (Apr. 27, 2026)

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

AMERICAN SECURITIES ASSOCIATION and
CITADEL SECURITIES LLC,

      *Petitioners*,

      v.

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

      *Respondent.*

No. 26-10936

**CERTIFIED LIST DESCRIBING
THE RECORD IN PROCEEDINGS
BEFORE THE SECURITIES AND EXCHANGE COMMISSION**

Pursuant to Section 25(a)(2) of the Securities Exchange Act of 1934, 15 U.S.C. 78y(a)(2), and Federal Rule of Appellate Procedure 17, the Securities and Exchange Commission certifies that the items listed below constitute the record upon which the order under review in this Court was entered, with the exception of materials that are publicly available such as statutes, rules, judicial decisions, Commission orders and releases, books, treatises, and other similar materials.[1]

---

[1] The order under review considered certain comments received in connection with prior Commission proceedings. *See* Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by the Commission, Regarding Implementation of a Revised Funding Model, 91 Fed. Reg. 13,410, 13,415 & nn.73-74 (Mar. 19, 2026) (identifying the prior comment letters considered). Those prior comments are publicly available at https://www.sec.gov/comments/4-698/4-698-a.htm.

1

**A1**

Doc.
No.                                    Description

1.          Notice of Filing of Amendment to the National Market System Plan
            Governing the Consolidated Audit Trail Regarding CAT Funding
            Model, Securities Exchange Act Release No. 103960 (Sept. 12, 2025),
            published at 90 Fed. Reg. 44,910 (Sept. 17, 2025).

Comment Letters (https://www.sec.gov/comments/4-698/4-698-a.htm)

2.          Gentry Collins, CEO, The American Free Enterprise Chamber of
            Commerce, Oct. 17, 2025.

3.          Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati Professional
            Corporation on behalf of the Financial Industry Regulatory Authority,
            Inc. (FINRA), Oct. 17, 2025.

4.          Stephen John Berger, Managing Director, Global Head of Government
            and Regulatory Policy, Citadel Securities, Oct. 17, 2025.

5.          Joseph P. Corcoran, Managing Director and Associate General Counsel,
            and Katie Kolchin CFA, Managing Director, Head of Equity & Options
            Market Structure, The Securities Industry and Financial Markets
            Association (SIFMA), Oct. 21, 2025.

6.          Christopher A. Iacovella, President & Chief Executive Officer,
            American Securities Association, Oct. 31, 2025.

7.          Patrick Sexton, EVP, General Counsel & Corporate Secretary, The Cboe
            Exchanges (CBOE), Oct. 31, 2025.

8.          Joanna Mallers, Secretary, PTG, Nov. 24, 2025.

9.          Robert Walley, CAT NMS Plan Operating Committee Chair,
            Consolidated Audit Trail, LLC, Dec. 18, 2025.

10.         Gerald O'Hara, Vice President & Assistant General Counsel, and Katie
            Kolchin CFA, Managing Director, Head of Equity & Options Market
            Structure, The Securities Industry and Financial Markets Association
            (SIFMA), Dec. 19, 2025.

2

**A2**

| Doc. No. | Description |
|---|---|
| 11. | Robert Walley, CAT NMS Plan Operating Committee Chair, Consolidated Audit Trail, LLC, Jan. 14, 2026. |
| 12. | Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, Jan. 30, 2026. |
| 13. | Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati Professional Corporation on behalf of the Financial Industry Regulatory Authority, Inc. (FINRA), Jan. 30, 2026. |
| 14. | Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, Financial Industry Regulatory Authority, Inc. (FINRA), Jan. 30, 2026. |
| 15. | Howard Meyerson, Managing Director, Financial Information Forum, Feb. 10, 2026. |
| 16. | Christopher A. Iacovella, President & Chief Executive Officer, American Securities Association, Feb. 10, 2026 |

Meetings with SEC Officials (https://www.sec.gov/comments/4-698/4-698-a.htm)

| | |
|---|---|
| 17. | Memorandum from the Division of Trading and Markets regarding a December 12, 2025, meeting with the Participants, dated Dec. 12, 2025. |
| 18. | Memorandum from the Division of Trading and Markets regarding a November 20, 2025, meeting with the Participants, dated Dec. 19, 2025. |
| 19. | Memorandum from the Division of Trading and Markets regarding a January 13, 2026, meeting with the Participants, dated Jan. 13, 2026. |
| 20. | Memorandum from the Division of Trading and Markets regarding a January 30, 2026, meeting with the Participants, dated Jan. 30, 2026. |
| 21. | Memorandum from the Division of Trading and Markets regarding a February 4, 2026, meeting with the Participants, dated Feb. 4, 2026. |

3

**A3**

Doc.
No.                            Description

Additional Materials

22.       Order Instituting Proceedings to Determine Whether to Approve or
          Disapprove an Amendment to the National Market System Plan
          Governing the Consolidated Audit Trail, Securities Exchange Act
          Release No. 104234 (Nov. 21, 2025), published at 90 Fed. Reg. 54,438
          (Nov. 26, 2025).

23.       Order Approving an Amendment to the National Market System Plan
          Governing the Consolidated Audit Trail, as Modified by the
          Commission, Regarding Implementation of a Revised Funding Model,
          Securities Exchange Act Release No. 105003 (Mar. 16, 2026), published
          at 91 Fed. Reg. 13,410 (Mar. 19, 2026).


          For the Commission, by its Secretary, pursuant to delegated authority.


                              _____
                              J. Matthew DeLesDernier
                              Deputy Secretary


Dated:  April 27, 2026

**A4**

# CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2026, I electronically filed the foregoing Certified List Describing the Record in Proceedings Before the Securities and Exchange Commission using the Court's CM/ECF system, which will send notice to all the parties.

/s/ Daniel E. Matro
Daniel E. Matro
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-8248
matrod@sec.gov

Dated:  April 27, 2026

# TAB B

Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail Regarding CAT Funding Model, Securities Exchange Act Release No. 103960 (Sept. 12, 2025), published at 90 Fed. Reg. 44,910 (Sept. 17, 2025)

## SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–103960; File No. 4–698]**

**Joint Industry Plan; Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail Regarding CAT Funding Model**

September 12, 2025.

### I. Introduction

On September 5, 2025, the Consolidated Audit Trail, LLC ("CAT LLC"), on behalf of the following parties to the National Market System Plan Governing the Consolidated Audit Trail (the "CAT NMS Plan" or "Plan"): [1] 24X National Exchange LLC, BOX Exchange LLC, Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc. ("FINRA"), Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX LLC, Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, MIAX Sapphire, LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, The NASDAQ Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc., and NYSE Texas, Inc. (collectively, the "Participants," "self-regulatory organizations," or "SROs") filed with the Securities and Exchange Commission ("SEC" or "Commission") pursuant to Section 11A(a)(3) of the Securities Exchange Act of 1934 ("Exchange Act"),[2] and Rule 608 thereunder,[3] a proposed amendment to implement a revised funding model (the "Funding Proposal") for the consolidated audit trail (the "CAT") and to establish a fee schedule for Participant CAT fees in accordance with the Funding Proposal.[4] *Exhibit A* sets

forth the cumulative changes proposed to be made to the CAT NMS Plan. The Commission is publishing this notice to solicit comments from interested persons on the Funding Proposal.

### II. Description of the Plan

Set forth in this Section II is the description of the proposed Funding Proposal, along with information required by Rule 608(a) under the Exchange Act,[5] as prepared and submitted by the Participants to the Commission.[6]

When the Commission approved the CAT NMS Plan in 2016, the Commission approved the funding model set forth in Article XI of the original CAT NMS Plan (the "Original Funding Model"). The Original Funding Model involved a bifurcated approach, where costs associated with building and operating the CAT would be borne by (1) Industry Members (other than alternative trading systems ("ATSs") that execute transactions in Eligible Securities ("Execution Venue ATSs")) through fixed tiered fees based on message traffic for Eligible Securities, and (2) Participants and Industry Members that are Execution Venue ATSs for Eligible Securities through fixed tiered fees based on market share.

On September 6, 2023, the SEC approved a proposed amendment to the CAT NMS Plan to replace the Original Funding Model with a new funding model (the "Executed Share Model").[7] The Executed Share Model charged fees based on executed equivalent share volume of transactions in Eligible Securities whereas the Original Funding Model charged fees based on market share and message traffic. In proposing the Executed Share Model, CAT LLC had undertaken an extensive process of evaluating and seeking comment on various funding models since the inception of CAT. In addition to the variety of alternative models considered by CAT LLC (as described in Section A.10 of this filing), the Executed Share Model was subject to substantial public review and comment via the proposed amendment to the CAT NMS Plan published by the SEC on May 25, 2022 (the "2022 Funding Proposal"),[8] the subsequent order instituting proceedings related to the 2022 Funding

Proposal [9] and two partial amendments regarding the 2022 Funding Proposal,[10] as well as the proposed amendment to the CAT NMS Plan published by the SEC on March 15, 2023 ultimately approved by the Commission.[11]

Under the Executed Share Model, CAT LLC established two categories of CAT fees. The first category of CAT fees were fees ("CAT Fees") payable by Participants and Industry Members that are CAT Executing Brokers for the Buyer and for the Seller with regard to CAT costs not previously paid by the Participants ("Prospective CAT Costs"). The CAT Fee for each transaction was calculated by multiplying the executed equivalent shares in the transaction by one-third and the applicable "Fee Rate." The Executed Share Model described in detail each aspect relevant to the CAT Fees, including a description of the Prospective CAT Costs, the calculation of the Fee Rate, the definition of "CAT Executing Broker," the fee filings made pursuant to Section 19(b) of the Exchange Act for CAT Fees, and information available related to CAT Fees, both publicly and upon request.

The second category of CAT fees were fees ("Historical CAT Assessments") to be payable by Industry Members that are CAT Executing Brokers for the Buyer and for the Seller with regard to CAT costs previously paid by the Participants ("Past CAT Costs"). The Historical CAT Assessment for each transaction was calculated by multiplying the number of executed equivalent shares in the transaction by one-third and the applicable "Historical Fee Rate." Like with the CAT Fees related to Prospective CAT Costs, the Funding Proposal described in detail each aspect relevant to Historical CAT Assessments, including a description of Historical CAT Costs, the calculation of the Historical Fee Rate, the definition of "CAT Executing Broker," the fee filings made pursuant to Section 19(b) of the Exchange Act for Historical CAT Assessments, and information available related to Historical CAT Assessments, both publicly and upon request.

After the SEC approved the Executed Share Model, each Participant separately filed rule filings under Section 19(b) of the Exchange Act and

---

[1] In July 2012, the Commission adopted Rule 613 of Regulation NMS, which required the Participants to jointly develop and submit to the Commission a national market system plan to create, implement, and maintain a consolidated audit trail (the "CAT"). *See* Securities Exchange Act Release No. 67457 (July 18, 2012), 77 FR 45722 (Aug. 1, 2012 ("Rule 613 Adopting Release"); 17 CFR 242.613. On November 15, 2016, the Commission approved the CAT NMS Plan. *See* Securities Exchange Act Release No. 78318 (Nov. 15, 2016), 81 FR 84696 (Nov. 23, 2016) ("CAT NMS Plan Approval Order"). The CAT NMS Plan is Exhibit A to the CAT NMS Plan Approval Order. See CAT NMS Plan Approval Order, at 84943–85034.

[2] 15 U.S.C. 78k–1(a)(3).

[3] 17 CFR 242.608.

[4] *See* Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission, dated Sept. 5, 2025.

[5] *See* 17 CFR 242.608(a).

[6] *See* Transmittal Letter, *supra* note 4. Unless otherwise defined herein, capitalized terms used herein are defined as set forth in the CAT NMS Plan.

[7] Securities Exchange Act Rel. No. 98290 (Sept. 6, 2023), 88 FR 62628 (Sept. 12, 2023) ("Executed Share Model Approval Order").

[8] Securities Exchange Act Rel. No. 94984 (May 25, 2022), 87 FR 33226 (June 1, 2022) ("2022 Funding Proposal Release").

[9] Securities Exchange Act Rel. No. 95634 (Aug. 30, 2022), 87 FR 54558 (Sept. 6, 2022).

[10] Securities Exchange Act Rel. No. 96394 (Nov. 28, 2022), 87 FR 74183 (Dec. 2, 2022) ("Partial Amendment I"), and Letter from Michael Simon, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Feb. 15, 2023) ("February 2023 Proposed Partial Amendment").

[11] Securities Exchange Act Rel. No. 97151 (Mar. 15, 2023), 88 FR 17086 (Mar. 21, 2023) ("Executed Share Model Proposal Release").

Rule 19b–4(f)(2) thereunder to establish CAT Fees and a Historical CAT Assessment to be charged to Industry Members based on the Executed Share Model. Specifically, to date, each of the Participants filed fee filings related to three CAT Fees [12] and one Historical CAT Assessment,[13] and CAT LLC has collected or is collecting such CAT fees. To date, the process for billing and collecting CAT fees has proven to be highly efficient and manageable to administer, with approximately 99% of CAT fees paid on time. In addition, the Plan Processor makes available trade-by-trade data to CAT Executing Brokers for each CAT bill. CAT LLC understands that many Industry Members have implemented processes to pass-through their CAT fees to upstream broker-dealers and customers.

In response to comments on the Executed Share Model that Participants should be prohibited from passing-on their CAT cost allocation to their members, CAT LLC stated that Participants are permitted by the Exchange Act to charge their members fees to fund the Participants' share of CAT fees, as long as they submit fee filings that demonstrate that any proposed fee is consistent with the Exchange Act.[14] The Commission's 2012 order adopting Rule 613 specifically acknowledges that the Participants may seek to pass-through CAT costs,[15] the CAT NMS Plan approved in 2016 contemplates that "Participants may charge their members to cover the CAT NMS Plan costs either explicitly or subsume those costs in other fees or assessments," [16] and the

Commission's 2023 order approving the Executed Share Model explains that Participants could choose to pass-through their CAT fee allocations to their members subject to the Section 19(b) fee filing process.[17] To date, however, only FINRA has sought to pass-through its CAT fees. The CAT NMS Plan itself does not address whether Industry Members may pass-through their CAT fees to their investors.

On July 25, 2025, the U.S. Court of Appeals for the Eleventh Circuit vacated the Commission's order approving the Executed Share Model,[18] finding that the Executed Share Model Approval Order violated the Administrative Procedures Act as a result of (1) the Commission allowing for the possibility for "self-regulatory organizations to pass through 100% of their fees to broker-dealers—without considering the effects of that choice," [19] and (2) the Commission failing to "conduct a new economic analysis or revise its previous economic analysis" [20] in the Executed Share Model Approval Order. The Court acknowledged that no self-regulatory organization other than FINRA has asked for 100% pass-through approval so far, but noted that the Executed Share Model Approval Order does not limit the potential for 100% pass-through costs to FINRA. The Court temporarily stayed its order to allow the SEC to conduct a new economic analysis and to reconsider the allocation of Historical CAT Costs and Prospective CAT Costs in accordance with the Court's opinion. Once the Court's judgment takes effect, however, there will be no ongoing source of funding for the continued operation of the CAT absent further Commission action.[21]

To address the pass-through fee discussion in the Eleventh Circuit's opinion, CAT LLC proposes to add a new paragraph (e) to Section 11.3 providing that each Participant agrees not to establish a new fee for passing through its CAT fees.[22] The proposed

amendment does not address whether Industry Members may pass-through their CAT fees to their customers; as discussed below, CAT LLC understands that many Industry Members do pass-through their CAT fees. Subject to the addition of this new paragraph and a discussion thereof, the Funding Proposal set forth herein is the same proposal as the Executed Share Model. The changes made to the Executed Share Model are noted in this filing, and separately identified in *Exhibit B* to this filing.

The Participants and the Commission depend on the CAT for vital regulatory functions, but the CAT cannot exist without a viable funding model. CAT LLC welcomes the SEC Chairman's leadership in calling for a comprehensive review of the CAT and will be working collaboratively and expeditiously with the Commission to dramatically reduce CAT costs while preserving effective market oversight and surveillance, but it is also critical to resolve the fundamental issue of how to fund the CAT. The Commission has long recognized that, "[b]ecause the CAT is a critical regulatory tool/system, the CAT needs to have a stable funding source to build financial stability to support the Company as a going concern," and that "[f]unding for the CAT, as noted in Section 11.1(b), is the responsibility of the Participants and the industry." [23] While reducing overall CAT operating costs remains a top priority, the Commission should simultaneously ensure the necessary funding still exists to operate the CAT.

The Funding Proposal would provide reasonable fees that are equitably allocated, not unfairly discriminatory, and do not impose an undue burden on competition, in that the proposal reflects a reasonable effort to allocate costs based on the extent to which different CAT Reporters participate in and benefit from the equities and options markets. Moreover, the Funding Proposal would be consistent with past fee structures that have been approved by the Commission. It also is transparent, has proven to be relatively easy to calculate and administer, and is designed not to have an impact on market activity because it is neutral as to the location and manner of execution.

---

[12] Each of the Participants filed rule filings to implement CAT Fee 2024–1, CAT Fee 2025–1 and CAT Fee 2025–2. *See, e.g.,* Securities Exchange Act Rel. No. 100828 (Aug. 27, 2024), 89 FR 71699 (Sept. 3, 2024) (New York Stock Exchange LLC filing for CAT Fee 2024–1); Securities Exchange Act Rel. No. 102054 (Dec. 30, 2024), 90 FR 714 (Jan. 6, 2025) (Long-Term Stock Exchange, Inc. filing for CAT Fee 2025–1); Securities Exchange Act Rel. No. 103400 (July 8, 2025), 90 FR 30172 (July 11, 2025) (Investors Exchange LLC filing for CAT Fee 2025–2).

[13] Each of the Participants filed rule filings to implement Historical CAT Assessment 1. *See, e.g.,* Securities Exchange Act Rel. No. 100936 (Sept. 5, 2024), 89 FR 74430 (Sept. 22, 2024) (BOX Exchange LLC filing for Historical CAT Assessment 1).

[14] *See* Executed Share Model Approval Order at 62635.

[15] *See* Securities Exchange Act Rel. No. 67457 (Jul. 18, 2012), 77 FR 45722, 45795 (Aug. 1, 2012) ("Rule 613 Adopting Release") ("[A]lthough the plan sponsors likely would initially incur the costs to establish and fund the central repository directly, they may seek to recover some or all of these costs from their members.").

[16] CAT NMS Plan at Appendix C–80. *See also* Securities Exchange Act Rel. No. 79318 (Nov. 15, 2016), 81 FR 84696, 84795 (Nov. 23, 2016) ("CAT NMS Plan Approval Order") ("[T]he Participants are permitted to recoup their regulatory costs under

the Exchange Act through the collection of fees from their members, as long as such fees are reasonable, equitably allocated and not unfairly discriminatory, and otherwise are consistent with Exchange Act standards.").

[17] Executed Share Model Approval Order at 62655.

[18] *Am. Sec. Ass'n, Citadel Sec. LLC* v. *U.S. Sec. & Exch. Comm'n,* No. 23–13396, 2025 WL 2092054 (11th Cir. July 25, 2025).

[19] *Id.* at 20.

[20] *Id.* at 24.

[21] Prior to the SEC's approval of the Executed Share Model, CAT was funded entirely by voluntary loans from the Participants; such an approach is not sustainable.

[22] Appendix C of the CAT NMS Plan provides that "Participants may charge their members to cover the CAT NMS Plan costs either explicitly or

subsume those costs in other fees or assessments." Because the Commission has acknowledged that Appendix C was not intended to be continually updated once the CAT NMS Plan was approved, CAT LLC is not proposing to update Appendix C to reflect the proposed amendments. *See* Securities Exchange Act Rel. No. 89632 (Aug. 21, 2020), 85 FR 65990 (Oct. 16, 2020).

[23] Executed Share Model Approval Order at 62657.

The Exchange Act does not require CAT LLC to demonstrate that the Funding Proposal is superior to any other potential proposal. Instead, CAT LLC must demonstrate that the Funding Proposal is consistent with the Exchange Act and the rules and regulations thereunder. CAT LLC believes that the Funding Proposal satisfies the requirements of the Exchange Act and the Eleventh Circuit's opinion and should be approved by the Commission.

*Requirements Pursuant to Rule 608(a)*

A. Description of the Proposed Amendments to the CAT NMS Plan

CAT LLC describes in detail the Funding Proposal in this Section A. As noted above, other than the addition of new paragraph (e) to Section 11.3 providing that each Participant agrees not to establish a new fee for passing through its CAT fees, the proposed amendments set forth in *Exhibit A* of this filing are identical to the amendments adopted in the Executed Share Model Approval Order. The Executed Share Model was approved in 2023 and the first CAT Fees and Historical CAT Assessments based on the Executed Share Model were introduced in 2024. In this time, the Commission, Participants and Industry Members all have gained substantial experience through the implementation of the funding model and in how the model operates, including, for example, how CAT fees are calculated and charged to a CAT Executing Broker. In addition, the process for issuing and paying CAT invoices has proven to work effectively.[24] Accordingly, other than addressing the pass-through fee discussion in the Eleventh Circuit's opinion, the Funding Proposal does not introduce any novel regulatory or operational issues.

• *Definition of CAT Executing Broker:* CAT LLC describes the definition of a "CAT Executing Broker" in Section A.1 of this filing.

• *CAT Budget:* Budgeted CAT costs are described in Section A.2 of this filing.

• *CAT Fees related to Prospective CAT Costs:* CAT LLC discusses CAT Fees related to Prospective CAT Costs in Section A.3 of this filing.

• *Historical CAT Assessments:* CAT LLC discusses Historical CAT Assessments related to Historical CAT Costs in Section A.4 of this filing.

• *Participant Pass-Through Fees:* CAT LLC discusses Participant pass-through fees in Section A.5 of this filing.

• *CAT Fee Schedule for Participants:* To implement the CAT fees to be paid by the Participants under the Funding Proposal, CAT LLC proposes to add a fee schedule, entitled "Consolidated Audit Trail Funding Fees," to Appendix B of the CAT NMS Plan. This fee schedule is discussed in Section A.6 of this filing.

• *Additional Changes from Original Funding Model:* CAT LLC discusses additional proposed revisions to Article XI of the CAT NMS Plan to implement the change from the Original Funding Model to the Funding Proposal in Section A.7 of this filing.

• *Billing and Collection of CAT Fees:* The billing and collection of CAT fees are discussed in Section A.8 of this filing.

• *Advantages of and Support for Funding Proposal:* CAT LLC proposes to adopt the Funding Proposal as it provides a variety of advantages over the Original Funding Model. CAT LLC discusses the advantages of the Funding Proposal in Section A.9 of this filing.

• *Alternative Funding Models Considered:* CAT LLC discusses the advantages and disadvantages of a variety of alternative funding models to the Funding Proposal in Section A.10 of this filing.

• *Satisfaction of Exchange Act and CAT NMS Plan Requirements:* CAT LLC discusses how the Funding Proposal satisfies each of the funding principles and other requirements of the CAT NMS Plan, as proposed to be revised herein, as well as the applicable requirements of the Exchange Act in Section A.11 of this filing.

1. Definition of CAT Executing Broker

Under the Funding Proposal, each Industry Member that is a CAT Executing Broker for the buyer in a transaction in Eligible Securities ("CAT Executing Broker for the Buyer" or "CEBB") and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities ("CAT Executing Broker for the Seller" or "CEBS") would be required to pay CAT Fees and Historical CAT Assessments. Accordingly, CAT LLC proposes to add a definition of the

term "CAT Executing Broker" to Section 1.1 of the CAT NMS Plan. CAT LLC would define "CAT Executing Broker" to mean:

(a) with respect to a transaction in an Eligible Security that is executed on an exchange, the Industry Member identified as the Industry Member responsible for the order on the buy-side of the transaction and the Industry Member responsible for the sell-side of the transaction in the equity order trade event and option trade event in the CAT Data submitted to the CAT by the relevant exchange pursuant to the Participant Technical Specifications; and (b) with respect to a transaction in an Eligible Security that is executed otherwise than on an exchange and required to be reported to an equity trade reporting facility of a registered national securities association, the Industry Member identified as the executing broker and the Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event in the CAT Data submitted to the CAT by FINRA pursuant to the Participant Technical Specifications; provided, however, in those circumstances where there is a non-Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event or no contra-side executing broker is identified in the TRF/ORF/ADF transaction data event, then the Industry Member identified as the executing broker in the TRF/ORF/ADF transaction data event would be treated as CAT Executing Broker for the Buyer and for the Seller.

Under the Participant Technical Specifications, for transactions occurring on a Participant exchange, there is a field for the exchange to report the market participant identifier ("MPID") of "the member firm that is responsible for the order on this side of the trade."[25] The Industry Members identified in these fields for the transaction reports would be the CAT Executing Brokers for transactions executed on an exchange. Specifically, the following fields of the Participant Technical Specifications would indicate the CAT Executing Brokers for the transactions executed on an exchange.

---

[24] There have been only three fee dispute applications filed (two of which were by the same firm relating to the same issue) out of approximately 5,778 invoices issued through August 2025. Those few issues were promptly resolved via a corrected invoice without the need for a decision made through the formal fee dispute resolution process.

[25] *See* Section 4.7 (Order Trade Event) and Section 5.2.5.1 (Simple Option Trade Event: Side Details) of the CAT Reporting Technical Specifications for Plan Participants, Version 4.2.0–r1 (Aug. 22, 2025) ("Participant Technical Specifications), *https://www.catnmsplan.com/sites/default/files/2025-08/08.22.2025-CAT_Reporting_Technical_Specifications_for_Participants_4.2.0-r1.pdf.*

## EQUITY ORDER TRADE (EOT) [26]

| # | Field name | Data type | Description | Include key |
|---|---|---|---|---|
| 12.*n*.8/13.*n*.8 ................... | member .......................... | Member Alias ................. | The identifier for the member firm that is responsible for the order on this side of the trade. Not required if there is no order for the side as indicated by the NOBUYID/NOSELLID instruction. This must be provided if orderID is provided. | C |

## OPTION TRADE (OT) [27]

| # | Field name | Data type | Description | Include key |
|---|---|---|---|---|
| 16.*n*.13/17.*n*.13 ............... | member .......................... | Member Alias ................. | The identifier for the member firm that is responsible for the order. | R |

FINRA is required to report to the CAT transactions in Eligible Securities reported to a FINRA trade reporting facility (*i.e.,* the FINRA Trade Reporting Facilities (''TRF''), Over-the Counter Reporting Facility (''ORF'') and Alternative Display Facility (''ADF'')).[28] Under the Participant Technical Specifications, for such transactions reported to a FINRA trade reporting facility, FINRA is required to report the MPID of the executing party as well as the MPID of the contra-side executing party. The Industry Members identified in these two fields for the transaction reports would be the CAT Executing Brokers for over-the-counter transactions. Specifically, the following fields of the Participant Technical Specifications will indicate the CAT Executing Brokers for the transactions executed otherwise than on an exchange.

## TRF/ORF/ADF TRANSACTION DATA EVENT (TRF) [29]

| # | Field name | Data type | Description | Include key |
|---|---|---|---|---|
| 26 .................................... | reportingExecutingMpid .. | Member Alias ................. | MPID of the executing party ................................... | R |
| 28 .................................... | contraExecutingMpid ...... | Member Alias ................. | MPID of the contra-side executing party ................ | C |

Note that a CAT Executing Broker in over-the-counter transactions identified on the TRF/ORF/ADF Transaction Data Event is determined based on the tape or media report, that is, a trade report that is submitted to a FINRA trade reporting facility and reported to and publicly disseminated by the appropriate exclusive Securities Information Processor. A CAT Executing Broker for over-the-counter transactions is *not* determined based on a non-tape report (*e.g.,* a regulatory report or a clearing report), which are not publicly disseminated.[30]

Therefore, with respect to transactions on an exchange and over-the-counter transactions, CAT LLC would use transaction reports reported to the CAT by FINRA or the exchanges to identify the transaction for purposes of calculating the CAT fees as well as the CAT Executing Broker for each transaction for purposes of calculating the CAT fees. Accordingly, all data used to calculate the fees under the Funding Proposal would be CAT Data, and, therefore, it would be available through the CAT for calculating CAT fees. The Plan Processor would be responsible for calculating the CAT fees and submitting invoices to the CAT Executing Brokers based on this CAT Data. Moreover, defining a ''CAT Executing Broker'' in this way is a simpler analytical approach than other potential approaches for defining the relevant executing broker, such as identifying the originating broker for the order via an evaluation of CAT linkages.[31]

CAT LLC proposes to make use of the defined term ''CAT Executing Broker'' in Proposed Section 11.3 in describing the Funding Proposal. CAT LLC believes the proposed definition of CAT Executing Broker and the use of the defined term in Article XI would set forth clearly when and in what situations an Industry Member would be considered a CAT Executing Broker for purposes of the Funding Proposal.

a. Treatment of ATSs

The Funding Proposal would describe how CAT fees would be assessed with regard to transactions executed on ATSs, including clarification as to which party to an ATS transaction would be treated as the CAT Executing Broker for purposes of the Funding Proposal. The definition of a ''CAT Executing Broker'' as proposed above would determine the CAT Executing Brokers for transactions executed on an ATS. Specifically, if an ATS is identified as the executing party and/or the contra-side executing party in the TRF/ORF/ADF Transaction Data Event, then the ATS would be a CAT Executing Broker for purposes of the Funding Proposal. If the ATS is identified as the executing party for the buyer in such transaction reports, then the ATS would be the CAT Executing Broker for the

---

[26] *See* Table 23, Section 4.7 (Order Trade Event) of the Participant Technical Specifications.

[27] *See* Table 52, Section 5.2.5.1 (Simple Option Trade Event) of the Participant Technical Specifications.

[28] *See* Section 6.1 of the Participant Technical Specifications.

[29] *See* Table 62, Section 6.1 (TRF/ORF/ADF Transaction Data Event) of the Participant Technical Specifications.

[30] There is an exception to this statement for away-from-market trades. These are non-media trades reported to the TRF with an ''SRO Required Modifier Code'' of ''R''.

[31] Each CAT Executing Broker could determine, but would not be required, to pass their CAT fees through to their clients, who, in turn, could pass their CAT fees to their clients, until the fee is imposed on the ultimate participant in the transaction.

**A9**

USCA11 Case: 26-10936    Document: 62-1    Date Filed: 05/28/2026    Page: 16 of 208

Buyer, and if the ATS is identified as the executing party for the seller in such transaction reports, then the ATS would be the CAT Executing Broker for the Seller. An ATS also could be identified as both the CAT Executing Broker for the Buyer and the CAT Executing Broker for the Seller. ATSs would determine the executing party and the contra-side executing party reported to FINRA's equity trading facilities in accordance with the transaction reporting requirements for FINRA's equity trading facilities.

b. Treatment of Fractional Shares

The Funding Proposal also would address how transactions in fractional shares would be treated. As described above, CAT fees would be charged based on the Equity Order Trade Events, Options Trade Events and the ADF/ ORF/TRF Transaction Data Events in the Participant Technical Specifications. None of these transaction reports provide for fractional quantities; the transaction reports must reflect whole shares/contracts. Therefore, under the Funding Proposal, CAT fees would be calculated without reference to fractional shares or fractional share components of executed orders.[32]

c. Non-Industry Members on Transaction Reports

The Funding Proposal also would address how transactions that involve a non-Industry Member would be treated under the Funding Proposal (*e.g.,* for internalized trades or trades with a non-FINRA member). The FINRA trade reporting requirements state that "[w]hen reporting a trade with a broker-dealer that is not a FINRA member, the non-member should not be identified on the trade report as the contra party to the trade."[33] Accordingly, when the transaction in these cases is reported to CAT via the TRF/ORF/ADF Transaction Data Event, the field for the reportingExecutingMpid would be populated with the MPID of the executing broker and the field for the contraExecutingMpid would be blank or null. As noted above, the reportingExecutingMpid is a required field (include key = 'R') that must be entered on all CAT reports, but the contraExecutingMpid field is conditional; it does not need to be populated, specifically to account for cases like those at issue here (*e.g.,* transactions with a non-FINRA

member). Therefore, in those scenarios where the contraExecutingMpid is blank, the FINRA member identified in the reportingExecutingMpid field would be treated as the CAT Executing Broker for both the buy-side and the sell-side of the transaction, that is, as the CEBS and CEBB.

In addition, under the FINRA trade reporting requirements, there is a limited exception to the general rule about not reporting a non-member as the contra party to the trade. Specifically, pursuant to FINRA Trade Reporting FAQ 202.1, "[t]here is a limited exception where a Canadian non-member firm uses the FINRA/NASDAQ TRF or ORF for purposes of comparing trades pursuant to a valid Non-Member Addendum to the NASDAQ Services Agreement. In that instance, however, the Canadian non-member must appear on the trade report as the contra party to the trade and not as the reporting party. For any trade report on which a Canadian non-member appears as a party to the trade, the FINRA member must appear as the reporting party." In this case involving the Canadian non-member firm exception, the executing broker identified in the reportingExecutingMpid field would be billed for both sides of the transaction.

CAT LLC proposes to include language in the definition of "CAT Executing Broker" to address these scenarios. Specifically, CAT LLC proposes to state the following in the definition of "CAT Executing Broker: "in those circumstances where there is a non-Industry Member identified as the contra-side executing broker in the TRF/ ORF/ADF transaction data event or no contra-side executing broker is identified in the TRF/ORF/ADF transaction data event, then the Industry Member identified as the executing broker in the TRF/ORF/ADF transaction data event would be treated as CAT Executing Broker for the Buyer and for the Seller."

d. Cancellations and Corrections

The Funding Proposal also would provide for cancellations and corrections. CAT LLC expects to determine CAT fees based on the transaction reports for a month as of a particular day. To the extent that changes are made to the transaction reports on or before the day the CAT fees are determined for the given month, the changes will be reflected in the monthly bill. To the extent that changes are made to the transaction reports after the day the CAT fees are determined for that month, subsequent bills will reflect any changes via debits or credits, as applicable. As CAT LLC is required

under the CAT NMS Plan to adopt policies, procedures, and practices regarding the billing and collection of fees,[34] CAT LLC will establish specific policies and procedures regarding the treatment of such adjustments as those related to cancellations and corrections. Furthermore, CAT LLC will inform Industry Members and other market participants of these policies and procedures via FAQs, CAT Alerts and/ or other appropriate methods.

2. CAT Budget

Section 11.1(a) of the CAT NMS Plan describes the requirement for the Operating Committee to approve an operating budget for CAT LLC on an annual basis. It requires the budget to "include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company." CAT LLC proposes to provide additional detail regarding the CAT LLC operating budget by adding proposed subparagraphs (i) and (ii) to Section 11.1(a) of the CAT NMS Plan. Such detailed information would provide Participants, Industry Members and other interested parties with a clear understanding of the CAT budget, and, in turn, the calculation of the CAT Fees.

a. Budgeted CAT Costs

CAT LLC proposes to add subparagraph (i) to Section 11.1(a) of the CAT NMS Plan to provide additional clarity regarding the costs to be included in the CAT budget. This proposed provision would list the types of CAT costs to be included in the budget. Specifically, Proposed Section 11.1(a)(i) of the CAT NMS Plan would state that "[w]ithout limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve, and such other categories as reasonably determined by the Operating Committee to be included in the budget."

Because technology costs account for more than 90% of CAT costs,[35] CAT

---

[32] To the extent that FINRA's equity transaction reporting facilities or the exchanges report transactions in fractional shares in the future, then the calculation of CAT fees would reflect fractional shares as well.

[33] FINRA Trade Reporting FAQ 202.1.

[34] Section 11.1(d) of the CAT NMS Plan.

[35] This percentage is based on the 2025 Financial and Operating Budget. *See* CAT, LLC, 2025 Financial and Operating Budget (May 19, 2025), *https://www.catnmsplan.com/sites/default/files/*

LLC proposes to provide more granular information about such costs. Specifically, CAT LLC proposes to require the inclusion of five subcategories of technology costs in the budget: (1) cloud hosting services, (2) operating fees, (3) Customer and Account Information System ("CAIS") operating fees, (4) change request fees, and (5) capitalized developed technology costs. Breaking out technology costs in this manner is consistent with how such costs are broken out in the CAT budgets available on the CAT website.[36] CAT LLC currently does not propose to require the disclosure of additional subcategories of cost information, such as a further breakdown of the category of cloud hosting services into production costs, including linker costs and storage costs. However, CAT LLC will consider the need to provide additional cost disclosure going forward.

Furthermore, CAT LLC has determined not to provide more detailed subcategories for the other cost categories (that is, legal, consulting, insurance, professional and administration, and public relations costs) at this time. Breaking out these costs into further subcategories would establish new subcategories that are not set forth in the budgets. In addition, these costs in the aggregate represent less than six percent (6%) of total CAT costs, with professional and administration costs and public relations costs, in particular, each representing less than one percent (1%) of overall CAT costs.[37] Therefore, CAT LLC does not believe that these costs warrant additional subcategory disclosure. CAT LLC further notes that it is not considered a best practice to publicly disclose detailed legal or insurance information, which is particularly sensitive. Nevertheless, CAT LLC notes that the CAT NMS Plan requires that detailed cost information be made available to the Commission upon request, and detailed information on CAT costs and operations is regularly made available to the Commission staff

and the Advisory Committee on a confidential basis.

CAT LLC also intends to determine costs for the operating budget for the CAT in a reasonable manner. Accordingly, CAT LLC proposes to amend Section 11.1(a) of the CAT NMS Plan to refer to a "reasonable" operating budget for CAT LLC. Specifically, the first sentence of Section 11.1(a) of the CAT NMS Plan would be revised to read: "On an annual basis the Operating Committee shall approve a reasonable operating budget for the Company." In addition, CAT LLC proposes to include the term "reasonably" in proposed paragraph (a)(i) of Section 11.1 of the CAT NMS Plan. Specifically, CAT proposes to introduce the term "reasonably" to the following proposed provision of the CAT NMS Plan: "Without limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees, and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve and such other cost categories as reasonably determined by the Operating Committee to be included in the budget."

Finally, CAT LLC proposes to amend Section 11.1(b) of the CAT NMS Plan. Currently, Section 11.1(b) of the CAT NMS Plan states that:

Subject to Section 11.2, the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay; and (ii) establishing fees for Industry Members that shall be implemented by Participants. The Participants shall file with the SEC under Section 19(b) of the Exchange Act any such fees on Industry Members that the Operating Committee approves, and such fees shall be labeled as "Consolidated Audit Trail Funding Fees."

CAT LLC proposes to amend Section 11.1(b) to include a reference to Section 11.1 as well as Section 11.2 in the "subject to" clause at the beginning of the provision. CAT LLC believes this reference is relevant because Section 11.1 sets forth requirements related to the budget, and the budget is used in calculating CAT Fees.

b. Reserve

Section 11.1(a) of the CAT NMS Plan states that the budget shall include "the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company." In addition, Proposed Section 11.1(a)(i) of the CAT NMS Plan would state that the budgeted CAT costs shall include a reserve. Section 11.1(c)

of the CAT NMS Plan states that "[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees." CAT LLC proposes to add subparagraph (ii) to Section 11.1(a) of the CAT NMS Plan to provide additional details regarding the size and use of the reserve.

To provide additional clarity regarding the size of the reserve, CAT LLC proposes to add proposed paragraph (ii) to Section 11.1(a) of the CAT NMS Plan to set forth the parameters for the size of the reserve. Based on the difficulty in accurately predicting various variable CAT costs, CAT LLC believes that a 25% reserve would appear to be reasonable. Accordingly, Proposed Section 11.1(a)(ii) of the CAT NMS Plan would state that "[f]or the reserve referenced in paragraph (a)(i) of this Section, the budget will include an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget." CAT LLC also intends to include a reserve in the CAT budget that is "reasonably" necessary to allow the CAT LLC to maintain a reserve of not more than 25% of the annual budget. Accordingly, CAT LLC proposes to include the term "reasonably" in this sentence. Moreover, CAT LLC would calculate the reserve based on the amount of the budget other than the reserve, as the reserve is intended to provide funds for CAT LLC to pay its bills if necessary. Accordingly, Proposed Section 11.1(a)(ii) of the CAT NMS Plan would state that "[f]or the avoidance of doubt, the calculation of the amount of the reserve would exclude the amount of the reserve from the budget."

CAT LLC also believes that it is reasonable to base the reserve on a percentage of the budget. First, CAT LLC believes that setting the reserve at 25% of the budget is appropriate in light of the timeline for the collection of CAT fees.[38] Many of CAT LLC's bills must be paid on a monthly basis. However, CAT fees will be collected approximately three months after the activity on which a CAT fee is based—that is, 25% of the year. For example, activity in January would be subject to a bill in February, which would be required to be paid within 30 days,[39] which would be in March. Accordingly, the reserve would be available to address the funding

---

2025-05/05.19.25-CAT-LLC-2025-Financial_and_Operating-Budget.pdf.

[36] The CAT LLC budgets are available on the CAT website at *https://www.catnmsplan.com/cat-financial-and-operating-budget.*

[37] This percentage is based on the 2025 Financial and Operating Budget. *See* CAT, LLC, 2025 Financial and Operating Budget (May 19, 2025), *https://www.catnmsplan.com/sites/default/files/2025-05/05.19.25-CAT-LLC-2025-Financial_and_Operating-Budget.pdf.* In addition, CAT LLC has not incurred public relations costs since Q1 2025, and the 2025 Financial and Operating Budget does not contemplate any public relations costs will be incurred through the remainder of 2025.

[38] For a discussion of the billing and collection of CAT fees, *see* Section A.8 of this filing.

[39] *See* Sections 3.7(b) and 11.4 of the CAT NMS Plan.

needs related to the delay in CAT LLC's receipt of the CAT fees.

Second, CAT LLC has established a number of measures for establishing a reasonable budget for the CAT, thereby providing a reasonable starting point for the reserve calculation. For example, the CAT NMS Plan would require the budget to be ''reasonable.''[40] The Fee Rate established at the beginning of the year would be adjusted mid-year to address changes in the actual or budgeted costs or changes in the actual or projected executed equivalent share volume. CAT LLC has established a variety of cost management measures, as discussed in detail in Section A.9.bb of this filing, and has and would provide substantial cost transparency as discussed in detail in Section A.9.l of this filing. The CAT fee filings pursuant to Section 19(b) of the Exchange Act would provide a description of how the budget is reconciled to the collected fees.

CAT LLC proposes to provide additional clarification regarding the collection of the reserve by providing additional information as to how budget surpluses would be treated for purposes of the reserve. CAT LLC proposes to clarify how CAT fees collected in excess of CAT costs, including the reserve, would be used. Specifically, proposed subparagraph (ii) of Section 11.1(a) of the CAT NMS Plan would state that ''[t]o the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus will be used to offset future fees.'' In addition, CAT LLC further proposes to state in Proposed Section 11.1(a)(ii) of the CAT NMS Plan that ''[f]or the avoidance of doubt, the Company will only include an amount for the reserve in the annual budget if the Company does not have a sufficient reserve (which shall be up to but not more than 25% of the annual budget).''

The following examples explain the circumstances under which a reserve would be included in the budget:

(1) Suppose that the Operating Committee had approved a budget of $100 million for CAT costs for Year X, and a reserve of $25 million, for a total budget of $125 million for Year X. Suppose that CAT Fees of $125 million were collected during Year X, and that actual CAT costs for Year X were $100 million. Therefore, CAT ended Year X with $25 million in reserve. Suppose further that the Operating Committee had approved a budget of $100 million for CAT costs and a reserve of $25 million, for a total budget of $125

million for Year X+1. Because CAT LLC had collected $25 million in excess of costs for the reserve in Year X, and the excess was not necessary to cover additional costs in Year X, CAT LLC would not include any additional amount in the budget for a reserve for Year X+1. CAT LLC would use the excess fees collected for the reserve.

(2) Suppose that the Operating Committee had approved a budget of $100 million for CAT costs for Year Y, and a reserve of $25 million, for a total budget of $125 million for Year Y. Suppose that CAT Fees of $110 million were collected during Year Y, and that actual CAT costs for Year Y were $100 million. Therefore, CAT ended Year Y with $10 million in reserve. Suppose further that the Operating Committee had approved a budget of $100 million for CAT costs, and a reserve of $25 million, for a total budget of $125 million for Year Y+1. Because CAT LLC had collected $10 million in excess of costs for the reserve in Year Y, and the entire reserve was not necessary to cover additional costs in Year Y, CAT LLC would only need to collect an additional $15 million for the reserve in Year Y+1, not $25 million.

### c. Publicly Available Budgets

CAT LLC publicly provides the annual operating budget for the Company as well as updates to the budget that occur during the year.[41] This publicly available budget information describes in detail the budget for the Company. For example, among other things, the budget provides specific budgeted technology costs (including cloud hosting services, operating fees, CAIS operating fees and change request fees) and general and administrative costs (including legal, consulting, insurance, professional and administration, and public relations). The Company provides such budget information on a dedicated web page on the CAT NMS Plan website to make it readily accessible to CAT Reporters and others.

### 3. CAT Fees Related to Prospective CAT Costs

CAT LLC proposes to describe CAT Fees related to Prospective CAT Costs in Section 11.3(a) of the CAT NMS Plan. Proposed Section 11.3(a) of the CAT NMS Plan would describe that the CAT Fees related to Prospective CAT Costs apply to both Participants and Industry Members, the manner of calculating the Fee Rate for CAT Fees, the description of the calculation of the Participant CAT Fees, a description of the calculation of the Industry Member CAT Fees, a description of the fee filings under Section 19(b) of the Exchange Act for Industry Member CAT Fees, and details regarding the calculation of the CAT Fees that are available upon request or publicly available. The following describes Proposed Section 11.3(a) of the CAT NMS Plan in detail.

### a. Introductory Statement

CAT LLC proposes to revise Section 11.3(a) of the CAT NMS Plan to address CAT Fees related to Prospective CAT Costs for both Participants and Industry Members. Accordingly, CAT LLC proposes to revise the introductory statement in Proposed Section 11.3(a) of the CAT NMS Plan to state that ''[t]he Operating Committee will establish fees ('CAT Fees') to be payable by Participants and Industry Members with regard to CAT costs not previously paid by the Participants ('Prospective CAT Costs') as follows:''.

### b. Fee Rate for CAT Fees

CAT LLC proposes to describe the timing and method for calculating the Fee Rate for the CAT Fees related to Prospective CAT Costs in Proposed Section 11.3(a)(i) of the CAT NMS Plan, and to provide additional detail regarding the Fee Rate in that provision. Proposed Section 11.3(a)(i) of the CAT NMS Plan would state that CAT Fees related to Prospective CAT Costs would be calculated twice a year. Specifically, this proposed provision would state that ''[t]he Operating Committee will calculate the Fee Rate for the CAT Fee twice per year, once at the beginning of the year and once during the year as follows.'' CAT LLC recognizes the need to align CAT Fees with CAT costs. Requiring the adjustment of the Fee Rate both at the beginning of the year and once mid-year in response to changes in the budgeted or actual costs or projected or actual total executed equivalent share volume during the year would likely lead to the greater alignment of CAT Fees and CAT costs, thereby potentially avoiding the collection of CAT Fees in excess of CAT costs or CAT Fees that

---

[40] *See* Proposed Section 11.1(a) of the CAT NMS Plan.

[41] To address potential changes related to the CAT during the year, the Operating Committee may adjust the budgeted CAT costs for the year as it reasonably deems appropriate for the prudent operation of the Company. For example, the Operating Committee may determine that an adjustment to the budget is necessary if actual costs during the year are more or less than the budget, or if unanticipated expenditures are necessary. To the extent that the Operating Committee adjusts the budgeted CAT costs during the year and determines to adjust the Fee Rate, the adjusted budgeted CAT costs would be used in calculating the new Fee Rate for the remaining months of the year.

are insufficient to cover CAT costs. Accordingly, CAT LLC proposes to require both an annual and a mid-year adjustment of the Fee Rate for the CAT Fee.

i. General

CAT LLC proposes to provide details regarding the calculation of the Fee Rate for the CAT Fees in Proposed Section 11.3(a)(i) of the CAT NMS Plan. The detail provided in Proposed Section 11.3(a)(i) of the CAT NMS Plan would include a description of the calculation of the Fee Rate at the beginning of the year and during the year, the counting method for executed equivalent shares, the budgeted CAT costs, and the projected total executed equivalent share volume of transactions in Eligible Securities for the relevant period. Each of these aspects of the CAT Fees are discussed in more detail below.

A. Annual Calculation of Fee Rate

Proposed Section 11.3(a)(i)(A)(I) of the CAT NMS Plan would describe the annual calculation of the Fee Rate and the requirement for Participants to file a fee filing for CAT Fees to be charged Industry Members calculated using the Fee Rate. This proposed provision also would state that Participants and Industry Members would be required to pay such CAT Fees once the CAT Fees are in effect with regard to Industry Members. Specifically, this proposed provision would state:

For the beginning of each year, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the year. Once the Operating Committee has approved such Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using such Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

CAT LLC proposes to clarify that the annual calculation of CAT Fees would be performed using reasonably budgeted CAT costs and reasonably projected total executed equivalent share volume. Accordingly, CAT LLC proposes to use the term ''reasonably'' twice in the following sentence: ''For the beginning of each year, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the reasonably projected total executed equivalent share volume

of all transactions in Eligible Securities for the year.''

B. Mid-Year Calculation of Fee Rate

Proposed Section 11.3(a)(i)(A)(II) of the CAT NMS Plan describes the mandatory mid-year calculation of a new Fee Rate. This proposed provision would describe the mid-year calculation of the Fee Rate and the requirement for Participants to file a fee filing for CAT Fees to be charged Industry Members calculated using the Fee Rate. This proposed provision also would state that Participants and Industry Members would be required to pay such CAT Fees once the CAT Fees are in effect with regard to Industry Members. Specifically, this proposed provision would state:

During each year, the Operating Committee will calculate a new Fee Rate by dividing the reasonably budgeted CAT costs for the remainder of the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year. Once the Operating Committee has approved the new Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the new Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this new Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

CAT LLC proposes to clarify that CAT Fees would be calculated during the year using reasonably budgeted CAT costs and reasonably projected total executed equivalent share volume. Accordingly, CAT LLC proposes to use the term ''reasonably'' twice in the following sentence: ''During each year, the Operating Committee will calculate a new Fee Rate by dividing the reasonably budgeted CAT costs for the remainder of the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year.''

C. Continuing CAT Fee

CAT LLC also proposes to add Section 11.3(a)(i)(A)(III) to the CAT NMS Plan to clarify that CAT Fees related to Prospective CAT Costs do not sunset automatically; such CAT Fees would remain in place until new CAT Fees are in place with a new Fee Rate. The Funding Proposal is designed to collect CAT fees continuously so as to provide uninterrupted revenue to pay CAT bills. Specifically, this proposed provision would state:

For the avoidance of doubt, CAT Fees with a Fee Rate calculated as set forth in this

paragraph (a)(i) shall remain in effect until the Operating Committee approves a new Fee Rate as described in this paragraph (a)(i) and CAT Fees with the new Fee Rate are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

D. Commencement of CAT Fee

CAT LLC believes that it would be appropriate to commence the first CAT Fee either at the beginning of the year or during the year (due to, for example, mid-year approval of the CAT Fee by the SEC), whichever is closest to the time that such a CAT Fee could become effective, so as to seek prompt recovery of CAT costs. If the CAT Fee were to commence during the year, the first CAT Fee would be calculated in the same way that a mid-year CAT Fee would be calculated. To clarify this approach, CAT LLC proposes to add Proposed Section 11.3(a)(i)(A)(IV) to the CAT NMS Plan. This provision would state that ''[f]or the avoidance of doubt, the first CAT Fee may commence at the beginning of the year or during the year. If it were to commence during the year, the CAT Fee would be calculated as described in paragraph (II) of this Section.''

ii. Executed Equivalent Shares

CAT LLC proposes to describe in Proposed Section 11.3(a)(i)(B) of the CAT NMS Plan how executed equivalent shares would be counted for purposes of calculating CAT Fees. Under the Funding Proposal, a CAT Fee would be charged with regard to each transaction in Eligible Securities as reported in CAT Data. As set forth in Section 1.1 of the CAT NMS Plan, ''Eligible Securities'' are defined to include all NMS Securities and all OTC Equity Securities. Section 1.1 of the CAT NMS Plan, in turn, defines an ''NMS Security'' as ''any security or class of securities for which transaction reports are collected, processed, and made available pursuant to an effective transaction reporting plan, or an effective national market system plan for reporting transactions in Listed Options.'' In addition, Section 1.1 of the CAT NMS Plan defines an ''OTC Equity Security'' as ''any equity security, other than an NMS Security, subject to prompt last sale reporting rules of a registered national securities association and reported to one of such association's equity trade reporting facilities.'' A CAT Fee would be imposed with regard to transactions in Eligible Securities in the CAT Data regardless of whether the trade is executed on an exchange or otherwise than on an exchange.

The Funding Proposal uses the concept of executed equivalent shares as the transactions subject to a CAT Fee involve NMS Stocks, Listed Options and OTC Equity Securities, each of which have different trading characteristics.

*NMS Stocks.* Under the Funding Proposal, each executed share for a transaction in NMS Stocks would be counted as one executed equivalent share. Accordingly, Proposed Section 11.3(a)(i)(B)(I) of the CAT NMS Plan would state that "[f]or purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows: (I) each executed share for a transaction in NMS Stocks will be counted as one executed equivalent share."

*Listed Options.* Recognizing that Listed Options trade in contracts rather than shares, each executed contract for a transaction in Listed Options will be counted using the contract multiplier applicable to the specific Listed Option in the relevant transaction. Typically, a Listed Option contract represents 100 shares; however, it may also represent another designated number of shares. Accordingly, Proposed Section 11.3(a)(i)(B)(II) of the CAT NMS Plan would state that "[f]or purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows: . . . (II) each executed contract for a transaction in Listed Options will be counted based on the multiplier applicable to the specific Listed Option (*i.e.,* 100 executed equivalent shares or such other applicable multiplier)."

*OTC Equity Securities.* Similarly, in recognition of the different trading characteristics of OTC Equity Securities as compared to NMS Stocks, the Funding Proposal would discount the share volume of OTC Equity Securities when calculating CAT Fees. Many OTC Equity Securities are priced at less than one dollar—and a significant number are priced at less than one penny—per share and low-priced shares tend to trade in larger quantities. Accordingly, a disproportionately large number of shares are involved in transactions involving OTC Equity Securities versus NMS Stocks.[42] Because the Funding Proposal would calculate CAT Fees

based on executed share volume, CAT Reporters trading OTC Equity Securities would likely be subject to higher fees than their market activity may warrant. To address this potential concern, the Funding Proposal would count each executed share for a transaction in OTC Equity Securities as 0.01 executed equivalent shares. Accordingly, Proposed Section 11.3(a)(i)(B)(III) of the CAT NMS Plan would state that "[f]or purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows: . . . (III) each executed share for a transaction in OTC Equity Securities shall be counted as 0.01 executed equivalent share."

The discount to 1% was selected based on a reasoned analysis of a variety of different metrics for comparing the markets for OTC Equity Securities and NMS Stocks, rather than a simple calculation. For example, using 2021 data, the Operating Committee calculated the following metrics: (1) the ratio of total notional dollar value traded for OTC Equity Securities to OTC Equity Securities and NMS Stocks was 0.051%; (2) the ratio of total trades in OTC Equity Securities to total trades in OTC Equity Securities and NMS Stocks was 0.90%; and (3) the ratio of average share price per trade of OTC Equity Securities to average share price per trade for OTC Equity Securities and NMS Stocks was 0.065%. In recognition of the fact that these calculations involve averages and for ease of application, the Operating Committee determined to round these metrics to 1%.

In calculating CAT Fees, CAT LLC intends for executed equivalent shares in a transaction in Eligible Securities to be reasonably counted. Accordingly, CAT LLC proposes to include the term "reasonably" in the following sentence in Proposed Section 11.3(a)(i)(B) of the CAT NMS Plan: "For purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows:".

### iii. Budgeted CAT Costs

The calculation of the Fee Rate for CAT Fees related to Prospective CAT Costs requires the determination of the budgeted CAT costs for the year or other relevant period. Proposed Section 11.3(a)(i)(C) of the CAT NMS Plan would describe the budgeted CAT costs for calculating CAT Fees. It would state the following:

The budgeted CAT costs for the year shall be comprised of all reasonable fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the

development, implementation and operation of the CAT as set forth in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan, or as adjusted during the year by the Operating Committee.

As discussed above, CAT LLC also proposes to provide additional details regarding what is included in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan in proposed paragraphs (i) and (ii) of Section 11.1(a) of the CAT NMS Plan.

Moreover, CAT LLC proposes to clarify that CAT Fees must be calculated using reasonably budgeted CAT costs. Accordingly, CAT proposes to include the terms "reasonably" and "reasonable" the following sentence: "The budgeted CAT costs for the year shall be comprised of all reasonable fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and operation of the CAT as set forth in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan, or as adjusted during the year by the Operating Committee."

### iv. Projected Total Executed Equivalent Share Volume

The calculation of the Fee Rate for CAT Fees also requires the determination of the projected total executed equivalent share volume of transactions in Eligible Securities for each relevant period. Each year, the Operating Committee would determine this projection based on the total executed equivalent share volume of transactions in Eligible Securities from the prior twelve months. Therefore, Proposed Section 11.3(a)(i)(D) of the CAT NMS Plan would state that "[t]he Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each relevant period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months." CAT LLC determined that the use of the data from the prior twelve months provides an appropriate balance between using data from a period that is sufficiently long to avoid short-term fluctuations while providing data close in time to the upcoming relevant period. In addition, CAT LLC proposes to allow the Operating Committee to base its projection on the prior twelve months, but to use its discretion to analyze the likely volume for the upcoming year. As set forth in Proposed Section

---

[42] For example, based on data from 2021, (1) the average price per executed share of OTC Equity Securities was $0.072 and the average price per executed share for NMS Stocks was $49.51; and (2) the average trade size for OTC Equity Securities was 63,474 and the average trade size for NMS Stocks was 166 shares. Trades in OTC Equity Securities accounted for 77% of the number of all equity shares traded, but only 0.51% of the notional value of all equity shares traded.

11.3(a)(iii)(B), Participants will be required to provide a description of the calculation of the projection in their fee filings pursuant to Section 19(b) of the Exchange Act. Furthermore, CAT LLC intends to calculate the CAT Fees based on a reasonable determination of the projected total executed equivalent share volume of transactions in Eligible Securities. Accordingly, CAT LLC proposes to include the term ''reasonably'' in the Proposed Section 11.3(a)(i)(D) of the CAT NMS Plan to indicate that the Operating Committee will ''reasonably determine the projected total executed equivalent share volume.''

c. Participant CAT Fees for Prospective CAT Costs

CAT LLC proposes to describe the Participant CAT Fees related to Prospective CAT Costs in Proposed Section 11.3(a)(ii) of the CAT NMS Plan. Proposed Section 11.3(a)(ii) of the CAT NMS Plan would have two paragraphs (A) and (B), where paragraph (A) would describe the CAT Fee obligation for Participants and paragraph (B) would clarify that Participants would only be required to pay CAT Fees when Industry Members are required to pay CAT Fees.

i. CAT Fee Obligation of the Participants

CAT LLC proposes to add paragraph (A) to Proposed Section 11.3(a)(ii) of the CAT NMS Plan to describe the CAT Fee obligation of the Participants. Specifically, proposed paragraph (A) of Proposed Section 11.3(a)(ii) of the CAT NMS Plan would state the following:

Each Participant that is a national securities exchange will be required to pay the CAT Fee for each transaction in Eligible Securities executed on the exchange in the prior month based on CAT Data. Each Participant that is a national securities association will be required to pay the CAT Fee for each transaction in Eligible Securities executed otherwise than on an exchange in the prior month based on CAT Data. The CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.

CAT LLC intends for the Participant CAT Fee to be calculated using the Fee Rate reasonably determined pursuant to Proposed Section 11.3(a)(i) of the CAT NMS Plan. Accordingly, CAT LLC proposes to include the term ''reasonably'' in the following sentence: ''[t]he CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate

reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.''

ii. Effectiveness of Participant CAT Fees

CAT LLC also proposes to include proposed paragraph (B) of Proposed Section 11.3(a)(ii) of the CAT NMS Plan to clarify that Participants would only be required to pay CAT Fees when Industry Members are required to pay CAT Fees. Under the Funding Proposal, CAT Fees are designed to cover 100% of CAT costs by allocating costs between and among Participants and Industry Members. However, the CAT Fees charged to Participants are implemented via a different process than CAT Fees charged to Industry Members. CAT Fees charged to Participants are implemented via an approval of the CAT Fees by the Operating Committee in accordance with the requirements of the CAT NMS Plan. In contrast, CAT Fees charged to Industry Members may only become effective in accordance with the requirements of Section 19(b) of the Exchange Act. Accordingly, proposed paragraph (B) of Proposed Section 11.3(a)(ii) of the CAT NMS Plan would state that ''[e]ach Participant will be required to pay the CAT Fee calculated using the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3 and approved by the Operating Committee only if such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.'' CAT LLC intends for the Participant CAT Fee to be calculated using the Fee Rate reasonably determined pursuant to Proposed Section 11.3(a)(i) of the CAT NMS Plan. Accordingly, CAT LLC proposes to include the term ''reasonably'' in the phrase ''the Fee Rate reasonably determined'' in this provision.

d. Industry Member CAT Fees for Prospective CAT Costs

CAT LLC proposes to describe the Industry Member CAT Fees related to Prospective CAT Costs in Proposed Section 11.3(a)(iii) of the CAT NMS Plan. Proposed Section 11.3(a)(iii) of the CAT NMS Plan would have three paragraphs, (A), (B) and (C), where paragraph (A) would describe the CAT Fee obligation for Industry Members, paragraph (B) would described the required content of the fee filings required to be filed pursuant to Section 19(b) of the Exchange Act regarding the CAT Fees for Industry Members, and paragraph (C) would clarify that Participants would not make CAT fee filings regarding CAT Fees until the Financial Accountability Milestone related to Period 4 as described in

Section 11.6 of the CAT NMS Plan has been satisfied.

i. Industry Member CAT Fee Obligation

CAT LLC proposes to describe the CAT Fees related to Prospective CAT Costs that would be charged to Industry Members in Proposed Section 11.3(a)(iii)(A) of the CAT NMS Plan. Accordingly, Proposed Section 11.3(a)(iii)(A) of the CAT NMS Plan would state the following:

Each Industry Member that is the CAT Executing Broker for the buyer in a transaction in Eligible Securities (''CAT Executing Broker for the Buyer'' or ''CEBB'') and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities (''CAT Executing Broker for the Seller'' or ''CEBS'') will be required to pay a CAT Fee for each such transaction in Eligible Securities in the prior month based on CAT Data. The CEBB's CAT Fee or CEBS's CAT Fee (as applicable) for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.

CAT LLC intends for the Participant CAT Fee to be calculated using the Fee Rate reasonably determined pursuant to Proposed Section 11.3(a)(i) of the CAT NMS Plan. Accordingly, CAT LLC proposes to include the phrase ''the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3'' in this provision.

ii. Fee Filings Under Section 19(b) of the Exchange Act for Industry Member CAT Fees

CAT LLC proposes to describe the information that Participants would be required to include in their fee filings to be made pursuant to Section 19(b) of the Exchange and Rule 19b–4 thereunder for Industry Member CAT Fees in proposed paragraph (B) of Proposed Section 11.3(a)(iii) of the CAT NMS Plan.[43] Specifically, such filings would be required to include with regard to the CAT Fee: (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3)

[43] CAT LLC expects the fee filings required to be made by the Participants pursuant to Section 19(b) of the Exchange Act with regard to CAT Fees to be filed pursuant to Section 19(b)(3)(A) of the Exchange Act and Rule 19b–(f)(2) thereunder. In accordance with Section 19(b)(3)(A) of the Exchange Act and Rule 19b–4(f)(2) thereunder, such fee filings would be effective upon filing.

consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget and the reason for changes in each such line item from the prior CAT Fee filing; [44] (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or remainder of the year, as applicable), and a description of the calculation of the projection. This detail would describe how the Fee Rate is calculated, and explain how the budget used in the calculation is reconciled to the collected fees. Such detailed information would provide Industry Members and other interested parties with a clear understanding of the calculation of the CAT Fees and their relationship to CAT costs.[45]

In addition, CAT LLC proposes to clarify that the budgeted CAT costs described in the fee filings must provide sufficient detail to demonstrate that the CAT budget used in calculating the CAT Fees is reasonable and appropriate. Therefore, CAT LLC proposes to add the following sentence to Proposed Section 11.3(a)(iii)(B) of the CAT NMS Plan: ''The information provided in this Section would be provided with sufficient detail to demonstrate that the budget for the upcoming year, or part of year, as applicable, is reasonable and appropriate.''

### iii. Financial Accountability Milestone

CAT LLC recognizes that the collection of CAT Fees from Industry Members is subject to Section 11.6 of the CAT NMS Plan regarding the Financial Accountability Milestones. Accordingly, CAT LLC proposes to clarify that Participants will not make fee filings pursuant to Section 19(b) of the Exchange Act regarding CAT Fees until the Financial Accountability Milestone related to Period 4 described in Section 11.6 of the CAT NMS Plan has been satisfied. Specifically, CAT LLC proposes to add proposed paragraph (C) to Proposed Section 11.3(a)(iii) to the CAT NMS Plan to address the Financial Accountability

Milestone. This provision would state that ''[n]o Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any CAT Fee related to Prospective CAT Costs until the Financial Accountability Milestone related to Period 4 described in Section 11.6 has been satisfied.''

### e. CAT Fee Details

CAT LLC proposes to provide Participants and CAT Executing Brokers with details regarding the calculation of their CAT Fees upon request. Specifically, CAT LLC proposes to add Proposed Section 11.3(a)(iv)(A) to the CAT NMS Plan to describe this disclosure. This provision would state that ''[d]etails regarding the calculation of a Participant or CAT Executing Brokers' CAT Fees will be provided upon request to such Participant or CAT Executing Broker. At a minimum, such details would include each Participant or CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.'' Such information would provide Participants and CAT Executing Brokers with the ability to understand the details regarding the calculation of their CAT Fees.

In addition, CAT LLC proposes to make certain aggregate statistics regarding the CAT Fees publicly available. Specifically, CAT LLC proposes to add Proposed Section 11.3(a)(iv)(B) to the CAT NMS Plan to describe this public disclosure. This provision would state that ''[f]or each CAT Fee, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.'' [46]

### 4. Historical CAT Assessment

CAT LLC proposes to describe Historical CAT Assessments related to Historical CAT Costs in Proposed Section 11.3(b) of the CAT NMS Plan. Proposed Section 11.3(b) of the CAT NMS Plan would describe that Historical CAT Assessments apply only

to Industry Members (not to Participants), the manner of calculating the Historical Fee Rate for the Historical CAT Assessment, a description of the calculation of the Industry Member CAT Fees, a description of the fee filings under Section 19(b) of the Exchange Act for Historical CAT Assessments, and details regarding the calculation of the Historical CAT Assessments that are available upon request or publicly available. The following describes in detail Section 11.3(b) of the CAT NMS Plan.

### a. Introductory Statement

CAT LLC proposes to revise Section 11.3(b) of the CAT NMS Plan to address Historical CAT Assessments related to Historical CAT Costs to be charged to Industry Members. Accordingly, CAT LLC proposes to revise the introductory statement in Proposed Section 11.3(b) of the CAT NMS Plan to state that ''[t]he Operating Committee will establish one or more fees (each a ''Historical CAT Assessment'') to be payable by Industry Members with regard to CAT costs previously paid by the Participants (''Past CAT Costs'') as follows:''.[47] With the reference to ''one or more'' Historical CAT Fees, this provision also clarifies that there may be one or more Historical CAT Assessments.

### b. Calculation of Historical Fee Rate

CAT LLC proposes to provide details regarding the calculation of the Historical CAT Assessment in Proposed Section 11.3(b)(i) of the CAT NMS Plan. These details would include a description of the calculation of the Historical Fee Rate, the counting method for executed equivalent shares, the Historical CAT Costs, the Historical Recovery Period, and the projected total executed equivalent share volume of transactions in Eligible Securities for the Historical Recovery Period.

### i. General

Proposed paragraph (a) of Proposed Section 11.3(b)(i) of the CAT NMS Plan would describe the calculation of the Historical Fee Rate for each Historical CAT Assessment and the requirement for Participants to file a fee filing for each Historical CAT Assessment. This proposed provision also would state that Industry Members would be

---

[44] CAT LLC intends to include any other categories as reasonably determined by the Operation Committee. Accordingly, this provision refers to ''such other categories as reasonably determined by the Operating Committee to be included in the budget.''

[45] As a practical matter, the fee filing would provide the exact fee per executed equivalent share to be paid for the CAT Fees, by multiplying the Fee Rate by one-third and describing the relevant number of decimal places for the fee.

[46] *See* CAT, LLC, *Billing Trade Summaries, https://www.catnmsplan.com/billing-trade-summaries.*

[47] To date, there has been one Historical CAT Assessment, referred to as Historical CAT Assessment 1. *See, e.g.,* Securities Exchange Act Rel. No. 100936 (Sept. 5, 2024), 89 FR 74430 (Sept. 22, 2024) (BOX Exchange LLC filing for Historical CAT Assessment 1). There may be one or more additional Historical CAT Assessments related to CAT costs incurred prior to the completion of the fourth and final Financial Accountability Milestone (''FAM 4'') in July 2024.

required to pay each Historical CAT Assessment once such Historical CAT Assessment is in effect in accordance with Section 19(b) of the Exchange Act. Specifically, this proposed provision would state that:

The Operating Committee will calculate the Historical Fee Rate for each Historical CAT Assessment by dividing the Historical CAT Costs for each Historical CAT Assessment by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period for each Historical CAT Assessment. Once the Operating Committee has approved such Historical Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act such Historical CAT Assessment to be charged Industry Members calculated using such Historical Fee Rate. Industry Members will be required to pay such Historical CAT Assessment calculated using such Historical Fee Rate once such Historical CAT Assessment is in effect in accordance with Section 19(b) of the Exchange Act.

CAT LLC proposes to clarify that the calculation of each Historical Fee Rate would be performed using reasonably projected total executed equivalent share volume. Accordingly, CAT LLC proposes to use the term ''reasonably'' to the describe ''projected total executed equivalent share volume'' in this provision.

ii. Executed Equivalent Shares

The Historical CAT Assessment would be calculated based on the same executed equivalent share calculation as CAT Fees related to Prospective CAT Costs. Accordingly, Proposed Section 11.3(b)(i)(B) of the CAT NMS Plan would make it clear that the calculation is the same for both types of fees. Specifically, Proposed Section 11.3(b)(i)(B) of the CAT NMS Plan would state that ''[f]or purposes of calculating each Historical CAT Assessment, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted in the same manner as set forth in paragraph (a)(i)(B) of this Section 11.3.''

iii. Historical CAT Costs

The calculation of the Historical CAT Assessment depends upon the determination of the Historical CAT Costs. Proposed Section 11.3(b)(i)(C) of the CAT NMS Plan would describe the Historical CAT Costs for calculating Historical CAT Assessments. The Operating Committee will reasonably determine the Past CAT Costs sought to be recovered through the Historical CAT Assessment. CAT LLC proposes to make this approach clear in the language of the CAT NMS Plan by adding Proposed

Section 11.3(b)(i)(C) of the CAT NMS Plan, which would state that ''[t]he Operating Committee will reasonably determine the Historical CAT Costs sought to be recovered by each Historical CAT Assessment, where the Historical CAT Costs will be Past CAT Costs minus Past CAT Costs reasonably excluded from Historical CAT Costs by the Operating Committee.''

CAT LLC proposes to further clarify the amount to be collected via the Historical CAT Assessments in Proposed Section 11.3(b)(i)(C) of the CAT NMS Plan. Specifically, CAT LLC proposes to add the clarifying statement that ''[e]ach Historical CAT Assessment will seek to recover from CAT Executing Brokers two-thirds of Historical CAT Costs incurred during the period covered by the Historical CAT Assessment.'' This statement reiterates the requirement set forth in Proposed Section 11.3(b)(iii)(A) of the CAT NMS Plan regarding the calculation of the Historical CAT Assessment, which requires the multiplication of the number of executed equivalent shares in the transaction by *one-third* and by the Historical Fee Rate. Each CEBS and CEBB pays one-third, and, therefore, two-thirds of the Historical CAT Costs would be collected from CAT Executing Brokers.

CAT LLC also proposes to add the term ''reasonably'' to the following sentence in Section 11.1(c) of the CAT NMS Plan before the word ''incurred'': ''In determining fees on Participants and Industry Members the Operating Committee shall take into account fees, costs and expenses (including legal and consulting fees and expenses) reasonably incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT.'' The addition of the term ''reasonably'' would require such fees, costs and expenses to be reasonable.

iv. Historical Recovery Period

The calculation of the Historical CAT Assessment also depends upon the determination of the Historical Recovery Period. Based on CAT costs incurred to date, however, CAT LLC believes that the Historical Recovery Period should not be less than 24 months or more than five years.[48] In analyzing the potential Historical Recovery Periods, CAT LLC sought to weigh the need for a

reasonable Historical Fee Rate that spreads the Historical CAT Costs over an appropriate amount of time and the need to repay the loan notes to the Participants in a timely fashion. Based on an analysis of the Historical CAT Costs and executed equivalent share volume of transactions in Eligible Securities to date, CAT LLC determined that the Historical Fee Rate calculated using a Historical Recovery Period of two to five years would establish a reasonable Historical Fee Rate even if Industry Members were required to pay a Historical CAT Assessment and the ongoing CAT Fee at the same time. CAT LLC notes, however, that the actual Historical CAT Assessment would be calculated using Historical CAT Costs to be recovered for such Historical CAT Assessment and executed equivalent share volume.

Proposed Section 11.3(b)(i)(D)(I) of the CAT NMS Plan would describe the Historical Recovery Period used in calculating the Historical Fee Rate. This proposed provision would state that ''[t]he length of the Historical Recovery Period used in calculating each Historical Fee Rate will be reasonably established by the Operating Committee based upon the amount of the Historical CAT Costs to be recovered by the Historical CAT Assessment.''[49] This proposed provision, however, would state that ''no Historical Recovery Period used in calculating the Historical Fee Rate shall be less than 24 months or more than five years.'' As discussed below, the Historical Recovery Period is used to calculate the Historical Fee Rate. The actual recovery period may be longer or shorter than the Historical Recovery Period depending on the actual executed equivalent share volumes during the time that the Historical CAT Assessment is in effect. Any Historical CAT Assessment would remain in effect until the relevant Historical CAT Costs are recovered, whether that time is shorter or longer than the Historical Recovery Period used in calculating the Historical Fee Rate.

Proposed Section 11.3(b)(i)(D)(II) of the CAT NMS Plan would describe the length of the time that the Historical CAT Assessment would be in effect, which may be greater than or less than the Historical Recovery Period, depending on the amount of the Historical CAT Assessments collected based on the actual volume during the time that the Historical Assessment is in effect. Any Historical CAT Assessment

---

[48] CAT LLC used a Historical Recovery Period of two years for Historical CAT Assessment 1, which has a fee rate of $0.000013 per executed equivalent share. *See, e.g.,* Securities Exchange Act Rel. No. 100936 (Sept. 5, 2024), 89 FR 74430 (Sept. 22, 2024) (BOX Exchange LLC filing for Historical CAT Assessment 1).

[49] This provision would require that the Historical Recovery Period be ''reasonably'' established by the Operating Committee.

would remain in effect until the relevant Historical CAT Costs are collected, whether that time is shorter or longer than the Historical Recovery Period used in calculating the Historical Fee Rate. Accordingly, this provision states that ''[n]otwithstanding the length of the Historical Recovery Period used in calculating the Historical Fee Rate, each Historical CAT Assessment calculated using the Historical Fee Rate will remain in effect until all Historical CAT Costs for the Historical CAT Assessment are collected.''

v. Projected Total Executed Equivalent Share Volume

The Historical Fee Rate for a Historical CAT Assessment would be calculated by using the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period for such Historical CAT Assessment. CAT LLC proposes to clarify the manner of calculating the projected total executed equivalent share volume for each Historical CAT Assessment in Proposed Section 11.3(b)(i)(E) to the CAT NMS Plan. CAT LLC proposes to state in this provision that the projection will be determined based on transactions in Eligible Securities for the prior twelve months. Accordingly, Proposed Section 11.3(b)(i)(E) of the CAT NMS Plan would state that ''[t]he Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each Historical Recovery Period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.'' As with the calculation of the projections for CAT Fees, CAT LLC determined that the use of the data from the prior twelve months provides an appropriate balance between using data from a period that is sufficiently long to avoid short-term fluctuations while providing data close in time to the upcoming relevant period. In addition, CAT LLC proposes to allow the Operating Committee to base its projection on the prior twelve months, but to use its discretion to analyze the likely volume for the upcoming year. As set forth in Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan, Participants will be required to provide a description of the calculation of the projection in their fee filings pursuant to Section 19(b) of the Exchange Act for Historical CAT Assessments. As noted, this provision would require the Operating Committee to ''reasonably'' determine the projected total executed equivalent share volume.

c. Past CAT Costs and Participants

Proposed Section 11.3(b)(ii) of the CAT NMS Plan would clarify that the Participants would not be required to pay the Historical CAT Assessment as the Participants previously have paid all Past CAT Costs. It would state that, ''[b]ecause Participants previously have paid Past CAT Costs via loans to the Company, Participants would not be required to pay any Historical CAT Assessment.'' In addition, Proposed Section 11.3(b)(ii) of the CAT NMS Plan would clarify that the Historical CAT fees collected from Industry Members would be allocated to Participants for repayment of the outstanding loan notes of the Participants to the Company on a pro rata basis; such fees would not be allocated to Participants based on the executed equivalent share volume of transactions in Eligible Securities. Specifically, Proposed Section 11.3(b)(ii) of the CAT NMS Plan would state that ''[i]n lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans.'' Furthermore, Proposed Section 11.3(b)(ii) of the CAT NMS Plan would emphasize that ''Historical CAT Assessments are designed to recover two-thirds of the Historical CAT Costs.''

d. Historical CAT Assessment for Industry Members

CAT LLC proposes to describe the Historical CAT Assessment for Industry Members in Proposed Section 11.3(b)(iii) of the CAT NMS Plan. Proposed Section 11.3(b)(iii) of the CAT NMS Plan would have two paragraphs, (A) and (B), where paragraph (A) would describe the Historical CAT Assessment for Industry Members, and paragraph (B) would describe the fee filings required to be filed pursuant to Section 19(b) of the Exchange Act regarding the Historical CAT Assessments.

i. Industry Member Obligation for Historical CAT Assessment

CAT LLC proposes to describe the Historical CAT Assessment charged to Industry Members in Proposed Section 11.3(b)(iii)(A) of the CAT NMS Plan. Specifically, this proposed paragraph would state that:

Each month in which a Historical CAT Assessment is in effect, each CEBB and each CEBS shall pay a fee for each transaction in Eligible Securities executed by the CEBB or CEBS from the prior month as set forth in CAT Data, where the Historical CAT

Assessment for each transaction will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Historical Fee Rate reasonably determined pursuant to paragraph (b)(i) of this Section 11.3.

As noted, this provision would require the Operating Committee to ''reasonably'' determine the Historical Fee Rate pursuant to Proposed Section 11.3(b)(i) of the CAT NMS Plan.

ii. Historical CAT Assessment Fee Filings

CAT LLC proposes to provide additional details regarding the fee filings to be filed by the Participants regarding each Historical CAT Assessment pursuant to Section 19(b) of the Exchange Act in Proposed Section 11.3(b)(iii)(B) of the CAT NMS Plan.[50] Specifically, this provision would describe that fee filings would be required for each Historical CAT Assessment, the content of such fee filings, and the effect of the Financial Accountability Milestones described in Section 11.6 of the CAT NMS Plan on the fee filings.

A. Number of Fee Filings for Historical CAT Assessments

CAT LLC proposes to clarify how many fee filings pursuant to Section 19(b) of the Exchange Act Participants would be required to make with regard to Historical CAT Assessments. CAT LLC proposes to clarify that each Participant will be required to file a fee filing pursuant to Section 19(b) of the Exchange Act to describe each Historical CAT Assessment. Accordingly, CAT LLC proposes to describe this requirement in Proposed Section 11.3(b)(iii)(B)(I) of the CAT NMS Plan, which would state that ''Participants will be required to file with the SEC pursuant to Section 19(b) of the Exchange Act a filing for each Historical CAT Assessment.''

B. Content of Fee Filings for Historical CAT Assessments

CAT LLC proposes to provide additional detail as to the information that Participants would be required to include in their fee filings to be made pursuant to Section 19(b) of the Exchange and Rule 19b–4(f)(2) for Historical CAT Assessments in proposed paragraph (b)(iii)(B)(II) of Proposed Section 11.3 of the CAT NMS

---

[50] CAT LLC expects the fee filings required to be made by the Participants pursuant to Section 19(b) of the Exchange Act with regard to Historical CAT Assessments to be filed pursuant to Section 19(b)(3)(A) of the Exchange Act. In accordance with Section 19(b)(3)(A) of the Exchange Act, fee filings made pursuant to Section 19(b)(3)(A) of the Exchange Act would be effective upon filing.

Plan. The proposed paragraph sets forth the information about the Historical CAT Assessments that should be included in the fee filings required to be made by the Participants pursuant to Section 19(b) of the Exchange Act. Specifically, such filings would be required to include: (A) the Historical Fee Rate; (B) a brief description of the amount and type of Historical CAT Costs, including (1) the technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs; (C) the Historical Recovery Period and the reasons for its length; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period, and a description of the calculation of the projection. Such detailed information would provide Industry Members and other interested parties with a clear understanding of the calculation of each Historical CAT Assessment and its relationship to Historical CAT Costs.[51]

In addition, CAT LLC proposes to clarify that the Historical CAT Costs described in the fee filings must provide sufficient detail to demonstrate that such costs are reasonable and appropriate. Therefore, CAT LLC proposes to add the following sentence to Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan: ''The information provided in this Section would be provided with sufficient detail to demonstrate that the Historical CAT Costs are reasonable and appropriate.''

C. Financial Accountability Milestones

CAT LLC recognizes that the collection of Historical CAT Assessments from Industry Members is subject to Section 11.6 of the CAT NMS Plan regarding the Financial Accountability Milestones. Accordingly, CAT LLC proposes to clarify that Participants will not make CAT fee filings pursuant to Section 19(b) of the Exchange Act regarding a Historical CAT Assessment until any applicable Financial Accountability Milestone has been satisfied. Specifically, CAT LLC proposes to add Proposed Section 11.3(b)(iii)(B)(III) to the CAT NMS Plan. This provision would state that ''[n]o Participant will make a filing with the SEC pursuant to Section 19(b) of the

Exchange Act regarding any Historical CAT Assessment until any applicable Financial Accountability Milestone described in Section 11.6 has been satisfied.''

e. Historical CAT Assessment Details

CAT LLC proposes to provide CAT Executing Brokers with details regarding the calculation of their Historical CAT Assessments upon request. Specifically, CAT LLC proposes to add Proposed Section 11.3(b)(iv)(A) to the CAT NMS Plan, which would state that ''[d]etails regarding the calculation of a CAT Executing Broker's Historical CAT Assessment will be provided upon request to such CAT Executing Broker. At a minimum, such details would include each CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.'' Such information would provide CAT Executing Brokers with the ability to understand the details regarding the calculation of their Historical CAT Assessments.

In addition, CAT LLC proposes to make certain aggregate statistics regarding Historical CAT Assessments publicly available. Specifically, CAT LLC proposes to add Proposed Section 11.3(b)(iv)(B) to the CAT NMS Plan. This provision would state that ''[f]or each Historical CAT Assessment, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.''

5. Participant Pass-Through Fees

CAT LLC proposes to add a new paragraph (e) to Section 11.3 to address the Eleventh Circuit's opinion regarding the potential for Participants to pass-through 100% of their CAT fees to Industry Members, and its effect on the allocation of CAT costs under the Executed Share Model. Proposed new paragraph (e) of Section 11.3 would state that ''[e]ach Participant agrees not to file with the SEC a proposed rule change pursuant to Section 19(b) and Rule 19b–4 thereunder that would establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with

Section 11.3(a).'' [52] This proposed provision would respond to the Eleventh Circuit's decision regarding the possibility for Participants to pass-through their CAT fees to their members, thereby causing Industry Members to bear more than two-thirds of the CAT costs (ignoring what Industry Members would pass-through to investors).

6. CAT Fee Schedule for Participants

To implement the Participant CAT fees, CAT LLC proposes to add a fee schedule, entitled ''Consolidated Audit Trail Funding Fees,'' to Appendix B of the CAT NMS Plan. Proposed paragraph (a) of the fee schedule would describe the CAT Fees to be paid by the Participants under the Funding Proposal. Specifically, paragraph (a) of the Participant fee schedule would state that ''[e]ach Participant shall pay the CAT Fee set forth in Section 11.3(a) of the CAT NMS Plan to Consolidated Audit Trail, LLC in the manner prescribed by Consolidated Audit Trail, LLC on a monthly basis based on the Participant's transactions in Eligible Securities in the prior month.''

7. Additional Changes From Original Funding Model

CAT LLC proposes certain revisions to Article XI of the CAT NMS Plan to implement the Funding Proposal. CAT LLC proposes to make the following changes to the CAT NMS Plan in addition to the proposed changes to the CAT NMS Plan discussed above.

a. Elimination of Definition of ''Execution Venue''

Section 1.1 of the CAT NMS Plan defines the term ''Execution Venue'' to mean ''a Participant or an alternative trading system ('ATS') (as defined in Rule 300 of Regulation ATS) that operates pursuant to Rule 301 of Regulation ATS (excluding any such ATS that does not execute orders).'' Currently, the term ''Execution Venue'' is used in Sections 11.2 and 11.3 of the CAT NMS Plan to describe how CAT costs would be allocated among CAT Reporters under the Original Funding Model. The Original Funding Model would have imposed fees based on market share to CAT Reporters that are Execution Venues, including ATSs, and fees based on message traffic for Industry Members' non-ATS activities. In contrast, the Funding Proposal would impose fees based on the executed equivalent shares of transactions in

---

[51] As a practical matter, the fee filing would provide the exact fee per executed equivalent share to be paid for the Historical CAT Assessment, by multiplying the Historical Fee Rate by one-third and describing the relevant number of decimal places for the fee.

[52] As highlighted in *Exhibit B,* Proposed Section 11.3(e) of the CAT NMS Plan was not included in the Executed Share Model.

Eligible Securities for three categories of CAT Reporters: Participants, CEBBs and CEBSs. Accordingly, as the concept for an ''Execution Venue'' would not be relevant for the Funding Proposal, CAT LLC proposes to delete this term and its definition from Section 1.1 of the CAT NMS Plan.

b. Use of Executed Equivalent Share Volume Under Funding Proposal

The Original Funding Model set forth in the CAT NMS Plan requires Participants and Execution Venue ATSs to pay CAT fees based on market share and Industry Members (other than Execution Venue ATSs) to pay CAT fees based on message traffic. The CAT NMS Plan also describes how the market share-based fee would be calculated for Participants and other Execution Venue ATSs and how the message traffic-based fee would be calculated for Industry Members (other than Execution Venue ATSs). CAT LLC proposes to amend the CAT NMS Plan to require Participants, CEBBs and CEBSs to pay CAT fees based on the number of executed equivalent shares in a transaction in Eligible Securities, rather than based on market share and message traffic. Accordingly, the Operating Committee proposes to amend Section 11.2(b) and (c) and Section 11.3(a) and (b) of the CAT NMS Plan to reflect the proposed use of the number of executed equivalent shares in transactions in Eligible Securities in calculating CAT fees.

Section 11.2(b) of the CAT NMS Plan states that ''[i]n establishing the funding of the Company, the Operating Committee shall seek . . . (b) to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT and distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations.'' CAT LLC proposes to delete the requirement to take into account ''distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations.'' This requirement related to using message traffic and market share in the calculation of CAT fees, as message traffic and market share were metrics related to the impact of a CAT Reporter on the Company's resources and operations. With the proposed move to the use of the executed equivalent shares metric instead of message traffic

and market share, the requirement is no longer relevant.

Section 11.2(c) of the CAT NMS Plan states that ''[i]n establishing the funding of the Company, the Operating Committee shall seek . . . (c) to establish a tiered fee structure in which the fees charged to: (i) CAT Reporters that are Execution Venues, including ATSs, are based upon the level of market share; (ii) Industry Members' non-ATS activities are based upon message traffic.'' CAT LLC proposes to delete subparagraphs (i) and (ii) and replace these subparagraphs with the requirement that the fee structure in which the fees charged to ''Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities.'' [53]

In addition, CAT LLC proposes to amend the CAT funding principles to clarify that CAT Fees and the Historical CAT Assessments are intended to be cost-based fees—that is, the fees are designed to recover the cost of the creation, implementation and operation of the CAT. CAT LLC proposes to amend the funding principle set forth in Section 11.2(c) by making a specific reference to the costs of the CAT. With this proposed change, Proposed Section 11.2(c) would state that ''[i]n establishing the funding of the Company, the Operating Committee shall seek: . . . to establish a fee structure in which the fees charged to Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT.''

Section 11.3(a) of the CAT NMS Plan provides additional detail regarding the market share-based fees to be paid by Participants and Execution Venue ATSs under the Original Funding Model. Specifically, Section 11.3(a) of the CAT NMS Plan states:

(a) The Operating Committee will establish fixed fees to be payable by Execution Venues as provided in this Section 11.3(a):

(i) Each Execution Venue that: (A) executes transactions; or (B) in the case of a national securities association, has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange, in NMS Stocks or OTC Equity Securities will pay a fixed fee depending on the market share of that Execution Venue in NMS Stocks and OTC Equity Securities, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's NMS Stocks and OTC Equity Securities market share. For these purposes, market share for Execution Venues that execute transactions will be calculated

by share volume, and market share for a national securities association that has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange in NMS Stocks or OTC Equity Securities will be calculated based on share volume of trades reported, provided, however, that the share volume reported to such national securities association by an Execution Venue shall not be included in the calculation of such national security association's market share.

(ii) Each Execution Venue that executes transactions in Listed Options will pay a fixed fee depending on the Listed Options market share of that Execution Venue, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's Listed Options market share. For these purposes, market share will be calculated by contract volume.

CAT LLC proposes to delete Section 11.3(a) of the CAT NMS Plan and replace this paragraph with a description of the CAT Fees related to Prospective CAT Costs, as described above.

Section 11.3(b) of the CAT NMS Plan provides additional detail regarding the message traffic-based CAT fees to be paid by Industry Members (other than Execution Venue ATSs) under the Original Funding Model. Specifically, Section 11.3(b) of the CAT NMS Plan states:

The Operating Committee will establish fixed fees to be payable by Industry Members, based on the message traffic generated by such Industry Member, with the Operating Committee establishing at least five and no more than nine tiers of fixed fees, based on message traffic. For the avoidance of doubt, the fixed fees payable by Industry Members pursuant to this paragraph shall, in addition to any other applicable message traffic, include message traffic generated by: (i) an ATS that does not execute orders that is sponsored by such Industry Member; and (ii) routing orders to and from any ATS sponsored by such Industry Member.

CAT LLC proposes to delete Section 11.3(b) of the CAT NMS Plan and replace this paragraph with a description of the Historical CAT Assessments, as described above.

c. Elimination of Tiered Fees

CAT LLC proposes to eliminate the use of tiered fees that were included in the Original Funding Model. Instead, under the Funding Proposal, each Participant, CEBB or CEBS would pay a fee based solely on its transactions in Eligible Securities. The Operating Committee therefore proposes to amend Sections 11.1(d), 11.2(c), 11.3(a) and 11.3(b) of the CAT NMS Plan to eliminate tiered fees and related concepts.

Utilizing a tiered fee structure, by its nature, would create certain inequities

---

[53] As discussed in the next section, the Operating Committee also proposes to delete the reference to a ''tiered'' fee structure.

among the CAT fees paid by CAT Reporters. For example, two CAT Reporters with comparable executed equivalent share volume may pay notably different fees if one falls in a higher tier and the other falls within a lower tier. Correspondingly, a tiered fee structure generally would reduce fees for CAT Reporters with higher executed share volume in one tier, while increasing fees for Industry Members with lower executed share volume in the same tier, as compared to a non-tiered fee. Furthermore, CAT Reporters in lower tiers potentially pay more than they would without the use of tiers. While tiering appropriately exists in various other self-regulatory fee programs, CAT LLC proposes to eliminate the tiering concept for the Funding Proposal.

By charging each Participant, CEBB and CEBS a CAT fee directly based on its own executed equivalent share volume, rather than charging a tiered fee, the Funding Proposal would result in a CAT fee being tied more directly to the CAT Reporter's executed share volume. In contrast, with a tiered fee, CAT Reporters with different levels of executed equivalent share volume that are placed in the same tier would all pay the same CAT fee, thereby limiting the correlation between a CAT Reporter's activity and its CAT fee.

The proposed non-tiering approach is simpler and more objective to administer than the tiering approach. With a tiering approach, the number of tiers for Participants, CEBBs and CEBSs, the boundaries for each tier and the fees assigned to each tier must be established. In the absence of clear groupings of CAT Reporters, selecting the number of, boundaries for, and the fees associated with each tier would be subject to some level of subjectivity. Furthermore, the establishment of tiers would need to be continually reassessed based on changes in the executed equivalent share volume of transactions in Eligible Securities, thereby requiring regular subjective assessments. Accordingly, the removal of tiering from the Funding Proposal eliminates a variety of subjective analyses and judgments from the model and simplifies the determination of CAT fees.

Section 11.1(d) of the CAT NMS Plan states that "[c]onsistent with this Article XI, the Operating Committee shall adopt policies, procedures, and practices regarding the budget and budgeting process, assignment of tiers, resolution of disputes, billing and collection of fees, and other related matters." With the elimination of tiered fees, the reference to the "assignment of tiers"

would no longer be relevant for the Funding Proposal. Therefore, CAT LLC proposes to delete the reference to "assignment of tiers" from Section 11.1(d).

Section 11.1(d) of the CAT NMS Plan also states that:

For the avoidance of doubt, as part of its regular review of fees for the CAT, the Operating Committee shall have the right to change the tier assigned to any particular Person in accordance with fee schedules previously filed with the Commission that are reasonable, equitable and not unfairly discriminatory and subject to public notice and comment, pursuant to this Article XI. Any such changes will be effective upon reasonable notice to such Person.

As noted above, unlike the Original Funding Model, the Funding Proposal would not utilize tiered fees. Accordingly, these two sentences would not be applicable to the Funding Proposal. Therefore, CAT LLC proposes to delete these two sentences from Section 11.1(d) of the CAT NMS Plan.

CAT LLC proposes to delete the reference to "tiered" fees from Section 11.2(c) of the CAT NMS Plan. Section 11.2(c) of the CAT NMS Plan states that "[i]n establishing the funding of the Company, the Operating Committee shall seek: . . . (c) to establish a tiered fee structure . . ." CAT LLC propose to delete the word "tiered" from this provision as the CAT fees would not be tiered under the Funding Proposal.

CAT LLC also proposes to delete paragraph (iii) of Section 11.2(c) of the CAT NMS Plan. Paragraph (iii) of Section 11.2(c) of the CAT NMS Plan states that the Operating Committee shall seek to establish a tiered fee structure in which fees charged to:

the CAT Reporters with the most CAT-related activity (measured by market share and/or message traffic, as applicable) be generally comparable (where for these comparability purposes, the tiered fee structure takes into consideration affiliations between or among CAT Reporters, whether Execution Venues and/or Industry Members).

Under the Original Funding Model, the comparability provision was an important factor in determining the tiers for Industry Members and Execution Venues. In determining the tiers, the Operating Committee sought to establish comparable fees among the CAT Reporters with the most Reportable Events.[54] Under the Funding Proposal, however, the comparability provision is no longer necessary, as a tiered fee structure would not be used for Industry Members or Participants.

As discussed above, the Operating Committee proposes to replace the language in Sections 11.3(a) and (b) of the CAT NMS Plan with language implementing the Funding Proposal. These proposed changes would remove the references to tiers in Sections 11.3(a)(i) and (ii) and 11.3(b) of the CAT NMS Plan, along with the other proposed changes. Specifically, Section 11.3(a)(i) of the CAT NMS Plan states that the Operating Committee, when establishing fees for Execution Venues for NMS Stocks and OTC Equity Securities, will establish "at least two and no more than five tiers of fixed fees, based on an Execution Venue's NMS Stocks and OTC Equity Securities market share." Similarly, Section 11.3(a)(ii) of the CAT NMS Plan states that the Operating Committee, when establishing fees for Execution Venues that execute transactions in Listed Options, will establish "at least two and no more than five tiers of fixed fees, based on an Execution Venue's Listed Options market share." Section 11.3(b) of the CAT NMS Plan states that the Operating Committee, when establishing fees to be payable by Industry Members, will establish "at least five and no more than nine tiers of fixed fees, based on message traffic." CAT LLC proposes to delete each of these references to tiers from the CAT NMS Plan.

### d. No Fixed Fees

As discussed above, CAT LLC proposes to replace the language in Sections 11.3(a) and (b) of the CAT NMS Plan with language implementing the Funding Proposal. These proposed changes also would remove the references to "fixed fees" in Sections 11.3(a), 11.3(a)(i), 11.3(a)(ii) and 11.3(b) and replaced them with references to "fees." Under the Funding Proposal, the CAT fees to be paid by Participants, CEBBs and CEBSs will vary in accordance with their executed equivalent share volume of transactions in Eligible Securities, although the Fee Rate will be fixed for a relevant period. Therefore, the concept of a fixed fee— that is, a fee that does not vary depending on circumstances—is not relevant under the Funding Proposal.

### 8. Billing and Collection of CAT Fees

Consistent with Section 11.1(d) of the CAT NMS Plan, CAT LLC will adopt policies, procedures and practices regarding the billing and collection of fees. In addition, pursuant to Section 11.4 of the CAT NMS Plan, CAT LLC will establish a system for the collection of CAT fees from Participants and Industry Members. As set forth in

---

[54] *See, e.g.,* Securities Exchange Act Rel. No. 82451 (Jan. 5, 2018), 83 FR 1399, 1406–07 (Jan. 11, 2018) ("2018 Fee Proposal Release").

Section 11.4 of the CAT NMS Plan, each Participant would be required to pay its CAT fees authorized under the CAT NMS Plan as required by Section 3.7(b) of the CAT NMS Plan.[55] Section 3.7(b) of the CAT NMS Plan provides the following:

Each Participant shall pay all fees or other amounts required to be paid under this Agreement within thirty (30) days after receipt of an invoice or other notice indicating payment is due (unless a longer payment period is otherwise indicated) (the ''Payment Date''). The Participant shall pay interest on the outstanding balance from the Payment Date until such fee or amount is paid at a per annum rate equal to the lesser of: (i) the Prime Rate plus 300 basis points; or (ii) the maximum rate permitted by applicable law. If any such remaining outstanding balance is not paid within thirty (30) days after the Payment Date, the Participants shall file an amendment to this Agreement requesting the termination of the participation in the Company of such Participant, and its right to any Company Interest, with the SEC. Such amendment shall be effective only when it is approved by the SEC in accordance with SEC Rule 608 or otherwise becomes effective pursuant to SEC Rule 608.

Section 11.4 of the CAT NMS Plan also addresses the payment of CAT fees by Industry Members. Section 11.4 of the CAT NMS Plan states:

Participants shall require each Industry Member to pay all applicable fees authorized under this Article XI within thirty (30) days after receipt of an invoice or other notice indicating payment is due (unless a longer payment period is otherwise indicated). If an Industry Member fails to pay any such fee when due (as determined in accordance with the preceding sentence), such Industry Member shall pay interest on the outstanding balance from such due date until such fee is paid at a per annum rate equal to the lesser of: (a) the Prime Rate plus 300 basis points; or (b) the maximum rate permitted by applicable law.

9. Advantages of and Support for the Funding Proposal

CAT LLC proposes to adopt the Funding Proposal as it provides a variety of advantages over the Original Funding Model. CAT LLC discusses these advantages in this section of the filing.

a. Comparable to Existing Fee Precedent

The Funding Proposal would operate in a manner similar to other funding models employed by the SEC and the Participants, including the SEC's Section 31 fees, FINRA's trading activity fee (''FINRA TAF'') and the options regulatory fee (''ORF'') utilized by options exchanges. The SEC previously has determined that the Participants' sales value fees related to Section 31, the FINRA TAF and the ORF are consistent with the Exchange Act.

i. Section 31 Fees

Pursuant to Section 31 of the Exchange Act, a national securities exchange must pay the Commission a fee based on the aggregate dollar amount of sales of securities transacted on the exchange, and a national securities association must pay the Commission a fee based on the aggregate dollar amount of sales of securities transacted by or through any member of the association otherwise than on a national securities exchange (collectively, ''covered sales''). The SEC calculates the amount of Section 31 fees due from each exchange or FINRA by multiplying the aggregate dollar amount of its covered sales by the fee rate set by the Commission in a procedure set forth in Section 31(j) of the Exchange Act. These fees are designed to recover the costs related to the government's supervision and regulation of the securities markets and securities professionals. Section 31 requires the SEC to make annual and, in some cases, mid-year adjustments to the fee rate. These adjustments are necessary to make the SEC's total collection of transaction fees in a given year as close as possible to the amount of the regular appropriation to the Commission by Congress for that fiscal year.

To recover the costs of their Section 31 fee obligations, each of the national securities exchanges and FINRA have adopted, and the SEC has approved, rules assessing a regulatory transaction fee on their members, the amount of which is set in accordance with Section 31 of the Exchange Act.[56] Broker-dealers, in turn, often impose fees on their customers that provide the funds to pay the fees owed to the exchanges and FINRA.

Like the well-known, longstanding and accepted Section 31-related fee model, the Funding Proposal would use a predetermined fee rate for the calculation of the fees, seek to recover designated regulatory costs (as CAT provides a solely regulatory function), and allow for the adjustment of the fee rate during the year to seek to match regulatory costs with fees collected. The Funding Proposal, however, would impose fees based on executed equivalent share volume rather than the sales values of certain transactions. Despite the different calculation metric, the Funding Proposal is similar to a model well-known, long accepted and justified under the Exchange Act the purpose of which is also to cover costs associated with the regulation of securities markets and securities professionals.

ii. FINRA Trading Activity Fee

The transaction-based fees charged under the Funding Proposal also would be similar to FINRA's transaction-based trading activity fee,[57] which was modeled on the Commission's Section 31 fee.[58] Although the FINRA TAF is designed to cover a subset of the costs of FINRA services (*e.g.,* costs to FINRA of the supervision and regulation of members, including performing examinations, financial monitoring, and policy, rulemaking, interpretive, and enforcement activities) rather than all of FINRA's costs like the CAT, the transaction-based calculation of the FINRA TAF and the proposed CAT fees are similar. With the FINRA TAF, FINRA members on the sell-side of a transaction are required to pay a per share fee for each sale of covered securities, which includes exchange registered securities, equity securities traded otherwise than on an exchange, security futures, TRACE-Eligible Securities and municipal securities, subject to certain exceptions. In approving the FINRA TAF, the SEC stated that the implementation of the FINRA TAF ''is consistent with section 15A(b)(5) of the Act, in that the proposal is reasonably designed to recover NASD costs related to regulation and oversight of its members.''[59] The SEC further stated that ''[t]he Commission recognizes the difficulties inherent in restructuring the NASD's regulatory fees, and believes that the NASD has done so in a manner that is fair and reasonable.''[60] The CAT fees calculated under the Funding Proposal would be similar to the FINRA TAF in that they would be transaction-based fees intended to provide funding for regulatory costs.

iii. Options Regulatory Fee

The fees charged under the Funding Proposal also would be similar to the ORF charged by the options

---

[55] Participants and CAT Executing Brokers would be responsible for a fee each month in which they are a CAT Reporter. If a Participant or CAT Executing Broker ceases to the meet the definition of a CAT Reporter during a month, the Participant or CAT Executing Broker would still be responsible for CAT fees associated with its transactions during that month.

[56] *See, e.g.,* Section 3 of Schedule A of FINRA's By-Laws.

[57] Section 1 of Schedule A of FINRA's By-Laws.

[58] *See* Securities Exchange Act Rel. No. 46416 (Aug. 23, 2002), 67 FR 55901 (Aug. 30, 2002).

[59] Securities Exchange Act Rel. No. 47946 (May 30, 2003), 68 FR 34021, 34023 (June 6, 2003) (''TAF Release'').

[60] *Id.*

exchanges.[61] The ORF is a per contract fee charged by an options exchange for certain options transactions to options members of the relevant exchange. The ORF is collected indirectly from exchange members through their clearing firms by the Options Clearing Corporation on behalf of the Exchange. Revenue generated from the ORF is designed to recover a material portion of an options exchange's regulatory costs related to the supervision and regulation of its members' options business, including performing routine surveillance, investigations, examinations and financial monitoring as well as policy, rulemaking, interpretive, and enforcement activities. Exchange members generally pass-through the ORF to their customers in the same manner that firms pass-through to their customers the fees charged by SROs to help the SROs meet their obligations under Section 31 of the Exchange Act.[62] The CAT fees calculated under the Funding Proposal would be similar to the ORF in that they would be transaction-based fees intended to provide funding for regulatory costs.

b. Fee Metric: Executed Equivalent Share Volume

CAT LLC proposes to use the executed equivalent share volume of transactions in Eligible Securities as the means for allocating CAT costs among Participants and Industry Members. The use of executed equivalent share volume would replace the use of message traffic for allocating costs among Industry Members and the use of market share for allocating costs among Participants as set forth in the Original Funding Model. The use of executed equivalent share volume is a reasonable and equitable method for allocating costs for a variety of reasons, and CAT LLC believes it improves upon the use of message traffic.

The proposed use of CAT-reported message traffic as set forth in the Original Funding Model raised a variety of issues for allocating CAT costs. First, based on a subsequent study of cost drivers for the CAT, it was determined that message traffic may be a factor in the CAT costs, but it is not the primary factor. CAT costs are dominated by technology costs, and the predominant technology costs are data processing (e.g., linker) and storage costs.[63] The

data processing and storage costs are related to the level of message traffic, but such costs also relate to other factors. The data processing and storage costs also are directly related to the complexity of the reporting requirements for the market activity. For example, in light of the complexity of market activity, the CAT's order reporting and linkage scenarios document for Industry Members is over 800 pages in length, addressing nearly 200 scenarios.[64] The processing and storage of such a large number of complex reporting scenarios requires very complex algorithms, which, in turn, lead to significant data processing and storage costs. The data processing and storage costs also are driven by the stringent performance, timelines and operational requirements for processing CAT Data. For example, the CAT NMS Plan requires that CAT order events be processed within established timeframes to ensure data can be made available to Participants' regulatory staff and the SEC in a timely manner. Accordingly, a CAT Reporter's message traffic may be a factor, but not a primary factor, in terms of the costs of the CAT.

Second, in general, Industry Member revenue, including revenue derived from fees Industry Members charge their clients, is often driven by transactions. Because message traffic is separate from whether or not a transaction occurs, fees based on message traffic may not correlate with common revenue or fee models. As a result, CAT fees based on message traffic could impose an outsized adverse financial impact on certain Industry Members.

Third, imposing CAT fees on each CAT Reporter based on its message traffic may have an adverse effect on competition, liquidity or other aspects of market structure, and may increase model complexity. For example, the number of messages for any given order, whether or not ultimately executed, could vary depending on how a given order is processed, leading to a lack of predictability on the applicable cost to process any given order or executions for broker-dealers or non-broker-dealer customers.[65] As one example, discussed in the context of the previously proposed funding models,[66] market makers in Eligible Securities may have

very high levels of message traffic due to their quoting obligations. Such high levels of message traffic may lead to outsized fees for market makers in comparison to their transaction activity, thereby placing an excessive financial burden on market makers. This, in turn, may lead to a decrease in the number of market makers, resulting in a decrease in liquidity and a reduction in market quality. To address this effect on market makers, CAT LLC proposed to discount the fees that market makers would need to pay. However, such a discount adds complexity to the message traffic approach, as the model must determine when a discount is necessary and how much the discount should be.

The use of executed equivalent share volume to allocate CAT costs addresses each of these concerns. The fees are not divorced from transactions, the traditional source of revenue for Industry Members; fees based on executed equivalent share volume would not adversely impact certain market participants to the detriment of the markets, and the model is simple to understand and implement. Moreover, in addition to these benefits, the executed equivalent share volume is related to, but not precisely linked to, the CAT Reporter's burden on the CAT. In light of the many inter-related cost drivers of the CAT (e.g., storage, message traffic, processing), determining the precise cost burden imposed by each individual CAT Reporter on the CAT is not feasible. Accordingly, CAT LLC has determined that trading activity provides a reasonable proxy for cost burden on the CAT, and therefore is an appropriate metric for allocating CAT costs among CAT Reporters. This conclusion is consistent with the SEC's prior recognition of the use of transaction volume in setting regulatory fees. For example, in approving the FINRA TAF, the SEC recognized that transaction volume was closely enough connected to FINRA's regulatory responsibilities to satisfy the statutory standard in the Exchange Act.[67]

c. CAT Executing Brokers

i. Charging CAT Executing Brokers

CAT LLC proposes to charge CAT fees to CAT Executing Brokers. CAT LLC believes that such an approach is consistent with the requirements of the Exchange Act for a variety of reasons, including the following reasons.

First, the proposal to charge executing brokers is broadly supported by the

---

[61] See, e.g., Cboe Fee Schedule, MIAX Fee Schedule, and NYSE Arca Fee Schedule.

[62] See, e.g., Securities Exchange Act Rel. No. 58817 (Oct. 20, 2008), 73 FR 63744, 63745 (Oct. 27, 2008).

[63] For a detailed discussion of cost drivers of the CAT, see CAT LLC Webinar, CAT Costs (Sept. 21,

2021), https://www.catnmsplan.com/events/cat-costs-september-21-2021.

[64] CAT Industry Member Reporting Scenarios, Version 4.16 (July 31, 2025), https://www.catnmsplan.com/sites/default/files/2025-07/07.31.25_Industry_Member_Tech_Specs_Reporting_Scenarios_v4.16_CLEAN.pdf.

[65] The predictability of fees is discussed further below in Section A.9.u of this filing.

[66] See 2018 Fee Proposal Release.

[67] TAF Release at 34024.

industry.[68] For example, SIFMA has supported charging executing brokers, and continues to support charging executing brokers, rather than clearing brokers.[69] In one of its comment letters on the 2022 Funding Proposal, SIFMA stated that ''we support the Participants' decision to allocate CAT costs to executing brokers rather than clearing brokers.''[70] CAT LLC notes that there have been very few issues with the ability of CAT Executing Brokers to pay their invoices for CAT fees; approximately 99% of CAT fees are paid on time. CAT LLC understands that, under the Executed Share Model, many Industry Members have implemented processes to pass-through their CAT fees to upstream broker-dealers and customers.

Second, the proposal to rely on executing brokers, rather than clearing brokers, was proposed in direct response to comments raised by SIFMA and other commenters on the 2022 Funding Proposal regarding the cost burden that clearing firms may experience if clearing brokers were charged CAT fees.[71] As noted by commenters, imposing the fee payment obligation on clearing brokers, rather than on executing brokers more generally, potentially may impose a significant financial burden on clearing firms if the fees imposed on clearing firms are not passed through to their clients.

Third, charging the CEBBs and CEBSs would reflect the executing role the CEBB and CEBS have in each transaction. Such a fee model is currently used and well-known in the securities markets. For example, SRO members regularly pay transaction-based fees. As a result, the CAT fees could be paid by Industry Members without requiring significant and potentially costly changes.

Fourth, charging CEBBs and CEBSs is in line with the use of transaction reports from the exchanges and FINRA's equity trading reporting facilities for calculating the CAT fees. The CEBBs and CEBSs are identified on the transaction reports, thereby streamlining the CAT collection process.

Fifth, CAT LLC does not believe that the proposal would burden CAT Executing Brokers. The CEBBs and CEBSs could determine, but would not be required, to pass their CAT fees through to their clients (both non-broker-dealer customers and upstream broker-dealers), who, in turn, could pass their CAT fees to their clients, until the fee is imposed on the ultimate participant in the transaction. With such a pass-through, the CEBBs and CEBSs would not ultimately incur the cost of all CAT fees related to their transactions. It is common practice in the industry for broker-dealers to pass transaction-based fees through to their clients, and CAT fees would introduce no unique issues for passing the CAT fee on to clients. Indeed, CAT LLC understands that, under the Executed Share Model, many Industry Members have implemented processes to pass-through their CAT fees to upstream broker-dealers and customers. Moreover, those CAT Executing Brokers that do not directly pass-through their CAT fees may account for and recover such fees as part of their overall business costs when considering and establishing other revenue-generating sources.

Finally, the proposal to charge CAT Executing Brokers CAT fees as set forth in the Funding Proposal only addresses the party responsible for the payment of the CAT fee. As an administrative matter regarding the method of payment, each CAT Executing Broker may seek to enter into a bilateral arrangement with its clearing broker for the clearing broker to collect and pass-through the CAT fees as it does in other contexts.

### ii. Effect on Net Capital of CAT Executing Brokers

CAT fees do not raise new or different issues for CAT Executing Brokers with respect to net capital requirements than other transaction-based fees charged to executing brokers. CAT fees will be billed on a monthly basis, and Section 11.4 of the CAT NMS Plan states that ''Participants shall require each Industry Member to pay all applicable fees authorized under this Article XI within thirty (30) days after receipt of an invoice or other notice indicating payment is due (unless a longer payment period is otherwise indicated).'' With respect to net capital requirements, CAT Executing Brokers may determine whether to establish arrangements with their brokerage clients to account for costs incurred by the CAT Executing Broker on the client's behalf, including setting the terms under which they must be repaid by their broker-dealer clients such that receivables need not extend beyond 30 days.

### d. Cost Allocation

### i. One-Third/One-Third/One-Third Allocation of Prospective CAT Costs Between CEBS, CEBB and Participant

When calculating the CAT Fees related to Prospective CAT Costs under the Funding Proposal, CAT LLC proposes to allocate one-third of Prospective CAT Costs to Participants, one-third of Prospective CAT Costs to CEBSs and one-third of Prospective CAT Costs to CEBBs. CAT LLC believes that this proposed allocation satisfies the requirements of the Exchange Act and Rule 608 of Regulation NMS under the Exchange Act.

The proposed ⅓, ⅓, ⅓ allocation of Prospective CAT Costs recognizes the three primary roles in each transaction: the buyer, the seller and the market regulator, and assigns an equal one-third share of the fee per transaction to each of these three roles. The Exchange Act itself recognizes the importance of these three roles in a transaction by imposing registration and other regulatory obligations on the broker-dealers and regulator involved in a transaction. This allocation is similar to the approach taken with the FINRA TAF, ORF and Section 31 sales value fees, and also recognizes the role of the market regulator and the buyer in the transaction as well as the seller.[72]

Furthermore, the allocation of two-thirds of the CAT costs to Industry Members and only one-third to Participants recognizes that a substantial portion of CAT costs originates from Industry Members. CAT costs are dominated by technology costs, and the predominant technology costs are data processing (*e.g.,* linker) and storage costs. The data processing and storage costs are related to message traffic and the complexity of the reporting requirements for CAT, which, in turn, are determined by market activity. Industry Members are responsible for originating trading activity that necessitates message traffic to the CAT, and the complexity of Industry Members' chosen business models contributes substantially to the costs of the CAT.

---

[68] *See* Partial Amendment I at 74185; February 2023 Proposed Partial Amendment at 5.

[69] *See* Letter from Ellen Greene, Managing Director, Equities and Options Market Structure, SIFMA, to Vanessa Countryman, Secretary, SEC (Dec. 14, 2022) (''December 2022 SIFMA Letter'') at 2; Letter from Ellen Greene, Managing Director, Equities and Options Market Structure, SIFMA, to Vanessa Countryman, Secretary, SEC (Oct. 7, 2022) at 4–5.

[70] Letter from Ellen Greene, Managing Director, Equities and Options Market Structure, and Joseph Corcoran, Managing Director, Associate General Counsel, SIFMA, to Vanessa Countryman, Secretary, SEC (Jan. 12, 2023) at 7. *See also* December 2022 SIFMA Letter at 2 (''[W]e support changing the payment obligation to executing brokers.'').

[71] *See* Partial Amendment I at 74185; February 2023 Proposed Partial Amendment at 5.

[72] As discussed below in Section A.9.e, Proposed Section 11.3(e) of the CAT NMS Plan would maintain the Participants' one-third contribution to CAT costs.

One of the factors driving CAT costs is the complexity of the Industry Members' CAT reporting requirements, which are driven by the inherent complexity of Industry Members' chosen business models. For example, in light of the complexity of market activity, the CAT's reporting scenarios document for Industry Members is over 800 pages in length, addressing almost 200 scenarios, including, for example, scenarios related to representative orders, internal routing, order modification, order cancellation, ATS scenarios, OTC scenarios, foreign scenarios, child orders, proprietary orders, fractional shares, stop and conditional orders, RFQs, floor activity and more.[73] The processing and storage of such a large number of complex reporting scenarios requires very complex algorithms, which, in turn, lead to significant data processing and storage costs. In contrast, the Participants do not originate market activity or orders or otherwise bring this level of complexity to the markets. As a result, the technical specifications for the Participants are far less complex than for Industry Members. For example, the technical specifications for Participants have 13 reporting events for stock exchanges compared to 39 equity reporting events in the technical specifications for Industry Members, and the technical specifications for Participants have 28 reporting events for options exchanges compared to 60 reporting options events in the technical specifications for Industry Members.[74] Since the complexity of Industry Members' chosen business models contributes substantially to the costs of the CAT, it is reasonable and equitable to require that Industry Members pay a substantial portion of those costs.

Participant activity does not impact CAT costs in the same way that Industry Member activity impacts CAT costs. The analysis regarding the complexity of Industry Member activity is based on the effects of the business models *on the costs of the CAT,* not on the complexity of the market generally. The complexity of Industry Member activity adds significantly to the cost of the CAT in a way that Participant activity does not.

Moreover, allocating a greater percentage of the CAT costs to Participants would raise fairness issues in light of the greater financial resources of Industry Members. There are only 27 Participants and approximately 1,000 Industry Members.[75] Moreover, based upon a 2021 analysis of available CAT Reporter revenue, Participants only represented approximately 4% of the total CAT Reporter revenue while Industry Members represented 96% of the total CAT Reporter revenue.[76] In addition, various individual Industry Members have revenue in excess of some or all of the Participants. Accordingly, CAT LLC determined that allocating a higher percentage of the total CAT costs to the Participants was not a fair and equitable approach.

Finally, CAT LLC analyzed a variety of alternative allocations of CAT costs and continues to support the proposed one-third, one-third, one-third allocation as consistent with the requirements of the Exchange Act and the CAT NMS Plan. Alternative allocations considered by CAT LLC are discussed in detail below in Section A.10 of this filing.

ii. ⅓, ⅓ Allocation for Historical CAT Assessment

Under the Funding Proposal, the CEBS and the CEBB would each pay one-third of the fee obligation for each transaction related to Historical CAT Costs. Because the Participants have already paid for Past CAT Costs via loans to CAT LLC, the Participants would not be required to pay any Historical CAT Assessment. As stated in Proposed Section 11.3(b)(ii) of the CAT NMS Plan, "[i]n lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans." Furthermore, Proposed Section 11.3(b)(ii) of the CAT NMS Plan would emphasize that "Historical CAT Assessments are designed to recover

two-thirds of the Historical CAT Costs." Like with the allocation of Prospective CAT Costs discussed above, CAT LLC believes that the proposed allocation of the Historical CAT Costs is consistent with the requirements of the Exchange Act and the CAT NMS Plan.

iii. Internal Cost of Compliance by Industry Members

CAT LLC does not propose to take into consideration the internal costs incurred by Industry Members in complying with CAT requirements in determining how to allocate costs between Industry Members and Participants. There is no precedent for regulatory fees to be determined based on the cost of compliance of the regulated entity. Regulatory fees are intended to cover the regulatory costs of the entity providing the regulation. In the case of the CAT, the Funding Proposal is intended to charge fees to pay for the direct costs of the CAT, not for ancillary compliance costs of Industry Members.[77] Moreover, as a practical matter, accurately determining an Industry Member's compliance costs, without recordkeeping requirements and appropriate standards to determine expenses accurately, would be infeasible.

Likewise, the substantial internal compliance costs of the Participants are not taken into consideration in the Funding Proposal. Each Participant incurs its own internal costs to comply with the requirements of the CAT NMS Plan, including, among other things, updating its systems for CAT reporting. Additionally, Participants have expended countless internal hours on the creation, implementation and operation of the CAT. These costs are not included in the cost allocation under the Funding Proposal.

iv. Alternative Approach Based on Individualized CAT Reporter Cost to CAT

CAT LLC has determined not to propose a funding approach for the CAT in which a CAT Reporter's fees would be based on each CAT Reporter's exact cost burden on the CAT. In light of the many inter-related cost drivers of the CAT (*e.g.,* storage, message traffic, processing), determining the precise cost burden imposed by each individual CAT Reporter on the CAT is not feasible. Moreover, trading activity

---

[73] CAT Industry Member Reporting Scenarios, Version 4.16 (July 31, 2025), *https://www.catnmsplan.com/sites/default/files/2025-07/07.31.25_Industry_Member_Tech_Specs_Reporting_Scenarios_v4.16_CLEAN.pdf.*

[74] *Compare* Participant Technical Specifications, *with* CAT Reporting Technical Specifications for Industry Members, Version 4.1.0 r9 (July 31, 2025), *https://www.catnmsplan.com/sites/default/files/2025-07/07.31.25_CAT_Reporting_Technical_Specifications_for_Industry_Members_v4.1.0r9_CLEAN.pdf.*

[75] Approximately 1,034 unique CAT Reporters sent transaction data to the CAT in August 2025.

[76] *See* Securities Exchange Act Rel. No. 91555 (Apr. 14, 2021), 86 FR 21050, 20155 (Apr. 21, 2021) ("2021 Fee Proposal Release"). Industry Member revenue was calculated based on the total revenue reported in the Industry Member's FOCUS reports. Participant revenue was calculated based on revenue information provided in Form 1 amendments and/or publicly reported figures. Participants are not required to file uniform FOCUS-type reports regarding revenue like Industry Members. Accordingly, the revenue calculation for Participants is not as straightforward as for Industry Members.

[77] *See* CAT NMS Plan Approval Order at 84795, n.1749 ("The Participants stated that the funding model provides a framework for the recovery of the costs to create, develop and maintain the CAT, and is not meant to address the cost of compliance for Industry Members and Participants with the reporting requirements of Rule 613.").

provides a reasonable proxy for cost burden on the CAT, and therefore is an appropriate metric for allocating CAT costs among CAT Reporters. CAT LLC emphasizes that the Exchange Act requires CAT fees to be fair, reasonable and equitably allocated, and CAT LLC believes that the use of executed equivalent share volume satisfies these requirements. The Exchange Act does not require each CAT Reporter's fees to be a proxy for that CAT Reporter's cost burden on the CAT, let alone an exact proxy.

### A. Difficulty in Determining Individual CAT Reporter Costs Due to Inter-Related Cost Drivers

CAT LLC has analyzed the cost drivers for the CAT, and has concluded that determining the precise cost burden imposed by each individual CAT Reporter on the CAT is not feasible. The computation of a specific CAT Reporter's burden on the CAT is complicated by the many inter-related factors that contribute to CAT costs, including message traffic, data processing, storage, the complexity of reporting requirements, reporting timelines, infrastructure, connectivity and more. The use of executed equivalent share volume as the metric for the funding model is an improvement over the message traffic model. CAT LLC analyzed the cost drivers of CAT and determined that, although message traffic is one factor in CAT costs, it is not the primary factor. CAT costs are dominated by technology costs, and the predominant technology costs are data processing (*e.g.,* linker) and storage costs. Compute costs represent more than half of all technology costs. While such costs are related in part to message traffic, they are driven by the stringent performance timelines, data complexity and operational requirements in the CAT NMS Plan. The Plan requires that order events be processed, corrected, and made available to regulatory users within established timeframes, including a four-hour window for initial linkage processing. For this reason, among other issues with the message traffic model and other considerations discussed herein, CAT LLC determined to shift its focus to the new metric of executed equivalent share volume from the message traffic and market share metrics set forth in the CAT NMS Plan as approved.

### B. Trading Activity as Reasonable Proxy for Cost Burden

CAT LLC determined that trading activity provides a reasonable proxy for cost burden on the CAT, and therefore

is an appropriate metric for allocating CAT costs among CAT Reporters. CAT LLC analyzed reasonable metrics for determining CAT fees, and determined that, although executed equivalent share volume is not an exact proxy for the cost burden (nor need it be), trading activity provides a reasonable proxy for cost burden on the CAT. Increased trading activity impacts message traffic, data processing, storage and other factors, and thus necessarily correlates with increased cost burden on the CAT. Moreover, Industry Member activity in the market generally is engaged in for the purpose of effecting transactions, and, as a result, it is common for Participants to use transaction-based fees. Therefore, executed share volume is an appropriate metric for allocating CAT costs among CAT Reporters.

This conclusion is consistent with the SEC's prior recognition of the use of transaction volume in setting regulatory fees. For example, in approving FINRA's TAF, the SEC recognized that transaction volume was closely enough connected to FINRA's broad regulatory responsibilities to satisfy the statutory standard in the Exchange Act.[78] FINRA proposed a transaction-based TAF to fund its member regulatory activities in a variety of areas such as "sales practices, routine examinations, financial and operational reviews, new member applications, enforcement * * * . . . wherever such member activity occurs." [79] The SEC noted that "[a]ssessing fees in relation to transactions correlates to heightened NASD responsibilities regarding firms that engage in the trading," but the fees were not an exact proxy for the costs of such regulatory responsibilities.[80] The SEC noted this lack of a precise correlation:

In most cases, the NASD has direct responsibility to oversee the firm's dealing with the public in effecting the transactions; the NASD may also have responsibility to oversee the impact of the trading on the firm's financial condition. In most cases, where responsibility for certain member activities has been allocated to other SROs, the NASD retains responsibility for other member functions.[81]

Nevertheless, the SEC concluded that "while trading activity is not wholly correlated to the full range of NASD responsibility for members in all instances, the Commission believes that they are closely enough connected to

satisfy the statutory standard." [82] CAT LLC believes that this same logic is applicable to the Funding Proposal.

### v. Alternative Approach: 50–50 Allocation Between Industry Members and Participant Exchanges

CAT LLC has considered and rejected allocating 50% of CAT costs to the Participants and 50% to Industry Members under the Funding Proposal. Although a 50–50 allocation between Industry Members and Participants would provide a mathematically equal split between two groups, it would not provide an equitable allocation between and among Industry Members and Participants. Such an allocation raises fairness issues as Industry Members have far greater financial resources than the Participants, and the complexity of Industry Members' chosen business models contributes substantially to the costs of the CAT.

### e. Fee Pass-Throughs

### i. Fee Pass-Throughs by Participants

As discussed above, the Eleventh Circuit vacated the SEC's order approving the Executed Share Model, noting, in part, that the Commission allowed "self-regulatory organizations to pass through 100% of their fees to broker-dealers—without considering the effects of that choice." [83] CAT LLC proposes to add Section 11.3(e) to the CAT NMS Plan regarding Participant pass-through fees to address the Court's order. As set forth in Proposed Section 11.3(e) of the CAT NMS Plan, "Each Participant agrees not to file with the SEC a proposed rule change pursuant to Section 19(b) and Rule 19b–4 thereunder that would establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a)." Accordingly, Participants would agree not to file any fee filing with the Commission to assess on its members CAT fees charged to such Participant. This provision is intended to maintain the one-third allocation of CAT costs as a Participant obligation, and to be responsive to the Eleventh Circuit's opinion with respect to the potential for 100% pass-through costs.

### ii. Fee Pass-Throughs by CAT Executing Brokers

CAT LLC acknowledges that CAT Executing Brokers may choose to pass their CAT fees through to their clients, who, in turn, may pass their CAT fees

---

[78] TAF Release at 34023.

[79] *Id.*

[80] *Id.*

[81] *Id.*

---

[82] *Id.* at 34024.

[83] *Am. Sec. Ass'n, Citadel Sec. LLC* v. *U.S. Sec. & Exch. Comm'n,* No. 23–13396, 2025 WL 2092054 (11th Cir. July 25, 2025).

through to their clients, until the fees are imposed on the account that executed the transaction, in lieu of paying CAT fees through other means. The Funding Proposal does not limit or prohibit such pass-throughs, nor does CAT LLC take a position on whether Industry Members should pass CAT fees on to their clients; however, CAT LLC understands that many Industry Members have implemented processes to pass-through their CAT fees to upstream broker-dealers and customers.

In adopting the CAT NMS Plan, the Commission specifically contemplated and accepted that ''broker-dealers may seek to pass on to investors their costs to build and maintain the CAT, which may include their own costs and any costs passed on to them by Participants,'' noting that the ''extent to which these costs are passed on to investors depends on the materiality of the costs and the ease with which investors can substitute away from any given broker-dealer.''[84] Moreover, CAT LLC notes that the use of pass-through fees by broker-dealers is a commonly accepted practice that has been approved by the SEC in the securities markets in some cases. For example, the SEC has recognized the common practice of broker-dealers passing through Section 31-related fees to their customers.[85] The pass-through concept also is applied in the context of other SRO regulatory fees applicable to the SROs' members. For example, ''it is regular practice among some clearing and trading firms to 'pass through' the TAF to the underlying firm executing the trade. Further, FINRA understands that the executing firms commonly pass the TAF directly on to their customers. Typically, TAF fees are reflected on the confirmation statement received by customers.''[86] Similarly, the pass-through process is used for ORFs as well. ORFs are collected indirectly from members through their clearing firms by OCC on behalf of the respective options exchange. As noted in rule filings related to ORFs, ''[t]he Exchange expects that [members] will pass through the ORF to their customers in

the same manner that firms pass-through to their customers the fees charged by Self-Regulatory Organizations ('SROs') to help the SROs meet their obligations under Section 31 of the Exchange Act.''[87]

CAT LLC understands that it has been common practice for Industry Members to pass-through their CAT fees directly to their clients to date. Indeed, commenters on prior CAT funding proposals have advocated for CAT fees to be structured in such a way as to easily pass-through such fees to their clients. For example, one commenter commented in favor of a model similar to the Section 31 fees in which the fee could be passed through to ultimate customers.[88] Similarly, another commenter noted the benefits of a model that allows fees to be passed through to customers, arguing that ''[i]t would also provide transparency into the fees which seek to recoup costs and a vehicle to pass-thru fees to the ultimate beneficiary of each trade.''[89]

CAT LLC does not believe that the Funding Proposal raises issues with regard to Industry Members that do not have customers, and therefore cannot directly pass their CAT fees on and must pay for their CAT fees in other ways. Such Industry Members should not be evaluated differently based upon the inability to recoup CAT fees by directly assessing them to counterparties that are not customers. First, as noted above, the Funding Proposal does not set forth any requirement regarding whether or not an Industry Member may or may not pass-through its CAT fees to its customers; such pass-throughs are outside of the Funding Proposal. Second, each CAT Executing Broker will need to determine for itself how it will obtain the funds to pay for its CAT fees. Industry Members that do not have customers have

revenue-generating activity other than direct pass-through of fees to fund the CAT fees (*e.g.,* market making activity). As a former member of the Advisory Committee for the CAT and the former Chief Economist of the Commission explained, even if CAT fees are not passed through directly, such costs would ultimately be passed on through a change in services or other costs.[90]

f. FINRA Fee

Under the Funding Proposal, for each transaction in Eligible Securities based on CAT Data, the CEBS, the CEBB and the applicable Participant for the transaction each would pay a CAT Fee calculated by multiplying the number of executed equivalent shares in the transaction and the applicable Fee Rate and dividing the product by three. The applicable Participant for the transaction would be the national securities exchange on which the transaction was executed, or FINRA for each transaction executed otherwise than on an exchange. CAT LLC believes that the proposed CAT fees for FINRA are consistent with the Exchange Act and the CAT NMS Plan. CAT LLC does not believe that the assessment of a CAT fee on FINRA in the same manner as other Participants would result in a burden on competition for FINRA or for Industry Members engaging in activity otherwise than on an exchange.

The Funding Proposal is designed to be neutral as to the manner of execution and place of execution. The CAT fees would be the same regardless of whether the transaction is executed on an exchange or in the over-the-counter market. All Participants are self-regulatory organizations that have the same regulatory obligations under the Exchange Act, regardless of whether they operate as a for-profit or not-for-profit entity. Their usage of CAT Data, either directly or indirectly through regulatory services agreements, would be for the same regulatory purposes in accordance with those obligations. By treating each Participant the same, the CAT fees would not become a competitive issue by and among the Participants, or a competitive issue between on exchange and off exchange trading.

In addition, the size of FINRA's fee is calculated based on the activity in the over-the-counter market, which is substantial. For example, the executed equivalent share volume for over-the-counter trades in Eligible Securities in

[84] CAT NMS Plan Approval Order at 84992.

[85] *See, e.g.,* Securities Exchange Act Rel. No. 49928 (June 28, 2004), 69 FR 41060, 41072 (July 7, 2004). *See also* SEC, Section 31 Transaction Fees, Fast Answers, *https://www.sec.gov/fast-answers/answerssec31htm.html* (noting that the ''[t]he SROs have adopted rules that require their broker-dealer members to pay a share of these fees. Broker-dealers, in turn, impose fees on their customers that provide the funds to pay the fees owed to their SROs.''); CAT NMS Plan Approval Order at 84992; NYSE American Rule 393.01; and NYSE Rule 440H.03.

[86] Securities Exchange Act Rel. No. 90176 (Oct. 14, 2020), 85 Fed Reg. 66592, 66603 (Oct. 20, 2020).

[87] Securities Exchange Act. Rel. No. 67596 (Aug. 6, 2012), 77 FR 47902, 47903 (Aug. 10, 2012). *See also* Securities Exchange Act Rel. No. 61133 (Dec. 9, 2009), 74 FR 66715, 66716 (Dec. 16, 2009) (noting that ''[t]he Exchange expects that member firms will pass-through the ORF to their customers in the same manner that firms pass-through to their customers the fees charged by SROs to help the SROs meet their obligation under Section 31 of the Exchange Act''); Securities Exchange Act Rel. No. 83878 (Aug. 17, 2018), 83 FR 42715, 42717 (Aug. 23, 2018) (noting that ''by collecting the ORF in this manner Members and non-Members could more easily pass-through the ORF to their customers'').

[88] *See, e.g.,* Letter from Michael Blaugrund, Chief Operating Officer, NYSE, to Vanessa Countryman, Secretary, SEC (May 10, 2021) at 3; Letter from Andrew Stevens, General Counsel, IMC Chicago, LLC, to Vanessa Countryman, Secretary, SEC (May 20, 2021) at 3.

[89] Letter from James Toes, President and CEO, and Andre D'Amore, Chairman of the Board, Securities Trader Association, to Vanessa Countryman, Secretary, SEC (June 10, 2021) at 4.

[90] Letter from Larry Harris, Fred V. Keenan Chair in Finance, U.S.C. Marshal School of Business, to Vanessa Countryman, Secretary, SEC (June 21, 2022) at 2.

June 2025 was 377,983,597,154.08 out of a total volume of 952,977,614,616.08 executed equivalent shares for trades in Eligible Securities. Accordingly, approximately 40% of the executed equivalent share volume in Eligible Securities took place in the over-the-counter market.

Furthermore, FINRA and the exchanges should not be evaluated differently based upon the potential for a particular Participant to recoup its fees through revenue-generating activity other than fees imposed on its members. Each Participant will need to determine for itself how it will obtain the funds to pay for its CAT fees. FINRA, just like the exchange Participants, has revenue sources other than membership fees. For example, FINRA generates significant revenues via regulatory services agreements with the exchanges, among other sources.[91] These sources, too, may be used to pay CAT fees, and, if they are used, it would not lead to an increase in fees for Industry Members, but rather the exchange Participants. Any review of how the Participants obtain their funds to pay CAT fees is beyond the scope of the CAT fee filing.

Finally, CAT LLC does not believe that FINRA should not be treated as a market center for CAT funding purposes merely because FINRA is not treated as a market center for governance purposes under the National Market System Plan Regarding Consolidated Equity Market Data ("CT Plan"). Although the CT Plan and the CAT Plan are both national market system plans, their purpose and implementation are different. The CAT NMS Plan, as approved by the Commission, explicitly contemplates charging fees to all Participants, including FINRA. For example, Section 11.1(b) of the CAT NMS Plan states that "[s]ubject to Section 11.2, the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay."[92] In addition, the purpose of the CAT is solely for regulatory purposes; it provides a regulatory system to facilitate the performance of the self-regulatory obligations of all the Participants, including the exchanges and FINRA. In contrast, the CT Plan governs the public dissemination of real-time consolidated equity market data for NMS stocks.

g. Impact on Options Versus Equities

CAT LLC believes that the Funding Proposal provides for a fair, reasonable and equitable treatment of the equities

and options markets. CAT LLC does not believe that the Funding Proposal would burden inappropriately efficiency, competition or capital formation in how it treats equities and options. As a preliminary matter, unlike other previously proposed fee models,[93] the Funding Proposal does not allocate costs between the equities and options markets; instead, the fee attributable to a transaction in an equity or option security depends on equivalent executed share volume. In addition, the use of equivalent executed share volume is designed to normalize options and equities in the calculation of fees, and to recognize and address the different trading characteristics of different types of securities. Recognizing that Listed Options trade in contracts rather than shares, the Funding Proposal would count executed equivalent share volume differently for Listed Options. Specifically, each executed contract for a transaction in Listed Options would be counted based on the multiplier applicable to the specific Listed Option contract in the relevant transaction (*e.g.,* 100 executed equivalent shares or such other applicable equivalency).

h. Sell-Side and Buy-Side

CAT LLC proposes to charge both the buy-side and sell-side of a transaction in Eligible Securities a CAT fee. The proposal to charge both the buy-side and the sell-side of a transaction is consistent with other types of fees charged to both the buyer and the seller that are common in the industry. As such, CAT LLC believes that the proposal would comply with the requirements of the Exchange Act. For example, the ORF, a fee common to the options exchanges, is one example of a regulatory fee charged to both the buy-side and sell-side of the transaction. For example, the MIAX fee schedule lists the options regulatory fee as applying "per executed contract side."[94] Similarly, under its pricing schedule, Nasdaq PHLX charges an options regulatory fee "per contract side."[95] As set forth in its fee schedule, CBOE EDGX also charges an options regulatory fee to each side of the contract.[96] In addition, the industry is familiar with transaction-based fees charged to both the buyer and the seller by the exchanges and FINRA.[97]

[91] *See* 2024 FINRA Annual Financial Report at 43.

[92] *See also* Sections 11.2 and 11.3 of the CAT NMS Plan.

[93] *See, e.g.,* 2018 Fee Proposal Release at 1400.

[94] MIAX Options Exchange, Fee Schedule, as of Sept. 1, 2025.

[95] Nasdaq PHLX Rules, Options 7, Section 6(D).

[96] Cboe EDGX Fee Schedule, effective Aug. 25, 2025.

[97] *See, e.g.,* NYSE Price List 2025 for fees charged to both sides.

i. Fee Rate Changes Twice per Year for CAT Fees Related to Prospective CAT Costs

CAT LLC proposes to require the calculation of the Fee Rate for CAT Fees related to Prospective CAT Costs twice a year. CAT LLC believes that the proposal to adjust the Fee Rate twice a year, once at the beginning of the year and once during the year, appropriately balances the need to coordinate the Fee Rate with potential changes in the costs and projections with the cost and effort to the industry related to more frequent fee changes.

CAT LLC believes its proposal is in keeping with views expressed by the industry in other contexts regarding the appropriate frequency of regulatory rate changes. For example, in the ORF context, the industry requested that rate changes be limited to twice per year. SIFMA stated in a comment letter on one of the ORF fee proposals that "[r]ates should only be changed two times per year to reduce operational complexity and reduce risk."[98] The exchanges with ORF fees noted that the possibility for fee rate changes only twice per year would also "better enable [their members] to properly account for ORF charges among their customers."[99]

j. Plan Amendment Process for Fee Rate Changes

Under the Funding Proposal, once any Fee Rate has been established by a majority vote of the Operating Committee in accordance with the Funding Proposal set forth in the CAT NMS Plan,[100] each Participant would be required to pay the applicable CAT Fee calculated in accordance with the requirements set forth in the CAT NMS Plan (subject to the requirement for the Industry Member CAT Fee to be in effect). CAT LLC does not plan to submit an amendment to the CAT NMS Plan each time that the Fee Rate for the CAT Fee is established or adjusted because of the length of time and burden required to amend the CAT NMS Plan for each adjustment to the Fee Rate. Moreover, CAT LLC believes that it is unnecessary to file a new separate amendment for the Participant CAT Fees each time a new Fee Rate is

[98] *See, e.g.,* Letter from Ellen Greene, Managing Director, SIFMA to Vanessa Countryman, Secretary, SEC, re: SIFMA Comment Letter on the Options Regulatory Fee Filings by SR–EMERALD–2019–01 (Apr. 10, 2019) at 5, *https://www.sifma.org/wp-content/uploads/2019/04/MIAX-Emerald-ORF.pdf.*

[99] *See, e.g.,* Securities Exchange Act Rel. 93667 (Oct. 15, 2021).

[100] Participants would be required to pay the CAT Fee once the CAT Fee is in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.

approved because the CAT NMS Plan would set forth in detail the manner in which the CAT fees are established and the inputs for calculating the specific CAT Fees would be published on the CAT website and included in the Participant fee filings under Section 19(b) of the Exchange Act for Industry Member CAT fees. Therefore, the amendments to the Plan for a fee rate change would be redundant and impractical in terms of timing.

CAT LLC proposes to amend the CAT NMS Plan to describe in detail how CAT Fees would be calculated, including the formula for the calculation and the methods for determining the inputs for the calculation (*i.e.,* the budget, projected executed equivalent share volume, executed equivalent shares per transaction). As such, the Participants would be required to calculate the Fee Rate and the related CAT Fees using the proposed formula; this process would be mandatory, including the mid-year Fee Rate change. Moreover, the budgetary and projection inputs to the calculation would be public, including in public fee filings pursuant to Section 19(b) of the Exchange. Accordingly, CAT LLC does not believe that a Plan amendment would be necessary each time a new Fee Rate is calculated in accordance with the Plan.

The CAT NMS Plan would require each Participant to pay the proposed CAT Fees determined in accordance with the Funding Proposal. Proposed Section 11.3(a)(ii)(A) sets forth the requirement for Participants to pay the CAT fees. It states that "[e]ach Participant that is a national securities exchange will be required to pay the CAT Fee for each transaction in Eligible Securities executed on the exchange in the prior month based on CAT Data," and that "[e]ach Participant that is a national securities association will be required to pay the CAT Fee for each transaction in Eligible Securities executed otherwise than on an exchange in the prior month based on CAT Data." It further states that "[t]he CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3." In addition, proposed paragraph (a) of the Participant fee schedule would state that "[e]ach Participant shall pay the CAT Fee set forth in Section 11.3(a) of the CAT NMS Plan to Consolidated Audit Trail, LLC in the manner prescribed by Consolidated Audit Trail, LLC on a monthly basis

based on the Participant's transactions in the prior month."

The Participants would be required to follow the requirements set forth in the CAT NMS Plan for establishing and calculating CAT Fees and requiring the payment of the CAT Fees as both a regulatory and contractual matter. Rule 613(h)(1) of Regulation NMS under the Exchange Act states that "[e]ach national securities exchange and national securities association shall comply with the provisions of the national market system plan approved by the Commission," that is, the CAT NMS Plan. Rule 613(h)(2) of Regulation NMS under the Exchange Act states that "[a]ny failure by a national securities exchange or national securities association to comply with the provisions of the national market system plan approved by the Commission shall be considered a violation of this section." Similarly, Rule 608(c) of Regulation NMS under the Exchange Act states that "[e]ach self-regulatory organization shall comply with the terms of any effective national market system plan of which it is a sponsor or a participant." Section 3.11 of the CAT NMS Plan reiterates this requirement, stating that "[e]ach Participant shall comply with . . . the provisions of SEC Rule 613 and of this Agreement, as applicable, to the Participant." In addition, each Participant is a signatory to the CAT NMS Plan as a member of the limited liability company. Accordingly, a failure to comply with the requirements of the CAT NMS Plan related to the CAT fees would be a violation of the regulatory obligation to comply with the CAT NMS Plan and a breach of contractual requirements of the CAT NMS Plan.

### k. Executed Equivalent Shares for NMS Stocks, Listed Options and OTC Equity Securities

The Funding Proposal uses the concept of executed equivalent shares as the metric for calculating CAT fees for transactions in NMS Stocks, Listed Options and OTC Equity Securities, each of which have different trading characteristics. Under the Funding Proposal, each executed share for a transaction in NMS Stocks would be counted as one executed equivalent share, each executed contract for a transaction in Listed Options would be counted using the contract multiplier applicable to the specific Listed Option in the relevant transaction, and each executed share for a transaction in OTC Equity Securities would be counted as 0.01 executed equivalent shares. CAT LLC believes that the proposed counting methods for each category of security

are appropriate, as discussed in detail above in Section A.3.b.ii of this filing.

### l. Cost Transparency

### i. Cost Transparency and Level of Detail of CAT Costs

CAT LLC provides substantial cost transparency for Past CAT Costs and Prospective CAT Costs, including transparency above and beyond what is required under the CAT NMS Plan, and more than other national market system plans. Such transparency includes cost descriptions in the fee filings made pursuant to Section 19(b) of the Exchange Act and Rule 19b–4(f)(2) thereunder, as well as the public availability of CAT financial and budget information.

CAT LLC proposes to require substantial transparency for CAT costs in the fee filings to be made pursuant to Section 19(b) of the Exchange Act. For example, Proposed Section 11.3(a)(iii)(B) of the CAT NMS Plan would require such filings for CAT Fees to include, among other things, the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget and the reason for changes in each such line item from the prior CAT Fee filing; and a discussion of how the budget is reconciled to the collected fees. Similarly, Proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan would require such filings for Historical CAT Assessments to include, among other things, a brief description of the amount and type of Historical CAT Costs, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs.

CAT LLC provides substantial additional financial information regarding the operation of the CAT as required by the CAT NMS Plan. For example, CAT LLC currently makes detailed financial information about the CAT publicly available. Section 9.2(a) of the CAT NMS Plan requires CAT LLC to maintain a system of accounting

established and administered in accordance with GAAP and requires ''all financial statements or information that may be supplied to the Participants shall be prepared in accordance with GAAP (except that unaudited statements shall be subject to year-end adjustments and need not include footnotes).'' Section 9.2(a) of the CAT NMS Plan also requires the Company to prepare and provide to each Participant ''as soon as practicable after the end of each Fiscal Year, a balance sheet, income statement, statement of cash flows and statement of changes in equity for, or as of the end of, such year, audited by an independent public accounting firm.'' The CAT NMS Plan requires that this audited balance sheet, income statement, statement of cash flows and statement of changes in equity be made publicly available. Among other things, these financial statements provide operating expenses, including technology, legal, consulting, insurance, professional and administration and public relations costs. CAT LLC also maintains a dedicated web page on the CAT NMS Plan website that consolidates its annual financial statements in a public and readily accessible place.[101] The Company's annual financial statements from inception in 2017 through 2023 are currently available on the CAT website.

In addition to providing financial information required under the CAT NMS Plan and otherwise, CAT LLC also has voluntarily determined to provide more financial transparency to the public regarding its costs. For example, CAT LLC publicly provides its annual operating budget as well as periodically provides updates to the budget that occur during the year. CAT LLC includes such budget information on a dedicated web page on the CAT NMS Plan website to make it readily accessible to the public, like the CAT financial statements. CAT LLC also has held webinars providing additional detail about CAT costs and about potential alternative funding models for the CAT, and commenters submitted questions and comments on the webinars.[102]

ii. Composition and Transparency of Past CAT Costs

CAT LLC also provides detailed disclosures regarding Past CAT Costs. The Historical Fee Rate for each Historical CAT Assessment would be calculated based on actual past costs incurred by the CAT (except any costs that CAT LLC has determined to exclude from the calculation), rather than budgeted costs. The audited financial statements for CAT LLC and its predecessor CAT NMS, LLC, which describe the actual costs for CAT LLC, are available on the CAT website.[103] In addition, the Historical CAT Costs for prior to 2022 are described in detail in the Participants' rule filings for Historical CAT Assessment 1.[104] The Participants expect to describe the costs for any additional Historical CAT Assessment in the relevant fee filings that the Participants submit pursuant to Section 19(b) under the Exchange Act and Rule 19b–4(f)(2) thereunder regarding Historical CAT Assessments.

iii. Alternative Transparency Proposals

CAT LLC believes that its proposed methods of cost transparency will provide Industry Members and other interested parties with detailed information about the CAT and the CAT fees. CAT LLC does not believe that additional transparency measures, such as a mechanism to allow for the review of budget information prior to a fee filing, or an independent cost review mechanism, are necessary or appropriate.

A. Budget Disclosure Prior to Fee Filings

CAT LLC does not believe that it is necessary to add a requirement to the CAT NMS Plan to provide Industry Members and other members of the public with an opportunity to review the budget that would be included in the SRO fee filings prior to such filings. CAT LLC is currently providing CAT budget information to the public on a continuing basis. CAT LLC publicly provides the annual operating budget for CAT LLC as well as an update to the budget mid-year. This budget information is readily accessible to the public on a dedicated web page on the CAT NMS Plan. Accordingly, Industry Members and other members of the public will continue to have the

opportunity to review regular updates of the budget. Such transparency would allow Industry Members and other members of the public to understand the budget and changes thereto throughout the year. Moreover, the fee filing process under Section 19(b) of the Exchange Act provides the public with the opportunity to review the budgeted CAT costs that CAT LLC would seek to recover via the CAT Fees.

B. Independent Cost Review Mechanism

CAT LLC also does not believe that it would be necessary or appropriate to include an independent review mechanism for the cost of proposed CAT expenditures. First, as a preliminary matter, unlike the Commission, CAT LLC is not a governmental entity, with a responsibility to the taxpaying public. It is a private entity subject to the regulatory requirements of the Exchange Act. Second, such a budget review process is unnecessary as any CAT fees proposed to be established pursuant to the CAT NMS Plan are already subject to the existing, well-established review practices under Rule 608 of Regulation NMS under the Exchange Act and Section 19(b) of the Exchange Act and Rule 19b–4 thereunder. Under those provisions, CAT fees must be filed with the SEC, thereby providing transparency and an opportunity for comment by the public, and may only be implemented if they satisfy the requirements of the Exchange Act. Third, the SEC has the ability to request budget and financial information from CAT LLC to the extent that it believes that such additional information is necessary for it to evaluate any CAT fee proposals.

m. Allocation of Past CAT Costs to Participants: Pro Rata Versus Use of Funding Proposal

The Participants have been responsible for all costs related to the CAT until the approval of the Executed Share Model, and Industry Members did not pay any of the costs prior to that time. Accordingly, under the Funding Proposal, the Participants would not be required to pay a CAT fee related to Past CAT Costs in addition to prior payments. The two-thirds of the Historical CAT Costs collected from Industry Members would be allocated to the Participants pro rata, based on the outstanding amounts due under the notes to the Participants for repayment of outstanding loan notes to the Company. The one-third of Historical CAT Costs that are not allocated to Industry Members would not be allocated to the Participants pursuant to the Funding Proposal based on executed

---

[101] *See* CAT Audited Financial Statements, *https://www.catnmsplan.com/audited-financialstatements.*

[102] *See, e.g.,* CAT LLC Webinar, CAT Costs (Sept. 21, 2021), *https://www.catnmsplan.com/events/catcostsseptember-21-2021;* CAT LLC Webinar, CAT Funding (Sept. 22, 2021), *https://www.catnmsplan.com/events/catfundingseptember-22-2021;* and CAT LLC Webinar, CAT Funding (Apr. 6, 2022), *https://www.catnmsplan.com/events/cat-funding.*

[103] The audited financial statements for CAT NMS, LLC and Consolidated Audit Trail, LLC are available at *https://www.catnmsplan.com/audited-financial-statements.*

[104] *See, e.g.,* Securities Exchange Act Rel. No. 100936 (Sept. 5, 2024), 89 FR 74430 (Sept. 22, 2024) (BOX Exchange LLC filing for Historical CAT Assessment 1).

equivalent shares. Instead, such Historical CAT Costs would be allocated to the Participants pro rata based on the outstanding amounts due under the notes (as discussed further below in Section A.9.n of this filing). CAT LLC entered into the loans with the Participants pursuant to its authority under the CAT NMS Plan as approved by the SEC to pay for CAT costs, and, as such, the loans and their repayment terms are consistent with the Exchange Act and Rule 608 of Regulation NMS. The terms of the loans do not need to satisfy the requirements of the funding model set forth in Article XI of the CAT NMS Plan.

Section 3.9 of the CAT NMS Plan states that ''[i]f the Company requires additional funds to carry out its purposes, to conduct its business, to meet its obligations, or to make any expenditure authorized by this Agreement, the Company may borrow funds from such one or more of the Participants, or from such third party lender(s), and on such terms and conditions, as may be approved by a Supermajority Vote of the Operating Committee.'' As the Company—CAT LLC—did not have a source of revenue to fund its activities without a funding model approved by the SEC, CAT LLC determined to borrow funds from the Participants on terms approved by a Supermajority Vote of the Operating Committee. After this vote, CAT LLC entered into loan agreements with the Participants to cover CAT costs. The terms of the loan agreements dictate that repayment of the notes will be pro rata, based on the outstanding amounts loaned to CAT LLC. Accordingly, CAT LLC is obligated by contract, approved in accordance with the terms of the CAT NMS Plan, to repay the notes pro rata, not by another method.

Moreover, Section 3.8 of the CAT NMS Plan states that ''[e]xcept as may be determined by the unanimous vote of all the Participants or as may be required by applicable law, no Participant shall be obligated to contribute capital or make loans to the Company.'' The Participants voluntarily have agreed to provide loans to CAT LLC under the agreed upon terms to fund the CAT until a funding model is approved. Without a unanimous vote of the Participants, however, CAT LLC cannot require the Participants to make a new loan to CAT LLC. Accordingly, without the agreement of the Participants, the loans must be repaid in accordance with their terms.

n. Sufficient Detail Regarding Pro Rata Allocation of Past CAT Costs to Participants

Further with regard to the pro rata allocation of Past CAT Costs, the manner in which the loans are repaid are governed by the loan agreements between CAT LLC and the Participants, as approved by CAT LLC. The following provides additional detail as to the allocation of Past CAT Costs to Participants in accordance with the loans to CAT LLC.

Pending SEC approval of CAT fees to fund the CAT, the Participants voluntarily determined to fund the development and operation of the CAT through loans to CAT LLC. The Participants determined to use the market share, tier-based funding model applicable to Execution Venues described in the proposed amendment to the CAT NMS Plan submitted to the SEC on December 11, 2017 (without including ATSs as Equity Execution Venues) to allocate loan amounts among Participants (''Tiered Market Share Proposal'').[105] As described in that proposal, each Equity Execution Venue is placed in one of four tiers of fixed fees based on market share, and each Options Execution Venue is placed in one of two tiers of fixed fees based on market share. Equity Execution Venue market share is determined by calculating each Equity Execution Venue's proportion of the total volume of NMS Stock and OTC Equity shares reported by all Equity Execution Venues during the relevant time period. For purposes of calculating market share, the OTC Equity Securities market share of Execution Venue ATSs trading OTC Equity Securities as well as the market share of the FINRA OTC reporting facility are discounted. Similarly, market share for Options Execution Venues is determined by calculating each Options Execution Venue's proportion of the total volume of Listed Options contracts reported by all Options Execution Venues during the relevant time period. The tiers are refreshed on a quarterly basis in accordance with the Tiered Market Share Proposal.

Each of the Participants voluntarily have loaned CAT LLC funds in amounts in accordance with the Tiered Market Share Proposal to cover Past CAT Costs. Accordingly, under the Funding Proposal, the Participants propose to be reimbursed for two-thirds of the Historical CAT Costs pro rata based on the outstanding amounts loaned to CAT LLC pursuant to the Tiered Market

Share Proposal, as this is what is required under the loan contract between CAT LLC and the Participants. Correspondingly, for the remaining one-third of the Historical CAT Costs that are not reimbursed via the Historical CAT Assessment, the Participants propose to remain responsible for the amounts loaned to CAT LLC pursuant to the Tiered Market Share Proposal. The Participants' one-third share of the Historical CAT Costs would be paid by the cancellation of the loans on a pro rata basis. In addition, for any Past CAT Costs that are excluded from Historical CAT Costs, the Participants propose to remain responsible for the amounts loaned to CAT LLC pursuant to the Tiered Market Share Proposal as well. These excluded costs also would be paid by cancellation of the loans on a pro rata basis.

o. Past CAT Costs: Collected From Current Versus Past Industry Members and Use of Prior Month's Transactions

CAT LLC believes that Historical CAT Assessments are appropriately assessed to current Industry Members based on current market activity. CAT LLC does not believe that Historical CAT Assessments should be charged to Industry Members that were active at the time when the Past CAT Costs were incurred and based on trading activity from the time when the Past CAT Costs were incurred.

CAT LLC believes that it is appropriate to collect the Historical CAT Assessments from current Industry Members based on current market activity because current market participants are the beneficiaries of the regulatory value provided by the CAT to the securities markets. The SEC has emphasized that the CAT provides a benefit to all market participants,[106] and, therefore, current Industry Members are benefitting from the efforts to create and operate the CAT.

In addition, the approach recognizes the many practical difficulties of imposing fees retroactively on Industry Members' market activity from the past, sometimes years in the past as the relevant recovery period extends to 2012. For example, one of the practical difficulties may include the fact that some Industry Members that would be subject to such a retroactive fee may no longer be in business or no longer registered as a broker-dealer that is subject to the jurisdiction of the Participants or SEC. Indeed, this is likely to be a substantial issue. For example, in the SEC's approval order of

---

[105] *See* 2018 Fee Proposal Release.

[106] *See generally* Rule 613 Adopting Release at 45795 (emphasis added).

the CAT NMS Plan, the SEC used an estimate of 1,800 broker-dealers subject to CAT reporting for its cost estimates.[107] However, the number of current Industry Members has greatly diminished from these early estimates to approximately 1,000.[108] Therefore, at least approximately 40% of the broker-dealers that may have been subject to CAT reporting in 2012 are no longer CAT Reporters.

Another practical issue involves the difficulty of accurately determining the transactions in Eligible Securities of the Industry Member for the past decade that would be subject to CAT fees. Because the recovery period for Past CAT Costs spans a period in which the CAT was not in existence yet, as well as periods in which CAT reporting was being phased in, the CAT may not have any record of relevant transactions from earlier periods, and it may not have a complete record of the relevant transactions for later periods. The SEC anticipated the recovery of CAT fees after such costs were incurred, as it contemplated the recovery of CAT costs for the creation of the CAT as well as its implementation and maintenance.[109]

Moreover, imposing retroactive fees for past market activity could raise fairness issues. For example, because the fee would be retroactive, market participants could not have taken into consideration the CAT fee when they decided to enter into the transactions in the past. In addition, given the passage of time, past CAT Reporters, particularly small CAT Reporters, may not be in a position to pay a fee related to earlier market activity.[110]

In addition, CAT LLC notes that the SEC has approved similar funding practices with regard to new Participants for the CAT as well as new participants for other national market system plans. In each case, the new participant is required to pay a fee to join the plan, and the fee is based on past costs for creating, implementing

and maintaining the plan at issue.[111] As a result, a new participant would be required to pay a fee for costs incurred in the past by the relevant plan. For example, Section 3.3 of the CAT NMS Plan states that, to become a new Participant to the CAT NMS Plan, the applicant must:

pay a fee to the Company in an amount determined by a Majority Vote of the Operating Committee as fairly and reasonably compensating the Company and the Participants for costs incurred in creating, implementing, and maintaining the CAT, including such costs incurred in evaluating and selecting the Initial Plan Processor and any subsequent Plan Processor and for costs the Company incurs in providing for the prospective Participant's participants in the Company, including after consideration of the factors identified in Section 3.3(b) (the ''Participation Fee'').

As this provision indicates, new CAT Participants are required to contribute to paying for costs incurred since the inception of the CAT. Indeed, the costs related to evaluating and selecting the Initial Plan Processor were incurred in 2017 and before.[112] For example, a CAT Participant applicant in 2023 may be required to pay a fee that reflects CAT costs incurred years ago. Similarly, the Funding Proposal would require current Industry Members to pay a share of CAT costs from years ago.

p. Budgeted Versus Incurred Costs

Under the Funding Proposal, the budgeted CAT costs set forth in the annual operating budget would be used to determine the Fee Rate for CAT Fees related to Prospective CAT Costs. The budgeted CAT costs would comprise estimated fees, costs and expenses to be reasonably incurred by the Company for the development, implementation and operation of the CAT during the year, which would include costs for the Plan Processor, insurance, and third-party support, as well as an operational reserve. CAT LLC does not propose to use costs already incurred in calculating the CAT Fees.

CAT LLC believes that using budgeted CAT costs, rather than CAT costs already incurred, is critical to ''build[ing] financial stability to support the Company as a going concern.'' [113] Using budgeted CAT costs to determine the Fee Rate would allow CAT LLC to collect fees before bills become payable. If, however, CAT Fees are only collected

after bills become payable, then the Participants would be required to continue to fund 100% of CAT costs to pay the bills as they come due. Making the Participants responsible for all of the CAT costs upfront, rather than one-third of the CAT costs, would change the proposed model in a significant manner.

Requiring the calculation of the Fee Rate based on incurred CAT costs, rather than budgeted CAT costs would only be necessary if budgeted and incurred CAT costs were likely to diverge. However, the Funding Proposal has been designed to address this concern. As proposed, CAT LLC would be required to calculate the Fee Rate each year based upon the budget for the upcoming year, and to adjust the fee rate mid-year to reflect changes in the budgeted or actual CAT costs or the projected or actual executed equivalent share volume. Accordingly, CAT LLC would be required to adjust CAT Fees twice a year to ensure that they are closely aligned with CAT costs. Moreover, when establishing the annual budget or its mid-year adjustment, CAT LLC would adjust the budget to reflect any surplus or deficit in CAT Fees collected during the prior period.

In addition, the CAT NMS Plan requires that the Company operate on a ''break-even'' basis, with fees imposed to cover costs and an appropriate reserve. Any surpluses would be treated as an operational reserve to offset future fees and would not be distributed to the Participants as profits. To ensure that the Participants' operation of the CAT will not contribute to the funding of their other operations, Section 11.1(c) of the CAT NMS Plan specifically states that ''[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.'' In addition, CAT LLC proposes to limit the size of the reserve to not more than 25% of the annual budget. To the extent that collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus shall be used to offset future fees.[114] Furthermore, CAT LLC is set up as a business league to mitigate concerns that CAT LLC's earnings could be used to benefit individual Participants.[115]

---

[107] CAT NMS Plan Approval Order at 84862.

[108] Approximately 1,034 unique CAT Reporters sent transaction data to the CAT in August 2025.

[109] *See, e.g.,* Rule 613(a)(1)(vii)(D) of Regulation NMS under the Exchange Act.

[110] CAT LLC notes, however, that there has been substantial continuity in the largest Industry Members over time. The top 10 firms in terms of equivalent executed shares in July 2025 were allocated 57% of the total Industry Member CAT costs; six of those 10 firms were also ranked in the top 10 throughout 2021. Similarly, of the top 30 firms in July 2025 (representing an allocation of 86% of the total Industry Member CAT costs), all but seven ranked in the top 30 throughout 2021. Furthermore, of the top 10 firms by CAT record volume in July 2025, six were also top 10 reporters by message volume in 2021. Of the top 30 firms by CAT record volume in July 2025, 20 were in the top 30 reporters of 2020.

[111] *See, e.g.,* Section III(b) of the CTA Plan; Section VIII of the UTP Plan.

[112] Letter from Participants to Brent J. Fields, Secretary, SEC, re: Selection of Plan Processor for the National Market System Plan Governing Consolidated Audit Trail (Jan. 18, 2017).

[113] Section 11.2(f) of the CAT NMS Plan.

[114] *See* Proposed 11.1(a)(ii) of the CAT NMS Plan.

[115] To qualify as a business league under Section 501(c)(6) of the Internal Revenue Code, an organization must ''not [be] organized for profit and no part of the net earnings of [the organization can] inure[ ] to the benefit of any private shareholder or individual.'' As the SEC stated when approving the CAT NMS Plan, ''the Commission believes that the Company's application for Section 501(c)(6) business league status addresses issues raised by commenters about the Plan's proposed allocation of profit and loss by mitigating concerns that the

## q. Continuous Fees Versus Sunsetting Fees

CAT LLC does not propose to require the proposed CAT Fees related to Prospective CAT Costs to sunset automatically; instead, a CAT Fee would continue until a new CAT Fee is in place in accordance with the requirements of the CAT NMS Plan and Section 19(b) of the Exchange Act. CAT LLC believes that it is critical that a CAT Fee remain in place at all times. Accordingly, CAT LLC proposes to add Section 11.3(a)(i)(A)(III) of the CAT NMS Plan to clarify that CAT Fees related to Prospective CAT Costs do not sunset automatically; such CAT Fees would remain in place until new CAT Fees with a new Fee Rate is in effect.

The financial viability of the CAT would be put at risk without a constant source of revenue. CAT LLC pays various bills, including technology bills, on a monthly basis. Accordingly, even short delays in the implementation of new CAT Fees after the sunsetting of a prior CAT Fee may have a deleterious effect on the operation of the CAT. Indeed, adopting sunsetting fees would contradict the funding principle of seeking to ''build financial stability to support the Company as a going concern.'' [116]

Moreover, CAT LLC does not believe that a sunsetting requirement is necessary to ensure that the CAT Fees are closely coordinated with Prospective CAT costs. CAT LLC has proposed a comprehensive, multi-pronged approach to ensure that the CAT Fees are closely tied to CAT costs. First, CAT LLC will be required to calculate the Fee Rates for the CAT Fees based on budgeted CAT costs. In addition, CAT LLC will be required to calculate the Fee Rate twice a year to determine whether the Fee Rate has changed due to changes in the budgeted or actual costs or actual or projected executed equivalent share volume, and to make a fee filing twice a year to reflect this calculation. Accordingly, the Fee Rate would be required to be updated twice a year, thereby ensuring the CAT Fees are closely tied to CAT costs.

Second, the CAT NMS Plan requires that the Company operate on a ''break-even'' basis, with fees imposed to cover costs and an appropriate reserve. Any surpluses would be treated as an operational reserve to offset future fees and would not be distributed to the Participants as profits. To ensure that the Participants' operation of the CAT

Company's earnings could be used to benefit individual Participants.'' CAT NMS Plan Approval Order at 84793.

[116] Section 11.2(f) of the CAT NMS Plan.

will not contribute to the funding of their other operations, Section 11.1(c) of the CAT NMS Plan specifically states that ''[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.'' Moreover, CAT LLC proposes to amend the CAT NMS Plan to limit the reserve to no more than 25% of the annual budget and to clarify that CAT fees collected in excess of the CAT costs, including the reserve, will be used to offset future fees.[117]

Third, CAT LLC proposes to amend the CAT NMS Plan to require Participants to provide significant details in their fee filings regarding Industry Member CAT Fees. Proposed paragraph (a)(iii)(B) of Section 11.3 of the CAT NMS Plan would state that, ''[w]hen the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the Fee Rate that the Operating Committee approved in accordance with paragraph (a) of this Section 11.3,'' such filings would be required to include (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget, and the reason for changes in each such line item from the prior CAT Fee filing; (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or remainder of the year, as applicable), and a description of the calculation of the projection. This detail would describe how the Fee Rate was calculated and explain how the budget used in the calculation is reconciled to the collected fees. Such detailed information would provide Industry Members and other interested parties with a clear understanding of the calculation of the CAT fees and their relationship to CAT costs.

## r. Conflicts of Interest

CAT LLC believes that the current process for developing the CAT funding

[117] *See* Proposed Section 11.1(a)(i) and (ii) of the CAT NMS Plan.

model appropriately addresses potential conflicts of interest related to CAT fees. The CAT NMS Plan, as approved by the SEC, adopts various measures to protect against potential conflicts issues raised by the Participants' fee-setting authority, including, but not limited to, the fee filing requirements under the Exchange Act and operating the CAT on a break-even basis. CAT LLC believes that these and other measures address potential conflicts of interest related to CAT fees.

## s. Effect on Efficiency, Competition or Capital Formation

CAT LLC believes that the Funding Proposal would have a positive impact on efficiency, competition and capital formation. The Funding Proposal is designed to provide a predictable revenue stream sufficient to cover CAT costs each year. In doing so, the Funding Proposal would be designed to maintain the CAT as a going concern financially. By providing for the financial viability of the CAT, the Funding Proposal would allow the CAT to provide its intended benefits. For example, the CAT is intended to provide significant improvements in efficiency related to how regulatory data is collected and used. In addition, by providing enhanced regulatory oversight and surveillance, the CAT could result in improvements in market efficiency by deterring violative activity. Similarly, the CAT is intended to improve capital formation by improving investor confidence in the market due to enhancements in surveillance.

In addition, the Funding Proposal would not impose an inappropriate burden on competition. The Funding Proposal would operate in a manner similar to the funding models employed by the SEC and the Participants related to Section 31 of the Exchange Act, the FINRA TAF and the ORF. These fees are long-standing and have been approved by the Commission as satisfying the requirements under the Exchange Act, including not imposing a burden on the competition that is not necessary or appropriate under the Exchange Act. In addition, the Funding Proposal avoids potentially burdensome fees for market makers or other market participants based on message traffic. Furthermore, the Funding Proposal addresses the specific trading characteristics of Listed Options and OTC Equity Securities to avoid adverse effects of the trading of those instruments. For example, the Funding Proposal includes the discounting of transactions involving OTC Equity Shares which, given the volume of shares typically involved in such securities transactions, otherwise may result in disproportionate fees to

market participants engaging in transaction in these securities.

The Funding Proposal also would not unfairly burden FINRA or any of the exchanges. The Funding Proposal is designed to be neutral as to the manner of execution and place of execution. The CAT fees would be the same regardless of whether the transaction is executed on an exchange or in the over-the-counter market. All Participants are self-regulatory organizations that have the same regulatory responsibilities under the Exchange Act. Their usage of CAT Data will be for the same regulatory purposes. By treating each Participant the same, the CAT fees would not become a competitive issue by and among the Participants, or a competitive issue between on exchange and off exchange trading.

CAT LLC does not believe that this proposal would unfairly burden CEBBs and CEBSs. Such a transaction-based fee is a type of fee that is currently used and well-known in the securities markets. For example, SRO members regularly pay transaction-based fees. As a result, the CAT fees could be paid by Industry Members without requiring significant and potentially costly changes. Moreover, the CEBBs and CEBSs could determine, but would not be required, to pass their CAT fees through to their customers, who, in turn, could pass their CAT fees to their customers, until the fee is imposed on the ultimate participant in the transaction. With such a pass-through, the CEBBs and CEBSs would not ultimately incur the cost of all CAT fees related to their transactions.

t. Straightforward Approach

One advantage of the Funding Proposal is that the approach is simple, straightforward and easy to understand. Using the predetermined Fee Rate or Historical Fee Rate, CAT LLC would calculate CAT fees by multiplying the number of executed equivalent shares in each Participant, CEBB or CEBS's transactions in Eligible Securities by the Fee Rate or Historical Fee Rate (as applicable) and one-third. The values necessary for the calculation are readily available. The Fee Rates and Historical Fee Rates would be publicly available, and Participants, CEBBs and CEBSs have easy access to their transaction data. Moreover, the two adjustments— one for Listed Options and one for OTC Equity Securities—are similarly straightforward calculations. The Funding Proposal does not include other complexities, such as tiered fees, minimum or maximum fees, excluded types of Eligible Securities or excluded transactions in Eligible Securities.

u. Predictable Fees

The Funding Proposal also provides CAT Reporters with predictable CAT fees. Because the fee rates would be established in advance, Participants, CEBBs and CEBSs can calculate the CAT fee that applies to each transaction when it occurs. Accordingly, CAT Reporters with a CAT fee obligation may easily estimate and validate their applicable fees based on their own trading data. In addition, to the extent any CAT fees charged to CAT Executing Brokers are passed on to customers, such customers also can calculate the applicable CAT fee for each transaction.

The predictability of CAT fees under the Funding Proposal improves upon the lack of fee predictability in the Original Funding Model and other message traffic-based models.[118] For example, with potential message traffic models,[119] CAT Reporters would not know the actual per message rate until after the end of the relevant reporting period for which they were assessed the fee and also could not determine in advance the number of messages that may be associated with a given order or the total number of messages, thereby making it difficult for a CAT Reporter to predict a CAT fee related to its market activity. In addition, this lack of predictability related to message-based fees also could complicate efforts by Industry Members to estimate, explain and directly pass message-based fees back to customers, particularly if no trade has occurred.

v. Administrative Ease

The Funding Proposal also would allow for ''ease of billing and other administrative functions.'' [120] As discussed above, the Funding Proposal relies upon a basic calculation using a predetermined fee rate, thereby making the fee determination a straightforward process. In addition, the CAT fees will be collected in a manner similar to the collection process that Industry Members are already accustomed, thereby further reducing the administrative burden on the industry.

w. Equal Treatment of Trading Venues

The Funding Proposal also has the benefit of treating transactions in Eligible Securities equally regardless of the trading venue. The Fee Rate or Historical Fee Rate would be the same

regardless of whether a trade was executed on an exchange or in the OTC market, or how the trade ultimately occurred more generally (*e.g.,* in a manner that generated more message traffic). In addition, Proposed Section 11.3(e) of the CAT NMS Plan regarding Participant pass-throughs applies equally to FINRA and the exchange Participants. As a result, it would not favor or unfairly burden any one type of trading venue or method.

x. Equitable Treatment of Different Eligible Securities

The Funding Proposal also recognizes and addresses the different trading characteristics of different types of securities. Recognizing that Listed Options trade in contracts rather than shares, the Funding Proposal would count executed equivalent share volume differently for Listed Options. Specifically, each executed contract for a transaction in Listed Options would be counted based on the multiplier applicable to the specific Listed Option contract in the relevant transaction (*e.g.,* 100 executed equivalent shares or such other applicable equivalency). Similarly, in recognition of the different trading characteristics of OTC Equity Securities as compared to NMS Stocks, the Funding Proposal would discount the share volume of OTC Equity Securities when calculating the CAT fees. Specifically, each executed share for a transaction in OTC Equity Securities would be counted as 0.01 executed equivalent shares. As a result, the Funding Proposal would not favor or unfairly burden any one type of product or product type.

y. Contributions by Both Industry Members and Participants

The Funding Proposal would require both Participants and Industry Members to contribute to the funding of the CAT. Until Commission approval of the Executed Share Model, the Participants paid the full cost of the creation, implementation and maintenance of the CAT since 2012. The continued funding of the CAT solely by the Participants was and is not contemplated by the CAT NMS Plan, nor is it a financially sustainable approach. As noted by the SEC, the CAT ''substantially enhance[s] the ability of the SROs and the Commission to oversee today's securities markets,'' [121] thereby benefiting all market participants. The Funding Proposal would require both Participants and Industry Members to contribute to the cost of the CAT, as

---

[118] *See* Securities Exchange Act Rel. No. 92451 (July 20, 2021), 86 FR 40114, 40122 (July 26, 2021) (''2021 Fee Proposal OIP'').

[119] Potential message traffic models, including the 2018 Fee Proposal and 2021 Fee Proposal, and the message traffic only model, are discussed further below in Section A.10 of this filing.

[120] Section 11.2(d) of the CAT NMS Plan.

[121] Rule 613 Adopting Release at 45726.

contemplated by Rule 613 and the CAT NMS Plan.

Rule 613(a)(1)(vii)(D) specifically contemplates Industry Members contributing to the payment of CAT costs. Specifically, this provision requires the CAT NMS Plan to address "[h]ow the plan sponsors propose to fund the creation, implementation, and maintenance of the consolidated audit trail, including the proposed allocation of such estimated costs among the plan sponsors, and between the plan sponsors and members of the plan sponsors." In approving Rule 613, the SEC noted that "although the plan sponsors likely would initially incur the costs to establish and fund the central repository directly, they may seek to recover some or all of these costs from their members." [122]

In addition, as approved by the SEC, the CAT NMS Plan specifically contemplates CAT fees to be paid by both Industry Members and Participants. Section 11.1(b) of the CAT NMS Plan states that "the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay; and (ii) establishing fees for Industry Members that shall be implemented by the Participants." [123] The Commission stated in approving the CAT NMS Plan the following:

The Commission believes that the proposed funding model reflects a reasonable exercise of the Participants' funding authority to recover the Participants' costs related to the CAT. The CAT is a regulatory facility jointly owned by the Participants and, as noted above, the Exchange Act specifically permits the Participants to charge members fees to fund their self-regulatory obligations. The Commission further believes that the proposed funding model is designed to impose fees reasonably related to the Participants' self-regulatory obligations because the fees would be directly associated with the costs of establishing and maintaining the CAT, and not unrelated SRO services. [124]

Likewise, the Commission stated that "the Participants are permitted to recoup their regulatory costs under the Exchange Act through the collection of fees from their members, as long as such fees are reasonable, equitably allocated and not unfairly discriminatory, and otherwise are consistent with Exchange

Act standards," [125] and noted that "Rule 613(a)(1)(vii)(D) requires the Participants to discuss in the CAT NMS Plan how they propose to fund the creation, implementation and maintenance of the CAT, including the proposed allocation of estimated costs among the Participants, and *between the Participants and Industry Members.*" [126]

In its amendments to the CAT NMS Plan regarding financial accountability, the SEC reaffirmed the ability for the Participants to charge Industry Members a CAT fee. Specifically, the SEC noted that the amendments were not intended to change the basic funding structure for the CAT, which may include fees established by the Operating Committee, and implemented by the Participants, to recover from Industry Members the costs and expenses incurred by the Participants in connection with the development and implementation of the CAT.[127]

z. Use of CAT Data

CAT Data would be used to calculate the CAT fees under the Funding Proposal. CAT Data would be used to identify each transaction in Eligible Securities for which a CAT fee would be collected. Specifically, CAT fees will be charged with regard to trades reported to CAT by FINRA via the ADF/ORF/TRF and by the exchanges. In addition, the same transaction data in the CAT Data would be used in the calculation of the projected total executed equivalent share volume for the Fee Rate. Furthermore, the transaction data in the CAT Data provides the identity of the relevant CAT Executing Brokers for each transaction for purposes of the CAT fees. Using CAT Data for the CAT fee calculations provides administrative efficiency, as the data will be accessible via the CAT.

aa. Twelve Month Look Back for Projected Volume

The calculation of the Fee Rate and the Historical Fee Rate requires the determination of the projected total executed equivalent share volume of transactions in Eligible Securities for the year. CAT LLC proposes to determine this projection based on the total executed equivalent share volume of transactions in Eligible Securities from the prior twelve months. CAT LLC determined that the use of the data from the prior twelve months provides an appropriate balance between using data from a period that is sufficiently long to

avoid short-term fluctuations while providing data close in time to the calculation of the Fee Rate or Historical Fee Rate. In addition, using twelve months, rather than a period less than a year, would address the issue of potential seasonality. For example, if the projection were based on a period shorter than one year, the projection could be based on a period that typically has lighter trading volume than the other half of the year, thereby causing the projection to be too low.

bb. Cost Discipline Mechanisms

i. General

The reasonableness of the Funding Proposal and the fees calculated under the Funding Proposal are supported by key cost discipline mechanisms for the CAT—a cost-based funding structure, cost transparency, cost management efforts and oversight. Together, these mechanisms help ensure the ongoing reasonableness of the CAT's costs and the level of fees assessed to support those costs.

First, the CAT NMS Plan requires that the Company operate on a "break-even" basis, with fees imposed to cover costs and an appropriate reserve. Any surpluses would be treated as an operational reserve to offset future fees and would not be distributed to the Participants as profits.[128] To ensure that the Participants' operation of the CAT will not contribute to the funding of their other operations, Section 11.1(c) of the CAT NMS Plan specifically states that "[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees." In addition, as set forth in Article VIII of the CAT NMS Plan, the Company "intends to operate in a manner such that it qualifies as a 'business league' within the meaning of Section 501(c)(6) of the [Internal Revenue] Code." To qualify as a business league, an organization must "not [be] organized for profit and no part of the net earnings of [the organization can] inure[ ] to the benefit of any private shareholder or individual." [129] As the SEC stated when approving the CAT NMS Plan, "the Commission believes that the Company's application for Section 501(c)(6) business league status addresses issues raised by commenters about the Plan's proposed allocation of profit and loss by mitigating concerns that the Company's earnings could be used to benefit individual

[122] *Id.* at 45795.

[123] *See also* Sections 11.1(c), 11.2(c), and 11.3(a) and (b) of the CAT NMS Plan.

[124] CAT NMS Plan Approval Order at 84794.

[125] *Id.* at 84795.

[126] *Id.* at 84797 (emphasis added).

[127] Securities Exchange Act Rel. No. 88890 (May 15, 2020), 85 FR 31322, 31329 (May 22, 2020).

[128] CAT NMS Plan Approval Order at 84792.

[129] 26 U.S.C. 501(c)(6).

USCA11 Case: 26-10936 Document: 62-1 Date Filed: 05/28/2026 Page: 42 of 208

Participants.'' [130] The Internal Revenue Service has determined that the Company is exempt from federal income tax under Section 501(c)(6) of the Internal Revenue Code.

Second, the CAT's commitment to reasonable funding in support of its regulatory obligations is further reinforced by the transparency it has committed to provide on an ongoing basis regarding its financial performance. The Company currently makes detailed financial information about the CAT publicly available. Section 9.2(a) of the CAT NMS Plan requires the Operating Committee to maintain a system of accounting established and administered in accordance with GAAP and requires ''all financial statements or information that may be supplied to the Participants shall be prepared in accordance with GAAP (except that unaudited statements shall be subject to year-end adjustments and need not include footnotes).'' Section 9.2(a) of the CAT NMS Plan also requires the Company to prepare and provide to each Participant ''as soon as practicable after the end of each Fiscal Year, a balance sheet, income statement, statement of cash flows and statement of changes in equity for, or as of the end of, such year, audited by an independent public accounting firm.'' The CAT NMS Plan requires that this audited balance sheet, income statement, statement of cash flows and statement of changes in equity be made publicly available. Among other things, these financial statements provide operating expenses, including technology, legal, consulting, insurance, professional and administration and public relations costs. The Company also maintains a dedicated web page on the CAT NMS Plan website that consolidates its annual financial statements in a public and readily accessible place.[131]

In addition, the Company publicly provides the annual operating budget for the Company as well as periodically provides updates to the budget that occur during the year. The Company includes such budget information on a dedicated web page on the CAT NMS Plan website to make it readily accessible, like the CAT financial statements.

CAT LLC also has held webinars providing additional detail about CAT costs and about potential alternative funding models for the CAT.[132] In addition, CAT LLC plans to offer additional webinars on cost and funding for the industry as appropriate going forward. Collectively, these reports and other efforts provide extensive and comprehensive information regarding the CAT's operations with respect to its budgets, revenues, costs, and financial reserves, among other information.

Third, CAT LLC regularly engages in and oversees efforts to reduce CAT costs responsibly while appropriately funding its regulatory obligations. CAT LLC's efforts to manage its expenses responsibly include oversight of the CAT's annual budget, including technology and other expenditures and initiatives. This oversight is informed by key CAT working groups, such as the Technology Working Group, Regulatory Working Group and Interpretive Working Group, each of which brings varied expertise to issues of responsible cost management. In particular, the Operating Committee currently utilizes a Cost Management Working Group to analyze opportunities to manage CAT costs responsibly. In addition, the Plan Processor regularly reviews options to lower compute and storage needs and works with CAT technology providers to provide services in a cost-effective manner. These collective efforts have led to a variety of technological changes to reduce costs.

Fourth, the CAT's funding and operations are subject to the oversight of the Commission. The CAT is extensively supervised by the Commission, including regular and continuous attendance at Operating Committee, Subcommittee and working group meetings. In addition, CAT fees as well as cost management efforts that require an amendment of the CAT NMS Plan are subject to review by the Commission's Division of Trading and Markets, as well as public comment.

ii. Implementation of Cost Savings Measures

Under the CAT NMS Plan, the CAT must process and store extremely large data volumes within strict requirements that leave little room for flexibility or discretion. CAT LLC and the Plan Processor have continuously and effectively pursued cost savings measures within their control and have achieved meaningful cost reductions within these significant regulatory restraints. As a result of these optimizations, per unit costs have decreased significantly, allowing cloud fees to remain generally flat over the last three years despite 41% growth in data volumes over the same three-year period—$136 million and 109 trillion events in 2022, $128 million and 116 trillion events in 2023, and $135 million and 154 trillion events in 2024. While these optimizations have allowed the CAT to keep pace with that growth, more comprehensive cost reductions require Commission approval to permit their implementation.

In recent years, CAT LLC has presented a series of Plan amendments, exemptive relief requests, and no-action requests presented to the Commission that would materially reduce costs while preserving the CAT's core regulatory objectives. For example:

• In December 2024, the SEC approved CAT LLC's proposed amendment to the CAT NMS Plan to implement certain cost savings measures, including (A) provisions that would change processing, query, and storage requirements for options market maker quotes in listed options; (B) provisions that would permit the Plan Processor to move raw unprocessed data and interim operational copies of CAT Data older than 15 days to a more cost-effective storage tier; and (C) provisions that would codify and expand exemptive relief recently provided by the Commission related to certain recordkeeping and data retention requirements for industry test data older than three months.[133] This amendment was originally estimated to result in roughly $20 million in additional annual savings in the first year, but actual savings have proven better than anticipated and are now projected to be approximately $30 million in the first year. As a result, 2025 cloud costs are currently projected at $126 million, despite continued increases in data volumes.

• On March 7, 2025, CAT LLC filed with the SEC a proposed amendment to the CAT NMS Plan relating to the Customer and Account Information System (''CAIS''). Subject to notice and comment and SEC approval, the amendment would eliminate requirements that Industry Members report Customer names, Customer addresses, account names, account addresses, years of birth, and authorized trader names, and would provide for the deletion of previously reported Customer information. It is estimated to achieve significant annual savings of $12 million in CAT costs.[134] The proposed CAIS amendment has been widely supported but remains outstanding, pending action by the Commission.

---

[130] CAT NMS Plan Approval Order at 84793.

[131] *See* CAT Audited Financial Statements, *https://www.catnmsplan.com/audited-financial-statements.*

[132] *See, e.g.,* CAT LLC Webinar CAT Costs (Sept. 21, 2021), *https://www.catnmsplan.com/events/cat-costs-september-21-2021;* CAT LLC Webinar, CAT Funding (Sept. 22, 2021), *https://www.catnmsplan.com/events/cat-funding-september-22-2021;* and CAT LLC Webinar, CAT Funding (Apr. 6, 2022), *https://www.catnmsplan.com/events/cat-funding.*

[133] Securities Exchange Act Rel. No. 101901 (Dec. 12, 2024), 89 FR 103033 (Dec. 18. 2024). In addition, the cost savings amendment originally would have permitted the Plan Processor to provide an interim CAT-Order-ID on an ''as requested'' basis, rather than on a daily basis, which would have resulted in an addition $2 million in savings, but this cost savings proposal was withdrawn following discussions with the SEC staff.

[134] Securities Exchange Act Rel. No. 102665 (Mar. 13, 2025), 90 FR 12845 (Mar. 19, 2025).

• On June 16, 2025, the SEC approved proposed amendments to the CAT NMS Plan relating to the reporting of certain unstructured verbal and electronic upstairs activity.[135] The SEC extended an exemption of the reporting of verbal floor activity to 2030. The exclusion of the reporting of such upstairs activity and the extended exemption with respect to similar floor activity will avoid substantial cost increases for Participants and Industry Members.

In addition, CAT LLC continues to evaluate other additional amendments to the CAT NMS Plan to substantially reduce the cost of CAT to the benefit of all market participants.

10. Alternative Models Considered

CAT LLC has determined to propose the Funding Proposal to fund the CAT for the reasons discussed above. In reaching this conclusion, CAT LLC considered the advantages and disadvantages of a variety of possible alternative funding and cost allocation models for the CAT in detail. After analyzing the various alternatives and considering comments on the previously proposed models, CAT LLC determined that, although various funding models may be reasonable and appropriate, the Funding Proposal provides a variety of advantages in comparison to the alternatives, and satisfies the requirements of the Exchange Act, including providing for an equitable allocation of reasonable fees among CAT Reporters, not being designed to permit unfair discrimination among CAT Reporters and not imposing any burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

a. 2018 Fee Proposal

CAT LLC previously filed a fee proposal in line with the CAT NMS Plan—the 2018 Fee Proposal.[136] Under that model, CAT LLC, among other things, proposed a 75%–25% allocation of CAT costs between Execution Venues (which included Participants and Execution Venue ATSs) and Industry Members (other than Execution Venue ATSs), and required Execution Venues to pay fees based on market share, and Industry Members (other than Execution Venue ATSs) to pay fees based on CAT message traffic.[137]

Each Industry Member (other than Execution Venue ATSs) would be placed into one of seven tiers of fixed fees, based on CAT message traffic in Eligible Securities. Options Market Maker and equity market maker quotes would be discounted when calculating message traffic.

CAT LLC determined to allocate 67% of Execution Venue costs recovered to Equity Execution Venues and 33% to Options Execution Venues. Each Equity Execution Venue would be placed in one of four tiers of fixed fees based on market share, and each Options Execution Venue would be placed in one of two tiers of fixed fees based on market share. Equity Execution Venue market share would be determined by calculating each Equity Execution Venue's proportion of the total volume of NMS Stock and OTC Equity shares reported by all Equity Execution Venues during the relevant time period. For purposes of calculating market share, the OTC Equity Securities market share of Execution Venue ATSs trading OTC Equity Securities as well as the market share of the FINRA OTC reporting facility would be discounted. Similarly, market share for Options Execution Venues would be determined by calculating each Options Execution Venue's proportion of the total volume of Listed Options contracts reported by all Options Execution Venues during the relevant time period.

The 2018 Fee Proposal was a very complex model with many interrelated parts, including allocation percentages, discounts for certain market behavior, and multiple tiered fees, and the complexity raised concerns from the Commission regarding its use as the CAT funding model. In addition, in response to the proposal, the industry provided a number of other comments related to the proposal, including comments regarding the proposed allocation of CAT costs between Participants and Industry Members, and the ability of certain market segments to afford the proposed CAT fee.[138]

b. 2021 Fee Proposal

In response to the comments on the 2018 Fee Proposal, CAT LLC

determined to revise various aspects of the proposed model, thereby developing the 2021 Fee Proposal.[139] The 2021 Fee Proposal would have continued to require many of the same elements as the 2018 model, including the bifurcated funding approach, and the use of market share and message traffic for allocating costs, as required by the current CAT NMS Plan. The 2021 Fee Proposal, however, proposed to revise the model in certain ways, including (1) dividing the CAT costs between Participants and Industry Members, rather than between Execution Venues and Industry Members (other than Execution Venue ATSs); (2) eliminating the use of tiers in calculating CAT fees for Participants and Industry Members; (3) adopting certain minimum and maximum CAT fees for Industry Members and Participants; (4) revising the allocation between Equity Execution Venues and Options to be 60%–40%; and (5) excluding, rather than discounting, market share in OTC Equity Shares from the calculation of market share for FINRA.

Although the revisions of the 2021 Fee Proposal addressed certain comments on the prior 2018 Fee Proposal, commenters continued to raise issues regarding the proposal. For example, commenters provided feedback regarding the 75%–25% cost allocation between Industry Members and Participants, the 60%–40% cost allocation between Equity Participants and Options Participants, the use of market share and message traffic for allocating costs among Participants and Industry Members, respectively, and the proposed minimum and maximum fees. Noting these and other issues, the SEC determined to institute proceedings to determine whether to disapprove the 2021 Fee Proposal or to approve the proposal with any changes or subject to any conditions the SEC deemed necessary or appropriate after considering public comment.[140] Ultimately, the Operating Committee determined to withdraw the 2021 Fee Proposal.[141]

c. Revenue Funding Model

CAT LLC also considered a model in which all CAT Reporters, including both Industry Members and Participants, would pay fees based solely on revenue. The concept underlying this proposal is that CAT

---

[135] Securities Exchange Act Rel. No. 103275 (June 16, 2025), 90 FR 26337 (June 20, 2025).

[136] For a description of the 2018 Fee Proposal, *see* 2018 Fee Proposal Release. CAT LLC later withdrew this proposed amendment. Securities Exchange Act Rel. No. 82892 (Mar. 16, 2018), 83 FR 12633 (Mar. 22, 2018).

[137] In developing the 2018 Fee Proposal, CAT LLC considered many variations of different aspects of that model. For example, CAT LLC evaluated

different cost allocations between Industry Members (other than Execution Venue ATSs) and Execution Venues, including 80%–20%, 75%–25%, 70%–30% and 65%–35% allocations, and different cost allocations between Equity and Options Execution Venues. CAT LLC also considered different discounts for equities and options market makers, different numbers of tiers of Industry Members and Execution Venues, different fee levels for each tier, and other aspects of the model.

[138] For a discussion of comments made regarding the Original Funding Model and the 2018 Fee Proposal, *see generally* 2018 Fee Proposal Release.

[139] *See* 2021 Fee Proposal Release.

[140] *See* 2021 Fee Proposal OIP. *See also* Securities Exchange Act Rel. No. 93227 (Oct. 1, 2021), 86 FR 55900 (Oct. 7, 2021).

[141] Letter from Mike Simon, Chair, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, SEC (Dec. 8, 2021).

costs would be borne by CAT Reporters based on their ability to pay. Under this model, Industry Member revenue would be calculated based on revenue reported in FOCUS reports, and Participant revenue would be calculated based on revenue information in Form 1 amendments and other publicly reported figures.

CAT LLC did not select this model for various reasons. Under this approach, Participants as a group would only pay approximately 4% of the total CAT costs. Given their role as SROs and their use of the CAT, CAT LLC did not believe that such a small allocation of the CAT costs to the Participants was appropriate. Using revenue also raised a variety of practical issues. For example, questions were raised as to what revenue was appropriate to include in the calculation of revenue for Industry Members. The gross revenue set forth on FOCUS reports was proposed, as it was similar to an existing FINRA regulatory fee.[142] However, questions were raised as to whether revenue unrelated to NMS Securities or OTC Equity Securities, or otherwise unrelated to the CAT, should be included for calculation of the CAT fee. Eliminating revenue unrelated to CAT-related activity would have been difficult or impossible. In addition, the lack of a uniform approach to calculating revenue for the Participants could raise inequities in the collection of a CAT fee.

To address the issues regarding the 96%–4% allocation and the calculation of the Participant revenue in the straight revenue model described above, CAT LLC considered an alternative version of the revenue model in which the CAT costs would be allocated between Industry Members and Participants based on a set percentage (*e.g.,* 75%–25%) and the Industry Member allocation would be allocated among Industry Members based on revenue and the Participant allocation would be allocated among Participants based on market share. However, this alternative revenue model failed to address the issues regarding the appropriate revenue calculations for Industry Members.

d. Message Traffic Only Model

CAT LLC considered a funding model in which CAT costs were allocated across all CAT Reporters—both Industry Members and Participants—based on message traffic in the CAT. Specifically, CAT LLC considered eliminating the concepts of a Participant allocation and an Industry Member allocation entirely,

and treating Participants and Industry Members the same under the model. The use of message traffic, however, raised issues regarding the predictability of fees. It also introduced complexity to the model, as discounts were necessary for certain types of activity to avoid fees that may adversely impact market making activity and other market activity.

e. Alternative Allocation for the Funding Proposal

The Operating Committee also discussed an alternative funding model that would calculate fees in a manner similar to the Funding Proposal, but would allocate the fee to one Industry Member, the CEBS, rather than allocating one-third of the fees each to the CEBS, the CEBB and the applicable Participant. This allocation would more closely parallel the existing Section 31 fee allocation structure that is already in place. This alternative allocation would eliminate complexity from the fee process, including the process of allocating fees among Industry Members and Participants that are likely to be passed through to the ultimate investors, and would provide for a more transparent funding process for investors. Instead of using this approach, CAT LLC determined to allocate costs among the main participants in a transaction and allow those participants to determine whether and how to recover the costs.

f. Sales Value Model

CAT LLC also considered a funding model in which fees would be calculated based on transaction sales values, similar to the method used in the Section 31/sales value fee programs. Under this model, the per sales value fee rate would be calculated by dividing the annual CAT budget by the projected annual total industry transaction sales values. The fee would be calculated by multiplying the sales value fee rate by a given trade's sales value. The CEBB, the CEBS and the relevant Participant would each be assessed one-third of the fee, or, in the alternative, the CEBS would be assessed two-thirds of the fee and the relevant Participants would be assessed one-third of the fee. The same rate would apply to all transactions equally, regardless of the type of product in the trade (*i.e.,* NMS Stocks, Listed Options or OTC Equity Securities). Based on an analysis of 2021 data, CAT LLC observed that the sales value model could potentially impose a disproportionate share of the CAT costs on Participants and Industry Members trading NMS Stocks versus Listed Options. In comparison, also based on

an analysis of 2021 data, CAT LLC observed that the Funding Proposal would impose an equitable allocation of fees among Participants and Industry Members trading NMS Stocks and Listed Options, as well as OTC Equity Securities.

g. Other Models

CAT LLC also considered other possible funding models. For example, CAT LLC considered allocating the CAT costs equally among each of the Participants, and then permitting each Participant to charge its own members as it deems appropriate. CAT LLC determined that such an approach raised a variety of issues, including the likely inconsistency of the ensuing charges, potential for lack of transparency, and the impracticality of multiple SROs submitting invoices for CAT charges. CAT LLC also discussed the advantages and disadvantages of various alternative models during the development of the CAT NMS Plan, such as a cost allocation based on a strict pro-rata distribution, regardless of the type or size of the CAT Reporters.[143]

11. Satisfaction of Exchange Act and CAT NMS Plan Requirements

The Funding Proposal offers a variety of benefits over the Original Funding Model and satisfies each of the funding principles and other requirements of the CAT NMS Plan, as proposed to be revised herein, as well as the applicable requirements of the Exchange Act for the reasons discussed below and for the reasons discussed in more detail above.

a. Funding Principle: Section 11.2(a) of the CAT NMS Plan

The Funding Proposal satisfies the funding principles set forth in Section 11.2(a) of the CAT NMS Plan. Section 11.2(a) of the CAT NMS Plan requires the Operating Committee, in establishing the funding of the Company, to seek ''to create transparent, predictable revenue streams for the Company that are aligned with the anticipated costs to build, operate and administer the CAT and the other costs of the Company.''

First, by adopting a CAT-specific fee tied directly to CAT costs, CAT LLC would be fully transparent regarding the costs of the CAT and how those costs would be allocated among CAT Reporters. The CAT fees would be designed solely to cover CAT costs, and no other regulatory costs. In contrast, charging a general regulatory fee, which

---

[142] *See* paragraphs (c) and (d) of Section 1 of Schedule A of FINRA's By-Laws regarding FINRA's annual Gross Income Assessment.

[143] For a discussion of alternatives considered in the drafting of the CAT NMS Plan, *see* Appendix C of the CAT NMS Plan at C–88–C–89.

might otherwise be used to cover CAT costs as well as other regulatory costs, would be less transparent than the selected approach of charging a fee designated to cover CAT-related costs only. Such a general regulatory fee could cover a variety of regulatory costs without differentiating those costs related to the CAT.

Second, the Funding Proposal would provide a predictable revenue stream for the Company. The Funding Proposal is designed to collect the annual CAT costs each year, thereby providing for a predictable revenue stream. In addition, to address the possibility of some variability in the collected CAT fees, an unexpected increase in costs or variations from the budgeted costs or projected executed equivalent share volume of transactions in Eligible Securities, the CAT costs covered by the Funding Proposal would include an operational reserve. The operational reserve could be used in the event that the total CAT fees collected differ from the actual CAT costs. Moreover, the Funding Proposal includes a method for adjusting the calculation of the Fee Rate during the year if there are changes in the projected total volume of transactions in Eligible Securities or the CAT costs.

Third, the Funding Proposal provides for a revenue stream for the Company that is aligned with the anticipated costs to build, operate and administer the CAT and the other costs of the Company. The total CAT fees to be collected from CAT Reporters are designed to cover the CAT costs. Any surpluses collected would be treated as an operational reserve to offset future fees and would not be distributed to the Participants as profits.[144]

b. Funding Principle: Section 11.2(b) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(b) of the CAT NMS Plan, as proposed to be amended herein, which would require the Operating Committee to seek ''to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT.'' As discussed in detail above, the Funding Proposal establishes an allocation of CAT costs among Participants and Industry Members that is consistent with the Exchange Act. In addition, the Funding Proposal provides for an equitable allocation of reasonable dues, is not unfairly discriminatory and does

not impose a burden on competition that is not necessary or appropriate in furtherance of the Exchange Act. In addition, the Funding Proposal takes into account the timeline for implementation of the CAT. The CAT fees are designed to cover the CAT costs for each relevant period.

c. Funding Principle: Section 11.2(c) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(c) of the CAT NMS Plan, as proposed to be modified herein. Section 11.2(c), as proposed to be modified herein, requires the Operating Committee to seek ''to establish a fee structure in which the fees charged to Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT.'' The Funding Proposal requires Participants and Industry Members to pay fees based upon the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT, as described above.

d. Funding Principle: Section 11.2(d) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(d) of the CAT NMS Plan, which requires the Operating Committee to seek ''to provide for ease of billing and other administrative functions.'' The Funding Proposal satisfies this principle in several ways. The Funding Proposal is modeled after the existing Section 31-related fee programs, with which the Participants and Industry Members have a longstanding familiarity. The Funding Proposal relies upon a basic calculation using a predetermined fee rate along with an Industry Member or Participant's executed equivalent share volume, thereby making the fee determination a straightforward process.

Furthermore, the Funding Proposal provides CAT Reporters with predictable CAT fees. Because the Fee Rate is established in advance for a relevant time period, Participants, CEBBs and CEBSs know the CAT fee that applies to each transaction when it occurs. Accordingly, Participants, CEBBs and CEBSs are able to easily estimate and validate their applicable fees based on their own trading data. In addition, to the extent any CAT fees are passed on to customers, the customers, too, can calculate the applicable CAT fee for each transaction.

e. Funding Principle: Section 11.2(e) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(e) of the CAT NMS Plan, which requires the Operating Committee to seek ''to avoid any disincentives such as placing an inappropriate burden on competition and a reduction in market quality.'' The Funding Proposal would operate in a manner similar to the funding models employed by the SEC and the Participants related to Section 31 of the Exchange Act, the FINRA TAF and the ORF. These fees are long-standing, and have been approved by the Commission as satisfying the requirements under the Exchange Act, including not imposing a burden on competition that is not necessary or appropriate under the Exchange Act. In addition, the Funding Proposal avoids potentially burdensome fees for market makers or other market participants based on message traffic. Furthermore, the Funding Proposal addresses the specific trading characteristics of Listed Options and OTC Equity Securities to avoid adverse effects of the trading of those instruments. For example, the Funding Proposal includes the discounting of transactions involving OTC Equity Shares which, given the volume of shares typically involved in such securities transactions, otherwise may result in disproportionate fees to market participants' transactions in these securities.

The Funding Proposal also would not unfairly burden FINRA or any of the exchanges. The Funding Proposal is designed to be neutral as to the manner of execution and place of execution. The CAT fees would be the same regardless of whether the transaction is executed on an exchange or in the over-the-counter market. All Participants are SROs that have the same regulatory responsibilities under the Exchange Act. Their usage of CAT Data will be for the same regulatory purposes. By treating each Participant the same, the CAT fees would not become a competitive issue by and among the Participants, or a competitive issue between on exchange and off exchange trading.

The Funding Proposal also would not unfairly burden CAT Executing Brokers. CAT LLC determined to charge CEBBs and CEBSs because such a fee collection model is currently used and well-known in the securities markets. As a result, the CAT fees could be paid by Industry Members without requiring significant and potentially costly changes. Moreover, the CEBBs and CEBSs would be permitted, but not required, to pass their CAT fees through to their

---

[144] CAT NMS Plan Approval Order at 84792.

USCA11 Case: 26-10936  Document: 62-1  Date Filed: 05/28/2026  Page: 46 of 208

customers, who, in turn, could pass their CAT fees to their customers, until the fee is imposed on the ultimate participant in the transaction. With such a pass-through, the CEBBs and CEBSs would not ultimately incur the cost of all CAT fees related to the transactions that they clear. Moreover, CEBBs and CEBSs that do not have customers are engaged in profit-making business activities and have revenue sources other than the direct pass-through of CAT fees. Because the CAT is a regulatory tool used to oversee the activities of market participants, it is reasonable for all such market participants to incur CAT fees, even if those fees cannot be directly passed on to customers.

f. Funding Principle: Section 11.2(f) of the CAT NMS Plan

The Funding Proposal satisfies the funding principle set forth in Section 11.2(f) of the CAT NMS Plan, which requires the Operating Committee to seek ''to build financial stability to support the Company as a going concern.'' CAT LLC believes that the Funding Proposal is structured to collect sufficient funds to pay for the cost of the CAT going forward. In addition, the Funding Proposal would collect an operational reserve for the CAT. This operational reserve is intended to address potential shortfalls in collected CAT fees versus actual CAT costs. Moreover, the Funding Proposal includes a requirement to adjust the Fee Rate during the year in order to address any changes in the projected or actual total volume of transactions in Eligible Securities or the budgeted or actual CAT costs. Furthermore, the Funding Proposal is designed to collect CAT fees continuously so as to provide uninterrupted revenue to pay CAT bills; the CAT Fees related to Prospective CAT Costs are not designed to sunset.

g. Section 11.1(c) of the CAT NMS Plan

The Funding Proposal would satisfy the requirements in Section 11.1(c) of the CAT NMS Plan, as proposed to be modified herein. Section 11.1(c) of the CAT NMS Plan states that ''[t]o fund the development and implementation of the CAT, the Company shall time the imposition and collection of all fees on Participants and Industry Members in a manner reasonably related to the timing when the Company expects to incur such development and implementation costs.'' The CAT fees are designed to cover the CAT costs for a relevant period. As such, on a going forward basis, they are designed to be imposed close in time to when costs are incurred. In addition, the Historical CAT

Assessments are designed to ''take into account fees, costs and expenses (including legal and consulting fees and expenses) reasonably incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT, and such fees, costs and expenses shall be fairly and reasonably shared among the Participants and Industry Members.''

Section 11.1(c) of the CAT NMS Plan also requires that ''[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.'' The Company would operate on a ''break-even'' basis, with fees imposed to cover costs and an appropriate reserve. Any surpluses would not be distributed to the Participants as profits. In addition, as set forth in Article VIII of the CAT NMS Plan, the Company ''intends to operate in a manner such that it qualifies as a 'business league' within the meaning of Section 501(c)(6) of the [Internal Revenue] Code.'' To qualify as a business league, an organization must ''not [be] organized for profit and no part of the net earnings of [the organization can] inure[ ] to the benefit of any private shareholder or individual.'' [145] As the SEC stated when approving the CAT NMS Plan, ''the Commission believes that the Company's application for Section 501(c)(6) business league status addresses issues raised by commenters about the Plan's proposed allocation of profit and loss by mitigating concerns that the Company's earnings could be used to benefit individual Participants.'' [146] The Internal Revenue Service has determined that the Company is exempt from federal income tax under Section 501(c)(6) of the Internal Revenue Code.

h. Equitable Allocation of Reasonable Fees

The proposed CAT fees provide for the ''equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities necessary or appropriate in furtherance of the purposes of this chapter,'' [147] as required by the Exchange Act. CAT LLC believes that the CAT fees equitably allocate CAT costs between and among Participants and Industry Members. For the reasons discussed above, CAT LLC believes that the allocation of one-third of the CAT costs each to Participants,

CEBBs and CEBSs in the Funding Proposal as well as the use of the total equivalent share volume of transactions in Eligible Securities for allocating costs provide for an equitable allocation of CAT costs among CAT Reporters.

CAT LLC also believes that the Funding Proposal would provide for reasonable fees. The transaction-based fees contemplated by the Funding Proposal are a reasonable fee structure. The SROs have a long history of charging transaction-based fees, as transactions are the intended economic goal of the securities markets. In addition to the transaction-based regulatory fees discussed above (*e.g.,* the SROs' Section 31-related fees, the FINRA TAF and the ORF), the SROs charge a variety of other types of transaction fees to fund their operations.[148] Indeed, each of the SROs collect transaction-based fees from their members.[149] In each case, the transaction-based fees charged by SROs have been subject to the fee filing process and found to satisfy the requirements of the Exchange Act. Not only is the type of fee reasonable, but the level of the fee is reasonable as well. Although the exact Fee Rate or Historical Fee Rate to be paid for any particular period will be determined at a later date, experience to date indicates that the Funding Model provides a per-transaction fee rate that is not excessive in comparison to existing transaction fee rates.

i. No Unfair Discrimination

The Funding Proposal is ''not designed to permit unfair discrimination between customers, issuers, brokers, or dealers,'' [150] as required by the Exchange Act. In addition, the Funding Proposal does not unfairly discriminate between Industry Members and Participants, among Industry Members or among Participants. Both Participants and Industry Members would contribute to the cost of the CAT; Participants alone would no longer be required to shoulder the cost burden of the CAT without the contribution of Industry Members. In addition, both Participants and Industry Members would pay a fee based on the executed equivalent share volume of their transactions in Eligible Securities; the type of metric would not vary based

---

[145] 26 U.S.C. 501(c)(6).

[146] CAT NMS Plan Approval Order at 84793.

[147] Sections 6(b)(4) and 15A(b)(5) of the Exchange Act.

[148] The SEC has noted that SRO transaction fees account for a significant portion of SRO revenue. Securities Exchange Act Rel. No. 50700 (Nov. 18, 2004), 69 FR 71256, 71271 (Dec. 8, 2004).

[149] *See, e.g.,* NYSE Price List; Nasdaq Price List.

[150] Sections 6(b)(5) and 15A(b)(6) of the Exchange Act.

on whether the CAT Reporter is an Industry Member or Participant.

Furthermore, the Fee Rate or Historical Fee Rate would be the same regardless of the type of venue a trade was executed on, or how the trade ultimately occurred more generally (*e.g.,* in a manner that generated more message traffic). In addition, the Funding Proposal recognizes the different trading characteristics of Listed Options and OTC Equity Securities as compared to NMS Stocks. The Funding Proposal recognizes that Listed Options trade in contracts rather than shares, and, therefore, counts the executed equivalent shares for Listed Options accordingly. Similarly, in recognition of the different trading characteristics of OTC Equity Securities as compared to NMS Stocks, the Funding Proposal would discount the share volume of OTC Equity Securities when calculating the CAT fees. As a result, the Funding Proposal would not favor or unfairly burden any one type of trading venue, product or product type.

With the elimination of tiers, fees for Industry Members and Participants are directly related to their executed equivalent share volume of their transactions. With tiers, the relationship between a CAT Reporter's share volume and the CAT fee would not have been as direct.

j. No Burden on Competition

The Funding Proposal does ''not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter,'' [151] as required by the Exchange Act, and it fairly and equitably allocates costs among CAT Reporters. The Funding Proposal would operate in a manner similar to the funding model employed by the SEC and the Participants related to Section 31 of the Exchange Act as well as the FINRA TAF [152] and the ORF rules, and these long-standing fees to cover regulatory costs have been approved by the Commission as satisfying the requirements under the Exchange Act, including not imposing a burden on the competition that is not necessary or appropriate under the Exchange Act. Furthermore, the Funding Proposal does not impose a burden on competition for the reasons

set forth above, including in Sections A.9.s and A.11.e of this filing above.

B. Governing or Constituent Documents

Not applicable.

C. Implementation of Amendment

CAT LLC is filing this proposed amendment pursuant to Rule 608(b)(1) of Regulation NMS under the Exchange Act.[153]

D. Development and Implementation Phases

The Participants expect to implement the proposed CAT fees upon approval by the SEC, subject to applicable requirements for the implementation of the CAT fees, including the requirements of Section 19(b) of the Exchange Act with regard to Industry Member CAT Fees.

E. Analysis of Impact on Competition

CAT LLC does not believe that the proposed amendment would result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act. CAT LLC notes that the proposed amendment implements provisions of the CAT NMS Plan approved by the Commission, subject to proposed revisions to the CAT NMS Plan described above, and is designed to assist the Participants in meeting their regulatory obligations pursuant to the CAT NMS Plan. Because all Participants are subject to the Funding Proposal set forth in the proposed amendment, this is not a competitive filing that raises competition issues between and among the Participants. Furthermore, for the reasons discussed above, including in Sections A.11.e and A.11.j of this filing above, CAT LLC does not believe that the Funding Proposal would result in any burden on competition that is not necessary or appropriate in furtherance of the purpose of the Exchange Act.

F. Written Understanding or Agreements Relating to Interpretation of, or Participation in, Plan

Not applicable.

G. Approval by Plan Sponsors in Accordance With Plan

Section 12.3 of the CAT NMS Plan states that, subject to certain exceptions, the CAT NMS Plan may be amended from time to time only by a written amendment, authorized by the affirmative vote of not less than two-thirds of all of the Participants, that has been approved by the SEC pursuant to Rule 608 of Regulation NMS under the

Exchange Act or has otherwise become effective under Rule 608 of Regulation NMS under the Exchange Act. In addition, Section 4.3(a)(vi) of the Plan requires the Operating Committee, by Majority Vote, to authorize action to determine the appropriate funding-related policies, procedures and practices-consistent with Article XI. The Operating Committee has satisfied both of these requirements.

H. Description of Operation of Facility Contemplated by the Proposed Amendment

Not applicable.

I. Terms and Conditions of Access

Not applicable.

J. Method of Determination and Imposition, and Amount of, Fees and Charges

Section A of this filing describes in detail how CAT LLC developed the Funding Proposal for the CAT.

K. Method and Frequency of Processor Evaluation

Not applicable.

L. Dispute Resolution

Section 11.5 of the CAT NMS Plan addresses the resolution of disputes regarding CAT fees charged to Participants and Industry Members. Specifically, Section 11.5 of the CAT NMS Plan states that:

[d]isputes with respect to fees the Company charges Participants pursuant to Article XI of the CAT NMS Plan shall be determined by the Operating Committee or a Subcommittee designated by the Operating Committee. Decisions by the Operating Committee or such designated Subcommittee on such matters shall be binding on Participants, without prejudice to the rights of any Participant to seek redress from the SEC pursuant to Rule 608 of Regulation NMS under the Exchange Act or in any other appropriate forum.

In addition, the Participants adopted rules to establish the procedures for resolving potential disputes related to CAT fees charged to Industry Members.[154]

**III. Solicitation of Comments**

The Commission seeks comment on the amendment. Interested persons are invited to submit written data, views and arguments concerning the foregoing, including whether the amendment is consistent with the Exchange Act. Comments may be submitted by any of the following methods:

---

[151] Sections 6(b)(8) and 15A(b)(9) of the Exchange Act.

[152] Although the FINRA TAF is designed to cover a subset of the costs of FINRA services (*e.g.,* costs to FINRA of the supervision and regulation of members, including performing examinations, financial monitoring, and policy, rulemaking, interpretive, and enforcement activities) rather than all of FINRA's costs like the CAT, the transaction-based calculation of the FINRA TAF and the proposed CAT fees are similar.

[153] 17 CFR 242.608(b)(1).

[154] *See* Securities Exchange Act Rel. No. 81500 (Aug. 30, 2017), 82 FR 42143 (Sept. 6, 2017).

*Electronic Comments*

• Use the Commission's internet comment form (*https://www.sec.gov/rules/sro.shtml*); or

• Send an email to *rule-comments@sec.gov.* Please include File Number 4–698 on the subject line.

*Paper Comments*

• Send paper comments in triplicate to Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090.

All submissions should refer to File Number 4–698. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's internet website (*http://www.sec.gov/rules/sro.shtml*). Copies of the submission, all subsequent amendments, all written statements with respect to the proposed plan amendment that are filed with the Commission, and all written communications relating to the amendment and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for website viewing. Copies of the filing also will be available for inspection and copying at the Participants' offices. All comments received will be posted without change. Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. You should submit only information that you wish to make available publicly. All submissions should refer to File Number 4–698 and should be submitted on or before October 17, 2025.

For the Commission, by the Division of Trading and Markets, pursuant to delegated authority.[155]

**Sherry R. Haywood,**
*Assistant Secretary.*

### Exhibit A

### Proposed Revisions to the CAT NMS Plan

Additions *in italics;* deletions [bracketed]

\*      \*      \*      \*      \*

### Article I

### Definitions

\*      \*      \*      \*      \*

''*CAT Executing Broker*'' *means (a) with respect to a transaction in an Eligible Security that is executed on an exchange, the*

---

[155] 17 CFR 200.30–3(a)(85).

Industry Member identified as the Industry Member responsible for the order on the buy-side of the transaction and the Industry Member responsible for the sell-side of the transaction in the equity order trade event and option trade event in the CAT Data submitted to the CAT by the relevant exchange pursuant to the Participant Technical Specifications; and (b) with respect to a transaction in an Eligible Security that is executed otherwise than on an exchange and required to be reported to an equity trade reporting facility of a registered national securities association, the Industry Member identified as the executing broker and the Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event in the CAT Data submitted to the CAT by FINRA pursuant to the Participant Technical Specifications; provided, however, in those circumstances where there is a non-Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event or no contra-side executing broker is identified in the TRF/ORF/ADF transaction data event, then the Industry Member identified as the executing broker in the TRF/ORF/ADF transaction data event would be treated as CAT Executing Broker for the Buyer and for the Seller.

\*      \*      \*      \*      \*

[''Execution Venue'' means a Participant or an alternative trading system (''ATS'') (as defined in Rule 300 of Regulation ATS) that operates pursuant to Rule 301 of Regulation ATS (excluding any such ATS that does not execute orders).]

\*      \*      \*      \*      \*

### Article XI

### Funding of the Company

### Section 11.1. Funding Authority

(a) On an annual basis the Operating Committee shall approve [an] *a reasonable* operating budget for the Company. The budget shall include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company.

*(i) Without limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve and such other cost categories as reasonably determined by the Operating Committee to be included in the budget.*

*(ii) For the reserve referenced in paragraph (a)(i) of this Section, the budget will include an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget. To the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus shall be used to offset future fees. For the avoidance of doubt, the Company will only include an amount for the*

reserve in the annual budget if the Company does not have a sufficient reserve (which shall be up to but not more than 25% of the annual budget). For the avoidance of doubt, the calculation of the amount of the reserve would exclude the amount of the reserve from the budget.

(b) Subject to *Section 11.1 and* Section 11.2, the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay; and (ii) establishing fees for Industry Members that shall be implemented by Participants. The Participants shall file with the SEC under Section 19(b) of the Exchange Act any such fees on Industry Members that the Operating Committee approves, and such fees shall be labeled as ''Consolidated Audit Trail Funding Fees.''

(c) To fund the development and implementation of the CAT, the Company shall time the imposition and collection of all fees on Participants and Industry Members in a manner reasonably related to the timing when the Company expects to incur such development and implementation costs. In determining fees on Participants and Industry Members the Operating Committee shall take into account fees, costs and expenses (including legal and consulting fees and expenses) *reasonably* incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT, and such fees, costs and expenses shall be fairly and reasonably shared among the Participants and Industry Members. Any surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.

(d) Consistent with this Article XI, the Operating Committee shall adopt policies, procedures, and practices regarding the budget and budgeting process, [assignment of tiers,] resolution of disputes, billing and collection of fees, and other related matters. [For the avoidance of doubt, as part of its regular review of fees for the CAT, the Operating Committee shall have the right to change the tier assigned to any particular Person in accordance with fee schedules previously filed with the Commission that are reasonable, equitable and not unfairly discriminatory and subject to public notice and comment, pursuant to this Article XI. Any such changes will be effective upon reasonable notice to such Person.]

### Section 11.2. Funding Principles

In establishing the funding of the Company, the Operating Committee shall seek:

(a) to create transparent, predictable revenue streams for the Company that are aligned with the anticipated costs to build, operate and administer the CAT and the other costs of the Company;

(b) to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT [and distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations];

(c) to establish a [tiered] fee structure in which the fees charged to [: (i)] *Participants and* [CAT Reporters that are Execution Venues, including ATSs, are based upon the level of market share; (ii)] Industry Members[' non-ATS activities] are based upon *the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT* [message traffic; and (iii) the CAT Reporters with the most CAT-related activity (measured by market share and/or message traffic, as applicable) are generally comparable (where, for these comparability purposes, the tiered fee structure takes into consideration affiliations between or among CAT Reporters, whether Execution Venues and/or Industry Members)].

(d) to provide for ease of billing and other administrative functions;

(e) to avoid any disincentives such as placing an inappropriate burden on competition and a reduction in market quality; and

(f) to build financial stability to support the Company as a going concern.

### Section 11.3. Recovery.

(a) *Prospective CAT Costs.* The Operating Committee will establish [fixed] fees ("*CAT Fees*") to be payable by [Execution Venues] *Participants and Industry Members with regard to CAT costs not previously paid by the Participants ("Prospective CAT Costs") as follows* [provided in this Section 11.3(a)]:

(i) *Fee Rate. The Operating Committee will calculate the Fee Rate for the CAT Fee twice per year, once at the beginning of the year and once during the year as follows.*

*(A) General.*

*(I) For the beginning of each year, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the year. Once the Operating Committee has approved such Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using such Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.*

*(II) During each year, the Operating Committee will calculate a new Fee Rate by dividing the reasonably budgeted CAT costs for the remainder of the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year. Once the Operating Committee has approved the new Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the new Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this new Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.*

*(III) For the avoidance of doubt, CAT Fees with a Fee Rate calculated as set forth in this paragraph (a)(i) shall remain in effect until the Operating Committee approves a new Fee Rate as described in paragraph (a)(i) and CAT Fees with the new Fee Rate are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.*

*(IV) For the avoidance of doubt, the first CAT Fee may commence at the beginning of the year or during the year. If it were to commence during the year, the first CAT Fee would be calculated as described in paragraph (II) of this Section.*

*(B) Executed Equivalent Shares. For purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows:*

*(I) each executed share for a transaction in NMS Stocks will be counted as one executed equivalent share;*

*(II) each executed contract for a transaction in Listed Options will be counted based on the multiplier applicable to the specific Listed Option (i.e., 100 executed equivalent shares or such other applicable multiplier); and*

*(III) each executed share for a transaction in OTC Equity Securities shall be counted as 0.01 executed equivalent share.*

*(C) Budgeted CAT Costs. The budgeted CAT costs for the year shall be comprised of all reasonable fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and operation of the CAT as set forth in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan, or as adjusted during the year by the Operating Committee.*

*(D) Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities. The Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each relevant period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.*

*(ii) Participant CAT Fees.*

*(A) CAT Fee Obligation. Each Participant that is a national securities exchange will be required to pay the CAT Fee for each transaction in Eligible Securities executed on the exchange in the prior month based on CAT Data. Each Participant that is a national securities association will be required to pay the CAT Fee for each transaction in Eligible Securities executed otherwise than on an exchange in the prior month based on CAT Data. The CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.*

*(B) Effectiveness. Each Participant will be required to pay the CAT Fee calculated using the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3 and approved by the Operating Committee only if such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.*

*(iii) Industry Member CAT Fees.*

*(A) CAT Fee Obligation. Each Industry Member that is the CAT Executing Broker for the buyer in a transaction in Eligible Securities ("CAT Executing Broker for the Buyer" or "CEBB") and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities ("CAT Executing Broker for the Seller" or "CEBS") will be required to pay a CAT Fee for each such transaction in Eligible Securities in the prior month based on CAT Data. The CEBB's CAT Fee or CEBS's CAT Fee (as applicable) for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.*

*(B) Content of Fee Filings. When the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the Fee Rate that the Operating Committee approved in accordance with paragraph (a) of this Section 11.3, such filings shall set forth (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget, and the reason for changes in each such line item from the prior CAT Fee filing; (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or remainder of the year, as applicable), and a description of the calculation of the projection. The information provided in this Section would be provided with sufficient detail to demonstrate that the budget for the upcoming year, or part of year, as applicable, is reasonable and appropriate.*

*(C) No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any CAT Fee related to Prospective CAT Costs until the Financial Accountability Milestone related to Period 4 described in Section 11.6 has been satisfied.*

*(iv) CAT Fee Details.*

*(A) Details regarding the calculation of a Participant or CAT Executing Brokers' CAT Fees will be provided upon request to such Participant or CAT Executing Broker. At a minimum, such details would include each Participant or CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

**A43**

USCA11 Case: 26-10936    Document: 62-1    Date Filed: 05/28/2026    Page: 50 of 208

*(B) For each CAT Fee, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

[(i) Each Execution Venue that: (A) executes transactions; or (B) in the case of a national securities association, has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange, in NMS Stocks or OTC Equity Securities will pay a fixed fee depending on the market share of that Execution Venue in NMS Stocks and OTC Equity Securities, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's NMS Stocks and OTC Equity Securities market share. For these purposes, market share for Execution Venues that execute transactions will be calculated by share volume, and market share for a national securities association that has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange in NMS Stocks or OTC Equity Securities will be calculated based on share volume of trades reported, provided, however, that the share volume reported to such national securities association by an Execution Venue shall not be included in the calculation of such national security association's market share.]

[(ii) Each Execution Venue that executes transactions in Listed Options will pay a fixed fee depending on the Listed Options market share of that Execution Venue, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's Listed Options market share. For these purposes, market share will be calculated by contract volume.]

(b) *Past CAT Costs.* The Operating Committee will establish [fixed] *one or more* fees *(each a "Historical CAT Assessment")* to be payable by Industry Members *with regard to CAT costs previously paid by the Participants ("Past CAT Costs") as follows:* [, based on the message traffic generated by such Industry Member, with the Operating Committee establishing at least five and no more than nine tiers of fixed fees, based on message traffic. For the avoidance of doubt, the fixed fees payable by Industry Members pursuant to this paragraph shall, in addition to any other applicable message traffic, include message traffic generated by: (i) an ATS that does not execute orders that is sponsored by such Industry Member; and (ii) routing orders to and from any ATS sponsored by such Industry Member.]

(i) *Calculation of Historical Fee Rates.*

*(A) General. The Operating Committee will calculate the Historical Fee Rate for each Historical CAT Assessment by dividing the Historical CAT Costs for each Historical CAT Assessment by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the*

*Historical Recovery Period for each Historical CAT Assessment. Once the Operating Committee has approved such Historical Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act such Historical CAT Assessment to be charged to Industry Members calculated using such Historical Fee Rate. Industry Members will be required to pay such Historical CAT Assessment calculated using such Historical Fee Rate once such Historical CAT Assessment is in effect in accordance with Section 19(b) of the Exchange Act.*

*(B) Executed Equivalent Shares. For purposes of calculating each Historical CAT Assessment, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted in the same manner as set forth in paragraph (a)(i)(B) of this Section 11.3.*

*(C) Historical CAT Costs. The Operating Committee will reasonably determine the Historical CAT Costs sought to be recovered by each Historical CAT Assessment, where the Historical CAT Costs will be Past CAT Costs minus Past CAT Costs reasonably excluded from Historical CAT Costs by the Operating Committee. Each Historical CAT Assessment will seek to recover from CAT Executing Brokers two-thirds of Historical CAT Costs incurred during the period covered by the Historical CAT Assessment.*

*(D) Historical Recovery Period.*

*(I) The length of the Historical Recovery Period used in calculating each Historical Fee Rate will be reasonably established by the Operating Committee based upon the amount of the Historical CAT Costs to be recovered by the Historical CAT Assessment; provided, however, no Historical Recovery Period used in calculating the Historical Fee Rate shall be less than 24 months or more than five years.*

*(II) Notwithstanding the length of the Historical Recovery Period used in calculating the Historical Fee Rate, each Historical CAT Assessment calculated using the Historical Fee Rate will remain in effect until all Historical CAT Costs for the Historical CAT Assessment are collected.*

*(E) Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities for Historical Recovery Period. The Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each Historical Recovery Period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.*

*(ii) Past CAT Costs and Participants. Because Participants previously have paid Past CAT Costs via loans to the Company, Participants would not be required to pay any Historical CAT Assessment. In lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans. Historical CAT Assessments are designed to recover two-thirds of the Historical CAT Costs.*

*(iii) Historical CAT Assessment for Industry Members.*

*(A) Each month in which a Historical CAT Assessment is in effect, each CEBB and each CEBS shall pay a fee for each transaction in Eligible Securities executed by the CEBB or CEBS from the prior month as set forth in CAT Data, where the Historical CAT Assessment for each transaction will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Historical Fee Rate reasonably determined pursuant to paragraph (b)(i) of this Section 11.3.*

*(B) Historical CAT Assessment Fee Filings.*

*(I) Participants will be required to file with the SEC pursuant to Section 19(b) of the Exchange Act a filing for each Historical CAT Assessment.*

*(II) When the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act a Historical CAT Assessment calculated using the Historical Fee Rate that the Operating Committee approved in accordance with paragraph (b) of this Section 11.3, such filing shall set forth (A) the Historical Fee Rate; (B) a brief description of the amount and type of the Historical CAT Costs, including (1) the technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees, and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration and (6) public relations costs; (C) the Historical Recovery Period and the reasons for its length; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period, and a description of the calculation of the projection. The information provided in this Section would be provided with sufficient detail to demonstrate that the Historical CAT Costs are reasonable and appropriate.*

*(III) No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any Historical CAT Assessment until any applicable Financial Accountability Milestone described in Section 11.6 has been satisfied.*

*(iv) Historical CAT Assessment Details.*

*(A) Details regarding the calculation of a CAT Executing Broker's Historical CAT Assessment will be provided upon request to such CAT Executing Broker. At a minimum, such details would include each CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

*(B) For each Historical CAT Assessment, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.*

(c) The Operating Committee may establish any other fees ancillary to the operation of

the CAT that it reasonably determines appropriate, including fees: (i) for the late or inaccurate reporting of information to the CAT; (ii) for correcting submitted information; and (iii) based on access and use of the CAT for regulatory and oversight purposes (and not including any reporting obligations).

(d) The Company shall make publicly available a schedule of effective fees and charges adopted pursuant to this Agreement as in effect from time to time. The Operating Committee shall review such fee schedule on at least an annual basis and shall make any changes to such fee schedule that it deems appropriate. The Operating Committee is authorized to review such fee schedule on a more regular basis, but shall not make any changes on more than a semiannual basis unless, pursuant to a Supermajority Vote, the Operating Committee concludes that such change is necessary for the adequate funding of the Company.

*(e) Participant Pass-Through Fees. Each Participant agrees not to file with the SEC a proposed rule change pursuant to Section* 19(b) and Rule 19b–4 thereunder that would *establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a).*

\*        \*        \*        \*        \*

### Appendix B

### Fee Schedule

### Consolidated Audit Trail Funding Fees for Participants

*(a) CAT Fee. Each Participant shall pay the CAT Fee set forth in Section 11.3(a) of the CAT NMS Plan to Consolidated Audit Trail, LLC in the manner prescribed by Consolidated Audit Trail, LLC on a monthly basis based on the Participant's transactions in Eligible Securities in the prior month.*

\*        \*        \*        \*        \*

### Exhibit B

### Proposed Revisions to CAT NMS Plan as Approved by the Commission in 2023

Additions *italic*; deletions [bracketed]

\*        \*        \*        \*        \*

### Section 11.3. Recovery

(a) No change.
(b) No change.
(c) No change.
(d) No change.
*(e) Participant Pass-Through Fees. Each Participant agrees not to file with the SEC a proposed rule change pursuant to Section 19(b) and Rule 19b–4 thereunder that would establish a new fee for assessing on its members the CAT fee charged to such Participant in accordance with Section 11.3(a).*

\*        \*        \*        \*        \*

[FR Doc. 2025–17929 Filed 9–16–25; 8:45 am]

**BILLING CODE 8011–01–P**

# TAB C

Letter from Gentry Collins, CEO, The American Free Enterprise Chamber of Commerce, (Oct. 17, 2025)



October 17, 2025

Ms. Vanessa A. Countryman
Secretary, Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

Re:    2025 CAT Funding Proposal (File No. 4-698)

The American Free Enterprise Chamber of Commerce ("AmFree") appreciates the opportunity to comment on the latest Funding Proposal for the consolidated audit trial ("CAT"). AmFree also appreciates the call by Chairman Atkins for the Securities and Exchange Commission ("Commission" or "SEC") to perform a "comprehensive review" of the CAT that examines not only the system's staggering costs, but also its overbroad scope and onerous requirements.[1] For the reasons that follow, AmFree urges the Commission to reject the latest Funding Proposal as both contrary to law and inconsistent with the Commission's ongoing comprehensive review.

The Funding Proposal is unlawful, first and foremost, because the CAT it purports to bankroll itself exceeds the Commission's statutory authority. As American Securities Association, Citadel Securities, and others argued before the Eleventh Circuit last year, no federal statute authorizes the creation of this unprecedented, multibillion-dollar surveillance apparatus that captures all orders across all U.S. securities markets.[2] Indeed, the Commission has conceded that Congress has never provided "express authorization for CAT."[3] That concession is dispositive here, as agencies require "clear congressional authorization" before making "major policy decisions" on matters of vast public significance such as the ones here.[4] The CAT cannot rest on any of the narrow statutory provisions that the Commission invoked before the Eleventh Circuit, including one provision that simply shields self-regulatory organizations ("SROs") from liability under the antitrust laws[5] or others that simply recount the Exchange Act's policy goals.[6]

---

[1] https://www.sec.gov/newsroom/speeches-statements/atkins-prepared-remarks-sec-speaks-051925.

[2] *See, e.g.*, Opening Brief of Petitioners at 13-31, *Am. Sec. Ass'n v. SEC*, No. 23-13396 (Feb. 8, 2024); *see also* Amicus Brief of AmFree at 4-17, *Am. Sec. Ass'n v. SEC*, No. 23-13396 (Feb. 15, 2024) (explaining that the CAT is an unprecedented expansion of the Commission' surveillance system that invites abuse).

[3] 88 Fed. Reg. 62628, 62673 (2023).

[4] *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)

[5] *See* 15 U.S.C. §78k-1(a)(3)(B); *see also* SEC Br. at 5, *Nasdaq Stock Market LLC v. SEC*, No. 21-1167 (D.C. Cir.) (conceding that § 78k-1(a)(3) "simply enables joint action that might otherwise raise antitrust concerns").

[6] *See* 15 U.S.C. §78k-1(a)(1).

1

These flaws in the CAT doom the latest Funding Proposal. Because the Commission lacks the statutory authority to create the CAT, it necessarily lacks the authority to compel broker-dealers to fund that program. Moreover, it would be arbitrary and capricious to adopt the Funding Proposal without examining its "key assumptions," including those that concern the "statutory authority" for funding the program in the first place.[7] For those reasons alone, the Commission should reject the Funding Proposal pending its ongoing reconsideration of the CAT's proper and lawful scope.

The remainder of this comment identifies a separate and equally fundamental defect with the CAT. The basic problem is that both the CAT and its accompanying Funding Proposal depend on the Financial Industry Regulatory Authority ("FINRA"). Without FINRA, Consolidated Audit Trail, LLC ("CAT LLC") would be unable to collect the transaction-level data that it needs to function, let alone compute the fees that are set forth in the latest Funding Proposal. But as AmFree previously explained to the D.C. Circuit, FINRA's exercise of regulatory authority over broker-dealers is unconstitutional.[8] And those constitutional problems cannot be excised from either the CAT itself or the latest proposal to fund it. In short, the Commission should not compel broker-dealers to pay billions of dollars to support a program that is administered in significant part by an unconstitutional entity—and one that will unravel if just one of the many constitutional challenges to FINRA pending throughout the country proves successful.

## I.    FINRA's Unilateral Regulatory Authority Over Broker-Dealers Is Unconstitutional.

FINRA is plagued by a constitutional dilemma. Whether it is characterized as a private actor or a government entity, FINRA's regulatory authority over broker-dealers defies the Constitution.

***Private Entity***: If FINRA is a private entity, then its unilateral authority over broker-dealers violates the private non-delegation doctrine. As a general matter, that doctrine prevents the federal government from delegating regulatory authority to private entities, unless those entities "function subordinately to" a governmental body.[9] This principle plays an essential role in our constitutional structure: "If the vast powers of the federal government could be exercised outside the constitutional system, the government would be 'able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form.'"[10]

The Commission, however, cannot adequately supervise the substantial authority that FINRA wields pursuant to the Exchange Act. For that straightforward reason, FINRA's authority over broker-dealers runs afoul of the private non-delegation doctrine. Specifically, as the Commission knows, FINRA may take a wide array of regulatory actions without prior SEC oversight. These include (i) opening an investigation; (ii) demanding to inspect books and records; (iii) compelling the submission of trading data; (iv) authorizing complaints against broker-dealers; (v) holding adjudicatory proceedings before an in-house tribunal; (vi) issuing large fines; (vii) negotiating

---

[7] *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014).

[8] *See* Amicus Brief of AmFree, No. 23-5129 (D.C. Cir. Sept. 5, 2023).

[9] *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940).

[10] *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1343 (D.C. Cir. 2024) (Walker, J., concurring in part and dissenting in part) (quoting *Lebron v. National Railroad Passenger Corp.,* 513 U.S. 374, 397 (1995)).

2

settlements; and (viii) expelling broker-dealers from the entire securities market based on purported violations of the federal securities laws, federal regulations, or its own rules.[11] By virtue of these authorities, FINRA is the "principal decisionmaker in the use of federal power" for "brokers required (by statute) to join a securities association."[12] And while the Commission may eventually reverse sanctions that FINRA imposes, that relief "does not negate the vast array of powers that FINRA exercises before the matter even reaches the SEC."[13]

Indeed, the D.C. Circuit has already held that the extent of FINRA's unilateral authority poses a serious constitutional problem. Last year, that court—in an opinion authored by Judge Millett and joined by Chief Judge Srinivasan and (in relevant part) Judge Walker—granted a preliminary injunction that prevents FINRA from "unilaterally" expelling one of its members, on the ground that the expulsion would likely violate the private non-delegation doctrine.[14] In doing so, the court acknowledged that the Commission could reverse FINRA's decisions concerning expulsion.[15] But it explained that federal law prevents the Commission from reviewing FINRA's decisions until they are final, and that "delayed SEC review of expulsion orders will almost always be too little too late."[16] Accordingly, the Commission's authority to (sometimes) review (certain) FINRA decisions does not satisfy the Constitution's (categorical) requirement that federal authority remain in the control of government entities.

Looking ahead, both the Third Circuit and the Sixth Circuit are currently considering similar non-delegation challenges to FINRA's significant regulatory reach.[17] Litigation is also ongoing in the D.C. Circuit, where a federal district court will soon issue a merits decision concerning the same non-delegation claim described above.[18] And if one or more of those decisions reaches the Supreme Court, FINRA will face an uphill battle. The Court—along with the President and the Solicitor General—has made clear that the President must control *all* the executive power, including the quintessentially executive power to decide "whether to take enforcement actions against violators of federal law."[19] That principle is incompatible with leaving substantial executive power—here, power that is expressly conferred by the Exchange Act[20]—in the hands of

---

[11] *Id.* at 1343-44 (collecting authorities).

[12] *Id*. at 1344.

[13] *Id.* at 1355.

[14] *Id.* at 1324-26

[15] *Id.* at 1326.

[16] *Id.* (citing 15 U.S.C. § 78s(d)(1)–(2)).

[17] *See Smith v. SEC* (No. 24-3907) (6th Cir.); *Blankenship v. FINRA* (No. 24-2860) (3d Cir.).

[18] *See* Minute Order, *Alpine Sec. v. FINRA*, No. 1:23-cv-01506 (D.D.C. July 1, 2025) (ordering that the parties complete briefing on a motion to dismiss on or before November 17, 2025).

[19] *United States v. Texas*, 599 U.S. 670, 684 (2023); *see, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 219 (2020) (similar); *Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (similar); Exec. Order 14215, § 1 (Feb. 18, 2025) ("For the Federal Government to be truly accountable to the American people, officials who wield vast executive power must be supervised and controlled by the people's elected President."); U.S. Br. at 4, *Trump v. Slaughter*, No. 25-332 (U.S. Oct. 10, 2025) ("By vesting the President with all 'executive Power,' Article II authorizes him to oversee those who execute federal law").

[20] *See, e.g.*, 15 U.S.C. § 78o-3(b)(2) (charging FINRA with "enforc[ing] compliance" with the federal securities laws).

3

an SRO inadequately supervised by the Commission. As such, if FINRA is a private entity, the extent of its unilateral regulatory authority violates the private non-delegation doctrine.

*Government Entity*: By contrast, if FINRA is a government entity, then its structure would still violate the Constitution—this time, the Appointments Clause.[21] As a general matter, the Appointments Clause provides that all "Officers of the United States" must be appointed by the President and confirmed by the Senate, except to the extent that Congress has vested the appointment of "inferior officers" in the President himself, a court, or certain department heads directly accountable to the President.[22] For this purpose, an Officer of the United States is someone who exercises "significant authority pursuant to the laws of the United States" in a "continuing" position.[23] And to the extent that FINRA qualifies as a government entity, that description captures FINRA's CEO, its board members, and every one of its hearing officers.[24]

The problem for FINRA is that none of its employees are appointed in the manner that the Appointments Clause prescribes.[25] So if its employees are in fact Officers of the United States, they are exercising significant authority in contravention of that Clause—a conclusion that would render their authority *ultra vires*.[26]

*    *    *

FINRA therefore faces an insuperable constitutional dilemma. If FINRA is a private entity, its unilateral regulatory authority violates the private non-delegation doctrine. And if FINRA is a government entity, its substantial executive authority violates the Appointments Clause. Either way, FINRA's current role in regulating the financial industry is unconstitutional.

## II. The Commission Should Not Ground The CAT And Funding Proposal On The Authority And Involvement Of An Unconstitutional Agency.

The constitutional problems with FINRA require rejecting the latest Funding Proposal for the CAT for at least six related reasons.

*First*, the Funding Proposal is unlawful because it depends on the authority and involvement of an unconstitutional actor. As the Commission is aware, FINRA is the largest SRO involved in operating the CAT.[27] In addition, the CAT relies on transaction data that is reported by broker-

---

[21] *See Alpine Sec.*, 121 F. 4th at 1346-47 (Walker, J., concurring in part and dissenting in part).

[22] U.S. Const. Art. II, § 2, cl. 2.

[23] *Lucia v. SEC*, 585 U.S. 237, 245 (2018).

[24] *See supra* at 2-3 (describing FINRA's substantial regulatory authority).

[25] *See Alpine Sec.*, 121 F. 4th at 1347 (Walker, J., concurring in part and dissenting in part).

[26] *See Collins v. Yellen*, 594 U.S. 220, 258 (2021) (noting the usual rule that a "a Government actor's exercise of power that the actor did not lawfully possess" is "void").

[27] *See* 88 Fed. Reg. 62628, 62643 (Sept. 12, 2023).

4

**A49**

dealers at FINRA's direction.[28] And FINRA, in turn, compels the reporting of that data by virtue of its substantial regulatory authority over broker-dealers, including its ability to take enforcement actions, impose significant fines, and expel broker-dealers from the securities industry.[29] In those respects, and many others, FINRA plays an essential and inseverable role in operating the CAT. So because FINRA is unlawful under the Constitution, the CAT—and its latest Funding Proposal— must be unlawful as well.

*Second*, the Funding Proposal does not justify FINRA's role in operating the CAT. As discussed, the CAT depends heavily on transaction-level data that is ultimately supplied by FINRA. If a court enjoins FINRA from compelling the provision of that data, or otherwise prevents FINRA from using its familiar coercive tools, the CAT will be unable to function. For those reasons, the constitutionality of FINRA—a live question in several federal courts—is a "key assumption" that the Funding Proposal must adequately address.[30] At minimum, the Funding Proposal may not compel broker-dealers to pay billions of dollars in CAT fees without explaining why the funded program is consistent with the Constitution.

*Third*, the Funding Proposal does not justify FINRA's role in calculating its proposed fees. As relevant here, the Proposal provides that "CAT fees will be charged with regard to trades reported to CAT by FINRA via the ADR/ORF/TRF and by the exchanges."[31] The Proposal also relies on "CAT Data," supplied principally by FINRA, to determine the overall "Fee Rate."[32] The upshot is that the Proposal's fee methodology cannot operate without FINRA's provision of transaction-level data. But the Proposal does not evaluate the possibility that FINRA will become unable to provide that data. Nor does it consider "alternative" methods for calculating CAT Fees that could operate independently of FINRA.[33] Those omissions render the Funding Proposal arbitrary and capricious.

*Fourth*, the Funding Proposal does not justify allowing FINRA to pass on substantial fees to broker-dealers, with the threat that nonpayment will lead to expulsion from the securities industry. Under the latest Funding Proposal, FINRA is responsible for roughly 10% of the entire CAT budget. In addition, nothing in the Funding Proposal stops FINRA from passing on 100% of those costs to its members by increasing its existing membership fees.[34] And the Commission has previously stated that "non-profit national securities associations like FINRA" are "likely" to fund their CAT costs through increased fees.[35] There is thus every indication that FINRA will pass along its share of the CAT budget to its members, just as it did under the prior, unlawful funding order from 2023.

---

[28] *See* 77 Fed. Reg. 45722, 44723, 44810 (Aug. 1. 2012).

[29] *See supra* at 2-3 (describing FINRA's substantial regulatory authority).

[30] *Nat. Res. Def. Council*, 755 F.3d at 1023.

[31] 90 Fed. Reg. 44910, 44939 (Sept. 17, 2025).

[32] *Id.*

[33] *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34 (1983)

[34] *See* 90 Fed. Reg. at 44932 (noting that "[a]ny review of how [FINRA] obtain[s] the[] funds to pay CAT fees is beyond the scope of the CAT fee filing").

[35] *See* 88 Fed. Reg. at 62665 n.807.

5

But the Funding Proposal neither acknowledges that probability nor justifies inviting FINRA to collect fees pursuant to its unconstitutional authority. The Funding Proposal must therefore prohibit FINRA from increasing its existing membership fees to account for CAT costs. At a minimum, the Funding Proposal may not permit FINRA to increase its existing membership fees without evaluating potential methods for ensuring that those fees are lawfully collected—namely, that they are collected without threats of unlawful, unilateral expulsion from the securities industry.

*Fifth*, the Funding Proposal does not address how FINRA's collection and payment of CAT fees will affect "efficiency, competition, and capital formation."[36] To evaluate those consequences, the Commission should begin by estimating the amount of CAT fees that it expects FINRA to collect on an annual basis. The Commission could reach that estimate by multiplying FINRA's approximate share of the CAT budget (10%)[37] by the total amount of CAT Fees that it expects will be collected each year. From there, the Commission should evaluate the economic effects of raising FINRA's portion of the CAT budget through increased fees on broker-dealers, as well as account for the possibility that FINRA is unable to collect those fees in light of its constitutional problems. In particular, the Commission should evaluate how an adverse decision on one or more of the above constitutional defects in the various pending challenges discussed would affect the CAT's budget, the fees imposed on broker-dealers, and the economic considerations set forth in the Exchange Act—*i.e.*, "efficiency, competition, and capital formation."[38] Absent such analysis, the Funding Proposal's economic analysis is woefully incomplete.

*Finally*, the Funding Proposal does not account for the probability that at least one court will hold FINRA to be unlawful. The Commission must consider how adverse judicial rulings will impact its orders.[39] As explained above, neither the CAT nor its Funding Proposal can operate without continuing support from FINRA. Indeed, even a temporary pause in FINRA's ability to supply transactional data would prevent CAT LLC from both (i) collecting the data necessary to surveil the complete equities and future markets and (ii) calculating the proposed CAT fees. The same is true for any injunction against FINRA that is limited by the relevant court's jurisdiction. If FINRA loses its authority to compel the production of transaction-level data within the Sixth Circuit, for example, both the calculation of CAT fees and the CAT itself would break down. But despite the high probability that at least one court holds FINRA to be unlawful, the Funding Proposal does not evaluate alternative methods for either operating or funding the CAT in the absence of FINRA's participation. Nor does it address the probability that the Funding Proposal may compel broker-dealers to pay exorbitant fees in support of a CAT that will eventually be either held unlawful or rendered ineffective. Put differently, the Funding Proposal comes nowhere close to justifying the collection of substantial fees for a surveillance system that the federal courts are likely to hold unconstitutional.

---

[36] 15 U.S.C. § 77b(b).

[37] *See* 90 Fed. Reg. at 44928, 44931-32.

[38] 15 U.S.C. § 77b(b).

[39] *See Ohio v. EPA*, 603 U.S. 279, 293 (2024) (holding that a challenge to an EPA rule was likely to succeed where the rule "rested on an assumption that [] 23 upwind States would adopt emissions-reduction tools up to a 'uniform' level of 'costs' to the point of diminishing return," and where 12 of those States in fact obtained stays that allowed them to avoid that mandate, thereby upending the rule's calculation of the appropriate emissions targets).

Each of those defects requires rejecting the Funding Proposal and tabling all future proposals pending the Commission's ongoing reconsideration of the entire CAT. In short, because FINRA's role in regulating broker-dealers creates an insuperable constitutional dilemma, and because both the CAT and the Funding Proposal depend on FINRA's continuing participation, the Funding Proposal is contrary to law and should not be approved.

*      *      *

Please feel free to call the undersigned with any questions regarding these comments.

Respectfully,

Gentry Collins
CEO, AmFree Chamber

7

**A52**

# TAB D

Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati Professional Corporation on behalf of the Financial Industry Regulatory Authority, Inc. (FINRA), (Oct. 17, 2025)

# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

1700 K Street NW
Fifth Floor
Washington, D.C. 20006-3817

O: 202.973.8800
F: 866.974.7329

STEFFEN N. JOHNSON
sjohnson@wsgr.com

October 17, 2025

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090
Via Email to rule-comments@sec.gov

**Re:   Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail (File No. 4-698)**

Dear Ms. Countryman:

We write on behalf of the Financial Industry Regulatory Authority, Inc. ("FINRA")[1] in connection with the above-captioned proposed amendments to the National Market System Plan Governing the Consolidated Audit Trail ("Plan" or "CAT NMS Plan").

In early September, over FINRA's objections, CAT LLC filed a Plan amendment to re-propose the executed share funding model.[2] The only substantive difference between the re-proposed version of the funding model and the earlier version is the addition of a new provision stating that each self-regulatory organization ("SRO") that is a participant in the Plan ("Participant") "agrees not to … establish a new fee for assessing on its members [its SRO CAT fees]."[3]

The Funding Proposal fails to address fundamental issues identified by the Eleventh Circuit when it vacated the previous funding model. FINRA's concerns center on four principal points.

---

[1]   This letter does not reflect or represent the views of FINRA CAT, LLC ("FCAT"), a distinct corporate subsidiary of FINRA that acts as the CAT Plan Processor pursuant to an agreement with Consolidated Audit Trail, LLC.

[2]   *See* Securities Exchange Act Release No. 103960 (Sept. 12, 2025), 90 Fed. Reg. 44910 (Sept. 17, 2025) (the "Funding Proposal").

[3]   *See* Funding Proposal, Proposed Section 11.3(e).

**WILSON SONSINI**

Ms. Vanessa Countryman
October 17, 2025
Page 2

First, the pass-through prohibition is unlawful.  Nothing in the Exchange Act or Rule 608 of Regulation NMS authorizes SROs to control how other SROs choose to internally fund their costs.

Second, the Funding Proposal's pass-through provision rests on a false premise and would be ineffective.  It is not true that "[e]ach Participant agree[d] not to file with the SEC a proposed rule change … that would establish a new [pass-through] fee."  FINRA objected to the proposal and did not agree.  In all events, the pass-through provision would likely be ineffective in addressing the Eleventh Circuit's concern about 100% pass-through of CAT costs, as it prohibits only "new fees" and does nothing to limit Participants from increasing *existing* fees and assessments.

Third, in proposing a permanent funding model, the Funding Proposal is premature.  Instead, these issues should be integrated with Chairman Atkins' comprehensive CAT review.  FINRA supports recent cost-saving measures, but believes rushing to permanently adopt the same Executed Share Model that was vacated, without understanding the full implications of the potentially significant changes to CAT now underway, would be counterproductive.

As discussed in this letter, FINRA believes there is a path forward to achieve a sensible CAT system that fulfills its purpose while distributing costs fairly.  We recommend that the Commission consider a time-limited interim funding solution while the comprehensive review progresses, allowing for a more equitable, sustainable, and transparent permanent funding mechanism to emerge from a thorough assessment of CAT.  Specifically, while the comprehensive CAT review remains underway, the Commission could exercise its authority under Rule 608(b)(2) of Regulation NMS[4] to modify the Funding Proposal so that, by its terms, it would expire after a specified period (*e.g.*, one year) to allow for progress on the CAT cost savings efforts and the comprehensive review, which may provide for a funding bridge in addition to CAT LLC's reserve levels.

The Commission could also use its authority under Rule 608(b)(2) of Regulation NMS to remove the pass-through prohibition unlawfully proposed by CAT LLC. To support the interim approach, FINRA would consider filing a proposed rule change stipulating that it will not file a new recovery fee for a specific finite period (*e.g.*, one year, which would coincide with the one-year sunset provision for the temporary funding model).  The Commission could explore whether other Participants are willing to

---

[4]    17 C.F.R. § 242.608(b)(2).

**WILSON
SONSINI**

Ms. Vanessa Countryman
October 17, 2025
Page 3

file similar proposed rule changes to support the interim approach.  These individual Participant rule changes, filed pursuant to Section 19(b) of the Exchange Act and Rule 19b-4 thereunder, committing to not establish CAT recovery fees for the specified period could be adopted before Commission action on any interim funding model. This would provide certainty that separate fees would not be sought by the Participants in connection with recovering the costs of prospective fees allocated to the SROs during the interim period.

## BACKGROUND

### A.    The Consolidated Audit Trail And CAT LLC

Responding in part to the Flash Crash of 2010, the Commission proposed a new rule that would require SROs to establish a consolidated audit trail system that would enable regulators to track information related to orders received, routed and executed across the securities markets.  The proposed Consolidated Audit Trail "would require [SROs] to act jointly in developing a national market system ... plan to develop, implement, and maintain a consolidated order tracking system, or consolidated audit trail, with respect to the trading of NMS securities."[5]  The Commission adopted the CAT in 2012, issuing a rule that required the self-regulatory organizations "to submit a national market system ... plan to create, implement, and maintain a consolidated order tracking system, or consolidated audit trail."[6]

In 2015, the SROs "filed with the [Commission] ... a National Market System Plan Governing the Consolidated Audit Trail."[7]  Under the CAT NMS Plan, the SROs operate "the CAT through CAT NMS, LLC."[8]  Each individual SRO—or, for purposes of CAT NMS, LLC, each "Participant"—has a single vote on its Operating Committee.[9]

---

[5]    Consolidated Audit Trail, 75 Fed. Reg. 32556, 32556 (June 8, 2010).

[6]    Consolidated Audit Trail, 77 Fed. Reg. 45722, 45722 (Aug. 1, 2012).

[7]    Joint Industry Plan; Notice of Filing of the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 30614, 30614 (May 17, 2016).

[8]    *Id*. at 30616.

[9]    *Id.*

**A55**

**WILSON SONSINI**

Ms. Vanessa Countryman
October 17, 2025
Page 4

### B.    The 2023 Funding Order

One of the central challenges of building and operating the Consolidated Audit Trail has been funding it.  In 2023, seeking to move to a permanent funding model, CAT LLC filed with the Commission a proposed amendment to the CAT Plan to establish a funding model that charges fees based on the executed equivalent share volume of transactions in Eligible Securities (the "Executed Share Model").[10]

FINRA objected to that proposal because, among other things, it forced FINRA (and thus its members) to bear a disproportionate share of the total CAT costs.[11]  For example, under the Executed Share Model, for each reportable transaction executed otherwise than on an exchange, a fee would be assessed on the Industry Member that is identified as the executing broker, the Industry Member identified as the contra-side executing broker, and FINRA—each would pay a fee calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate.[12]  Specifically, under the Executed Share Model, FINRA would be responsible for paying fees for the entire over-the-counter market.  As FINRA then explained, it "would be assessed an estimated 34% of the total CAT costs to be borne amongst the 25 SRO Plan Participants, (based on 2021 data), even though FINRA is the only Participant that does not operate a market" and is "a not-for-profit."[13]

In September 2023, the SEC issued an order approving the Executed Share Model ("2023 Funding Order").[14]

---

[10]    *See* Securities Exchange Act Release No. 34–97151 (March 13, 2023), 88 Fed. Reg. 17086 (March 21, 2023) (Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail).

[11]    FINRA incorporates by reference its prior comment letters concerning the Executed Share Model.  *See* Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated April 11, 2023 at 2.  *See also* Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated May 12, 2021; Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated June 22, 2022 ("June 2022 Comment Letter"); Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated May 25, 2023.  (Collectively "FINRA Comment Letters").

[12]    88 Fed. Reg. 17086.

[13]    *See* Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated April 11, 2023, at 3.

[14]    *See* Securities Exchange Act Release No. 98290 (Sept. 6, 2023), 88 Fed. Reg. 62628 (Sept.

**A56**

**WILSON
SONSINI**

Ms. Vanessa Countryman
October 17, 2025
Page 5

### C.    The Eleventh Circuit Vacates The 2023 Funding Order

In October 2023, the American Securities Association and Citadel Securities LLC petitioned for review of the 2023 Funding Order in the U.S. Court of Appeals for the Eleventh Circuit.[15]  Among other things, the petitioners challenged the 2023 Funding Order as arbitrary and capricious.  In late July 2025, the Court vacated the 2023 Funding Order, finding that it violated the Administrative Procedure Act.[16]

First, the Court found that the 2023 Funding Order failed to consider the effects of SROs other than FINRA potentially passing through 100% of their fees to broker-dealers.[17]  The Court concluded that the 2023 Funding Order was internally inconsistent because, although it "states that the 2015 Plan 'requires both [SROs] … and Industry Members … to fund the CAT,'" it also "permits the [SROs] to pass through all of their CAT costs onto the broker-dealers."[18]  The Court acknowledged that "no [SRO] other than FINRA has asked for 100% pass-through approval so far," and that "FINRA may be unique because … it is the only nonprofit exchange of the twenty-four currently-registered exchanges," but "the 2023 Funding Order does not limit the potential for 100% pass-through costs to FINRA."[19]  The Court found that the 2023 Funding Order was unreasonable and violated the Administrative Procedure Act because it allowed for "[SROs] to pass through 100% of their fees to broker-dealers—without considering the effects of that choice."[20]

Second, the Court found that the Commission acted unreasonably in declining to "conduct a new economic analysis or revise its previous economic analysis"[21] even though the cost of building the CAT "exceeded the Commission's 2016 estimate by

12, 2023) (the "2023 Funding Order").

[15]    *See Am. Sec. Ass'n v. U.S. SEC*, No. 23-13396 (11th Cir. filed Oct. 17, 2023).

[16]    *See Am. Sec. Ass'n v. U.S. SEC*, 147 F.4th 1264 (11th Cir. 2025) ("ASA Citadel Decision").

[17]    *See Am. Sec. Ass'n*, 147 F.4th at 1275.

[18]    *See Am. Sec. Ass'n*, 147 F.4th at 1274.

[19]    *See Am. Sec. Ass'n*, 147 F.4th at 1279.  FINRA is registered as a national securities association pursuant to Section 15A of the Securities Exchange Act of 1934.  FINRA is a not-for-profit association whose members are registered broker-dealers.  FINRA is not a national securities exchange and does not operate a securities market.

[20]    *See Am. Sec. Ass'n*, 147 F.4th at 1277.

[21]    *See Am. Sec. Ass'n*, 147 F.4th at 1278.

**A57**

**WILSON
SONSINI**

eight times" and "the annual cost of operating the system going forward appears likely to exceed the Commission's 2016 estimate by nearly four times."[22]

Based on these conclusions, the Court vacated the 2023 Funding Order, while staying its decision for 60 days after issuance of the mandate, and remanded the matter to the Commission for further proceedings.[23]  The Court provided its short stay to "afford the Commission an opportunity to conduct the appropriate economic analysis that was lacking in the 2023 Funding Order and reconsider the allocation of historical and prospective CAT costs in accordance with this opinion."[24]

### D.    CAT LLC's Funding Proposal

On September 12, 2025, over FINRA's objections, CAT LLC filed the Funding Proposal with the Commission.[25]  The substantive difference between the re-proposed version of the funding model and the model approved by the 2023 Funding Order is the addition of a new provision stating that "[e]ach Participant agrees not to file with the SEC a proposed rule change … that would establish a new fee for passing through to its members the CAT fee charged to each Participant."  CAT LLC's proposal states that this pass-through provision is intended to "address the Eleventh Circuit's opinion regarding the potential for Participants to pass-through 100% of their CAT fees to Industry Members."[26]

The Funding Proposal acknowledges that Executed Share Model would force FINRA to bear a disproportionate share of CAT costs:  "the size of FINRA's fee is calculated based on the activity in the over-the-counter market, which is substantial" because recent data show that "approximately 40% of the executed equivalent share volume in Eligible Securities took place in the over-the-counter market."[27]  But the

---

[22]    *See Am. Sec. Ass'n*, 147 F.4th at 1269.

[23]    *See Am. Sec. Ass'n*, 147 F.4th at 1280.  The Court issued its mandate on September 30, 2025, and the stay of the Court's judgment will end 60 days from the mandate date.  *See also* Mandate to Petitioners, *Am. Sec. Ass'n v. U.S. SEC*, No. 23-13396 (11th Cir. Sept. 30, 2025).

[24]    *See Am. Sec. Ass'n*, 147 F.4th at 1280.

[25]    *See* Funding Proposal *supra* note 3.

[26]    *See* Funding Proposal, *supra* note 3, 90 Fed. Reg. 44910, 44930.

[27]    *See* Funding Proposal, *supra* note 3, 90 Fed. Reg. 44932.

**WILSON
SONSINI**

Ms. Vanessa Countryman
October 17, 2025
Page 7

proposal does not grapple with these implications, particularly given FINRA's status as a non-profit, member-funded national securities association.

## ANALYSIS

### I.    CAT LLC's Proposed Pass-Through Prohibition Is Unlawful.

CAT LLC proposed a pass-through prohibition seeking to dictate how an individual SRO could—or could not—choose to fund its costs to comply with their individual operational, legal, and other requirements.  However, even acting under the guise of the Plan, SROs are not legally authorized to control, in any manner, the fees charged by other SROs.  Most particularly, SROs may not use the mechanism of a national market system plan to control the fees of other SROs that are participants in the plan.  That proposition is clear from the Exchange Act, from Rule 608, and from the history of national market system plan structure.

Congress adopted Section 11A of the Securities Exchange Act to establish a framework for a national market system.  Among other things, the statute empowers the Commission to "… authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under this title in planning, developing, operating, or regulating a national market system (or a subsystem thereof) or one or more facilities thereof."[28]  Given the legal and market structure concerns that drove the passage of Section 11A, the statute sought to strike a balance between strengthening the U.S. markets by facilitating a national market system and permitting joint coordination and action for tightly circumscribed purposes—activities that otherwise could run afoul of antitrust laws.  Congress permitted a narrow scope of joint action subject to oversight and regulation by the Commission.[29]

Nothing in Section 11A authorizes SROs to dictate what rules other SROs propose or how other SROs fund their operations.  On the contrary, Section 11A concerns only matters over which SROs "act jointly" and "share authority" with respect to national market system plans.  Separately, Section 19(b) grants "each self-regulatory organization" the right to propose rule changes.[30]  And it recognizes that each SRO

---

[28]    Section 11A(a)(3)(B) of the Securities Exchange Act.

[29]    *See* H.R. Report No. 94-123 (1975) (adopting former Section 20A(a)(6) of the Exchange Act).

[30]    15 U.S.C. § 78s(b)(1).

**A59**

WILSON
SONSINI

Ms. Vanessa Countryman
October 17, 2025
Page 8

needs the flexibility to propose rule changes appropriate to its individual circumstances.

The Commission preserved this careful balance when, in 1981, it adopted SEA Rule 11Aa3-2.[31] That rule established procedures related to the filing of joint industry plans by SROs for the planning, developing, operating, or regulating of a national market system or one or more facilities thereof.[32] Many of these procedures ultimately became a part of today's Rule 608 of Regulation NMS.[33] Regulation NMS provides that every national market system plan or plan amendment filed by SROs include a description of the manner in which any facility contemplated by the plan or plan amendment will be operated, including to the extent applicable: "[t]he method by which any fees or charges collected **on behalf of all of the sponsors and/or participants** in connection with **access to, or use of, any facility contemplated by the plan** *or amendment will be determined and imposed* (including any provision for distribution of any net proceeds from such fees or charges to the sponsors and/or participants) and the amount of such fees or charges."[34]

Critically, the above language focuses narrowly on fees and charges collected on behalf of *all plan participants* in connection with *access to or use of an NMS plan facility,* and *not* on fees charged individually by plan participants—a line that the Commission deliberately drew in adopting this provision. The fact that Rule 608's scope of fee authority is limited to *joint* fees for NMS plans is not only abundantly clear from the face of the *text,* but even clearer in light of the *history* of Rule 608's predecessor.

When the Commission first proposed SEA Rule 11Aa3-2(b)(5)(ii) relating to joint SRO fees, it included similar, though less specific language, requiring that SROs submitting NMS plans and amendments thereto describe:

---

[31] *See* Securities Exchange Act Release No. 17580 (Feb. 26, 1981), 46 Fed. Reg. 15866 (March 10, 1981) ("Rule 11Aa3-2 Adopting Release").

[32] *Id*.

[33] SEA Rule 11Aa3-2 was redesignated as Rule 608 in 2005 when Regulation NMS was adopted.

[34] *See* 17 C.F.R. § 242.608(a)(5)(ii) (emphasis added); *see also* Securities Exchange Act Release No. 51808 (June 9, 2005), 70 Fed. Reg. 37496 (June 29, 2005).

**WILSON SONSINI**

"The method by which any fees or charges in connection with access to, or use of, any facility contemplated by the plan will be determined and imposed (including any provision for distribution of any net proceeds from such fees or charges to the sponsors and/or participants) and the amount of such fees or charges."[35]

However, exchange commenters voiced concern that the language "might be broad enough to require a description of the fees or charges collected on behalf of ***an individual SRO rather than all NMS Plan sponsors jointly***."[36] In response, the SEC modified the original proposal to by adding the emphasized language below:

"The method by which any fees or charges ***collected on behalf of all of the sponsors and/or participants*** in connection with access to, or use of, any facility contemplated by the plan or amendment will be determined and imposed (including any provision for distribution of any net proceeds from such fees or charges to the sponsors and/or participants) and the amount of such fees or charges."[37]

It is clear that the carefully calibrated Exchange Act framework does not authorize SROs to act jointly to impose restrictions on, or otherwise govern, individual SRO fees. But the proposed pass-through prohibition would do just that: It does not control CAT LLC fees; instead, it purports to control how a Participant SRO funds its own SRO costs through separate SRO fees. In the terms of Rule 608, the notional "pass-through" fees that CAT LLC seeks to address through an NMS Plan fail to relate not only to "access to, or use of, any facility contemplated by the plan or amendment," but also to fees "collected on behalf of all of the sponsors and/or participants." This unlawful action by CAT LLC could potentially establish a dangerous precedent and enable similar overreach in other NMS plans, including those governing securities information processing.

In addition, given that the Plan imposes substantial and disproportionate costs on FINRA, if the Funding Proposal were adopted—potentially forbidding FINRA

---

[35] S*ee* Securities Exchange Act Release No. 16410 (Dec. 7, 1979), 44 Fed. Reg. 72606 (Dec. 14, 1979).

[36] *See* Rule 11Aa3-2 Adopting Release, *supra* note 31, 46 Fed. Reg. 15866, 15870 (emphasis added).

[37] *See id.* at 15871 (emphasis added).

**WILSON SONSINI**

Ms. Vanessa Countryman
October 17, 2025
Page 10

from recouping those costs—the Plan may violate FINRA's due process rights and run afoul of the Takings Clause.[38]

## II. The Proposed Pass-through Prohibition Rests On A False Premise And, In All Events, Does Not Respond To The Court's Finding That The 2023 Funding Order Violates The APA.

CAT LLC's Funding Proposal purports to "address the Eleventh Circuit's opinion regarding the potential for Participants to pass-through 100% of their CAT fees to Industry Members" simply by adding a new provision stating that "[e]ach Participant agrees not to file with the SEC a proposed rule change … that would establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a)."[39] But that assertion is not true. FINRA is a "Participant," and it emphatically did *not* agree "not to file with the SEC … a new fee for assessing on its members [SRO CAT costs]." While, as noted, FINRA would contemplate agreeing not to file new fees for passing through SRO CAT costs *under certain conditions*, it has not yet done so and did not agree to do so under the terms of this amendment. CAT LLC's proposed remedy thus rests on a manifestly false premise.

In addition, the pass-through provision—*i.e.*, that the SROs agree not to file a proposed rule change "that would establish a new fee" for assessing CAT fees—does not specifically address, much less expressly preclude, the possibility that Participants may pass through 100% of their CAT fees to Industry Members. The proposed pass-through provision only prohibits "new fee[s]," leaving SROs free to pass CAT costs through to members via *existing* fees and assessments. Indeed, the Funding Proposal owns this, explaining that CAT LLC intentionally left untouched Appendix C of the CAT NMS Plan, which provides that "Participants may charge their members to cover the CAT NMS Plan costs either explicitly *or subsume those costs in other fees or assessments*."[40]

Because the Funding Proposal does not explain this choice further or discuss the implications of the difference among SROs noted above, it raises concerns that it is designed to continue to permit the Participants to pass through 100% of their CAT costs to Industry Members, so long as they do so through increases to existing fees

---

[38]  *See Armstrong v. United States*, 364 U.S. 40, 49 (1960).

[39]  *See* Funding Proposal, *supra* note 3, 90 Fed. Reg. 44910, 44930.

[40]  *See id.* at 44911 n.22 (emphasis added).

**A62**

**WILSON
SONSINI**

and assessments.  This result would not address the issues raised by the Eleventh Circuit, and the Funding Proposal does not provide the SEC any grounds to remedy this fundamental deficiency.

In addition, regrettably, the Funding Proposal also does not meaningfully engage with the economic realities of CAT cost allocation, how different SROs are funded, and the impact of fees on different SROs' members—leaving it largely to the Commission to analyze who ultimately bears CAT costs.  The Funding Proposal simply declares that any "new fee" for passing on the SRO costs of CAT should be prohibited, without serious discussion of the underlying impact among the Participants and industry members that animated the Eleventh Circuit's decision.

CAT LLC's Funding Proposal did not account for such issues.  Its theoretical limit on pass-through fees is not only factually inaccurate and fails to prevent a 100% pass-through but also ignores the reality of FINRA's funding structure.  The Funding Proposal suggests that FINRA, "just like the exchange Participants," will need to determine for itself how to obtain the funds needed to pay its CAT fees.[41]  But FINRA and the exchange Participants are not similarly situated.  Like FINRA, each exchange Participant is subject to statutory provisions requiring "the equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons" using exchange facilities or any facility or system that the association operates or controls.[42]  Unlike FINRA, however, exchanges have a diverse set of potential revenue sources—members, issuers, persons subscribing to its market data or using other facilities—whereas FINRA's costs are predominantly funded by fees allocated among its members.  Thus, FINRA is not "just like the exchange Participants"— the Funding Proposal rests on an apples-to-oranges comparison.

In addition, unlike exchanges, FINRA's members include many firms who are not users of the trading facilities for reporting the transactions on which CAT fees are assessed; and the majority of FINRA members are not CAT reporters.  For FINRA, the most direct way to allocate FINRA's designated CAT costs among its members (who ultimately will bear costs allocated to FINRA) would be to apply cost recovery fees to the members whose activities most directly contribute to FINRA's

---

[41]    *See id.* at 44924.

[42]    15 U.S.C. § 78(f)(b)(4) and 15 U.S.C. § 78o-3(b)(5).

**WILSON SONSINI**

Ms. Vanessa Countryman<br>October 17, 2025<br>Page 12

designated portion of Participant CAT fees, which is precisely what the Funding Proposal would *prevent*, at least insofar as those fees are new.

The Funding Proposal fails to engage meaningfully with these unique features of FINRA's structure, funding sources, and the range of FINRA members' business models, and the consequences for the Eleventh Circuit's fundamental concern about the allocation of costs among Participants and industry members. Indeed, the Funding Proposal elides the difference between FINRA and exchanges by pointing vaguely to "revenue sources other than membership fees,"[43] only expressly identifying revenue generated through the Regulatory Services Agreements ("RSAs") that FINRA has entered into with various exchanges to perform regulatory oversight and market surveillance functions. Yet RSA-related revenues cover FINRA's costs of regulatory services provided to the exchanges. They have not been—and, as voluntary commercial contracts, cannot reasonably be viewed as—a reliable source of sustainable CAT funding sufficient to replace membership fees at the levels required by the Executed Share Model.

Nor does FINRA currently directly receive fees from its trade reporting facilities for listed stocks ("TRFs") that would cover CAT costs. Under the Executed Share Model, FINRA's portion of Participant CAT fees is determined based on over-the-counter executions reported to FINRA's reporting facilities, including volume reported to the TRFs. While TRF reporters pay reporting fees for using the TRFs, FINRA does not retain either TRF trade reporting or market data revenues. Each FINRA TRF is operated by an exchange business member that is also a CAT Plan Participant, and such exchanges retain the trade reporting and market data revenues generated by the TRFs, subject to certain payments to FINRA for agreed-upon costs.

Therefore, the exchanges have direct revenue streams from the operation of the facilities on which the transactions that are taxed using the Executed Share Model occur, whereas FINRA generally does not retain such revenue for OTC transactions in listed securities. This mismatch represents another key distinction between FINRA's and the exchanges' funding structures: FINRA is charged CAT fees based on TRF activity but does not directly derive revenue from TRF reporting or data. And to date the exchange business members that operate the TRFs have not conceded that TRF revenues will be available to cover any amount of FINRA's designated portion of CAT costs based on TRF-reported trades.

---

[43]    *See* Funding Proposal, *supra* note 3, 90 Fed. Reg. 44910, 44924.

**WILSON SONSINI**

Ms. Vanessa Countryman
October 17, 2025
Page 13

The Funding Proposal's declaration that "[a]ny review of how the Participants obtain their funds to pay CAT fees is beyond [its] scope" therefore does not change the practical reality that any allocation of Participants' CAT costs to FINRA will almost certainly be equivalent to allocating those costs to industry members.[44]  The Funding Proposal's vague references to "revenue sources other than membership fees" do not begin to explain how it could result in a workable and equitable allocation of costs in light of FINRA's broad membership and not-for-profit funding structure.[45]

## III.    A Decision On A Permanent Funding Model Should Be Part Of The Comprehensive Review of CAT, Which Should Consider Plan Governance.

Ultimately, FINRA believes that a full analysis of the allocation of costs among Participants and industry members should await further progress on the comprehensive review of CAT that has been initiated by Chairman Atkins,[46] which FINRA strongly supports.[47]

Since CAT was first adopted, FINRA, other regulators, and industry members have gained useful experience from its operation, and FINRA is prepared to share its experience in the Commission's review.  FINRA applauds the Commission's recent

---

[44]    *See* Funding Proposal, *supra* note 3, 90 Fed. Reg. 44932.

[45]    The Eleventh Circuit also raised the issue of aligning incentives in the CAT structure so as to better control CAT costs.  *See Am. Sec. Ass'n*, 147 F.4th at 1272-73, 1275-76.  FINRA is very cognizant of and sensitive to the ultimate impact of CAT costs on industry members.  From FINRA's perspective, the current outcome with respect to elevated CAT costs is not due to a misalignment of FINRA's incentives, either with its members' or investors' interests, but rather due to rigid NMS Plan technological requirements and with that, process challenges in implementing new, lower cost requirements.

[46]    Paul S. Atkins, Chairman, SEC, *Prepared Remarks Before SEC Speaks* (May 19, 2025), https://www.sec.gov/newsroom/speeches-statements/atkins-prepared-remarks-sec-speaks-051925.  *See also* Paul S. Atkins, Chairman, SEC, *Statement on the Spring 2025 Regulatory Agenda* (Sept. 4, 2025), https://www.sec.gov/newsroom/speeches-statements/atkins-2025-regulatory-agenda-090425; and SEC, *Evaluating the Continued Effectiveness of the Consolidated Audit Trail*, https://www.reginfo.gov/public/do/eAgenda-ViewRule?pubId=202504&RIN=3235-AN54.

[47]    *See* Robert Cook, *CAT Should Be Modified to Cease Collecting Personal Information on Retail Investors* (Jan. 17, 2025), https://www.finra.org/media-center/blog/cat-should-be-modified-to-cease-collecting-personal-information-on-retail-investors.

WILSON
SONSINI

exemptive order, which paves the way for four sensible cost-savings measures—all of which FINRA supports.[48]  FINRA also supports the now-pending proposed amendment to the Customer and Account Information System, or "CAIS," which would achieve additional cost savings by, among other things, eliminating name, address, and year of birth from the CAT—the collection of which is not justified in light of available alternatives and raises security considerations and potential risks.[49]

Given these ongoing efforts to achieve additional cost savings and the review of the scope of CAT,[50] FINRA is concerned that rushing to adopt—*permanently*—the same Executed Share Model vacated by the Eleventh Circuit is counterproductive. All stakeholders need to understand the full implications of the potentially significant changes to CAT now underway.  FINRA has long opposed the Executed Share Model[51] because it fails to address the issues it creates for the allocation of costs among SROs and the industry (including that allocations to FINRA are in essence allocations to industry members), a flaw acknowledged in the Eleventh Circuit's decision vacating the 2023 Funding Order, and one that further changes to the CAT may complicate.

Accordingly, adopting any funding model at this time that does not explicitly limit its effectiveness to a reasonable, specified timeframe is premature: it front-runs the outcome of the comprehensive CAT review initiated by Chairman Atkins and prevents full evaluation of cost allocation in line with the Eleventh Circuit's decision. Instead, a permanent funding model should be determined in concert with that

---

[48]   *See* Securities Exchange Act Release No. 104144 (Sept. 30, 2025), 90 Fed. Reg. 47853 (Oct. 2, 2025).

[49]   *See* Robert Cook, *Eliminating All PII from CAT* (March 19, 2025), https://www.finra.org/media-center/blog/eliminating-all-pii-from-cat.

[50]   *See* Paul S. Atkins, Chairman, SEC, *Consolidated Audit Trail: A New Day for the CAT* (September 30, 2025), https://www.sec.gov/newsroom/speeches-statements/atkins-093025-consolidated-audit-trail-new-day-cat?utm_medium=email&utm_source=govdelivery and SEC, *Evaluating the Continued Effectiveness of the Consolidated Audit Trail*, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202504&RIN=3235-AN54.

[51]   *See* Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated April 11, 2023, at 2.  *See also* Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated May 12, 2021; Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated June 22, 2022 ("June 2022 Comment Letter");  and Letter from Marcia Asquith, Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, dated May 25, 2023.

**WILSON
SONSINI**

comprehensive review of CAT, including CAT's scope, costs, and governance. Once the results of this review are determined, all parties will be better positioned to design a funding mechanism that is equitable, sustainable and transparent.[52] As an interim measure, FINRA recommends the temporary funding solution described above. However, if this approach is not implemented (and with respect to any future CAT funding model), FINRA's unique status as a national securities association funded by members who represent a wide range of business models requires consideration in the Commission's evaluation of the impact of the allocation of CAT costs.

While the Eleventh Circuit found that the 2023 Funding Order failed to adequately consider the economic effects of pass-throughs, it did not conclude that SRO fees to recover CAT costs are impermissible in all cases; nor did it establish specific requirements or parameters for the CAT funding model. In fact, the court acknowledged that there are differences among the SROs that may validly affect the allocation of costs among SROs and the industry, stating: "FINRA may be unique because [] it is the only nonprofit [SRO] of the twenty-four currently-registered exchanges."[53]

In connection with a permanent funding model, it would be critical that the Commission consider the differences among the Participants and the resulting impact of these differences on the true allocation of costs among the Participants and industry members to adequately address the issues raised by the Eleventh Circuit. For example, FINRA is the sole national securities association among the Participants; the sole not-for-profit Participant; the sole Participant with a majority of members who do not engage in activity that generates CAT reports; and the sole Participant that does not operate a market. These features of FINRA's organization and structure significantly affect the workability, ultimate economic impact and fairness of cost allocation among Participants and the industry. If there is ultimately to be a

---

[52] While the vacated Executed Share Model arguably provides for the sharing of costs between industry members and Participants, the Eleventh Circuit's opinion faulted the 2023 Funding Order for not adequately considering the economic reality of costs being passed from Participants to industry members through separate fees. Although the court did not discuss in the same way the economic reality of costs being passed from industry members to their customers through separate fees, FINRA understands that such pass-throughs of regulatory fees are not uncommon. Therefore, once a better sense of the costs of a newly refined CAT is available, regulators and industry members alike will be better informed and positioned to develop a funding model that is consistent with the Exchange Act (including one that is transparent and conducive to industry member pass-throughs).

[53] *See Am. Sec. Ass'n*, 147 F.4th at 1279.

**A67**

WILSON
SONSINI

Ms. Vanessa Countryman
October 17, 2025
Page 16

reasonable basis for a permanent allocation of fees among Participants and industry members, the Commission will need to expressly identify and evaluate these factors and other salient features of SRO structures, funding, and membership profiles.  In particular, confronting the fundamental realities of FINRA's funding structure and the inevitable impact on FINRA members of any cost allocation to FINRA must be a key element in analyzing the true economic impact of any CAT funding proposal.

As part of its comprehensive review, in addition to working to reduce costs and arrive at a permanent funding model, FINRA also requests that the Commission review CAT's flawed governance structure and how it can better support appropriate allocation of costs among CAT's varied stakeholders.  FINRA has repeatedly questioned the voting structure that governs the CAT NMS Plan, which allows large voting blocks for affiliated exchanges to impose costs on other SROs.[54]  At present, four blocks of affiliated exchanges together represent 21 out of 27 votes, resulting in voting dynamics that are susceptible to outcomes that favor some Participants at the expense of the broader securities industry.  For example, FINRA, which has just one vote representing itself and its member firms, was allocated an estimated 38% of total Participant CAT costs from January to August of this year, with no acknowledgment of the impact of this allocation on the industry.

\* \* \* \* \*

The Funding Proposal before the Commission fails to address the fundamental issues identified by the Eleventh Circuit when it vacated the 2023 Funding Order. Rather than engaging with the court's core concern about the economic impact of CAT

---

[54]  The Commission observed similar inequities resulting from the voting structure of the equity market data NMS plans and accordingly ordered that the new consolidated equity market data plan include a voting structure allocating voting power by exchange group and market share.  *See* Order Directing the Exchanges and the Financial Industry Regulatory Authority To Submit a New National Market System Plan Regarding Consolidated Equity Market Data, Securities Exchange Release No. 88827 (May 6, 2020), 85 Fed. Reg. 28702, 28713 (May 13, 2020) ("The Commission…believe[s] that there is a need to rebalance voting power in Plan governance to address the disproportionate influence of affiliated exchange groups…. The current governance structure provides voting power based on each exchange license and thereby concentrates voting power in a small number of exchange group stakeholders, which also have inherent conflicts of interest with respect to the operation of the Plans. The Commission believes that this has perpetuated disincentives for the Equity Data Plans to make improvements to the SIP data products." (footnotes omitted)).

**A68**

**WILSON
SONSINI**

Ms. Vanessa Countryman
October 17, 2025
Page 17

costs on broker-dealers, the proposal attempts to sidestep this issue through an unworkable and unlawful pass-through prohibition, all while failing to account for the effect of allocating undue CAT costs to FINRA.

FINRA remains committed to working collaboratively with the Commission and other stakeholders to develop a sensible and serviceable CAT that fulfills its regulatory purpose while distributing costs fairly across the industry. FINRA appreciates the Commission's consideration of its concerns and stands ready to engage constructively in developing an appropriate funding solution that addresses the legitimate needs of all stakeholders.

Sincerely,

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation

/s/ Steffen N. Johnson

Steffen N. Johnson

**A69**

# TAB E

Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati
Professional Corporation on behalf of the Financial Industry Regulatory
Authority, Inc. (FINRA), (Oct. 17, 2025)

**CITADEL | Securities**

October 17, 2025

Ms. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549–1090

**Re:    2025 CAT Funding Proposal (File No. 4-698)**

Funding the consolidated audit trail ("CAT") has been a historic debacle. Broker-dealers and their customers have been compelled to pay hundreds of millions of dollars for the system's development and operation—on top of billions in implementation costs—pursuant to a funding order that the Eleventh Circuit recently determined was unlawful for multiple reasons.[1] Despite that proven illegality, these vast sums of money are now gone forever, money that otherwise could have been deployed to benefit investors, issuers, and U.S. financial markets.

Current Securities and Exchange Commission (the "Commission") leadership has rightly indicated that a new course must be charted. Chairman Atkins has called for a "comprehensive review" that covers not only the funding of the CAT, but also governance, scope, data security, and budget.[2] Meanwhile, Commissioners Peirce and Uyeda have described the CAT as a "system that one would expect to find in a dystopian surveillance state, not the shining beacon for liberty and the free world."[3]

Ignoring this backdrop, the CAT Operating Committee has once again come hat in hand to request that this Commission simply reinstate the unlawful 2023 funding order with the addition of one "new paragraph" (the "2025 Funding Proposal").[4] This audacious attempt to circumvent the Eleventh Circuit's ruling and the Commission's pending comprehensive review must be swiftly rejected. Not only does the latest funding proposal fail fully to address the serious deficiencies identified by the Eleventh Circuit as detailed below, but it defies basic common sense. The SROs who have been independently operating the CAT for over a decade—replete with implementation delays, uncontrolled budgets, and a refusal to collaboratively engage with the industry—cannot be trusted to rapidly chart a new course if the rest of the industry must continue bailing them out for their mess. Broker-dealers and their customers have suffered enough, and new fees must not be assessed until the Commission completes its comprehensive review.

---

[1] *Am. Sec. Ass'n, v. SEC*, 147 F.4th 1264 (11th Cir. 2025) ("Eleventh Circuit Decision").

[2] https://www.sec.gov/newsroom/speeches-statements/atkins-prepared-remarks-sec-speaks-051925 and https://www.sec.gov/newsroom/speeches-statements/atkins-093025-consolidated-audit-trail-new-day-cat?utm_medium=email&utm_source=govdelivery.

[3] https://www.sec.gov/newsroom/speeches-statements/peirce-uyeda-statement-focus-report-121624.

[4] 90 FR 44910 (Sept. 17) at 44911, available at: https://www.govinfo.gov/content/pkg/FR-2025-09-17/pdf/2025-17929.pdf.

1

**A70**

**CITADEL | Securities**

## I. The CAT Funding Proposal Exceeds the Commission's Authority

The 2025 Funding Proposal exceeds the Commission's authority in multiple respects.

*First*, the CAT itself is unlawful and, thus, any attempt to compel broker-dealers to fund it is unlawful as well. In approving the unlawful 2023 funding order, and during the subsequent litigation, the Commission was unable to identify any statutory authority explicitly granting the Commission the power to create the CAT. Instead, the Commission attempted to shoehorn its surveillance system into §78k-1(a)(1)'s generic objectives of "preserving and strengthening the securities markets, assuring fair competition, protecting investors, and maintaining fair and orderly markets," and §78k-1(a)(2)'s aim of "facilitat[ing] the establishment of a national market system."[5] But the CAT "cannot rest merely on the 'policy objectives of the Act,'"[6] especially when such majestic generalities could in theory justify virtually any Commission action, making the more limited grants of authority in §78k-1 and the rest of the Exchange Act meaningless.

Attempts to rely on the mousehole of SRO joint action under §78k-1(a)(3)(B) fail as well. Long seen as an antitrust-immunity provision for the SROs, §78k-1(a)(3)(B) does not give the Commission *carte blanche* to hijack the SROs for carrying out whatever regulatory measures it deems fit. If this provision really allowed the Commission to do *indirectly* what it could not do *directly*, then it would render much of the Exchange Act superfluous. To conclude otherwise would transform §78k-1 into a roving police power for the Commission, leaving the agency free to do whatever it wants so long as it does so by proxy.

Finally, §78q of the Exchange Act addresses internal broker-dealer recordkeeping requirements, not the creation and funding of a market-wide audit trail.

There is no precedent for the CAT, not only in terms of its size and scope, but also in its purported statutory basis, which meaningfully departs from prior SRO-led audit trails.[7] Ultimately, the multi-billion dollar all-encompassing CAT system is greatly consequential both politically and economically,[8] and, thus, requires "clear congressional authorization" under the major questions doctrine.[9] The Commission has conceded that no such express authorization exists.[10]

*Second*, and relatedly, it is unlawful for the Commission to outsource the funding of the CAT so as to effectively immunize the surveillance program from congressional appropriations or

---

[5] 88 FR 62628 (Sept. 12, 2023) at 62673, available at: https://www.sec.gov/files/rules/sro/nms/2023/34-98290.pdf ("2023 Funding Order").

[6] *Georgia v. President*, 46 F.4th 1283, 1298 (11th Cir. 2022).

[7] We note prior SRO-led audit trails did not rely on Section 11A of the Exchange Act for statutory authority and instead pointed to §78f(b)(1) and §78o–3(b)(2), neither of which are sufficient here.

[8] We note the that nearly half the States and over 20 Members of Congress have questioned the CAT's legality. *See Amicus Brief of Arkansas et al.* at 10–24, *Am. Sec. Ass'n v. SEC*, 23-13396 (11th Cir. 2024); *Amicus Brief of Senator Tom Cotton et al.* at 8–28, *Am. Sec. Ass'n v. SEC*, 23-13396 (11th Cir. 2024).

[9] *Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

[10] 2023 Funding Order at 62673.

2

CITADEL | Securities

oversight.  As both Commissioners Peirce and Uyeda have noted, the CAT is "essentially funded by the public but operates outside the direct oversight or authorization of Congress."[11]  While Congress has explicitly permitted the Commission to recoup *appropriated* expenditures through industry fees, the Commission has refused to include the CAT in its appropriated budget, despite the fact that it is a Commission project—undertaken pursuant to Commission rulemaking and relied upon by Commission personnel to perform their statutorily-mandated market surveillance responsibilities.[12]  This end-run turns the Appropriations Clause on its head by permitting an executive branch agency to fund its own regulatory initiatives through outsourcing taxing authority to the SROs, thus eviscerating Congress's power over "the purse."  This theory would allow the Commission to remove most, if not all, of its operations—including its most controversial initiatives—from the congressional appropriations process through the simple expedient of conscripting the SROs into service.  That cannot be correct.  At a minimum, such a scheme would have to be expressly authorized by Congress, but again, there is no such authorization here.

We note that the Commission taking the formal step of approving the 2025 Funding Proposal would represent a new application of the *ultra vires* CAT regime.  With the vacatur of the 2023 funding order, only Commission Rule 613 and the 2016 CAT NMS Plan remain in effect.[13]  Neither allocate *any* costs associated with the development and operation of the CAT to broker-dealers and their customers.[14]  Therefore, the 2025 Funding Proposal would be the only operative Commission action that purports to compel broker-dealers and their customers to pay hundreds of millions for the development and operation of CAT.  Before taking this significant step, the Commission has a "duty to examine key assumptions"—including ones "regarding [its] statutory authority"—"as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule."[15]  Commissioner Peirce recognized this duty by specifically asking "Does the Commission have the authority to fund its primary market surveillance tool with money that does not run through the Congressional appropriation process?" when considering the unlawful 2023 funding order.[16]  The Commission never provided a rational response and cannot ignore these fundamental questions here.

---

[11] https://www.sec.gov/newsroom/speeches-statements/peirce-uyeda-statement-focus-report-121624.

[12] *See* 77 FR 45722 (Aug. 1, 2012), available at: https://www.govinfo.gov/content/pkg/FR-2012-08-01/pdf/2012-17918.pdf ("Rule 613").

[13] In Rule 613, the Commission explicitly deferred "its economic analysis of the actual creation, implementation, and maintenance of a consolidated audit trail itself until such time as it may approve the NMS plan submitted to the Commission for its consideration."  Rule 613 at 45802.  In its economic analysis of the 2016 CAT NMS Plan, the Commission made clear that the CAT funding model "has not yet been finalized" and "the Funding Model will be filed with the Commission and subject to public comment."  81 FR 84696 (Nov. 23, 2016) at 84804, 84881, available at: https://www.govinfo.gov/content/pkg/FR-2016-11-23/pdf/2016-27919.pdf ("2016 CAT NMS Plan").

[14] *See* Rule 613 at 45802 and 2016 CAT NMS Plan at 84804 and 84864.

[15] *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019) (cleaned up).  Further, an agency's approval of another entity's proposal to allocate "the percentage" that "each contributor must provide to" a regulatory "fund" is enough to "'restart[] the sixty-day clock'" for challenging not only the agency's "prior regulations," but even "the entire statutory delegation scheme." *Consumers' Rsch. v. FCC, 88 F.4th 917, 921–22 (11th Cir. 2023).*

[16] https://www.sec.gov/newsroom/speeches-statements/peirce-statement-cat-funding-090623.

3

**A72**

**CITADEL | Securities**

## II.  The CAT Funding Proposal Does Not Remedy The Commission's Prior Deficient Economic Analysis

The Eleventh Circuit determined that it was arbitrary and capricious for the Commission to refuse to update its 2016 economic analysis before approving a material amendment to the CAT NMS Plan.[17]  As noted by the Eleventh Circuit, "[a]gencies must consider material changes in circumstances, and they must act reasonably when they discover new evidence or encounter new facts."[18]  Thus, the Commission cannot approve the 2025 Funding Proposal before conducting a new and accurate economic analysis.

Below, we set forth key aspects of the 2016 economic analysis that must be updated to reflect "real-world numbers," [19] all of which directly relate to the fundamental question of whether the 2025 Funding Proposal is consistent with the Exchange Act.  We note that it is the Commission's responsibility—independent of the SROs—to weigh the costs and benefits of the 2025 Funding Proposal and determine its impact on efficiency, competition, and capital formation. [20]  In connection with fulfilling this statutory obligation, the Commission should require the SROs to provide necessary data.

### A.  The CAT Operational Budget

In order to evaluate the 2025 Funding Proposal's economic implications, it is necessary to accurately document the aggregate amount of costs that are proposed to be allocated to broker-dealers and their customers relating to the ongoing operation of the CAT.  In 2016, the Commission estimated that it would cost $37.5 million to $65 million to build CAT and that annual operating costs would range from $36.5 million to $55 million.[21]  These estimates proved to be grossly inaccurate and must be updated with current figures and reasonable future projections.

*First*, the Commission must comprehensively document the current state of play, including (i) the current CAT budget, (ii) key metrics related to the system's overall costs, such as the number of executed transactions per day (subdivided by equities and options), the number of quotation messages per day (subdivided by equities and options), and the number of CAT records created per day, (iii) the number of broker-dealers who are responsible for shouldering the costs in the first instance (i.e. invoiced by CAT LLC), and (iv) the number of unique market participants who may ultimately bear a portion of the costs (i.e. have transaction records stored in the CAT system).  In addition, the Commission should detail the usage-related costs (e.g. due to data requests made by the Commission or the SROs) that are now being incurred.

*Second*, the Commission must explain why its 2016 estimates were so inaccurate, and identify the key drivers that led to the dramatic increase in overall costs.  The Commission must determine

---

[17] Eleventh Circuit Decision at 1277–78.

[18] *See* Eleventh Circuit Decision at 1277; *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011).

[19] Eleventh Circuit Decision at 1269.

[20] *See* Rule 613(a)(5).

[21] 2016 CAT NMS Plan at 84801.

**CITADEL | Securities**

whether (and to what extent) the observed cost increases were due to (i) changes in market volume, (ii) changes in required system scope and functionality, or (iii) technological design choices made by CAT LLC and the Commission.  In order to perform this assessment, the Commission must detail the most important cost drivers and the key system design choices that contributed to these cost drivers.  In addition, the Commission should detail the key design alternatives that were considered in relation to these cost drivers before the current CAT system was finalized.

*Third*, the Commission must update its estimates of the future trajectory of the CAT budget based on the identified cost drivers to determine the future costs that broker-dealers and their customers will bear under the 2025 Funding Proposal.  In addition to projecting an average annual rate of increase, the Commission must also consider costs associated with (i) the building of additional system functionality if existing no-action relief expires without being extended or codified,[22] (ii) implementation of approved (but not yet implemented) Commission rules, such as the Tick Sizes and Access Fees rule (which is expected to significantly increase equities message traffic),[23] and (iii) implementation of approved (but not yet implemented) SRO rules, such as the launch of newly approved equities and options exchanges (e.g. 24X Exchange, the Texas Stock Exchange, the Green Impact Exchange, and IEX Options) and the launch of overnight on-exchange trading (both of which will significantly increase equities and options message traffic).  Further, the Commission must identify whether there are expected future costs associated with AWS contract renegotiations or planned system design changes.

### B.  Broker-Dealer Reporting Costs

In order to evaluate the 2025 Funding Proposal's economic implications, it also is necessary to accurately document the CAT-related costs that the industry is already bearing.  In 2016, the Commission estimated that broker-dealers would incur one-time system implementation costs of $2.2 billion and annual reporting costs of $1.5 billion.[24]  These estimates alone led the Commission to conclude that broker-dealers would incur approximately 90% of total CAT-related costs, even if they were not allocated *any* additional costs for the development and operation of the system.[25]  Of course, these estimates proved to be grossly inaccurate and must be updated with actual figures now that the CAT is operational.

*First*, the Commission must determine the annual CAT reporting costs being incurred by broker-dealers and SROs by refreshing the industry surveys used in the 2016 economic analysis.  This involves conducting a new "Reporters Study" and "Participants Study."[26]

---

[22] *See, e.g.,* Release No. 34-103528 (July 23, 2025), available at: https://www.sec.gov/files/rules/other/2025/34-103528.pdf and Release No. 34-98848 (Nov. 2, 2023), available at: https://www.sec.gov/files/rules/exorders/2023/34-98848.pdf.

[23] 89 FR 81620 (Oct. 8, 2024), available at: https://www.govinfo.gov/content/pkg/FR-2024-10-08/pdf/2024-21867.pdf.

[24] 2016 CAT NMS Plan at 84859.

[25] 2016 CAT NMS Plan at 84864.

[26] *See* the "Reporters Study" and "Participants Study" detailed in the 2016 CAT NMS Plan.

**CITADEL | Securities**

*Second*, the Commission must determine the reporting and compliance costs associated with the Electronic Blue Sheet system, which the Commission in its 2016 economic analysis incorrectly assumed would be replaced by the CAT and "dramatically reduce the hundreds of thousands of requests that regulators must make each year."[27]  These savings have not materialized to offset broker-dealer CAT reporting costs and, therefore, must be added back in (both past and future).

### C. The Industry's Allocation of CAT Operational Costs

In order to evaluate the 2025 Funding Proposal's economic implications, it is necessary to consider the impact of allocating to broker-dealers and their customers at least two-thirds of the total CAT operating budget in perpetuity.  In 2016, the Commission's economic analysis did not allocate *any* costs to operate CAT to broker-dealers since a funding model was not being finalized at the time, meaning that no such analysis was even attempted.[28]  Several relevant considerations are set forth below.

*First*, the 2025 Funding Proposal picks winners and losers in terms of how it proposes to allocate costs *among* broker-dealers and their customers.  The Commission must consider the economic implications of these choices, including:

- **Undue Impact on Equities (versus Options)**.  Even though one member of the CAT Operating Committee has stated that equities trading volume creates "a relatively low burden on CAT, from a cost-generation perspective, compared to other cost drivers, such as options activity,"[29] equities market participants will contribute far more under the 2025 Funding Proposal than options market participants due to the proposed allocation methodology.  The Commission must evaluate (i) the proposed split between equities and options using CAT data and the invoices sent by CAT LLC over the past year under the vacated 2023 funding order (as the proposed allocation is the same) and (ii) the estimated CAT system costs associated with equities versus options trading activity in order to determine whether equities market participants are inappropriately subsidizing CAT costs arising from options activity and the associated economic implications.

- **Undue Impact on Retail Investors**.  Although other regulatory fees are allocated based on executed *notional value*, the 2025 Funding Proposal allocates CAT costs based on executed *shares*.  This means that a 1000-share transaction in a $2 stock would result in 100 times the fees compared to a 10 share transaction in a $200 stock, despite being equivalent in notional value.  Retail investors would be particularly impacted, given the amount of retail trading in low-priced NMS stocks.  For example, data shows that approximately 33% of total retail NMS stock trading activity is in sub-dollar NMS stocks.

---

[27] 2016 CAT NMS Plan at 84829.

[28] *See* Table 5 at 2016 CAT NMS Plan at 84864.

[29] Letter from FINRA (Apr. 11, 2023) at FN 23, available at: https://www.sec.gov/comments/4-698/4698-20164063-334005.pdf.

6

**A75**

CAT LLC recognized the unfairness of allocating fees in this manner for certain low-priced stocks (i.e. OTC equities) by amending the allocation formula. However, no similar adjustment for low-priced NMS stocks was included. This creates nonsensical outcomes—for example, buying 1,000 shares of an NMS stock priced at $0.50 results in 50 times more fees than buying 2,000 shares of an OTC stock priced at $5, even though the purchase was for half the number of shares and 1/20th of the notional value.

Therefore, the Commission must assess the economic implications for retail investors in particular, including gathering data on (i) the percentage of total retail NMS stock trading activity in low-priced symbols and (ii) the percentage of CAT system costs allocated to retail investor trading activity by looking at CAT data and the invoices sent by CAT LLC over the past year under the vacated 2023 funding order (as the proposed allocation is the same). This will help determine whether retail investors are inappropriately subsidizing CAT costs arising from other trading activity, leading to negative impacts on efficiency, competition, and capital formation.

- **Undue Impact on Market Makers**. CAT LLC has previously acknowledged that it is important that a CAT funding model not "disproportionately affect market makers, thereby leading to a reduction in liquidity and market quality."[30] However, the 2025 Funding Proposal would do exactly that by allocating a disproportionate percentage of total CAT system costs to a small handful of market makers. And since market makers would be allocated CAT system costs for their proprietary trading activity, those costs could be passed-on to other market participants through higher trading spreads.

  The Commission must assess the economic implications for market makers and overall market liquidity by determining (i) the percentage of total CAT costs that the ten largest market makers would be allocated based their proprietary trading activity (using CAT data and the invoices sent by CAT LLC over the past year under the vacated 2023 funding order) and (ii) the potential impact on spreads, particularly in less liquid stocks with wider quoted spreads.

*Second*, separate from how the CAT's costs will ultimately come to rest between broker-dealers and their customers, the Commission must consider the economic implications of allocating at least two-thirds of CAT system costs in perpetuity to those entities (currently over 100 million dollars per year). In addition, the Commission should assess the economic implications of broker-dealers and their customers being compelled to pay hundreds of millions of dollars under the unlawful 2023 funding order. All of these amounts could otherwise be deployed to benefit investors, issuers, and U.S. financial markets.

All of the economic analyses outlined above are critically important in determining whether the 2025 Funding Proposal is consistent with the Exchange Act and are required by the Eleventh Circuit's Opinion. In fact, many are consistent with questions the Commission has itself asked (but never fully analyzed) when considering prior funding proposals.[31] Further, they are eminently

---

[30] Release No. 34-91555 (Apr. 14, 2021) at 28, available at: https://www.sec.gov/rules/sro/nms/2021/34-91555.pdf.

[31] See https://www.sec.gov/files/rules/sro/nms/2022/34-95634.pdf at 84-91.

7

**A76**

**CITADEL | Securities**

feasible using existing CAT data.  The Commission cannot attempt to evade its statutory requirement to conduct rigorous economic analysis by simply noting that the per-share cost will be small, given that trillions of shares are traded each year.  Instead, it is the aggregate amounts (and how those amounts fall among broker-dealers and their customers) that matter, on top of all of the other CAT-related costs that broker-dealers and their customers are already bearing.  As Chairman Atkins recently confirmed, "[u]ltimately, these costs make participating in our equities and options markets more expensive."[32]

As part of its economic analysis, the Commission should also consider whether reasonable alternatives would mitigate some of the concerns detailed above.  For example, enhancements could include (i) minimum and maximum fee levels, (ii) appropriate calibrations to fees for market makers, and (iii) a different percentage split between the SROs and the industry.

After completing the required economic analysis, it will be clear that allocating at least two-thirds of CAT system costs to broker-dealers and their customers in the manner contemplated by the 2025 Funding Proposal is not fair and equitable under the Exchange Act.[33]  The reasoning provided by Commissioners Peirce and Uyeda in dissenting from the nearly identical 2023 funding order is instructive, with Commissioner Peirce noting that "[t]he allocation required under this plan, with industry members bearing directly two-thirds of the costs of CAT, will reduce the incentives of plan participants and the Commission to subject the budget and resulting fees to rigorous scrutiny"[34] and Commissioner Uyeda pointing out that "the key issue here is whether this proposal sufficiently aligns incentives regarding decision-making that may impact these costs."[35]  The Commission's comprehensive review of the CAT must address these core issues; until then, broker-dealers and their customers must not be forced to pay new, unrecoverable fees for a broken regime.

---

[32] https://www.sec.gov/newsroom/speeches-statements/atkins-093025-consolidated-audit-trail-new-day-cat?utm_medium=email&utm_source=govdelivery.

[33] CAT LLC makes two additional flawed arguments to support allocating at least two-thirds of the costs to broker-dealers and their customers.  First, CAT LLC argues that there are many more broker-dealers than SROs and broker-dealers have "greater financial resources."  2025 Funding Proposal at 46.  This argument, apart from its redistributive undertones, ignores that an exorbitant percentage of total CAT system costs will be allocated to a *small handful* of market makers.  Second, CAT LLC argues that broker-dealers have adopted business models that bring "complexity to the markets."  *Id.* at 45.  This argument conveniently ignores the complexity introduced by SROs, including via trading venue fragmentation, complex order types, and fee models.  Neither argument addresses the actual costs of operating the CAT, and why the system was designed and implemented such that the number of CAT records has increased by five times original estimates even though overall market trading volume has not.  Nor does it account for the fact that these complexities are the product of a process overseen exclusively by CAT LLC and its constituent SROs, which maintain authority over the design, implementation, and operation of the CAT.  Broker-dealers and their customers, by contrast, have no say and, thus, no ability to exert control over the CAT costs they are being asked to bear.

[34] https://www.sec.gov/newsroom/speeches-statements/peirce-statement-cat-funding-090623.

[35] https://www.sec.gov/newsroom/speeches-statements/uyeda-statement-cat-funding-090623.

**A77**

CITADEL | Securities

## III.   The CAT Funding Proposal Does Not Sufficiently Prohibit SRO Pass-Throughs

The Eleventh Circuit determined that it was arbitrary and capricious for the Commission to allow the SROs "to pass along *all* of their CAT costs to their members, should they choose to do so."[36]  In response to the Eleventh Circuit's decision, CAT LLC "proposes to add a new paragraph (e) to Section 11.3 providing that each Participant agrees not to establish a *new fee* for passing through its CAT fees."[37]   CAT LLC's careful wording represents an audacious attempt to circumvent the Eleventh Circuit's ruling.

In particular, the 2025 Funding Proposal does not modify a separate provision in the CAT NMS Plan stating that the SROs "may charge their members to cover the CAT NMS Plan costs either explicitly *or subsume those costs in other fees or assessments.*"[38]  By merely prohibiting the imposition of a "new fee" for SRO pass-throughs, and explicitly refusing to amend or delete the sentence above,[39] CAT LLC is clearly attempting to preserve the ability for SROs to pass through some or all of their CAT costs to their members in other ways in direct contravention of the Eleventh Circuit's decision—for example, simply by including them in already-existing fees.

As further evidence of CAT LLC's attempt to "hide the ball," the 2025 Funding Proposal provides no explanation as to how FINRA, as a not-for-profit organization, will fund its allocation of CAT costs, which amount to more than 10% of the entire CAT budget.  To the extent that FINRA will attempt to pass through these costs to its members by adding them into existing fees, that must be clearly disclosed and explained *now*, as the Eleventh Circuit concluded that these types of fundamental allocation questions cannot be left to later fee filings.[40]  Instead, the Commission must either require the SROs to clearly prohibit all attempts to pass through their CAT fees (in whatever form, whether through new fees or existing fees), or specifically acknowledge that SRO pass-throughs may continue to occur and to take that into account when considering whether the 2025 Funding Proposal is consistent with the Exchange Act and the Eleventh Circuit's decision.  Continuing to allow SRO pass-throughs would directly conflict with the Eleventh Circuit's decision and fundamentally alters the allocation formula that the SEC is now considering.  If broker-dealers and their customers are actually being allocated, for example, at least 80% of the entire CAT budget (rather than 67%) due to bearing FINRA's portion (with the potential of bearing 100% of the entire CAT budget if other SROs follow suit), that must be factored into all of the economic analyses detailed above and into the ultimate determination as to whether the 2025 Funding Proposal is consistent with the Exchange Act.

Finally, the 2025 Funding Proposal does not compensate broker-dealers and their customers for the unlawful SRO pass-through fees that were collected under the vacated 2023 funding order.  Despite repeatedly representing to the Eleventh Circuit that any "overpayments"

---

[36] Eleventh Circuit Decision at 1269.

[37] 2025 Funding Proposal at 7 (emphasis added).

[38] CAT NMS Plan at Appendix C-80 (emphasis added).

[39] 2025 Funding Proposal at FN 20.

[40] Eleventh Circuit Decision at 1276 (holding "[t]he Commission's *post hoc* review of fee filings is insufficient" given that they are considered immediately effective upon filing).

9

**CITADEL | Securities**

by broker-dealers and their customers could be fairly addressed in future proceedings,[41] there is no mention of the tens of millions in extra fees that broker-dealers and their customers were unlawfully compelled to pay to FINRA under the 2023 funding order as an explicit SRO pass-through.  There is no question that this SRO pass-through was unlawful—in fact, it was withdrawn by FINRA immediately after the Eleventh Circuit's decision—and broker-dealers and their customers have not been made whole.  At the very least, these unlawful payments must be accounted for in any future funding model, and yet the 2025 Funding Proposal makes no attempt to do so.

## IV.  The CAT Funding Proposal Unlawfully Circumvents SEC Rule 608

As with CAT LLC's flawed prior proposal, the 2025 Funding Proposal does not include *any* detail regarding the actual CAT costs that will be allocated to broker-dealers and their customers under the proposed allocation formula.   Instead, CAT LLC asks the Commission to punt, explaining that these details will be provided in later filings made by each SRO pursuant to Commission Rule 19b-4.[42]  This approach is unlawful for several reasons.

*First*, fee filings relating to an NMS Plan are governed by Commission Rule 608 and cannot be filed as immediately effective under Rule 19b-4.  Specifically, in 2020, the Commission amended Rule 608 to explicitly require that fee filings relating to NMS plans must be approved by the Commission prior to becoming effective.[43]  In doing so, the Commission specifically referenced the CAT NMS Plan multiple times throughout the release.[44]  The conclusion that these proposed CAT fees are governed by Rule 608 is further supported by how they are administered.  In stark contrast to a typical fee set by an individual SRO for its members, CAT fees are administered at the NMS Plan level by FINRA CAT, LLC.  Individual SROs have no role in (a) determining the specific fee amounts payable by each broker-dealer, (b) sending invoices to broker-dealers, (c) receiving payment, or (d) handling fee disputes.  The Commission thus already has correctly determined that fee filings under the CAT NMS Plan would be covered by Rule 608; taking a different position now would represent an arbitrary and unlawful reversal.[45]  The 2025 Funding Proposal ignores this and proposes to rely on an unlawful process for setting and collecting fees to fund the CAT.

---

[41] *See Motion for Stay and Injunctive Relief* at 4, 11, *Am. Sec. Ass'n v. SEC*, 23-13396 (11th Cir. 2024) (explaining why unlawfully demanded CAT fees are unrecoverable); CAT LLC Opp. to Motion for Stay and Injunctive Relief at 17, *Am. Sec. Ass'n v. SEC*, 23-13396 (11th Cir. 2024) (contending overpayments "could be adjusted in any CAT postmortem proceedings"); CAT LLC Petition for Panel Rehearing at 11, *Am. Sec. Ass'n v. SEC*, 23-13396 (11th Cir. 2025) (arguing that "any 'overpayments'" made by broker-dealers "'can be addressed through a revised funding model'")

[42] 2025 Funding Proposal at 20.

[43] *See* 85 Fed. Reg. 65470 (Oct. 15, 2020), available at: https://www.govinfo.gov/content/pkg/FR-2020-10-15/pdf/2020-18572.pdf.

[44] *See, e.g., id.* at 65471, 65481-83, 65490.

[45] We note the suggestion in the 2023 Funding Order that the fee filing process under Rule 608 only covers "fees imposed on vendors and subscribers of market data under Market Data Plans," 2023 Funding Order at 62674, is without legal basis and ignores the fact that the CAT NMS Plan was referenced throughout the Commission's 2020 release.  *See* 85 Fed. Reg. at 65471, 65481-83, 65490.

10

**A79**

CITADEL | Securities

*Second*, even if subsequent fee filings are permitted under Rule 19b-4, the Commission must assess *now* whether the actual costs that may be allocated are fair and reasonable as part of determining whether the 2025 Funding Proposal complies with the Exchange Act. The Eleventh Circuit has clearly stated that the Commission's "*post hoc* review of fee filings is insufficient," since they are considered immediately effective without Commission approval and appear immune from judicial challenge.[46] Further, we have already witnessed how the SROs are able to abuse and game the 19b-4 process: in response to the Commission suspending their first set of CAT fee filings in 2024, the SROs simply withdrew them and refiled virtually identical ones, daring the Commission to suspend them again, which the Commission did not. Similarly, after the Eleventh Circuit ruled that the prior funding order was unlawful, the SROs made a failed attempt to delay issuance of the court's mandate to continue collecting millions in fees pursuant to 19b-4 filings they had accepted were unlawful.

The 2025 Funding Proposal cannot be fair and equitable if it allows the SROs to recoup clearly unreasonable costs from broker-dealers and their customers pursuant to filings that are deemed immediately effective and immune from judicial review. A cursory review of the fee filings submitted under the unlawful 2023 funding order illustrates just how ludicrous many of these costs are—such as requiring broker-dealers and their customers to pay for (i) the multi-year litigation between the CAT Operating Committee and the Commission, (ii) costs related to designing and attempting to implement numerous funding models that were not consistent with the Exchange Act (including the unlawful 2023 funding order), (iii) costs relating to the Customer & Account Information System (CAIS)—which never should have been built—including for a vendor that was terminated for implementation delays and cost overruns, and (iv) costs for public relations firms "monitoring comments made by market participants about CAT."[47] Before approving the 2025 Funding Proposal, the Commission must explain how compelling broker-dealers and their customers to pay for these costs is consistent with the Exchange Act. In addition, CAT LLC has repeatedly refused to provide sufficient detail regarding the technical design of the CAT system or the costs incurred to design and maintain it. The historical CAT costs and the current CAT budget are known *right now*, and the Commission must determine whether those costs are reasonable to recoup from broker-dealers and their customers as part of assessing whether the 2025 Funding Proposal is consistent with the Exchange Act.

## V.    **The Commission Must Independently Confirm The Financial Accountability Milestones Have Been Satisfied**

The SROs are not permitted to recoup CAT costs from broker-dealers and their customers until a series of Financial Accountability Milestones ("FAMs") are met.[48] While the SROs provide various dates by which they assert that specific FAMs were met, the Commission must independently validate these assertions and document its analysis. And to the extent the Commission permits the SROs to make subsequent fee filings under Rule 19b-4—meaning they are deemed immediately effective without Commission approval and immune from judicial

---

[46] Eleventh Circuit Decision at 1276.

[47] *See, e.g.,* 89 FR 10850, 10859 (Feb. 13, 2024).

[48] 85 FR 31322 (May 22, 2020) at 31348, available at: https://www.govinfo.gov/content/pkg/FR-2020-05-22/pdf/2020-10963.pdf.

11

A80

CITADEL | Securities

review—the 2025 Funding Proposal provides the only opportunity for the Commission to scrutinize and clearly document SRO compliance with the FAMs, as required by the CAT NMS Plan.  Several issues in particular warrant scrutiny.

*First*, the SROs are not permitted to recoup ongoing CAT costs until the date on which they delivered "Full Implementation of CAT NMS Plan Requirements."[49]  The SROs assert this was achieved in July 2024.[50]  However, the SROs are, still to this date, relying on various exemptive orders issued by the Commission that provide relief from specific CAT NMS Plan requirements.[51]  Therefore, it is clear that, according to the Commission, the SROs have not fully implemented *all* of the CAT NMS Plan requirements and the only question is whether the granted exemptive relief also serves as a backdoor way to comply with the FAMs.

In certain more recent exemptive orders, the Commission has asserted that "to the extent that the [SROs] are availing themselves of exemptive relief from a CAT NMS Plan requirement, such requirement shall not be included in the requirements for a FAM, provided that the conditions of the exemption are satisfied."[52]  However, the exemptive orders do not contain the statutorily-required analysis to support such an assertion.  In particular, the Commission would have to conclude that it is in the public interest to permit the SROs to allocate hundreds of millions of CAT costs to broker-dealers and their customers even though they have failed to comply with specific CAT NMS Plan requirements and the express terms of the FAMs.[53]  The interests of broker-dealers and their customers must be considered before the Commission can take action that results in specific CAT NMS Plan requirements being excluded from the FAMs or that otherwise impacts how the FAMs are interpreted.[54]  Such an analysis would have to be completed before the Commission can conclude that all of the FAMs have been met and should be conducted before any approval of the 2025 Funding Proposal.

*Second*, even if the Commission's exemptive orders also provide an exemption from the FAMs, they cannot retroactively do so for purposes of allowing the SROs to recoup historical costs.  Under the CAT NMS Plan, in order for the SROs to recoup any historical costs, all of the requirements associated with "Period 1" must have been completed by July 31, 2020.[55]  However, according to the Commission, one such "Period 1" requirement is the reporting of responses to electronic requests for quotes ("RFQs") that are not immediately actionable.[56]  This requirement was never completed, and, instead, the Commission eventually granted exemptive relief in May 2024.  This belated exemptive relief, granted years after the deadline established in the CAT NMS Plan, cannot retroactively bring the SROs into compliance with the July 31, 2020 deadline and

---

[49] *Id.*

[50] 2025 Funding Proposal at FN 47.

[51] *See, e.g.*, *supra* note 22.

[52] *See* 89 FR 45715 (May 23, 2024) at 45716, FN 11, available at: https://www.govinfo.gov/content/pkg/FR-2024-05-23/pdf/2024-11360.pdf.

[53] *See Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 980 (D.C. Cir. 2023).

[54] We note that notice-and-comment was not provided before issuing the relevant exemptive orders.

[55] *Supra* note 48.

[56] *Supra* note 52.

12

**CITADEL | Securities**

retroactively authorize them to impose hundreds of millions in costs on broker-dealers.  And even if it somehow could, the grant of exemptive relief does not contain any explanation justifying such a dramatic change in position.  Since the SROs failed to meet the relevant deadlines, no historical fees can be collected.

## VI.   **The Path Forward**

We wholeheartedly agree with Chairman Atkins' call for a "comprehensive review" that covers all aspects of the CAT.[57]   If the CAT is to remain, any strategic solution must put the regime on more solid legal footing as well as address the core governance issues that led to its ballooning scope and budget.

*First*, the Commission must include the CAT in its appropriated budget.  In addition to being required by law,[58] this action will address several core problems with the current CAT structure. For the first time, there will be meaningful checks and balances as part of the governance process— the Commission will be incentivized to carefully oversee the size of the CAT budget and carefully weigh the costs and benefits of required functionality, while Congress will have a clear role in order to protect against waste and regulatory overreach.  In addition, the funding controversy would be put to bed—the CAT would be treated the same as any other Commission project and funded through Section 31 fees (paid by the industry, not taxpayers writ large).

*Second*, while recent cost-saving efforts are a good initial step, the annual CAT budget is still estimated to be nearly $200 million.[59]  This is far too high, and all options must be on the table to rightsize the system and design it more efficiently.  We look forward to providing more detailed recommendations as the Commission conducts its comprehensive review, but suggestions include:

- Engage a third-party technology firm to perform an independent review of the technological design of CAT to identify opportunities to optimize and reduce costs;[60]

- Relax the most costly and compute-intensive deadlines, such as moving the initial FINRA CAT processing deadline to T+2 and moving the deadline to resolve errors to T+5;

- Reduce, simplify, and streamline the data fields required to be reported, rely on TRF or exchange-reported data when possible, and eliminate unnecessary records;

---

[57] https://www.sec.gov/newsroom/speeches-statements/atkins-prepared-remarks-sec-speaks-051925 and https://www.sec.gov/newsroom/speeches-statements/atkins-093025-consolidated-audit-trail-new-day-cat?utm_medium=email&utm_source=govdelivery.

[58] *See supra* Part I.

[59] https://www.sec.gov/newsroom/press-releases/2025-127-sec-issues-order-reduce-operating-costs-consolidated-audit-trail.

[60] *See also* Letter from Citadel Securities (Mar. 5, 2024) at 9-21, available at: https://www.sec.gov/comments/sr-finra-2024-002/srfinra2024002-442099-1120722.pdf (detailing numerous CAT design-related questions that should be analyzed).

13

**CITADEL | Securities**

- Optimize the linkage process, including by eliminating the production of all interim linkage data by FINRA CAT; and

- Retire the Electronic Blue Sheets system.

These actions must be taken prior to assessing new fees on broker-dealers and their customers. Doing so does not foreclose the SROs from recouping appropriate CAT fees that went uncollected in the interim; rather, it recognizes—as the Eleventh Circuit did—that the balance of equities clearly favors broker-dealers and their customers who have already paid hundreds of millions of dollars pursuant to an unlawful funding order and would have no recourse to the extent new fees are unlawfully collected given the SROs' immunity.

The Commission should be allocating its limited resources to implement Chairman Atkins' call for a comprehensive review and to chart a new path forward, rather than becoming embroiled in yet another controversy over the funding of a broken system.   We urge the Commission and the SROs to move as quickly as possible to rectify the errors of the past decade.

*    *    *    *    *    *    *    *    *    *

We thank the Commission for considering our comments.

Please feel free to call the undersigned with any questions regarding these comments.

> Respectfully,
>
> /s/ Stephen John Berger
>
> Managing Director
>
> Global Head of Government & Regulatory Policy

14

**A83**

# TAB F

Letter from Joseph P. Corcoran, Managing Director and Associate General Counsel, and Katie Kolchin CFA, Managing Director, Head of Equity & Options Market Structure, The Securities Industry and Financial Markets Association (SIFMA), (Oct. 21, 2025)

**sifma**®

*Invested in America*

October 21, 2025

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

> **Re:    Joint Industry Plan; Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail ("CAT NMS Plan") Regarding the CAT Funding Model; File No. 4-698**

Dear Ms. Countryman:

The Securities Industry and Financial Markets Association ("SIFMA")[1] submits this letter to the U.S. Securities and Exchange Commission ("Commission" or "SEC") to urge the Commission to disapprove the proposal ("Proposal"),[2] filed by the self-regulatory organizations ("SROs") as the Participants in the CAT NMS Plan, to re-adopt the legacy CAT Funding Model, with a slight modification, that the 11th Circuit Court of Appeals held as unlawful.[3]  The Participants' Proposal is a flawed attempt to circumvent the Court's Opinion invalidating the prior funding model.  The Commission should reject this attempt by immediately disapproving the Proposal.  Moreover, as we have stated previously, the legacy CAT Funding Model should be abandoned in favor of a new CAT funding approach involving the fee process in Section 31 of the Securities Exchange Act of 1934 ("Exchange Act").  While broker-dealers would still pay for CAT through the Section 31 process,[4] inclusion in the SEC's budget would serve to better align incentives to control costs and address longstanding concerns about ineffective governance, as well as provide a basis for a more transparent allocation of CAT costs.

---

[1] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's one million employees, we advocate on legislation, regulation and business policy affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA).

[2] Release No. 34-103960 (Sept. 12, 2025), 90 FR 44910 (Sept. 17, 2025).

[3] *Am. Sec. Ass'n et al. v. SEC*, No. 23-13396 (11th Cir.) (July 25, 2025) ("Opinion").

[4] Under Section 31 of the Exchange Act, the Commission charges Section 31 fees to SROs on certain transactions to reimburse the Commission for its budget.  The SROs in turn under their rules charge their broker-dealer members to recover the Section 31 fees.

Ms. Vanessa Countryman
U.S. Securities and Exchange Commission
October 21, 2025
Page 2


**The Court's Opinion**

As the Participants note in the Proposal, the Court invalidated the CAT Funding Model for two reasons. First, the Court found that the Commission did not adequately justify its decision to allow the Participants to pass through 100% of their CAT costs to Industry Members.[5] Second, the Court found that the Commission failed to update its 2016 economic analysis of the CAT conducted when it approved the CAT NMS Plan, even though the costs to build and operate the CAT have skyrocketed since 2016. The Court held that these flaws in the CAT Funding Model were serious and warranted vacatur of the Funding Model.

**The Participants Seek to Circumvent the Court's Opinion Through the Proposal**

In submitting the Proposal, the Participants attempted to address the first reason why the Court vacated the CAT Funding Model by proposing to amend the CAT NMS Plan to prevent SROs from filing rule changes *to establish new fees* to pass through their share of CAT costs to members. However, as described below, this action by the Participants is a flawed attempt to circumvent the Court's Opinion. The Commission should therefore disapprove the Proposal.

In the Proposal, the Participants seek to amend the CAT NMS Plan to prevent each Participant from filing a rule change with the SEC to establish "a new fee" for passing through to its members the CAT costs charged to such Participant in accordance with the CAT NMS Plan. By using the term "new fee," the Participants raise the specter of adding CAT costs to existing fees the SROs already charge their members to recoup their CAT costs, thus doing indirectly what they cannot do directly. The Court was clear in its holding that the SROs could not pass through their share of CAT costs to broker-dealers absent some new Commission finding that the ultimate allocation of cost burdens was consistent with the Exchange Act and otherwise lawful. The Commission has not made, nor do we believe it can make, such a finding. Therefore, the Commission should disapprove the Proposal as it directly contradicts the Court's Opinion.

Participants also seek to circumvent the Court's Opinion regarding the Commission's deficient economic analysis by attempting to force the Commission to act on the Proposal without providing any updated data that would feed into the Commission's statutorily required analysis. There is a whole host of information that the Commission must obtain and assess to conduct this analysis, including (i) the current and future trajectory of the CAT budget (including the key cost drivers and a detailed explanation as to why the 2016 estimates proved to be so inaccurate),[6] (ii) the CAT reporting costs that already have been, and continue to be, incurred by

---

[5] The term "Industry Member" is defined in the CAT NMS Plan to mean "a member of a national securities exchange or a member of a national securities association."

[6] See Release No. 34-79318 (Nov. 15, 2016), 81 FR 84696, 84863 (Nov. 23, 2016), where the Commission estimated, "In aggregate, the Commission believes that that industry will spend $2.4 billion to implement CAT, and $1.7 billion per year in ongoing annual costs." The Commission also stated that it, "continues to recognize that the methodology and data limitations used to develop these cost estimates could result in imprecise estimates that may

2

**A85**

Ms. Vanessa Countryman
U.S. Securities and Exchange Commission
October 21, 2025
Page 3

broker-dealers (including conducting a new "Reporters Study" to inform the analysis), (iii) whether the proposed funding model unfairly favors one group of market participants over another, (iv) the potential cost of security breaches given that there is more public information around security incidents and data breaches than there was in 2016,[7] (v) the continued cost of duplicative reporting that CAT was supposed to replace,[8] and (vi) the market-wide impacts on liquidity and competition associated with allocating at least two-thirds of CAT costs in perpetuity to broker-dealers and their customers.  The Participants' submission of the Proposal therefore reflects another attempt to circumvent the Court's Opinion, and the Commission should disapprove the Proposal on this basis as well.

**The Legacy CAT Funding Model Should be Abandoned in Favor of a New Approach**

The SROs through the CAT Operating Committee have for years sought to establish a funding model for the CAT without meaningful industry input.[9]  These efforts culminated in the adoption of a funding model over the strong objections of Industry Members, which have been validated by the Court's recent decision vacating the CAT Funding Model.  The Court's Opinion discusses in detail many of the significant flaws with the CAT Funding Model that SIFMA and others have raised before it was approved.  Given these significant flaws, instead of simply reimposing the same broken model as the SROs' Proposal attempts to do, it is time to adopt a new approach regarding CAT funding.  SIFMA believes that the new approach should involve funding CAT through the fee process found in Section 31 of the Exchange Act.

For example, the Court's Opinion discusses the flaws with relying on the SRO rule filing process to establish CAT fees.  In trying to support its decision to allow for 100% pass-through of CAT costs to Industry Members, the Commission asserted that it would review the appropriateness of any attempt by the SROs to pass-through CAT costs through the SRO fee filing process under Section 19(b) of the Exchange Act.  This was the process provided for in the

---

significantly differ from actual costs."  Id.  SIFMA believes that the Commission's original estimate is significantly lower than the actual costs borne by the industry to implement and annually report to CAT.

[7] See id. at 84874, where the Commission stated, "The Commission explained its belief that it is difficult to form reliable economic expectations for the costs of security breaches because there are few examples of security breaches analogous to the type that could occur under the CAT NMS Plan."  Given years of data since 2016, SIFMA believes that there is sufficient information in the public domain available for the Commission to conduct an economic analysis that outlines the ongoing costs to protect CAT data as well as costs resulting from potential breaches of CAT data.

[8] SEC Rule 613(a)(1)(ix) is much broader than just FINRA's Order Audit Trail System ("OATS") (retired in Sept. 2021) as it requires a plan to eliminate any rules and systems "rendered duplicative by the consolidated audit trail."  See also 81 FR at 84777, where the Commission stated, "Specifically, the Commission believes that, going forward, CAT will provide Commission Staff with much of the equity and option data that is currently obtained through equity and option cleared reports and [Electronic Blue Sheets], including the additional transaction data captured in connection with Rule 13h-1 concerning large traders."  Broker-dealers continue to incur the costs of complying with duplicative rules well past the original Commission estimate of 2 to 2.5 years.

[9] Indeed, the current Proposal was filed without prior consultation with Industry Members.

3

**A86**

Ms. Vanessa Countryman
U.S. Securities and Exchange Commission
October 21, 2025
Page 4

CAT Funding Model for the Commission to assess the SROs' changes to CAT fees over time. However, the Court rejected this argument and found that the Commission's *post hoc* review of SRO fee filings was an insufficient mechanism to determine whether it was appropriate for the SROs to pass through their share of CAT costs because, among other things, the filings were immediately effective and not subject to any judicial review unless the Commission suspended the filings. Notwithstanding the Court's findings, the Participants in the Proposal seek to perpetuate this problematic aspect of the funding model.

The Court's Opinion discusses other flaws with the CAT Funding Model that SIFMA and others raised while the model was under consideration at the Commission. Seeking to re-adopt essentially the same, now-vacated, CAT Funding Model is the wrong approach. The Court's decision vacating the funding model is clear evidence that an objective third-party recognized the significant flaws with the model.

SIFMA believes it is time to chart a new path forward regarding CAT funding. Consistent with earlier SIFMA comments, we recommend that the SEC fund the CAT through its standard budget process, as it does with other tools and technology used by the Commission. Importantly, this would make CAT costs—which would ultimately be funded through the regular Section 31 process—subject to Congressional review and oversight. In connection with this recommendation, we note that the Section 31 fee collection process itself needs to be updated to allow the Commission to adjust fees when volumes are higher or lower than projections even when Congress has not funded the government through a "regular appropriation."[10]

We greatly appreciate the recent efforts by the Commission and the SROs to reduce CAT costs and look forward to further engagement on this front as well as on other significant CAT reforms the Commission should consider as part of its ongoing comprehensive review of the CAT.[11] However, without an SEC funding obligation for CAT, the SEC may not have an incentive to consider the costs associated with operating the CAT because these costs are borne primarily by broker-dealers and their customers. In other words, the SEC would have no "skin in the game" (or meaningful oversight) regarding how much it costs to operate the CAT and whether it could be done more efficiently. To address this disconnect, we recommend that the CAT be included in the SEC's budget.

As the CAT is a regulatory system used by the SEC, it should be part of the SEC's budget. While the industry will still pay for CAT through the Section 31 process, inclusion in the SEC's budget will serve to better align incentives to control costs and address longstanding

---

[10] The fee adjustment process under Section 31 is triggered by a "regular appropriation" for the Federal government's fiscal year and is impacted when this does not occur. SIFMA would welcome the opportunity to explore this and possibly other updates to the Section 31 fee collection process.

[11] Paul S. Atkins, Chairman, Prepared Remarks Before SEC Speaks, May 19, 2025, https://www.sec.gov/newsroom/speeches-statements/atkins-prepared-remarks-sec-speaks-051925. We expect that CAT governance will be evaluated as part of these efforts.

4

A87

Ms. Vanessa Countryman
U.S. Securities and Exchange Commission
October 21, 2025
Page 5

concerns about ineffective governance.[12]  We anticipate that CAT would be a line item in the SEC's budget subject to Congressional review as part of the SEC's appropriations process.  As we have previously stated, the CAT ultimately should be subject to the checks and balances of the appropriations process for the SEC.

\*                \*                \*

As discussed above, SIFMA urges the Commission to disapprove the proposal.  Among the Proposal's flaws, it represents an attempt to circumvent the Court's Opinion and therefore should be disapproved.  SIFMA also calls on the SEC and SROs to chart a new path forward regarding CAT funding, with the SEC ultimately assuming CAT funding through the Section 31 process.  If you have any questions or need any additional information, please contact Katie Kolchin at (212) 313-1239, Joe Corcoran at (202) 962-7383, or Gerald O'Hara at (202) 962-7343.

Sincerely,

Katie Kolchin, CFA
Managing Director, Head of Equity &
Options Market Structure

Joseph Corcoran
Managing Director and Associate
General Counsel

---

[12] Following a Section 31-like process may provide a more traceable path between a customer's trading activity and the fee if a firm chooses to pass along the fee.

5

# TAB G

Letter from Christopher A. Iacovella, President & Chief Executive Officer, American Securities Association, (Oct. 31, 2025)



**american securities association**
*America's Voice for Main Street's Investors*

---

**VIA ELECTRONIC MAIL to: <u>rule-comments@sec.gov</u>**

February 10, 2026

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

*Re: Consolidated Audit Trail Funding Proposal (File No. 4-698)*

Dear Ms. Countryman:

The American Securities Association[1] (ASA) submits these comments in response to the proposed new funding plan for the Consolidated Audit Trail ("CAT") submitted by the self-regulatory organizations ("SROs") in 2025 (the "Proposal"). ASA has been deeply involved in issues regarding the CAT since its inception, including the CAT's funding model, its unprecedented invasion of the privacy rights of American investors, and the legality of the CAT itself. None of these foundational concerns have been resolved in the Commission's recent actions or in the most recent order and related Proposal.

In our October 31, 2025 letter on this file (the "October 31 ASA Letter[2]"), ASA explained how the CAT has imposed billions of dollars in costs on broker-dealers and their customers, violated the constitutional right to privacy for millions of Americans, and provided no meaningful benefits that could not have been achieved through less intrusive means. We incorporate that letter by reference here and request that it be made part of the comment file for this submission.

## I. <u>Background</u>.

Since the Commission first established the CAT under Rule 613 in 2012, the CAT has evolved into an extraordinarily expensive, centralized surveillance system that collects and stores vast amounts of trading data about American investors. In 2023, ASA and Citadel challenged the Commission's CAT funding plan in court. In July 2025, the U.S. Court of Appeals for the Eleventh Circuit ruled in our favor, holding that the Commission acted arbitrarily and capriciously in adopting the 2023 funding plan and that it relied on incomplete and incompatible

---

[1] ASA is a trade association that represents the retail and institutional capital markets interests of regional financial services firms who provide Main Street businesses with access to capital and advise hardworking Americans how to create and preserve wealth. ASA's mission is to promote trust and confidence among investors, facilitate capital formation, and support efficient and competitively balanced capital markets. This mission advances financial independence, stimulates job creation, and increases prosperity. ASA has a geographically diverse membership base that spans the Heartland, Southwest, Southeast, Atlantic, and Pacific Northwest regions of the United States.

[2] ASA Letter to the Securities and Exchange Commission regarding Re: Consolidated Audit Trail Funding Proposal (Release No. 34-103960; File No. 4-698) available here: https://www.sec.gov/comments/4-698/4698-672447-2037474.pdf.

---


**American Securities Association**
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004


AmericanSecurities.org
@amersecurities


202.621.1784

**A89**

1



economic analysis to justify that plan[3].

Despite that ruling, the Proposal essentially seeks to reinstate the unlawful 2023 funding framework, again placing the overwhelming burden of CAT costs on broker-dealers and, ultimately, their customers. As we explained in our October Letter, neither Rule 613 nor the CAT NMS Plan authorizes the Commission or the SROs to treat broker-dealers as an off-budget funding source for an SEC surveillance project whose legality and necessity remain unresolved.

## II. <u>The SEC Must First Determine Whether the CAT Is Legal</u>.

The CAT continues to raise fundamental questions of administrative and constitutional law. The Eleventh Circuit's decision exposed only a fraction of the deeper legal flaws embedded in the CAT's structure, including the Commission's insistence on collecting and storing personally identifiable information ("PII") of every American who trades a single share of stock. That collection and storage of PII in a large, centralized database accessible to government employees and contractors is a stark intrusion on Americans' Fourth Amendment rights and creates an enormous cybersecurity target.

Before approving any new funding arrangement, the Commission should determine whether a system resembling the current CAT is lawful at all—both in terms of statutory authority and constitutional constraints. If the Commission nonetheless concludes that the CAT can be operated lawfully, it must ensure that any funding mechanism complies with the Appropriations Clause and does not simply shift the entire cost of this system onto broker-dealers and their customers.

## III. <u>The SEC Should Perform a Full Financial Audit of CAT Costs</u>.

As ASA explained previously, the Commission should conduct a complete and transparent financial audit of the CAT. That audit should include, at a minimum:

- All CAT-related expenditures, including contractor and vendor costs, consulting and legal fees, and compensation to CAT LLC and SRO personnel.
- How broker-dealer financial responsibilities were determined, including the allocation of costs across different types of firms and business models.
- A detailed accounting of any reserves, surplus collections, and other balances accumulated under prior funding arrangements.

The results of that audit should be compiled into a public report that identifies any waste, mismanagement, or abuse, and should be completed before the Commission approves any new funding plan.

---

[3] Am. Sec. Ass'n, v. SEC, 147 F.4th 1264 (11th Cir. 2025) (ASA).

 **American Securities Association** 1455 Pennsylvania Ave. NW, Suite 400 Washington, D.C. 20004     AmericanSecurities.org @amersecurities     202.621.1784

**A90**

2



**american securities association**
America's Voice for Main Street's Investors

## IV. The SEC Should Determine How Legacy CAT Costs Should Be Reimbursed.

The Eleventh Circuit's decision vacating the 2023 funding plan raises an obvious question: what happens to the substantial sums that broker-dealers have already been forced to pay under an unlawful model? As noted in our October Letter, it took roughly $500 million to build the CAT and approximately $200 million per year to operate it—numbers far exceeding the Commission's initial estimates. Many of these funds were extracted from broker-dealers outside the normal appropriations process and used to build and operate a system whose legality remains unresolved.

The Commission should identify and adopt a mechanism to reimburse broker-dealers (and, by extension, American investors) for amounts contributed under unlawful or defective funding arrangements. Possible mechanisms include direct reimbursement funds, fee offsets over time, or a congressional appropriation to restore funds that should never have been taken outside the appropriations process.

## V. The Proposal Is Fundamentally Flawed for the Following Reasons.

Building on each of the foregoing concerns, ASA believes the Proposal is fundamentally flawed and cannot be approved in its current form. In particular, the Proposal:

1. **Fails to address the Commission's authority and the legality of the CAT itself.** The Proposal does not meaningfully grapple with whether the Commission has statutory authority to operate a multi-billion-dollar surveillance system like the CAT, nor does it address the constitutional issues raised by the collection and storage of massive volumes of investor data. The Commission has an affirmative duty to examine its own statutory authority and legal assumptions when approving an NMS Plan amendment of this scope; it has not done so here.

2. **Does not remedy the Commission's prior deficient economic analysis.** The Eleventh Circuit held that the Commission's prior economic analysis was incomplete and incompatible with the funding plan it adopted. Yet the Proposal proceeds without the updated, detailed economic analysis necessary to determine whether the current allocation of costs is reasonable and equitable. Among other things:

   - CAT LLC has not publicly provided key metrics needed for a proper analysis, including the number of daily executed transactions, quotation messages, CAT records, unique market participants with records in the system, and usage-related costs.[4]
   - The Commission has not explained why its past cost estimates were so inaccurate or identified the core cost drivers that caused this project to diverge so

---

[4] See Letter from Citadel Securities (Jan. 30, 2026) at 2–3 (identifying key metrics the Commission must obtain from CAT LLC).


American Securities Association
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004


AmericanSecurities.org
@amersecurities


202.621.1784

**A91**

3



# american securities association
## America's Voice for Main Street's Investors

dramatically from prior projections.

- There is no robust, forward-looking cost-trajectory analysis that accounts for expected changes in market structure, including new exchanges, overnight trading, and rules that will increase message traffic.[5]
- The Commission has not evaluated how CAT fees were actually allocated under the vacated 2023 framework, including the distribution of fees across equities and options, retail and institutional activity, and different business models such as market making.; and
- The Proposal fails to account for CAT costs in the broader context of existing regulatory burdens, including ongoing CAT reporting expenses and the continued operation of systems like Electronic Blue Sheets.[6]

3. **Does not meaningfully prohibit SRO pass-throughs of CAT costs.** While the Proposal purports to limit certain pass-throughs, it leaves in place Plan language that permits SROs to bundle or otherwise incorporate CAT costs into their various other fees or assessments. The Eleventh Circuit made clear that the Commission cannot pretend that SROs will bear a portion of CAT costs while ignoring their ability to pass those costs on to broker-dealers and their customers[7]. If SRO pass-throughs up to 100% of their allocations are permitted in substance, the Commission must confront that reality, explain its policy shift, and incorporate the full economic impact into its analysis. The Proposal does not do so.[8]

4. **Circumvents Commission Rule 608 by relying on immediately-effective SRO fee filings.** The Proposal contemplates that CAT costs will be imposed on broker-dealers via immediately effective SRO fee filings under Rule 19b-4, even though Commission rules require that fees associated with NMS Plans like the CAT be approved under Rule 608 before they become effective. This effectively shields core elements of the CAT funding model from both Commission approval and judicial review, contrary to the Commission's own rulemaking and the concerns highlighted by the Eleventh Circuit.[9]

5. **Relies on unverified claims that the Financial Accountability Milestones have been satisfied.** The Proposal assumes that the Financial Accountability Milestones ("FAMs") have been met and that historical CAT costs are properly recoverable from broker-dealers.[10] But the Commission has not independently verified FAM compliance,

---

[5] See, e.g., CAT Cost Savings Amendment, Exchange Act Release No. 34-104504 (Dec. 23, 2025); Tick Sizes and Access Fees rule, 89 Fed. Reg. 81,620 (Oct. 8, 2024); and recent approvals of new exchanges and options markets.

[6] See Citadel Securities Jan. 30, 2026 Letter at 3–4 (discussing CAT reporting costs and Electronic Blue Sheets obligations).

[7] See Am. Sec. Ass'n v. SEC, 147 F.4th at 1274–77 (discussing SRO pass-throughs and the need either to prohibit them or fully account for them).

[8] See Citadel Securities Jan. 30, 2026 Letter at 4–5 (explaining how the CAT NMS Plan still allows pass-throughs via existing fees and why that contravenes the Eleventh Circuit's ruling).

[9] See Citadel Securities Jan. 30, 2026 Letter at 5–6 (discussing the 2020 amendments to Rule 608 and their application to CAT fees); see also 85 Fed. Reg. 65,470 (Oct. 15, 2020).

[10] See Citadel Securities Jan. 30, 2026 Letter at 6–7 (explaining that the Commission has not independently confirmed FAM compliance and describing reliance on SRO self-certifications and exemptive relief).

 **American Securities Association**
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004

 AmericanSecurities.org
@amersecurities

 202.621.1784

**A92**

4



**american securities association**
*America's Voice for Main Street's Investors*

instead relying on SRO self-certifications and exemptive relief issued years after certain milestones passed. Exemptive orders issued long after a milestone deadline cannot retroactively cure noncompliance so as to justify the allocation of hundreds of millions of dollars in historical costs to broker-dealers and their customers.

6. **Permits the over-collection and misuse of CAT reserve funds.** The Proposal allows the establishment and maintenance of a substantial reserve, but does not establish adequate Commission oversight to prevent over-collection or to ensure that reserves are used solely to offset future fees consistent with the CAT NMS Plan. Experience under the prior framework shows that reserves can rapidly exceed stated limits and be used to fund CAT operations in the absence of a Commission-approved funding model, effectively allowing the SROs to continue operating as though a vacated order remains in place and depriving broker-dealers of the offsets they are due.[11]

7. **Postpones the necessary, comprehensive review of the CAT.** The Commission has committed to a comprehensive review of the CAT, including its necessity, design, data-collection approach, and costs. Approving the Proposal now would reverse the proper order of operations by locking in a new funding structure before that review is completed. The Commission's limited resources should be devoted first to that comprehensive review and to considering alternatives—including funding the CAT, if it is to continue at all, through the appropriations process rather than through perpetual assessments on broker-dealers and their clients.[12]

In ASA's view, these defects are not technicalities that can be patched at the margin. They go to the heart of whether the Commission may lawfully and prudently impose another CAT funding regime on the market at this time.

## VI. <u>Conclusion</u>.

ASA appreciates the Commission's willingness to revisit the CAT and its funding model, and we strongly support a comprehensive, top-to-bottom review of this project. However, until the Commission has (i) resolved the fundamental legal and privacy issues surrounding the CAT, (ii) completed an accurate and transparent economic analysis, (iii) audited and publicly reported on CAT costs and reserves, and (iv) ensured that broker-dealers and their customers are not saddled with unlawful or unreasonable burdens, ASA believes the Proposal cannot be approved.

For these reasons, ASA respectfully urges the Commission to reject or defer action on the 2025 CAT Funding Proposal and instead focus its efforts on the broader legal, economic, and policy questions that must be answered before any durable funding solution can be considered.

---

[11] See Citadel Securities Jan. 30, 2026 Letter at 7–8; see also Petition for Rulemaking to Amend CAT NMS Plan to Direct Proper Use of CAT LLC Reserve (Jan. 15, 2026), File No. 4-878.

[12] See Citadel Securities Jan. 30, 2026 Letter at 8–9; see also Remarks of Chairman Atkins on the CAT (Sept. 30, 2025 and May 19, 2025).


American Securities Association
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004

AmericanSecurities.org
@amersecurities


202.621.1784

**A93**

5



# american securities association
### America's Voice for Main Street's Investors

Sincerely,

*Christopher A. Iacovella*

Christopher A. Iacovella
President & Chief Executive Officer
American Securities Association

 

American Securities Association
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004

AmericanSecurities.org
@amersecurities

202.621.1784

**A94**

6

# TAB H

Letter from Patrick Sexton, EVP, General Counsel & Corporate Secretary, The Cboe Exchanges (CBOE), (Oct. 31, 2025)



433 W Van Buren St.
Chicago, IL
60607
United States

**cboe.com**

October 31, 2025

*Submitted Electronically*

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549-1090

> **Re:    September 5, 2025 Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail (File No. 4-698)**

Dear Ms. Countryman:

The Cboe Exchanges ("Cboe")[1] submit this letter to request that the U.S. Securities and Exchange Commission (the "Commission") disapprove the above-referenced proposed amendment[2] (the "Amendment") to the National Market System Plan Governing the Consolidated Audit Trail (the "CAT Plan"). Cboe has long advocated for changes that would reduce the scope and operating costs of the CAT and will continue to work constructively with the Commission as it continues its ongoing comprehensive review of CAT both to (i) propose a streamlined CAT that will continue to meet the regulatory needs of the Plan Participants to effectively surveil and regulate the markets we operate; and (ii) address the issues raised in *Am. Sec. Ass'n v. Citadel Sec. LLC*, 147 F.4th 1264 (11th Cir. 2025) to ensure there is an appropriate funding model for CAT so the cost and burden of CAT is not incurred by the Plan Participants.[3]

## The Proposed Amendment Exceeds CAT LLC's Authority

The Amendment seeks to dictate what Cboe and the other Plan Participants can and cannot do with respect to fee filings and decision making about how Cboe and the other Plan Participants can fund themselves. The Amendment cites Section 11A(a)(3) of the Exchange Act and NMS Rule 608,[4] but those provisions do not empower Consolidated Audit Trail, LLC ("CAT LLC") to restrict fee filings that are made by Cboe and the other Plan Participants. Specifically, Section 11A(a)(3)(B) provides that the Commission can authorize or require SROs to act jointly with respect to matters as to which they share authority under the Exchange Act with respect to national market system matters, but fee rule filings made by an individual SRO fall outside the scope of that Section.[5] In addition, Rule 608(a)(5)(ii) (which requires that NMS plans contain a

---

[1] The Cboe Exchanges include Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc.

[2] Joint Industry Plan, Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail Regarding CAT Funding Model, Exchange Act Rel. No. 34-103960 (Sept. 12, 2025), 90 Fed. Reg. 44910 (Sept. 17, 2025).

[3] *See, e.g.,* Order Granting Conditional Exemptive Relief, Pursuant to Section 26(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 608(e) of Regulation NMS Thereunder, From Certain Requirements of the National Market System Plan Governing the Consolidated Audit Trail, Rule 613 of Regulation NMS, and Rule 17a-1 Under the Exchange Act, Exchange Act Rel. No. 34-104144 (Sept. 30, 2025), 90 Fed. Reg. 47853, 47854 (Oct. 2, 2025).

[4] Amendment, 90 Fed. Reg. at 44910.

[5] 15 U.S.C. § 78k-1(a)(3)(B).

description of the plan fees and how those fees are imposed)[6] does not authorize CAT LLC to go beyond the subject of its own fees and dictate how Cboe and other Plan Participants determine their fees and their individual rule filings that are made reflecting those choices.[7]

Additionally, the Amendment is factually incorrect because it purports to reflect an agreement by Cboe and each CAT Plan Participant to refrain from establishing certain fees, which Cboe did not agree to. In fact, Cboe voted against the Amendment because the Exchange Act does not authorize the Plan Participants to restrict SRO fee filings. Further, the rationale and timing for the Amendment is now moot because the Eleventh Circuit did not grant the extension of the stay for which the Amendment was intended to support. In short, while Cboe may understand the motivation of the Plan Participants to propose the Amendment, the vehicle by which it did so was improper under the Exchange Act.

## A Temporary Funding Model Alternative

In its October 17, 2025 comment letter, Financial Industry Regulatory Authority, Inc. ("FINRA") suggested that the Commission should "consider a time-limited interim funding solution" while the comprehensive review of CAT moves forward and Cboe agrees that an interim funding solution is necessary.[8] In connection with an interim funding model, Cboe is open to discussing a voluntary agreement by all of the SROs not to make rule filings seeking to pass through their CAT costs for a specified period (e.g., one year) in contrast to the mandate that CAT LLC seeks to impose in the Amendment.

* * * * *

For the above reasons, the Amendment is unlawful, should be disapproved and is a distraction from the other important work that is ongoing to reduce the scope and cost of CAT. Cboe is eager to continue focusing efforts on all issues related to CAT, including pursuit of a permanent funding model that does not unfairly require the Plan Participants to fund CAT costs as has been done for more than a decade. If you have any questions or need any additional information, please feel to contact us.

Regards,

/s/ Patrick Sexton

Patrick Sexton
EVP, General Counsel, Corporate Secretary

---

[6] 17 C.F.R. § 242.608(a)(5)(ii).

[7] The conclusion that CAT LLC has no authority to restrict fee filings that are made by Cboe and other individual Plan Participants is reinforced by the fact that other provisions of the Exchange Act specifically govern SRO rule filings.

[8] *See* Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati on behalf of FINRA, to Vanessa Countryman, Secretary, SEC (Oct. 17, 2025).

2

# TAB I

Letter from Joanna Mallers, Secretary, PTG (Nov. 24, 2025)



November 24, 2025

Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

**Re: 2025 CAT Funding Proposal (File No. 4-698)**

PTG[1] writes in response to the latest attempt by the self-regulatory organizations ("SROs") to offload hundreds of millions of dollars of CAT costs on to broker-dealers and investors.[2]  The SROs' most recent filing (the "2025 Funding Proposal") disregards the 11th Circuit's decision vacating a nearly identical funding order.  Rather than grappling with the serious flaws identified by the Court, the SROs attempt to simply repackage the same unlawful model the 11th Circuit rejected.

For the reasons discussed in more detail below, the Commission should not seriously entertain the 2025 Funding Proposal. The CAT Operating Committee's efforts would be better directed toward working collaboratively with the industry to reduce costs, enhance CAT governance, and transition to a viable funding structure. We welcome the opportunity to work with the CAT Operating Committee and the Commission to support the Chair's comprehensive review announced in September.[3]  By bringing CAT within the Commission's budget, streamlining its scope, and retiring duplicative systems, the SEC can realign CAT with its original objectives.

---

[1]  PTG, formerly known as the FIA Principal Traders Group ("FIA PTG") is an association of firms, many of whom are broker-dealers, who trade their own capital on exchanges in futures, options and equities markets worldwide. PTG members engage in manual, automated and hybrid methods of trading, and they are active in a wide variety of asset classes, including equities, fixed income, foreign exchange and commodities. PTG member firms serve as a critical source of liquidity, allowing those who use the markets, including individual investors, to manage their risks and invest effectively. The presence of competitive professional traders contributing to price discovery and the provision of liquidity is a hallmark of well-functioning markets. PTG advocates for open access to markets, transparency and data-driven policy.

[2]  Joint Industry Plan; Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail Regarding CAT Funding Model, 90 Fed. Reg. 44910 (Sept. 17, 2025) available at https://www.govinfo.gov/content/pkg/FR-2025-09-17/pdf/2025-17929.pdf.

[3]  Chairman Atkins, "Consolidated Audit Trail: A New Day For the CAT (Sept. 30, 2025) available at https://www.sec.gov/newsroom/speeches-statements/atkins-093025-consolidated-audit-trail-new-day-cat.

Vanessa Countryman, U.S. Securities and Exchange Commission
November 24, 2025
Page 2

Until the Commission determines a sustainable path forward, broker-dealers and their customers should not be left to bear the brunt of the CAT's historical and ongoing mismanagement.

## I.    The 2025 Funding Proposal Fails to Remedy the Flaws Identified by the 11th Circuit

In *Am. Sec. Ass'n et al. v. SEC*, No. 23-13396 (11th Cir. 2025) the Court found that the "2023 Funding Order's allocation of costs and its economic analysis are arbitrary and capricious, and thus violate the Administrative Procedure Act."[4]  *First*, the Court found that the 2023 funding order improperly permitted the SROs to pass all of the CAT costs to broker-dealers and their customers.

The 2025 Funding Order fails to meaningfully address the Court's finding. It adds a single paragraph prohibiting the SROs from establishing 'new fees' for passing through SRO-allocated CAT fees, but says nothing about passing those costs through *existing* fees—producing the same result the Court rejected.[5]  This language seeks to preserve precisely the conduct that the Eleventh Circuit held unlawful—the imposition of unapproved, unreviewable CAT costs on broker-dealers and their customers through opaque SRO fee structures.

*Second,* the Court also found that the 2023 Funding Order's economic analysis was deficient and violated the APA. Despite this, the 2025 Funding Proposal fails to provide the Commission with any new data or analysis that would support the Commission's statutorily required analysis. Nothing in the 2025 Funding Model provides the Commission with new information to update its deeply flawed economic analysis in the 2016 CAT NMS Plan approval, such as data regarding the future trajectory of CAT costs or total CAT reporting costs already borne by broker-dealers.[6] Absent a rigorous economic analysis grounded in real-world data, the Commission cannot reasonably determine that the proposed funding model is "fair and equitable" or consistent with the Exchange Act.

## II.    The Commission's Comprehensive Review Must Precede Any New Funding Model

We fully support Chairman Atkins' call for a "comprehensive review" of the CAT and urge the Commission to commence this effort as soon as practicable. Beyond addressing its skyrocketing costs, the Commission must take a hard look at the underlying legal assumptions and governance failures that have plagued the CAT since its inception.

Approving the SROs' latest funding model before that review puts the cart before the horse. The CAT's decade-long history of cost overruns and governance failures demands a fundamental course correction. To ensure long-term sustainability, the Commission's review should focus on establishing a structure that aligns incentives, strengthens accountability, and imposes meaningful cost discipline.

---

[4]  *Am Sec. Ass'n* at 13-14.

[5]  90 Fed. Reg. at 44911.

[6]  *Id.* at 24.

2

A98

Vanessa Countryman, U.S. Securities and Exchange Commission
November 24, 2025
Page 3

### a. The CAT Should Be Funded Through the Commission's Budget

We reiterate that the CAT—a Commission system—should be funded through the Commission's budget. Re-architecting CAT's budget in this way would be a significant improvement from the status quo, addressing many of the governance failures and conflicts of interest that persist under the current structure. Though the industry will still fund CAT through the Commission's regular Section 31 process, placing CAT within the Commission's budget would better align incentives to control CAT costs and improve cost discipline and accountability. As an SEC system, the CAT should operate under a Congressionally-authorized budget, driving disciplined decisions on scope and technology and restoring public confidence that costs are justified by benefits.

### b. Technology Review & Cost Reduction Measures

We were encouraged by the Commission's September 30 exemptive order to facilitate CAT cost reductions, but far more needs to be done to reform and rationalize the system.[7]  As part of its comprehensive review, the Commission should direct the CAT Operating Committee to engage an independent technology firm to evaluate the CAT's scope and system design, identifying opportunities to reduce costs.  Market participants, who have historically been excluded from the Operating Committee's decision-making, must be directly involved in these efforts to ensure that technical and operational realities inform any path forward.

### c. Retirement of Duplicative Systems

The Commission should also retire duplicative and costly legacy reporting systems, including the electronic blue sheets system ("EBS"). When the SEC directed the SROs to submit a plan to create the CAT, the SEC expressly contemplated that the CAT would result in the retirement of the parallel EBS.[8]  Yet even though the CAT is now fully operational, the EBS remains and no retirement plan has been announced.  This results in market participants incurring duplicative costs for market surveillance.

## III.    Conclusion

The Commission should reject the 2025 Funding Proposal, which flies in the face of the 11th Circuit's decision and perpetuates the same structural and governance flaws that have contributed to a decade of mismanagement. Instead, the Commission should prioritize its comprehensive review to establish a sustainable, transparent and accountable framework for CAT governance and funding. By bringing CAT within the Commission's budget, engaging independent experts, and retiring duplicative systems, the SEC can realign CAT with its original objectives.

PTG and its members stand ready to assist the Commission and the SROs in advancing these reforms to ensure the CAT operates efficiently, securely, and in the public interest.

If you have any questions or need more information, please contact Joanna Mallers (jmallers@ptgmarkets.org).

---

[7] Exch. Act Rel. No. 104144 (Sept. 30 ,2025) available at https://www.sec.gov/files/rules/exorders/2025/34-104144.pdf.

[8] Consolidated Audit Trail, 77 Fed. Reg. 45722 (Aug. 1, 2012).

**A99**

Vanessa Countryman, U.S. Securities and Exchange Commission
November 24, 2025
Page 4

Sincerely,

PTG

*[signature]*

Joanna Mallers
Secretary

cc:    Paul S. Atkins, Chairman
       Hester M. Peirce, Commissioner
       Caroline A. Crenshaw, Commissioner
       Mark T. Uyeda, Commissioner

**A100**

# TAB J

Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, Consolidated Audit Trail, LLC (Dec. 18, 2025)

**VIA EMAIL (rule-comments@sec.gov)**

December 18, 2025

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

> Re:  File Number 4-698
> Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail regarding CAT Funding Model – Response to Comments

Dear Ms. Countryman:

On September 5, 2025, the Consolidated Audit Trail, LLC ("CAT LLC"), on behalf of the Participants[1] in the National Market System Plan Governing the Consolidated Audit Trail[2] (the "CAT NMS Plan" or "Plan"), filed with the Securities and Exchange Commission ("SEC" or "Commission") a proposed amendment to the CAT NMS Plan pursuant to Rule 608 of Regulation NMS under the Securities Exchange Act of 1934 ("Exchange Act")[3] to implement a revised funding model (the "Funding Proposal") for the consolidated audit trail (the "CAT") and to establish a fee schedule for Participant CAT fees in accordance with the Funding Proposal.[4] The Proposed Amendment was published for comment in the Federal Register on September 17, 2025.[5] On November 21, 2025, the Commission instituted proceedings to determine whether to approve or disapprove the Proposed Amendment.[6]

To date, commenters have submitted seven comment letters in response to the Proposed Amendment. CAT LLC submits this letter to respond to issues raised in those comment letters

---

[1]    The twenty-seven Participants of the CAT NMS Plan are:  24X National Exchange LLC, BOX Exchange LLC, Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc. ("FINRA"), Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX LLC, Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, MIAX Sapphire, LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, The NASDAQ Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc., and NYSE Texas, Inc.

[2]    The CAT NMS Plan is a national market system plan approved by the Commission pursuant to Section 11A of the Exchange Act and the rules and regulations thereunder.  See Securities Exchange Act Rel. No. 79318 (Nov. 15, 2016), 81 Fed. Reg. 84696 (Nov. 23, 2016) ("CAT NMS Plan Approval Order").  The full text of the CAT NMS Plan is available at www.catnmsplan.com.  Unless otherwise defined herein, capitalized terms are defined as set forth in the CAT NMS Plan or the Proposed Amendment, as applicable.

[3]    17 C.F.R. § 242.608.

[4]    Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Sept. 5, 2025) ("Proposed Amendment").  See also Securities Exchange Act Rel. No. 98290 (Sept. 6, 2023), 88 Fed. Reg. 62628 (Sept. 12, 2023) ("Executed Share Model Approval Order").

[5]    Securities Exchange Act Rel. No. 103960 (Sept. 12, 2025), 90 Fed. Reg. 44910 (Sept. 17, 2025).

[6]    Securities Exchange Act Rel. No. 104234 (Nov. 21, 2025), 90 Fed. Reg. 54438 (Nov. 26, 2025) ("OIP").

Ms. Vanessa Countryman
December 18, 2025
Page 2

and in the OIP that are directed to CAT LLC.[7]  This letter is divided into four sections.  Section I discusses comments related to the allocation of CAT fees among Participants and Industry Members under the Funding Proposal; Section II discusses comments related to the Funding Proposal's use of executed equivalent share volumes to calculate CAT fees; Section III addresses comments related to the pass-through prohibition described in the Proposed Amendment; and Section IV addresses various other issues raised by commenters.  CAT LLC notes that these responses represent the consensus of the Participants, but that all Participants may not fully agree with each response set forth in this letter.

The Funding Proposal directly addresses concerns discussed in the decision of the U.S. Court of Appeals for the Eleventh Circuit ("Eleventh Circuit")[8] regarding the possibility for 100% pass-through of Participant CAT costs under the 2023 funding order without the SEC considering the effects of that choice, and would provide reasonable fees that are equitably allocated, not unfairly discriminatory, and do not impose an undue burden on competition.  CAT LLC believes that the Funding Proposal is consistent with the Exchange Act and should be approved by the Commission.

## I.    Allocation of Fees Among Participants and Industry Members

Commenters make several arguments related to the decision in the Funding Proposal to allocate one-third of CAT costs to Participants and two-thirds of CAT costs to Industry Members.[9]  These commenters made the same arguments with respect to the allocation of CAT costs between Participants and Industry Members under the Executed Shares Model when it was originally proposed, and CAT LLC addressed those comments in detail in its prior comment letters

---

[7]    *See* Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati Professional Corporation on behalf of FINRA, to Vanessa Countryman, Secretary, Commission (Oct. 17, 2025) ("FINRA Letter"); Letter from Gentry Collins, CEO, The American Free Enterprise Chamber of Commerce, to Vanessa Countryman, Secretary, Commission (Oct. 17, 2025) ("Amfree Chamber Letter"); Letter from Stephen John Berger, Managing Director, Global Head of Government and Regulatory Policy, Citadel Securities, to Vanessa Countryman, Secretary, Commission (Oct. 17, 2025) ("Citadel Letter"); Letter from Joseph P. Corcoran, Managing Director and Associate General Counsel, and Katie Kolchin CFA, Managing Director, Head of Equity & Options Market Structure, Securities Industry and Financial Markets Association, to Vanessa Countryman, Secretary, Commission (Oct. 21, 2025) ("SIFMA Letter"); Letter from Patrick Sexton, EVP, General Counsel & Corporate Secretary, Cboe, to Vanessa Countryman, Secretary, Commission (Oct. 31, 2025) ("Cboe Letter"); and Letter from Christopher A. Iacovella, President & CEO, American Securities Association, to Vanessa Countryman, Secretary, Commission (Oct. 31, 2025) ("ASA Letter"); Letter from Joanna Mallers, Secretary, PTG, to Vanessa Countryman, Secretary, Commission (Nov. 24, 2025) ("PTG Letter").

[8]    *Am. Sec. Ass'n, Citadel Sec. LLC v. U.S. Sec. & Exch. Comm'n*, No. 23-13396, 2025 WL 2092054 (11th Cir. July 25, 2025) ("Eleventh Circuit Opinion").

[9]    *See* Citadel Letter at 6-8; FINRA Letter at 4.

Ms. Vanessa Countryman
December 18, 2025
Page 3

concerning the Executed Shares Model, as well as when it originally proposed the Executed Shares Model.[10]

## II.    Executed Equivalent Shares

One commenter makes several arguments stating that the Proposed Amendment does not adequately explain why it is equitable to use executed equivalent share volume as the basis for calculating CAT fees rather than message traffic.[11]  This commenter made the same arguments with respect to the use of executed equivalent share volume to calculate CAT fees under the Executed Shares Model when it was originally proposed, and CAT LLC addressed those comments in its May 2023 Response to Comments.[12]  CAT LLC also addressed this issue in its original filing proposing the Executed Shares Model.[13]

Another commenter raised several objections to the proposed allocation of CAT costs to FINRA under the Funding Proposal.[14]  This commenter raised the same objections with respect to the Executed Shares Model when it was originally proposed, and CAT LLC addressed those objections in its July 2023 Response to Comments.[15]  CAT LLC also addressed these issues when it originally proposed the Executed Shares Model.[16]

## III.    Pass-Through Prohibition

Commenters incorrectly assert that the Funding Proposal attempts to circumvent the Eleventh Circuit's opinion, and therefore should be disapproved.[17]

The Eleventh Circuit found that the Commission's order approving the Executed Shares Model violated the Administrative Procedures Act as a result of (1) the Commission allowing for the possibility for "self-regulatory organizations to pass through 100% of their fees to broker-dealers—without considering the effects of that choice" or providing a "reasoned justification or explanation" of that policy change; and (2) the Commission failing to "conduct a new economic

---

[10]    CAT LLC incorporates by reference its prior letters concerning the Executed Shares Model.  *See* Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission at 5-14 (July 28, 2023) ("July 2023 Response to Comments"); Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission at 6-9 (May 18, 2023) ("May 2023 Response to Comments"); Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission at 43-47 (Mar. 13, 2023) ("Executed Shares Model Proposal").  Prior to the 2023 Executed Shares Model Proposal, the Executed Share Model was subject to substantial public review and comment via the proposed amendment to the CAT NMS Plan published by the SEC on May 25, 2022 (the "2022 Funding Proposal"), the subsequent order instituting proceedings related to the 2022 Funding Proposal, and two partial amendments regarding the 2022 Funding Proposal.

[11]    *See* Citadel Letter at 6-7.  *See also,* FINRA Letter at 4 n.11 (incorporating prior FINRA comment letters by reference).

[12]    *See* May 2023 Response to Comments at 3-4 (May 18, 2023).

[13]    *See* Executed Shares Model Proposal at 31-36, 39-42.

[14]    *See* FINRA Letter at 4 n.11.

[15]    *See* July 2023 Response to Comments at 34-35.

[16]    *See* Executed Shares Model Proposal at 51-53.

[17]    *See* SIFMA Letter at 2-3.  *See also* Citadel Letter at 9-10; FINRA Letter at 2, 10-11; PTG Letter at 2.

**A103**

Ms. Vanessa Countryman
December 18, 2025
Page 4

analysis or revise its previous economic analysis".[18]  The Funding Proposal directly addresses the Eleventh Circuit's core concern regarding the possibility of 100% pass-through costs under the 2023 funding order without the SEC considering the effects of that choice, and CAT LLC will continue to work collaboratively with the Commission to inform its new economic analysis.

*First*, commenters argue that amending the CAT NMS Plan to prevent each Participant from filing a rule change to establish a "new fee" to pass-through their share of CAT costs would circumvent the Eleventh Circuit's decision, because it "raise[s] the specter of adding CAT costs to existing fees the SROs already charge their members to recoup their CAT costs, thus doing indirectly what they cannot do directly."[19]

These commenters incorrectly read the Eleventh Circuit's decision.  For one, the Eleventh Circuit disapproved the Executed Shares Model Approval Order only insofar as it permitted "self-regulatory organizations to pass through 100% of their fees to broker-dealers—without considering the effects of that choice" or satisfactorily explaining that policy change.  The Court did not hold that SROs could never pass through 100% of their CAT-related fees, but rather that in considering a pass-through the SEC must weigh the effects of and explain its decision.

For another, the Eleventh Circuit's decision narrowly focused on a footnote in the Executed Shares Model Approval Order explaining that if the SROs "passed their CAT costs to broker dealers 'in full,' the broker-dealers would 'effectively bear 100% of the CAT allocation (ignoring what they would pass to investors).'"  The Court did not provide support for objecting to any and every existing SRO fee as "indirectly" related to CAT.  Rather, the Court specifically cited the CAT cost recovery fees implemented by FINRA to directly pass-through to its members 100% of the CAT fees allocated to FINRA as a Participant in the CAT NMS Plan under the Executed Shares Model,[20] which were "designed to permit FINRA to recoup its designated portion of the reasonably budgeted CAT costs of the [CAT NMS Plan]."[21]  The Court expressly "acknowledge[d] that no self-regulatory organization other than FINRA has asked for 100% pass-through approval so far,"[22] and, in response to the Court's decision, FINRA has withdrawn its CAT cost recovery fees.[23]  Accordingly, the Proposed Amendment directly addresses the Eleventh Circuit's core concern by precluding any Participant from establishing a new fee for passing through to its members the CAT fee charged to such Participant.

---

[18]    Eleventh Circuit Opinion at 16-17, 20, 24.

[19]    *See* SIFMA Letter at 2.  *See also,* PTG Letter at 2.

[20]    *See* Eleventh Circuit Opinion at 15-16, n.1.

[21]    *See, e.g.*, Securities Exchange Act Rel. No. 103373 (July 2, 2025), 90 Fed. Reg. 30171 (July 8, 2025).

[22]    Eleventh Circuit Opinion at 26.

[23]    *See* Withdrawal of Proposed Rule Change, Proposed Rule Change to Amend FINRA Rule 6897 (Consolidated Audit Trail Funding Fees) to Implement Prospective CAT Cost Recovery Fee 2025-2, File No. SR-FINRA-2025-010, available at https://www.finra.org/rules-guidance/rule-filings/sr-finra-2025-010; Withdrawal of Proposed Rule Change, Proposed Rule Change to Adopt FINRA Rule 6897(b) (CAT Cost Recovery Fees) to Implement a Historical Consolidated Audit Trail Recovery Assessment, File No. SR-FINRA-2024-003, available at https://www.finra.org/rules-guidance/rule-filings/sr-finra-2024-003#:~:text=Financial%20Industry%20Regulatory%20Authority%2C%20Inc,This%20filing%20has%20been%20withdrawn.

Ms. Vanessa Countryman
December 18, 2025
Page 5

*Second*, two commenters argue that the formulation that "[e]ach Participant agrees not to file with the SEC a proposed rule change . . . that would establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a)" is factually incorrect because they voted against the Proposed Amendment.[24]  This provision was intended impose an obligation on all Participants, not to suggest that all Participants voted to approve the Proposed Amendment.  As required by the CAT NMS Plan, a supermajority of Participants voted in favor of the Proposed Amendment, but there was not unanimity.  To better reflect that the Proposed Amendment was approved under the Plan and avoid statements suggesting that all Participants voted for the proposal, CAT LLC is amending the Proposed Amendment to state that "[n]o Participant will file" instead of "[e]ach Participant agrees not to file".  With this change, proposed Section 11.3(e) would state as follows:

> Participant Pass-Through Fees.  No Participant will file with the SEC a proposed rule change pursuant to Section 19(b) and Rule 19b-4 thereunder that would establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a).

Exhibit A to this letter sets forth the cumulative changes proposed to be made to the existing CAT NMS Plan under the Proposed Amendment.  Exhibit B to this letter sets forth the proposed additional revisions to new Section 11.3(e) against the Proposed Amendment.

*Third*, these commenters further argue that it is unlawful for the CAT NMS Plan to prevent individual Participants from passing their CAT fees through to Industry Members.  These commenters contend that Rule 608(a)(5)(ii), which requires that NMS plans include a description of fees "collected on behalf of all of the sponsors and/or participants," does not authorize the CAT NMS Plan to impose restrictions on individual SRO fees.  However, Rule 608(a)(4)(ii) more broadly requires NMS plans to include "[a] detailed description of the manner in which the . . . amendment . . . will be implemented" and "[a] description of any written understandings or agreements between or among plan sponsors or participants relating to interpretation of the plan or conditions for becoming a sponsor or participant in the plan."  The Proposed Amendment falls squarely within this broad authority because it embodies a written understanding relating to the interpretation of the CAT NMS Plan—*i.e.*, that no Participant shall establish a new fee for passing through to its members the CAT fee charged to such Participant.  In addition, the Eleventh Circuit's decision is premised on the notion that the 2023 funding order was a "shift from a mandate that both self-regulatory organizations and broker-dealers fund the CAT to an allowance for self-regulatory organizations to pass through 100% of their CAT costs" without the SEC considering the effects of that choice,[25] which necessarily implies the Court's view that prior to 2023 the CAT NMS Plan did not contemplate 100% pass-throughs via individual SRO fees.[26]  Finally, the CAT NMS Plan currently includes provisions that prevent the Participants from collecting Post-

---

[24]    *See* FINRA Letter at 10; Cboe Letter at 2.

[25]    Eleventh Circuit Opinion at 16.

[26]    The Eleventh Circuit's decision did not cite to any specific provision of the CAT NMS Plan prohibiting 100% pass-throughs via individual SRO fees but, instead, stated that "[a]ll prior Commission CAT promulgations stated that self-regulatory organizations would be responsible for some 'allocation of the costs'" of CAT, citing to the SEC's 2016 order approving the CAT NMS Plan.

Ms. Vanessa Countryman
December 18, 2025
Page 6

Amendment Industry Member Fees.[27]    Accordingly, the CAT NMS Plan already imposes restrictions on individual SRO fees.  For these reasons, CAT LLC disagrees that approval of the Proposed Amendment would exceed the Commission's statutory authority.

## IV.    Other Comments

Commenters separately raised nine additional topics related to the Funding Proposal for the Commission's consideration, which CAT LLC responds to, in turn, in the sections below.

### A.  Lack of Industry Input

*First*, certain commenters incorrectly state that the Proposed Amendment lacks input from the industry.[28]  On the contrary, as discussed in detail in CAT LLC's May 2023 Response to Comments and July 2023 Response to Comments, CAT LLC has engaged with the industry—including the CAT Advisory Committee, industry associations, as well as individual Industry Members—extensively and in good faith since 2016 as it has explored different approaches to CAT funding and considered various CAT funding issues.[29]  CAT LLC remains committed to working constructively with the industry on issues related to CAT funding.

### B.  Rule 613 and the CAT NMS Plan

*Second*, certain commenters reassert that "the CAT itself is unlawful."[30]  Although this argument was raised in the Eleventh Circuit litigation, the Court clearly chose not to address it in resolving this matter and instead focused narrowly on the potential for 100% pass-through costs under the 2023 funding order without the SEC considering the effects of that choice and the Commission's economic analysis.[31]  CAT LLC believes that arguments challenging the legality of the CAT are directed primarily at the Commission.  However, CAT LLC notes that certain of these commenters previously acknowledged the Commission's authority to adopt the CAT.  In a 2020 comment letter, Citadel wrote that it "greatly appreciates the continued efforts of the [Commission] to ensure that the consolidated audit trail ('CAT') is effectively implemented" and

---

[27]    *See, e.g.*, CAT NMS Plan at Section 11.3(a)(iii) ("No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any CAT Fee related to Prospective CAT Costs until the Financial Accountability Milestone related to Period 4 described in Section 11.6 has been satisfied."); Section 11.3(a)(ii)(B)(III) ("No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any Historical CAT Assessment until any applicable Financial Accountability Milestone described in Section 11.6 has been satisfied."); Section 11.6(a)(ii)-(iii) (providing that the amount of Post-Amendment Industry Member Fees that the Participants are entitled to collect for Periods 1, 2, 3, and 4 will be reduced if the Participants miss the deadline set forth for that period).

[28]    *See* SIFMA Letter at 3.

[29]    *See* July 2023 Response to Comments at 26-28; May 2023 Response to Comments at 12.

[30]    Citadel Letter at 2.  *See also* ASA Letter at 2; Amfree Chamber Letter at 1.

[31]    *Am. Sec. Ass'n, Citadel Sec. LLC v. U.S. Sec. & Exch. Comm'n* at 4 ("We do not need to reach the argument as to whether the CAT itself is unlawful [. . .].").

**A106**

Ms. Vanessa Countryman
December 18, 2025
Page 7

that it "fully support[s] the need for a robust CAT."[32]  In a 2019 comment letter, the ASA wrote that it "appreciates the work of the SEC to bring the CAT online" and reaffirmed its support for "a market-wide surveillance system that allows the SEC to properly oversee markets, take action against wrongdoers, and protect investors."[33]

A commenter argues that to read the Proposed Amendment, "one would think that the 11th Circuit's decision never happened," and that "neither Rule 613 nor the national market system (NMS) plan adopted for the CAT in 2016 authorizes a single dollar of [CAT] expenses to be paid by broker-dealers."[34]  This is an incorrect reading of the Eleventh Circuit's decision, which is premised on the Court's conclusion that Rule 613 and the CAT NMS Plan "required both the self-regulatory organizations and the broker-dealers to bear the costs of the CAT."  Contrary to this commenter's contention, the Eleventh Circuit did not hold that broker-dealers cannot be required to share in the costs of the CAT.

### C.  Economic Analysis

*Third*, commenters argue that the Funding Proposal does not adequately address the Eleventh Circuit's opinion because the Participants ask the SEC to perform a new or updated economic analysis of the Funding Proposal without providing updated data to support a new or updated economic analysis.[35]

CAT LLC understands that the SEC staff is currently working on a new or updated economic analysis of the Funding Proposal consistent with the Eleventh Circuit's opinion.  The Commission and its staff are authorized to access CAT data directly for a variety of purposes, including in connection with rulemaking proceedings.[36]  In addition, CAT LLC recently published a revised 2025 Financial and Operating Budget on the CAT website, which provides up-to-date information about current CAT costs.[37]  CAT LLC also has recently filed a proposed amendment to the CAT NMS Plan proposing certain cost savings initiatives, which provides detailed information about current CAT costs.[38]  The SEC's recent exemptive order aimed at reducing CAT

---

[32]     *See* Letter from Letter from Stephen John Berger, Managing Director, Global Head of Government and Regulatory Policy, Citadel Securities, to Vanessa Countryman, Secretary, Commission (June 1, 2020), https://www.sec.gov/comments/s7-10-20/s71020-8077418-225995.pdf.  *See also* Letter from Letter from Stephen John Berger, Managing Director, Global Head of Government and Regulatory Policy, Citadel Securities, to Vanessa Countryman, Secretary, Commission (Nov. 30, 2020), ("Citadel Securities has consistently supported the Commission's efforts to address the need for a robust and secure CAT.").

[33]     Letter from Christopher A. Iacovella, Chief Executive Officer, American Securities Association to Vanessa Countryman, Secretary, Commission (Oct. 28, 2019), https://www.sec.gov/comments/s7-13-19/s71319-6381876-197754.pdf.

[34]     ASA Letter at 1-2.

[35]     *See* SIFMA Letter at 2; Citadel Letter at 4-8; PTG Letter at 2.

[36]     *See* Securities Exchange Act Rel. No. 79318 (Nov. 15, 2016), 86 Fed. Reg. 84696, 84817, 84835, 84977 (Nov. 23, 2016).

[37]     Consolidated Audit Trail, LLC, 2025 Financial Operating Budget (Nov. 7, 2025), available at https://www.catnmsplan.com/sites/default/files/2025-11/11.07.25-CAT-LLC-2025-Finacial_and_Operating-Budget.pdf.

[38]     *See* Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Dec. 17, 2025), https://catnmsplan.com/sites/default/files/2025-12/LLC-Proposed-CAT-NMS-Plan-Amendment-2025-Cost-Savings-Amendment-12.17.25.pdf.

Ms. Vanessa Countryman
December 18, 2025
Page 8

operating costs provides similarly detailed cost-related information about the CAT.[39]  Finally, CAT LLC is available to provide information that the SEC staff deems helpful to its updated economic analysis of the Funding Proposal upon request.

### D.  Rule 608 of Regulation NMS and Rule 19b-4

*Fourth*, one commenter argues that the Funding Proposal unlawfully circumvents Rule 608 because fee filings related to NMS Plans are governed by Rule 608 and, therefore, Participant fee filings related to CAT cannot be filed as immediately effective under Exchange Act Section 19(b), and Rule 19b-4 thereunder.[40]  In the alternative, this commenter argues that even if Participant fee filings are permitted under Rule 19b-4, the SEC's post hoc review of immediately effective fee filings does not provide Industry Members sufficient protection from unreasonable fees because they are immune from judicial challenge unless the SEC suspends a fee filing.[41]  This commenter argues that the Commission must determine whether the actual costs underling fee filings that will be filed pursuant to the Funding Proposal are reasonable.

As discussed in CAT LLC's July 2023 Response to Comments, CAT LLC believes that the Funding Proposal complies with Rule 608 of Regulation NMS because Section 11.1(b) of the CAT NMS Plan, as approved by the Commission, requires the Participants to file Industry Member CAT fees pursuant to Section 19(b) of the Exchange Act, and Section 19(b) permits fees to become immediately effective upon filing.[42]  Indeed, in approving the Executed Shares Model, the Commission stated that "[t]he filing of Industry Member CAT fees under Rule 19b-4 is consistent with the structure of the CAT."[43]

Furthermore, CAT LLC believes that the fee filing process under Section 19(b), and Rule 19b-4 thereunder, provides Industry Members protection from potentially unreasonable fees. Indeed, the SEC addressed this issue in approving the Executed Shares Model, noting that immediately effective rule changes are published for public notice and comment as part of the Section 19(b) and Rule 19b-4 process, and that the Commission may temporarily suspend immediately effective rule changes based upon comments received and institute proceedings to determine whether to approve or disapprove the proposed rule change.[44]

### E.  Alternatives to the Proposed Amendment

*Fifth*, commenters proposed two alternative funding mechanisms for the CAT, including a time-limited, interim funding solution that would remain in place while the SEC's comprehensive review is ongoing, as well as a suggestion that CAT be funded through Section 31 fees.  The Exchange Act does not require CAT LLC to demonstrate that the Funding Proposal is superior to any other potential proposal.  Instead, CAT LLC must demonstrate that the Funding Proposal is

---

[39]        *See* Securities Exchange Act Rel. No. 104144 (Sept. 30. 2025), 90 Fed. Reg. 47853 (Oct. 2, 2025).
[40]        *See* Citadel Letter at 10-11.
[41]        *See* Citadel Letter at 11.
[42]        *See* July 2023 Response to Comments at 30-31.
[43]        Executed Shares Model Approval Order at 62674.
[44]        *See* Executed Shares Model Approval Order at 62636-37.

**A108**

Ms. Vanessa Countryman
December 18, 2025
Page 9

consistent with the Exchange Act and the rules and regulations thereunder.[45]  For all of the reasons described in this letter, and in the Proposed Amendment, CAT LLC maintains that the Funding Proposal is consistent with the Exchange Act.

### i.  Proposal to Implement a Temporary Funding Solution

Commenters suggest that the Commission consider implementing a time-limited, interim funding solution while the comprehensive review of CAT is ongoing.[46]  These commenters recommend an alternative proposal whereby each Participant would agree not to make rule filings seeking to pass through their CAT costs only for a specified period (e.g., one year), in contrast to the prohibition in the Proposed Amendment, which would not be time-limited.[47]  In particular, one commenter suggested that the Commission could:

> exercise its authority under Rule 608(b)(2) to modify the Funding Proposal so that, by its terms, it would expire after a specified period (e.g., one year) to allow for progress on CAT cost savings efforts and the comprehensive review, which may provide for a funding bridge in addition to CAT LLC's reserve levels.[48]

The commenter also proposed that the Commission could remove the pass-through prohibition of the Funding Proposal and indicated that it would consider filing a proposed rule change stipulating that it would not file a new recovery fee for a specific finite period (e.g., one year).  The commenter noted that the Commission could determine if other Participants would similarly agree to file proposed rule changes to support this interim approach.

The proposal to modify the Funding Proposal so that it is limited to one year is in apparent conflict with the commenters' separate contention that it is unlawful for the CAT NMS Plan to prevent individual Participants from passing their CAT fees through to Industry Members.[49]  Similarly, to the extent the proposal is only intended as a voluntary, non-binding agreement and would not actually operate as a prohibition on such pass-throughs, it would not seem to address the Eleventh Circuit's decision.  And a decision to file a proposed rule change limiting its ability to file a new recovery fee under Section 19(b) would be at the ongoing discretion of the commenter and each other Participant.  More fundamentally, the Eleventh Circuit's decision does not suggest that an interim pause on the possibility of 100% pass-through costs would address the crux of its concerns, absent a new SEC order considering the effects of that choice.  Furthermore, a time-limited, interim funding solution would not address the pressing need to implement a stable funding mechanism for the CAT given the CAT System's significant costs and its substantial regulatory value to regulators.  Should alternative funding mechanisms develop in the future

---

[45]    *See* Rule 608 of Regulation NMS under the Exchange Act.  *See also* Exchange Act Section 19(b)(2)(C) ("The Commission shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this title and the rules and regulations issued under this title that are applicable to such organization.").

[46]    *See* Cboe Letter at 2; FINRA Letter at 2-3, 13-16.

[47]    *See* FINRA Letter at 2; Cboe Letter at 2.

[48]    FINRA Letter at 2.

[49]    *See supra*, Section III, at 5.

Ms. Vanessa Countryman
December 18, 2025
Page 10

following the implementation of the Funding Proposal, CAT LLC will consider them in the normal course for consistency with the Exchange Act and, to the extent that they offer material benefits over the Funding Proposal, CAT LLC will propose them as amendments to the CAT NMS Plan.

### ii.   Proposal to Fund CAT through Section 31 Fees

Commenters argue that the CAT should be funded through Section 31 fees, arguing that the SEC should fund the CAT through its standard budget process as it does with other tools and technologies that it uses, which would subject CAT costs to Congressional review and oversight.[50] Commenters suggest that including CAT in the SEC's budget would (1) align incentives by creating an incentive for the SEC to control CAT costs; (2) improve governance by giving the SEC greater oversight over the CAT;[51] and (3) increase transparency by making CAT a line item in the SEC's budget, which is subject to Congressional review as part of the appropriations process.[52]

These comments are focused on Congressional oversight of the Commission and its budget and, as such, they are more appropriately directed to the Commission—not CAT LLC.   In submitting the Proposed Amendment, CAT LLC has followed the requirements of Rule 608 of the Exchange Act which allows a proposed NMS Plan amendment to become effective upon a determination by the Commission that it is consistent with the Exchange Act and the rules and regulations thereunder.

### F.   Financial Accountability Milestones

*Sixth*, one commenter argues that the SEC must independently confirm that the Financial Accountability Milestones ("FAMs") have been satisfied before the Participants may start collecting CAT fees.[53]   Pursuant to Section 11.3(a)(iii)(C) of the CAT NMS Plan,

> [n]o Participant may make a filing with the SEC under Section 19(b) of the Exchange Act regarding any CAT Fee related to Prospective CAT Costs until the

---

[50]   *See* Citadel Letter at 2-3; SIFMA Letter at 3-5; PTG Letter at 3. Commenters note that the Section 31 fee collection process would need to be updated to allow the SEC to adjust fees based on transaction volumes and to continue funding the CAT when Congress has not funded the government through "regular appropriation."   *See* SIFMA Letter at 4.

[51]   Commenters suggest that greater oversight is necessary because Participant fee filings are immediately effective upon filing under Exchange Act Section 19(b), and Rule 19b-4 thereunder, and are not subject to judicial review unless the SEC suspends the filings.   *See* SIFMA Letter at 4; Citadel Letter at 10-11.   This comment is based on precedent in the D.C. Circuit stating that the SEC's decision not to reject or suspend a fee filing is not subject to judicial review.   *See NetCoalition v. U.S. Sec. & Exch. Comm'n*, 615 F.3d 525 (D.C. Cir. 2010).   CAT LLC agrees with the Commission's determination when it adopted the Executed Shares Model that the fee filing process under Section 19(b) of the Exchange Act, and Rule 19b-4 thereunder, provides sufficient protection from unreasonable fees because all immediately effective rule changes are published for public notice and comment, and the Commission may temporarily suspend immediately effective rule changes based upon comments received and institute proceedings to determine whether to approve or disapprove the proposed rule change.   *See* Executed Shares Model Approval Order at 62636-37.

[52]   *See* SIFMA Letter at 1.   *See also*, Citadel Letter at 2-3.

[53]   *See* Citadel Letter at 11-13.

**A110**

Ms. Vanessa Countryman
December 18, 2025
Page 11

> Financial Accountability Milestone related to Period 4 described in Section 11.6 [of the CAT NMS Plan] has been satisfied.[54]

The Financial Accountability Milestone related to Period 4 described in Section 11.6 of the CAT NMS Plan is "Full Implementation of CAT NMS Plan Requirements," which is defined, in relevant part, to "be considered complete as of the date identified in a Quarterly Progress Report meeting the requirements of Section 6.6(c)" of the CAT NMS Plan.[55]  In a Quarterly Progress Report dated July 29, 2024, the Participants identified July 15, 2024, as the date on which the "Full Implementation of CAT NMS Plan Requirements" milestone was satisfied.[56]  The Participants subsequently filed fee filings implementing CAT Fee 2024-1 to cover Prospective CAT Costs for the period beginning on July 16, 2024, and ending on December 31, 2024.[57]  Those fee filings became effective immediately upon filing and were neither rejected nor suspended by the Commission.

In addition, this commenter argues that the FAMs have not been satisfied because CAT LLC currently relies on SEC exemptive relief from certain CAT NMS Plan requirements.[58]  This commenter made the same argument in connection with Participant fee filings implementing Historical CAT Assessment 1.  As discussed in detail in CAT LLC's response to comments related to Historical CAT Assessment 1, dated June 13, 2024,[59] CAT LLC's reliance on SEC exemptive relief does not affect the conclusion that each of the FAMs has been satisfied.

### G.  Comprehensive Review of the CAT

*Seventh*, commenters present several arguments related to the SEC's ongoing comprehensive review of CAT and CAT-related costs, suggesting that a CAT funding mechanism should not be implemented until the SEC has completed its comprehensive review of CAT.[60]  In particular, commenters argue that the SEC should do a full audit of all CAT costs as part of its comprehensive review of CAT, including the reasonableness of costs paid to vendors, and produce a report detailing its findings.[61]  Commenters also suggest that the Commission should require CAT LLC to engage an independent technology firm to evaluate the CAT's scope and system

---

[54]     CAT NMS Plan, Section 11.3(a)(iii)(C).

[55]     CAT NMS Plan, Section 1.1 (defining "Full Implementation of CAT NMS Plan Requirements").

[56]     *See* Q2 & Q3 2024 Quarterly Progress Report (July 29, 2024).

[57]     *See, e.g.*, Securities Exchange Act Rel. No. 100828 (Aug. 27, 2024), https://www.nyse.com/publicdocs/nyse/markets/nyse/rule-filings/sec-approvals/2024/(SR-NYSE-2024-46)_34-100828.pdf.

[58]     *See* Citadel Letter at 12.

[59]     *See* Letter from Brandon Becker, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission, at 32-36 (June 13, 2024).

[60]     *See* Citadel Letter at 8; ASA Letter at 2; FINRA Letter at 2-3, 13-16; Cboe Letter at 2; PTG Letter at 2-3. Alternatively, as described in Section IV.E.i, some commenters propose implementing a temporary, interim funding mechanism that would remain in place until after the SEC has completed its comprehensive review.  *See* Cboe Letter at 2; FINRA Letter at 2-3, 13-16.

[61]     *See* ASA Letter at 3.  *See also*, Citadel Letter at 4-8.  In addition, one commenter argues that the SEC should analyze the legality of CAT as part of its comprehensive review.  *See* ASA Letter at 2-3.  This comment is addressed above in Section IV.B.

**A111**

Ms. Vanessa Countryman
December 18, 2025
Page 12

design to identify cost savings opportunities, and should retire duplicative and costly legacy reporting systems.[62]

CAT LLC supports the Commission's announced comprehensive review as well as its broader efforts to ensure that CAT achieves its intended regulatory purposes in a cost-effective manner. Furthermore, CAT LLC recognizes that certain changes to CAT's funding mechanism may come as a result of the comprehensive review but maintains that the comprehensive review should not prevent the Commission from acting to determine whether to approve or disapprove the Funding Proposal. The timing of any comprehensive review and related action by the Commission is not certain, while the need for a funding source to maintain the ongoing viability of CAT is urgent. The Funding Proposal described in the Proposed Amendment provides for a fair and reasonable allocation of CAT-related costs among market participants, is not unfairly discriminatory, does not impose an undue burden on competition and, therefore, is consistent with the Exchange Act and the rules and regulations thereunder. Therefore, the Funding Proposal is neither inconsistent with nor dependent upon the completion of the SEC's comprehensive review of CAT.

### H. Previously Collected Fees from Broker-Dealers

*Eighth*, commenters argue that the SEC should consider ways to reimburse Industry Members for CAT fees that have been paid to CAT LLC to date under the Executed Shares Model because the SEC's order approving the Executed Shares Model has now been vacated by the Eleventh Circuit's opinion.[63]

Commenters do not cite, nor is CAT LLC aware of, any precedent suggesting that fees paid pursuant to an immediately effective fee filing must be reimbursed if the fee is later invalidated. All CAT fees that have been paid to date by Industry Members were paid pursuant to validly adopted Participant fee filings that became effective immediately upon filing under Section 19(b)(3)(A) of the Exchange Act. CAT LLC further notes that the Participants also paid CAT fees under the Executed Shares Model.

---

[62] *See* PTG Letter at 3; Citadel Letter at 13. CAT LLC does not agree with commenters regarding the need to engage an independent technology firm to identify potential cost savings opportunities. CAT LLC believes that the Participants and the Plan Processor—in consultation with Industry Members—are best situated to identify opportunities to reduce CAT operating costs based on their deep expertise and familiarity with the technical aspects of the CAT System. Indeed, the Participants and the Plan Processor have worked diligently, in close collaboration with the industry, over the past year to reduce the CAT budget from approximately $249 million at the beginning of 2025 to approximately $188 million as of November 7, 2025. The Participants and the Plan Processor continue to seek additional opportunities to reduce CAT operating costs, whether by developing proposals to modify CAT NMS Plan requirements where the cost outweighs the regulatory need or by identifying opportunities to implement operational optimizations within the bounds of current CAT NMS Plan requirements. For example, on December 17, 2025, CAT LLC filed a proposed amendment to the CAT NMS Plan with the Commission that, if approved, would further reduce CAT costs by approximately $70 - $90 million per year.

[63] *See* ASA Letter at 3-4.

Ms. Vanessa Countryman
December 18, 2025
Page 13

## I.   FINRA Constitutionality

*Ninth*, one commenter argues that the Funding Proposal should be denied because it relies on FINRA to collect transaction data and to otherwise operate the CAT.[64]  This comment appears to be based on a misunderstanding regarding the entity that serves as the current Plan Processor. The current Plan Processor is FINRA CAT, LLC, a separate legal entity that is a subsidiary of Financial Industry Regulatory Authority, Inc.

*      *      *

As a result of the Eleventh Circuit's decision, following the expiration of the Court's stay of its mandate, the CAT's operations must be funded through its limited operational reserve, which is currently estimated to be exhausted in August 2026.[65]  Under the CAT NMS Plan, "no Participant shall be obligated to contribute capital or make loans to the Company."[66]  It should not be assumed that any Participant will voluntarily agree to loan funds to the Company once the operational reserve is exhausted.  Accordingly, absent Commission action to approve a viable funding model for the CAT, there is significant uncertainty regarding the continued operation of the CAT and the Company's ability to continue as a going concern.

Thank you very much for your attention to this matter.  If you have any questions or comments, please contact me at rwalley@deloitteretired.com.

Respectfully Submitted,

*/s/ Robert Walley*

Robert Walley
CAT NMS Plan Operating Committee Chair


cc.     The Hon. Paul S. Atkins, Chair
        The Hon. Hester M. Peirce, Commissioner
        The Hon. Caroline A. Crenshaw, Commissioner
        The Hon. Mark T. Uyeda, Commissioner
        Mr. Jamie Selway, Director, Division of Trading and Markets
        Mr. David Hsu, Assistant Director, Division of Trading and Markets
        Ms. Erika Berg, Special Counsel, Division of Trading and Markets
        CAT NMS Plan Participants

---

[64]     *See* Amfree Chamber Letter at 4-6.
[65]     The date on which the operational reserve will be exhausted may change based on costs actually incurred by CAT LLC, which depends on transaction volumes, among other things.
[66]     CAT NMS Plan, Section 3.8(a).

**A113**

Ms. Vanessa Countryman
December 18, 2025
Page 14

## EXHIBIT A

### Proposed Revisions to CAT NMS Plan

Additions **underlined**; deletions **[bracketed]**

\* \* \* \* \*

### ARTICLE I

### DEFINITIONS

\* \* \* \* \*

**"CAT Executing Broker" means (a) with respect to a transaction in an Eligible Security that is executed on an exchange, the Industry Member identified as the Industry Member responsible for the order on the buy-side of the transaction and the Industry Member responsible for the sell-side of the transaction in the equity order trade event and option trade event in the CAT Data submitted to the CAT by the relevant exchange pursuant to the Participant Technical Specifications; and (b) with respect to a transaction in an Eligible Security that is executed otherwise than on an exchange and required to be reported to an equity trade reporting facility of a registered national securities association, the Industry Member identified as the executing broker and the Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event in the CAT Data submitted to the CAT by FINRA pursuant to the Participant Technical Specifications; provided, however, in those circumstances where there is a non-Industry Member identified as the contra-side executing broker in the TRF/ORF/ADF transaction data event or no contra-side executing broker is identified in the TRF/ORF/ADF transaction data event, then the Industry Member identified as the executing broker in the TRF/ORF/ADF transaction data event would be treated as CAT Executing Broker for the Buyer and for the Seller.**

\* \* \* \* \*

**[**"Execution Venue" means a Participant or an alternative trading system ("ATS") (as defined in Rule 300 of Regulation ATS) that operates pursuant to Rule 301 of Regulation ATS (excluding any such ATS that does not execute orders).**]**

\* \* \* \* \*

**A114**

Ms. Vanessa Countryman
December 18, 2025
Page 15

# ARTICLE XI

# FUNDING OF THE COMPANY

**Section 11.1. Funding Authority.**

(a)    On an annual basis the Operating Committee shall approve **[an] a reasonable** operating budget for the Company.  The budget shall include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company.

**(i)    Without limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve and such other cost categories as reasonably determined by the Operating Committee to be included in the budget.**

**(ii)    For the reserve referenced in paragraph (a)(i) of this Section, the budget will include an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget.  To the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus shall be used to offset future fees.  For the avoidance of doubt, the Company will only include an amount for the reserve in the annual budget if the Company does not have a sufficient reserve (which shall be up to but not more than 25% of the annual budget).  For the avoidance of doubt, the calculation of the amount of the reserve would exclude the amount of the reserve from the budget.**

(b)    Subject to **Section 11.1 and** Section 11.2, the Operating Committee shall have discretion to establish funding for the Company, including: (i) establishing fees that the Participants shall pay; and (ii) establishing fees for Industry Members that shall be implemented by Participants.  The Participants shall file with the SEC under Section 19(b) of the Exchange Act any such fees on Industry Members that the Operating Committee approves, and such fees shall be labeled as "Consolidated Audit Trail Funding Fees."

(c)    To fund the development and implementation of the CAT, the Company shall time the imposition and collection of all fees on Participants and Industry Members in a manner reasonably related to the timing when the Company expects to incur such development and implementation costs.  In determining fees on Participants and Industry Members the Operating Committee shall take into account fees, costs and expenses (including legal and consulting fees and expenses) **reasonably** incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT, and such fees, costs and expenses shall be fairly and reasonably shared among the Participants and Industry Members.  Any surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees.

**A115**

Ms. Vanessa Countryman
December 18, 2025
Page 16

(d)    Consistent with this Article XI, the Operating Committee shall adopt policies, procedures, and practices regarding the budget and budgeting process, **[assignment of tiers,]** resolution of disputes, billing and collection of fees, and other related matters.  **[For the avoidance of doubt, as part of its regular review of fees for the CAT, the Operating Committee shall have the right to change the tier assigned to any particular Person in accordance with fee schedules previously filed with the Commission that are reasonable, equitable and not unfairly discriminatory and subject to public notice and comment, pursuant to this Article XI.  Any such changes will be effective upon reasonable notice to such Person.]**

Section 11.2. **Funding Principles**. In establishing the funding of the Company, the Operating Committee shall seek:

(a)    to create transparent, predictable revenue streams for the Company that are aligned with the anticipated costs to build, operate and administer the CAT and the other costs of the Company;

(b)    to establish an allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act, taking into account the timeline for implementation of the CAT **[and distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations]**;

(c)    to establish a **[tiered]** fee structure in which the fees charged to **[: (i)]** <u>**Participants and**</u> **[CAT Reporters that are Execution Venues, including ATSs, are based upon the level of market share; (ii)]** Industry Members**[' non-ATS activities]** are based upon <u>**the executed equivalent share volume of transactions in Eligible Securities, and the costs of the CAT**</u> **[message traffic; and (iii) the CAT Reporters with the most CAT-related activity (measured by market share and/or message traffic, as applicable) are generally comparable (where, for these comparability purposes, the tiered fee structure takes into consideration affiliations between or among CAT Reporters, whether Execution Venues and/or Industry Members)].**

(d)    to provide for ease of billing and other administrative functions;

(e)    to avoid any disincentives such as placing an inappropriate burden on competition and a reduction in market quality; and

(f)    to build financial stability to support the Company as a going concern.

Section 11.3. **Recovery.**

(a)    <u>**Prospective CAT Costs.**</u>  The Operating Committee will establish **[fixed]** fees <u>**("CAT Fees")**</u> to be payable by **[Execution Venues]** <u>**Participants and Industry Members with regard to CAT costs not previously paid by the Participants ("Prospective CAT Costs")**</u> as <u>**follows**</u> **[provided in this Section 11.3(a)]**:

**A116**

Ms. Vanessa Countryman
December 18, 2025
Page 17

(i)      **Fee Rate.  The Operating Committee will calculate the Fee Rate for the CAT Fee twice per year, once at the beginning of the year and once during the year as follows.**

(A)      **General.**

(I)      **For the beginning of each year, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the year.  Once the Operating Committee has approved such Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using such Fee Rate. Participants and Industry Members will be required to pay CAT Fees calculated using this Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.**

(II)      **During each year, the Operating Committee will calculate a new Fee Rate by dividing the reasonably budgeted CAT costs for the remainder of the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year.  Once the Operating Committee has approved the new Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the new Fee Rate.  Participants and Industry Members will be required to pay CAT Fees calculated using this new Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.**

(III)      **For the avoidance of doubt, CAT Fees with a Fee Rate calculated as set forth in this paragraph (a)(i) shall remain in effect until the Operating Committee approves a new Fee Rate as described in paragraph (a)(i) and CAT Fees with the new Fee Rate are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.**

(IV)      **For the avoidance of doubt, the first CAT Fee may commence at the beginning of the year or during the year. If it were to commence during the year, the first CAT Fee**

A117

Ms. Vanessa Countryman
December 18, 2025
 Page 18

would be calculated as described in paragraph (II) of this
Section.

(B)     Executed Equivalent Shares.  For purposes of
calculating CAT Fees, executed equivalent shares in a transaction in
Eligible Securities will be reasonably counted as follows:

(I)     each executed share for a transaction in NMS
Stocks will be counted as one executed equivalent share;

(II)     each executed contract for a transaction in Listed
Options will be counted based on the multiplier applicable to the
specific Listed Option (i.e., 100 executed equivalent shares or
such other applicable multiplier); and

(III)     each executed share for a transaction in OTC
Equity Securities shall be counted as 0.01 executed equivalent
share.

(C)     Budgeted CAT Costs.  The budgeted CAT costs for the
year shall be comprised of all reasonable fees, costs and expenses
reasonably budgeted to be incurred by or for the Company in
connection with the development, implementation and operation of
the CAT as set forth in the annual operating budget approved by the
Operating Committee pursuant to Section 11.1(a) of the CAT NMS
Plan, or as adjusted during the year by the Operating Committee.

(D)     Projected Total Executed Equivalent Share Volume of
Transactions in Eligible Securities.  The Operating Committee shall
reasonably determine the projected total executed equivalent share
volume of all transactions in Eligible Securities for each relevant
period based on the executed equivalent share volume of all
transactions in Eligible Securities for the prior twelve months.

(ii)     Participant CAT Fees.

(A)     CAT Fee Obligation. Each Participant that is a national
securities exchange will be required to pay the CAT Fee for each
transaction in Eligible Securities executed on the exchange in the
prior month based on CAT Data.  Each Participant that is a national
securities association will be required to pay the CAT Fee for each
transaction in Eligible Securities executed otherwise than on an
exchange in the prior month based on CAT Data.  The CAT Fee for
each transaction in Eligible Securities will be calculated by
multiplying the number of executed equivalent shares in the

A118

Ms. Vanessa Countryman
December 18, 2025
Page 19

**transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.**

**(B)      Effectiveness.  Each Participant will be required to pay the CAT Fee calculated using the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3 and approved by the Operating Committee only if such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.**

**(iii)      Industry Member CAT Fees.**

**(A)      CAT Fee Obligation.  Each Industry Member that is the CAT Executing Broker for the buyer in a transaction in Eligible Securities ("CAT Executing Broker for the Buyer" or "CEBB") and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities ("CAT Executing Broker for the Seller" or "CEBS") will be required to pay a CAT Fee for each such transaction in Eligible Securities in the prior month based on CAT Data.  The CEBB's CAT Fee or CEBS's CAT Fee (as applicable) for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate reasonably determined pursuant to paragraph (a)(i) of this Section 11.3.**

**(B)      Content of Fee Filings.  When the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act CAT Fees to be charged to Industry Members calculated using the Fee Rate that the Operating Committee approved in accordance with paragraph (a) of this Section 11.3, such filings shall set forth (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget, and the reason for changes in each such line item from the prior CAT Fee filing; (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or remainder of the year, as applicable), and a description of the calculation of the projection.  The information provided in this Section would be provided with sufficient detail to demonstrate that**

Ms. Vanessa Countryman
December 18, 2025
Page 20

**the budget for the upcoming year, or part of year, as applicable, is reasonable and appropriate.**

**(C)     No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any CAT Fee related to Prospective CAT Costs until the Financial Accountability Milestone related to Period 4 described in Section 11.6 has been satisfied.**

**(iv)     CAT Fee Details.**

**(A)     Details regarding the calculation of a Participant or CAT Executing Brokers' CAT Fees will be provided upon request to such Participant or CAT Executing Broker.  At a minimum, such details would include each Participant or CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.**

**(B)     For each CAT Fee, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.**

**[(i)     Each Execution Venue that: (A) executes transactions; or (B) in the case of a national securities association, has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange, in NMS Stocks or OTC Equity Securities will pay a fixed fee depending on the market share of that Execution Venue in NMS Stocks and OTC Equity Securities, with the Operating Committee establishing at least two and no more than five tiers of fixed fees, based on an Execution Venue's NMS Stocks and OTC Equity Securities market share. For these purposes, market share for Execution Venues that execute transactions will be calculated by share volume, and market share for a national securities association that has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange in NMS Stocks or OTC Equity Securities will be calculated based on share volume of trades reported, provided, however, that the share volume reported to such national securities association by an Execution Venue shall not be included in the calculation of such national security association's market share.]**

**[(ii)     Each Execution Venue that executes transactions in Listed Options will pay a fixed fee depending on the Listed Options market share of that Execution Venue, with the Operating Committee establishing at least two and no more**

**A120**

Ms. Vanessa Countryman
December 18, 2025
    Page 21

than five tiers of fixed fees, based on an Execution Venue's Listed Options market share. For these purposes, market share will be calculated by contract volume.]

(b)    **Past CAT Costs.**  The Operating Committee will establish **[fixed] one or more** fees **(each a "Historical CAT Assessment")** to be payable by Industry Members **with regard to CAT costs previously paid by the Participants ("Past CAT Costs") as follows: [,** based on the message traffic generated by such Industry Member, with the Operating Committee establishing at least five and no more than nine tiers of fixed fees, based on message traffic.  For the avoidance of doubt, the fixed fees payable by Industry Members pursuant to this paragraph shall, in addition to any other applicable message traffic, include message traffic generated by: (i) an ATS that does not execute orders that is sponsored by such Industry Member; and (ii) routing orders to and from any ATS sponsored by such Industry Member.]

(i)    **Calculation of Historical Fee Rates.**

(A)    **General.  The Operating Committee will calculate the Historical Fee Rate for each Historical CAT Assessment by dividing the Historical CAT Costs for each Historical CAT Assessment by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period for each Historical CAT Assessment.  Once the Operating Committee has approved such Historical Fee Rate, the Participants shall be required to file with the SEC pursuant to Section 19(b) of the Exchange Act such Historical CAT Assessment to be charged to Industry Members calculated using such Historical Fee Rate. Industry Members will be required to pay such Historical CAT Assessment calculated using such Historical Fee Rate once such Historical CAT Assessment is in effect in accordance with Section 19(b) of the Exchange Act.**

(B)    **Executed Equivalent Shares.  For purposes of calculating each Historical CAT Assessment, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted in the same manner as set forth in paragraph (a)(i)(B) of this Section 11.3.**

(C)    **Historical CAT Costs.  The Operating Committee will reasonably determine the Historical CAT Costs sought to be recovered by each Historical CAT Assessment, where the Historical CAT Costs will be Past CAT Costs minus Past CAT Costs reasonably excluded from Historical CAT Costs by the Operating Committee. Each Historical CAT Assessment will seek to recover from CAT Executing Brokers two-thirds of Historical CAT Costs incurred during the period covered by the Historical CAT Assessment.**

A121

Ms. Vanessa Countryman
December 18, 2025
Page 22

**(D)      Historical Recovery Period.**

**(I)      The length of the Historical Recovery Period used in calculating each Historical Fee Rate will be reasonably established by the Operating Committee based upon the amount of the Historical CAT Costs to be recovered by the Historical CAT Assessment; provided, however, no Historical Recovery Period used in calculating the Historical Fee Rate shall be less than 24 months or more than five years.**

**(II)      Notwithstanding the length of the Historical Recovery Period used in calculating the Historical Fee Rate, each Historical CAT Assessment calculated using the Historical Fee Rate will remain in effect until all Historical CAT Costs for the Historical CAT Assessment are collected**.

**(E)      Projected Total Executed Equivalent Share Volume of Transactions in Eligible Securities for Historical Recovery Period. The Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each Historical Recovery Period based on the executed equivalent share volume of all transactions in Eligible Securities for the prior twelve months.**

**(ii)      Past CAT Costs and Participants.  Because Participants previously have paid Past CAT Costs via loans to the Company, Participants would not be required to pay any Historical CAT Assessment.  In lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans.  Historical CAT Assessments are designed to recover two-thirds of the Historical CAT Costs.**

**(iii)      Historical CAT Assessment for Industry Members.**

**(A)      Each month in which a Historical CAT Assessment is in effect, each CEBB and each CEBS shall pay a fee for each transaction in Eligible Securities executed by the CEBB or CEBS from the prior month as set forth in CAT Data, where the Historical CAT Assessment for each transaction will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Historical Fee Rate reasonably determined pursuant to paragraph (b)(i) of this Section 11.3.**

**(B)      Historical CAT Assessment Fee Filings.**

A122

Ms. Vanessa Countryman
December 18, 2025
Page 23

**(I)** **Participants will be required to file with the SEC pursuant to Section 19(b) of the Exchange Act a filing for each Historical CAT Assessment.**

**(II)** **When the Participants file with the SEC pursuant to Section 19(b) of the Exchange Act a Historical CAT Assessment calculated using the Historical Fee Rate that the Operating Committee approved in accordance with paragraph (b) of this Section 11.3, such filing shall set forth (A) the Historical Fee Rate; (B) a brief description of the amount and type of the Historical CAT Costs, including (1) the technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees, and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration and (6) public relations costs; (C) the Historical Recovery Period and the reasons for its length; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period, and a description of the calculation of the projection. The information provided in this Section would be provided with sufficient detail to demonstrate that the Historical CAT Costs are reasonable and appropriate.**

**(III)** **No Participant will make a filing with the SEC pursuant to Section 19(b) of the Exchange Act regarding any Historical CAT Assessment until any applicable Financial Accountability Milestone described in Section 11.6 has been satisfied.**

**(iv)** **Historical CAT Assessment Details.**

**(A)** **Details regarding the calculation of a CAT Executing Broker's Historical CAT Assessment will be provided upon request to such CAT Executing Broker. At a minimum, such details would include each CAT Executing Broker's executed equivalent share volume and corresponding fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.**

**(B)** **For each Historical CAT Assessment, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed**

A123

Ms. Vanessa Countryman
December 18, 2025
Page 24

**otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.**

(c)     The Operating Committee may establish any other fees ancillary to the operation of the CAT that it reasonably determines appropriate, including fees: (i) for the late or inaccurate reporting of information to the CAT; (ii) for correcting submitted information; and (iii) based on access and use of the CAT for regulatory and oversight purposes (and not including any reporting obligations).

(d)     The Company shall make publicly available a schedule of effective fees and charges adopted pursuant to this Agreement as in effect from time to time.  The Operating Committee shall review such fee schedule on at least an annual basis and shall make any changes to such fee schedule that it deems appropriate. The Operating Committee is authorized to review such fee schedule on a more regular basis, but shall not make any changes on more than a semiannual basis unless, pursuant to a Supermajority Vote, the Operating Committee concludes that such change is necessary for the adequate funding of the Company.

**(e)     Participant Pass-Through Fees.  No Participant will file with the SEC a proposed rule change pursuant to Section 19(b) and Rule 19b-4 thereunder that would establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a).**

* * * * *

**A124**

Ms. Vanessa Countryman
December 18, 2025
Page 25

## EXHIBIT B

### Proposed Revisions to CAT NMS Plan

Additions **<u>underlined</u>**; deletions **[bracketed]**

\* \* \* \* \*

### ARTICLE XI

### FUNDING OF THE COMPANY

\* \* \* \* \*

**Section 11.3. Recovery.**

\* \* \* \* \*

  (e) <u>Participant Pass-Through Fees</u>. **[Each] <u>No</u>** Participant **<u>will</u> [agrees not to]** file with the SEC a proposed rule change pursuant to Section 19(b) and Rule 19b-4 thereunder that would establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a).

\* \* \* \* \*

**A125**

# TAB K

Letter from Gerald O'Hara, Vice President & Assistant General Counsel, and Katie Kolchin CFA, Managing Director, Head of Equity & Options Market Structure, The Securities Industry and Financial Markets Association (SIFMA) (Dec. 19, 2025)



December 19, 2025

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549


> Re:    Prohibition on the Use of Reserve Funds by the Consolidated Audit Trail
>        National Market System Plan

Dear Ms. Countryman:

The Securities Industry and Financial Markets Association ("SIFMA")[1] submits this letter to the U.S. Securities and Exchange Commission ("Commission" or "SEC") in connection with our ongoing review of the proposed amendment ("Proposed Amendment") to the Consolidated Audit Trail National Market System Plan ("CAT NMS Plan") to effectively readopt the now-vacated CAT funding model.[2]  CAT LLC filed the Proposed Amendment with the Commission purportedly in an attempt to address the decision by the 11th Circuit Court of Appeals that vacated the 2023 CAT funding model as of December 1, 2025.[3]

On October 21, 2025, SIFMA submitted a comment letter to the Commission urging it to disapprove the Proposed Amendment,[4] a view that was shared by a number of other commenters, including certain of the Plan Participants.  On December 18, 2025, the Plan Participants

---

[1] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's one million employees, we advocate on legislation, regulation and business policy affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association (GFMA).

[2] Release No. 34-103960 (Sept. 12, 2025), 90 FR 44910 (Sept. 17, 2025).  Consolidated Audit Trail, LLC ("CAT LLC") filed the Proposed Amendment on behalf of the self-regulatory organizations ("Plan Participants") that are parties to the CAT NMS Plan.  Capitalized terms not defined in this letter have the same meaning as in the CAT NMS Plan.

[3] *Am. Sec. Ass'n et al. v. SEC*, No. 23-13396 (11th Cir.) (July 25, 2025), available at https://media.ca11.uscourts.gov/opinions/pub/files/202313396.pdf.

[4] Letter from Katie Kolchin and Joseph Corcoran, SIFMA to Vanessa Countryman, SEC (Oct. 21, 2025), available at https://www.sec.gov/comments/4-698/4698-670807-2023354.pdf.

Ms. Vanessa Countryman
U.S. Securities and Exchange Commission
December 19, 2025
Page 2

responded to the comments submitted on the proposal.[5]  We are reviewing the response letter and may provide additional comments on the Proposed Amendment in light of the response and the Commission's recent order instituting proceedings ("OIP") regarding it.[6]  In the meantime, we write to express our concerns about the Plan Participants' intent to fund CAT through the millions in reserves it has built up in 2024 and 2025 under the now-vacated funding model.[7]  Spending down the reserves at this point would be unlawful and inconsistent with the Court's decision vacating (i.e., removing) the entire 2023 funding model that was added to the CAT NMS Plan for multiple reasons.[8]  We also note that such a course of action would be contrary to any remedy needed to address what appears to be significant overcharging of CAT fees by CAT LLC in 2025.  Furthermore, for the reserves it currently holds, we recommend that CAT LLC hold them in escrow until the Commission and industry stakeholders are able to chart a new path forward on CAT funding.

***The 11th Circuit's decision eliminated CAT LLC's funding authority under the 2023 CAT funding model.***

As of December 1, 2025, the Court vacated the CAT funding model adopted in September 2023.[9]  Not only does the decision mean that CAT LLC no longer has the authority to collect CAT fees pursuant to the 2023 funding model, but all of the provisions governing the 2023 funding model in the CAT NMS Plan, including the one governing reserve funds, are invalid and no longer in effect.  That includes a provision in Article XI allowing the CAT NMS Plan to include in its budget "an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget."[10]  The same provision stated: "To the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus shall be used to offset future fees."[11]

With regard to CAT funding, the Court's decision places the Plan Participants in the position they were in prior to the Commission's approval in September 2023 of the now-vacated funding model, which is no longer part of the CAT NMS Plan.  Prior to September 2023, the

---

[5] Letter from Robert Walley, CAT NMS Plan Operating Committee Chair to Vanessa Countryman, SEC (Dec. 18, 2025), available at https://www.sec.gov/comments/4-698/4698-685927-2125515.pdf.

[6] Release No. 34-104234 (Nov. 21, 2025), 90 FR 54438 (Nov. 26, 2025).

[7] See CAT NMS Plan letter, supra n. 5 at p. 13.

[8] As described in the Proposed Amendment, in September 2023 CAT LLC amended the CAT NMS Plan to adopt the so-called "Executed Share Model," which "charged fees based on executed equivalent share volume of transactions in Eligible Securities." 90 FR at 44910.  The Executed Share Model adopted in 2023 replaced the "Original Funding Model," which "charged fees based on market share and message traffic." Id.

[9] See *Am. Sec. Ass'n et al. v. SEC,* supra n. 2 at. pp. 28-29 (imposing a 60-day stay of its decision).

[10] Article XI, Section 11.1(a)(ii), CAT NMS Plan (Sept. 6, 2023), available at https://catnmsplan.com/sites/default/files/2025-06/LLC_Agreement_of_Consolidated_Audit_Trail_LLC_as-of-9.06.23.pdf.

[11] Id.

2

Ms. Vanessa Countryman
U.S. Securities and Exchange Commission
December 19, 2025
Page 3

Plan Participants funded CAT directly because the Commission had not yet approved a funding model for the CAT. The Plan Participants thus are now subject to the same funding obligations as they were prior to the Commission's approval of the 2023 funding model.

***The Court's decision prohibits CAT LLC from using any funds, including any reserves, collected pursuant to the vacated funding model to fund ongoing and future CAT costs.***

According to the most recent "Revised 2025 Financial and Operating Budget" posted on the CAT NMS Plan's website, the Plan's liquidity reserve balance is estimated to be $125,128,336 as of the end of 2025.[12] In a recent fee alert, CAT LLC stated that subsequent to the invoices it will issue in late December 2025 for November 2025 activity, it will not issue additional invoices for CAT fees to Industry Members "until further notice."[13] While the statement confirmed that CAT LLC no longer will charge CAT fees pursuant to the 2023 funding model, it raised the question of how the Plan Participants plan to pay for the CAT beginning in December 2025 since the funding model is no longer in place.[14] As discussed, the CAT NMS Plan confirmed that CAT LLC intends to fund the CAT by spending down the reserve amount.[15] CAT LLC cannot do so for multiple reasons.

First, as discussed, all of the money in the reserve fund was charged and collected using the authority given to CAT LLC by the now invalid 2023 funding model. Based on the Court's vacatur of the 2023 funding model, CAT LLC is now prohibited from using the reserves in any manner to fund the CAT. If CAT LLC is funding its ongoing operations costs using the reserves collected under the 2023 funding model, it would effectively extend the life of the unlawful 2023 funding model well beyond the date of its vacatur.

Second, the Plan Participants introduced the concept of a reserve in the funding model of the CAT NMS Plan to serve as a financial buffer, helping smooth out fluctuations and prevent sudden changes in fees and manage timing mismatches between fee collection and actual CAT expenses.[16] The reserve was not intended for use by the Plan Participants or the SEC as a way to

---

[12] We note that this estimated level of reserves, which is not a final audited amount and therefore may be underreporting the accurate reserve level, appears to be well in excess of the 25% maximum level of reserves that was previously permitted by the now invalidated funding model. CAT LLC has not provided any explanation for this apparent extreme overcollection of reserve funds. See CAT LLC's Revised 2025 Financial and Operating Budget on Nov. 7, 2025, available at https://www.catnmsplan.com/sites/default/files/2025-11/11.07.25-CAT-LLC-2025-Finacial_and_Operating-Budget.pdf.

[13] See https://catnmsplan.com/sites/default/files/2025-11/11.25.25-CAT-Fee-Alert-2025-4.pdf.

[14] See *Am. Sec. Ass'n et al. v. SEC*, supra n. 3, at p. 27 ("Our vacatur of the 2023 Funding Order leaves the CAT without a mechanism for the equitable allocation of costs between self-regulatory organizations and broker-dealers, and the Commission and the industry need some time to adjust and react to this reality.").

[15] See CAT NMS Plan letter, supra n. 5 at p. 13. See also CAT LLC – 2026 Financial and Operating Budget on Dec. 8, 2025, available at https://catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf.

[16] See Release No. 34-98290 (Sept. 6, 2023), 88 FR 62628, 62657 (Sept. 12, 2023).

3

**A128**

Ms. Vanessa Countryman
U.S. Securities and Exchange Commission
December 19, 2025
Page 4

avoid addressing the lack of a proper funding model. Using the reserve when its legal foundation has been deemed invalid contradicts its core purpose. Treating the reserve as a fund for the Plan Participants in the absence of a lawful funding model also could set a negative precedent for including such a reserve in future models. Any attempt by the Plan Participants to use the reserves to fund CAT costs would be in direct contravention of the Court's decision and unlawful.

Third, Article XI as amended by the 2023 funding model has been eliminated as of December 1, 2025. And just as the Court's decision confirmed that CAT LLC has no authority to charge CAT fees on behalf of Plan Participants, the decision also confirmed that CAT LLC has no authority to use (or further collect) any reserve funds under the unlawful funding model. All that is left governing the reserve in Article XI is the directive that "[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees."[17] However, there will be no "future fees" to "offset" unless and until the SEC approves a new (and lawful) funding model. CAT LLC therefore cannot spend down the reserve in the absence of such a model and fees subsequently charged under it.

Fourth, the level of the reserve—over $125 million—indicates that CAT LLC collected more fees from Industry Members than the funding model permitted even while the 2023 funding model was still in effect. As discussed, the 2023 funding model capped the reserve at 25% of CAT LLC's annual budget, directing that anything over that threshold be used to offset CAT fees. CAT LLC's 2025 budget was estimated at $248.8 million at the beginning of the year, resulting in a cap of roughly $62.2 million. Therefore, a reserve of more than $125 million is *more than double* the amount permitted by the 2023 funding model, and the true overage is likely even higher because CAT LLC's 2025 budget (and thus the 25% cap) has since decreased, now down to an estimated $182 million.[18] This apparent overcollection must be remedied before the reserve can be spent down. This apparent overcollection of reserves under the 2023 funding model also provides yet another reason for the Commission to disapprove the Proposed Amendment, which contains no safeguards to prevent CAT LLC from over-collecting again in the future.

---

[17] See https://catnmsplan.com/sites/default/files/2025-06/LLC_Agreement_of_Consolidated_Audit_Trail_LLC-as-of-3.24.23.pdf.

[18] It is unclear why CAT LLC did not project or foresee this downward cost trajectory when it had an estimated Liquidity Reserve Balance of $111 million at the end of Q2 2025, and as we understand it, CAT has the ability to make a mid-year adjustment to CAT fees. See CAT LLC's Revised 2025 Financial and Operating Budget on May 19, 2025, available at https://catnmsplan.com/sites/default/files/2025-05/05.19.25-CAT-LLC-2025-Financial_and_Operating-Budget.pdf.

4

Ms. Vanessa Countryman
U.S. Securities and Exchange Commission
December 19, 2025
Page 5

***CAT LLC should freeze the reserve fund and hold the funds in escrow for the benefit of CAT reporters that contributed CAT fees to the reserve fund. If CAT LLC is unwilling or unable to do that, the Commission should order CAT LLC to do so.***

We urge CAT LLC to publicly address how it plans to fund the CAT going forward because, as discussed, the Court's decision precludes CAT LLC from using any of the reserve to pay for CAT costs because all of those funds were charged and collected pursuant to the now-invalidated funding model. We also urge CAT LLC to establish an open and transparent mechanism to fairly address the reserves, including apparent overcollections, CAT LLC charged and collected for CAT transactions under the unlawful 2023 funding plan once the Plan Participants arrive at a new funding model that is consistent with their statutory and regulatory obligations.

We recommend that the Commission work with CAT LLC to ensure it holds the reserve funds in escrow until the Commission can complete its comprehensive review of the CAT. There are a number of potential long-term solutions for handling the improperly collected funds. But those solutions could be undercut by allowing CAT LLC to proceed with its plan to spend away the reserve even before the Commission has a chance to decide how to proceed with the Proposed Amendment. The Commission should therefore take action to preserve the integrity of the judicial ruling.

*          *          *

SIFMA looks forward to working with the Commission and the Plan Participants to ensure a transparent and lawful approach to CAT funding going forward. If you have any questions or need any additional information, please contact Katie Kolchin at (212) 313-1239, Joe Corcoran at (202) 962-7383, or Gerald O'Hara at (202) 962-7343.

Sincerely,

Katie Kolchin, CFA                          Gerald O'Hara
Managing Director, Head of Equity &         Vice President & Assistant
Options Market Structure                    General Counsel

**A130**

# TAB L

Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, Consolidated Audit Trail, LLC (Jan. 14, 2026)

**VIA EMAIL (rule-comments@sec.gov)**

January 14, 2026

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

> Re:    File Number 4-698
>        Notice of Filing of Amendment to the National Market System Plan Governing the
>        Consolidated Audit Trail regarding CAT Funding Model – Response to Comments

Dear Ms. Countryman:

On September 5, 2025, the Consolidated Audit Trail, LLC ("CAT LLC"), on behalf of the Participants[1] in the National Market System Plan Governing the Consolidated Audit Trail[2] (the "CAT NMS Plan" or "Plan"), filed with the Securities and Exchange Commission ("SEC" or "Commission") a proposed amendment to the CAT NMS Plan pursuant to Rule 608 of Regulation NMS under the Securities Exchange Act of 1934 ("Exchange Act")[3] to implement a revised funding model (the "Funding Proposal") for the consolidated audit trail (the "CAT") and to establish a fee schedule for Participant CAT fees in accordance with the Funding Proposal.[4]  The Proposed Amendment was published for comment in the Federal Register on September 17, 2025.[5] On November 21, 2025, the Commission instituted proceedings to determine whether to approve or disapprove the Proposed Amendment.[6]  On December 18, 2025, CAT LLC responded to the comment letters that had been submitted to date on the Proposed Amendment.[7]

---

[1]    The twenty-seven Participants of the CAT NMS Plan are:  24X National Exchange LLC, BOX Exchange LLC, Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc., Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX LLC, Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, MIAX Sapphire, LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, The NASDAQ Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc., and NYSE Texas, Inc.

[2]    The CAT NMS Plan is a national market system plan approved by the Commission pursuant to Section 11A of the Exchange Act and the rules and regulations thereunder.  *See* Securities Exchange Act Rel. No. 79318 (Nov. 15, 2016), 81 Fed. Reg. 84696 (Nov. 23, 2016) ("CAT NMS Plan Approval Order").  The full text of the CAT NMS Plan is available at www.catnmsplan.com.  Unless otherwise defined herein, capitalized terms are defined as set forth in the CAT NMS Plan or the Proposed Amendment, as applicable.

[3]    17 C.F.R. § 242.608.

[4]    Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Sept. 5, 2025) ("Proposed Amendment").  *See also* Securities Exchange Act Rel. No. 98290 (Sept. 6, 2023), 88 Fed. Reg. 62628 (Sept. 12, 2023) ("Executed Share Model Approval Order").

[5]    Securities Exchange Act Rel. No. 103960 (Sept. 12, 2025), 90 Fed. Reg. 44910 (Sept. 17, 2025).

[6]    Securities Exchange Act Rel. No. 104234 (Nov. 21, 2025), 90 Fed. Reg. 54438 (Nov. 26, 2025) ("OIP").

[7]    Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, SEC (Dec. 18, 2025), https://www.sec.gov/comments/4-698/4698-685927-2125515.pdf.

**A131**

Ms. Vanessa Countryman
January 14, 2026
Page 2

This letter responds to the additional comment letter submitted by the Securities Industry and Financial Markets Association ("SIFMA") on December 19, 2025.[8]  SIFMA incorrectly asserts that, as a result of the Eleventh Circuit's decision vacating the 2023 funding model,[9] use of the CAT operational reserve to fund CAT costs "would be unlawful and inconsistent with the Court's decision," and recommends that the Commission order such reserve funds be held in escrow.

SIFMA's letter is based on a mistaken reading of the Eleventh Circuit Opinion and the CAT NMS Plan.  The Eleventh Circuit did not address the reserve at all, and use of the remaining reserve to fund CAT costs is fully consistent with the CAT NMS Plan.  SIFMA's attempt to reinterpret and expand the Court's decision as prohibiting use of the reserve to fund CAT costs until a new funding model is in place—while framed as addressing a narrow issue—would result in a more sweeping adverse situation, where the CAT lacks the funds necessary to continue its operations.  Given the current absence of a funding model, the CAT's limited operational reserve (currently estimated to be exhausted in August 2026) is the only source of funding to support the CAT's ongoing operations.  Accordingly, SIFMA's proposed course of action would imperil the sustained operation of the CAT, and, relatedly, the ability of regulators to use the CAT to oversee the markets.

***The CAT NMS Plan provides that no Participant shall be obligated to contribute capital or make loans to the Company if it does not agree to do so.***

Initially, SIFMA's letter begins with an incorrect presumption.  Specifically, SIFMA notes that the Participants funded CAT directly prior to September 2023 and asserts that, as a result of the Court's decision, the Participants "are now subject to the same funding obligations as they were prior to the Commission's approval of the 2023 funding model."[10]

SIFMA does not cite any provision of the CAT NMS Plan for this statement.  Indeed, it cannot since such funding is not mandated by the CAT NMS Plan.  On the contrary, Section 3.8(a) of the CAT NMS Plan provides that, "[e]xcept as may be determined by the unanimous vote of all the Participants or as may be required by applicable law, no Participant shall be obligated to contribute capital or make loans to the Company."  Thus, no Participant is obligated to make loans to the CAT if it does not agree to do so, resulting in the CAT having been funded entirely by voluntary, interest-free loans from the Participants prior to the SEC's approval of the 2023 funding model.  There should be no presumption that every Participant will voluntarily agree to loan funds to the Company if the operational reserve is frozen.

More broadly, as the Court recognized, the CAT NMS Plan has always "required both the self-regulatory organizations and the broker-dealers to bear the costs of the CAT."[11]  Accordingly,

---

[8]    Letter from Katie Kolchin, Managing Director, Head of Equity & Options Market Structure, and Gerald O'Hara, Vice President & Assistant General Counsel, SIFMA, to Vanessa Countryman, SEC (Dec. 19, 2025) ("SIFMA Letter II"), https://www.sec.gov/comments/4-698/4698-686527-2127374.pdf.

[9]    *Am. Sec. Ass'n, Citadel Sec. LLC v. U.S. Sec. & Exch. Comm'n*, No. 23-13396, 147 F.4th 1264 (11th Cir. 2025) ("Eleventh Circuit Opinion").

[10]    SIFMA Letter II at 3.

[11]    Eleventh Circuit Opinion, 147 F.4th at 1271.

A132

Ms. Vanessa Countryman
January 14, 2026
Page 3

SIFMA's suggestion that the Participants have an obligation to fund CAT alone conflicts with what the CAT NMS Plan has provided from the outset.

***The Court's decision did not vacate, let alone address, existing provisions of the CAT NMS Plan governing the use of a reserve for the prudent operation of the CAT.***

SIFMA also argues that, "[b]ased on the Court's vacatur of the 2023 funding model, CAT LLC is now prohibited from using the reserves in any manner to fund the CAT," and that "[a]ny attempt by the Plan Participants to use the reserves to fund CAT costs would be in direct contravention of the Court's decision and unlawful."[12]  SIFMA does not cite any language from the Court's decision to support this contention because the Court never addressed, much less restricted, how the CAT can use any reserve funds in its possession.

Similarly, SIFMA argues that "the Court's decision precludes CAT LLC from using any of the reserve to pay for CAT costs because all of those funds were charged and collected pursuant to the now-invalidated funding model."[13]  Again, this is an incorrect reading of the Court's decision, and SIFMA offers no citation to any language from the Court's decision that would support its asserted conclusion.  The Court's decision vacated the 2023 funding model governing the collection of CAT fees.  It did not vacate, or even address, existing provisions of the CAT NMS Plan governing the use of a reserve for the prudent operation of the CAT, or more broadly the continued operation of the system.

Finally, SIFMA cites to CAT LLC's 2023 funding model filing and incorrectly insinuates that the Participants "introduced the concept of a reserve in the funding model of the CAT NMS Plan" in that filing.[14]  As SIFMA concedes later on in its letter and as discussed below, the original CAT NMS Plan adopted in 2016 also included provisions that permit the creation of a reserve and the use of that reserve for the prudent operation of the Company, and those provisions remain in effect following the Eleventh Circuit Opinion.[15]

***The CAT NMS Plan requires that any surpluses be treated as an operational reserve to fund future CAT costs, as opposed to being distributed to the Participants as profits.***

SIFMA also asserts that "[a]ll that is left governing the reserve in Article XI is the directive that '[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees'"—in reference to Section 11.1(c) of the CAT NMS Plan.[16]  SIFMA incorrectly concludes that because "there will be no 'future fees' to 'offset' unless and until the SEC approves a new (and lawful) funding model," CAT LLC "cannot spend down the reserve in the absence of such a model and fees subsequently charged under it."[17]

---

12    SIFMA Letter II at 3-4.
13    SIFMA Letter II at 5.
14    SIFMA Letter II at 3.
15    *See* Section 11.1(a) and (c) of the CAT NMS Plan; CAT NMS Plan Approval Order at 84710.
16    SIFMA Letter II at 4.
17    SIFMA Letter II at 4.

Ms. Vanessa Countryman
January 14, 2026
Page 4

SIFMA's assertion that Section 11.1(c) alone governs the reserve is factually incorrect. Section 11.1(a) of the CAT NMS Plan requires the Operating Committee to approve an annual budget to "include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, *as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company*" (emphasis added). Thus, the original CAT NMS Plan contemplated the use of a reserve for the prudent operation of the CAT, and this provision both was unaltered by any funding model and remains in effect.

SIFMA's argument also rests on a mistaken interpretation of the isolated phrase "to offset future fees" in the last sentence of Section 11.1(c) of the CAT NMS Plan as referring to CAT fees imposed on Participants and Industry Members under a funding model. But the plain language and the purpose of Section 11.1(c) make clear that the reference to "fees" in that final sentence means the total fees, costs and expenses incurred in operating the CAT—not, as SIFMA argues, the CAT fees imposed on Participants and Industry Members under a funding model. Indeed, the penultimate sentence in Section 11.1(c) refers to the "fees, costs and expenses (including legal and consulting fees and expenses) incurred . . . in connection with the creation and implementation of the CAT"—making it clear that "fees" as used in the phrase "to offset future fees" is synonymous with costs incurred to operate the CAT.

Moreover, SIFMA's interpretation ignores the clear intent and purpose of the reserve provisions. As described in the Commission's 2016 approval order, the Commission added this provision to Section 11.1(c) to ensure that the CAT be operated on a "break-even" basis, with any surpluses treated as an operational reserve to offset future fees and not distributed to the Participants as profits.[18] Specifically, the Commission described this "clarification in the Plan to the effect that profits from fees *will go toward funding future costs instead of being redistributed among the SROs*."[19] Accordingly, the Commission has recognized that the purpose of the "to offset future fees" language was to ensure that any revenue surplus would go toward funding future CAT costs (*i.e.*, precisely what CAT proposes to do), as opposed to being distributed to the Participants as profits. Taken altogether, use of the remaining reserve to fund CAT costs for the prudent operation of the CAT is fully consistent with the CAT NMS Plan.

### *CAT LLC did not "over-collect" fees in contravention of the prior funding model.*

Finally, SIFMA incorrectly asserts "CAT LLC collected more fees from Industry Members than the funding model permitted even while the 2023 funding model was still in effect."[20] This argument is based on a mistaken understanding of the 2023 funding model.

Under the 2023 funding model, the Fee Rate was calculated twice per year based on reasonably projected CAT costs and reasonably projected executed equivalent share volumes. Prior to Section 11.1(a)(ii) of the CAT NMS Plan being vacated by the Eleventh Circuit, that

---

[18]    CAT NMS Plan Approval Order at 84792.
[19]    CAT NMS Plan Approval Order at 84881 (emphasis added); *see also id.* at 84792-93 (explaining the intent to operate the CAT on a break-even basis and that "any surplus of the Company's revenues over its expenses will be treated as an operational reserve").
[20]    SIFMA Letter II at 4.

Ms. Vanessa Countryman
January 14, 2026
Page 5

provision stated that, "[t]o the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus will be used to offset future fees." Accordingly, the 2023 funding model contemplated the possibility of a surplus reserve exceeding 25% of the budget, and that such surplus would be used to offset future fees incurred by CAT (as discussed in the preceding section).

In November 2024, the Operating Committee originally approved a 2025 operating budget of approximately $249 million. Based on this budget, the Operating Committee established CAT Fee 2025-1, with a fee rate of $0.000022 per executed equivalent share beginning with transactions in January 2025. In May 2025, the Operating Committee revised the budget down by $21 million dollars to approximately $228 million to reflect cost savings achieved through the implementation of the 2024 Cost Savings Amendment and other optimizations. Based on this budget, the Operating Committee established CAT Fee 2025-2, with a significantly reduced fee rate of $0.000009 per executed equivalent share beginning with transactions in July 2025, to replace CAT Fee 2025-1. As detailed in the fee filings establishing CAT Fee 2025-2, the amount of the surplus reserve was primarily driven by (i) the collection of CAT fees in excess of the budgeted CAT costs for 2024 and 2025 as a result of the greater actual executed equivalent share volume than the projected executed equivalent share volume for CAT Fees 2024-1 and 2025-1, and (ii) a reduction in anticipated budgeted costs associated with the implementation of certain cost savings measures approved by the SEC pertaining to the processing of options market maker quotes and the storage of certain data.[21] Accordingly, the surplus reserve resulted from greater volumes than initially projected and the material cost savings CAT LLC achieved in 2025.

*    *    *

Thank you very much for your attention to this matter. If you have any questions or comments, please contact me at rwalley@deloitteretired.com.

Respectfully Submitted,

*/s/ Robert Walley*

Robert Walley
CAT NMS Plan Operating Committee Chair

---

[21]    *See, e.g.*, Securities Exchange Act Rel. No. 103387 (July 3, 2025), 90 Fed. Reg. 30274, 30288 (July 9, 2025).

A135

Ms. Vanessa Countryman
January 14, 2026
Page 6

cc.    The Hon. Paul S. Atkins, Chair
       The Hon. Hester M. Peirce, Commissioner
       The Hon. Caroline A. Crenshaw, Commissioner
       The Hon. Mark T. Uyeda, Commissioner
       Mr. Jamie Selway, Director, Division of Trading and Markets
       Mr. David Hsu, Assistant Director, Division of Trading and Markets
       Ms. Erika Berg, Special Counsel, Division of Trading and Markets
       CAT NMS Plan Participants

**A136**

# TAB M

Letter from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities (Jan. 30, 2026)

**CITADEL | Securities**

January 30, 2026

Ms. Vanessa A. Countryman
Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549–1090

**Re:    2025 CAT Funding Proposal (File No. 4-698)**

Citadel Securities appreciates the opportunity to provide further comment to the Securities and Exchange Commission (the "Commission") on the CAT Operating Committee's attempt to reinstate the unlawful 2023 funding order ("2023 Order"). In our previous letter,[1] we explained how, among other problems, the 2025 Funding Proposal[2] fails to address the defects identified in the Eleventh Circuit's decision invalidating the 2023 Order[3] and that new fees must not be assessed until the Commission completes its comprehensive review of the CAT.

The Commission has since received additional comments on the 2025 Funding Proposal.[4] Many of those letters simply incorporate by reference arguments contained in prior letters.[5] Certain points, however, require additional response.

**I.    The CAT Funding Proposal Exceeds the Commission's Authority**

Our first letter detailed how the 2025 Funding Proposal exceeds the Commission's authority in multiple respects. Once again, CAT LLC makes no attempt to defend the legality of the multi-billion-dollar surveillance system that it is operating for the Commission and for which it is seeking to collect hundreds of millions of dollars in fees annually from broker-dealers and their customers. Before approving the 2025 Funding Proposal, the Commission must address this critically important issue, as it has a "duty to examine key assumptions"—including ones "regarding [its] statutory authority"—"as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule.'"[6]

---

[1] Letter from Citadel Securities (Oct. 17, 2025), https://www.sec.gov/comments/4-698/4698-669947-2018874.pdf.

[2] 90 FR 44910 (Sept. 17) at 44911, https://www.govinfo.gov/content/pkg/FR-2025-09-17/pdf/2025-17929.pdf.

[3] *Am. Sec. Ass'n, v. SEC*, 147 F.4th 1264 (11th Cir. 2025) (*ASA*).

[4] *See*, *e.g.,* Letter from CAT Operating Committee (Jan. 14, 2026) ("CAT LLC Reserve Letter"), https://www.sec.gov/comments/4-698/4698-692067-2162194.pdf; Letter from CAT Operating Committee (Dec. 18, 2025) ("CAT LLC Letter"), https://www.sec.gov/comments/4-698/4698-685927-2125515.pdf; Letter from Cboe Exchanges (Oct. 31, 2025) ("Cboe Letter"), https://www.sec.gov/comments/4-698/4698-672527-2038054.pdf; Letter from FINRA (Oct. 17, 2025) ("FINRA Letter"), https://www.sec.gov/comments/4-698/4698-670027-2019234.pdf.

[5] Citadel Securities incorporates and restates the comments set forth in all of its prior submissions regarding the CAT.

[6] *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 589 (D.C. Cir. 2019) (cleaned up).

1

**A137**

CITADEL | Securities

## II.   The CAT Funding Proposal Does Not Remedy The Commission's Prior Deficient Economic Analysis

Our first letter detailed key aspects of the Commission's 2016 economic analysis that must be updated to reflect "real-world numbers," [7] all of which directly relate to the fundamental question as to whether the 2025 Funding Proposal is consistent with the Exchange Act.  Information and data from CAT LLC is essential to this analysis, including with respect to reporting volumes, technological design choices, overall budget, and how fees were allocated in practice under the invalidated 2023 Order.  And yet CAT LLC continues to refuse to publicly disclose this information, instead choosing to simply refer back to outdated letters that unsuccessfully attempted to justify the unlawful 2023 Order.[8]  In doing so, CAT LLC further underscores that the 2025 Funding Proposal is merely a thinly veiled attempt to reinstate the unlawful 2023 Order.

To accurately assess the economic implications of this specific proposal, the Commission must obtain detailed information from CAT LLC, including:

- Key metrics relating to the system's overall costs, such as (i) the number of executed transactions per day (subdivided by equities and options), (ii) the number of quotation messages per day (subdivided by equities and options), (iii) the number of CAT records created per day, (iv) the number of unique market participants who have transaction records stored in the CAT system, and (v) the usage-related costs (e.g. due to data requests made by the Commission or the SROs) that are now being incurred.

- Why the Commission's 2016 cost estimates were so inaccurate and the key cost drivers that led to the dramatic increase.  This should be informed by the cost savings analysis that CAT LLC has undertaken in connection with recent Commission efforts to reduce overall costs.[9]  Simply attributing those cost overruns to an unanticipated increase in market volume is not accurate or sufficient, as we are now witnessing the CAT budget start to decrease as a result of addressing certain key cost drivers (such as options market maker quotes and data retention requirements), despite the persistence of record trading volumes.

- Estimated future trajectory of the CAT budget, including (i) an average annual rate of increase, (ii) costs associated with the implementation of approved (but not yet implemented) Commission rules, such as the Tick Sizes and Access Fees rule (which is expected to significantly increase equities message traffic), [10] and (iii) costs associated with the implementation of approved (but not yet implemented) SRO rules, such as the launch of newly approved equities and options exchanges (e.g. 24X Exchange, the Texas Stock Exchange, the Green Impact Exchange, and IEX Options)

---

[7] *ASA*, 147 F.4th at 1269.

[8] CAT LLC Letter at FN 10.

[9] *See, e.g.,* CAT Cost Savings Amendment, Release No. 34-104504 (Dec. 23, 2025), https://www.sec.gov/files/rules/sro/nms/2025/34-104504.pdf.

[10] 89 FR 81620 (Oct. 8, 2024), available at: https://www.govinfo.gov/content/pkg/FR-2024-10-08/pdf/2024-21867.pdf.

2

**CITADEL | Securities**

and the launch of overnight on-exchange trading (both of which will significantly increase equities and options message traffic).

- How fees were allocated in practice among broker-dealers under the 2023 Order, including (i) the total number of broker-dealers invoiced by CAT LLC, (ii) how fees were allocated across equities and options trading (and whether this was reasonable and equitable based on estimated CAT system costs associated with each),[11] (iii) how fees were allocated to retail broker-dealers (and whether this unfairly weighted trading in low-priced NMS stocks), (iv) how fees were allocated to market makers (and whether this was reasonable and equitable based on the key CAT cost drivers).

As the above list illustrates, much has changed since the Commission approved the 2023 Order – even the number of SROs has meaningfully increased, and yet this funding model would reduce the per-SRO allocation while offloading the same percentage of total costs to broker-dealers and their customers. The Commission must rigorously assess the economic implications of the proposed funding model, taking into account related costs already being borne by broker-dealers, including (i) annual CAT reporting costs and (ii) reporting and compliance costs related to the Electronic Blue Sheets system, which is continuing to operate alongside the CAT. After completing the required economic analysis, it will be clear that allocating at least two-thirds of CAT system costs (and likely far more as detailed immediately below) to broker-dealers and their customers in the manner contemplated by the 2025 Funding Proposal is not reasonable and equitable under the Exchange Act.

### III.   The CAT Funding Proposal Does Not Sufficiently Prohibit SRO Pass-Throughs

Our first letter explained how the 2025 Funding Proposal leaves the door wide open for SROs to pass through their allocated portion of CAT fees to broker-dealers: by prohibiting only a "new fee" for pass-throughs, the Proposal leaves unchanged language in the CAT NMS Plan allowing SROs to "subsume [CAT costs] *in other fees or assessments*."[12] Preserving that method for pass-throughs flouts the Eleventh Circuit's ruling that the Commission must either (a) prohibit SRO pass-throughs altogether or (b) acknowledge that SROs may pass-through up to 100% of the entire CAT budget to broker-dealers and their customers, explain that departure from the Commission's longstanding approach to funding the CAT, and account for SRO pass-throughs of up to 100% when considering whether the 2025 Funding Proposal is consistent with the Exchange Act.[13]

Rather than fix the problem, the CAT Operating Committee has dug in its heels. The 2025 Funding Proposal offers no explanation for why SROs should be permitted to pass-through 100% of the entire CAT budget, nor does it offer the Commission a way to account for the economic effects of SRO pass-throughs. Rather, it asks the Commission to pay lip service to the fallacy that SRO pass-throughs will be stemmed by prohibiting them via a "new fee," while silently allowing them through other unmodified language in the CAT NMS Plan. That is the exact opposite of a

---

[11] For example, CAT LLC has found that more efficiently processing and storing options market maker quotes has resulted in "better than anticipated" savings of "approximately $30 million in the first year." *Supra* note 9 at FN 8.

[12] Citadel Securities Letter at 9 (internal quotation omitted).

[13] S*ee ASA*, 147 F.4th at 1274–75, 1277; FINRA Letter at 10–11.

3

CITADEL | Securities

"reasoned justification or explanation" for the sort of "about-face" the CAT Operating Committee is again urging the Commission to adopt.[14]

The CAT Operating Committee also insists that the Eleventh Circuit was concerned only with SRO pass-throughs via *new* fees because the court "specifically cited the CAT cost recovery fees implemented by FINRA to directly pass-through to its members 100% of the CAT fees allocated to FINRA."[15] That contention misreads the Eleventh Circuit's decision. While the court cited FINRA's new fee as an example of an SRO pass-through, the relevant problem in the 2023 Order was that it shifted from "a *mandate* that both self-regulatory organizations and broker-dealers fund the CAT to an *allowance* for self-regulatory organizations to pass through 100% of their CAT costs."[16] The problem is, therefore, permitting SRO pass-throughs *in general*, and that problem exists whether those pass-throughs are implemented through new fees or through inflation of extant ones. Both methods effectively nullify any nominal allocation the Commission assigns to the SROs and leaves broker-dealers and their customers holding the bag. So, just as the unlawful 2023 Order did, the 2025 Funding Proposal would make the longstanding requirement that both SROs and broker-dealers bear the costs of the CAT "quietly vanish[]."[17]

Other comments by members of the CAT Operating Committee make clear that the largest SROs fully expect to pass-through any fees purportedly allocated to them under the 2025 Funding Proposal. Indeed, both FINRA and the Cboe Exchanges contend that CAT LLC cannot restrict individual SRO pass-throughs at all.[18] Even if that were true, the Exchange Act and Rule 608 clearly authorize *the Commission* to prohibit individual SRO pass-throughs. Sections 6(b)(4) and 15A(b)(5) of the Exchange Act require SRO rules to provide for "reasonable … fees."[19] And Rule 608 empowers the Commission to make "changes" to and impose "conditions" on NMS Plan amendments "as the Commission may deem necessary or appropriate," if it finds the amendment is "necessary or appropriate in the public interest … or otherwise in furtherance of the purposes of the Act."[20] The Commission may, therefore, conclude that including a prohibition on SRO pass-throughs in the Plan is "necessary" and "appropriate" in furtherance of "the purposes of the Act" because any SRO pass-throughs would not result in "reasonable … fees" under Sections 6(b)(4) and 15A(b)(5), since they would undercut the Plan's allocation of CAT costs.

Indeed, the Commission took that exact approach when imposing the Plan's Financial Accountability Milestones ("FAMs") in 2020. The Commission explained that fees eventually imposed after continued delays in the CAT's implementation would not be "reasonable" under

---

[14] *ASA*, 147 F.4th at 1275.

[15] CAT LLC Letter at 4.

[16] *ASA*, 147 F.4th at 1274.

[17] *Id.* at 1275.

[18] FINRA Letter at 7–9; Cboe Letter at 1–2.

[19] 15 U.S.C. § 78f(b)(4) (national securities exchanges); 15 U.S.C. § 78o-3(b)(5) (national securities associations).

[20] 17 C.F.R. § 242.608(b)(2).

**CITADEL | Securities**

Sections 6(b)(4) and 15A(b)(5), so it incorporated limits on those fees into the Plan itself.[21]  The Commission has the same authority here to get ahead of another form of unreasonable fees—and an "allocation" in name only—by prohibiting SRO pass-throughs.

More generally, FINRA and Cboe appear to argue that the Commission must wait to disapprove SRO pass-throughs as part of its review of each individual Rule 19b-4 fee-filing, but that approach is both inefficient and contrary to the Eleventh Circuit's decision on the 2023 Order.[22]  As that court recognized, policing pass-throughs at the Rule 19b-4 stage is "insufficient" because those filings purport to take effect immediately, they do not focus on "the market-wide allocation formula," and the SEC's refusal to institute proceedings is not judicially reviewable.[23]  Moreover, the Eleventh Circuit never questioned the Commission's ability to prohibit SRO pass-throughs in the Plan; to the contrary, the court faulted the Commission for *not* doing so and failing to explain that decision.[24]

Fundamentally, it is clear that the largest (if not all) of the SROs fully intend to pass-through any fees purportedly allocated to them under the 2025 Funding Proposal.  The Commission must take this into account when determining whether the proposed funding model is lawful – even if only FINRA and the Cboe Exchanges were to pass-through their allocation, that would mean broker-dealers and their customers would be bearing more than 80% of the total CAT budget.

## IV.  The CAT Funding Proposal Unlawfully Circumvents Commission Rule 608

Our first letter detailed why the 2025 Funding Proposal unlawfully circumvents Commission Rule 608 by contemplating that CAT costs will be allocated to broker-dealers and their customers via immediately effective fee filings under Rule 19b-4.  In contrast, Rule 608 requires that fee filings relating to NMS Plans (including CAT) must be approved by the Commission prior to becoming effective.

---

[21] 85 Fed. Reg. 31322, 31330 (May 22, 2020), https://www.govinfo.gov/content/pkg/FR-2020-05-22/pdf/2020-10963.pdf; 84 Fed. Reg. 48458, 48465–66 (Sept. 13, 2019), https://www.govinfo.gov/content/pkg/FR-2019-09-13/pdf/2019-19852.pdf.

[22] Given its disagreement with CAT LLC's proposal, FINRA also suggests that the Commission adopt what FINRA calls "a time-limited interim funding solution" by (1) amending the 2025 Funding Proposal to remove the bar on pass-throughs via new fees; (2) amending the 2025 Funding Proposal so that it will expire "after a specified period (e.g., one year)," and (3) asking the SROs to file rule changes committing not to pass through their allocated portion of CAT fees for the specified period.  As even CAT LLC recognizes, the fundamental defect in that "solution" is that it would not address the problem of pass-throughs identified by the Eleventh Circuit.  The substance of FINRA's proposed amendment would be identical to the  2023 Order: there would be no prohibition on SRO pass-throughs, and no "reasoned justification or explanation for the Commission's about-face" on its prior position that CAT should be funded by SROs and broker-dealers alike.  FINRA's proposal still would leave SRO pass-throughs to the discretion of the SROs, and nothing would stop them from reversing course on a hypothetical informal agreement not to pass through their portion of CAT costs.  The Commission cannot simply reenact the unlawful 2023 Order on a "temporary" basis.  *See* FINRA Letter; CAT LLC Letter; *ASA*, 147 F.4th at 1275.

[23] *ASA*, 147 F.4th at 1276.

[24] *Id.* at 1274–77.

5

A141

CITADEL | Securities

In response, CAT LLC simply points back to the 2016 CAT NMS Plan as permitting fee filings under Rule 19b-4.[25]  However, the Commission amended Rule 608 in 2020 to require Commission approval of these fee filings, *several years after* it approved the CAT NMS Plan.  In doing so, the Commission specifically referenced the CAT NMS Plan multiple times throughout the release, clearly conveying the expectation that fee filings under the CAT NMS Plan would be subject to Commission approval going forward.[26]  The 2025 Funding Proposal cannot be reasonable and equitable if it allows the SROs to recoup clearly unreasonable costs from broker-dealers and their customers pursuant to filings that are deemed immediately effective and immune from judicial review, contrary to explicit Commission rules.

## V.  <u>The Commission Must Independently Confirm That The Financial Accountability Milestones Have Been Satisfied</u>

Our first letter explained why the Commission must independently assess whether CAT LLC has fulfilled the FAMs before approving the 2025 Funding Proposal.  In particular, CAT LLC continues to rely on various exemptive orders issued by the Commission that provide relief from specific CAT NMS Plan requirements, including exemptive orders that were issued *after* the relevant FAM compliance date.

In response, the CAT Operating Committee points to the SROs self-certifying compliance with the FAMs in a "Quarterly Progress Report" provided to the Commission that invoked Commission exemptive relief.[27]  However, the Commission has never independently concluded – in the various exemptive orders or otherwise – that it is in the public interest to permit the SROs to allocate hundreds of millions of CAT costs to broker-dealers and their customers even though they have failed to comply with specific CAT NMS Plan requirements and the express terms of the FAMs.  The Commission must decide *now* whether the FAMs have been satisfied before giving the green light for immediately effective CAT fees under a new funding model.[28]

Further, the CAT Operating Committee makes no attempt to explain how a Commission exemptive order issued *after* a FAM deadline could retroactively bring the SROs into compliance with the relevant FAM, thus allowing them to recoup historical costs under the NMS Plan.  Under the CAT NMS Plan, in order for the SROs to recoup *any* historical costs, all of the requirements

---

[25] CAT LLC Letter at 8.

[26] *See, e.g.,* 85 Fed. Reg. 65470 (Oct. 15, 2020), https://www.govinfo.gov/content/pkg/FR-2020-10-15/pdf/2020-18572.pdf at 65471, 65481-83, 65490.  As detailed in our first letter, even if subsequent fee filings are permitted under Rule 19b-4, the Commission must assess *now* whether the actual costs that may be allocated are fair and reasonable as part of determining whether the 2025 Funding Proposal complies with the Exchange Act.  The Eleventh Circuit has clearly stated that the Commission's "post hoc review of fee filings is insufficient," since they are considered immediately effective without Commission approval and appear immune from judicial challenge. *ASA*, 147 F.4th at 1276.

[27] CAT LLC Letter at 11; *see* Q2 & Q3 2024 Quarterly Progress Report 7 (July 29, 2024), https://www.catnmsplan.com/sites/default/files/2024-07/CAT_Q2-and-Q3-2024-QPR.pdf.

[28] As the Eleventh Circuit explained, review at the fee-filing stage is "insufficient" to address global defects in the imposition of CAT fees *because* those filings purport to "take effect immediately upon filing" and the Commission's assessment of those filings "will not be subject to judicial review."  *ASA*, 147 F.4th at 1276.

6

**CITADEL | Securities**

associated with "Period 1" must have been completed by July 31, 2020.[29]  However, according to the Commission, one such "Period 1" requirement is the reporting of responses to electronic requests for quotes ("RFQs") that are not immediately actionable.  This requirement was never completed, and, instead, the Commission eventually granted exemptive relief in May 2024, nearly three years after the due date.[30]  This belated exemptive relief cannot retroactively bring the SROs into compliance with the July 31, 2020 deadline and, by the same token, retroactively authorize them to impose hundreds of millions in historical costs on broker-dealers.  Granting the SROs an extension of the relevant FAM deadlines *after those deadlines already have passed* is a major policy change from the Commission's rationale in establishing the FAMs—particularly because doing so retroactively imposes significant financial burdens on broker-dealers and their customers.  Even if the Commission could somehow justify that about-face, it has not done so.

### VI.    The CAT Funding Proposal Enables the Unlawful Over-Collection of Fees

The 2025 Funding Proposal permits the SROs to establish a reserve fund of "not more than 25% of the annual budget."[31]  However, it does not provide for any Commission oversight to ensure that the 25% limit is enforced or to approve how collected reserve amounts are ultimately spent by the SROs.

This lack of Commission oversight has resulted in disastrous consequences under the unlawful 2023 Order.[32]  First, CAT LLC improperly over-collected fees to fund the reserve, allowing it to balloon far beyond the 25% limit over the course of 2025.  CAT LLC's 2026 budget disclosed a reserve amount of approximately $120 million to start the year.[33]  Based on CAT LLC's original 2025 budget of $248.8 million, that reserve is *nearly double* the amount that was allowed under the 2023 Order. But the true overage is even higher because CAT LLC's actual 2025 expenses (and thus the 25% cap) decreased, with expenses expected to top out at $187.5 million.[34]  Thus, over the course of 2025, CAT LLC collected *tens of millions* more in fees than even the unlawful 2023 Order allowed.

Second, CAT LLC is unlawfully spending down the excess reserve—not to "offset future fees," as the CAT NMS Plan requires,[35] but to fund its operations in 2026, even in the absence of any Commission-approved funding model.  Without a Commission-approved funding model, there

---

[29] 85 FR 31322 (May 22, 2020) at 31348, https://www.govinfo.gov/content/pkg/FR-2020-05-22/pdf/2020-10963.pdf.

[30] *See* 89 FR 45715 (May 23, 2024), https://www.govinfo.gov/content/pkg/FR-2024-05-23/pdf/2024-11360.pdf.

[31] 2025 Funding Proposal at 44915.

[32] *See* Petition for Rulemaking to Amend CAT NMS Plan to Direct Proper Use of CAT LLC Reserve, Citadel Securities (Jan. 15, 2026), https://www.sec.gov/files/rules/petitions/2026/petn4-878.pdf.

[33] https://catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf.

[34] https://catnmsplan.com/sites/default/files/2025-12/12.22.25_CAT-LLC-2025-Finacial_and_Operating-Budget.pdf.

[35] CAT NMS Plan, § 11.1(a) (Nov. 15, 2016) (*2016 CAT NMS Plan*), https://catnmsplan.com/sites/default/files/2020-02/34-79318-exhibit-a.pdf.

**CITADEL | Securities**

are no "fees" that can be assessed against broker-dealers and their customers.  And under the clear provisions of the CAT NMS Plan, the reserve funds cannot be spent until the Commission approves a new funding model that establishes new broker-dealer fees, which then can be offset by any excess reserve amounts.

CAT LLC contends that the NMS Plan's requirement to offset "fees" refers to its "expenses incurred in operating the CAT" rather than "fees imposed …under a funding model."[36]  But the same sentence already refers to the CAT's "expenses," and it then uses a different term—"fees"—for what the reserve must be used to "offset."[37]  There is no way to interpret the word "fees" as also encompassing the costs and expenses incurred in operating the CAT.

Further, the NMS Plan makes clear that the SROs should in no case obtain a windfall from the reserve—whether as profit or otherwise—and that is precisely what is happening here.  By using the unlawfully inflated reserve to fund the CAT in the absence of a Commission-approved funding model, the SROs are avoiding the need to fund the CAT themselves.  And doing so makes a mockery of the Eleventh Circuit's decision to vacate the 2023 Order, as broker-dealers and their customers effectively continue to fund the CAT throughout 2026 as if the 2023 Order remains in place.

The Commission cannot approve the 2025 Funding Proposal without addressing these serious deficiencies.  Any limit on the size of a reserve must be monitored and enforced to prevent the SROs from once again over-collecting fees with abandon.  In addition, any spending of a reserve fund must be approved by the Commission to ensure that doing so complies with the terms of the NMS Plan, instead of being used purely to enrich the SROs.

In addition, the Commission must provide a way for broker-dealers and their customers to be made whole.  Every dollar of the reserve spent now without a Commission-approved funding model in place is a dollar less that can and should be used to offset future CAT fees in the event another funding model is approved.  The full amount of the improperly collected reserve must be refunded, or at the very least applied against any future payments assessed to broker-dealers and their customers under the 2025 Funding Proposal.

### VII.    The Commission's Comprehensive Review Should Precede Any New Funding Model

We wholeheartedly agree with Chairman Atkins's call for a "comprehensive review" that covers all aspects of the CAT.[38]  The Commission should be allocating its limited resources to conduct this comprehensive review and to chart a new path forward—including funding the CAT through the Section 31 process by including it in the Commission's appropriated budget—rather than becoming embroiled in yet another controversy over the funding of a broken system.

---

[36] CAT LLC Reserve Letter at 4.

[37] CAT NMS Plan Section 11.1(c).

[38] https://www.sec.gov/newsroom/speeches-statements/atkins-prepared-remarks-sec-speaks-051925 and https://www.sec.gov/newsroom/speeches-statements/atkins-093025-consolidated-audit-trail-new-day-cat?utm_medium=email&utm_source=govdelivery.

8

**A144**

CITADEL | Securities

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

We thank the Commission for considering our comments.

Please feel free to call the undersigned with any questions regarding these comments.

Respectfully,

/s/ Stephen John Berger

Managing Director

Global Head of Government & Regulatory Policy

9

**A145**

# TAB N

Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati Professional Corporation on behalf of the Financial Industry Regulatory Authority, Inc. (FINRA)  (Jan. 30, 2026)

# WILSON SONSINI

Wilson Sonsini Goodrich & Rosati
Professional Corporation

1700 K Street NW
Fifth Floor
Washington, D.C. 20006-3817

O: 202.973.8800
F: 866.974.7329

STEFFEN N. JOHNSON
sjohnson@wsgr.com

January 30, 2026

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090
Via Email to rule-comments@sec.gov

**Re:    Notice of Filing of Amendment to the National Market System
Plan Governing the Consolidated Audit Trail (File No. 4-698)**

Dear Ms. Countryman:

We write on behalf of the Financial Industry Regulatory Authority, Inc. ("FINRA")[1] in connection with the above-captioned proposed amendments to the National Market System Plan Governing the Consolidated Audit Trail ("Plan" or "CAT NMS Plan"). This letter supplements FINRA's October 17, 2025, letter and responds to the December 18, 2025, letter submitted by CAT LLC.

The Funding Proposal re-proposes the executed share funding model with only one material difference: the addition of a new provision seeking to bar each self-regulatory organization ("SRO") that is a participant in the Plan from establishing new fees to pass through CAT costs. That pass-through prohibition is unlawful, ineffective, and fails to cure the defects identified by the Eleventh Circuit.[2] For reasons stated in FINRA's earlier letter, CAT LLC's attempts to justify this prohibition are unpersuasive. FINRA submits this further letter to address CAT LLC's response.

*First*, CAT LLC attempts to defend proposed Section 11.3(e)—which precludes Participants from filing "new" fees to pass through CAT costs—by arguing that Rule 608(a)(4)(ii) authorizes such a prohibition as a "written understanding relating to the

---

[1]    This letter does not represent the views of FINRA CAT, LLC ("FCAT"), a distinct corporate subsidiary of FINRA that acts as the CAT Plan Processor pursuant to an agreement with Consolidated Audit Trail, LLC.

[2]    *See* Securities Exchange Act Release No. 103960 (Sept. 12, 2025), 90 Fed. Reg. 44910 (Sept. 17, 2025) (the "Funding Proposal").

AUSTIN    BOSTON    BOULDER    BRUSSELS    HONG KONG    LONDON    LOS ANGELES    NEW YORK    PALO ALTO
SALT LAKE CITY    SAN DIEGO    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, DC    WILMINGTON, DE

A146

**WILSON
SONSINI**

Ms. Vanessa Countryman
January 30, 2026
Page 2

interpretation of the CAT NMS Plan."[3]  This argument conflates interpreting the plan with controlling individual SRO actions, and thus rests on a flawed reading of Rule 608's text and purpose.

Rule 608 requires proposed amendments to include "description[s]" of how they "will be implemented" and "any written understandings or agreements between or among plan sponsors or participants relating to [their] interpretation."[4]  These are "procedur[al]" requirements designed to facilitate transparency, by requiring disclosure to the Commission and the public of how internal operations of the Plan—not the external relationship between a distinct SRO and its members—will be managed.[5]  They do not grant substantive authority of any sort, much less authority for a majority of Plan Participants to effectively suspend Section 19(b) of the Exchange Act, the plain text of which grants individual SROs the right to file their own fee rules.  What is more, proposed Section 11.3(e) is not a "written understanding" reflecting an agreement among Participants.[6]  As CAT LLC belatedly admits, it is instead a provision "intended to impose an obligation on all Participants," including those who objected to it.[7]  Rule 608(a)(4)(ii) cannot support proposed Section 11.3(e).

Lacking any basis in Rule 608 for its proposal, CAT LLC observes that the CAT NMS Plan "currently includes provisions that prevent the Participants from collecting Post Amendment Industry Member Fees."  But these provisions are nothing like proposed Section 11.3(e).[8]  Unlike proposed Section 11.3(e), the provisions cited by CAT LLC involve joint fees "establish[ed]" by the CAT LLC Operating Committee,[9]

---

[3]   Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Dec. 18, 2025) ("CAT LLC Letter") at 5.

[4]   17 C.F.R. § 242.608(a)(4)(ii); *see also* CAT LLC Letter at 5.

[5]   70 Fed. Reg. 37620, 37571 n.664 (June 29, 2005) ("Exchange Act Rule 11Aa3–2 (redesignated as Rule 608) codifies the procedures that SROs must follow to seek approval for or amendment of a national market system plan.").

[6]   CAT LLC Letter at 5.

[7]   CAT LLC Letter at 5.

[8]   CAT LLC Letter at 5-6 (citing CAT NMS Plan at Section 11.3(a)(iii); *id.* at Section 11.3(a)(ii)(B)(III); *id.* at Section 11.6(a)(ii)-(iii)).

[9]   CAT NMS Plan at Section 11.3(a) (providing that "[t]he Operating Committee will establish fees ('CAT Fees') to be payable by Participants and Industry Members with regard to CAT costs not previously paid by the Participants ('Prospective CAT Costs')"); *id.* at Section

**A147**

**WILSON
SONSINI**

Ms. Vanessa Countryman
January 30, 2026
Page 3

or fees to recover costs "incurred by or for" CAT LLC.[10]  None of these provisions are analogous to the proposed pass-through prohibition, and none of them support the proposition that the CAT NMS Plan may lawfully restrict how an individual Participant SRO funds its own SRO costs through separate SRO fees.

*Second*, CAT LLC argues (at 5) that prohibiting all pass-throughs is lawful because the Eleventh Circuit implicitly held that "prior to 2023 the CAT NMS Plan did not contemplate 100% pass-throughs via individual SRO fees."  That is a false dichotomy.  The Eleventh Circuit vacated the 2023 Funding Order because it allowed —without explanation or "reason"—for the possibility that all SROs would pass through 100% of CAT costs, leaving "broker-dealers … on the hook for [the CAT's] *entire cost*."[11]  Nothing in the Eleventh Circuit's decision hinted that it viewed 100% pass-through by FINRA as unlawful or inconsistent with the prior CAT NMS Plan. On the contrary, the Court acknowledged that "FINRA may be unique[ly]" justified in passing through its CAT costs, as it is "the only nonprofit exchange."[12]

*Third*, CAT LLC's initial Funding Proposal proposed adding a new provision stating that "[e]ach Participant agrees not to file with the SEC a proposed rule change … that would establish a new fee for passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a)."[13]  But as FINRA and other commenters pointed out, this statement was not correct.[14]  And CAT LLC has now acknowledged as much, stating that not "all Participants voted to approve the Proposed Amendment."[15]

---

11.3(b) (providing that "[t]he Operating Committee will establish one or more fees (each a 'Historical CAT Assessment') to be payable by Industry Members with regard to CAT costs previously paid by the Participants ('Past CAT Costs')"); *id.* at Section 11.6

[10]   CAT NMS Plan at Section 11.6.

[11]   *Am. Sec. Ass'n v. SEC*, 147 F.4th 1264, 1275 (11th Cir. 2025) (emphasis added).

[12]   *Id.* at 1279.

[13]   *See* Funding Proposal, *supra* note 3, 90 Fed. Reg. 44910, 44930.

[14]   Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati, P.C., on behalf of FINRA, to Vanessa Countryman, Secretary, Commission (Oct. 17, 2025) ("FINRA Letter") at 10; Letter from Patrick Sexton, EVP, General Counsel & Corporate Secretary, Cboe, to Vanessa Countryman, Secretary, Commission (Oct. 31, 2025) ("Cboe Letter") at 2.

[15]   CAT LLC Letter at 5.

**A148**

**WILSON
SONSINI**

Ms. Vanessa Countryman
January 30, 2026
Page 4

CAT LLC's solution is a new proposal to amend the text of proposed Section 11.3(e) by deleting the phrase "[e]ach Participant agrees" not to file new pass through fees and replacing it with the phrase to "[n]o Participant will file" such fees.[16]  That is more accurate, but no more lawful.  Indeed, it only underscores and confirms that Section 11.3(e) is not a "written understanding" among consenting parties, but rather a regulation that CAT LLC is attempting to unlawfully impose over the objection of dissenting Participants.

*Fourth*, CAT LLC elides FINRA's continued objections to a cost allocation methodology based entirely on executed share volume (the "Executed Share Model").[17]  In particular, FINRA objected to that model because it disproportionately allocated the Participants' share of CAT costs to FINRA, the only not-for-profit SRO that relies primarily on fees from its members for funding and the only Participant not operating a market.  The practical reality is that any allocation of Participants' CAT costs to FINRA will almost certainly be equivalent to allocating those costs to industry members.  CAT LLC claims that it had adequately addressed these objections in its July 2023 response letter.  Even if that were the case (and it is not), CAT LLC's previous filings cannot speak to the implications of the Eleventh Circuit's 2025 ruling, which requires the Commission to "reconsider the allocation" of CAT costs between SROs and broker-dealers.  The Funding Proposal does not grapple with the inherent inequity in the Executed Share Model's allocation between Participants and industry and instead doubles down by purporting to restrict FINRA's ability to fund itself while leaving untouched the commercial revenue generated for exchanges.[18]

*Fifth*, CAT LLC misapprehends FINRA's statement that, to support an interim funding approach, it would be willing to consider filing a proposed rule change stipulating that it will not file a new recovery fee for a specific finite period (*e.g.*, one year, which would coincide with the one-year sunset provision for the temporary funding

---

[16]    CAT LLC Letter at 5.

[17]    CAT LLC Letter at 3.

[18] Under the Executed Share Model, FINRA's portion of Participant CAT fees is determined based on over-the-counter executions reported to FINRA's reporting facilities, including volume reported to the Trade Reporting Facilities.  Each FINRA Trade Reporting Facility is operated by an exchange business member that is also a CAT Plan Participant, and such exchanges retain the trade reporting and market data revenues generated by the Trade Reporting Facilities, subject to certain payments to FINRA for agreed-upon costs.

**WILSON**
**SONSINI**

Ms. Vanessa Countryman
January 30, 2026
Page 5

model).[19]  CAT LLC misreads this proposal as entailing merely a "voluntary, non-binding agreement" subject to FINRA's "ongoing discretion."[20]  Under FINRA's suggestion, the proposed rule changes by SROs would be submitted under Section 19(b)—and thus durable.  To be sure, SROs could submit proposed rule changes permitting new recovery fees before the expiration of the finite period, but that change of course would be subject to oversight by the Commission.[21]

*Finally*, FINRA continues to urge that a permanent CAT funding model be addressed as part of Chairman Atkins' comprehensive review.  Seeking to implement a permanent model now needlessly front-runs this review.  While CAT LLC argues (at 12-13) that the timing of the comprehensive review is unknown and that CAT LLC may exhaust operational reserves later this year, that concern may be addressed through an interim funding model, and FINRA stands ready to work collaboratively on an interim solution.  The contrary approach that CAT LLC urges—front-running the comprehensive review with an unlawful and flawed Funding Proposal—would foster "uncertainty" rather than resolve it.[22]

\* \* \*

The Funding Proposal, even as revised, remains unlawful and ineffective in addressing the issues identified by the Eleventh Circuit.  FINRA remains committed to continued engagement with the Commission and others to develop a sensible, serviceable CAT that fulfills its purpose while distributing costs fairly.  FINRA appreciates the Commission's consideration of its concerns and stands ready to help develop a funding solution that addresses the legitimate needs of all stakeholders.

Sincerely,

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation

*/s/ Steffen N. Johnson*
Steffen N. Johnson

---

[19]  FINRA Letter at 2-3.

[20]  CAT LLC Letter at 9.

[21]  17 C.F.R. § 240.19b-4(g).

[22]  CAT LLC Letter at 13.

**A150**

# TAB O

Letter from Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, Financial Industry Regulatory Authority, Inc. (FINRA)
(Jan. 30, 2026)



**Marcia E. Asquith**                    Direct: (202) 728-8831
Corporate Secretary, EVP               Fax: (202) 728-8300
Board and External Relations

January 30, 2026

Ms. Vanessa Countryman
Secretary
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

**Via Email to rule-comments@sec.gov**

> **Re:    Notice of Filing of Amendment to the National Market System Plan Governing the Consolidated Audit Trail (File No. 4-698)**

Dear Ms. Countryman:

The Financial Industry Regulatory Authority, Inc. ("FINRA")[1] is submitting this letter in connection with the Securities and Exchange Commission's (Commission) consideration of the above-captioned proposed amendments to the National Market System Plan Governing the Consolidated Audit Trail ("Plan" or "CAT NMS Plan") submitted by CAT LLC in September 2025 and modified in December 2025.[2] This letter offers a practical path forward that both addresses the Eleventh Circuit's concerns and respects the statutory framework Congress established for SRO governance, while supporting interim CAT funding given the Commission's comprehensive review. This letter supplements the letter submitted today by Wilson Sonsini on FINRA's behalf.[3]

---

[1]    FINRA is submitting this letter solely in its capacity as a participant of the CAT NMS Plan. This letter does not reflect or represent the views of FINRA CAT, LLC, which is a distinct corporate subsidiary of FINRA that acts as the CAT Plan Processor pursuant to an agreement with Consolidated Audit Trail, LLC.

[2]    *See* Securities Exchange Act Release No. 103960 (Sept. 12, 2025), 90 FR 44910 (Sept. 17, 2025); and letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary, Commission (Dec. 18, 2025) (together, the "Funding Proposal").

[3]    *See* Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati, P.C., on behalf of FINRA, to Vanessa Countryman, Secretary, Commission (Jan. 30, 2026).

**A151**

Ms. Vanessa Countryman
January 30, 2026
Page 2 of 4

FINRA has previously submitted a letter to the Commission regarding our concerns with the legal and practical limitations of the proposed passthrough prohibition in the Funding Proposal, particularly as it relates to the scope of CAT LLC's authority under the Exchange Act.[4]  In our prior letter, FINRA supported the Commission's comprehensive review of the CAT and advocated for a temporary alternative to address funding needs while the comprehensive review of CAT moves forward.[5]  To propose a legally valid, near-term option to address the passthrough issues identified by the Eleventh Circuit, FINRA suggested an approach where SROs voluntarily could commit not to file rule changes seeking to pass through their CAT costs for a specified period of time to coincide with the duration of an interim funding model.[6]

While the initial passthrough provision in the Funding Proposal inaccurately stated that the SRO participants to the CAT NMS Plan ("Participants") agreed to not pass through fees, CAT LLC subsequently has acknowledged that its statement was not correct because not all Participants voted to approve the passthrough prohibition.[7]  CAT LLC has since proposed a further amendment to delete the phrase "[e]ach Participant agrees" not to file new pass through fees and to replace it with the phrase to "[n]o Participant will file" such fees.[8]  While this formulation is more accurate, it is no more lawful because FINRA did not vote in favor of this modified formulation, in part because **SROs may not use the mechanism of a national market system plan to control the fees of other SROs that are participants in the plan**.[9]

The Exchange Act carefully delineates the scope of NMS Plan authority and individual SRO fee-setting authority.  Regulation NMS Rule 608's scope regarding fees is limited to "[t]he method by which any fees or charges collected on behalf of all of the sponsors and/or participants…" will be determined and imposed.[10]  Because of the unlawfulness of the passthrough prohibition in the Funding Proposal, it cannot address the Eleventh Circuit's finding that the 2023 Funding Order was unreasonable and violated the Administrative Procedure Act because it allowed "[SROs] to pass through

---

[4]   *See* Letter from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati, P.C., on behalf of FINRA, to Vanessa Countryman, Secretary, Commission (Oct. 17, 2025) ("FINRA Letter").

[5]   *See* FINRA Letter.

[6]   *See id.*

[7]   *See* Funding Proposal.

[8]   *See id.*

[9]   *See* FINRA Letter.  *See also* Letter from Patrick Sexton, EVP, General Counsel & Corporate Secretary, Cboe, to Vanessa Countryman, Secretary, Commission (Oct. 31, 2025) ("Cboe Letter").

[10]  *See* Securities Exchange Act Rule 608(a)(5)(ii).

Ms. Vanessa Countryman
January 30, 2026
Page 3 of 4

100% of their fees to broker-dealers—without considering the effects of that choice."[11]

While the Eleventh Circuit found that the 2023 Funding Order failed to adequately consider the economic effects of pass-throughs, it did not conclude that SRO fees to recover CAT costs are impermissible in all cases; nor did it establish specific requirements or parameters for the CAT funding model. FINRA believes that, while SRO pass-through fees remain permissible under the CAT NMS Plan, there are various approaches that could adequately address the issues raised by the Eleventh Circuit other than bluntly seeking to permanently prohibit passthroughs through improper means.

In the near term, to support the continued funding of CAT while the comprehensive review is underway and while preserving individual SRO fee authority, FINRA makes the following firm commitment: should the Commission approve a CAT funding model on a temporary or interim basis, FINRA will not establish any CAT recovery fees for a period of two years from approval of such temporary funding model (or for a shorter period designated by the Commission in an approval order as the effective period of such interim funding model).[12] This commitment is intended to provide an expedient, short-term path forward on CAT funding in support of a comprehensive evaluation of the CAT.

Cboe has previously expressed that it is "open to discussing a voluntary agreement by all of the SROs not to make rule filings seeking to pass through their CAT costs for a specified period."[13] The other CAT Plan Participant votes were in support of the Funding Model, and therefore those SROs already have individually determined and committed to not establish CAT recovery fees. SRO commitments adequately address, for an interim period, the Court's finding that the 2023 Funding Order was unreasonable and violated the Administrative Procedure Act because it allowed for "[SROs] to pass through 100% of their fees to broker-dealers—without considering the effects of that choice."[14] An approach whereby individual SROs commit temporarily to forego passthrough fees supports short-term funding stability for CAT operations without displacing the statutory NMS Plan governance structure or prejudging the outcome of the Commission's comprehensive CAT review.

---

[11]    *See* Am. Sec. Ass'n, 147 F.4th at 1277.

[12]    The effectiveness of this temporary commitment to not file passthrough fees for a period of no more than two years is intended to coincide with the sunset provision of a temporary funding model approved by the Commission. As discussed in prior FINRA comment letters, a permanent passthrough prohibition does not comport with the economic realities of FINRA's funding structure, particularly given FINRA's status as a non-profit, member-funded national securities association. *See e.g.,* FINRA Letter.

[13]    *See* Cboe Letter.

[14]    *See* Am. Sec. Ass'n, 147 F.4th at 1277.

Ms. Vanessa Countryman
January 30, 2026
Page 4 of 4

FINRA remains committed to working collaboratively with the Commission in pursuit of developing an appropriate long-term funding solution that addresses the legitimate needs of all impacted parties.

Sincerely,

Marcia E. Asquith
Corporate Secretary, EVP
Board and External Relations

**A154**

# TAB P

Letter from Howard Meyerson, Managing Director, Financial Information Forum (Feb. 10, 2026)

# FINANCIAL INFORMATION FORUM

February 10, 2026

**By electronic mail to rule-comments@sec.gov**

Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090
Attn: Secretary

Re:     File Number 4-698: Joint Industry Plan; Notice of Filing of Amendments to the National Market
        System Plan Governing the Consolidated Audit Trail to Further Reduce the Costs of the
        Consolidated Audit Trail

Dear Secretary,

The Financial Information Forum ("FIF")[1] appreciates the opportunity to submit this comment letter in
response to the above-referenced Notice of Filing published by the Securities and Exchange Commission
(the "Commission") on December 23, 2025 (the "Notice of Filing").[2] The Notice of Filing relates to a filing
by The Consolidated Audit Trail, LLC ("CAT LLC") on behalf of the Participants in the National Market
System Plan Governing the Consolidated Audit Trail (the "CAT NMS Plan") on December 17, 2025 (the
"rule filing").[3] The rule filing proposes amendments to the CAT NMS Plan to reduce the operating costs
of the consolidated audit trail ("CAT").[4] FIF is submitting this comment letter on behalf of FIF members
that are broker-dealers and technology vendors that support these broker-dealers; references in this
letter to FIF members refer to these members.

FIF focuses on implementation issues. Accordingly, this letter is not intended to address all issues of
concern to FIF members relating to the rule filing. These issues may be addressed in comment letters
submitted by other industry associations or individual firms.

---

[1] FIF (www.fif.com) was formed in 1996 to provide a centralized source of information on the implementation
issues that impact the securities industry across the order lifecycle. Our participants include broker-dealers,
exchanges, back office service bureaus, and market data, regulatory reporting and other technology vendors in the
securities industry. Through topic-oriented working groups, FIF participants focus on critical issues and productive
solutions to technology developments, regulatory initiatives, and other industry changes.
[2] Securities Exchange Act Release No. 104504 (December 23, 2025), 90 FR 61506 (December 31, 2025).
[3] Letter from Robert Walley, CAT NMS Plan Operating Committee Chair, to Vanessa Countryman, Secretary,
Securities and Exchange Commission (Dec. 7, 2025), available at https://catnmsplan.com/sites/default/files/2025-
12/LLC-Proposed-CAT-NMS-Plan-Amendment-2025-Cost-Savings-Amendment-12.17.25.pdf ("Rule Filing").
[4] Id. at 1.

FINANCIAL INFORMATION FORUM                                                                          1

The following is a summary of key points discussed in this letter:

***FIF members support the seven cost savings amendments and request two conforming changes***

- FIF members support the seven cost savings amendments proposed in the rule filing.[5]
- As a general principal, when CAT LLC proposes a change for Participants (as defined in the CAT NMS Plan), CAT LLC should also consider whether an equivalent change should also apply for Industry Members (as defined in the CAT NMS Plan). In addition, when the Commission is considering changes to the obligations of Participants, the Commission should also consider whether equivalent changes should also apply for Industry Members. More specifically:
    - FIF members support the proposed change to clarify that Participants are not required to report route requests that they receive and reject and agree with the Participants that reporting of these rejected requests is beyond the scope of Rule 613.[6] FIF members are concerned that the proposed amendment relating to route requests that are received and rejected -- by specifically referencing Participants -- could create an inference that Industry Members are required to report route requests that they receive and reject. Accordingly, FIF members request that the Commission and CAT NMS Plan clarify in writing that Industry Members also are not required to report route requests that they receive and reject.
    - FIF members support the proposal by CAT LLC to delete CAT data older than three years,[7] provided that this change would not (i) impede the retirement of Electronic Blue Sheets ("EBS")[8] or (ii) result in a material increase in the number of EBS or equivalent informational requests. In connection with approving this change, the Commission should provide written guidance (or direct the self-regulatory organizations ("SROs") to adopt rules) to clarify that Industry Members similarly are not required to retain CAT data that is older than three years.

***FIF members oppose the two alternative proposals***

FIF members oppose the two alternative proposals described in the rule filing: the full elimination of CCIDs (as defined in the CAT NMS Plan) from CAT; and the reduced linkage timeline.

***FIF members oppose the full elimination of CCIDs***

FIF members oppose the full elimination of CCIDs for the following reasons:

---

[5] Id. at 6.
[6] Id. at 39-42.
[7] Id. at 17-18.
[8] References to EBS in this letter refer specifically to EBS for securities that are reportable to CAT.

FINANCIAL INFORMATION FORUM                                                                2

- Removal of CCIDs removes the core function of CAT,[9] which is to monitor activity of a single customer across multiple accounts at the same broker-dealer or across broker-dealers; a projected cost reduction of 1.88% to 2.61%[10] does not justify removing the core function of CAT.
- As an alternative to the removal of CCIDs from CAT, FIF members support (i) retaining CCIDs in CAT, and (ii) replacing EBS[11] by automating and securing the request-response approach currently used by regulatory personnel. For the reasons discussed in this letter, FIF members continue to support the retirement of EBS on an expedited basis.
- The Commission recently confirmed its support for the approach recommended by FIF members in the Commission's Order approving the removal of personally-identifiable information ("PII") from CAT (the "PII approval order"); in the PII approval order, the Commission wrote that it "… agrees that the CCID process should be maintained and codified in the Plan."[12]
- EBS should be retired and replaced with a request-response system[13]
  - EBS requires the transmission of large volumes of PII (including social security numbers) in plaintext
  - EBS is primarily a system for collecting transaction data, which is duplicative of CAT; EBS should be replaced with a system that is specifically focused on collecting customer data
  - As a system for collecting customer data, EBS is inferior to a request-response system because (i) EBS does not include the CCIDs that are necessary to conduct oversight of trading by a single customer across accounts and broker-dealers; and (ii) EBS does not provide information on investment managers and other persons with investment authority over an account.
- The increased compliance costs incurred by Industry Members resulting from the continuation and expansion of EBS would greatly exceed the projected cost savings (1.88% to 2.61% of annual CAT operating costs) of removing CCIDs from CAT.
- The CAT adopting release identifies various shortcomings of EBS.
- FIF members have similarly highlighted deficiencies with EBS and why EBS should be retired, including the fact that EBS does not account for the common scenario where the beneficial owner of an account is not the party making the trading decisions for the account.
- The Commission, as part of its approval of the CAT NMS Plan in 2016, provided directions for the retirement of EBS.

---

[9] This is discussed extensively in the Adopting Release for CAT, including the following passage: "In general, existing SRO audit trails only identify the broker-dealer handling the order and not the account holder or the person exercising investment discretion for the account holder, if different. This limitation makes the process of identifying the customers involved in unusual trading patterns or market events very difficult. Even determining whether or not an unusual trading pattern exists is challenging if the data does not identify trades by a single customer at multiple broker-dealers." Securities Exchange Act Release No. 67457 (July 18, 2012), 77 FR 45722 ("CAT Adopting Release"), at 77 FR 45730. See further discussion below.

[10] See discussion below on the calculation of these percentages.

[11] As noted above, references to EBS in this letter refer specifically to EBS for securities that are reportable to CAT.

[12] Securities Exchange Act Release No. 104586 (Jan. 13, 2026), 91 FR 2164 (Jan. 16, 2026) ("PII Approval Order"), at 91 FR 2168.

[13] This request and response approach, discussed in further detail below, involves regulatory personnel submitting one or more FDIDs to an Industry Member and requesting that the Industry Member identify the customers associated to the FDIDs.

FINANCIAL INFORMATION FORUM                                                                 3

*FIF members highlight issues to consider for an automated and secure request-response system*

FIF members propose automating and securing the request and response approach currently used by SRO personnel, as this approach will (i) result in higher quality data being made available to regulatory personnel, (ii) address the significant security problems with EBS, and (iii) reduce the compliance and operational costs for market participants.

*FIF members oppose the revised linkage timeline*

FIF members oppose the reduced linkage timeline for the following reasons:

- This proposal would reduce the quality of the CAT audit trail, as many incorrectly reported events will remain unresolved.
- The increased compliance and operational costs for Industry Members resulting from this proposal would significantly outweigh the cost savings for the CAT system.
- It is unreasonable for the Commission and SROs to impose fines and other sanctions on Industry Members for linkage errors if the Commission and SROs have intentionally eliminated processes (the 2nd and 3rd repair cycles) that have been documented to assist Industry Members in identifying and resolving large numbers of linkage errors.

**A. FIF members support the seven proposed amendments and request two conforming changes**

*FIF members support the seven proposed amendments*

The rule filing proposes the following amendments to the CAT NMS Plan:

- Elimination of the requirement to generate an interim CAT Order ID
- Reduction of the retention period for certain categories of CAT data
- Elimination of data reprocessing
- Elimination of the Online Targeted Query Tool
- Elimination of Participant reporting of rejected messages
- Adoption of a more cost-efficient data availability timeline
- Replacement of CAIS with a Reference Data approach to generate CCIDs.[14]

FIF members support each of these amendments based on the projected cost savings to the CAT system. FIF members further note that these amendments would not impact the quality of CAT data, do not raise security concerns, and would not increase the compliance and operational costs for Industry Members.

---

[14] Rule Filing, at 6.

***Consideration of applying proposed changes for Participants to Industry Members***

As a general principal, when CAT LLC proposes a change for Participants, CAT LLC should also consider whether an equivalent change should also apply for Industry Members. In addition, when the Commission is considering changes to the obligations of Participants, the Commission should also consider whether equivalent changes should also apply for Industry Members.

***The Commission and the CAT NMS Plan should clarify that Industry Members also are not obligated to report order requests that they receive and reject***

FIF members support the proposed amendment to clarify that a Participant is not required to report an order route request that the Participant receives and rejects. FIF members agree with CAT LLC that the current requirement for Participants to report order route requests that they reject is beyond the scope of Commission Rule 613 (Consolidated audit trail).[15] Rule 613(c)(1) requires market participants to report the "… receipt or origination of an order…."[16] Rule 613(c)(7) similarly limits reporting to the receipt, origination or routing of an order.[17] When a Participant rejects an order route request, the Participant is not receiving, originating or routing an order. While the Participant receives an order route request, the Participant does not receive an order unless it accepts the order route request. Accordingly, requiring a Participant to report an order route request that the Participant receives and rejects is (and always has been) beyond the scope of Rule 613.

FIF members understand that there is currently no requirement for Industry Members to report order route requests that they receive and reject. For example, the Technical Specifications document for Participants includes a Reject Message Event,[18] but there is no equivalent event in the Technical Specifications document for Industry Members. In other words, there currently is no mechanism in CAT for an Industry Member to report a route request that it receives and rejects.[19] FIF members are concerned that the proposed amendment relating to route requests that are received and rejected -- by specifically referencing Participants -- could create an inference that Industry Members are required to report route requests that they receive and reject. Accordingly, FIF members request that the Commission and CAT NMS Plan clarify in writing through an amendment to the CAT NMS Plan or updates to the CAT Technical Specifications that Industry Members also are not required to report route requests that they receive and reject. More generally, amendments relating to Participants should not be read to impose new or implied obligations on Industry Members absent express Commission action.

---

[15] 17 CFR §242.613.

[16] 17 CFR §242.613(c)(1).

[17] 17 CFR §242.613(c)(7).

[18] CAT Reporting Technical Specifications for Plan Participants, Version 4.2.0-r1 (Aug. 22, 2025), available at https://catnmsplan.com/sites/default/files/2025-08/08.22.2025-CAT_Reporting_Technical_Specifications_for_Participants_4.2.0-r1.pdf, at 47-50.

[19] The scenario where an Industry Member receives and rejects a route request should be distinguished from the scenario when an Industry Member accepts a route request (thereby creating a New Order) and subsequently cancels the order that the Industry Member has created (this could be a "reject" in FIX). Under the latter scenario, the Industry Member is required to report New Order and Order Cancel events to CAT.

FINANCIAL INFORMATION FORUM                                                    5

There is no policy basis for differentiating between Participants and Industry Members on this issue; if there were such a basis, it would be necessary to explain this in the rule filing. In addition, in the same manner that the reporting of route requests that are received and rejected goes beyond the scope of Rule 613 for Participants, this reporting also goes beyond the scope of Rule 613 for all reporting parties, including Industry Members.

***Deleting CAT data older than three years***

FIF members support the proposal by CAT LLC to delete CAT data older than three years,[20] provided that this change would not (i) impede the retirement of EBS or (ii) result in a material increase in the number of EBS or equivalent informational requests. In connection with approving this change, the Commission should provide a safe-harbor exemption (or direct the SROs to adopt rules providing a safe-harbor exemption) that Industry Members similarly are not required to retain CAT data that is older than three years. CAT LLC previously has provided the following guidance:

> According to each of the Participant's CAT compliance rules, information required to be reported to the CAT must be maintained in accordance with SEC Rule 17a-4(b). This rule states that these records must be preserved for at least three years, the first two years in an accessible place.[21]

This guidance appears to apply to the underlying data being reported, and it is not clear whether this guidance also applies to the CAT submissions themselves. FIF members request that the Commission provide guidance specifically with respect to CAT submissions, as requested above.

### B.  FIF members oppose the alternative proposals in the rule filing

In the rule filing, CAT LLC requests that the Commission seek comment on the following two alternative proposals:

- Elimination of CCIDs from CAT
- Reduced linkage processing.[22]

For the reasons discussed below, FIF members oppose these two alternative proposals. Please also refer to Annex 2, which discusses long-term objectives that the Commission should seek to achieve with respect to market oversight and why the two alternative proposals are contrary to these objectives.

---

[20] Rule Filing, at 17-18.
[21] FINRA CAT, LLC, CAT FAQ A23, available at https://catnmsplan.com/faq.
[22] Rule Filing, at 66-71.

FINANCIAL INFORMATION FORUM                                                    6

**A160**

C.  **FIF members oppose the removal of CCIDs from CAT; FIF members support the retirement of EBS and the replacement of EBS with a request-response system with FDID-based requests**

*Removal of CCIDs removes the core function of CAT; a projected cost reduction of 1.88% to 2.61% does not justify removing the core function of CAT*

The core function of CAT is to allow for regulatory personnel to identify activity of a natural person or legal entity (i) across multiple accounts at the same broker-dealer and (ii) across accounts at different broker-dealers. A projected cost reduction of 1.88% to 2.61% (see discussion below) does not justify removing this core function of CAT. If this core function is removed, it is not clear to FIF members as to why CAT was implemented.

*FIF members support retaining CCIDs in CAT and automating and securing the FDID-based request-response approach currently utilized by regulators*

FIF members support retaining CCIDs in CAT, retaining CAT as a replacement for EBS (as directed by the Commission in the Commission's 2016 approval of the CAT NMS Plan)[23] and automating and securing the FDID-based request and response approach currently utilized by regulators. This approach, which relies on CCIDs and enables regulatory personnel to continue to monitor a customer's activity across accounts and broker-dealers, is discussed in more detail below.

Annex 1 to this comment letter illustrates how removing CCIDs from CAT would prevent regulatory personnel from linking activity of a single customer across accounts and broker-dealers, and how retaining CCIDs in CAT and replacing EBS with an automated and secure request-response system would allow regulatory personnel to link activity of a single customer across accounts and broker-dealers.

*The Commission has recently confirmed the Commission's support for the approach recommended by FIF members*

In the Commission's recent PII approval order, the Commission confirmed its support for the approach recommended by FIF members. In the order, the Commission wrote that it "… agrees that the CCID process should be maintained and codified in the Plan."[24] The Commission further wrote as follows relating to the retention of CCIDs in CAT:

> The ability to link information about order events throughout the national market system to a unique customer identifier is one of the core regulatory advances of the CAT over the fragmented regulatory data sources that preceded it. The CCID process makes that possible ….
>
> ….

---

[23] See discussion below.
[24] PII Approval Order, at 91 FR 2168.

FINANCIAL INFORMATION FORUM                                                                          7

In doing so, the CCID process greatly facilitates the regulatory and surveillance efforts of the Participants and the Commission by, among other things, enabling regulators to detect potentially unlawful trading activity and to identify those responsible for or victims of it. Codification of the CCID process, combined with the further elimination of PII reporting as described in Part III.B. below, preserves the regulatory benefits of the CAT while addressing the privacy, security, and other risks associated with capturing and storing personal customer information in the CAT.[25]

In the PII approval order, the Commission further discusses the importance of CCIDs to track activity of a customer across broker-dealers:

The Commission continues to believe that the CCID process provides CAT the ability to provide customer attribution of order and trade activity even if such trading activity spans multiple broker-dealers, and without this ability, the value and usefulness of the CAT would be significantly diminished.[26]

The Commission also explains in the PII approval order that CCIDs represent an improvement over pre-CAT processes:

The Commission stated, in approving the CAT NMS Plan, the importance of the CCID approach, as it "constitutes a significant improvement relative to the Baseline because it would consistently identify the Customer responsible for market activity, obviating the need for regulators to collect and reconcile Customer Identifying Information from multiple broker-dealers." This Order generally preserves this benefit of the CCID process, thereby preserving one of the critical innovations of the CAT, the ability to track one Customer's market activity across multiple exchanges.[27]

In the PII approval order, the Commission also discusses building upon the current request-response approach used by regulatory personnel as a replacement for the costs, burdens and inefficiencies of EBS:

With respect to the creation of a request-response system, Commission agrees that it is beyond the scope of the Proposed Amendment. However, such a system could decrease regulators' reliance on EBS, which could facilitate the eventual elimination of EBS and could reduce the cost and burdens to Industry Members and increase efficiencies. Accordingly, as stated in the CAIS Exemption Order, the Commission continues to urge the Participants to work with Industry Members to establish such a request-response system by taking advantage of the systems Industry Members have already established to format and submit customer information consistent with CAT specifications.[28]

---

[25] Ibid.

[26] Ibid.

[27] Id. at 91 FR 2174.

[28] Id. at 91 FR 2169.

FINANCIAL INFORMATION FORUM                                                                 8

**A162**

***Consideration of impact beyond CAT***

It is important for the Commission to consider the impact on market oversight and costs beyond CAT itself. Limiting consideration to CAT itself does not properly account for the adverse impact of this proposal, as expected by FIF members. This is discussed in further detail in Annex 2.

***Impact beyond CAT if CCIDs are removed***

FIF members see two potential paths forward if CCIDs are removed from CAT:

- First, the Commission terminates EBS, as directed by the Commission when the Commission approved the CAT NMS Plan.
- Second, the Commission retains EBS indefinitely, contrary to the Commission's directions when the Commission approved the CAT NMS Plan.

If the Commission plans to remove CCIDs from CAT and terminate EBS, FIF members do not understand how regulatory personnel would monitor activity of a customer across accounts and broker-dealers. It is clear that the Commission understands this point, as evidenced by the Commission's support -- in the PII approval order -- for building upon the request-response approach currently used by regulatory personnel.

If the Commission plans to remove CCIDs from CAT and retain EBS indefinitely, FIF members expect the following adverse impact, as discussed in more detail below:

- The continued transmission of large volumes of PII (including social security numbers) in plaintext in response to EBS requests
- Inability for regulatory personnel to monitor activity of a customer across multiple accounts and broker-dealers
- Significant increase in the volume of EBS requests
- As a result of this increase in EBS requests, a significant increase in ongoing operational and compliance costs for Industry Members
- The Commission, the SROs and Industry Members moving backwards from automated to manual processes.

These and other adverse impacts are discussed in further detail below. While the PII approval order makes clear that the Commission does not intend to remove CCIDs from CAT, if the Commission were to propose removing CCIDs from CAT, the Commission would need to (i) provide clarity as to its intent with respect to EBS and (ii) address the concerns discussed in this section.

***If CCIDs are removed, regulatory personnel can no longer use CAT to detect activity by a single customer across accounts and broker-dealers, which is the core function of CAT***

If CCIDs are removed, regulatory personnel can no longer use CAT to detect activity by a single customer across accounts, either at the same broker-dealer or across different broker-dealers. This point is illustrated in detail in Annex 1.

***The ability to identify trading by a customer across accounts is the core function of CAT***

In the adopting release for CAT, the Commission identified various objectives for CAT. The key objective of CAT has been to enable regulatory personnel to identify trading activity of a single customer across accounts. This is discussed extensively in the adopting release for CAT, including the following passage:

> An additional shortcoming of existing SRO audit trails is the lack of customer identifiers. In general, existing SRO audit trails only identify the broker-dealer handling the order and not the account holder or the person exercising investment discretion for the account holder, if different. This limitation makes the process of identifying the customers involved in unusual trading patterns or market events very difficult. Even determining whether or not an unusual trading pattern exists is challenging if the data does not identify trades by a single customer at multiple broker-dealers. Requests therefore must be made to one or more broker-dealers to obtain information about the customer or customers behind an order. Multiple requests may be necessary before the information is obtained. EBS data may have to be requested as a supplement. A further challenge arises in any type of customer-based cross-market analysis because there is no standard convention for how customers are identified at different broker dealers – the same party directing trades across multiple venues, or through different broker-dealers, can be known by many different names."[29] [footnotes omitted]

This point is discussed further in another passage in the CAT adopting release:

> Even more critically, the absence of reliable information about who initiated which orders makes detection of schemes that involve repeat instances of activity through accounts at multiple broker-dealers difficult. Schemes of this sort may be among the most harmful and difficult to police, but without a customer identifier that consistently and uniquely identifies responsibility for orders across all broker-dealers, no amount of technical sophistication and securities market insight can produce a data query or analysis to detect them.[30] [footnotes omitted]

As discussed above, the Commission reemphasized this point in its recent PII approval order:

> The ability to link information about order events throughout the national market system to a unique customer identifier is one of the core regulatory advances of the CAT

---

[29] CAT Adopting Release, at 77 FR 45730.
[30] Id. at 77 FR 45731.

over the fragmented regulatory data sources that preceded it. The CCID process makes that possible ….[31]

***The objective of identifying customer activity across accounts can be achieved through retaining CCIDs in CAT and automating and securing the request and response process currently utilized by regulatory personnel***

FIF members support the removal of PII from CAT for security reasons. At the same time, FIF members understand the need for regulatory personnel to identify activity of a single customer across multiple accounts and broker-dealers. This result can be achieved through building upon the request and response process currently utilized by regulatory personnel, as described below. This request and response process is an automated version of the process illustrated in Diagram 3 of Annex 1 (which would no longer be available to regulatory personnel if CCIDs are removed from CAT).

***The projected cost savings (1.88% to 2.61% of annual CAT operating costs) do not justify removing the core function of CAT; in addition, the increased compliance costs incurred by Industry Members would greatly exceed this cost savings***

CAT LLC projects cost savings ranging from $2.5 million to $3 million[32] (1.88% to 2.61% of CAT operating costs) resulting from the removal of CCIDs. We first calculate the percentage based on the high-end of the range of projected cost savings by CAT LLC. At the high-end, if the Commission approves the seven cost-saving proposals submitted by CAT LLC, CAT LLC projects annual CAT operating costs of $115 million.[33] At the high-end, CAT LLC projects an incremental cost savings of $3 million ($9 million less $6 million) resulting from the incremental change of removing CCIDs from CAT.[34] $3 million divided by $115 million is 2.61%. At the low-end, if the Commission approves the seven cost-saving proposals, CAT LLC projects annual CAT operating costs of $133 million.[35] At the low-end, CAT LLC projects an incremental cost savings of $2.5 million ($6.5 million less $4 million) resulting from the incremental change of removing CCIDs from CAT.[36] $2.5 million divided by $133 million is 1.88%.

This percentage of savings in CAT operating costs does not justify removing the core function of CAT. Further, the increased compliance costs resulting from the removal of CCIDs will greatly exceed this cost savings. Specifically, if CCIDs are removed from CAT, the Commission will need to continue and expand the manual EBS query process, which is costly for Industry Members.[37] The Commission should also consider the increased investigative costs that would result from the removal of CCIDs from CAT and the need for greater reliance by the Commission on manual processes. Further, the Commission should consider the costs of implementing appropriate security controls for EBS.

---

[31] PII Exemptive Order, at 91 FR 2168.

[32] See, Rule Filing, at 4-6, and discussion in this paragraph.

[33] Ibid.

[34] Ibid.

[35] Ibid.

[36] Ibid.

[37] As discussed above, the Commission could remove CCIDs from CAT and retire EBS, but the Commission would need to explain how it would plan to conduct market oversight if it adopts this approach.

FINANCIAL INFORMATION FORUM                                                                 11

***The CAT adopting release identifies various shortcomings of EBS***

EBS is inferior to CAT in a number of respects. In the adopting release for CAT, the Commission identifies various shortcomings of EBS:

> "… EBS data, which is currently sourced from the so-called back-office records of clearing brokers, are **limited to executed trades** and do not contain information on orders or quotes (and thus no information on routes, modifications, and cancellations). Also, in frequent cases where brokers utilize **average-price accounts** to execute and aggregate multiple trades for one or more customers, the details of each individual trade execution are typically lost when reported through the EBS system because it is only the average aggregate price and volume of a series of executed trades that are transmitted to the clearing systems for processing.
>
> Furthermore, the EBS data currently includes only the dates, but not the times, of each trade execution (regardless of whether or not the trade represents an average-price series of executions). Since there could be many broker-dealers trading a given security on a given day of interest, to reconstruct trading on the market for one security on one day could involve many, perhaps hundreds, of EBS requests. Consequently, EBS data, alone, are not generally useful for price or short sale manipulations analysis, order flow analysis, depth-of-book analysis, or any large-scale market reconstructions in which the timing of events is required to build a useful picture of the market.[38]
>
> In addition, though the EBS system provides the names associated with each account in which a trade has been placed, these names are based on the separate records of each broker-dealer providing data to the EBS system, and the **same party may be identified by a different name across multiple broker-dealers**. Experience of staff at the Commission has shown that it is difficult to perform cross-broker customer analysis of trading since the same customer may be known by different names depending on the account and broker-dealer through which it traded.
>
> The EBS system also typically requires SRO and Commission staff needing EBS data to request the information from each broker-dealer, and **complete responses from each broker-dealer may take days or weeks depending upon the scope of the request**. As a result of these various limitations, the EBS system is generally only used by regulators in narrowly-focused enforcement investigations that generally involve trading in particular securities on particular dates or with specific broker-dealers.[39] [emphasis added; footnotes omitted]

---

[38] EBS includes execution timestamp to seconds. Since EBS does not include any order information, EBS does not include order timestamps.

[39] CAT Adopting Release, at 77 FR 45727-45728.

*FIF members have similarly highlighted deficiencies with EBS and why EBS should be retired*

In a comment letter that FIF submitted to the Commission on July 14, 2025, FIF discussed the importance of retiring EBS.[40] There are two potential regulatory arguments for retaining EBS (in this letter, we are specifically focused on EBS for equities and options)[41]:

- Collection of transaction data
- Collection of customer and account data.

Regarding the use of EBS for collection of transaction data:

- EBS transaction data is fully duplicative of CAT; all transaction data provided in response to EBS requests is already in CAT.
- The transaction data in EBS is far inferior to CAT; for example, CAT includes order events and trade executions, while EBS includes trade executions but does not include order events. In addition, CAT trade executions are linked to trades reported to the Trade Reporting Facilities and OTC Reporting Facility, while EBS does not provide this linkage.

Regarding the use of EBS for collection of customer data:

- EBS does not contain FDIDs or CCIDs, so it cannot be used to link CAT transaction data to customer information. A request and response approach focused on FDIDs and CCIDs, as discussed in this letter, would achieve this objective that EBS cannot achieve.
- EBS is intended to be a transaction reporting system; EBS includes PII but is not intended to function as a database for customer information. EBS should be replaced with a system that is specifically focused on obtaining customer information.
- EBS provides for the plaintext transmission of SSNs and account numbers, as discussed above.
- The PII transmitted to EBS in plaintext is associated to specific transactions.
- FIF members are not aware of any controls for EBS to require the encrypted storage of SSNs and other PII.
- Responding to EBS queries is manually intensive.
- EBS does not take advantage of the structured PII data that Industry Members have generated to comply with their CAIS reporting obligations.
- The record format of EBS is inferior to the CAIS record format in many respects; for example, EBS only allows one customer (i.e., natural person or legal entity) to be associated to an account,[42] while the CAIS record format allows multiple customers to be associated to an

---

[40] Letter from FIF to the Commission (July 14, 2025), available at https://www.sec.gov/comments/4-698/4698-625367-1847814.pdf.

[41] While this letter is focused on EBS for equities and options, the Commission, the SROs and Industry Members should also consider potential approaches to modernize or replace EBS for other asset classes, such as fixed income.

[42] See, for example, FINRA Regulatory Notice 20-19, Electronic Blue Sheet Submissions (June 23, 2020), available at https://www.finra.org/sites/default/files/2020-06/Regulatory-Notice-20-19.pdf, at 9-10.

FINANCIAL INFORMATION FORUM                                    13

account (for example, a beneficial holder and an investment adviser).[43] Accordingly, EBS fails to account for the increasingly common scenario where the beneficial owner of an account is not the party making the trading decisions for the accounts (i.e., managed accounts).

***The Commission, as part of its approval of the CAT NMS Plan in 2016, provided directions for the retirement of EBS***

When approving the CAT NMS Plan in 2016, the Commission made clear its understanding that EBS would be redundant of CAT for equities and options and should be retired for these two asset classes upon the CAT Transaction Reporting system becoming operational:

> Specifically, the Commission believes that, going forward, CAT will provide Commission Staff with much of the equity and option data that is currently obtained through equity and option cleared reports and EBS, including the additional transaction data captured in connection with Rule 13h–1 concerning large traders. Accordingly, Commission Staff is directed to develop a proposal for Commission consideration, within six months of the Effective Date, to: (i) Amend Rule 17a–25 to eliminate the components of EBS that are redundant of CAT, and (ii) amend Rule 13h–1, the large trader Rule, to eliminate its transaction reporting requirements, in each case effective at such time as CAT Data meets minimum standards of accuracy and reliability. In addition, as part of this proposal, Commission Staff will recommend whether there will continue to be any need for the Commission to make requests for equity and option cleared reports, except for historical data, once CAT is fully operational and CAT Data meets minimum standards of accuracy and reliability. The Commission notes that the EBS system will still be used to collect historical equity and options data—i.e., for executions occurring before CAT is fully operational—and data on asset classes not initially covered by CAT, such as fixed income, municipal, or other government securities, and that the components of the EBS system necessary to enable such usage will need to be retained. However, to the extent that CAT is expanded to include data on additional asset classes, the Commission will consider whether the components of the EBS system related to the retention and reporting of data on these asset classes can also be eliminated.[44] [footnotes omitted]

> D. **FIF members highlight issues to consider for an automated and secure request-response system**

***Automating and securing the current request and response process***

With the removal of PII from CAT, regulatory personnel need a method to identify customer trading across accounts. FIF members are aware of at least two potential approaches to achieve this objective: (i) automating and securing the current request and response process as illustrated in Diagram 3 of

---

[43] See, for example, CAT Reporting Customer & Account Technical Specifications for Industry Members, Version 2.2.0 r4 (Aug. 14, 2025), available at https://catnmsplan.com/sites/default/files/2025-08/08.14.25_Full_CAIS_Technical_Specifications_2.2.0_r4_CLEAN.pdf, at 44-51.
[44] Securities Exchange Act Release No. 79318 (Nov. 15, 2016), 81 FR 84696 (Nov. 23, 2016), at 81 FR 84777-84778.

FINANCIAL INFORMATION FORUM                                                                 14

Annex 1 and discussed in this section; and (ii) maintaining and expanding EBS. For the reasons discussed in the preceding section, FIF members support the retirement of EBS and implementation of the first approach. If CCIDs are removed from CAT, the first approach is no longer feasible because regulatory personnel will have no way to identify customer trading across accounts. Accordingly, FIF members support retiring EBS, retaining CCIDs in CAT, and automating and securing the current request and response process utilized by regulators.

Currently, as illustrated in Diagram 3 of Annex 1, regulatory personnel send inquiries to Industry Members where the regulatory personnel specify one or more FDIDs (obtained by the regulatory personnel from the CAT system) and request that the Industry Member provide the customer information associated to these FDIDs. FIF members have identified various challenges with the current request-response process, including the fact that the requests are manual and non-standard. This means that Industry Members are required to spend significant time (and incur significant associated costs) in responding to these requests. Accordingly, while FIF members support the request-response approach, FIF members emphasize the need to automate and standardize the current request-response process on an expedited basis. While automation could take additional time, FIF members request that regulatory personnel take steps in the interim to standardize the request-response process, as this would assist broker-dealers in standardizing their own response processes.

While greater standardization can be achieved in the near-term, the Commission and the SROs should seek, longer term, to automate and secure the current request and response process through establishing a standardized, published data format for responses and providing a secure means for Industry Members to submit responses.

More specifically, FIF members recommend that the Commission and the SROs implement a system whereby the Commission and the SROs could obtain, through a request and response approach, the data fields containing PII that are no longer reported to CAT. These requests would be based on one or more FDIDs specified by the Commission or an SRO, as applicable. This type of system would address each of the deficiencies of EBS identified above. While there would be a cost to implement this type of system, these costs would be recovered over a short period of time through automation, increased clarity as to the data to be reported, and the ability for Industry Members to rely on the systems and data structures that they developed to enable CAIS reporting. These cost savings would continue for the foreseeable future. FIF members would support the implementation of this type of system on an expedited basis.

FIF members believe that the requests in this system could be centralized through FINRA, as is the case with current EBS requests. FINRA could then forward the responses to the requesting party, which would be the Commission, FINRA or an exchange (as applicable).

As proposed:

- The responses by Industry Members would include all customer information for an FDID for the applicable historical period being requested by the Commission or SRO
- A request identifier would be associated to each request

- FINRA would provide a secure method for Industry Members to respond to these requests
- The data elements and format for these responses would be based on the prior CAIS data elements and format, including data elements that include PII
- The requested data would not be centrally stored by FINRA (unless FINRA were the requesting party) or any other intermediary party but would be delivered to the requesting party (the Commission or an SRO, as applicable) to be maintained in the requesting party's own secured storage environment
- The requesting party (the Commission or an SRO, as applicable) would delete the data collected in response to a request identifier upon the termination of the applicable investigation
- The Commission and SROs would implement oversight processes to monitor for compliance with the obligation described in the preceding bullet.

***Objectives achieved with this approach***

FIF members support this approach because it achieves the following objectives:

- Allows for the retirement of EBS
- Low-touch (i.e., highly automated) for Industry Members to implement and operate
- Takes advantage of costs and efforts already incurred by the Commission, the SROs and Industry Members to implement CAT and CAIS
- Avoids the risk of PII being stored centrally; reduces risk by decentralizing the secured storage of PII
- Allows for removing PII from CAT while still allowing regulatory personnel to monitor trading by a customer across accounts and broker-dealers.

***Commission support for automating the request and response process***

In its 2025 Exemptive Order relating to CAIS PII, the Commission discusses the benefits of having an automated request and response process:

> … technological advances such as more efficient computing and networking, could result in the development of an automated or partially automated system for requesting information from broker-dealers and for responding to regulator requests for information held by broker-dealers.[45]

FIF members agree with the Commission as to the desirability of automating any regulatory request and response process.

***Additional issues for the Commission and SROs to consider***

The following are additional issues that the regulators would need to consider when implementing an automated request-response system:

---

[45] Securities Exchange Act Release No. 102386 (Feb. 10, 2025), 90 FR 9642 (Feb. 14, 2025), at 90 FR 9645.

FINANCIAL INFORMATION FORUM                                                                16

- ***Reporting and submitting parties.*** The regulators would need to consider the reporting and submitting party roles in this process. FIF members recommend that the request-response system maintain the approach currently used for CAT where a "submitting firm" can submit records on behalf of a reporting firm. FIF members propose that the reporting firm receive all requests with the ability to permission one or more submitting firms to also receive these requests. The regulators would need to consider certain scenarios where a reporting firm has changed submitting firms and a regulatory query relates to a historical period during which the reporting firm was using a prior submitting firm.
- ***Historical periods.*** The regulators would need to consider how they would request and collect customer data for periods prior to the implementation of an automated request and response system.
- ***Feedback.*** The regulators would need to consider the type of feedback that FINRA would provide to reporting and submitting firms. FIF members recommend a simplified feedback process and would be concerned about a feedback process that is overly complicated. FIF members recommend further discussion between regulators and market participants relating to the feedback process for an automated request-response system.

Industry Members would require a reasonable time period to update their systems to conform to the requirements of a new request and response system.

***Regulatory policies***

In connection with their collection of PII through an automated request and response system, the Commission and SROs should implement policies that address the following issues:

- Limiting requests to scenarios where regulatory personnel have identified potential suspicious activity
- Identifying the categories of personnel that can access the data in the system and for what purpose
- Access controls
- Surveillance and audit to be conducted relating to this access
- Deleting PII data reported by Industry Members after an investigation has closed
- Notification of security breaches.

**E.   FIF members oppose the proposed revised linkage timeline**

FIF members oppose the proposed revised linkage timeline because it would reduce the quality of the CAT audit trail, expose Industry Members to unreasonable compliance risk, and increase compliance and operational costs for broker-dealers beyond the cost savings projected by CAT LLC.

The Repair Timeline Diagram below compares the current linkage timeline to the proposed revised linkage timeline:

FINANCIAL INFORMATION FORUM                                                                              17

# Repair Timeline Diagram



As illustrated in the diagram above, CAT currently allows for three cycles of feedback and repair, while the proposed alternative approach would only allow for one cycle of feedback and repair. Given the complexities of coordinating linkage issues with counterparties, one cycle of feedback and repair is not sufficient. As discussed below, the reduction from three feedback cycles to one would significantly impair the ability of Industry Members to resolve the 7% of linkage errors that are unresolved after the 2nd feedback cycle and additional errors that are introduced after the first feedback cycle. As further discussed below, the rule filing does not provide sufficient information for market participants to properly comment on, and for the Commission to make a determination on, this proposal.

The rule filing notes that, through the first ten months of 2025, 80% of linkage errors were resolved by T+2 by 8 a.m., 12% were resolved by T+3 at 8 a.m., 1% were resolved by T+4 at 8 a.m., 6% were resolved outside the T+4 window, and 2% were unrepaired.[46] This means that 20% of linkage errors were not resolved during the first cycle of feedback and repair. While currently 18% of linkage errors[47] are resolved beyond T+2, reducing from three feedback cycles to one feedback cycle will likely result in many of these errors never being resolved. For example, after the 2nd feedback cycle, 12% of linkage errors are resolved. This is currently communicated to the impacted Industry Members. The Industry Members can then focus on the 9% of linkage errors that remain unresolved (presumably due to rounding, the percentages provided in the rule filing total to 101%). Ultimately, Industry Members have been successful in resolving 7% of these 9% of linkage errors. But without awareness as to which of the 20% of linkage errors remaining unresolved, Industry Members would be significantly impeded in resolving this 7% of linkage errors.

---

[46] Rule Filing, at 70.

[47] For clarity of presentation, the percentages in this paragraph refer to the percentage of total linkage errors, not the percentage of unresolved linkage errors.

FINANCIAL INFORMATION FORUM                                                                 18

It is important to consider not only the percentage of linkage errors that are resolved, but also the volume of linkage errors that are generated and resolved each day, as this is relevant to understanding the operational and compliance costs for Industry Members and the impact on the CAT audit trail and regulatory personnel. FIF members request that CAT LLC provide data for 2025 on the number of linkage errors that were generated on average each day. The Commission should require that this data be included in an amended rule filing prior to making a determination on this specific proposal.

The rule filing also does not discuss the scenario where new linkage errors are generated because of repairs. FIF members request that CAT LLC provide data for 2025 on the average daily number of new linkage errors that were generated on T+2, T+3 and T+4 because of previously submitted repairs. Reducing from three repair cycles to one repair cycle will effectively prevent Industry Members from repairing this category of errors. The Commission should require that this data be included in an amended rule filing prior to making a determination on this specific proposal.

While, ideally, Industry Members should be able to repair errors within one repair cycle, this is not practical in many cases given the complexity of CAT reporting and CAT linkage validations, and the need for many Industry Members to coordinate this complex reporting with large numbers of counter-parties.

The rule filing projects an annual cost savings of $6 - $8 million for this change.[48] FIF members believe that the increased annual operational and compliance costs for Industry Members resulting from this change will significantly exceed this projected costs savings. Industry Members will need to hire additional staff to handle the same number of linkage errors within a shorter timeframe. Industry Members will also need to allocate additional resources to investigate the 20% of linkage errors that remain after the first linkage feedback cycle based on only having one cycle of feedback from FINRA CAT (as opposed to the current three cycles of feedback). Industry Members also will need to incur increased costs during regulatory examinations because of the larger number of unresolved errors that would result and less clarity regarding which errors have been resolved and which errors are still outstanding.

It is also unreasonable for the Commission and SROs to impose fines and other sanctions on Industry Members for linkage errors if the Commission and SROs have intentionally eliminated processes (the 2nd and 3rd repair cycles) that have been documented to assist Industry Members in identifying and resolving large numbers of linkage errors. If the Commission is considering approval of this proposal, the Commission first should consider and propose, and solicit comment on, changes to current compliance and enforcement expectations relating to CAT reporting, given the reduced ability for Industry Members to repair CAT errors that would result from approval of this proposal. It is also important that the issue of how compliance and enforcement expectations should be modified in light of this proposal be addressed in the rule filing. For example, Industry Members should not be sanctioned for errors that were previously remediable under Commission-approved processes.

While the discussion above in this section is focused on Industry Members, similar costs will be imposed on exchanges if the current three cycles of feedback and repair are reduced to one.

---

[48] Rule Filing, at 5.

FINANCIAL INFORMATION FORUM                                                                    19

FIF members oppose the revised linkage timeline proposed in the Rule Filing but support the focus by CAT LLC on identifying potential changes to the linkage and repair process to reduce CAT operating costs. FIF members are interested in engaging in further dialogue with CAT LLC in identifying potential changes to the linkage and repair process to reduce CAT operating costs.

* * * * *

FIF members appreciate the opportunity to comment on the Notice of Filing. If you would like clarification on any of the items discussed in this letter or would like to discuss further, please contact me at howard.meyerson@fif.com.

Very truly yours,

/s/ Howard Meyerson

Howard Meyerson
Managing Director, Financial Information Forum

FINANCIAL INFORMATION FORUM                                                          20

**A174**

**Annex 1**

**The Need for CCIDs to Track a Customer's Activity Across Accounts and Brokers**

Diagram 1 illustrates the design of the CAT Transaction Reporting and CAIS systems prior to the removal of PII from CAIS:

## Diagram 1



As illustrated in Diagram 1, prior to the removal of PII from CAIS, regulatory personnel could identify trading activity of a particular entity or natural person customer (represented by a CCID) across accounts (represented by FDIDs) at the same broker or different brokers. Regulatory personnel could then identify the name, address and other PII for the customer.

With the removal of PII from CAIS, regulatory personnel can still identify trading activity of a particular entity or natural person customer across accounts, but they no longer have access to Customer PII in CAIS. This is illustrated in Diagram 2:

FINANCIAL INFORMATION FORUM                                                    21

**Diagram 2**



To address this challenge, regulatory personnel have adopted an approach illustrated in Diagram 3:

**Diagram 3**



This approach involves regulatory personnel identifying multiple FDIDs associated to a particular CCID. Regulatory personnel send these FDIDs to the applicable Industry Members, and the Industry Members provide the Customer PII in response. We refer to this approach as the "request and response approach."

If CCIDs are removed from CAT, regulatory personnel could still request Customer PII based on an FDID, but they would lose the ability to use CAT to detect suspicious activity of a single customer across multiple accounts:

## Diagram 4



The scenario depicted in Diagrams 5 and 6 further illustrates this point:

## Diagram 5



Assume in the scenario depicted in Diagram 5 that regulatory personnel detect suspicious activity in FDID A1. If CCIDs are retained in CAT, regulatory personnel can identify FDID A2 (at the same broker-dealer) and FDID A3 (at another broker-dealer) associated to the same CCID (CCID 123). Regulatory personnel can then review the activity of CCID 123 across all three FDIDs.

If CCIDs are removed from CAT, regulatory personnel would not know to also look at the activity in FDIDs A2 and B1. This is illustrated in Diagram 6:

FINANCIAL INFORMATION FORUM    23

## Diagram 6



A comparison of Diagrams 5 and 6 illustrates the inferior CAT audit trail that results from the removal of CCIDs from CAT. Without CCIDs, regulatory personnel would need to engage in extensive manual effort to recreate Diagram 5, and regulatory personnel could only do so by querying every broker in the industry (because regulatory personnel do not know where CCID 123 has other accounts). Additional challenges arise in the common scenario where the same customer is identified by a different name across multiple broker-dealers.

**Annex 2**
**Analysis of the Commission's Long-Term Objectives**

In evaluating the two alternative proposals, it is important for the Commission to consider the long-term objectives that the Commission seeks to achieve with respect to regulatory oversight. Based on this analysis, the Commission should not move forward with either proposal.

***Consideration of long-term Commission objectives relating to market oversight***

In evaluating the alternative proposals, the Commission should consider its long-term objectives relating to market oversight. These objectives should not be considered with respect to CAT in a vacuum; instead the Commission should consider its market oversight function, with CAT as one component of this wider function.

The Commission's objectives with respect to market oversight (including CAT) should be as follows

- Maintain the quality of the data reported to CAT and other regulatory reporting systems[49]
- Protect the data reported to CAT and other regulatory reporting systems[50]
- Manage the costs of operating CAT and other reporting systems[51]
- Avoid undue compliance and operational costs for market participants[52]

FIF members oppose the alternative proposals based on applying these objectives. FIF members apply these objectives to the proposal to eliminate CCIDs from CAT:

---

[49] See, for example, 17 CFR §242.613(a)(1)(iii).
[50] See, for example, 17 CFR §242.613(a)(1)(iv).
[51] See, for example, 17 CFR §242.613(a)(1)(vii).
[52] See, for example, 17 CFR §242.613(a)(1)(vii)(B) and (a)(1)(ix).

FINANCIAL INFORMATION FORUM                                                    25

| Commission Objective | Analysis |
|---|---|
| **Maintain the quality of the data reported to CAT and other regulatory reporting systems** | • If CCIDs are removed from CAT, regulatory personnel can no longer use CAT to detect activity by a single customer across accounts; the ability to identify trading by a customer across accounts is the core function of CAT<br>• As discussed by the Commission in the PII approval order, the objective of identifying customer activity across accounts can be achieved through retaining CCIDs in CAT and automating the request and response process currently used by SRO personnel |
| **Protect the data reported to CAT and other regulatory reporting systems** | • The EBS system requires the transmission of large volumes of PII (including social security numbers) in plaintext<br>• The security controls applied for the CAT system are not applied to the PII collected through EBS |
| **Manage the costs of operating the CAT system** | • If CCIDs are removed from CAT, the Commission would need to retain EBS indefinitely,[53] and the volume of EBS requests would increase significantly<br>• The costs of retaining EBS are significantly greater than any cost savings that would result from the elimination of CCIDs from CAT<br>• The Commission would be forfeiting the core function of CAT to save between 1.88% and 2.61% of CAT operating costs<br>• The Commission needs to balance this 1.88% to 2.61% savings against (i) the Commission's increased investigative costs that would result from having to send manual queries to attempt to reconstruct activity of a single customer across multiple accounts, and (ii) the resulting increased operational and compliance costs for Industry Members |
| **Avoid undue compliance and operational costs for market participants** | • If CCIDs are removed from CAT, regulatory personnel will need to rely on EBS to detect activity by a single customer across accounts<br>• The EBS system is manually intensive and, accordingly, very costly for Industry Members.<br>• The majority of the EBS system is duplicative of CAT and, accordingly, imposes undue costs on Industry Members.<br>• These costs are significantly greater than any cost savings that would result from the elimination of CCIDs from CAT |

As an alternative to the full elimination of CCIDs, FIF members propose the retention of CCIDs, retiring EBS, and automating the request and response system currently used by regulatory personnel. This approach will result in higher quality data reported to CAT, protection of PII, and reduced compliance and operational costs for market participants.

FIF members further apply the objectives above to the proposal for reduced linkage processing:

---

[53] As discussed in this letter, the Commission could remove CCIDs from CAT and retire EBS, but the Commission would need to explain how it would plan to conduct market oversight if it adopts this approach.

FINANCIAL INFORMATION FORUM                                                            26

| Commission Objective | Analysis |
|---|---|
| Maintain the quality of the data reported to CAT and other regulatory reporting systems | • This proposal would reduce the quality of the data reported to CAT |
| Protect the data reported to CAT and other regulatory reporting systems | • This proposal does not impact data protection |
| Manage the costs of operating the CAT system | • The increased compliance and operational costs resulting from this proposal would significantly outweigh the cost savings for the CAT system and must also be balanced against the reduction in the quality of the data reported to CAT |
| Avoid undue compliance and operational costs for market participants | • The increased compliance and operational costs resulting from this proposal would significantly outweigh the cost savings for the CAT system |

# TAB Q

Letter from Christopher A. Iacovella, President & Chief Executive Officer, American Securities Association (Feb. 10, 2026)

**american securities association**
*America's Voice for Main Street's Investors*

**VIA ELECTRONIC MAIL to: rule-comments@sec.gov**

February 10, 2026

Ms. Vanessa Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

*Re: Consolidated Audit Trail Funding Proposal (File No. 4-698)*

Dear Ms. Countryman:

The American Securities Association[1] (ASA) submits these comments in response to the proposed new funding plan for the Consolidated Audit Trail ("CAT") submitted by the self-regulatory organizations ("SROs") in 2025 (the "Proposal"). ASA has been deeply involved in issues regarding the CAT since its inception, including the CAT's funding model, its unprecedented invasion of the privacy rights of American investors, and the legality of the CAT itself. None of these foundational concerns have been resolved in the Commission's recent actions or in the most recent order and related Proposal.

In our October 31, 2025 letter on this file (the "October 31 ASA Letter[2]"), ASA explained how the CAT has imposed billions of dollars in costs on broker-dealers and their customers, violated the constitutional right to privacy for millions of Americans, and provided no meaningful benefits that could not have been achieved through less intrusive means. We incorporate that letter by reference here and request that it be made part of the comment file for this submission.

**I. Background.**

Since the Commission first established the CAT under Rule 613 in 2012, the CAT has evolved into an extraordinarily expensive, centralized surveillance system that collects and stores vast amounts of trading data about American investors. In 2023, ASA and Citadel challenged the Commission's CAT funding plan in court. In July 2025, the U.S. Court of Appeals for the Eleventh Circuit ruled in our favor, holding that the Commission acted arbitrarily and capriciously in adopting the 2023 funding plan and that it relied on incomplete and incompatible

---

[1] ASA is a trade association that represents the retail and institutional capital markets interests of regional financial services firms who provide Main Street businesses with access to capital and advise hardworking Americans how to create and preserve wealth. ASA's mission is to promote trust and confidence among investors, facilitate capital formation, and support efficient and competitively balanced capital markets. This mission advances financial independence, stimulates job creation, and increases prosperity. ASA has a geographically diverse membership base that spans the Heartland, Southwest, Southeast, Atlantic, and Pacific Northwest regions of the United States.

[2] ASA Letter to the Securities and Exchange Commission regarding Re: Consolidated Audit Trail Funding Proposal (Release No. 34-103960; File No. 4-698) available here: https://www.sec.gov/comments/4-698/4698-672447-2037474.pdf.

 American Securities Association
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004

 AmericanSecurities.org
@amersecurities

 202.621.1784

**A182**


**american securities association**
*America's Voice for Main Street's Investors*

economic analysis to justify that plan[3].

Despite that ruling, the Proposal essentially seeks to reinstate the unlawful 2023 funding framework, again placing the overwhelming burden of CAT costs on broker-dealers and, ultimately, their customers. As we explained in our October Letter, neither Rule 613 nor the CAT NMS Plan authorizes the Commission or the SROs to treat broker-dealers as an off-budget funding source for an SEC surveillance project whose legality and necessity remain unresolved.

## II. The SEC Must First Determine Whether the CAT Is Legal.

The CAT continues to raise fundamental questions of administrative and constitutional law. The Eleventh Circuit's decision exposed only a fraction of the deeper legal flaws embedded in the CAT's structure, including the Commission's insistence on collecting and storing personally identifiable information ("PII") of every American who trades a single share of stock. That collection and storage of PII in a large, centralized database accessible to government employees and contractors is a stark intrusion on Americans' Fourth Amendment rights and creates an enormous cybersecurity target.

Before approving any new funding arrangement, the Commission should determine whether a system resembling the current CAT is lawful at all—both in terms of statutory authority and constitutional constraints. If the Commission nonetheless concludes that the CAT can be operated lawfully, it must ensure that any funding mechanism complies with the Appropriations Clause and does not simply shift the entire cost of this system onto broker-dealers and their customers.

## III. The SEC Should Perform a Full Financial Audit of CAT Costs.

As ASA explained previously, the Commission should conduct a complete and transparent financial audit of the CAT. That audit should include, at a minimum:

- All CAT-related expenditures, including contractor and vendor costs, consulting and legal fees, and compensation to CAT LLC and SRO personnel.
- How broker-dealer financial responsibilities were determined, including the allocation of costs across different types of firms and business models.
- A detailed accounting of any reserves, surplus collections, and other balances accumulated under prior funding arrangements.

The results of that audit should be compiled into a public report that identifies any waste, mismanagement, or abuse, and should be completed before the Commission approves any new funding plan.

---

[3] Am. Sec. Ass'n, v. SEC, 147 F.4th 1264 (11th Cir. 2025) (ASA).


**American Securities Association**
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004


AmericanSecurities.org
@amersecurities


202.621.1784

**A183**

2



# american securities association
## America's Voice for Main Street's Investors

**IV. <u>The SEC Should Determine How Legacy CAT Costs Should Be Reimbursed</u>.**

The Eleventh Circuit's decision vacating the 2023 funding plan raises an obvious question: what happens to the substantial sums that broker-dealers have already been forced to pay under an unlawful model? As noted in our October Letter, it took roughly $500 million to build the CAT and approximately $200 million per year to operate it—numbers far exceeding the Commission's initial estimates. Many of these funds were extracted from broker-dealers outside the normal appropriations process and used to build and operate a system whose legality remains unresolved.

The Commission should identify and adopt a mechanism to reimburse broker-dealers (and, by extension, American investors) for amounts contributed under unlawful or defective funding arrangements. Possible mechanisms include direct reimbursement funds, fee offsets over time, or a congressional appropriation to restore funds that should never have been taken outside the appropriations process.

**V. <u>The Proposal Is Fundamentally Flawed for the Following Reasons</u>.**

Building on each of the foregoing concerns, ASA believes the Proposal is fundamentally flawed and cannot be approved in its current form. In particular, the Proposal:

1. **Fails to address the Commission's authority and the legality of the CAT itself.** The Proposal does not meaningfully grapple with whether the Commission has statutory authority to operate a multi-billion-dollar surveillance system like the CAT, nor does it address the constitutional issues raised by the collection and storage of massive volumes of investor data. The Commission has an affirmative duty to examine its own statutory authority and legal assumptions when approving an NMS Plan amendment of this scope; it has not done so here.

2. **Does not remedy the Commission's prior deficient economic analysis.** The Eleventh Circuit held that the Commission's prior economic analysis was incomplete and incompatible with the funding plan it adopted. Yet the Proposal proceeds without the updated, detailed economic analysis necessary to determine whether the current allocation of costs is reasonable and equitable. Among other things:

    - CAT LLC has not publicly provided key metrics needed for a proper analysis, including the number of daily executed transactions, quotation messages, CAT records, unique market participants with records in the system, and usage-related costs.[4]
    - The Commission has not explained why its past cost estimates were so inaccurate or identified the core cost drivers that caused this project to diverge so

---

[4] See Letter from Citadel Securities (Jan. 30, 2026) at 2–3 (identifying key metrics the Commission must obtain from CAT LLC).


**American Securities Association**
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004


AmericanSecurities.org
@amersecurities


202.621.1784

**A184**

3



**american securities association**
America's Voice for Main Street's Investors

dramatically from prior projections.

- There is no robust, forward-looking cost-trajectory analysis that accounts for expected changes in market structure, including new exchanges, overnight trading, and rules that will increase message traffic.[5]
- The Commission has not evaluated how CAT fees were actually allocated under the vacated 2023 framework, including the distribution of fees across equities and options, retail and institutional activity, and different business models such as market making.; and
- The Proposal fails to account for CAT costs in the broader context of existing regulatory burdens, including ongoing CAT reporting expenses and the continued operation of systems like Electronic Blue Sheets.[6]

3. **Does not meaningfully prohibit SRO pass-throughs of CAT costs.** While the Proposal purports to limit certain pass-throughs, it leaves in place Plan language that permits SROs to bundle or otherwise incorporate CAT costs into their various other fees or assessments. The Eleventh Circuit made clear that the Commission cannot pretend that SROs will bear a portion of CAT costs while ignoring their ability to pass those costs on to broker-dealers and their customers[7]. If SRO pass-throughs up to 100% of their allocations are permitted in substance, the Commission must confront that reality, explain its policy shift, and incorporate the full economic impact into its analysis. The Proposal does not do so.[8]

4. **Circumvents Commission Rule 608 by relying on immediately-effective SRO fee filings.** The Proposal contemplates that CAT costs will be imposed on broker-dealers via immediately effective SRO fee filings under Rule 19b-4, even though Commission rules require that fees associated with NMS Plans like the CAT be approved under Rule 608 before they become effective. This effectively shields core elements of the CAT funding model from both Commission approval and judicial review, contrary to the Commission's own rulemaking and the concerns highlighted by the Eleventh Circuit.[9]

5. **Relies on unverified claims that the Financial Accountability Milestones have been satisfied.** The Proposal assumes that the Financial Accountability Milestones ("FAMs") have been met and that historical CAT costs are properly recoverable from broker-dealers.[10] But the Commission has not independently verified FAM compliance,

---

[5] See, e.g., CAT Cost Savings Amendment, Exchange Act Release No. 34-104504 (Dec. 23, 2025); Tick Sizes and Access Fees rule, 89 Fed. Reg. 81,620 (Oct. 8, 2024); and recent approvals of new exchanges and options markets.

[6] See Citadel Securities Jan. 30, 2026 Letter at 3–4 (discussing CAT reporting costs and Electronic Blue Sheets obligations).

[7] See Am. Sec. Ass'n v. SEC, 147 F.4th at 1274–77 (discussing SRO pass-throughs and the need either to prohibit them or fully account for them).

[8] See Citadel Securities Jan. 30, 2026 Letter at 4–5 (explaining how the CAT NMS Plan still allows pass-throughs via existing fees and why that contravenes the Eleventh Circuit's ruling).

[9] See Citadel Securities Jan. 30, 2026 Letter at 5–6 (discussing the 2020 amendments to Rule 608 and their application to CAT fees); see also 85 Fed. Reg. 65,470 (Oct. 15, 2020).

[10] See Citadel Securities Jan. 30, 2026 Letter at 6–7 (explaining that the Commission has not independently confirmed FAM compliance and describing reliance on SRO self-certifications and exemptive relief).

 **American Securities Association**
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004

 AmericanSecurities.org
@amersecurities

 202.621.1784

**A185**



**american securities association**
America's Voice for Main Street's Investors

instead relying on SRO self-certifications and exemptive relief issued years after certain milestones passed. Exemptive orders issued long after a milestone deadline cannot retroactively cure noncompliance so as to justify the allocation of hundreds of millions of dollars in historical costs to broker-dealers and their customers.

6. **Permits the over-collection and misuse of CAT reserve funds.** The Proposal allows the establishment and maintenance of a substantial reserve, but does not establish adequate Commission oversight to prevent over-collection or to ensure that reserves are used solely to offset future fees consistent with the CAT NMS Plan. Experience under the prior framework shows that reserves can rapidly exceed stated limits and be used to fund CAT operations in the absence of a Commission-approved funding model, effectively allowing the SROs to continue operating as though a vacated order remains in place and depriving broker-dealers of the offsets they are due.[11]

7. **Postpones the necessary, comprehensive review of the CAT.** The Commission has committed to a comprehensive review of the CAT, including its necessity, design, data-collection approach, and costs. Approving the Proposal now would reverse the proper order of operations by locking in a new funding structure before that review is completed. The Commission's limited resources should be devoted first to that comprehensive review and to considering alternatives—including funding the CAT, if it is to continue at all, through the appropriations process rather than through perpetual assessments on broker-dealers and their clients.[12]

In ASA's view, these defects are not technicalities that can be patched at the margin. They go to the heart of whether the Commission may lawfully and prudently impose another CAT funding regime on the market at this time.

## VI. <u>Conclusion</u>.

ASA appreciates the Commission's willingness to revisit the CAT and its funding model, and we strongly support a comprehensive, top-to-bottom review of this project. However, until the Commission has (i) resolved the fundamental legal and privacy issues surrounding the CAT, (ii) completed an accurate and transparent economic analysis, (iii) audited and publicly reported on CAT costs and reserves, and (iv) ensured that broker-dealers and their customers are not saddled with unlawful or unreasonable burdens, ASA believes the Proposal cannot be approved.

For these reasons, ASA respectfully urges the Commission to reject or defer action on the 2025 CAT Funding Proposal and instead focus its efforts on the broader legal, economic, and policy questions that must be answered before any durable funding solution can be considered.

---

[11] See Citadel Securities Jan. 30, 2026 Letter at 7–8; see also Petition for Rulemaking to Amend CAT NMS Plan to Direct Proper Use of CAT LLC Reserve (Jan. 15, 2026), File No. 4-878.
[12] See Citadel Securities Jan. 30, 2026 Letter at 8–9; see also Remarks of Chairman Atkins on the CAT (Sept. 30, 2025 and May 19, 2025).

 American Securities Association
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C. 20004

 AmericanSecurities.org
@amersecurities

 202.621.1784

**A186**

5



# american securities association
*America's Voice for Main Street's Investors*

Sincerely,

*Christopher A. Iacovella*

Christopher A. Iacovella
President & Chief Executive Officer
American Securities Association

 American Securities Association
1455 Pennsylvania Ave. NW, Suite 400
Washington, D.C.  20004

AmericanSecurities.org
@amersecurities

 202.621.1784

**A187**

6