**No. 26-10936**

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

CONSOLIDATED AUDIT TRAIL LLC; THE NASDAQ STOCK
MARKET, LLC, ET AL.,

*Intervenors*.

Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-105003; File No. 4-698

**APPENDIX
VOLUME 2**

J. Michael Connolly
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Petitioner
American Securities Association*

Noel J. Francisco
Brian C. Rabbitt
Brinton Lucas
Christopher S. Dinkel
Hannah Templin
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

David Phillips
JONES DAY
4655 Executive Dr., Ste. 1500
San Diego, CA 92121

*Counsel for Petitioner
Citadel Securities LLC*

# INDEX OF APPENDIX

**Tab**

### Volume 1

Certified List Describing the Record in Proceedings Before the
Securities and Exchange Commission (Apr. 27, 2026) (A1-A5) ................ A

Notice of Filing of Amendment to the National Market System
Plan Governing the Consolidated Audit Trail Regarding CAT
Funding Model, Securities Exchange Act Release No. 103960
(Sept. 12, 2025), published at 90 Fed. Reg. 44,910
(Sept. 17, 2025) (A6-A45) ...................................................................... B

Letter from Gentry Collins, CEO, The American Free Enterprise
Chamber of Commerce (Oct. 17, 2025) (A46-A52) ................................. C

Letter from Steffen N. Johnson, Wilson Sonsini Goodrich &
Rosati Professional Corporation on behalf of the Financial
Industry Regulatory Authority, Inc. (FINRA) (Oct. 17, 2025)
(A53-A69) ............................................................................................... D

Letter from Stephen John Berger, Managing Director, Global
Head of Government and Regulatory Policy, Citadel Securities,
(Oct. 17, 2025) (A70-A83) ...................................................................... E

Letter from Joseph P. Corcoran, Managing Director and Associate
General Counsel, and Katie Kolchin CFA, Managing Director,
Head of Equity & Options Market Structure, The Securities
Industry and Financial Markets Association (SIFMA),
(Oct. 21, 2025) (A84-A88) ...................................................................... F

Letter from Christopher A. Iacovella, President & Chief Executive
Officer, American Securities Association
(Oct. 31, 2025) (A89-A94) ...................................................................... G

Letter from Patrick Sexton, EVP, General Counsel & Corporate
Secretary, The Cboe Exchanges (CBOE)
(Oct. 31, 2025) (A95-A96) ...................................................................... H

Letter from Joanna Mallers, Secretary, PTG (Nov. 24, 2025)
(A97-A100) ........................................................................................ I

Letter from Robert Walley, CAT NMS Plan Operating Committee
Chair, Consolidated Audit Trail, LLC (Dec. 18, 2025)
(A101-A125) ...................................................................................... J

Letter from Gerald O'Hara, Vice President & Assistant General
Counsel, and Katie Kolchin CFA, Managing Director, Head of
Equity & Options Market Structure, The Securities Industry
and Financial Markets Association (SIFMA)
(Dec. 19, 2025) (A126-A130) ....................................................... K

Letter from Robert Walley, CAT NMS Plan Operating Committee
Chair, Consolidated Audit Trail, LLC,
(Jan. 14, 2026) (A131-A136) ......................................................... L

Letter from Stephen John Berger, Managing Director, Global
Head of Government & Regulatory Policy, Citadel Securities,
(Jan. 30, 2026) (A137-A145) ......................................................... M

Letter from Steffen N. Johnson, Wilson Sonsini Goodrich &
Rosati Professional Corporation on behalf of the Financial
Industry Regulatory Authority, Inc.
(FINRA) (Jan. 30, 2026) (A146-A150) ....................................... N

Letter from Marcia E. Asquith, Corporate Secretary, EVP, Board
and External Relations, Financial Industry Regulatory
Authority, Inc. (FINRA) (Jan. 30, 2026) (A151-A154) ............ O

Letter from Howard Meyerson, Managing Director, Financial
Information Forum (Feb. 10, 2026) (A155-A181) ...................... P

Letter from Christopher A. Iacovella, President & Chief Executive
Officer, American Securities Association (Feb. 10, 2026)
(A182-A187) ...................................................................................... Q

**Volume 2**

**Tab**

Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by the Commission, Regarding Implementation of a Revised Funding Model, Securities Exchange Act Release No. 105003 (Mar. 16, 2026), published at 91 Fed. Reg. 13,410 (Mar. 19, 2026) (A188-A259) ............................................................... R

Certificate of Service

# TAB R

Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by the Commission, Regarding Implementation of a Revised Funding Model, Securities Exchange Act Release No. 105003 (Mar. 16, 2026), published at 91 Fed. Reg. 13,410 (Mar. 19, 2026)

# SECURITIES AND EXCHANGE COMMISSION

**[Release No. 34–105003; File No. 4–698]**

## Joint Industry Plan; Order Approving an Amendment to the National Market System Plan Governing the Consolidated Audit Trail, as Modified by the Commission, Regarding Implementation of a Revised Funding Model

March 16, 2026.

## I. Introduction

On September 5, 2025, the Consolidated Audit Trail, LLC ("CAT LLC"), on behalf of the Participants [1] to the National Market System Plan Governing the Consolidated Audit Trail ("CAT NMS Plan" or "Plan"),[2] filed with the Securities and Exchange Commission ("Commission"), pursuant to Section 11A of the Exchange Act [3] and Rule 608 of Regulation National Market System ("Regulation NMS") thereunder,[4] a proposed amendment to the CAT NMS Plan ("Initial Proposed Amendment") to implement a revised funding model (the "Executed Share

---

[1] The Participants are: 24X National Exchange LLC, BOX Exchange LLC, Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe Exchange, Inc., Financial Industry Regulatory Authority, Inc. ("FINRA"), Investors Exchange LLC, Long-Term Stock Exchange, Inc., MEMX LLC, Miami International Securities Exchange LLC, MIAX Emerald, LLC, MIAX PEARL, LLC, MIAX Sapphire, LLC, Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, Nasdaq PHLX LLC, Nasdaq Texas, LLC, The NASDAQ Stock Market LLC, New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE National, Inc., and NYSE Texas, Inc. (collectively, the "Participants," "self-regulatory organizations," or "SROs").

[2] The CAT NMS Plan is a national market system plan approved by the Commission pursuant to Section 11A of the Securities Exchange Act of 1934 ("Exchange Act") and the rules and regulations thereunder. *See* Securities Exchange Act Release No. 78318 (Nov. 15, 2016), 81 FR 84696 (Nov. 23, 2016) ("CAT NMS Plan Approval Order"). The CAT NMS Plan is Exhibit A to the CAT NMS Plan Approval Order. *See* CAT NMS Plan Approval Order, 81 FR at 84943–85034. The CAT NMS Plan functions as the limited liability company agreement of the jointly owned limited liability company formed under Delaware state law through which the Participants conduct the activities of the CAT ("Company"). Each Participant is a member of the Company and jointly owns the Company on an equal basis. The Participants submitted to the Commission a proposed amendment to the CAT NMS Plan on August 29, 2019, which they designated as effective on filing. On August 29, 2019, the Participants replaced the CAT NMS Plan in its entirety with the limited liability company agreement of a new limited liability company, CAT LLC, which became the Company. *See* Securities Exchange Act Release No. 87149 (Sept. 27, 2019), 84 FR 52905 (Oct. 3, 2019). The latest version of the CAT NMS Plan is available at *https://catnmsplan.com/about-cat/cat-nms-plan.*

[3] 15 U.S.C. 78k–1.

[4] 17 CFR 242.608.

Model") for the consolidated audit trail ("CAT") [5] and to establish a fee schedule for Participant CAT fees in accordance with the Executed Share Model.[6] The Initial Proposed Amendment was published for comment in the **Federal Register** on September 17, 2025.[7]

On November 21, 2025, the Commission instituted proceedings pursuant to Rule 608(b)(2)(i) of Regulation NMS [8] to determine whether to disapprove the Initial Proposed Amendment or to approve the Initial Proposed Amendment with any changes or subject to any conditions the Commission deems necessary or appropriate after considering public comment ("OIP").[9] On December 18, 2025, CAT LLC, on behalf of the Participants to the CAT NMS Plan, filed an amendment to the Initial Proposed Amendment.[10]

This order approves the Proposed Amendment, as modified by the Commission (hereinafter, the "Proposed Amendment" unless otherwise noted).[11] For the reasons discussed below, the Commission finds that the Proposed Amendment, as modified by the Commission, is appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanism of, a national market

---

[5] The Proposed Amendment modifies the existing funding model in Article XI of the CAT NMS Plan.

[6] *See* Letter to Vanessa Countryman, Secretary, Commission, from Robert Walley, Chair, CAT NMS Plan Operating Committee, dated Sept. 5, 2025.

[7] *See* Securities Exchange Act Release No. 103960 (Sept. 12, 2025), 90 FR 44910 ("Notice"). Comments received in response to the Notice can be found on the Commission's website at *https://www.sec.gov/comments/4-698/4-698-a.htm.*

[8] 17 CFR 242.608(b)(2)(i).

[9] *See* Securities Exchange Act Release No. 104234 (Nov. 21, 2025), 90 FR 54438 (Nov. 26, 2025). Comments received in response to the OIP can be found on the Commission's website at *https://www.sec.gov/comments/4-698/4-698-a.htm.*

[10] *See* Letter to Vanessa Countryman, Secretary, Commission, from Robert Walley, Chair, CAT NMS Plan Operating Committee, dated Dec. 18, 2025, *available at: https://www.sec.gov/comments/4-698/4698-685927-2125515.pdf* ("CAT LLC December 2025 Response Letter" or "Amendment No. 1"). In Amendment No. 1, CAT LLC proposes to revise proposed Section 11.3(e) of Appendix D of the CAT NMS Plan to "better, reflect that the Proposed Amendment was approved under the Plan and avoid statements suggesting that all Participants voted for the proposal," by modifying the provision to modify a clause stating that "[e]ach Participant agrees not to file . . ." to instead be, "[n]o Participant will file." *Id.* at 5.

[11] The Commission is modifying the Proposed Amendment to reflect Amendment No. 1 and approving the Proposed Amendment, as so modified, pursuant to Rule 608(b)(2), as discussed in more detail in Part III.A.2 below.

system, or is otherwise in furtherance of the purposes of the Exchange Act.

## II. Background

On July 11, 2012, the Commission adopted Rule 613 of Regulation NMS, which required the SROs to submit a national market system ("NMS") plan to create, implement and maintain a consolidated audit trail that would capture customer and order event information for orders in NMS securities.[12] On November 15, 2016, the Commission approved the CAT NMS Plan.[13] Under the CAT NMS Plan, the Operating Committee of the Company, of which each Participant is a member, has the discretion (subject to the funding principles set forth in the Plan) to establish funding for the Company to operate the CAT, including establishing fees to be paid by the Participants and Industry Members.[14]

Under the CAT NMS Plan, CAT fees are to be implemented in accordance with various funding principles, including an "allocation of the Company's related costs among Participants and Industry Members that is consistent with the Exchange Act taking into account . . . distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon the Company resources and operations" and the "avoid[ance of] any disincentives such as placing an inappropriate burden on competition and reduction in market quality."[15] The Plan specifies that, in establishing the funding of the Company, the Operating Committee shall establish "a tiered fee structure in which the fees charged to: (1) CAT Reporters [16] that are Execution Venues,[17] including ATSs,[18] are based upon the level of market share; (2) Industry Members' non-ATS activities are based upon message traffic; and (3) the CAT Reporters with the most CAT-related activity (measured by market

---

[12] 17 CFR 242.613.

[13] *See* CAT NMS Plan.

[14] The CAT NMS Plan defines "Industry Member" as "a member of a national securities exchange or a member of a national securities association." *See* CAT NMS Plan, at Section 1.1. *See also id.* at Section 11.1(b).

[15] *Id.* at Section 11.2(b) and (e).

[16] The CAT NMS Plan defines "CAT Reporter" as "each national securities exchange, national securities association and Industry Member that is required to record and report information to the Central Repository pursuant to SEC Rule 613(c)." *Id.* at Section 1.1.

[17] The CAT NMS Plan defines "Execution Venue" as "a Participant or an alternative trading system ('ATS') (as defined in Rule 300 of Regulation ATS) that operates pursuant to Rule 301 of Regulation ATS (excluding any such ATS that does not execute orders)." *Id.*

[18] *Id.*

share and/or message traffic, as applicable) are generally comparable (where, for these comparability purposes, the tiered fee structure takes into consideration affiliations between or among CAT Reporters, whether Execution Venues and/or Industry Members).'' [19]

On May 15, 2020, the Commission adopted amendments to the CAT NMS Plan designed to increase the Participants' financial accountability for the timely completion of the CAT (''Financial Accountability Amendments'').[20] The Financial Accountability Amendments added Section 11.6 to the CAT NMS Plan to govern the recovery from Industry Members of any fees, costs, and expenses (including legal and consulting fees, costs and expenses) incurred by or for the Company in connection with the development, implementation and operation of the CAT from June 22, 2020 until such time that the Participants have completed Full Implementation of CAT NMS Plan Requirements [21] (''Post-Amendment Expenses''). Section 11.6 establishes target deadlines for four Financial Accountability Milestones (Periods 1, 2, 3 and 4) [22] and reduces the amount of fee recovery available to the Participants if these deadlines are missed.[23]

Since the CAT plan's approval in 2016, CAT LLC has proposed, withdrawn, and refiled several iterations of the funding amendment, resulting in an extensive process of evaluating and receiving comment on various funding models. On September 6, 2023, the Commission approved an amendment to the CAT NMS Plan to implement a new funding model (the

''Executed Share Model''), which charged fees based on executed equivalent share volume of transactions in Eligible Securities (''2023 Funding Model Amendment'').[24]

The Executed Share Model established two categories of CAT fees: (1) ''CAT Fees'' payable by Participants and Industry Members that are CAT Executing Brokers for the Buyer and for the Seller with regard to CAT Costs not previously paid by the Participants (''Prospective CAT Costs''); and (2) ''Historical CAT Assessments'' to be payable by Industry Members who were CAT Executing Brokers for the Buyer and for the Seller with regard to CAT Costs previously paid by the Participants (''Past CAT Costs'').[25] For each of these categories, Participants were to submit fee filings pursuant to Section 19(b) of the Exchange Act to establish CAT Fees and a Historical CAT Assessment to be charged to Industry Members based on the Executed Share Model. To date, each of the Participants filed fee filings related to three CAT fees and one Historical CAT Assessment, and as of the initial filing of the Proposed Amendment, CAT LLC collected or was collecting such CAT fees.[26]

On July 25, 2025, the U.S. Court of Appeals for the Eleventh Circuit (the ''Court'') issued an opinion vacating the 2023 Funding Model Order and remanding the matter to the Commission for further proceedings consistent with its opinion.[27] The Court did not take issue with—and, in their briefing, the petitioners did not challenge the reasonableness of—the Executed Share Model or its allocation of fees among the Participants and the Executing Brokers for the Buyer and for the Seller. Rather, the Court concluded that the 2023 Funding Model Order was arbitrary and capricious because the Commission ''did not explain or justify'' its decision not to preemptively prohibit

the Participants from ''pass[ing] through'' their share of CAT costs onto Industry Members in future fee filings and failed to incorporate actual CAT costs into its economic analysis.[28] The Court stayed its judgment for sixty days following the issuance of its mandate, recognizing that vacatur would ''leave[ ] the CAT without a mechanism for the equitable allocation of costs between self-regulatory organizations and broker-dealers'' and that ''the Commission and the industry need some time to adjust and react to this reality.'' [29] Prior to the effective date of the Court's judgment (December 1, 2025), the Participants filed the Proposed Amendment, seeking to implement an Executed Share Model similar to that in the 2023 Funding Model Amendment with the addition of a provision related to direct pass-through fees.[30]

**III. Discussion and Commission Findings**

The Commission is currently engaged in a comprehensive review of the CAT which is intended to include, among other things, its design and functionality, the scope of information it collects, and an examination of CAT costs.[31] Several commenters suggest that the Proposed Amendment should not be approved in advance of the outcome of that review.[32] FINRA and the Cboe

---

[19] *See* CAT NMS Plan, at Section 11.2(c). *See id.* at Article XI for additional detail.

[20] *See* Securities Exchange Act Release No. 88890, 85 FR 31322 (May 22, 2020).

[21] ''Full Implementation of CAT NMS Plan Requirements'' means ''the point at which the Participants have satisfied all of their obligations to build and implement the CAT, such that all CAT system functionality required by Rule 613 and the CAT NMS Plan has been developed, successfully tested, and fully implemented at the initial Error Rates specified by Section 6.5(d)(i) or less, including functionality that efficiently permits the Participants and the Commission to access all CAT Data required to be stored in the Central Repository pursuant to Section 6.5(a), including Customer Account Information, Customer-ID, Customer Identifying Information, and Allocation Reports, and to analyze the full lifecycle of an order across the national market system, from order origination through order execution or order cancellation, including any related allocation information provided in an Allocation Report. This Financial Accountability Milestone shall be considered complete as of the date identified in a Quarterly Progress Report meeting the requirements of Section 6.6(c).'' CAT NMS Plan, at Section 1.1.

[22] *See* CAT NMS Plan, Section 11.6(a)(i).

[23] *Id.* at Section 11.6(a)(ii) and (iii).

[24] *See* Notice, at 44910; Securities Exchange Act Release No. 98290, 88 FR 62628 (Sept. 12, 2023) (the ''2023 Funding Model Order'')

[25] *Id.*

[26] *See* Notice, at 44911. On November 25, 2025, CAT LLC issued CAT Fee Alert 2025–4, which states that CAT Reporters would not receive further monthly invoices for CAT Fees and for Historical CAT Assessments until further notice. *See* CAT Fee Alert 2025–4, dated Nov. 25, 2025, *available at: https://www.catnmsplan.com/sites/default/files/2025-11/11.25.25-CAT-Fee-Alert-2025-4.pdf.* The Commission anticipates that CAT LLC will establish a new CAT Fee and Historical CAT Assessment, and that the Participants will submit new rule filings pursuant to Section 19(b) of the Exchange Act to implement those fees, after approval of the Proposed Amendment, as modified by the Commission.

[27] *See Am. Sec. Ass'n* v. *SEC,* 147 F.4th 1264 (11th Cir. 2025).

[28] *Id.* at 1269, 1274.

[29] *Id.* at 1280.

[30] *See supra* note 7.

[31] *See* Prepared Remarks Before SEC Speaks, Chairman Paul S. Atkins, May 19, 2025, *available at https://www.sec.gov/newsroom/speeches-statements/atkins-prepared-remarks-sec-speaks-051925.*

[32] *See* Letters to Vanessa Countryman, Secretary, Commission, from Steffen N. Johnson, Wilson Sonsini Goodrich & Rosati, dated October 17, 2025 (''FINRA October 2025 Letter''), at 14–15 and dated Jan. 30, 2026 (''FINRA Wilson Sonsini January 2026 Letter''), at 5; Letter to Vanessa Countryman, Secretary, Commission, from Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, FINRA, dated January 30, 2026, at 2 (''FINRA January 2026 Letter''); Letters to Vanessa Countryman, Secretary, Commission, from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, dated October 17, 2025 (''Citadel October 2025 Letter''), at 14 and dated Jan. 30, 2026 (''Citadel January 2026 Letter''), at 8; Letter, to Vanessa Countryman, Secretary, Commission, from Katie Kolchin, CFA, Managing Director, Head of Equity & Options Market Structure and Joseph Corcoran, Managing Director and Associate General Counsel, Securities Industry and Financial Markets Association, dated October 21, 2025 (''SIFMA October 2025 Letter''), at 4 Letters to Vanessa Countryman, Secretary, Commission, from Christopher A. Iacovella, President & Chief Executive Officer, American Securities Association, dated October 31, 2025 (''ASA October 2025 Letter''), at 2 and dated Feb. 10, 2026 (''ASA January 2026 Letter''), at 2; Letter to Vanessa Countryman, Secretary, Commission, from Gentry Collins, CEO, AmFree Chamber, dated October 17,

Continued

Exchanges, both Participants or representing multiple Participants of the CAT NMS Plan, suggest that the Commission should consider a time-limited interim funding solution.[33]

CAT LLC states in response that it supports the Commission's announced comprehensive review as well as its broader efforts to ensure that CAT achieves its intended regulatory purposes in a cost-effective manner, but asserts that a time-limited, interim funding solution would not address the pressing need to implement a stable funding mechanism for the CAT given the CAT's significant costs and its substantial regulatory value to regulators.[34] CAT LLC cautions that it "should not be assumed that any Participant will voluntarily agree to loan funds to the Company once the operational reserve is exhausted," and that, "absent Commission action to approve a viable funding model for the CAT, there is significant uncertainty regarding the continued operation of the CAT and the Company's ability to continue as a going concern." [35]

The Commission agrees with commenters that it would be premature to adopt a new, permanent funding model while it considers changes to the CAT that could potentially affect its design, functionality, the information it collects, and how and by whom it is funded. Any such changes to the system could bear on the Commission's analysis of options for a permanent funding solution. At the same time, the SROs and the Commission currently rely on CAT to carry out their market

oversight functions, and a defined funding source is needed to ensure its continued existence and funding during the period in which the Commission conducts its review. Operating CAT without consistent, defined funding during this interim period would be a potentially destabilizing option, that is inconsistent with the CAT NMS Plan's premise that the costs of CAT are to be allocated to both the Participants and Industry Members.[36]

As discussed in detail below, the Commission concludes that the Proposed Amendment constitutes a reasonable approach to allocating the costs of CAT during the interim period. The Commission is therefore approving the Proposed Amendment, with a modification, pursuant to Rule 608(b)(2), that provides for a two-year deadline for the proposed funding model. Specifically, new subparagraph (f) to Section 11.3 (Recovery) of the CAT NMS Plan will state the following:

*(f) Time Limitation. The Company, the Plan Processor and the Participants will not be permitted to bill or otherwise request the payment of CAT Fees or Historical CAT Assessments from Industry Members after March 31, 2028. No Industry Member can be required to directly contribute to the funding of the CAT by the Company, the Plan Processor, or any Participant after such date except for CAT Fees or Historical CAT Assessments billed to the Industry Member prior to March 31, 2028.*

This provision will effectively end the collection of fees pursuant to the funding model in the Proposed Amendment in two years absent further action by the Commission. To the extent that commenters disagree with the Commission's conclusions regarding the likely effects of the Proposed Amendment, the Commission will be able to take the experience with this interim funding model into account when considering a longer-term replacement.

After careful review, the Commission, pursuant to Section 11A of the Exchange Act,[37] and Rule 608(b)(2) [38] thereunder, is approving the Proposed Amendment, as modified by the Commission, to provide for funding of the CAT for a two-year interim period while the Commission engages in its comprehensive review of the CAT. Section 11A of the Exchange Act authorizes the Commission, by rule or order, to authorize or require the self-regulatory organizations to act jointly with respect to matters as to which they

share authority under the Exchange Act in planning, developing, operating, or regulating a facility of the national market system.[39] Rule 608 of Regulation NMS authorizes two or more SROs, acting jointly, to file with the Commission proposed amendments to an effective NMS plan,[40] and further provides that the Commission shall approve an amendment to an effective NMS plan if it finds that the amendment is necessary or appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanisms of, a national market system, or otherwise in furtherance of the purposes of the Exchange Act.[41]

The Participants have sufficiently demonstrated that the proposed allocation of fees is appropriate and meets the Rule 608(b) approval standard. In the interim period during which the Commission undertakes its comprehensive review of the CAT, the CAT must be funded to ensure that the SROs and the Commission can continue to fulfill their regulatory responsibilities to oversee the equities and options markets. There are a number of potential approaches to allocating the costs of operating the CAT, all of which have relative strengths and weaknesses. The CAT NMS Plan requires both Execution Venues (which include the Participants) and Industry Members (which include CAT Executing Brokers) to fund the CAT. The Proposed Amendment provides for the allocation of one-third of CAT fees each to the applicable Participant in a transaction, the CAT Executing Broker for the buyer in a transaction, and the CAT Executing Broker for the seller in a transaction.[42] In our view, splitting the costs of the CAT evenly among the buyer, seller, and market regulator in transactions reportable to the CAT—at least during this interim period—constitutes a reasonable and equitable allocation of costs among the primary parties that participate in and benefit from such trading activity and the market oversight CAT enables.

Unlike the funding model approved in the 2023 Funding Model Order, the Proposed Amendment, as modified by the Commission,[43] states that no Participant will file with the SEC a proposed rule change pursuant to Section 19(b) and Rule 19b–4 thereunder that would establish a new

---

2025 ("AmFree Letter"), at 1; Letter to Vanessa Countryman, Secretary, Commission, from Patrick Sexton, EVP, General Counsel, Corporate Secretary, Cboe Exchanges, dated October 31, 2025 ("Cboe Letter"), at 2; Letter to Vanessa Countryman, Secretary, Commission, from Joanna Mallers, Secretary, PTG, dated Nov. 24, 2025 ("PTG Letter"), at 2; The Cboe Exchanges include Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe C2 Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., and Cboe Exchange, Inc. (collectively, "the Cboe Exchanges"). *See* Cboe Letter, at 1, n.1.

[33] *See* Cboe Letter, at 2; FINRA October 2025 Letter; FINRA Wilson Sonsini January 2026 Letter, at 5.

[34] *See* CAT LLC December 2025 Response Letter, at 9.

[35] *Id.* at 13. In a comment letter submitted in connection with the 2023 Funding Model Amendment, a commenter objected to a reference to the financial viability of the CAT as an attempt to "coerce the Commission into prematurely opining on a funding proposal that does not meet basic Exchange Act requirements." *See* Letter to Vanessa Countryman, Secretary, Commission, from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities, dated August 22, 2023 ("Citadel August 2023 Letter"), at 1. For the reasons explained in this order, the Proposed Amendment, as modified by the Commission, meets the applicable standard for approval.

[36] *See* CAT NMS Plan, at Section 11.2(b).

[37] 15 U.S.C. 78k–1.

[38] 17 CFR 242.608(b)(2).

[39] *See* 15 U.S.C. 78k–1(a)(3)(B).

[40] *See* 17 CFR 242.608.

[41] *See* 17 CFR 242.608(b)(2).

[42] *See infra* Part III.A.2.

[43] *See supra* note 10 and accompanying text.

fee for passing through to its members the CAT fee charged to such Participant.[44] The Commission believes that this prohibition on directly passing through CAT fees by Participants reasonably aligns with the premise of the Plan since the time of its approval that there is to be an ''allocation of the costs'' of CAT among the Participants and Industry Members.[45] The proposed prohibition reasonably responds to the concern that a Participant's ability to create a new fee directly passing-through the one-third share of CAT costs that the Plan allocates to the Participant calls into question whether there is an ''allocation of the costs'' of the CAT as contemplated by the Plan.[46] By precluding the simple filing of a new fee to directly pass through CAT costs, it places Participants in a similar position as Industry Members who must also make decisions as to how to fund their financial obligations to the CAT in the context of their overall regulatory and business expenses.

The provision would not prohibit Participants from funding their share of CAT costs through other mechanisms that may indirectly result in Industry Members (or others, including investors) ultimately bearing those costs, any more than it limits Industry Members' discretion to pass some or all of their costs onto their customers. As both a legal and practical matter, the Plan's cost-sharing premise governs the *initial* allocation of costs between Participants and Industry Members. From the inception of the CAT NMS Plan, the Commission has recognized both that some portion of the costs of the CAT should be allocated to the Participants and that the Exchange Act expressly permits the Participants to recover their regulatory costs—including the portion of costs that the Plan allocates to them—from their members through fee filings, subject to the requirements of the Act.[47]

Similarly, the Commission has long recognized that, despite the initial allocation of CAT costs to the Participants and Industry Members, ''some or most of the costs of CAT will be passed on to investors.'' [48] Thus, while the Proposed Amendment prevents the Participants from effectively altering the initial allocation of costs by directly passing their share through to Industry Members, the Plan has never purported to regulate the business decisions individual Participants or Industry Members may make to finance the costs they incur to comply with their regulatory obligations, including the costs allocated to them by the Plan.

In leaving open the possibility that the Participants could propose to recover their share of costs from Industry Members indirectly by increasing existing fees, the Commission is making no determination that it would be permissible to so recover costs in any particular instance. To the extent a Participant were to seek to offset the CAT costs it incurs by raising the rates of its other member fees, any such indirect pass-through fees would be subject to the rule filing process under Section 19(b)(2) of the Act and must be reasonable, equitable, and not unfairly discriminatory.[49] Participants must file proposed rule changes relating to fees with the Commission and these proposed rule changes are published by the Commission and there is an opportunity for public comment. The Commission has a statutory obligation to suspend and disapprove proposed rule changes if they do not satisfy the Act's requirements.[50] Moreover, if the

Participants were to attempt to increase existing fees for the purpose of recovering their share of CAT costs during the two-year period in which the Proposed Amendment is in effect, the Commission can take that experience into account in assessing options for a longer-term funding model. But the Commission cannot now assess a hypothetical future fee filing by an unknown Participant seeking recovery of an unknown amount of costs in an unknown manner under unknown circumstances. While this order therefore makes no determination as to the lawfulness of any future attempt by a Participant to indirectly pass through its share of CAT costs, the Commission nonetheless considers ''the effects of potential broker-dealer only funding'' of CAT for the next two years below,[51] consistent with the Eleventh Circuit's opinion.[52]

The use of executed equivalent share volume provides an appropriate basis for the calculation of CAT fees. Executed equivalent share volume is readily determinable and—because it is based on trading activity, which impacts CAT costs—provides a reasonable proxy for the costs to CAT, allowing CAT Reporters to be assessed fees corresponding to the cost burden they impose on the CAT. Charging CAT Executing Brokers is also appropriate because the proposed Executed Share Model is based on *executed* equivalent shares (emphasis added). Therefore, charging the CAT Executing Brokers would reflect their executing role in each transaction, which is already recorded in transaction reports from the exchanges and FINRA's equity trade reporting facilities. Because such entities are already identified and their CAT fees are known, this method could streamline the billing process and allow such entities to calculate their own fees. The Commission also concludes that the division of fees into Prospective CAT Fees and the Historical CAT Assessment provides an appropriate method of allowing Participants to ensure funding for operation of the system during the interim period. In addition, the provision of fee calculation information, approach to billing and collection of fees, conforming changes and the proposal for a fee schedule are all appropriate, and will provide transparency to CAT Reporters regarding the calculation of their CAT

---

[44] *See* proposed Section 11.3(e).

[45] *See* CAT NMS Plan Approval Order, at 84795; *see also* CAT NMS Plan Section 11.2(b); *Am. Secs. Ass'n,* 147 F.4th at 1274–75.

[46] *See Am. Secs. Ass'n,* 147 F.4th at 1274–75, 1279 & n.1 (discussing FINRA fees directly passing through FINRA's share of CAT costs). For example, the FINRA pass-through fees highlighted by the Eleventh Circuit were specific ''cost recovery fee[s] designed to permit FINRA to recoup its designated portion of the reasonably budgeted CAT costs of the [CAT NMS Plan].'' *See* Securities Exchange Act Release No. 103373 (July 2, 2025), 90 FR 30171, 30171 (July 8, 2025) (SR–FINRA–2025–010).

[47] For example, in adopting Rule 613 in 2012, the Commission explained that ''although the [SROs] likely would initially incur the costs to establish and fund the central repository''—*i.e.,* to establish and operate CAT—''directly, they may seek to recover some or all of these costs from their members.'' Securities Exchange Act Release No. 67457 (July 18, 2012), 77 FR 45722, 45795 (Aug. 1, 2012) (''Rule 613 Adopting Release''). In approving

the Plan in 2016, the Commission similarly acknowledged that the Exchange Act permits the Participants to recover their regulatory costs through fees on members if such fees meet the requirements of the Act. *See, e.g.,* CAT NMS Plan Approval Order, at 84794 (''The Participants, as SROs, have traditionally recovered their regulatory costs through the collection of fees from their members, and such fees are specifically contemplated by the Exchange Act . . . . [S]uch fees must be consistent with applicable statutory standards under the Exchange Act.''); *id.* (''[T]he Exchange Act specifically permits the Participants to charge members fees to fund their self-regulatory obligations.''); *id.* at 84796–97 (''[T]he Exchange Act permits the Participants to assess fees among their members to recoup their regulatory costs, as long as such fees meet the applicable Exchange Act standards.''). This understanding is also reflected in the Commission's assumption in the CAT NMS Plan Approval Order that the Participants would recover from Industry Members 100% of the CAT development costs they had incurred to date. *See id.* at 84,855, 84,858, 84, 864.

[48] *See* CAT NMS Plan Approval Order, at 84863.

[49] *See* Section 6(b)(4); Section 15A(b)(5); Section 6(b)(5); Section 15A(b)(6). 15 U.S.C. 78f(b)(4); 15 U.S.C. 78f(b)(6); 15 U.S.C. 78o–3(b)(5); 15 U.S.C. 78o–3(b)(6).

[50] *See Bloomberg L.P.* v. *SEC,* 45 F.4th 462, 476 (D.C. Cir. 2022) (recognizing that the Commission

''has control over proposed [SRO] fees and will not approve them unless they are reasonable and equitable such that they are consistent with the Exchange Act'').

[51] *See infra* Part IV.B.

[52] *See Am. Secs. Ass'n,* 147 F.4th at 1275.

Fees and should permit CAT Execution Brokers the ability to confirm the accuracy of their invoices for CAT Fees.

As discussed above, the Commission is modifying the Proposed Amendment to provide for a two-year limitation on collecting funds from Industry Members under this funding model. This limitation could be removed in the future, but removing the limitation (and thus codifying the funding model in the Proposed Amendment) would require another CAT NMS Plan amendment, either submitted by the Participants and approved by the SEC, or initiated by Commission rulemaking. The Commission believes that this is appropriate in light of the Commission's ongoing comprehensive review of the CAT,[53] and potential benefits of further deliberation on the mechanism and system for funding the CAT on a long-term basis. The Commission is therefore approving the Proposed Amendment, as modified and discussed above.

*A. Funding Model*

1. Overview

CAT LLC proposes to replace the funding model set forth in Article XI of the CAT NMS Plan ("Original Funding Model") with the Executed Share Model. The Executed Share Model is in most material respects identical to the funding model approved in the 2023 Funding Model Order, with the exception of the prohibition on new fees to directly pass-through costs incurred by the Participants to Industry Members. The Original Funding Model involved a bifurcated approach, where costs associated with building and operating the CAT would be borne by (1) Industry Members (other than alternative trading systems ("ATSs") that execute transactions in Eligible Securities ("Execution Venue ATSs")) through fixed tiered fees based on message traffic for Eligible Securities, and (2) Participants and Industry Members that are Execution Venue ATSs for Eligible Securities through fixed tiered fees based on market share.[54] In contrast, the Executed Share Model would charge fees based on the

executed equivalent share volume of transactions in Eligible Securities.[55] In addition, instead of charging fees to Industry Members, under the Executed Share Model, fees would be charged to each Industry Member that is a CAT Executing Broker[56] for the buyer in a transaction in Eligible Securities ("CAT Executing Broker for the Buyer" or "CEBB") and each Industry Member that is the CAT Executing Broker for the seller in a transaction in Eligible Securities ("CAT Executing Broker for the Seller" or "CEBS").[57]

Under the Executed Share Model, CAT LLC proposes to establish two categories of CAT fees. The first category of CAT fees would be fees payable by Participants and Industry Members that are CAT Executing Brokers for the Buyer and for the Seller with regard to CAT costs not previously paid by the Participants ("Prospective CAT Costs").[58] The second category of CAT fees would be fees ("Historical CAT Assessments") to be payable by Industry Members that are CAT Executing Brokers for the Buyer and for the Seller with regard to CAT costs previously paid by the Participants ("Past CAT Costs").[59]

For each category of fees, each CEBB and each CEBS will be required to pay a CAT fee for each such transaction in Eligible Securities in the prior month based on CAT Data.[60] The CEBB's CAT fee or CEBS's CAT fee (as applicable) for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the reasonably determined Fee Rate,[61] as described below.[62] Participants would incur CAT Fees only for Prospective CAT Costs and the Participant CAT Fee will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the reasonably determined Fee Rate.[63] The Participants' one-third share of

Historical CAT Costs[64] and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans.[65]

FINRA CAT would be responsible for calculating the CAT fees and submitting invoices to the CAT Executing Brokers based on this CAT Data.[66] All data used to calculate the fees under the Executed Share Model would be CAT Data, and, therefore, it would be directly available through the CAT to FINRA CAT for calculating CAT fees.[67] CAT fees would be charged to Industry Members pursuant to separately filed proposed rule filings pursuant to Section 19(b) of the Exchange Act,[68] establishing the amounts of the proposed CAT Fees and Historical CAT Assessments to be charged to Industry Members, subject to the satisfaction of applicable Financial Accountability Milestones as set forth in Section 11.6 of the CAT NMS Plan and the implementation of the billing and collection system for the CAT fees.[69] In each proposed rule filing, if the Participants seek to recover amounts under the Financial Accountability Milestones, they would need to discuss their completion of the applicable milestone.[70]

Commenters state that the Proposed Amendment lacks input from the industry.[71] One commenter states that the SROs through the CAT Operating Committee have for years sought to establish a funding model for CAT without meaningful industry input, including the Proposed Amendment

---

[53] *See* Securities Exchange Act Release No. 104144 (Sept. 30, 2025), 90 FR 47853, 47854 (Oct. 2, 2025) (stating that "the Chairman of the Commission instructed the staff to undertake a comprehensive review of the CAT" and citing Prepared Remarks Before SEC Speaks, Chairman Paul S. Atkins, May 19, 2025, *available at https:// www.sec.gov/newsroom/speeches-statements/ atkins-prepared-remarks-sec-speaks-051925*). *See also* SIFMA October 2025 Letter, at 2 (stating that the commenter "wholeheartedly" supports the announced comprehensive review of the CAT and is submitting a separate letter with several high-level recommendations).

[54] *See* CAT NMS Plan, at Section 11.3(a) and (b).

[55] *See* Notice, 90 FR at 44917–19.

[56] *See infra* Part III.A.4. for the definition of CAT Executing Broker.

[57] *See* Notice, 90 FR at 44919.

[58] *Id.,* at 44916; *see also* proposed Section 11.3(a). The defined term "CAT Fees" applies specifically to CAT fees related to Prospective CAT Costs. *Id.*

[59] *See* Notice, 90 FR at 44920; *see also* proposed Section 11.3(b).

[60] *See* Notice, 90 FR at 44919; *see also* proposed Section 11.3(a)(iii), proposed Section 11.3(b)(iii).

[61] *See infra* Part III.A.5.a. (Prospective CAT Fees—Fee Rate Formula) for the definition and description of the calculation of the Fee Rate.

[62] *See* Notice, 90 FR at 44919; *infra* Parts III.A.2 and III.A.5.a. *See also* proposed Section 11.3(a)(iii), proposed Section 11.3(b)(iii).

[63] *See* Notice, 90 FR at 44919; *see also* proposed Section 11.3(a)(ii).

[64] The actual amount of Past CAT Costs to be recovered through the Historical CAT Assessments would be reduced by an amount of excluded costs. The resulting amount would be defined as "Historical CAT Costs" in proposed Section 11.3(b)(i)(C) of the CAT NMS Plan. *See infra* Part III.A.6.a. for a discussion of Historical CAT Costs.

[65] *See* proposed Section 11.3(b)(ii).

[66] *See* Notice, 90 FR at 44913.

[67] *Id.*

[68] 15 U.S.C. 78s(b).

[69] *See* Notice, 90 FR at 44923.

[70] Proposed Section 11.3(b)(iii)(B)(III) would prohibit any Participant from filing proposed rule filings pursuant to Section 19(b) of the Exchange Act regarding any Historical CAT Assessment until any applicable Financial Accountability Milestone in Section 11.6 of the CAT NMS Plan has been satisfied.

[71] *See, e.g.,* SIFMA October 2025 Letter, at 3; PTG Letter, at 3. *See also* FINRA June 2022 Letter, at 8, 9 (advocating for a more inclusive development process that would include input from the industry); Letter to Vanessa Countryman, Secretary, Commission, from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, dated July 14, 2023 ("Citadel July 2023 Letter"), at 9–10.

which was filed without prior consultation with Industry Members.[72]

Two of these commenters submitted comment letters stating that they incorporate prior comment letters submitted regarding the 2023 Funding Model Amendment.[73] Because the 2023 Funding Model Amendment is substantively identical to the Proposed Amendment, with the exception of the pass-through prohibition discussed in Part III.A.2 below, the Commission is considering comment letters from these two commenters regarding the 2023 Funding Model Amendment to the extent that they are still applicable to the Proposed Amendment. In addition, the Commission is considering CAT LLC's responses to those previous comment letters, submitted in various response letters by CAT LLC in the context of the 2023 Funding Model Amendment.[74] The Commission is not otherwise discussing or considering comment letters submitted in connection with the 2023 Funding Model Amendment, which was a proposed amendment to the CAT NMS Plan that was subject to its own distinct comment period.

In connection with the 2023 Funding Model Amendment, one of these commenters states that the Operating Committee refuses to engage the industry in constructive dialogue, instead choosing to file funding proposals that are inconsistent with the Exchange Act.[75] The commenter also states that the CAT Advisory Committee has been completely ignored by the Operating Committee and that its recommendations are non-binding.[76]

CAT LLC states that commenters incorrectly state that the Proposed Amendment lacks input from the industry and that CAT LLC has engaged with the industry extensively and in good faith since 2016 as it has explored different approaches to CAT funding and considered various CAT funding issues, and as detailed in the CAT LLC May 2023 Response Letter and CAT LLC

July 2023 Response Letter.[77] CAT LLC previously stated that it has engaged with the industry on the funding model over the prior seven years, explaining that it has discussed funding model issues with the CAT Advisory Committee, which includes representation from the industry, as well as with industry associations such as SIFMA and the Financial Information Forum, and with individual Industry Members; analyzed and responded to comment letters on the prior proposals; and hosted webinars for the industry on funding issues.[78] CAT LLC listed ideas suggested by the industry that it adopted in revised versions of the funding model in 2023,[79] which is largely identical to the funding model proposed in the Proposed Amendment, and previously stated that "the current model results from years of modifications that have been made in significant part in response to industry comments to earlier versions."[80] CAT LLC previously stated that it welcomes industry input on the funding model but believes a decision on the model is overdue.[81] CAT LLC states that it remains "committed to working constructively with the industry on issues related to CAT funding."[82]

2. Allocation of Fees Between Participants and Industry Members

Under the Executed Share Model, CAT fees would be allocated one-third to the applicable Participant, one-third to the CEBS and one-third to the CEBB of a transaction. Certain commenters opposed the proposed allocation.[83]

Comments on the 2023 Funding Model Amendment

In comment letters submitted previously in response to the 2023 Funding Model Amendment, and incorporated by reference in the FINRA October 2025 Letter, FINRA stated that, while the Proposed Amendment justified the fairness of the Executed Share Model because it would operate like other fees, such as FINRA's Trading Activity Fee ("TAF"), Section 31 fees, and the options regulatory fee,[84] the Proposed Amendment did not support why those fee frameworks should be used as a model in this context.[85] For example, FINRA stated that the TAF is designed to recover the costs of FINRA's regulatory activities, while the CAT fees are intended to align with the costs to build, operate and administer the CAT.[86] Further, FINRA stated that the Proposed Amendment has insufficiently explained the connection between the TAF and CAT fees, merely stating that they are similar fees because they are transaction-based fees used to provide funding for regulatory costs.[87] FINRA stated that "CAT LLC's observations superficially focus on the fact that these fees also use transaction-based metrics (and may be assessed on members) and neglects other factors relevant to the analysis including, for example, that these fees are used in combination with other funding mechanisms and metrics to support an overall funding framework."[88]

Furthermore, in a comment on the 2023 Funding Model Amendment that FINRA incorporated by reference because it applies to the Proposed Amendment, FINRA objected to statements that Industry Members can pass through to their customers their CAT cost allocation and additional costs resulting from an increase in FINRA

---

[72] See SIFMA October 2025 Letter, at 3; *supra* note 27.

[73] See Citadel January 2026 Letter, at 5 n.5 (stating that Citadel Securities incorporates and restates the comments set forth in all of its prior submissions regarding the CAT); FINRA October 2025 Letter, at 4 (incorporating by reference FINRA's prior comment letters concerning the Executed Share Model and the 2023 Funding Model Amendment). Comments received in response to the 2023 Funding Model Amendment can be found on the Commission's website at *https://www.sec.gov/comments/4-698/4-698-a.htm.*

[74] See CAT LLC December 2025 Response Letter at 3, n.10 (stating that CAT LLC incorporates by reference its prior letters concerning the Executed Shares Model).

[75] See Citadel July 2023 Letter, at 9–10.

[76] Id. at 6.

[77] See CAT LLC December 2025 Response Letter, at 6.

[78] See Letter to Vanessa Countryman, Secretary, Commission, from Brandon Becker, Chair, CAT NMS Plan Operating Committee, dated May 18, 2023 ("CAT LLC May 2023 Response Letter"), at 12; Letter to Vanessa Countryman, Secretary, Commission, from Brandon Becker, CAT NMS Plan Operating Committee Chair, dated July 28, 2023 ("CAT LLC July 2023 Response Letter"), at 26–27; *see also* CAT LLC December 2025 Response Letter, at 6 (stating that, as "discussed in detail" in the CAT LLC May 2023 Response Letter, and CAT LLC July 2023 Response Letter, CAT LLC has engaged with the industry—including the CAT Advisory Committee, industry associations, as well as individual Industry Members—extensively and in good faith since 2016 as it has explored different approaches to CAT funding and considered various CAT funding issues).

[79] See CAT LLC July 2023 Response Letter, at 27–28.

[80] Id. at 28. CAT LLC also stated that it has "repeatedly sought the views of SIFMA and other industry participants on specific aspects of the model." Id.

[81] See CAT LLC May 2023 Response Letter, at 12.

[82] See CAT LLC December 2025 Response Letter, at 6.

[83] See Citadel October 2025 Letter, at 6–8; Citadel July 2023 Letter; Citadel August 2023 Letter; ASA October 2025 Letter, at 2 (stating that "neither Rule

613 nor the national market system (NMS) plan adopted for the CAT in 2016 authorizes a single dollar of those expenses to be paid by broker-dealers"); Letters to Vanessa Countryman, Secretary, Commission, from Marcia E. Asquith, Corporate Secretary, EVP, Board and External Relations, FINRA, dated May 25, 2023 ("FINRA May 2023 Letter"); April 11, 2023 ("FINRA April 2023 Letter"); and June 22, 2022 ("FINRA June 2022 Letter") (the FINRA June 2022 Letter was submitted in response to the prior funding proposal and was attached and incorporated by reference in the FINRA April 2023 Letter).

[84] See Notice, 90 FR at 44926–27.

[85] See FINRA June 2022 Letter, at 4. See also 2023 Funding Model Amendment Approval Order, at 62630.

[86] See FINRA April 2023 Letter, at 8.

[87] Id. FINRA also stated that "it is unclear how assessing on FINRA the largest allocation of the SRO portion of CAT expenses 'provides funding for regulatory costs' in any reasonable and equitable sense comparable to the TAF. . ." Id.

[88] See FINRA May 2023 Letter, at 3.

fees.[89] FINRA stated that "[s]ummarily stating that investors can be made to bear the costs resulting from the Funding Model without a detailed description of and transparency into how these fees would be determined or passed on to customers is inadequate, and does not provide interested parties sufficient information to consider the costs and benefits related to the Fee Proposal." [90] In response to that comment on the 2023 Funding Model Amendment, CAT LLC stated that Industry Members can pass through their own CAT fees to their customers, like broker-dealers do for transaction-based fees.[91] CAT LLC stated that this may result in Industry Members not having any funding burden if they decide to entirely pass-through their allocation to investors.[92] CAT LLC also stated that Participants are permitted by the Exchange Act to charge their members fees to fund the Participants' share of CAT fees, as long as they submit fee filings that demonstrate that any proposed fee is consistent with the Exchange Act.[93]

Another commenter states that the proposed CAT funding model cannot be compared to Section 31 fees, the TAF, or the options regulatory fee because the commenter believes that CAT fees appear to be unconstrained and out of the industry's control.[94] The commenter explains that, unlike the proposed CAT fees, Section 31 fees are based on an annual budget set by Congress and the options regulatory fee is only applied to customer transactions and thus can be easily passed-on to other market participants (unlike CAT fees for market making activity).[95] Additionally, the commenter states that there is no precedent for fees to be allocated to Industry Members in perpetuity, stating that this would contravene the Exchange Act.[96]

In response to the comment stating that there is no precedent for CAT fees to be allocated to Industry Members in perpetuity, and that the Exchange Act would not allow CAT LLC to require Industry Members to fund unlimited costs in perpetuity,[97] CAT LLC states that the proposed allocation would not require Industry Members to fund all costs since it would divide CAT costs such that one-third would be paid each by the Participant, CEBB and CEBS in a transaction.[98] Furthermore, CAT LLC states that fees would not be paid in perpetuity, as the Fee Rate set by the Operating Committee at the beginning of each year would be based on reasonably budgeted CAT costs and projected total executed equivalent share volume for the year and would be adjusted mid-year, and that to implement the Fee Rates, the Participants would need to file fee filings pursuant to Rule 19b–4 with the Commission that must be consistent with the Exchange Act and allow the public the opportunity to comment on the fees.[99] CAT LLC adds that the Executed Share Model would operate similarly to other fees that the Commission has determined are consistent with the Exchange Act, such as Participants' sales value fees related to Section 31, the TAF and the options regulatory fee, and that the comment did not recognize that Industry Members can choose to pass-through CAT fees to their customers like they do the Section 31-related sales value fees.[100]

FINRA also states that the Proposed Amendment did not justify why the proposed allocation by thirds to the Participant, buy-side and sell-side is equitable in the context of the CAT NMS Plan.[101] FINRA also states that the Proposed Amendment did not consider alternatives suggested by commenters on a prior proposed funding model,[102] such as a model similar to Section 31 fees and a CAT funding model based on the "Cost Recovery Principle" and the "Benefits Received Principle." [103] FINRA urges the Commission to require those alternatives to be analyzed.[104] Another commenter states that once analyzed by the Commission, "it will be clear" that allocating at least two-thirds of CAT system costs to broker-dealers

and their customers in the manner contemplated by the Proposed Amendment is not fair and equitable under the Exchange Act, and that that Commission must also consider the economic implications of the "winners and losers" in terms of the proposed allocation of costs.[105]

In response to the comment stating that the Participants had not analyzed a suggested Section 31-style approach to a funding model,[106] CAT LLC stated in a response letter submitted for the 2023 Funding Model Amendment that the CAT fee approach is similar to the Section 31 fee approach in how an exchange would be obligated to pay a transaction fee based on transactions occurring on that exchange, and that FINRA would be obligated to pay a transaction fee based on transactions in the over-the-counter market.[107] CAT LLC stated that the approaches are also similar because, in both, an exchange would be able to determine to pass the fee onto its members, as would FINRA.[108] CAT LLC stated that if the Section 31 approach would comply with the Exchange Act, then the proposed CAT fee approach should also comply with the Exchange Act and CEBBs and CEBSs could determine whether to pass such fees onto their clients.[109]

In response, FINRA stated that the CAT LLC May 2023 Response Letter misrepresented the commenter's letter by incorrectly stating that the commenter's letter recommended an approach similar to Section 31 fees.[110] FINRA clarified that it was noting that the Commission had received comments suggesting a model like the Section 31 fees, that the Participants had not "meaningfully analyzed" the suggested alternatives in the Proposed Amendment, and that the Commission should require the Participants to analyze the alternatives.[111]

CAT LLC further responded to FINRA's objections to the use of the TAF as precedent for CAT fees—specifically, FINRA's statement that unlike the proposed CAT fees, the TAF recovers the costs of FINRA's regulatory activities, while the Proposed Amendment is designed to align with the costs to build, operate and administer the CAT.[112] CAT LLC stated that there is no distinction between the

---

[89] See FINRA April 2023 Letter, at 6–7.

[90] Id. at 7.

[91] See CAT LLC July 2023 Response Letter, at 8.

[92] Id.

[93] See CAT LLC July 2023 Response Letter, at 9.

[94] See Citadel July 2023 Letter, at 27. See also 2023 Funding Model Order, at 62630–31.

[95] Id. The commenter also stated that FINRA has sought to avoid increases in the TAF. Id.

[96] Id. This commenter states that it is inequitable to require Industry Members to fund CAT costs in perpetuity when they lack representation on the Operating Committee and therefore have little transparency into the drivers of the costs, and there is no plan to contain the costs. See id. at 2.

[97] See Citadel July 2023 Letter, at 27.

[98] See CAT LLC July 2023 Response Letter, at 14.

[99] Id.

[100] Id.

[101] See FINRA June 2022 Letter, at 3.

[102] See Securities Exchange Act Release Nos. 94984 (May 25, 2022), 87 FR 33226 (June 1, 2022); 96394 (Nov. 28, 2022), 87 FR 74183 (Dec. 2, 2022); and Letter from Michael Simon, Chair Emeritus, CAT NMS Plan Operating Committee, to Vanessa Countryman, Secretary, Commission (Feb. 15, 2023).

[103] See FINRA April 2023 Letter, at 5 (citing Letter to Vanessa Countryman, Secretary, Commission, from Lawrence Harris, Fred V. Keenan Chair in Finance, Professor of Finance and Business and Economics, U.S.C. Marshall School of Business, dated June 21, 2022).

[104] Id.

[105] See Citadel October 2025 Letter, at 8.

[106] See FINRA April 2023 Letter, at 5.

[107] See CAT LLC May 2023 Response Letter, at 9.

[108] Id.

[109] Id.

[110] See FINRA May 2023 Letter, at 3, n.8.

[111] Id.

[112] See FINRA May 2023 Letter, at 3.

two points raised by the commenter because CAT only has a regulatory purpose; therefore, costs to build, operate and administer the CAT are inherently regulatory costs.[113] CAT LLC also noted that FINRA distinguished the TAF from the proposed CAT fees by describing the TAF as being used in combination with other funding mechanisms to support a funding framework, but CAT LLC stated that ''this does not change the general conclusion that a transaction-based fee complies with the Exchange Act.'' [114]

In a comment letter submitted previously in response to the 2023 Funding Model Amendment, a commenter states that the Proposed Amendment does not demonstrate that it is equitable, as required by Section 6(b)(4),[115] or rational, as required by the Administrative Procedure Act,[116] to allocate two-thirds of CAT costs to Industry Members, stating that ''there is no suggestion that Industry Members somehow receive 67% of the benefits from CAT.'' [117] Furthermore, the commenter states that the Proposed Amendment would result in an inequitable allocation to a small number of Industry Members.[118]

In response to comments that object to the proposed allocation to Industry Members because Industry Members would not benefit from the CAT,[119] CAT LLC states allocating costs based on who benefits from the CAT is ''not appropriate or practical.'' [120] CAT LLC states that the CAT is intended to benefit all market participants, explaining how it would benefit Industry Members, and stated that it would be ''impractical to determine a model that allocates a measurable amount of benefit that each market participant receives from the CAT.'' [121] In response to a commenter that suggests that Industry Members should not be allocated any ''costs for matters that primarily benefit the CAT Operating Committee or the SROs.'' [122] CAT LLC disagrees that Industry Members do not benefit from the CAT because CAT is critical for the protection of investors and because CAT supports fair and efficient markets.[123] CAT LLC also states that it was not ''reasonable or practical to attempt to

parse CAT costs by who 'primarily benefits' from those costs.'' [124]

The commenter also states that the Proposed Amendment would result in the allocation of all of the costs to build and operate the CAT to Industry Members and would therefore be inconsistent with Section 6(b)(4) to equitably allocate reasonable fees.[125] The commenter states that, in addition to the proposed allocation to Industry Members, FINRA's 11% cost allocation would be passed-on to Industry Members and that exchanges would also pass-on their 22% cost allocation.[126] The commenter stated that, with FINRA's allocation, 78% of the costs to build and operate the CAT would be allocated to Industry Members under the 2023 Funding Model Amendment.[127] The commenter stated that 78% is the same amount allocated to Industry Members in a prior CAT funding model proposal from 2021, and states that in the 2023 Funding Model Amendment, the Operating Committee concedes that the 2021 allocation ''may have an adverse effect on competition, liquidity or other aspects of market structure,'' [128] however the 2023 Funding Model Amendment does not explain why using a different metric—executed share volume rather than message traffic—to create the same allocation would not result in similar consequences.[129]

Further, the commenter states that Industry Members may also be required to pay the exchange cost allocation,[130] citing a statement in the 2023 Funding Model Amendment that ''each Participant may determine to charge their members fees to fund their share of the CAT fees.'' [131] The commenter states that if exchanges choose to do this, then Industry Members would be responsible for 100% of CAT costs, which would ''distort incentives and hinder the prioritization of critical cost-control measures, as the firms governing CAT are not bearing any of the

associated costs.'' [132] The commenter requests that the Commission prohibit exchanges from passing-on their CAT costs.[133] The commenter also states that even after restructuring the funding model to base allocation on share volume instead of message traffic, as in prior funding model proposals, the allocation to exchanges stayed the same, arguing that the exchanges are unwilling to allocate themselves more than 22% of total costs.[134] The commenter states that the proposed allocation methodology is inconsistent with the Exchange Act because of the excessive percentage of total costs proposed to be allocated to Industry Members and the unfair method of allocating costs among Industry Members,[135] stating, ''[t]he allocation methodology will have a direct and negative impact on market efficiency, competition, and capital formation, and the Commission must comprehensively assess those impacts before approving this filing.'' [136]

In response to comments that state that Industry Members could bear 100% of CAT costs if Participants decide to pass-through their costs to them,[137] and in the context of the 2023 Funding Model Amendment, CAT LLC states that Industry Members can pass through their own CAT fees to their customers, like broker-dealers do for transaction-based fees.[138] CAT LLC states that this may result in Industry Members not having any funding burden if they decide to entirely pass-through their allocation to investors.[139] In response to commenters that request that Participants be prohibited from passing-on their CAT costs to their members,[140] CAT LLC states that Participants are permitted by the Exchange Act to charge their members fees to fund the Participants' share of CAT fees, as long as they submit fee filings that demonstrate that any proposed fee is consistent with the Exchange Act.[141] As discussed below, unlike the 2023 Funding Model Amendment, the Proposed Amendment includes a proposed provision limiting the ability of Participants to establish new fees to pass-through their CAT costs.

[113] See CAT LLC July 2023 Response Letter, at 35.

[114] Id.

[115] 15 U.S.C. 78f(b)(4).

[116] 5 U.S.C. 551 et seq.

[117] See Citadel July 2023 Letter, at 17.

[118] Id.

[119] See Citadel July 2023 Letter, at 17.

[120] See CAT LLC July 2023 Response Letter, at 10.

[121] Id. at 11.

[122] See Citadel July 2023 Letter, at 32.

[123] See CAT LLC July 2023 Response Letter, at 13.

[124] Id. at 12. See also id. at 13.

[125] Id. at 1, 16, 22.

[126] Id. at 1, 21, 22.

[127] Id. at 21.

[128] Id.

[129] See Citadel July 2023 Letter, at 21.

[130] Id. at 22. See also Citadel August 2023 Letter, at 2.

[131] See Citadel July 2023 Letter, at 22. See also 2023 Funding Model Amendment, 88 FR at 17107. The commenter also states that while the 2023 Funding Model Amendment describes the funding model as ''neutral as to location and manner of execution,'' counterparties to off-exchange transactions would receive higher fees than on-exchange transactions if exchanges choose not to pass-on their cost allocation to Industry Members. See Citadel July 2023 Letter, at 21. See also 2023 Funding Model Amendment, 88 FR at 17087; Notice, 90 FR at 44911.

[132] Citadel July 2023 Letter, at 22. See also id. at 16. See also Citadel August 2023 Letter, at 2 (stating that an allocation of 100% of CAT costs to Industry Members cannot be lawful).

[133] Citadel July 2023 Letter, at 22.

[134] Id. at 10.

[135] Id. at 15.

[136] Id.

[137] See Citadel July 2023 Letter, at 16, 22.

[138] See CAT LLC July 2023 Response Letter, at 8.

[139] Id.

[140] See Citadel July 2023 Letter, at 3, 22, 30.

[141] See CAT LLC July 2023 Response Letter, at 9.

The commenter stated that the 2023 Funding Model Amendment does not provide the percentage of total costs to build and operate the CAT that will be borne by Industry Members in practice.[142] The commenter states that it is necessary to determine the ultimate allocation of CAT costs to evaluate whether the proposed allocation is consistent with the Exchange Act, arguing that the statements made in support of the allocation were premised on the Participants being responsible for one-third of total CAT costs, and that if this is untrue, ''the filing must be completely reconsidered, taking into account (a) the impact on market efficiency, competition and capital formation of allocating this magnitude of additional costs to Industry Members, (b) whether such a lopsided allocation is fair and equitable, and (c) the implications for CAT governance and budget control if the firms governing CAT do not have any skin-in-the-game.'' [143]

This commenter states that the allocation does not take into account fees currently paid by the industry and implementation costs incurred by Industry Members to comply with CAT reporting requirements.[144] The commenter states that Industry Members already provide funding for regulatory matters to exchanges through regulatory fees, membership fees, market data fees, and registration fees, and that these fees must be factored into any equitable or rational allocation of CAT costs.[145] The commenter states that although the 2023 Funding Model Amendment states that there is no precedent for regulatory fees to be determined based on the cost of compliance of a regulated entity, it is necessary to take into account all CAT-related costs including those already allocated to Industry Members to assess whether the Proposed Amendment is equitable.[146]

In response to comments objecting to the proposed allocation to Industry Members for not taking into account regulatory fees currently paid by Industry Members,[147] CAT LLC states

that the Proposed Amendment is intended to assess fees ''directly associated with the costs of establishing and maintaining the CAT, and not unrelated SRO services.'' [148]

This commenter also objects to statements made regarding the complexity of Industry Member business models contributes substantially to the costs of the CAT. This commenter states that the complexity arguments in the Proposed Amendment contradict statements from the Operating Committee that stringent performance and other requirements for processing CAT data are significant drivers of CAT costs,[149] and that the complexity arguments suggest that costs should be allocated evenly among Industry Members, not just a small group of Industry Members based on volume.[150]

In response to comments regarding the complexity of Industry Member business models as a driver of CAT costs,[151] CAT LLC states that its analysis of the complexity of the industry's business models is based on the effects of those models on the costs of the CAT, which it states are more profound than those of Participants, not on complexity of the market in general.[152] CAT LLC explains that the complexity of the Industry Members' business models results in significant data processing and storage costs, which Participants do not contribute to as they do not originate market activity or orders.[153] CAT LLC explains that (1) the complexity and diversity of Industry Members' business models and order handling practices require processing and storing hundreds of reporting scenarios for Industry Members, resulting in significant data processing and storage costs; [154] (2) Industry Members have more late data and corrections than Participants, resulting in significant linker costs; [155] and (3) Industry Members have customers, which results in CAT costs related to customer account information (FDID, CCID and CAIS) and customer

investment strategies.[156] CAT LLC also states that Participants would pay the same amount as the CEBBs and CEBSs in each transaction.[157] CAT LLC states that commenters did not demonstrate a causal connection between exchange fee structures and CAT costs.[158] CAT LLC states that it was not involved in these Industry Member business decisions and a substantial amount of CAT costs result from such business decisions.[159] CAT LLC also states that Participant activity does not contribute as much to CAT costs as complex Industry Member activity.[160]

This commenter also states that, while most Industry Members will pay little to no CAT costs, 20 Industry Members will be responsible for 75% of the costs allocated to Industry Members.[161] The commenter states that this would contradict the 2023 Funding Model Amendment's arguments that there are more Industry Members than Participants and that Industry Members have greater financial resources than Participants because the Operating Committee would outnumber the Industry Members that would be paying the most in costs.[162]

The commenter also states that the Proposed Amendment lacks support for the proposed allocation.[163] The commenter states that the Operating Committee has not met its burden to demonstrate that the proposed allocation is consistent with the Exchange Act.[164] The commenter also states that the Proposed Amendment does not consider the impact of the proposed allocation to Industry Members on market efficiency, competition and capital formation, particularly with respect to the costs the industry will incur to build systems to pass-through their CAT fees, the expected impact on volumes, the expected impact on retail investors, and the expected impact on market makers.[165]

---

[142] See Citadel August 2023 Letter, at 2.

[143] Id.

[144] See Citadel July 2023 Letter, at 17.

[145] See Citadel July 2023 Letter, at 17 (further stating, ''Industry Members are already bearing nearly all of the total CAT-related costs, at a rate much higher than the Commission estimated in its approval of the 2016 CAT NMS Plan.'' Id. at 18).

[146] Id.

[147] See Citadel July 2023 Letter, at 17. CAT LLC also objected to one commenter's description of the CAT as an exchange ''revenue generator,'' stating that CAT LLC is a business league under Section 501(c)(6) of the Internal Revenue Code, and that enforcement activity obtains restitution for

investors and deters future misconduct rather than generating revenue. See CAT LLC July 2023 Response Letter, at 13–14 (responding to Citadel July 2023 Letter, at 17).

[148] See CAT LLC July 2023 Response Letter, at 13.

[149] See Citadel July 2023 Letter, at 17–18. See also Notice, at 44927 (noting the ''complexity of market activity'').

[150] Id. at 18.

[151] See Citadel July 2023 Letter, at 17–18.

[152] See CAT LLC May 2023 Response Letter, at 6; CAT LLC July 2023 Response Letter, at 6.

[153] See CAT LLC May 2023 Response Letter, at 7; CAT LLC July 2023 Response Letter, at 7.

[154] See CAT LLC July 2023 Response Letter, at 7.

[155] Id.

[156] Id.

[157] Id. at 6.

[158] See CAT LLC July 2023 Response Letter, at 6.

[159] Id.

[160] Id.

[161] See Citadel July 2023 Letter, at 17. The commenter also stated that the Proposed Amendment does not explain why it would be equitable to allocate 50% of total CAT costs to 20 Industry Members and 22% of total CAT costs to 24 exchanges. Id.

[162] Id.

[163] Id. at 13. See also Citadel August 2023 Letter, at 2.

[164] See Citadel July 2023 Letter, at 13.

[165] Id. at 2, 16, 19, 20. The commenter further stated that the Proposed Amendment is inconsistent with the Exchange Act because it cannot equitably allocate fees and will harm market efficiency, competition and capital formation. Id. at 16.

The commenter suggests alternatives to the proposed allocation methodology.[166] The commenter states that Industry Members should not be allocated more than 50% of ongoing CAT costs (including FINRA's allocation) due to their lack of industry voting representation and because they already bear nearly all of the total CAT-related costs.[167] The commenter also suggests that exchanges should be prohibited from passing-on their CAT cost allocation to market participants,[168] and that the Participants consider allocating costs to the Commission ''to align incentives.'' [169] The commenter recommends a consistent methodology for allocating costs to both Industry Members and exchanges.[170] The commenter also recommends an allocation methodology that would ensure that ''a small group of firms are not disproportionately bearing costs given that CAT is designed to facilitate market-wide surveillance across all market participants,'' [171] and would not inequitably allocate costs to specific market segments (such as ''retail trading activity in NMS stocks'').[172] The commenter suggests that the approach could have ''(I) minimum and maximum fee levels, (II) appropriate calibrations for liquidity provision, (III) a volume component based on notional (instead of executed shares), and (IV) consideration of additional metrics that could achieve a more equitable outcome (e.g., broker-dealer capital).'' [173]

In response to the commenter that recommended allocating no more than 50% of CAT costs to Industry Members, including the FINRA allocation,[174] CAT LLC states that the commenter did not offer a reasoned basis why such an allocation would be consistent with the Exchange Act.[175] CAT LLC also states that such an allocation would raise fairness concerns because, as compared to Participants, Industry Members have greater financial resources, and their complex business models ''contribute

substantially to the costs of the CAT.'' [176] Furthermore, in response to the commenter's other suggested allocation methodology which the commenter states would ensure that a small group of firms and specific market segments would not be subject to inequitable cost burdens,[177] CAT LLC states that the commenter did not explain how the suggested methodology would fit into a funding model or how such a funding model would be consistent with the Exchange Act.[178] CAT LLC states that it evaluated various other funding models over the past seven years and concluded that ''the Executed Share Model provides a variety of advantages in comparison to the alternatives, and satisfies the requirements of the Exchange Act.'' [179]

In response, the commenter states that its suggestions, which included minimum and maximum fee levels, calibrations for liquidity provision, and consideration of additional metrics,[180] were included in prior funding model proposals.[181] The commenter states that the CAT Operating Committee should explain why it changed its position on ''the importance of these elements as part of a fair and equitable funding proposal that is consistent with the Exchange Act.'' [182]

This commenter also states that many of the largest Industry Members would be allocated CAT fees based on proprietary trading activity, so they would not be able to pass through their fees to investors.[183] The commenter urges for an analysis of proprietary executed volume compared to customer executed volume in order to evaluate how CAT costs will be allocated among Industry Members and whether the allocation methodology is fair, equitable and not unfairly discriminatory.[184] The commenter also states that the 2023 Funding Model Amendment is inconsistent with Section 6(b)(5) by imposing a new and increasing expense on investors, which would negatively impact liquidity and efficiency, and that

the proposed allocation to Industry Members would disproportionately impact market makers (because 20 firms would have to pay most of the costs) and retail investors (due to their trading in sub-dollar NMS stocks that increase executed share volume), in violation of Section 6(b)(8).[185]

Comments on the Proposed Amendment

Subsequent to the 2023 Funding Model Order and vacatur of that order by the Eleventh Circuit, the Participants submitted the Proposed Amendment which would include a new paragraph (e) to Section 11.3 of the CAT NMS Plan that would provide that each Participant agrees not to establish a new fee for passing through its CAT fees, which the Participants state is to ''address the Eleventh Circuit's opinion regarding the potential for Participants to pass-through 100% of their CAT fees to Industry Members, and its effect on the allocation of CAT costs under the Executed Share Model.'' [186] Proposed Section 11.3(e) of the CAT NMS Plan, as modified by the Commission,[187] would state that no Participant will file with the SEC a proposed rule change pursuant to Section 19(b) and Rule 19b–4 thereunder that would establish a new fee for directly passing through to its members the CAT fee charged to such Participant in accordance with Section 11.3(a) (the ''direct pass-through prohibition'').

Multiple commenters state that the direct pass-through prohibition would be ineffective in its stated goal.[188] Commenters specifically note that the direct pass-through prohibition only purports to prevent a Participant from filing a rule change with the Commission to establish a ''new fee.'' [189] One of these commenters states that this usage of the term ''new fee'' raises the specter of adding CAT costs to existing fees the SROs already charge their members to recoup their CAT costs, thus doing indirectly what they cannot

---

[166] Id. at 3, 30, 31. The commenter stated that the Commission must consider reasonable alternatives and that the proposal should be rejected and replaced by a proposal incorporating the commenter's recommendations. Id. at 30, 2.

[167] Id. at 3, 30, 31.

[168] See Citadel July 2023 Letter, at 3, 30, 31.

[169] Id. at 3, 31. In response, CAT LLC stated that the Commission is not a party to the CAT NMS Plan, or subject to Rule 608 of Regulation NMS or Section 19(b) of the Exchange Act. See CAT LLC July 2023 Response Letter, at 31, n.144.

[170] See Citadel July 2023 Letter, at 30–31.

[171] Id. at 30.

[172] Id. at 3, 30.

[173] See id. at 30. See also Citadel August 2023 Letter, at 5.

[174] See Citadel July 2023 Letter, at 31.

[175] See CAT LLC July 2023 Response Letter, at 10.

[176] Id.

[177] See Citadel July 2023 Letter, at 30.

[178] See CAT LLC July 2023 Response Letter, at 10.

[179] Id. at 11–12.

[180] See Citadel August 2023 Letter, at 5.

[181] Id. (citing the minimum and maximum fees and market making discounts proposed in a funding model proposal from the CAT Operating Committee that was filed in 2021. See Securities Exchange Act Release No. 91555 (Apr. 14, 2021), 86 FR 21050 (Apr. 21, 2021)).

[182] Id.

[183] See Citadel July 2023 Letter, at 20. See also Citadel August 2023 Letter, at 3.

[184] See Citadel August 2023 Letter, at 3. The commenter said that such an analysis is feasible and should account for aggregate costs to be borne by affiliated entities, stating that this is required in Section 11.2(c) of the 2016 CAT NMS Plan. Id.

[185] See Citadel July 2023 Letter, at 2.

[186] Notice, at 44923.

[187] See supra note 10 and accompanying text.

[188] See FINRA Wilson Sonsini January 2026 Letter, at 1; FINRA October 2025 Letter, at 10–11; Citadel October 2025 Letter, at 9–10; SIFMA October 2025 Letter, at 2; PTG Letter, at 2; AmFree Letter, at 5. See also Citadel July 2023 Letter, at 20 and Citadel August Letter, at 3 (both raising concerns about CAT costs being passed on to investors); ASA February 2026 Letter, at 4.

[189] See FINRA October 2025 Letter, at 10–11; Citadel October 2025 Letter, at 9; SIFMA October 2025 Letter, at 2; PTG Letter, at 2. See also ASA February 2026 Letter, at 4 (stating that while the Proposed Amendment purports to limit certain pass-throughs, it leaves in place Plan language that permits SROs to bundle or otherwise incorporate CAT costs into their various other fees or assessments).

do directly.[190] FINRA states that this theoretical limit on direct pass-through fees also ignores the reality of FINRA's funding structure, because the most direct way to allocate FINRA's designated CAT costs to its members (who ultimately will bear costs allocated to FINRA) would be to apply cost recovery fees to members whose activities most directly contribute to FINRA's designated portion of Participant CAT fees.[191] Another commenter states that CAT LLC is ''clearly'' attempting to preserve the ability for SROs to pass through some of all of their CAT costs to their members in other ways in direct contravention of the Eleventh Circuit's decision.[192] This commenter states that allowing SRO pass-throughs directly conflicts with the Eleventh Circuit's decision and fundamentally alters the allocation formula that the Commission is considering.[193] Another commenter states that FINRA is responsible for roughly 10% of the entire CAT budget, and nothing in the Proposed Amendment stops FINRA from passing on 100% of those costs to its members by increasing its existing membership fees.[194] Multiple commenters state that the Proposed Amendment is simply an attempt to circumvent the Eleventh Circuit's opinion vacating the 2023 Funding Model Order, and that the Proposed Amendment should be disapproved.[195]

Two commenters state that the Proposed Amendment exceeds CAT LLC's authority and is unlawful, because the Exchange Act and Rule 608 of Regulation NMS do not empower CAT LLC or the Plan Participants to restrict fee filings made by other Plan Participants or control how other Plan Participants internally fund their costs.[196] One commenter states that both the text and history of Rule 608's predecessor establishes that Rule 608's scope of fee authority is limited to *joint* fees for NMS plans.[197] This commenter states that the proposed direct pass-through prohibition would not control CAT LLC fees, but instead purport to control how a Participant SRO funds its own SRO costs through separate SRO fees, which could potentially establish a dangerous precedent and enable similar overreach in other NMS plans.[198]

CAT LLC states that commenters incorrectly state that the direct pass-through prohibition attempts to circumvent the Eleventh Circuit's opinion.[199] CAT LLC explains that the Eleventh Circuit held that the Commission's order approving the Executed Shares Model violated the Administrative Procedures Act as a result of (1) the Commission allowing for the possibility for ''self-regulatory organizations to pass through 100% of their fees to broker-dealers—without considering the effects of that choice'' or providing a ''reasoned justification or explanation'' of that policy change; and (2) the Commission failing to ''conduct a new economic analysis or revise its previous economic analysis.''[200] CAT LLC states that the Proposed Amendment directly addresses the Eleventh Circuit's core concern regarding the possibility of 100% pass-through costs under the 2023 funding order without the SEC considering the effects of that choice, and that CAT LLC will continue to work collaboratively with the Commission to inform its new economic analysis.[201]

CAT LLC disagrees with commenters that state that the direct pass-through prohibition would allow SROs to charge their members to recoup their CAT costs indirectly and that this would circumvent the Eleventh Circuit's

decision.[202] CAT LLC states that the Eleventh Circuit disapproved the Executed Shares Model Approval Order only insofar as it permitted ''self-regulatory organizations to pass through 100% of their fees to broker-dealers—without considering the effects of that choice'' or satisfactorily explaining that policy change.[203] CAT LLC states that the Eleventh Circuit did not hold that SROs could never pass through 100% of their CAT-related fees, but rather that in considering a pass-through the SEC must weigh the effects of and explain its decision.[204]

CAT LLC also states that the direct pass-through provision, as originally proposed, was intended to impose an obligation on all Participants, and not intended to suggest that all Participants voted to approve the Proposed Amendment.[205] Subsequent to the filing of those comment letters, CAT LLC submitted Amendment No. 1., which proposes to revise proposed Section 11.3(e) of Appendix D of the CAT NMS Plan to ''better reflect that the Proposed Amendment was approved under the Plan and avoid statements suggesting that all Participants voted for the proposal,'' by modifying the provision to state that ''[e]ach Participant agrees not to file . . .'' to instead be, ''[n]o Participant will file.''[206] CAT LLC states that this would better reflect that the Proposed Amendment was approved under the Plan and avoid statements suggesting that all participants voted for the proposal.[207] As noted above, the Commission instead is modifying the Proposed Amendment to reflect Amendment No. 1 pursuant to Rule 608(b)(2).

CAT LLC also objects to comments arguing that it is unlawful for the CAT NMS Plan to prevent individual Participants from passing their CAT fees through to Industry Members.[208] CAT LLC states that the proposed direct pass-through provision falls squarely within the broad authority of SEC Rule 608(a)(4)(ii) because it embodies a written understanding relating to the interpretation of the CAT NMS Plan.[209] CAT LLC also notes that the CAT NMS Plan already includes provisions that

---

[190] *See* SIFMA Letter, at 2. *See also* PTG Letter, at 2.

[191] *See* FINRA October 2025 Letter, at 11–12. This commenter states that the direct pass-through prohibition is ''unlawful, ineffective, and fails to cure the defects identified by the Eleventh Circuit.'' *See* FINRA Wilson Sonsini January 2026 Letter, at 1.

[192] *See* Citadel October 2025 Letter, at 9.

[193] *See id. See also* ASA February 2026 Letter, at 4 (stating that if SRO pass-throughs up to 100% of their allocations are permitted in substance, the Commission must confront that reality, explain its policy shift, and incorporate the full economic impact into its analysis).

[194] *See* AmFree Letter, at 5. The commenter states that at minimum the Proposed Amendment must prohibit FINRA from increasing its existing membership fees to account for CAT costs. *Id.* at 6. *See also* Citadel October 2025 Letter, at 9 (stating that the Proposed Amendment provides no explanation as to how FINRA, as a not-for-profit-organization, will fund its allocation of CAT costs, which amounts to more than 10% of the entire CAT budget).

[195] *See* Citadel October 2025 Letter, at 1; SIFMA October 2025 Letter, at 1–3. *See also* ASA October 2025 Letter, at 1–2 (stating that the Proposed Amendment ''mirrors the unlawful 2023 plan in every essential respect''); PTG Letter, at 1 (stating that the Proposed Amendment disregards the decision and is the SROs attempt to ''simply repackage the same unlawful model''); ASA February 2026 Letter, at 4 (stating that the Eleventh Circuit made clear that the Commission cannot pretend that SROs will bear a portion of CAT costs while ignoring their ability to pass those costs on to broker-dealers and their customers).

[196] *See* FINRA October 2025 Letter, at 2, 7–10; FINRA Wilson Sonsini January 2026 Letter, at 2–3; FINRA January 2026 Letter, at 2; Cboe Letter, at 1–2.

[197] *See* FINRA October 2025 Letter, at 8–9.

[198] *Id.* at 9. This commenter further states that the Plan may violate FINRA's due process rights and run afoul of the Takings Clause. *Id.* at 10.

[199] *See* CAT LLC December 2025 Response Letter, at 3.

[200] *Id.* at 3–4.

[201] *Id.* at 4.

[202] *Id.* at 4 (citing SIFMA October 2025 Letter, at 2 and PTG Letter, at 2).

[203] *Id.*

[204] *Id.*

[205] *Id.* at 5. CAT LLC states that as required by the CAT NMS Plan, a supermajority of Participants voted in favor of the Proposed Amendment, but there was no unanimity. *Id.*

[206] *See id.*

[207] *See* CAT LLC December 2025 Response Letter, at 5.

[208] *Id.* at 5.

[209] *Id.*

prevent the Participants from collecting Post-Amendment Industry Member Fees, and thus the CAT NMS Plan already imposes restrictions on individual SRO fees.[210]

One commenter responds by stating that CAT LLC's attempt to justify the direct pass-through prohibition are unpersuasive.[211] This commenter states that CAT LLC's argument regarding SEC Rule 608(a)(4)(ii) conflates interpreting the Plan with controlling individual SRO actions, and thus rests on a flawed reading of Rule 608's text and purpose.[212] This commenter states that Rule 608 imposes requirements to facilitate transparency, by requiring disclosure to the Commission and the public of how internal operations of the Plan—not the external relationship between a distinct SRO and its members—will be managed, and the relevant provisions of Rule 608 do not grant substantive authority of any sort, much less authority for a majority of Plan Participants to effectively suspend Section 19(b) of the Exchange Act, the plain text of which grants individual SROs the right to file their own fee rules.[213] The commenter also states that other provisions identified by CAT LLC in the CAT NMS Plan are not analogous to the proposed direct pass-through prohibition, and none of them support the proposition that the CAT NMS Plan may lawfully restrict how an individual Participant SRO funds its own SRO costs through separate SRO fees.[214]

This commenter also states that CAT LLC presents a false dichotomy when it states that prohibiting all pass-throughs is lawful because the Eleventh Circuit implicitly held that "prior to 2023 the CAT NMS Plan did not contemplate 100% pass-throughs via individual SRO fees."[215] The commenter states that the Eleventh Circuit vacated the 2023 Funding Order because it allowed—without explanation or "reason"—for the possibility that all SROs would pass through 100% of CAT costs, leaving "broker-dealers . . . on the hook for [the CAT's] *entire cost.*" (emphasis in original).[216] This commenter continues to state that "[n]othing in the Eleventh Circuit's decision hinted that it viewed 100% pass-through by FINRA as unlawful or inconsistent with the prior

CAT NMS Plan. On the contrary, the Court acknowledged that "FINRA may be unique[ly]" justified in passing through its CAT costs, as it is "the only nonprofit exchange." [217]

The commenter also states that CAT LLC's amendment of the language of the direct pass-through prohibition, deleting the phrase "[e]ach Participant agrees," by replacing it with "[n]o Participant will file," is more accurate but not more lawful, and underscores that proposed Section 11.3(e) is not a "written understanding" among consenting parties, but rather a regulation that CAT LLC is attempting to unlawfully impose over the objection of dissenting Participants.[218] This commenter states that the Proposed Amendment purports to restrict FINRA's ability to fund itself while leaving untouched the commercial revenue generated for exchanges, when FINRA is the only not-for-profit SRO that relies primarily on fees from its members for funding and the only Participant not operating a market, which means that the practical reality is that any allocation of Participants' CAT costs to FINRA will almost certainly be equivalent to allocating those costs to industry members.[219]

One commenter also states that the Proposed Amendment would have an "undue impact" on market makers, by allocating a disproportionate percentage of total CAT system costs to a "small handful of market makers," and that because market makers would be allocated costs for their proprietary trading activity, those costs could be passed-on to other market participants through higher trading spreads.[220] The commenter states that the Commission must assess the economic implications for market makers and overall market liquidity by determining (i) the percentage of total CAT costs that the ten largest market makers would be allocated based their proprietary trading activity (using CAT data and the invoices sent by CAT LLC over the past year under the vacated 2023 funding order) and (ii) the potential impact on spreads, particularly in less liquid stocks with wider quoted spreads.[221]

CAT LLC states that commenters make several arguments related to the decision to allocate one-third of CAT costs to Participants and two-thirds of CAT costs to Industry Members and that these commenters made the same arguments with respect to the allocation of CAT costs between Participants and Industry Members under the Executed Shares Model when it was originally proposed, and CAT LLC addressed those comments in detail in its prior comment letters concerning the Executed Shares Model, as well as when it originally proposed the Executed Shares Model.[222]

Findings Regarding Allocation of Fees

The Commission disagrees with the assertions of certain commenters that the Proposed Amendment violates the Exchange Act, contravenes the Eleventh Circuit's decision, imposes an excessive portion of CAT costs on Industry Members, or will result in an insufficient focus on cost control. The Executed Share Model reflects an appropriate approach to funding the operation of the CAT during the interim period while the Commission engages in its comprehensive review of CAT.[223] The CAT NMS Plan contemplates that the costs of the CAT are to be allocated between the Participants[224] and Industry Members (which would include CAT Executing Brokers).[225] How the costs of CAT should be allocated between Participants and Industry Members is a question of judgment for which there may be multiple reasonable approaches. CAT LLC's proposal to split CAT fees evenly among the three parties who have primary roles related to transactions reportable to CAT—the buyer, seller, and market regulator—constitutes a reasonable and equitable allocation of the costs of CAT among the primary

---

[210] *Id.* at 5–6.

[211] *See* FINRA Wilson Sonsini January 2026 Letter, at 1.

[212] *See id.* at 1–2.

[213] *See id.* at 2.

[214] *See id.* at 2–3.

[215] *See id.* at 3 (citing CAT LLC December 2025 Response Letter, at 5).

[216] *See* FINRA Wilson Sonsini January 2026 Letter, at 3 (citing Eleventh Circuit Decision, at 1275).

[217] *See* FINRA Wilson Sonsini January 2026 Letter, at 3 (citing Eleventh Circuit Decision, at 1279).

[218] *See id.* at 3–4. *See also* FINRA January 2026 Letter, at 2 (stating that while this formulation is more accurate, it is no more lawful because FINRA did not vote in favor of this modified formulation, in part because SROs may not use the mechanism of a national market system plan to control the fees of other SROs that are participants in the plan).

[219] *See* FINRA Wilson Sonsini January 2026 Letter, at 4.

[220] *See* Citadel October 2025 Letter, at 7.

[221] *Id.*

[222] *See* CAT LLC December 2025 Response Letter, at 2–3. *See also* Letter to Vanessa Countryman, Secretary, Commission, from Robert Walley, CAT NMS Plan Operating Committee Chair, dated Jan. 14, 2026 ("CAT LLC January 2026 Response Letter").

[223] *See* 17 CFR 242.608(b)(2).

[224] The CAT NMS Plan requires Execution Venues and Industry Members to fund the CAT. The definition of "Execution Venue" includes Participants. *See supra* note 17.

[225] *See* CAT NMS Plan, at Section 11.1(b), 11.3(a) and (b). Section 11.1(b) of the CAT NMS Plan authorizes the Operating Committee to establish fees for Execution Venues (which include Participants) and Industry Members to fund the CAT and Sections 11.3(a) and (b) of the CAT NMS Plan set forth how these fees would be calculated. *See also* Rule 613(a)(1)(vii)(D) discussing how the CAT NMS Plan shall discuss the proposed allocation of estimated costs among the plan sponsors, and between the plan sponsors and members of the plan sponsors. 17 CFR 242.613(a)(1)(vii)(D).

parties that participate in and benefit from such trading activity and the market oversight CAT enables. In vacating the 2023 funding order, the Eleventh Circuit decision did not question the reasonableness of this method of determining and allocating CAT fees.

The Proposed Amendment's approach to the issue of Participant pass-through does not alter our conclusion. As discussed above, the prohibition on Participants directly passing through their one-third share of CAT fees through a new fee on Industry Members reasonably reinforces CAT's cost-sharing premise.[226] Inconsistency with that Plan provision would be grounds for suspension and disapproval of a fee filing.[227] FINRA and the Cboe Exchanges state that a national market system plan cannot lawfully constrain how an SRO chooses to fund its own costs through fees on its own members.[228] FINRA also states that the direct pass-through prohibition ''ignores the reality of FINRA's funding structure,'' because the most direct way to allocate FINRA's designated CAT costs to its members (who ultimately will bear costs allocated to FINRA) would be to apply cost recovery fees to members whose activities most directly contribute to FINRA's designated portion of Participant CAT fees.[229] But FINRA represents that it makes ''the following firm commitment: should the Commission approve a CAT funding model on a temporary or interim basis, FINRA will not establish any new CAT recovery fees for a period of two years from approval of such temporary funding model (or for a shorter period designated by the Commission in an approval order as the effective period of such interim funding model).''[230] FINRA has thus voluntarily committed to abide by the direct pass-through prohibition for the two years the Proposed Amendment will be in effect. In addition, the Cboe Exchanges have expressed a willingness to agree to

refrain from new direct pass-through CAT fees to their members.[231] And as FINRA observes, all of the other CAT NMS Plan Participants voted in favor of the direct pass-through prohibition, thereby indicating that they too have individually determined and committed to not establish new CAT recovery fees.[232] Given the Participants' willingness to discuss a voluntary agreement to not make rule filings seeking to directly pass through their CAT costs for a specified period, the fact that we are only approving this funding model on a temporary basis while we consider the CAT more broadly, and because the Commission would have imposed the same direct pass-through prohibition if the Participants had not proposed it for reasons discussed elsewhere in this order, the Commission is not deciding at this time what limits a national market system plan can or cannot place on an SRO's discretion with respect to the way in which it recovers its regulatory costs.

The decision not to preemptively prohibit the Participants from passing through their share of CAT costs indirectly through other member fees is also reasonable. As discussed above, the Exchange Act expressly contemplates the ability of the Participants to recoup their costs to fulfill their statutory obligations under the Exchange Act, and consistent with that principle, the Commission has recognized since CAT's inception that the Participants may seek to recover some or all of the CAT costs they incur, subject to the requirements set forth in the Act.[233] The Eleventh Circuit did not hold that it would be arbitrary and capricious to leave open the possibility of pass-through, as one commenter suggests. Rather, the court held only that the 2023 funding order did not adequately ''explain or justify,'' and ''consider[ ] the effects of,'' that decision.[234]

The Commission is not including a prohibition on any action the Participants may take that might result in their indirectly recovering some of their CAT costs from Industry Members as suggested by some commenters.[235]

While the direct pass-through prohibition gives meaning to the Plan's requirement that the Participants and Industry Members share in CAT costs, the Plan doesn't change the reality as to how the Participants are funded, including how they fund the costs of fulfilling their regulatory obligations. It would be inequitable to single out the Participants and prevent only them from attempting to recover their costs when the Plan contains no restriction on the ability of Industry Members to pass through their share to others, particularly given that, unlike Industry Members, the Participants would be required to establish that increases in any other fees are reasonable, equitable, and not unfairly discriminatory in the rule filing process. Moreover, as a practical matter it would be difficult to effectively amend the CAT NMS Plan in such a way as to prevent a Participant from ever indirectly passing through any CAT costs.

Nor does the Commission believe that a total, preemptive prohibition on all forms of pass-through during the two years in which the Proposed Amendment will be in effect is necessary to maintain an adequate focus on cost control. CAT costs are driven by a variety of factors, including storage, data processing, and message traffic. Pursuant to the CAT NMS Plan, the CAT must process and store extremely large data volumes within specific timeframes, and this process has been occurring in a market environment of increasing message traffic.[236]

The Commission and the Participants have recently taken a series of measures to bring down these costs. For example, a 2024 CAT NMS Plan amendment was approved that CAT LLC states has resulted in projected savings of $30 million in the first year,[237] and another amendment recently approved relating to Customer data in the CAT is projected to achieve an estimated $7 to $9 million in annual cost savings (the

---

[226] See supra Part III.

[227] See 15 U.S.C. 78s(b)(2)(C) (''The Commission shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of [the Exchange Act] and the rules and regulations [thereunder] that are applicable to such organization,'' and ''shall disapprove'' the proposed rule change ''if it does not make [that] finding''); 17 CFR 242.608(c) (''Each self-regulatory organization shall comply with the terms of any effective national market system plan of which it is a sponsor or a participant.'').

[228] See FINRA October 2025 Letter, at 2, 7–10; FINRA January 2026 Letter, at 2–3; FINRA Wilson Sonsini January 2026 Letter, at 1–3; Cboe Letter, at 2–3.

[229] See FINRA October 2025 Letter, at 11–12.

[230] See FINRA January 2026 Letter, at 3.

[231] See Cboe Letter, at 2; FINRA January 2026 Letter, at 3 (stating that Cboe ''has previously expressed that it is 'open to discussing a voluntary agreement by all of the SROs not to make rule filings seeking to pass through their costs for a specified period,''' citing Cboe Letter).

[232] See FINRA January 2026 Letter, at 3.

[233] See supra Part III.

[234] Am. Secs. Ass'n, 147 F.4 at 1274–77.

[235] See, e.g., SIFMA October 2025 Letter, at 2 (stating that the Participants raise the specter of adding CAT costs to existing fees the SROs already charge their members to recoup their CAT costs, thus doing indirectly what they cannot do directly); Citadel October 2025 Letter, at 9 (stating that CAT

---

LLC is clearly attempting to preserve the ability for SROs to pass through some or all of their CAT costs to their members in other ways in direct contravention of the Eleventh Circuit's decision); PTG Letter, at 2; ASA February 2026 Letter, at 4 (stating that the Proposed Amendment does not meaningfully prohibit SRO pass-throughs of CAT costs).

[236] See Securities Exchange Act Release No. 104504 (Dec. 23, 2025), 90 FR 61506, 61506 n.7 (Dec. 31, 2025) (''2025 Cost Savings Amendment'') (stating that there were 109 trillion events in 202, 116 trillion events in 2023, and 154 trillion events in 2024, a 41% growth in data volumes over a three-year period).

[237] See Securities Exchange Act Release No. 101901 (Dec. 12, 2024), 89 FR 103033 (Dec. 18, 2024) (''2024 CAT Cost Savings Amendment'').

''CAIS Amendment'').[238] In addition, the Commission is currently considering a proposed CAT amendment that would in part codify exemptive relief granted by the Commission designed to allow the Participants to reduce the costs of operating the CAT,[239] and that proposed amendment is estimated by the Participants to provide cost savings of $55 million to $73 million, if approved.[240] The cost savings efforts that have been approved have already reduced the CAT budget significantly, with the projected 2026 CAT budget currently estimated to be $156,432,998,[241] compared to the initial estimated 2025 CAT budget of $248,846,076.[242] These efforts demonstrate that the Commission and the Participants are focused on controlling the costs of the CAT.

Even Participants that attempt to increase existing fees to recover their CAT costs will continue to have incentives to contain the costs that are within their control. Any such indirect pass-through effort would be subject to the rule filing process under Section 19(b) and Rule 19b–4, and, if the Participants fail to control costs, their ability to demonstrate that the CAT budget is ''reasonable'' and that a proposed fee is reasonable and consistent with the Exchange Act may be compromised. In general, after a Participant files proposed rule changes relating to fees with the Commission, those proposed rule changes are published by the Commission and there is an opportunity for public comment.[243] Although the proposed rule changes may take effect upon filing,[244] the Commission can

temporarily suspend immediately effective rule changes if such action is necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of the Exchange Act.[245] If the Commission takes such action, the Commission will institute proceedings under Section 19(b)(2)(B) to determine whether the proposed rule changes should be approved or disapproved.[246] As is the case with all of the fees the Participants collect from their members to fund their SRO responsibilities in market and member regulation, a Participant seeking to increase existing fees in an attempt to recover CAT costs paid by the Participant would be required to establish that the fee is consistent with applicable statutory standards under the Exchange Act, including being reasonable, equitable and not unfairly discriminatory.[247]

In addition, the Proposed Amendment requires that the Fee Rate calculated by the Operating Committee twice per year be based on ''reasonably budgeted CAT costs''[248] and that such budgeted CAT costs be composed of ''all reasonable fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and operation of the CAT.''[249] The Operating Committee must demonstrate that their proposed budget and associated fees are reasonable, and the Participants must provide support for such reasonableness in their associated fee filings. If a Participant cannot demonstrate both that their budgeted CAT costs are reasonable and that the proposed fee is reasonable and consistent the Exchange Act, then that would constitute grounds to suspend and disapprove not only fee filings seeking to recover the Participants' one-third share of CAT costs, but also fee filings seeking to collect Industry Members' two-thirds share.

The Participants may be further incentivized to limit CAT costs because even if a Participant were able to pass-

through the Participant's allocated CAT costs to its members, the Participant would experience a delay in recouping such funds and bear the risk of non-payment from members. In addition, the higher the relevant CAT costs are, the more difficult it may be for the Participants to explain to their members and the more difficult it would be to establish a pass-through of a CAT fee or a recovery of the CAT costs by increasing other fees. For example, a Participant seeking to increase other fees to recover substantial CAT costs paid by that Participant would be required to establish that the specific fee increase is reasonable, and Industry Members and market participants would have the opportunity to comment and question whether or not that fee increase is reasonable.[250] Additionally, these incentives are further reinforced by a number of cost discipline mechanisms discussed below.[251]

Moreover, even if a Participant is able to establish that an increase in existing fees to recover CAT costs is consistent with applicable statutory standards, including that it is reasonable, equitable, and not unfairly discriminatory, Industry Members may be able to offset fees assessed to them by passing their CAT fees through to their customers.[252] The Commission recognizes that not all Industry Members currently pass through fees

---

[238] See Securities Exchange Act Release No. 104586 (Jan. 13, 2026), 91 FR 2164 (Jan. 16, 2026) (''CAIS Amendment Approval Order'').

[239] See Securities Exchange Act Release No. 104144 (Sept. 30, 2025), 90 FR 47853 (Oct. 2, 2025) (''September 2025 Exemptive Order'').

[240] See 2025 Cost Savings Amendment, at 61508–09.

[241] See Consolidated Audit Trail, LLC, 2026 Financial and Operating Budget, dated Dec. 11, 2025, available at: https://www.catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf.

[242] See Consolidated Audit Trail, LLC, 2025 Financial and Operating Budget, dated Nov. 20, 2024, available at: https://www.catnmsplan.com/sites/default/files/2024-11/11.20.24-CAT-LLC-2025-Financial_and_Operating-Budget.pdf.

[243] 15 U.S.C. 78s(b).

[244] 15 U.S.C. 78s(b)(3)(A); 17 CFR 240.19b–4(f)(2). Pursuant to Exchange Act Rule 19b–4, a proposed rule change may take effect upon filing with the Commission pursuant to Section 19(b)(3)(A) of the Exchange Act if properly designated by the self-regulatory organization as: (1) constituting a stated policy, practice, or interpretation with respect to the meaning, administration, or enforcement of an existing rule; (2) establishing or changing a due, fee, or other charge applicable only to a member; (3)

concerned solely with the administration of the self-regulatory organization.

[245] 15 U.S.C. 78s(b)(3)(C).

[246] 15 U.S.C. 78s(b)(2)(B).

[247] See Section 6(b)(4); Section 15A(b)(5); Section 6(b)(5); Section 15A(b)(6). 15 U.S.C. 78f(b)(4); 15 U.S.C. 78f(b)(6); 15 U.S.C. 78o–3(b)(5); 15 U.S.C. 78o–3(b)(6). See also e.g., Schedule A to the By-Laws of FINRA, Section 1(a) (stating ''FINRA shall, in accordance with this section, collect member regulatory fees that are designed to recover the costs to FINRA of the supervision and regulation of members, including performing examinations, financial monitoring, and policy, rulemaking, interpretive, and enforcement activities'').

[248] See proposed Section 11.3(a)(i)(A)(I) and proposed Section 11.3(a)(i)(A)(II).

[249] See proposed Section 11.3(a)(i)(C).

[250] The Commission has previously suspended and/or disapproved numerous rule filings submitted under Section 19(b), and Participants would be required to establish that any fee seeking to indirectly recover CAT costs satisfy all Exchange Act requirements, and the rules and regulations thereunder. See e.g., Securities Exchange Act Release No. 101766, (SR–NASDAQ–2024–016) (disapproving fee proposal for, among other things, the Exchange not meeting its burden under the Exchange Act and the Commission's Rules of Practice to demonstrate that the Proposal is consistent with the requirements of Sections 6(b)(4), (b)(5), and (b)(8) of the Exchange Act, as well as Section 11A of the Exchange Act and Rules 603(a)(1) and 603(a)(2) of Regulation NMS which, among other things, require the Exchange to distribute market data on terms that are ''fair and reasonable'' and ''not unreasonably discriminatory.'').

[251] See infra notes 606–608 and accompanying text.

[252] See Notice, 90 FR at 17108; see also CAT LLC July Response Letter, at 8–9; cf. Citadel July 2023 Letter, at 20. Any efforts to recoup CAT costs will be subject to statutory and regulatory oversight as appropriate. Under the federal securities laws and FINRA rules, prices for securities and broker-dealer compensation are required to be fair and reasonable, taking into consideration all relevant circumstances. See, e.g., Exchange Act Sections 10(b) and 15(c); FINRA Rules 2121 (Fair Prices and Commissions), 2122 (Charges for Services Performed), and 2341 (Investment Company Securities). See also FINRA Rule 3221 (Non-Cash Compensation). Broker-dealers are also required to disclose the fees they charge related to a transaction pursuant to Exchange Act Rule 10b–10. See 17 CFR 240.10b–10.

and cannot determine in advance the extent to which Industry Members can or will pass-through their CAT fees to investors or would determine to do so in the future. But the Commission believes that many are able to and that at least some will do so. For all of these reasons, the Commission does not believe that the potential ability of SRO costs to be passed through to Industry Members indirectly precludes a finding that the allocation model set forth in the Proposed Amendment meets the approval standard.

Contrary to the arguments of one commenter,[253] it is appropriate to charge executing brokers regardless of whether they are trading for their own account or for a customer's account. The Commission acknowledges that there is not a customer *per se* for proprietary trades and therefore, proprietary trading firms would not be able to pass-through their CAT fees to customers and proprietary trading firms would be incentivized to recoup CAT fees in other ways, including potentially higher trading spreads. However, regardless of whether a firm trades for its own account or for a customer account, in both instances, the firm engages in trading activity to earn a profit. In the Commission's view, it is reasonable to allow a firm to incur CAT fees for its profit-making business activities, such as proprietary activity. The Commission recognizes that Industry Members may pass-through CAT fees for customer executed volume but in the case of proprietary trades where a firm is trading for its own account, there is no customer to which the firm can pass-through fees, as the firm itself is the ultimate investor, and thus it is reasonable for the firm to be responsible for payment of CAT fees for those trades. CAT enables the Participants and the Commission to oversee and ensure the integrity of the markets from which Industry Members earn profits and therefore it is reasonable for fees to be charged for that profit-making activity, regardless of whether those fees can be passed on to customers.

Further, the fact that the proposed allocation did not account for the costs already incurred by Industry Members to comply with the CAT or other fees paid by Industry Members to exchanges for other regulatory matters do not render that allocation unreasonable. Both Participants and Industry Members have incurred costs in adapting their operations to report to CAT as is required to achieve the benefits

anticipated from the CAT. The purpose of the funding model is to provide a framework for the recovery of a different set of costs—those incurred by the Participants' in developing and maintaining the CAT system. Section 11.1(c) of the CAT NMS Plan explicitly permits the Operating Committee to recover those costs, allowing it to ''take into account fees, costs and expenses . . . incurred by the Participants on behalf of the Company . . . and such fees, costs and expenses shall be fairly and reasonably shared among the Participants and Industry Members.'' [254] The decision to exclude the costs of compliance from this funding model is thus a reasonable one.

Nor does the Commission base its finding with respect to the proposed allocation of costs between Participant and Industry Members on their respective responsibility for any complexity in the markets. Regardless of the origin of that complexity, its existence contributes to the costs of CAT and the purpose of the funding model is to account for those current and future costs, not assess responsibility for the market structure. The Participants' decision to divide the costs evenly among the three parties who have primary roles related to the transaction is appropriate.

The Commission acknowledges the commenter concern that certain market makers may be responsible for a ''disproportionate percentage of total CAT system costs,'' and that these costs could be passed-on to other market participants through higher trading spreads, but the usage of executed equivalent share volume in the Executed Share Model is reasonably designed to attribute CAT fees to market participants in proportion to their trading activity. To the extent that certain market makers or market participants pay proportionately larger CAT fees, this is a result of more trading activity, which impacts CAT cost drivers. As previously stated, the Original Funding Model would have used message traffic, which could have resulted in an even greater share of costs on market makers and the provision of quotes.

The Commission believes that the Executed Share Model is a reasonable method of allocating costs for the interim period while the Commission engages in a comprehensive review of the CAT because it reasonably reflects the extent to which different CAT Reporters participate in and benefit from the equities and options

markets,[255] and is transparent, would be relatively easy to calculate and administer, and is designed not to have an impact on market activity because it is neutral as to the location and manner of execution (*e.g.,* CAT fees would be the same regardless of whether a transaction is executed on an exchange or in the over-the-counter market).[256] The Participants considered, and have previously proposed, alternative allocations and funding models.[257] And the Commission acknowledges the alternative funding models and allocations suggested by commenters.[258] Each of those alternatives has relative strengths and weaknesses. Similarly, the alternatives suggested by a commenter,[259] including maximum and minimum fees, appropriate calibrations for liquidity provision and consideration of additional provisions (*e.g.,* broker-dealer capital), have strengths and weaknesses. For example, imposing maximum and minimum fees would transfer costs from the largest members to the smallest members, distorting the economic incentives of the Executed Share Model. A similar distortion could arise to the extent market maker volume is discounted or otherwise calibrated or to the extent considering other metrics that are not necessarily correlated with the cost drivers of the CAT. Given that each of these alternatives has its own potential weaknesses, and the limited time period for which this funding model is being approved, the Commission does not believe that the existence of alternatives, or the remaining concerns identified by commenters individually or

---

[253] *See* Citadel October 2025 Letter, at 7; Citadel July 2023 Letter, at 20; Citadel August 2023 Letter, at 3.

[254] *See* CAT NMS Plan, at Section 11.1(c).

[255] *See* Notice, 90 FR at 44911.

[256] *Id.*

[257] In the Proposed Amendment, CAT LLC stated that it considered but rejected a number of alternative approaches to the CAT funding model; specifically, an approach based on a CAT Reporter's cost burden on the CAT, a 50%–50% allocation of costs between Industry Members and Participant exchanges, a revenue-based funding model in which CAT Reporters would pay fees based on their revenue, a message traffic model in which both Industry Members and Participants would be assessed fees based on message traffic in the CAT, a sales value model in which fees would be calculated based on transaction sales models, an alternative allocation in which fees would only be allocated to the CEBS, and the 2018 and 2021 Fee Proposals, a model in which CAT LLC would allocate all costs among the Participants and permit each Participant to charge its own members as it deems appropriate, and a cost allocation based on a strict pro-rata distribution regardless of the type or size of CAT Reporters. *Id.* at 44928–30, 44941–42. While alternative models have been suggested and considered, the proposed Executed Share Model meets the approval standard in Rule 608(b)(2).

[258] *See* FINRA April 2023 Letter, at 5; Citadel July Letter, at 3, 30–32; Citadel August 2023 Letter, at 5.

[259] *See* Citadel August 2023 Letter, at 5.

collectively, call into question the Proposed Amendment's satisfaction of the approval standard in Rule 608(b)(2),[260] or otherwise warrant a departure from the policy choices made by the Participants.

3. Executed Equivalent Shares

Under the Executed Share Model, a CAT fee would be charged with regard to each transaction in Eligible Securities[261] as reported in CAT Data based on executed equivalent shares.[262] A CAT Fee would be imposed with regard to transactions in Eligible Securities in the CAT Data regardless of whether the trade is executed on an exchange or otherwise than on an exchange.[263]

Proposed Section 11.3(a)(i)(B) of the CAT NMS Plan describes how executed equivalent shares would be counted for purposes of calculating CAT fees. Specifically, the Executed Share Model uses the concept of executed equivalent shares as the transactions subject to a CAT Fee involve NMS Stocks, Listed Options and OTC Equity Securities, each of which have different trading characteristics.[264] Proposed Section 11.3(a)(i)(B) would require the shares to be reasonably counted for each type of Eligible Securities in the following manner:

*NMS Stocks.* Under the Executed Share Model, each executed share for a transaction in NMS Stocks would be counted as one executed equivalent share.[265] Accordingly, proposed Section 11.3(a)(i)(B)(I) of the CAT NMS Plan would state that "[f]or purposes of calculating CAT Fees, executed equivalent shares in a transaction in Eligible Securities will be reasonably counted as follows: (I) each executed share for a transaction in NMS Stocks will be counted as one executed equivalent share."[266]

*Listed Options.* Recognizing that Listed Options trade in contracts rather than shares, each executed contract for a transaction in Listed Options will be counted using the contract multiplier applicable to the specific Listed Option in the relevant transaction.[267] Typically, a Listed Option contract represents 100 shares; however, it may also represent another designated number of shares.[268]

*OTC Equity Securities.* Similarly, in recognition of the different trading characteristics of OTC Equity Securities as compared to NMS Stocks, the Executed Share Model would discount the share volume of OTC Equity Securities when calculating CAT Fees.[269] CAT LLC explained that many OTC Equity Securities are priced at less than one dollar—and a significant number are priced at less than one penny—per share and low-priced shares tend to trade in larger quantities.[270] Accordingly, a disproportionately large number of shares are involved in transactions involving OTC Equity Securities versus NMS Stocks.[271] Because the Executed Share Model would calculate CAT Fees based on executed share volume, CAT Reporters trading OTC Equity Securities would likely be subject to higher fees than their market activity may warrant.[272] To address this potential concern, CAT LLC proposed that the Executed Share Model would count each executed share for a transaction in OTC Equity Securities as 0.01 executed equivalent shares.[273]

a. Executed Equivalent Share Volume

CAT LLC has represented that a disproportionately large number of shares are involved in transactions involving OTC Equity Securities versus NMS Stocks,[274] and that based on data from 2001, trades in OTC Equity Securities accounted for 77% of the number of all equity shares traded, but only 0.51% of the notional value of all equity shares traded,[275] and that under the Executed Share Model, CAT Reporters trading OTC Equity Securities would likely be subject to higher fees than their market activity may

warrant.[276] CAT LLC also explained the analysis it undertook to determine to count each executed share for a transaction in OTC Equity Securities as 0.01 executed equivalent shares, stating the discount was the result of an analysis of several different metrics comparing the markets for OTC Equity Securities and NMS Stocks. CAT LLC stated that, using 2021 data, "(1) the ratio of total notional dollar value traded for OTC Equity Securities to OTC Equity Securities and NMS Stocks was 0.051%; (2) the ratio of total trades in OTC Equity Securities to total trades in OTC Equity Securities and NMS Stocks was 0.90%; and (3) the ratio of average share price per trade of OTC Equity Securities to average share price per trade for OTC Equity Securities and NMS Stocks was 0.065%."[277] For ease of application and because the calculations involve averages, CAT LLC decided to round the metrics to 1%.[278]

In support of the use of executed equivalent shares to allocate costs under the Executed Share Model, CAT LLC explained that "trading activity provides a reasonable proxy for cost burden on the CAT, and therefore is an appropriate metric for allocating CAT costs among CAT Reporters."[279] CAT LLC stated that it is not feasible to determine the specific cost burden of each CAT Reporter on the CAT, explaining that "[t]he computation of a specific CAT Reporter's burden on the CAT is complicated by the many inter-related factors that contribute to CAT costs, including message traffic, data processing, storage, the complexity of reporting requirements, reporting timelines, infrastructure, connectivity and more."[280] CAT LLC added that increased trading activity correlates with an increased cost burden on the CAT and Industry Members are generally engaged in effecting transactions in the market, so executed share volume would be an appropriate metric for the allocation of CAT costs.[281] CAT LLC stated that this conclusion is consistent with the Commission's prior recognition of the use of transaction volume to set regulatory fees.[282] Additionally, CAT LLC stated that technology costs dominate all CAT costs, with compute costs comprising more than half of all technology costs, and "[w]hile [compute costs] are related in part to message

[260] 17 CFR 242.608(b)(2).

[261] The CAT NMS Plan defines an "Eligible Security" as including all NMS Securities and all OTC Equity Securities. *See* CAT NMS Plan, at Section 1.1. "NMS Security" is defined as "any security or class of securities for which transaction reports are collected, processed, and made available pursuant to an effective transaction reporting plan, or an effective national market system plan for reporting transactions in Listed Options." *Id.* "OTC Equity Security" is defined by the CAT NMS Plan as "any equity security, other than an NMS Security, subject to prompt last sale reporting rules of a registered national securities association and reported to one of such association's equity trade reporting facilities." *Id.*

[262] *See* Notice, 90 FR at 44917–18.

[263] *Id.* at 44917.

[264] *Id.* at 44918.

[265] *Id.*

[266] Proposed Section 11.3(a)(i)(B)(I).

[267] *See* Notice, 90 FR at 44918.

[268] *Id. See also* proposed Section 11.3(a)(i)(B)(II).

[269] *See* Notice, 90 FR at 44918.

[270] *Id.*

[271] In an example provided by CAT LLC, based on data from 2021, (1) the average price per executed share of OTC Equity Securities was $0.072 and the average price per executed share for NMS Stocks was $49.51; and (2) the average trade size for OTC Equity Securities was 63,474 and the average trade size for NMS Stocks was 166 shares. Trades in OTC Equity Securities accounted for 77% of the number of all equity shares traded, but only 0.51% of the notional value of all equity shares traded. *Id.* at 44918, n.42.

[272] *Id.* at 44918.

[273] *See* proposed Section 11.3(a)(i)(B)(III).

[274] *See* Notice, 90 FR at 44918.

[275] *Id.* at 44918, n.42.

[276] *Id.* at 44918.

[277] *Id.*

[278] *Id.*

[279] *See* Notice, 90 FR at 44927.

[280] *Id.* at 44930.

[281] *Id.*

[282] *Id.*

traffic, they are driven by the stringent performance timelines, data complexity and operational requirements in the CAT NMS Plan.'' [283] This was one of the reasons CAT LLC decided to change from using message traffic to calculate CAT fees using executed equivalent share volume.[284]

In comment letters submitted in connection with the 2023 Funding Model Amendment, and incorporated by reference by the FINRA October 2025 Letter, FINRA questioned the support for the use of executed share volume instead of message traffic, which was previously proposed in prior funding models.[285] FINRA stated that the Proposed Amendment does not explain why the use of executed share volume as the basis of the cost allocation methodology, instead of message traffic, is equitable.[286] FINRA explained that in prior models, message traffic was the key proxy for cost generation used to align CAT fees with CAT costs, but the Executed Share Model would base its cost allocation methodology entirely on executed share volume.[287] FINRA stated that the Participants' argument that executed share volume is related to cost generation is not enough to demonstrate that its use is reasonable and equitable.[288]

In comment letters submitted in connection with the 2023 Funding Model Amendment, another commenter states that the Operating Committee cannot explain why the proposed allocation to Industry Members is equitable, noting that it previously stated that charging Industry Members based on message traffic was the most equitable means of establishing fees.[289] The commenter states that allocating costs among Industry Members based on share volume is inconsistent with the Exchange Act.[290] The commenter states that there is no evidence to support the Operating Committee's assertion that trading activity is a reasonable proxy for cost burden on the CAT, explaining that the Operating Committee has stated before that CAT Data processing requirements and message traffic are significant drivers of CAT costs. The same commenter states that, according to one Participant, options activity creates a greater cost burden than equities trading volume and that the Proposed Amendment does not

accurately describe the sources of CAT's cost burdens.[291] The commenter states that the CAT Operating Committee must demonstrate how the proposed allocation would not unfairly discriminate against equities market participants and compare equities and options activity with respect to (i) their cost burden on the CAT and (ii) the allocation of CAT costs to Industry Members.[292] The commenter states that if the equities markets are subsidizing options activity, this could have broad impacts on equity market liquidity, competition and efficiency that must be assessed under the Exchange Act.[293]

Further, the commenter states that allocating costs based on volume would result in costs being mostly allocated to ''an extremely small group of broker-dealers,'' which would unduly burden competition.[294] The commenter states that the Proposed Amendment also lacks a discussion of the impact of this allocation on market competition, efficiency and liquidity, but that the Operating Committee recognized in the Proposed Amendment that prior proposals, where message traffic was a metric used for fee allocation, could impose an outsized financial impact on certain Industry Members.[295]

Additionally, FINRA objected to the statement in the Proposed Amendment that ''trading activity provides a reasonable proxy for cost burden on the CAT, and therefore is an appropriate metric for allocating CAT costs among CAT Reporters.'' [296] The commenter stated that this statement is inconsistent with information that demonstrates that volume from FINRA trade reporting facilities (''TRFs'') contribute ''a very small percentage of annual CAT compute and storage costs.'' [297] The commenter stated that as a result, it cannot support the Participants' assertion that trading activity is a reasonable proxy for cost burden.[298] The commenter stated that the Proposed Amendment ''fails to provide for reasonable fees that are equitably allocated and not unfairly discriminatory, does not reflect a reasonable approach to allocating costs amongst the Participants, nor does it transparently or accurately present

information regarding the true sources of cost burdens on the CAT.'' [299]

This commenter further states that the Executed Share Model is inconsistent with the ''cost alignment'' funding principle in Section 11.2(b) of the CAT NMS Plan, which requires the Participants to seek to establish an allocation of costs that takes into account distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations.[300] The commenter states that ''the Proposal fails to establish a sufficient nexus between executed share volume and the technology burdens that generate CAT costs and fails to relate each reporter group's allocation to the burden that each reporter group imposes on CAT.'' [301]

In response to FINRA's comment raising concerns about the use of trading activity as a proxy for costs,[302] CAT LLC stated in a comment letter submitted in connection with the 2023 Funding Model Amendment that the proposed funding model would provide an appropriate approach for allocating CAT costs because Industry Member activity is generally for the purpose of effecting transactions, and trading activity impacts various factors driving CAT costs, such as storage, data processing and message traffic.[303] CAT LLC also stated that the Exchange Act does not require fees to be directly correlated with the costs created by the person charged the fee.[304] CAT LLC stated that it is difficult to determine the precise cost burden created by each CAT Reporter on the CAT, and believes trading activity is a reasonable proxy for cost burden on the CAT.[305]

CAT LLC responded to the commenter's statement that the proposed allocation is inconsistent with the cost alignment principles of the CAT NMS Plan by noting that the Proposed Amendment incorporates the concept of cost burden in at least two ways.[306] Specifically, CAT LLC stated that it does so because ''the allocation of CAT costs contemplates the effect of Industry Member activity on the cost of the CAT. . . and because trading activity provides a reasonable proxy for cost burden on the CAT, trading activity is an appropriate metric for allocating CAT costs among CAT Reporters.'' [307] CAT

[283] *Id.*
[284] *Id.*
[285] *See* FINRA June 2022 Letter, at 3, 4; Citadel July 2023 Letter, at 10.
[286] *See* FINRA June 2022 Letter, at 3.
[287] *Id.*
[288] *Id.* at 4.
[289] *See* Citadel July 2023 Letter, at 10.
[290] *Id.* at 19.

[291] *Id.* at 18, 19. *See also* Citadel August 2023 Letter, at 4.
[292] *See* Citadel August 2023 Letter, at 4.
[293] *Id.*
[294] *See* Citadel July 2023 Letter, at 19.
[295] *Id. See also* Citadel August 2023 Letter, at 2–3.
[296] *See* Notice, 90 FR at 44927.
[297] *See* FINRA May 2023 Letter, at 2.
[298] *See id. See also* FINRA April 2023 Letter, at 8.

[299] *See* FINRA May 2023 Letter, at 4.
[300] *Id. See also* FINRA April 2023 Letter, at 7–9.
[301] *See* FINRA June 2022 Letter, at 4.
[302] *See* FINRA May 2023 Letter, at 2.
[303] *See* CAT LLC July 2023 Response Letter, at 34.
[304] *Id.*
[305] *Id.*
[306] *See* CAT LLC May 2023 Response Letter, at 7.
[307] *Id.*

LLC added that because there are other examples of trading activity-based fees, the Executed Share Model would not be novel or unique.[308]

One commenter also states that equities market participants will contribute ''far more'' under the Proposed Amendment than options market participants due to the proposed allocation methodology.[309] This commenter states that the Commission must evaluate this split using CAT data and the invoices sent by CAT LLC over the past year under the vacated 2023 funding order (as the proposed allocation is the same) and (ii) the estimated CAT system costs associated with equities versus options trading activity in order to determine whether equities market participants are inappropriately subsidizing CAT costs arising from options activity and the associated economic implications.[310]

In comments submitted for the 2023 Funding Model Amendment, this commenter states that the funding model discriminates against Industry Members that handle retail orders because of the amount of retail activity in sub-dollar stocks and fractional share trading, and that the Proposed Amendment does not explain why volume by shares was chosen over notional volume, or address its impact on specific Industry Members, investors, or overall market competition, efficiency and liquidity.[311] This commenter states that the Proposed Amendment would particularly impact retail investors given the amount of retail trading in low-priced NMS stocks.[312] This commenter states that CAT LLC recognized the unfairness of allocating fees for OTC equities by amending the allocation formula, but that no similar adjustment for low-priced NMS stocks was included.[313] The commenter states that this creates ''nonsensical outcomes,'' stating that, ''for example, buying 1,000 shares of an NMS stock priced at $0.50 results in 50 times more fees than buying 2,000 shares of an OTC stock priced at $5,

even though the purchase was for half the number of shares and 1/20th of the notional value.''[314] In particular, the commenter states that it is arbitrary, capricious, and unfairly discriminatory for the CAT Operating Committee to significantly adjust executed share volumes for sub-dollar OTC Equity Securities but not to do the same for sub-dollar NMS stocks, as retail investor transactions will be allocated a disproportionate percentage of total CAT costs simply due to the securities traded.[315] The commenter states that the Commission must assess the economic implications of the Proposed Amendment for retail investors in particular, to help determine whether retail investors are inappropriately subsidizing CAT costs arising from other trading activity, leading to negative impacts on efficiency, competition, and capital formation.[316]

CAT LLC states that this commenter makes several arguments stating that the Proposed Amendment does not adequately explain why it is equitable to use executed equivalent share volume as the basis for calculating CAT fees rather than message traffic, and that this commenter made the same arguments with respect to the use of executed equivalent share volume to calculate CAT fees under the Executed Shares Model when it was originally proposed, and CAT LLC addressed those comments in its May 2023 Response to Comments.[317]

CAT LLC proposed to delete the requirement in existing Section 11.2(b) of the CAT NMS Plan to take into account ''distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations'' in establishing the funding of the Company.[318] CAT LLC explained that this requirement is related to using

message traffic and market share in the calculation of CAT fees, as message traffic and market share were metrics related to the impact of a CAT Reporter on the Company's resources and operations.[319] CAT LLC explained that the requirement is no longer relevant because the proposed Executed Share Model uses the executed equivalent shares metric instead of message traffic and market share.[320]

With respect to the deletion in Section 11.2(b) of the requirement that, when establishing the funding of the CAT, the Operating Committee must take into account ''distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations,'' FINRA stated that the Participants have proposed to delete the language in Section 11.2(b) because the proposed Executed Share Model is inconsistent with the language.[321] FINRA stated that the Proposed Amendment ''seeks to amend the core funding principles to align with an unjustified allocation methodology.''[322] FINRA stated that any changes to the funding principles ''must be well-reasoned and transparent and must continue to support the achievement of a fair and equitable outcome.''[323]

In the Commission's view, the use of executed equivalent share volume as the basis for determining and allocating CAT costs during the two-year interim period is appropriate and consistent with the funding principles of the CAT NMS Plan.[324] The proposed use of executed equivalent shares would continue to incorporate the concept of cost alignment because trading activity, as reflected through executed equivalent share volume, would, as CAT LLC explained, correlate with the cost burden on the CAT.[325] It may not be possible to directly calculate each CAT Reporter's cost burden on the CAT due to the many factors impacting CAT costs, such as data processing, storage, reporting timelines and requirements, and connectivity. But executed equivalent share volume is a reasonable proxy for those costs because it is a result of trading activity, which CAT

---

[308] *Id.*

[309] *See* Citadel October 2025 Letter, at 6.

[310] *Id.*

[311] *See* Citadel July 2023 Letter, at 20; Citadel August 2023 Letter, at 5; Citadel October 2023 Letter, at 6.

[312] *See* Citadel October 2025 Letter, at 6. The commenter states that data shows that approximately 33% of total retail NMS stock trading activity in sub-dollar NMS stocks. *Id. See also* Citadel July 2023 Letter, at 20 (stating that the 2023 Funding Model Amendment made no adjustments for sub-dollar trading activity in NMS stocks, when adjustments were made to volume in OTC Equity Securities to adjust for the large number of shares transacted in sub-dollar securities).

[313] *See* Citadel October 2025 Letter, at 7.

[314] *See* Citadel October 2025 Letter, at 7.

[315] *See* Citadel August 2023 Letter, at 4–5 (stating that it is arbitrary, capricious, and unfairly discriminatory for the CAT Operating Committee to significantly adjust executed share volumes for sub-dollar OTC Equity Securities but not to do the same for sub-dollar NMS stocks, as retail investor transactions will be allocated a disproportionate percentage of total CAT costs simply due to the securities traded). The commenter states that since fractional shares would be rounded up to one share, the result would overstate volume. *See* Citadel July 2023 Letter, at 20.

[316] *See* Citadel October 2025 Letter, at 7. *See also* Citadel August 2023 Letter, at 4–5 (stating that the CAT Operating Committee must explain why it proposes to treat these securities differently and analyze the impact on retail investors).

[317] *See* CAT LLC December 2025 Response Letter, at 3; *see also supra* notes [345–350 and 372–374] and accompanying text. CAT LLC also states that it addressed this issue in the original filing proposing the 2023 Funding Model Amendment. *Id.*

[318] *See* proposed Section 11.2(b).

[319] *See* Notice, 90 FR at 44924.

[320] *Id.*

[321] *See* FINRA June 2022 Letter, at 4; *see also* FINRA April 2023 Letter, at 7.

[322] *See* FINRA June 2022 Letter, at 4. The commenter states that the Executed Share Model instead places the greatest emphasis on the funding principle relating to the ''ease of billing and other administrative functions,'' favoring that principle over cost alignment. *Id.* at 5.

[323] *Id.;* FINRA April 2023 Letter, at 8–9.

[324] *See* Section 11.2(b) of the CAT NMS Plan.

[325] *See* CAT LLC May 2023 Response Letter, at 7.

LLC explained impacts various CAT cost drivers, such as storage, data processing and message traffic.[326] In addition, because the proposed use of executed equivalent share volume would preserve the cost alignment principle, while no longer relying on message traffic, the deletion of the requirement in Section 11.2(b) of the CAT NMS Plan that the Operating Committee, in allocating costs, take into account ''distinctions in the securities trading operations of Participants and Industry Members and their relative impact upon Company resources and operations'' [327] is appropriate.

In response to the commenter that stated that equities market participants will contribute ''far more'' than options market participants,[328] the Commission believes that subsidization of options market activity likely is reduced due to other CAT cost burdens, such as those relating to data processing (such as equity linkage processing, which the Commission understands is more complex than options order linkage processing, and thus more costly), imposed on the CAT by equity market activity. The Commission, however, does not believe the failure to eliminate a potential subsidization of options market activity (and any potential attendant impacts on liquidity, competition and efficiency) renders the Participants' Funding Model proposal inconsistent with the Exchange Act. The Commission does not believe it is possible for the Participants to predict with certainty how the magnitude of each driver of CAT costs will change over time. To the extent the other costs noted above exceed, for example, the subsidy accorded to options market participants when calculating their executed equivalent shares, there may be no subsidy or even a reverse subsidy from options to equities markets. When the relative magnitudes of these cost drivers change, the amount of any subsidy changes. In light of the potential for the cost drivers to change over time, the Commission believes that the Participants' proposal is appropriate.

The Proposed Amendment's treatment of sub-dollar NMS stocks is appropriate. The Commission does not believe that the Participants' failure to discount sub-dollar NMS stocks renders the Proposed Amendment inconsistent with the Exchange Act. The Commission acknowledges one commenter's statement that retail investors could be allocated a disproportionate percentage of total CAT costs due to the lack of a discount for sub-penny NMS stocks.[329] However, treating a subset of NMS stocks differently from NMS securities could introduce unnecessary complexity or administrative burdens to the extent an NMS stock price falls or rises above a dollar. It is therefore appropriate for the Proposed Amendment to treat all NMS stocks the same, even though certain sub-dollar NMS stocks might have characteristics similar to OTC Equity Securities. Additionally, in response to the commenter's statement that since fractional shares would be rounded up to one share, the result would overstate volume,[330] the Commission notes that CAT fees will be based on the data contained in the transaction reports and transaction reports do not provide for fractional quantities; therefore, CAT fees cannot be calculated using fractional shares or fractional share components of executed orders at this time.[331] CAT LLC stated that if FINRA's equity transaction reporting facilities or the exchanges report transactions in fractional shares in the future, then the calculation of CAT fees would also reflect fractional shares.[332] In response to the comment that stated that the Proposed Amendment does not explain why volume by shares was chosen over notional volume,[333] calculating the notional value of stock introduces additional complexity as the notional value would have to be calculated and would depend on the value of the execution or trade, whereas the number of executed shares is reported and, in the cases of options for example, is based on a known multiplier (1/100). While using executed notional shares may offer advantages and may lessen any discrimination, the Proposed Amendment's use of executed shares is administratively easier, less prone to error, and thus for these reasons and the reasons set forth above, is a reasonable proxy for allocating the cost of the CAT.

The Original Funding Model would have used message traffic and market share to assess CAT fees on Industry Members and Execution Venues, respectively.[334] CAT LLC expressed its belief that the use of executed equivalent share volume would be an improvement on the Original Funding Model's use of message traffic,[335] explaining that the use of executed equivalent share volume would result in fees tied to transactions (which CAT LLC stated is the ''traditional source of revenue for Industry Members'' [336]), that the resulting CAT fees would not adversely impact market makers, and that the Executed Share Model is simple to understand and to implement.[337] CAT LLC stated that Industry Member revenue is often driven by transactions, but ''[b]ecause message traffic is separate from whether or not a transaction occurs, fees based on message traffic may not correlate with common revenue or fee models,'' [338] which could negatively impact certain Industry Members in a significant way.[339] CAT LLC stated that use of message traffic to calculate fees for Industry Members could adversely impact market makers because they generally create high levels of message traffic.[340] The Commission agrees with CAT LLC regarding the benefits of the Executed Share Model and the drawbacks of the Original Funding Model, and thus believe that the decision to replace the use of message traffic to calculate CAT fees with executed equivalent share volume in the Executed Share Model is appropriate.

Moreover, the Executed Share Model does not change the criteria used to charge Execution Venues (market share).[341] While there are differences in how the CAT fees would be allocated among the Participants under the Executed Share Model and the existing Original Funding Model, under the Executed Funding Model, as in the Original Funding Model, the fees charged to Participants will continue to be based upon the level of market share of each Participant.[342] The Original Funding Model approved by the Commission would have assessed CAT fees on Execution Venues (which would include the Participants) [343] based on market share determined by the share volume for a national securities exchange and determined by reported share volume of trades for a national securities association (*i.e.,* FINRA) that had trades reported by its members to

---

[326] *Id. See also* Notice, 90 FR at 44927, 44930.

[327] *See* Notice, 90 FR at 44924.

[328] *See* Citadel October 2024 Letter, at 6; *see also* Citadel August 2023 Letter, at 4.

[329] *See* Citadel October 2025 Letter, at 6–7; Citadel August 2023 Letter, at 4–5.

[330] *See* Citadel July 2023 Letter, at 20.

[331] *See* Notice, 90 FR at 44914.

[332] *Id.* at 44914, n.32.

[333] *See* Citadel July 2023 Letter, at 20. *See also* Citadel August 2023 Letter, at 5.

[334] *See* CAT NMS Plan, at Section 11.3(a) and (b).

[335] *See* Notice, 90 FR at 44930. The Original Funding Model uses message traffic as the basis of Industry Member CAT fees. *See* CAT NMS Plan, at Section 11.3(b).

[336] *See* Notice, 90 FR at 44927.

[337] *Id.*

[338] *Id.*

[339] *Id.*

[340] *Id.* at 44942.

[341] *See* CAT NMS Plan Approval Order, 81 FR at 84793–97; CAT NMS Plan, at Section 11.2, Section 11.3.

[342] *Id.*

[343] *See supra* note 17.

its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange in NMS Stocks or OTC Equity Securities.[344] FINRA's allocation of CAT fees under the Executed Share Model will continue to be based on its off-exchange market share.

The Commission recognizes that the proposed use of executed equivalent share volume is not a perfect proxy for CAT costs, but believes it is nonetheless a reasonable proxy. The costs of CAT are attributable to a number of factors, such as message traffic, storage, and data processing costs, and that for these reasons, the Commission understands that it is difficult to calculate each CAT Reporter's individual cost burden on the CAT. Additionally, there are other operational costs of the CAT that cannot be easily attributed to a particular CAT Reporter and that need to be funded, such as costs for CAT NMS Plan requirements related to intake capacity,[345] data search tools[346] and data security.[347] Based on the breadth of CAT costs, it is not feasible to calculate the cost burden on CAT of each CAT Reporter. A reasonable proxy for CAT cost burden must therefore be used. As discussed above, the Commission believes the proposed use of executed equivalent share volume is a reasonable method of approximating the cost burden of CAT.

Additionally, CAT LLC stated that the proposed Executed Share Model would not unfairly burden or favor a product or product type because the model would recognize the different types of securities by counting executed equivalent share volume differently for NMS Stocks, Listed Options and OTC Equity Securities.[348] The proposed treatment of these different types of securities would result in the equitable allocation of reasonable CAT fees across these securities. The Executed Share Model would count each executed contract for a transaction in Listed Options using the contract multiplier applicable to the specific Listed Option in the relevant transaction,[349] which is appropriate because a Listed Option contract typically represents 100 shares,

or it could represent another designated number of shares, and since Listed Options trade in contracts instead of shares, they would need to be converted into shares for purposes of calculating the executed equivalent share volume of a transaction in Listed Options. For OTC Equity Securities, the Executed Share Model would count each executed share for a transaction in OTC Equity Securities as 0.01 executed equivalent shares,[350] which is appropriate because CAT LLC represented that this amount was a result of an analysis it conducted of several different metrics comparing the markets for OTC Equity Securities and NMS Stocks, specifically total notional dollar value, total trades, and average share price per trade.[351] Additionally, since transactions in OTC Equity Securities typically are priced below one dollar, or even one penny, and tend to trade in larger quantities, this treatment is appropriate to prevent CAT Reporters trading OTC Equity Securities from being assessed higher CAT fees than their activity would deserve.

The equal allocation of Participant CAT fees to Participants, regardless of whether they are transacting in options or in equities, is appropriate. The Original Funding Model would have divided Participant CAT fees by Execution Venues that execute transactions (or in the case of a national securities association, has trades reported by its members to its trade reporting facility or facilities for reporting transactions effected otherwise than on an exchange) in NMS Stocks or OTC Equity Securities and by Execution Venues that execute transactions in Listed Options.[352] The Executed Share Model instead assesses a CAT fee based purely on executed equivalent share volume.[353] CAT LLC explained that the use of equivalent executed share volume is designed to normalize options and equities in the calculation of fees, and to recognize and address the different trading characteristics of different types of securities by counting executed equivalent share volume differently for Listed Options and for equities.[354] The use of executed equivalent share volume and, in particular, the different weights

assigned to equities versus options, are designed to result in an equitable treatment of the equities and options markets.

b. FINRA Allocation

Under the Executed Share Model, because FINRA is the Participant primarily responsible for oversight of off-exchange securities trading activity,[355] FINRA will likely have greater executed equivalent share volume than other Participants[356] and thus will be responsible for a significant portion of total CAT fees. In the Proposed Amendment, CAT LLC stated that the size of FINRA's fee is calculated based on the activity in the over-the-counter market.[357] CAT LLC stated that the executed equivalent share volume for over-the-counter trades in Eligible Securities in June 2025 was 377,983,597,154.08 out of a total volume of 952,977,614,616.08 executed equivalent shares for trades in Eligible Securities.[358] CAT LLC stated that approximately 40% of the executed equivalent share volume in Eligible Securities took place in the over-the-counter market.[359]

CAT LLC stated that the assessment of a CAT fee on FINRA in the same manner as the other Participants would not result in a burden on competition for FINRA or for Industry Members engaging in off-exchange activity.[360] CAT LLC also stated that FINRA and the exchanges should not be evaluated differently based upon the potential for a particular Participant to recoup its CAT fees through charging fees to its members or through revenue-generating activity other than passing its fees through to its members.[361] CAT LLC stated that each Participant, including FINRA, will need to determine for itself how it will obtain the funds to pay for its CAT fees.[362] Additionally, CAT LLC

---

[344] *See* CAT NMS Plan, at Section 11.3(a)(i).

[345] In the CAT NMS Plan Notice, the Commission said that it preliminarily believed that intake capacity level is likely to be a primary cost driver for the Central Repository. *See* Securities Exchange Act Release No. 77724 (Apr. 27, 2016), 81 FR 30614, 30770 (May 17, 2016) (''CAT NMS Plan Notice'').

[346] *See* CAT NMS Plan, at Appendix C, Section 8.1–8.2.

[347] *Id.* at Appendix D, Section 4.

[348] *See* Notice, 90 FR at 44938.

[349] *Id.* at 44918. A Listed Option contract typically represents 100 shares, or it could represent another designated number of shares. *Id.*

[350] *See* proposed Section 11.3(a)(i)(B)(III).

[351] *See* Notice, 90 FR at 44918.

[352] *See* CAT NMS Plan, at Section 11.3(a)(i), (ii).

[353] The Executed Share Model would count executed equivalent share volume differently for NMS Stocks, OTC Equity Securities and Listed Options for purposes of calculating a CAT fee. CAT LLC explains that the proposed approach ''would not favor or unfairly burden any one type of product or product type.'' *See* Notice, 90 FR at 44938. *See also supra* Part III.A.3.

[354] *See* Notice, 90 FR at 44918.

[355] *See* Securities Exchange Act Release No. 95388 (July 29, 2022), 87 FR 49930 (Aug. 12, 2022), at 49931 (stating that FINRA historically has overseen off-exchange securities trading activity and that ''the Exchange Act's statutory framework places SRO oversight responsibility with a [national securities association] for trading that occurs elsewhere than an exchange to which a broker or dealer belongs as a member.''), 49932 (stating that an exchange would primarily have SRO oversight responsibility of its members and their trading on the exchange, while SRO oversight of other trading activity, such as off-exchange trading, is primarily the responsibility of a national securities association).

[356] *See* Notice, 90 FR at 44932.

[357] *Id.*

[358] *Id.*

[359] *Id.*

[360] *Id.*

[361] *Id. See also* CAT LLC May 2023 Response Letter, at 9.

[362] *See* Notice, 90 FR at 44932.

stated that FINRA, just like the exchange Participants, has revenue sources other than membership fees,[363] explaining that FINRA generates significant revenues via Regulatory Services Agreements ("RSAs") with the exchanges, among other sources.[364] According to CAT LLC, these other revenue sources may be used to pay CAT fees, and, if they are used, would not lead to an increase in fees for Industry Members.[365]

FINRA objects to the Proposed Amendment on the ground that it forces FINRA to bear a disproportionate share of CAT costs without grappling with the implications of these costs, particularly given FINRA's status as a non-profit, member-funded national securities association.[366] FINRA also states that its allocation would largely be based on transaction volume reported to the TRF, but that TRF transactions generate fewer costs for the CAT,[367] as opposed to options activity, and yet only 25% of total Participant CAT fees would be assessed for options activity, while the remaining 75% would be assessed for equities activity.[368]

FINRA states that, unlike the exchange Participants, transactions are not executed on a FINRA marketplace and FINRA does not receive commercial revenue for those transactions.[369] FINRA explains that it does not currently directly receive fees from its TRFs for listed stocks that would cover CAT costs, because each FINRA TRF is operated by an exchange that retains the trade reporting and market data revenues generated by TRFs, subject to certain payments to FINRA for agreed-upon costs.[370] Thus, FINRA states that "exchanges have direct revenue streams from the operation of facilities on which

the transactions that are taxed using the Executed Share Model occur," whereas FINRA generally does not retain such revenue for over-the-counter transactions in listed securities.[371] FINRA also states that its members can report over-the-counter transactions in listed stocks to the FINRA Alternative Display Facility, although most transactions are reported to a TRF.[372]

FINRA further states that regulatory services agreements ("RSAs") that FINRA has entered into with various exchanges to perform regulatory oversight and market surveillance functions have RSA-related revenues that cover FINRA's costs of regulatory services provided to the exchanges. FINRA states that they have not been— and, as voluntary commercial contracts, cannot be reasonably viewed as—a reliable source of sustainable CAT funding sufficient to replace membership fees at the levels required by the Executed Share Model.[373] Additionally, FINRA questions CAT LLC's statement that the Proposed Amendment "reflects a reasonable effort to allocate costs based on the extent to which different CAT Reporters participate in and benefit from the equities and options markets." [374] Specifically, the commenter asks how CAT LLC's statement explains the size of FINRA's allocation [375] and notes that this statement "conflates the costs to create and operate the CAT with the usage of CAT data." [376]

FINRA also expresses concern about alleged arbitrary treatment by the other Participants of the CAT NMS Plan.[377] FINRA believes that its "outsized allocation" [378] was because of its limited voting power, only having one out of 25 votes on the Operating Committee as it does not control, nor is under common control with, any other Participant.[379] FINRA states that it is critical for the Commission to consider the differences among Participants and the inevitable impact on FINRA members of any cost allocation to FINRA.[380] FINRA believes that the other Participants' treatment of FINRA arbitrarily benefits themselves, treating FINRA as a market center in the

CAT NMS Plan while not as a market center under the CT Plan, which governs the public dissemination of real-time consolidated market data for national market system stocks.[381]

Commenters also believe that the allocation to FINRA would increase the allocation to Industry Members.[382] FINRA stated that because it relies on regulatory fees from its members for funding, it must increase its member fees in order to fund CAT costs that it cannot recover from contractual arrangements with TRF exchanges.[383] FINRA stated that the Proposed Amendment does not adequately analyze the allocation's impact, including whether the allocation would increase Industry Members' allocation of total costs beyond two-thirds.[384] The other commenter states that the Proposed Amendment provides no explanation as to how FINRA, as a not-for-profit organization, will fund its allocation of CAT costs, and suggests that broker-dealers and their customers could actually be allocated, for example, at least 80% of the entire CAT budget due to bearing FINRA's portion.[385]

In the Proposed Amendment, CAT LLC contested the view that FINRA should not be treated as a market center for CAT funding purposes merely because FINRA is not treated as a market center for governance purposes under the National Market System Plan Regarding Consolidated Equity Market Data ("CT Plan").[386] CAT LLC explained that the purpose and implementation of the CT Plan and the CAT NMS Plan are different.[387] CAT LLC stated that while the CAT NMS Plan explicitly contemplates charging fees to all Participants, including FINRA,[388] and that the CAT is solely for

---

[363] *Id.*

[364] *Id.*

[365] *Id.*

[366] *See* FINRA October 2025 Letter, at 4, 6–7; FINRA May 2023 Letter, at 2; FINRA April 2023 Letter, at 3; FINRA June 2022 Letter. *See also* FINRA Wilson Sonsini January 2026 Letter, at 4 (stating that CAT LLC "elides FINRA's continued objections to a cost allocation methodology based entirely on executed share volume," and that "FINRA objected to that model because it disproportionately allocated the Participants' share of CAT costs to FINRA, the only not-for-profit SRO that relies primarily on fees from its members for funding and the only Participant not operating a market"). The commenter has previously stated that FINRA's share was more than double that of the next highest Participant and $4 million more than all option exchanges combined. *See* FINRA April 2023 Letter, at 4; *see also* FINRA June 2022 Letter, at 5.

[367] *See* FINRA April 2023 Letter, at 8, n.23.

[368] *Id.;* FINRA May 2023 Letter, at 2.

[369] *See* FINRA April 2023 Letter, at 3; FINRA October 2025 Letter, at 12.

[370] *See* FINRA October 2025 Letter, at 12. *See also* FINRA April 2023 Letter, at 3.

[371] *See* FINRA October 2025 Letter, at 12. *See also* FINRA April 2023 Letter, at 4.

[372] *Id.* FINRA April 2023 Letter, 3, n.8.

[373] *See* FINRA October 2025 Letter, at 12. *See also* FINRA April 2023 Letter, at 4.

[374] *Id.* FINRA April 2023 Letter, at 7.

[375] *Id.*

[376] *Id.; see also* FINRA June 2022 Letter, at 6.

[377] *See* FINRA April 2023 Letter, at 6, n.16.

[378] *See* FINRA April 2023 Letter, at 7; FINRA June 2022 Letter, at 6.

[379] *See* FINRA April 2023 Letter, at 4, 8. *See also* FINRA June 2022 Letter, at 8.

[380] *See* FINRA October 2025 Letter, at 15–16.

[381] *See* FINRA April 2023 Letter, at 6, n.16.

[382] *See* FINRA April 2023 Letter, at 5–7; FINRA Wilson Sonsini January 2026 Letter, at 4; Citadel July 2023 Letter, at 2, 16, 21. *See also* Citadel October 2025 Letter, at 9.

[383] *See* FINRA April 2023 Letter, at 5–6. *See also* FINRA June 2022 Letter, at 7.

[384] *See* FINRA April 2023 Letter, at 6.

[385] *See* Citadel October 2025 Letter, at 9.

[386] *See* Notice, 90 FR at 44932. *See also* Joint Industry Plan; Order Approving, as Modified, a National Market System Plan Regarding Consolidated Equity Market Data; Securities Exchange Act Release No. 92586 (Aug. 6, 2021), 86 FR 44142 (Aug. 11, 2021) (File No. 4–757) ("Order Approving the CT Plan"). The Order Approving the CT Plan was vacated by the D.C. Circuit on July 5, 2022. *See The NASDAQ Stock Market LLC et al.* v. *SEC,* Case No. 21–1167, D.C. Cir. (July 5, 2022). *See also* Securities Exchange Act Release No. 88827; File No. 4–757 (May 6, 2020), 85 FR 28702 (May 13, 2020) (Order Directing the Exchanges and the Financial Industry Regulatory Authority to Submit a New National Market System Plan Regarding Consolidated Equity Market Data).

[387] *See* Notice, 90 FR at 44932.

[388] *See* CAT NMS Plan, at Sections 11.2 and 11.3.

regulatory purposes, providing a regulatory system to facilitate the performance of the self-regulatory obligations of all of the Participants, including the exchanges and FINRA,[389] "[i]n contrast, the CT Plan governs the public dissemination of real-time consolidated equity market data for NMS stocks." [390]

In a response to the comments to the 2023 Funding Model Amendment, CAT LLC stated that the proposed transaction-based CAT fee is purposely agnostic as to the location of where a trade occurs, and an intent of this design is to avoid influencing whether or where any trading activity would take place. Moreover, CAT LLC stated that FINRA is no different from the exchanges in terms of its regulatory obligations regarding the CAT.[391] CAT LLC also stated that FINRA's allocation is "fair and reasonable as FINRA is currently, and is expected to continue to be, one of the largest regulatory users of the CAT, and it is responsible for the oversight of the very large over-the-counter securities market." [392]

FINRA requested that if the Commission were to approve the Proposed Amendment, that it acknowledge "FINRA's need and ability to cover CAT costs that are not recovered through contractual arrangements through member fee increases, so as not to jeopardize FINRA's ability to carry out its critical regulatory mission." [393] FINRA also stated that it would file a rule change to increase its member fees with the filing of any proposed rule change to effectuate the Funding Model.[394]

The Commission acknowledges that executions do not take place on FINRA; however, the CAT NMS Plan already categorizes FINRA as an Execution Venue because it has trades reported by its members to its TRFs for reporting transactions effected otherwise than on an exchange. Thus, treatment of FINRA as an Execution Venue is not a change to the existing CAT NMS Plan.[395] Additionally, this allocation of fees to FINRA is similar to how Section 31 fees are assessed on FINRA.[396]

The Commission acknowledges the comments objecting to the allocation to FINRA of approximately 40% of the total CAT costs to be borne by Participants,[397] but believes that it is appropriate for the Proposed Amendment to assess fees to FINRA based on executed equivalent share volume like the other Participants for purposes of funding the CAT during the interim two-year period in which the Proposed Amendment is in effect. FINRA is a Participant of the CAT NMS Plan. The CAT NMS Plan contemplates the allocation of a share of CAT costs to all Participants, and any funding model that governs during the interim two-year period must determine how to allocate the Participants' share among the individual Participants.[398] The Executed Share Model reasonably allocates CAT fees among the Participants based on market share. In particular, the Executed Share Model assesses CAT fees based on executed equivalent share volume and splits the fees evenly among the buyer, seller, and the market regulator in each transaction. FINRA would pay the Participant CAT fee based on off-exchange trades reported by its members to its trade reporting facilities because FINRA is the market regulator responsible for the market in which the TRF transactions occur. Since FINRA is generally the market regulator for the over-the-counter markets, its CAT fees, and thus market share, will be based on the trading activity in the over-the-counter markets reported to it by its members. The trading volume of the over-the-counter markets is greater than that on the exchanges; consequently, FINRA will likely be allocated a greater executed equivalent share volume, and thus a greater share of CAT fees, than the other Participants. That outcome reasonably reflects the fact that trading volume generates costs for CAT. As discussed above, because it is difficult to calculate each CAT Reporter's individual cost burden on the CAT, a reasonable proxy for CAT cost burden must be used, and executed share volume is one such reasonable proxy because trading activity impacts CAT costs. The proposed use of executed equivalent share volume is thus a

readily determinable and equitable method of allocating costs during the interim two-year period. In practice, CAT Reporters will be assessed fees corresponding to their trading activity, or in FINRA's case, trading activity in the over-the-counter markets reported to it by its members.

The Commission recognizes that there could be other methodologies for allocating costs among CAT Reporters during the two-year interim period, such as allocations that take into account the manner in which each Participant earns revenue, but these other methodologies may be significantly more complex and would not necessarily more accurately reflect the cost burden of each CAT Reporter. CAT LLC chose to propose the use of executed equivalent share volume, explaining why trading activity is a reasonable proxy for cost burden and an appropriate metric for allocating CAT costs.[399] Although there may be multiple permissible approaches to cost allocation, the proposed allocation of Participant CAT fees based on executed equivalent share volume is appropriate and meets the Rule 608 approval standard.[400]

The Commission agrees with CAT LLC that the Executed Share Model reasonably assesses fees to FINRA in the same manner based on transaction volume as other Participants. The Executed Share Model is reasonably designed to be neutral as to the manner of execution and place of execution.[401] All Participants are self-regulatory organizations that have the same regulatory obligations under the Exchange Act, regardless of whether they operate as a for-profit or not-for-profit entity. Their regulatory responsibilities for the operations of CAT are the same.[402]

The Commission acknowledges the concern expressed that FINRA's allocation could indirectly increase the allocation of CAT fees to Industry Members since Industry Members contribute to FINRA's funding.[403] In addition, the Commission understands that FINRA does not directly receive fees from its TRFs for listed stocks that would cover CAT costs, because each FINRA TRF is operated by an exchange that retains the trade reporting and market data revenues generated by TRFs, and so FINRA generally does not

---

[389] See Notice, 90 FR at 44932.

[390] Id.

[391] Id.

[392] See CAT LLC July 2023 Response Letter, at 35.

[393] FINRA April 2023 Letter, at 7.

[394] Id.

[395] See CAT NMS Plan Approval Order, 81 FR at 84793; CAT NMS Plan, at Section 1.1. (defining "Executing Venues").

[396] 15 U.S.C. 78ee. Section 31 of the Securities Exchange Act requires each national securities exchange and national securities association to pay transaction fees to the Commission. Specifically, Section 31(c) requires each national securities association to pay to the Commission fees based on

the aggregate dollar amount of covered sales transacted by or through any member of the association other than on an exchange. 15 U.S.C. 78ee(c). Section 31(a) permits the Commission to collect transaction fees and assessments designed to recover the costs to the Government of the annual appropriation to the Commission by Congress. 15 U.S.C. 78ee(a).

[397] Id. at 3.

[398] See CAT NMS Plan, at Section 11.1(b); Section 11.3(a).

---

[399] See Notice, 90 FR at 44927.

[400] See 17 CFR 242.608(b)(2).

[401] See Notice, 90 FR at 44927.

[402] Id.

[403] See FINRA April 2023 Letter, at 5–7; Citadel July 2023 Letter, at 2, 16, 21. See also FINRA Wilson Sonsini January 2026 Letter, at 4; FINRA June 2022 Letter, at 4.

retain revenue for over-the-counter transactions in listed securities.[404] As discussed above, however, the costs of CAT must be allocated between the Participants and Industry Members according to some formula. And each Participant and Industry Member must decide how to pay for the costs it incurs under the Plan. The Participants and Industry Members have different means of potentially directly or indirectly recovering from others some of the costs allocated to them (*e.g.,* the Participants indirectly from Industry Members and Industry Members directly or indirectly from customers). That would be true regardless of the initial allocation and does not change the fact that dividing the costs evenly among the three parties who have primary roles related to the transaction is a reasonable method of determining the initial allocation of CAT costs. If FINRA were to try to recover CAT costs by increasing existing fees on Industry Members, and could demonstrate that the proposed fees were consistent with the requirements of the Exchange Act, Industry Members may be able to offset any such increase in fees by passing the increase through to their customers, just as they may do with Section 31-related fees and other fees. The Commission recognizes, however, that not all Industry Members currently pass through fees or would determine to do so in the future.

Finally, the Commission does not agree with the comment that the Participants' treatment of FINRA is arbitrary because FINRA is treated as a market center for purposes of determining its CAT funding obligations while the CT Plan, which governs the public dissemination of consolidated market data, would not have counted FINRA's market activity for purposes of determining the allocation of votes on the Operating Committee.[405] The different treatment of FINRA in these NMS plans reasonably reflects the very different roles that a market center is used for in these contexts. FINRA and the exchanges are similarly situated in the relevant respect in the context of the CAT NMS Plan: all have self-regulatory

obligations in their markets that CAT is intended to facilitate, and, like the original funding model, the Proposed Amendment thus allocates costs among the Participants based on market share. By contrast, the CT Plan concerns the dissemination of real-time market data for NMS stocks, a context in which FINRA and the exchanges are not similarly situated. Moreover, the CT Plan provisions discussed by the commenters involve the determination of which Participant(s) could be eligible for a second vote on the Operating Committee,[406] while the Executed Share Model proposes to assess FINRA a Participant CAT Fee based on its role as the regulator for the over-the-counter market in which such trades occur.[407] Any request that the Commission issue an order soliciting comment on whether the Operating Committee should be reorganized consistent with the CT Plan would be better addressed in the context of a separate Plan amendment.

4. CAT Executing Broker

As noted above, CAT Executing Brokers will be charged CAT fees.[408] CAT LLC proposed to add a definition of "CAT Executing Broker" to Section 1.1 of the CAT NMS Plan. The definition would explain which party would be identified as a CAT Executing Broker in a transaction.

With respect to transactions on an exchange and over-the-counter transactions, CAT LLC would use transaction reports reported to the CAT by FINRA or the exchanges to identify the transaction, as well as the CAT Executing Broker for each transaction, for purposes of calculating the CAT fees.[409] Under the Participant Technical Specifications, for transactions occurring on a Participant exchange, there is a field for the exchange to report the market participant identifier ("MPID") of "the member firm that is responsible for the order on this side of the trade." [410] The Industry Members identified in these fields for the transaction reports would be the CAT Executing Brokers for transactions

executed on an exchange.[411] FINRA is required to report to the CAT transactions in Eligible Securities reported to a FINRA trade reporting facility (*i.e.,* the TRF, Over-the-Counter Reporting Facility ("ORF") and Alternative Display Facility ("ADF")).[412] Under the Participant Technical Specifications, for such transactions reported to a FINRA trade reporting facility, FINRA is required to report the MPID of the executing party as well as the MPID of the contra-side executing party.[413] The Industry Members identified in these two fields for the transaction reports would be the CAT Executing Brokers for over-the-counter transactions.[414]

For transactions on ATSs, if an ATS is identified as the executing party and/ or the contra-side executing party in the TRF/ORF/ADF Transaction Data Event, then the ATS would be a CAT Executing Broker for purposes of the Executed Share Model.[415] If the ATS is identified as the executing party for the buyer in such transaction reports, then the ATS would be the CEBB.[416] If the ATS is identified as the executing party for the seller in such transaction reports, then the ATS would be the CEBS.[417] If the ATS is identified as both the executing party and contra-side executing party, the ATS would be both the CEBB and the CEBS.[418] ATSs would determine the executing party and the contra-side executing party reported to FINRA's equity trading facilities in accordance with the transaction reporting requirements for FINRA's equity trading facilities.[419]

---

[404] *See* FINRA October 2025 Letter, at 12. *See also* FINRA April 2023 Letter, at 3–4.

[405] *See* FINRA April 2023 Letter, at 6. The CT Plan provided that an exchange group or independent exchange that has more than 15 percent of consolidated equity market share during four of the six calendar months preceding a vote of the operating committee would be authorized to cast two votes. The CT Plan stated that FINRA is not considered a market center for purposes of determining consolidated equity market share solely by virtue of facilitating trades through any TRF that FINRA operates in affiliation with a national securities exchange designed to report transactions otherwise than on an exchange. *See supra* note 386.

[406] *See* FINRA April 2023 Letter, at 6.

[407] *See* Notice, 90 FR at 44931–32.

[408] *See id.* at 44926.

[409] *Id.* at 44912. The transaction reports used to identify transactions and CAT Executing Brokers do not provide for fractional quantities; therefore, CAT fees would not be calculated using fractional shares or fractional share components of executed orders. *Id.* at 44914.

[410] *See* Section 4.7 (Order Trade Event) and Section 5.2.5.1 (Simple Option Trade Event: Side Trade Details) of the CAT Reporting Technical Specifications for Plan Participants, Version 4.2.0– r1 (Aug. 22, 2025), *https://catnmsplan.com/sites/ default/files/2025-08/08.22.2025-CAT_Reporting_ Technical_Specifications_for_Participants_4.2.0- r1.pdf.*

[411] *See* Notice, 90 FR at 44912.

[412] *See* Section 6.1 of the CAT Reporting Technical Specifications for Plan Participants (Aug. 22, 2025), *supra* note 410. A CAT Executing Broker in over-the-counter transactions identified on the TRF/ORF/ADF Transaction Data Event is determined based on the tape or media report, that is, a trade report that is submitted to a FINRA trade reporting facility and reported to and publicly disseminated by the appropriate exclusive Securities Information Processor. A CAT Executing Broker for over-the-counter transactions is *not* determined based on a non-tape report (*e.g.,* a regulatory report or a clearing report), which is not publicly disseminated. There is an exception to this statement for away-from-market trades. These are non-media trades reported to the TRF with an "SRO Required Modifier Code" of "R".

[413] *See* Notice, 90 FR at 44913.

[414] *Id.*

[415] *Id.* at 44913–14.

[416] *Id.* at 44914.

[417] *Id.*

[418] *Id. See also* FINRA, Trade Reporting Frequently Asked Questions at Section 203, *available at https://www.finra.org/filing-reporting/ market-transparency-reporting/trade-reporting- faq#203;* FINRA Regulatory Notice 09–08, *available at https://www.finra.org/rules-guidance/notices/09- 08.*

[419] *See* Notice, 90 FR at 44914.

For transactions that do not occur on an exchange and there is only a FINRA member identified for one side of the trade, that FINRA member would be treated as the CAT Executing Broker for both the buy-side and the sell-side of the transaction, that is, as the CEBS and CEBB.[420] Additionally, "[f]or any trade report on which a Canadian non-member appears as a party to the trade, the FINRA member must appear as the reporting party."[421] In this situation, the executing broker identified in the "reportingExecutingMpid" field would be billed for both sides of the transaction.[422]

The Executed Share Model also provides for cancellations and corrections.[423] CAT LLC stated that it expects to determine CAT fees based on the transaction reports for a month as of a particular day.[424] To the extent that changes are made to the transaction reports on or before the day the CAT fees are determined for the given month, the changes will be reflected in the monthly bill.[425] To the extent that changes are made to the transaction reports after the day the CAT fees are determined for that month, subsequent bills will reflect any changes via debits or credits, as applicable.[426] CAT LLC represented that it will establish specific policies and procedures regarding the treatment of such adjustments as those related to cancellations and corrections, as is required under the CAT NMS Plan to adopt policies, procedures, and practices regarding the billing and collection of fees.[427] Furthermore, CAT LLC stated that it will inform Industry Members and other market participants of these policies and procedures via FAQs, CAT Alerts and/or other appropriate methods.[428]

In a comment for the 2023 Funding Model Amendment, a commenter suggests allocating costs to the party originating an order, stating that this would "streamline the process and more accurately allocate costs . . ."[429] With respect to alternatives to the proposed definition of the CAT Executing Broker, CAT LLC states that the "originating broker" suggestion was from a commenter who had previously recommended charging executing brokers in comment letters on an earlier

funding model proposal.[430] CAT LLC states that the commenter's objection to charging executing brokers in the Executed Share Model was an attempt to further delay the approval of a funding model and the resultant payment of CAT fees by its members, rather than expressing a concern about the merits of charging executing brokers.[431] CAT LLC states that assessing a transaction-based fee to an executing broker is "not new or novel."[432]

CAT LLC further states that it disagrees with charging an originating broker instead of an executing broker because there are already several existing examples of transaction-based fees being assessed to executing brokers as opposed to the originating broker (e.g., TAF, Section 31 fees, ORF fees), and it disagrees with the assertion that charging originating brokers would be easier.[433] CAT LLC states that charging the originating Industry Member would be difficult to implement and would increase the costs of implementing CAT fees, whereas charging CAT Executing Brokers is simple, straightforward and in line with existing fee and business models because for any given trade (buy or sell), there is only one CAT Executing Broker to which shares can be allocated.[434] As such, CAT LLC states that "charging the CAT Executing Broker is simple and straightforward, and leverages a one-to-one relationship between billable events (trades) and billable parties."[435] CAT LLC states that, for a single trade event, there may be many originating brokers, and each trade must be broken down on a pro-rata basis, "to account[ ] for one or more layers of aggregation, disaggregation, and representation of the underlying orders."[436] Therefore, CAT LLC states that a model that begins the funding analysis with new order events (e.g., MENO or MONO events) and then looks for any execution or fulfillment that is directly associated with that event does not reduce or mitigate the complexity associated with aggregation."[437] Further, CAT LLC states that the commenter's recommendation would not work with the design of the CAT

system, stating that "[w]hile CAT is indeed designed to capture and unwind complex aggregation scenarios, the data and linkages are structured to facilitate regulatory use, and not a billing mechanism that assesses fees on a distinct set of executed trades; it is not simply a matter of using existing CAT linkages."[438] CAT LLC also states that charging originating brokers would implicate issues related to lifecycle linkage rates, and issues related to corrections, cancellations and allocations, but charging CAT Executing Brokers would avoid such complications.[439] CAT LLC also states that allocating to the originating broker would not include Industry Members that were only involved in routing and execution, which would include "some of the largest Industry Members,"[440] and that these Industry Members "are not involved in the origination of orders or originate few orders in relation to their overall market activity."[441] Furthermore, CAT LLC states that originating brokers would also need to establish processes for paying CAT fees, just as CAT Executing Brokers would.[442]

The commenter responds to the 2023 CAT LLC response letters by expressing uncertainty about CAT LLC's response that some of the largest Industry Members are not involved in order origination or originate few orders relative to their market activity, stating that it is unclear to whom the statement is referring since the executing broker and the originating broker would be the same firm in the case of proprietary trading activity.[443] Additionally, the commenter stated that the originating broker model should be pursued if it dramatically reduces market-wide implementation costs with a marginal increase in CAT costs, noting that Industry Members could bear most, if not all, CAT costs to implement the originating broker model.[444] The commenter stated that, before proceeding, the CAT Operating Committee must publish an analysis of the costs and benefits of the executing broker and originating broker models including any differences in CAT implementation costs and Industry Member implementation costs.[445]

In the Commission's view, CAT LLC's definition of "CAT Executing Broker" is appropriate given that the Executed

---

[420] See proposed Section 1.1 of the CAT NMS Plan (definition of "CAT Executing Broker").
[421] See Notice, 90 FR at 44914.
[422] Id.
[423] Id.
[424] Id.
[425] Id.
[426] Id.
[427] See CAT NMS Plan, at Section 11.1(d).
[428] See Notice, 90 FR at 44914.
[429] See Citadel July 2023 Letter, at 20.

[430] See CAT LLC May 2023 Response Letter, at 2.
[431] See id. at 3.
[432] See CAT LLC July 2023 Response Letter, at 5.
[433] Id. at 5. See also CAT LLC July 2023 Response Letter, at 3–4, 4 (detailing challenges of allocating CAT costs to originating brokers).
[434] See CAT LLC May 2023 Response Letter, at 5. See also CAT LLC July 2023 Response Letter, at 3.
[435] See CAT LLC May 2023 Response Letter, at 5. See also CAT LLC July 2023 Response Letter, at 4.
[436] See CAT LLC May 2023 Response Letter, at 5. See also CAT LLC July 2023 Response Letter, at 3.
[437] See CAT LLC May 2023 Response Letter, at 5.

[438] Id.
[439] Id.
[440] See CAT LLC July 2023 Response Letter, at 3.
[441] Id.
[442] Id.
[443] See Citadel August 2023 Letter, at 6.
[444] Id.
[445] Id.

Share Model is based upon the calculation of *executed* equivalent shares (emphasis added),[446] and the executing brokers are reasonably suited to know their own volume and plan for future volume of executed equivalent shares to pay the CAT fees. In addition, the Commission agrees with the Participants that the ease of administration in using the transaction reports to identify the executing broker is an advantage of the Proposed Amendment.[447] Given the similar issues with either approach—either charging the fees to a subset of Industry Members based on whether they are the ''CAT Executing Broker'' or the originating broker—it is appropriate to choose the less administratively burdensome of the two options. Accordingly, the assessment of CAT fees on CAT Executing Brokers is appropriate.[448]

In response to the commenter that questioned CAT LLC's response that some of the largest Industry Members are not involved in order origination or originate few orders relative to their market activity,[449] the Commission is not relying on this statement by CAT LLC and understands that the executing broker and the originating broker would be the same in the case of proprietary trading activity. Although one commenter suggested that the originating broker model should be pursued if it dramatically reduces market-wide implementation costs with a marginal increase in CAT costs,[450] the Commission believes that the executing broker model is appropriate. The Commission understands the argument that charging originating brokers instead of executing brokers would be easier and more cost effective for the executing brokers, but it would be at the expense of the originating brokers. The Commission also understands that charging executing brokers instead of originating brokers is easier and more cost effective for the CAT Plan Processor. Using CAT Data, the CAT Plan Processor can more easily determine which executing broker to charge. On the other hand, if the CAT Plan Processor were to charge originating brokers, the Commission believes the CAT Plan Processor would have to rely on linkages, which may not be one-for-one in all circumstances, to determine which originating broker to charge for an execution. And this difficulty not only would add to the costs of the CAT but also would impact

transparency and potentially the relative simplicity of the CAT Fees. Moreover, the Proposed Amendment does not address how executing brokers pass-through CAT fees to their customers.

Using transaction reports to identify the transaction for purposes of calculating the CAT fees as well as the CAT Executing Broker for each transaction for purposes of calculating the CAT fees is a straightforward and more objective method of identifying executing brokers than other methods, such as identifying an originating broker through an evaluation of CAT linkages. Although the definition of ''CAT Executing Broker'' may not be used by the industry or universally accepted, CAT Executing Brokers will be able review their transactions reports and request details regarding the calculation of their fees, which should allow them to better assess the impact of the Executed Share Model on their business models.[451] It is appropriate for CAT LLC to establish policies and procedures on the treatment of adjustments related to cancellations and corrections. CAT LLC stated that to the extent changes are made to the transaction reports on or before the day the CAT fees are determined for the given month, the changes will be reflected in the monthly bill.[452] To the extent that changes are made to the transaction reports after the day the CAT fees are determined for that month, subsequent bills will reflect any changes via debits or credits, as applicable.[453] It is appropriate to adjust an Industry Member's or Participant's CAT fees for cancellations and corrections when such adjustments are made to the transaction reports that are used for calculate CAT fees for that month. Additionally, under Section 11.1(d) of the CAT NMS Plan, the Operating Committee is required to adopt policies and procedures regarding the billing and collection of fees.[454]

It is the Commission's view that charging CEBBs and CEBSs is appropriate. The Executed Share Model recognizes that there are three parties who play significant roles in transactions reportable to the CAT: the Participant, the buy-side and the sell-side.[455] The Proposed Amendment also is based on *executed* equivalent shares (emphasis added).[456] As such, CAT LLC stated that charging the CEBBs and

CEBSs would reflect the executing role the CEBB and CEBS have in each transaction.[457] Additionally, charging CEBBs and CEBSs is in line with the use of transaction reports from the exchanges and FINRA's equity trading reporting facilities for calculating the CAT fees.[458] Specifically, these transaction reports identify CEBBs and CEBSs, so charging such entities potentially streamlines the fee charging process.[459] CAT LLC also explained that charging both the buy-side and the sell-side of a transaction would be consistent with other fees, such as the options regulation fee.[460]

Charging CAT Executing Brokers, clearing firms or ''originating brokers'' all would impose the costs initially on a subset of Industry Members. As discussed above, given that the charges are based on executed equivalent shares, it makes sense to use the CAT Executing Brokers as the immediate recipients of the charge. Accordingly, the Commission agrees with CAT LLC that it is reasonable to impose the charge on CAT Executing Brokers. The Commission acknowledges that charging CEBBs and CEBSs would impose a burden on such firms, which could potentially have an effect on their net capital. However, currently, such firms regularly pay transaction-based fees to the Participants, which they may pass-through to their customers who, in turn, may pass their CAT fees to their customers, until the fee is imposed on the ultimate participant in the transaction.[461] Additionally, unlike clearing firms that may simply clear a trade on behalf of the executing broker, executing brokers are always parties to a transaction, including instances that may result in CAT costs but not in actual trades, such as unexecuted orders. The Commission therefore agrees with CAT LLC that assessing Industry Members CAT fees on CEBBs and CEBSs would be appropriate for their ''executing role'' in each transaction.[462]

### 5. Prospective CAT Fees

#### a. Fee Rate Formula

Under the Executed Share Model, Participants, CEBSs and CEBBs would be subject to fees designed to cover the ongoing budgeted costs of the CAT, as determined by the Operating

---

[446] *See* Notice, 90 FR at 44912.

[447] *See id.* at 44943.

[448] *See* 17 CFR 242.608(b)(2).

[449] *See* Citadel August 2023 Letter, at 6.

[450] *Id.*

[451] *See* proposed Section 11.3(a)(iv)(A) and 11.3(b)(iv)(A) of the CAT NMS Plan. *See also infra* Part III.A.7. (Calculation Information; Billing and Collection of CAT Fees).

[452] *See* Notice, 90 FR at 44914.

[453] *Id.*

[454] *See* CAT NMS Plan, at Section 11.1(d).

[455] *See* Notice, 90 FR at 44932.

[456] *Id.* at 44914.

[457] *Id.* at 44928.

[458] *Id.*

[459] *Id.*

[460] *Id.* at 44926.

[461] *See* Notice, 90 FR at 44938.

[462] *Id.*

Committee.[463] Each Participant and CAT Executing Broker would be required to pay a CAT Fee related to Prospective CAT Costs for each transaction in Eligible Securities in the prior month based on CAT Data.[464] CAT Fees would be calculated by multiplying the executed equivalent shares in the transaction by one-third and the applicable ''Fee Rate.'' [465] The Commission received no comments on the Fee Rate Formula.

At the beginning of each year, the Operating Committee would set the Fee Rate to be used to determine CAT Fees.[466] To calculate the Fee Rate for Prospective CAT Costs, the Operating Committee would divide the reasonably budgeted CAT costs by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for that year.[467] The Operating Committee would base the projected total executed equivalent share volume on the total executed equivalent share volume of transactions in Eligible Securities from the prior twelve months.[468] Additionally, CAT LLC would permit the Operating Committee to use its discretion to analyze likely volume for the upcoming year [469] and Participants would be required to describe the calculation of the projection in their fee filings submitted to the Commission pursuant to Section 19(b) to implement the CAT Fee for Industry Members.[470] The Operating Committee also would be required to perform a mid-year adjustment of the Fee Rate for CAT Fees related to Prospective CAT Costs.[471]

CAT LLC proposed Section 11.3(a)(i)(A)(I) of the CAT NMS Plan to describe the annual calculation of the Fee Rate and the requirement for Participants to file a fee filing for CAT Fees to be charged to Industry Members calculated using the Fee Rate. Under the Executed Share Model, the Operating Committee will calculate the Fee Rate by dividing the reasonably budgeted CAT costs for the year by the reasonably projected total executed equivalent share volume of all transactions in

Eligible Securities for the year.[472] Should the budgeted costs be higher than actual costs, any budget surplus will be credited against the fees for the following year, as CAT LLC cannot hold higher than a 25% reserve.[473]

Once the Operating Committee has approved such Fee Rate, the Participants shall be required to file with the Commission, pursuant to Section 19(b) of the Exchange Act,[474] CAT Fees to be charged to Industry Members calculated using such Fee Rate.[475] Participants and Industry Members will be required to pay CAT Fees calculated using this Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.[476]

Proposed Section 11.3(a)(i)(A)(II) of the CAT NMS Plan describes the mandatory mid-year calculation of the Fee Rate and the requirement for Participants to file a fee filing for CAT Fees to be charged Industry Members calculated using the Fee Rate. Under the Executed Share Model, the Operating Committee will adjust the Fee Rate once mid-year [477] by dividing the reasonably budgeted CAT costs for the remainder of the year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year.[478] Once the Operating Committee has approved the new Fee Rate, the Participants shall be required to file with the Commission, pursuant to Section 19(b) of the Exchange Act, CAT Fees to be charged to Industry Members calculated using the new Fee Rate.[479] Participants and Industry Members will be required to pay CAT Fees calculated using this new Fee Rate once such CAT Fees are in effect with regard to Industry Members in accordance with Section 19(b) of the Exchange Act.[480]

CAT LLC proposed to add Section 11.3(a)(i)(A)(III) to the CAT NMS Plan to state that CAT Fees related to Prospective CAT Costs do not sunset automatically; such CAT Fees would remain in place until new CAT Fees are in place with a new Fee Rate.[481]

CAT LLC proposed to add Section 11.3(a)(i)(A)(IV) to the CAT NMS Plan to provide that the first CAT Fee may commence at the beginning of the year or during the year. If it were to

commence during the year, the CAT Fee would be calculated as if it were a mid-year calculation.[482]

It is appropriate to require that each Participant, CEBB and CEBS pay a CAT Fee related to Prospective CAT Costs for each transaction in the prior month based on CAT Data.[483] Basing the CAT Fee on transaction data from the prior month is appropriate as it is recent in time and therefore more reflective of current market data, and the Commission did not receive any comments on this issue.

The manner in which the Fee Rate for Prospective CAT Costs will be calculated (*i.e.,* by dividing the CAT costs reasonably budgeted for the upcoming year by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the year) is appropriate.[484] The use of projected executed equivalent share volume in determining the Fee Rate is appropriate because it would provide the likely volume for the year to be used as the denominator. It is appropriate to use the prior twelve months to determine the projected total executed equivalent share volume of all transactions in Eligible Securities for the year [485] because it would be the most recent data available to use to make a projection needed to calculate the Fee Rate, and the most recent data is on balance more likely to resemble the near future.

Additionally, as noted above, that the Commission agrees with CAT LLC's analysis that ''trading activity provides a reasonable proxy for cost burden on the CAT, and therefore is an appropriate metric for allocating CAT costs among CAT Reporters.'' [486] Further, requiring that the CAT costs be ''reasonably budgeted'' and projected total executed equivalent share volume be ''reasonably projected'' is designed to help impose some discipline or constraints in the fee setting process. It is appropriate for CAT LLC to permit the Operating Committee to project the upcoming volume for the upcoming year.[487] It is not possible to know exactly what the volume will be before the year begins, so a projection will be necessary. If the volume turns out to be higher than projected, then CAT LLC will be able to use its reserve to cover any shortage. If it is lower, resulting in a budget surplus, the CAT fees for the following year would be

---

[463] *See* proposed Section 11.3(a)(i)(A)(I) and (II); proposed Section 11.3(a)(iii)(A).

[464] *See* proposed Section 11.3(a)(ii)(A) and (iii)(A).

[465] *Id.*

[466] *See* proposed Section 11.3(a)(i)(A)(I). The Fee Rate would be established through a majority vote of the Operating Committee. *See* Notice, 90 FR at 44932.

[467] *See* proposed Section 11.3(a)(i)(A)(I).

[468] *See* proposed Section 11.3(a)(i)(D).

[469] *See* Notice, 90 FR at 44918.

[470] *See* proposed Section 11.3(a)(iii)(B); 15 U.S.C. 78s(b).

[471] *See* proposed Section 11.3(a)(i)(A)(II).

[472] *See* proposed Section 11.3(a)(i)(A)(I).

[473] *See infra* Part III.A.5.c (Reserves).

[474] 15 U.S.C. 78s(b).

[475] *See* proposed Section 11.3(a)(i)(A)(I).

[476] *Id.*

[477] *See* proposed Section 11.3(a)(i)(A)(II).

[478] *Id.*

[479] *Id.*

[480] *Id.*

[481] *See* proposed Section 11.3(a)(i)(A)(III).

[482] *See* proposed Section 11.3(a)(i)(A)(IV).

[483] *See* proposed Section 11.3(a)(ii)(A) and (iii)(A).

[484] *See* proposed Section 11.3(a)(i)(A)(I).

[485] *See* proposed Section 11.3(a)(i)(D).

[486] *See* Notice, 90 FR at 44930.

[487] *Id.* at 44918.

lower.[488] Furthermore, since the Participants would be required to describe the calculation of the projected total executed equivalent share volume in the fee filings submitted to the Commission, pursuant to Section 19(b) of the Exchange Act, to implement CAT Fees for Industry Members, the public will have an opportunity to review the projection and provide comment.[489]

The annual and mid-year adjustments of the Fee Rate for Prospective CAT Costs [490] are appropriate because they would ensure that CAT Fees related to Prospective CAT Costs would stay aligned with changes to the budget and projected volume occurring as the year progresses with contemporaneous data. Additionally, calculating a CAT Fee that starts mid-year as if it were a mid-year Fee Rate calculation is appropriate because calculating it that way would base the CAT Fee on the budgeted CAT costs and projected total executed equivalent share volume of all transactions in Eligible Securities for the remainder of the year, rather than for the entire year. This is an appropriate treatment of a CAT Fee that would commence mid-year, not at the beginning of the year.

One commenter believes that the Proposed Amendment is unlawful because it does not include any detail regarding actual CAT costs that will be allocated to broker-dealers and instead relies on future filings made by each SRO pursuant to Commission Rule 19b–4.[491] This commenter states that Rule 608 of Regulation NMS, does not permit fee filings relating to an NMS Plan to be filed as immediately effective, and instead required that they be approved by the Commission prior to becoming effective.[492] In addition, the commenter states that the Commission must assess whether the actual costs that may be allocated are fair and reasonable because *post hoc* review of fee filings is insufficient.[493]

In response to a commenter to the 2023 Funding Model Amendment that raised a similar argument, CAT LLC stated that Proposed Amendment complies with Rule 608.[494] CAT LLC stated that Section 11.1(b) of the CAT NMS Plan requires the Participants to file Industry Member CAT fees pursuant to Section 19(b) of the Exchange Act,[495] and Section 19(b) permits fees to become effective upon filing.[496] CAT LLC also noted that the funding methodology for Participant fees would be established through the Proposed Amendment, which was filed in accordance with Rule 608; therefore, Participant CAT fees would be adopted in accordance with Rule 608.[497] CAT LLC stated that Industry Member CAT fees would be filed pursuant to Rule 19b–4 and those filings would be based on the Proposed Amendment, which would have to be approved pursuant to Rule 608, therefore "any Industry Member CAT fees will have been subject to the same extensive notice and comment process as Participant CAT fees and must satisfy the requirements of the Exchange Act." [498]

CAT LLC states that the Funding Proposal complies with Rule 608 of Regulation NMS because Section 11.1(b) of the CAT NMS Plan, as approved by the Commission, requires the Participants to file Industry Member CAT fees pursuant to Section 19(b) of the Exchange Act, and Section 19(b) permits fees to become immediately effective upon filing.[499] CAT LLC states that the fee filing process under Section 19(b), and Rule 19b–4 thereunder, provides Industry Members protection from potentially unreasonable fees.[500]

The commenter responds to CAT LLC's statements by stating that CAT LLC "simply" points back to the 2016 CAT NMS Plan as permitting fee filings under Rule 19b–4, but the Commission amended Rule 608 in 2020 to require Commission approval of these filings, several years after the Commission approved the CAT NMS Plan.[501] This commenter states that the Proposed Amendment cannot be reasonable and equitable if it allows the SROs to recoup clearly unreasonable costs from broker-dealers and their customers pursuant to filings that are deemed immediately effective and immune from judicial review, contrary to explicit Commission rules.[502] Another commenter supports the view of that commenter, stating that the Proposed Amendment circumvents Rule 608 by relying on immediately-effective SRO fee filings.[503] This commenter states that Commission rules require that fees associated with NMS Plans like the CAT be approved under Rule 608 before they become effective, and imposing CAT costs via immediately effective SRO fee filings under Rule 19b–4 effectively shields core elements of the CAT funding model from both Commission approval and judicial review, contrary to the Commission's own rulemaking and the concerns highlighted by the Eleventh Circuit.[504]

The Commission disagrees with the commenters' position. The filing of Industry Member CAT fees under Rule 19b–4 is consistent with the structure of the CAT. The CAT NMS Plan functions as a joint agreement amongst the SROs who are parties to the CAT NMS Plan. But Industry Members are not parties to the Plan and the Plan itself does not bind Industry Members. Rather, Rule 608(c) of Regulation NMS requires each SRO to enforce compliance by its members with an effective NMS plan of which it is a sponsor or a participant.[505] Additionally, Rule 613(g) requires: (1) each SRO plan sponsor to file a proposed rule change to require its members to comply with Rule 613 and the CAT NMS Plan pursuant to Section 19(b)(2) of the Exchange Act and Rule 19b–4 thereunder; [506] (2) each member of an SRO plan sponsor to comply with the CAT NMS Plan; [507] (3) each SRO plan sponsor to agree to enforce compliance by its members with the CAT NMS Plan; [508] and (4) the CAT NMS Plan to include a mechanism to ensure compliance with the CAT NMS Plan.[509] Thus, Industry Members' CAT reporting requirements stem from rules the Participants put in place for their members pursuant to the Section 19(b)(2) rule filing process.[510]

The amendments to Rule 608 ("Rescission of Effective-Upon-Filing Procedure for NMS Plan Fee Amendments"), among other things,

---

[488] *See infra* Part III.A.5.c (Reserve).

[489] *See* proposed Section 11.3(a)(iii)(B).

[490] *See* proposed Section 11.3(a)(i)(A)(I) and (II).

[491] *See* Citadel October 2025 Letter, at 10; Citadel January 2026 Letter, at 5.

[492] *See* Citadel October 2025 Letter, at 10. *See also* Citadel July 2023 Letter, at 15 (stating that the proposed approach seems inconsistent with recent Commission rulemaking to ensure that fee filings related to an NMS plan can no longer be effective upon filing); ASA February 2026 Letter, at 4.

[493] *See* Citadel October 2025 Letter, at 11. The commenter states that historical CAT costs and the current CAT budget are known right now, and the Commission must determine whether those costs are reasonable to recoup. *Id.*

---

[494] *See* CAT LLC July 2023 Response Letter, at 30.

[495] *Id.*

[496] *Id.*

[497] *Id.* at 31.

[498] *Id.*

[499] *See* CAT LLC December 2025 Response Letter, at 8.

[500] *Id.*

[501] *See* Citadel January 2026 Letter, at 6. This commenter states that the Commission specifically referenced the CAT NMS Plan multiple times throughout the release, clearly conveying the expectation that fee filings under the CAT NMS Plan would be subject to Commission approval going forward. *Id.*

---

[502] *See id.*

[503] *See* ASA February 2026 Letter, at 4.

[504] *See id.*

[505] 17 CFR 242.608(c). *See also* CAT NMS Plan, at Section 3.11 (requiring each Participant to comply with and enforce compliance, as required by Rule 608(c), by its Industry Members with the provisions of Rule 613 and the CAT NMS Plan).

[506] 17 CFR 242.613(g)(1).

[507] 17 CFR 242.613(g)(2).

[508] 17 CFR 242.613(g)(3).

[509] 17 CFR 242.613(g)(4).

[510] *See* Securities Exchange Act Release No. 80256 (Mar. 15, 2017), 82 FR 14526 (Mar. 21, 2017).

rescinded Rule 608(b)(3)(i),[511] a provision that permitted fee changes assessed under NMS plans to become effective-upon-filing, and required NMS Plan fee amendments to be filed pursuant to Rule 608(b)(1) and (2), thus mandating an opportunity for public comment and Commission approval by order before the effectiveness of such fees.[512] Vendors and subscribers of market data under the Market Data Plans are subject to vendor or subscribers' fees charged by the applicable NMS Plan and filed by the NMS Plan using Rule 608. As these vendors and subscribers are not parties to the NMS Plans, the mechanism by which fees are imposed on them is contractual. Specifically, in order to receive market data under the NMS Plans, vendors and subscribers must individually enter into a vendor and/or a subscription agreement under which they agree to pay fees.[513] The rescission impacted the way the Commission considers fees imposed on vendors and subscribers of market data under Market Data Plans since their fees are filed by the NMS Plans pursuant to Rule 608.

In contrast, all Industry Members who are CAT Reporters are members of at least one Participant. Industry Members are bound by the rules of the Participant(s) of which they are members. The process for adopting rules of a Participant that affect their members is through the Section 19(b) rule filing process, which includes the ability to adopt immediately-effective fees.[514] Additionally, fees filed by the Section 19(b) rule filing process are still subject to public notice and comment, and the Commission may suspend and institute proceedings on these filings.[515] The Section 19(b) rule filings will be based on fees established by the Proposed Amendment—an amendment that was not filed under rescinded Rule 608(b)(3)(i) but noticed and subject to notice and comment. Through this process, market participants are able to

comment on the Proposed Amendment, which is not effective upon filing, and market participants will not be charged a new or altered fee before comments can be submitted and considered, and the Commission approves the Proposed Amendment, consistent with the Rescission of Effective-Upon-Filing Procedure for NMS Plan Fee Amendments. Prior to the Rescission on Effective-Upon-Filing Procedure for NMS Plan Fee Amendments, the SROs could have filed fee proposals for immediate-effectiveness under the now rescinded Rule 608(b)(3)(i),[516] as well as through the Section 19(b) rule filing process.[517] The Rule 608 process would have permitted a single filing, while the Section 19(b) rule filing process requires each SRO to submit individual filings. In the case of the CAT, the Participants explicitly chose, in the CAT NMS Plan, the Section 19(b) rule filing process. For these reasons, the Commission does not believe that the Rescission of Effective-Upon-Filing Procedure for NMS Plan Fee Amendments impacts the CAT NMS Plan provisions relating to how Industry Member fees are filed with the Commission.

b. Budgeted CAT Costs

The calculation of the Fee Rate for CAT Fees related to Prospective CAT Costs requires the determination of the Budgeted CAT Costs for the year or other relevant period.[518] Proposed Section 11.3(a)(i)(C) of the CAT NMS Plan provides that the budgeted CAT costs for the year shall be comprised of all reasonable fees, costs and expenses reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and operation of the CAT as set forth in the annual operating budget approved by the Operating Committee pursuant to Section 11.1(a) of the CAT NMS Plan, or as adjusted during the year by the Operating Committee.[519]

Section 11.1(a) of the CAT NMS Plan describes the requirement for the Operating Committee to approve an operating budget for CAT LLC on an annual basis. It requires the budget to "include the projected costs of the Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company." [520] CAT LLC proposed to amend Section 11.1(a) to require the Operating Committee to approve a *reasonable* operating budget for CAT LLC on an annual basis.[521]

CAT LLC also proposed to amend Section 11.1(b) of the CAT NMS Plan to add a reference to Section 11.1. Currently, Section 11.1(b) states that "[s]ubject to Section 11.2, the Operating Committee shall have the discretion to establish funding for the Company" including establishing fees to be paid by the Participants and Industry Members (that shall be implemented by the Participants) . . ." [522] CAT LLC proposed to add a reference to Section 11.1 so that "[s]ubject to Section 11.1 and Section 11.2" the Operating Committee would have the discretion to establish funding for the Company.[523] CAT LLC explained that this proposed change is relevant because Section 11.1 relates to the budget and the budget is used to calculate fees.[524]

CAT LLC also proposed to add subparagraph (i) to Section 11.1(a) of the CAT NMS Plan to list the types of CAT costs to be included in the budget. Specifically, CAT LLC proposed to state that "[w]ithout limiting the foregoing, the reasonably budgeted CAT costs shall include technology (including cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs), legal, consulting, insurance, professional and administration, and public relations costs, a reserve, and such other categories as reasonably

[511] 17 CFR 242.608(b)(3)(i).

[512] *See* Securities Exchange Act Release No. 89618 (Aug. 19, 2020), 85 FR 65470, 65471 (Oct. 15, 2020) ("Rescission on Effective-Upon-Filing Procedure for NMS Plan Fee Amendments Order").

[513] *See, e.g.,* UTP Plan Subscriber Agreement, *available at https://www.utpplan.com/DOC/ subagreement.pdf;* Second Restatement of the Plan Submitted to the Securities and Exchange Commission Pursuant to Rule 11Aa3–1 under the Securities Exchange Act of 1934, composite as of June 3, 2021, *available at https://www.ctaplan.com/ publicdocs/ctaplan/notifications/trader-update/ 110000358917/CTA%20Plan%20- %20Composite%20as%20of%20June%203, %202021.pdf,* at Exhibit C (Form of Vendor Contract); at Exhibit D (Form of Subscriber Contracts).

[514] 15 U.S.C. 78s(b)(3)(A).

[515] *Id. See also* 17 CFR 240.19b–4(f)(2).

[516] *See* Rescission on Effective-Upon-Filing Procedure for NMS Plan Fee Amendments Order, at 65483 (noting that "[s]ince 2017, the CAT Plan has filed two NMS plan fee amendments under Rule 608(b)(3)(i) to establish the allocation of funding for the CAT."). As noted at the time, one of those fee filings was abrogated by the Commission and one was withdrawn by the Participants. *Id.* Subsequent to the Rescission on Effective-Upon-Filing Procedure for NMS Plan Fee Amendments, the Participants have filed all CAT Plan fee amendments pursuant to standard Rule 608 provisions, which means that such fee amendments have not been immediately effective and are subject to notice and comment, like the Proposed Amendment.

[517] *See* CAT NMS Plan Approval Order, at 84710, 84792–93, 84794, 84796–97.

[518] *See* proposed Section 11.3(a)(i)(A)(I).

[519] CAT LLC proposed to use budgeted CAT costs in calculating CAT Fees rather than costs incurred. CAT LLC explained that using budgeted CAT costs

is necessary to build financial stability to support the Company as a going concern, in accordance with the funding principle in Section 11.2(f) of the CAT NMS Plan, because it would allow CAT LLC to collect fees before bills become payable. CAT LLC stated that if CAT Fees were only collected after bills become payable, Participants would have to continue to fund the CAT for all CAT costs to pay bills as they are due. *See* Notice, 90 FR at 44936.

[520] *See* CAT NMS Plan, at Section 11.1(a).

[521] *See* proposed Section 11.1(a).

[522] *See* CAT NMS Plan, at Section 11.1(b).

[523] *See* Notice, 90 FR at 44914.

[524] *Id.*

determined by the Operating Committee to be included in the budget.'' [525]

In a comment letter submitted for the 2023 Funding Model Amendment, a commenter states that the Operating Committee refuses to provide cost transparency, such as more details on the broad expense categories provided in the operating expenses (as well as the Historical CAT Costs) provided in the proposed amendment.[526] The commenter believes that the lack of transparency into costs would prevent the Commission from finding that the proposed allocation methodology is reasonable [527] and would raise concerns that inappropriate expenses would be allocated to Industry Members, like litigation expenses incurred by the Operating Committee against the Commission, and expenses prohibited by the Financial Accountability Amendments from being recovered by the Operating Committee.[528]

The commenter also suggests enhancements to improve budget transparency.[529] The commenter suggests that all CAT operating budgets should remain published on the CAT website [530] and that any material change to the CAT system, related technology contracts or implementation scope should require the filing of an NMS plan amendment explaining the necessity of the change and include a robust cost-benefit analysis.[531]

In addition, the commenter suggests that exchanges be responsible for costs that exceed the budget in order to incentivize cost control,[532] and that Industry Members should not be allocated costs for matters specifically for the benefit of the Operating Committee or the Commission (such as

costs related to litigation ''or filings that are inconsistent with the Exchange Act'' [533]), stating that ''Industry Members should also not be allocated costs relating to how data is presented to, and used by, regulatory Staff at the SROs or the Commission.'' [534] Furthermore, the commenter suggests that change requests that do not involve specific NMS Plan requirements should be allocated to the requestor, including the Commission.[535]

This commenter also raises cost concerns in the context of the 2023 Funding Model Amendment, including discussing the need for a cost review mechanism.[536] The commenter requests that the Commission formally approve the CAT budget on an annual basis.[537] The commenter further states that the Proposed Amendment made no attempt to specify the key drivers of costs, such as explaining the requirements that resulted in significant cost increases, or the design alternatives the Operating Committee previously considered.[538] The commenter added that Industry Members must fund a 25% reserve above budgeted amounts, and ad-hoc discussions between the Operating Committee and the Commission could result in higher costs.[539] The commenter also suggests enhancements to reduce overall CAT operating costs.[540] Specifically, the commenter suggested that the Operating Committee and the Commission stop making changes to the CAT to stabilize operating costs, stating that there are changes slated for development that are currently subject to exemptive relief, and other requirements the commenter believes are outside the scope of the CAT NMS Plan that would result in costs that outweigh benefits.[541] The commenter suggests that the Operating Committee file an updated NMS plan to reflect the status quo,[542] and work with the Commission and industry to identify technical requirements that could be modified to reduce costs without sacrificing the key benefits of the CAT system, like moving timelines from T+1 to T+2.[543] The commenter also suggests

that steps should be taken to streamline the CAT submission process to minimize reporting errors and to reduce industry implementation costs, like implementing further data validation.[544]

In response to the comment that suggested that all CAT operating budgets should remain published on the CAT website,[545] submitted in connection with the 2023 Funding Model Amendment, CAT LLC states that it publishes its annual financial statements from 2017-on and voluntarily publishes its annual operating budget and updates to the budget occurring during the year.[546] CAT LLC states that, in response to the comment, it intends that prior CAT operating budgets will stay available on the CAT website.[547]

In addition, in response to a commenter suggesting that the exchanges be responsible for any costs that exceeded the approved budget,[548] CAT LLC states that this suggestion would not result in a fair and equitable allocation consistent with the Exchange Act because Industry Member trading activity ''contributes significantly'' [549] to CAT costs and it would not be fair for Participants to bear CAT costs exceeding the budget if unexpected increases in trading volume resulted in the increased CAT costs.[550] CAT LLC also states that this suggestion could incentivize the Participants to base the budget on ''the most conservative projections for future Industry Member data volume'' [551] to not be responsible for costs that go over the budget.[552] In addition, CAT LLC states that the Proposed Amendment would include both a requirement to adjust the Fee Rate during the year to address any changes in projected or actual transaction volume or budgeted or actual CAT costs, and an operational reserve to address shortfalls in collected fees versus actual CAT costs.[553]

In response to suggestions to use an independent cost review mechanism,[554] CAT LLC states that such a review process is unnecessary because it would go beyond what is required by either Rule 613 or the CAT NMS Plan, and would be superfluous since any CAT fees must, prior to being implemented,

---

[525] *Id.* CAT LLC has stated that it will consider providing additional detailed subcategories regarding technology costs, but notes that what it is currently providing is consistent with what is made publicly available on its website. CAT LLC has stated that it will consider the need to provide additional detailed subcategories for any area besides technology, both because technology costs account for the majority of the budget and because it is not considered ''best practices'' to disclose detailed legal or insurance information, as these are particularly sensitive. *Id.* at 44915. Detailed information is always available to the Commission for review upon request. *Id.*

[526] *See* Citadel July 2023 Letter, at 13–14. *See also id.* at 23.

[527] *Id.* at 2, 15, 26.

[528] *Id.* at 2.

[529] *See* Citadel July 2023 Letter, at 33–35.

[530] *Id.* at 3, 34.

[531] *Id.*

[532] *See* Citadel July 2023 Letter, at 3, 32. *See also* Citadel July 2023 Letter, at 2, 26 (stating that that ''the trajectory of annual operating expenses is unconstrained,'' and that the ''magnitude and trajectory'' of the costs are not reasonable since Industry Members have borne nearly all CAT-related costs''); Citadel August 2023 Letter, at 7.

[533] *Id.* at 32.

[534] *Id.*

[535] *Id.*

[536] *See* Citadel July 2023 Letter, at 8, 26, 27. *See also* Citadel July 2023 Letter, at 3, 33 (suggesting that an independent expert committee assess whether cost levels and third party arrangements are reasonable, and whether more cost-control measures are warranted).

[537] *Id.*

[538] *Id.* at 14.

[539] *Id.* at 26.

[540] *See* Citadel July 2023 Letter, at 33–35.

[541] *Id.* at 3, 32–33.

[542] *See* Citadel July 2023 Letter, at 3, 33.

[543] *Id.*

[544] *Id.*

[545] *See* Citadel July 2023 Letter, at 3, 34.

[546] *See* CAT LLC July 2023 Response Letter, at 26.

[547] *Id.*

[548] *See* Citadel July 2023 Letter, at 32.

[549] *See* CAT LLC July 2023 Response Letter, at 12.

[550] *Id.*

[551] *Id.*

[552] *Id.*

[553] *Id.*

[554] *See, e.g.,* Citadel July 2023 Letter, 3; 2023 Funding Model Order, at 62654.

undergo the review process detailed in Rule 608 and Section 19(b) of the Exchange Act.[555] CAT LLC also notes that the Commission is entitled to request additional budget or cost information it views as necessary to better evaluate those fees.[556] CAT LLC also states that it already provides significant cost transparency through the public disclosure of its quarterly budget information and its financials, and that it is already actively engaged in cost discipline efforts, including through a designated cost-management working group.[557] CAT LLC further explain that Participants are subject to regulatory requirements to implement CAT and oversee their members and cannot have their compliance subject to a third party without such restrictions.[558] CAT LLC adds that the Commission itself could have its ability to oversee the securities markets undermined if CAT is subject to review by a third party without regulatory restrictions.[559]

In connection with the 2023 Funding Model Amendment, CAT LLC provides a further response to commenters that recommended the adoption of an independent cost review mechanism for CAT costs,[560] stating that a review process is not necessary or appropriate.[561] CAT LLC explains that it is already actively involved in cost discipline efforts, such as through a designated cost management working group, and already provides ''significant cost transparency'' by publishing its quarterly budget information and financial information.[562] CAT LLC also states that such a review process would go beyond the requirements of Rule 613 and would be unnecessary because changes to the funding model would be filed as a plan amendment under Rule 608 of Regulation NMS and CAT fees for Industry Members would be filed pursuant to Section 19(b) of the Exchange Act, and both processes would permit the public to comment on such proposals.[563] CAT LLC further states that providing a third-party that does not have regulatory obligations control over the annual budget could ''impermissibly restrict the Participants from discharging their regulatory obligations'' and undermine the Commission's ability to oversee the

securities markets.[564] CAT LLC also responds to the commenter that urged the Commission to annually approve the CAT budget [565] by stating that such an approval process would not be necessary or appropriate as CAT LLC is a private entity subject to the requirements of the Exchange Act, not a governmental entity, and CAT fees would be filed with the Commission under Rule 608 of Regulation NMS and Section 19(b) of the Exchange Act and subject to the Commission's review for consistency with the Exchange Act.[566] Furthermore, CAT LLC states that the Commission can request budget and financial information from CAT LLC if necessary for the evaluation of CAT fee filings.[567]

In response to comments submitted in connection with the 2023 Funding Model Amendment expressing concern about increasing CAT operating costs,[568] CAT LLC describes its commitment to cost management,[569] stating that cost management is a top priority and that it works to reduce costs in a number of ways, including through the Cost Management Working Group comprised of senior members of the Participants that works to find and address cost management needs.[570] CAT LLC also notes that Rule 613 and the CAT NMS Plan ''impose significant regulatory obligations on the Participants regarding how to design, build and operate the CAT System'' and that the Commission could compel the Participants to comply with Rule 613 or the CAT NMS Plan through enforcement actions if CAT LLC and the Participants ever fail to do so.[571] CAT LLC states that its largest cost driver is the processing and storage of CAT data in the cloud.[572] CAT LLC states that CAT NMS Plan requirements ''do not allow for any material flexibility in cloud architecture design choices, processing timelines (*e.g.,* the use of non-peak processing windows), or lower-cost storage costs,'' limiting CAT LLC's cost management efforts, and provided examples where CAT LLC and the Plan Processor worked to optimize cloud cost savings despite regulatory constraints.[573] CAT LLC describes other steps it has taken to save costs, such as

through requests to the Commission for exemptive relief and litigation challenging the Commission's interpretation of specific requirements of the CAT NMS Plan,[574] as well as identification of other changes that could substantially lower costs but would require exemptive relief or the filing of a Plan amendment.[575]

In response to one commenter's recommendation that CAT LLC work with the Commission to identify technical requirements that could be modified to reduce costs without sacrificing the key benefits of the CAT system,[576] CAT LLC states that both it and the Plan Processor work to identify and raise with Commission staff potential fundamental changes to the CAT NMS Plan that would limit costs without compromising on regulatory goals, and provided examples of such changes.[577]

Multiple commenters criticize the current cost of CAT and budget for CAT.[578] One commenter asks that the Commission obtain and assess the current and future trajectory of the CAT budget, including the key cost drivers and a detailed explanation as to why estimates from 2016 proved to be ''so inaccurate.'' [579] Another commenter states that the 2016 estimates of the cost of CAT ''proved to be grossly inaccurate'' and states that while recent cost-saving efforts are a good initial step, the annual CAT budget is still estimated to be nearly $200 million, which is ''far too high,'' and ''all options'' must be on the table to ''rightsize the system'' and design it more efficiently.[580] This commenter suggests some specific cost-savings measures for the CAT, such as relaxing processing deadlines, optimizing the linkage process, and simplifying data fields.[581]

One commenter characterizes the costs of the CAT as ''ballooning costs'' of a ''failed program,'' and states that the Commission must conduct a ''complete and comprehensive analysis of every

---

[555] *See* CAT LLC May 2023 Response Letter, at 10.
[556] *Id.*
[557] *Id.*
[558] *Id.*
[559] *Id.*
[560] *See* Citadel July 2023 Letter, at 33; 2023 Funding Model Order, at 62654.
[561] *See* CAT LLC July 2023 Response Letter, at 19.
[562] *Id.* at 20.
[563] *Id.* at 19–20.

[564] *Id.* at 20.
[565] *See* Citadel July 2023 Letter, at 33.
[566] *See* CAT LLC July 2023 Response Letter, at 20–21.
[567] *Id.* at 21.
[568] *See* Citadel July 2023 Letter, at 7–9; 2023 Funding Model Order, 88 FR at 62655.
[569] *See* CAT LLC July 2023 Response Letter, at 22–25.
[570] *Id.* at 22.
[571] *Id.*
[572] *Id.*
[573] *Id.* at 23.

[574] *Id.* at 24.
[575] *See* CAT LLC July 2023 Response Letter, at 25.
[576] *See* Citadel July 2023 Letter, at 33.
[577] *See* CAT LLC July 2023 Response Letter, at 25–26.
[578] *See* Citadel October 2025 Letter, at 4, 13; SIFMA October 2025 Letter, at 2; PTG Letter, at 3. *See also* AmFree Letter, at 1 (stating that the CAT is an ''unprecedented, multibillion-dollar surveillance apparatus).
[579] *See* SIFMA October 2025 Letter, at 2.
[580] *See* Citadel October 2025 Letter, at 4, 13 (stating that 2016 estimates of the cost of CAT ''proved to be grossly inaccurate'' and stating that); *See also* AmFree Letter, at 1 (stating that the CAT is an ''unprecedented, multibillion-dollar surveillance apparatus).
[581] *See* Citadel October 2025 Letter, at 13–14.

CAT-related cost,'' including an examination of how broker-dealer financial responsibilities were determined, and produce a public report detailing the findings of this audit, in order to ''ensure accountability to the investing public'' and ''improve the SEC's understanding of how costs for the CAT grew out of control.'' [582] Two commenters recommend engagement of a third-party technology firm to perform an independent review of the technological design of CAT to identify opportunities to optimize and reduce costs.[583] Two commenters state that the Commission should retire the electronic blue sheets system (''EBS''), which one commenter describes as a ''duplicative and costly legacy reporting system[.]'' [584]

Certain commenters also state that funding for the CAT should be part of the Commission's budget, funded through Section 31 fees and through Congressional appropriations.[585] One commenter states that in addition to being required by law, for the first time there will be meaningful checks and balances as part of the governance process and the Commission will be incentivized to carefully oversee the size of the CAT budget and carefully weigh the costs and benefits of required functionality, while Congress will have a clear role in order to protect against waste and regulatory overreach.[586] Another commenter states that this approach would better align incentives to control costs, address longstanding concerns about ineffective governance, and subject CAT to the checks and balances of the appropriations process for the SEC.[587]

CAT LLC responds to cost concerns by stating that the Participants and the

Plan Processor have worked diligently, in close collaboration with the industry, over the past year to reduce the CAT budget from approximately $249 million at the beginning of 2025 to approximately $188 million as of November 7, 2025.[588] In the Notice, CAT LLC states that as a result of optimizations, per unit costs have decreased significantly, allowing cloud fees to remain generally flat over the last three years despite 41% growth in data volumes over the same three-year period—$136 million and 109 trillion events in 2022, $128 million and 116 trillion events in 2023, and $135 million and 154 trillion events in 2024.[589] CAT LLC states that the Participants and the Plan Processor continue to seek additional opportunities to reduce CAT operating costs, whether by developing proposals to modify CAT NMS Plan requirements where the cost outweighs the regulatory need or by identifying opportunities to implement operational optimizations within the bounds of current CAT NMS Plan requirements.[590]

CAT LLC disagrees with commenters regarding the need to engage an independent technology firm to identify potential cost savings opportunities, believing instead that the Participants and the Plan Processor—in consultation with Industry Members—are best situated to identify opportunities to reduce CAT operating costs based on their deep expertise and familiarity with the technical aspects of the CAT System.[591] CAT LLC also states that it supports the Commission's announced comprehensive review of the CAT as well as the Commission's broader efforts to ensure that CAT achieves its intended

regulatory purposes in a cost-effective manner.[592]

CAT LLC also states that comments regarding Congressional appropriations and usage of Section 31 fees to pay for the CAT are focused on Congressional oversight of the Commission and its budget and, as such, they are more appropriately directed to the Commission—not CAT LLC.[593] CAT LLC states that in submitting the Proposed Amendment, CAT LLC has followed the requirements of Rule 608 of the Exchange Act which allows a proposed NMS Plan amendment to become effective upon a determination by the Commission that it is consistent with the Exchange Act and the rules and regulations thereunder.[594]

The Commission believes that some aspects of these comments are beyond the scope of the Proposed Amendment, such as the requests to retire EBS and various other cost-savings measures proposed for the CAT.[595] Suggestions to retire EBS fall outside the scope of the purview of the Participants, and suggestions to reduce CAT operating costs are better addressed in the context of a separate Plan amendment or requests for exemptive relief. However, the Commission is engaged in a comprehensive review of the CAT, and as part of this process the Commission expects to engage with the Participants, Industry Members, and the public more broadly on EBS, potential cost-savings measures for the CAT, and other issues.[596]

In the context of its comprehensive review of the CAT, the Commission also expects to seek input on potential alternative methods for funding the CAT. For the reasons discussed above, the Commission believes that the Proposed Amendment represents a reasonable approach to allocating the costs of the CAT during the interim period while the Commission engages in its review.

The Commission acknowledges the comments expressing concern about past increases to the CAT operating budget,[597] and the comments urging the

---

[582] See ASA October 2025 Letter, at 3. See also ASA February 2026 Letter, at 2 (requesting that ''the Commission conduct a complete and transparent financial audit of the CAT,'' and stating that the ''results of that audit should be compiled into a public report that identifies any waste, mismanagement, or abuse, and should be completed before the Commission approves any new funding plan'').

[583] See Citadel October 2025 Letter, at 13; PTG Letter, at 3 (stating that the Commission should direct the CAT Operating Committee to engage an independent technology firm to evaluate the CAT's scope and system design, identifying opportunities to reduce costs).

[584] PTG Letter, at 3; Citadel October 2025 Letter, at 13.

[585] See Citadel January 2026 Letter, at 8; Citadel October 2025 Letter, at 13; SIFMA October 2025 Letter, at 4–5; PTG Letter, at 3. See also Citadel July 2023 Letter, at 28–29.

[586] See Citadel October 2025 Letter. at 13.

[587] See SIFMA October 2025 Letter. 4–5. See also PTG Letter, at 3 (stating that placing CAT within the Commission's budget would better, align incentives to control CAT costs and improve cost discipline and accountability).

[588] See CAT LLC December 2025 Response Letter, at 12 n.62. See also Notice, 90 FR at 44940 (stating that in spite of the need to process and store extremely large data volumes within strict requirements that leave little room for flexibility or discretion, the Plan Processor have continuously and effectively pursued cost savings measures within their control and have achieved meaningful cost reductions within these significant regulatory restraints).

[589] See Notice, 90 FR at 44940. In the Notice, CAT LLC also lists example Plan amendments, exemptive relief requests, and no-action requests presented to the Commission that CAT LLC states would materially reduce costs while preserving the CAT's core regulatory objectives. Id. at 44940–41.

[590] Id. (noting that on December 17, 2025, CAT LLC filed a proposed amendment to the CAT NMS Plan with the Commission that, if approved, would further reduce CAT costs by approximately $70–$90 million per year).

[591] See CAT LLC December 2025 Response Letter, at 12 n.62. CAT LLC continues to note that the Participants and the Plan Processor have worked diligently, in close collaboration with the industry, over the past year to reduce the CAT budget from approximately $249 million at the beginning of 2025 to approximately $188 million as of November 7, 2025, and continue to seek additional opportunities to reduce CAT costs. Id.

[592] See CAT LLC December 2025 Response Letter, at 12.

[593] See id. at 10.

[594] Id.

[595] See PTG Letter, at 3; Citadel October 2025 Letter, at 13; Citadel October 2025 Letter, at 13.

[596] See ''Evaluating the Continued Effectiveness of the Consolidated Audit Trail,'' https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202504&RIN=3235-AN54.

[597] See, supra note 578. See also Citadel August Letter, at 8; Citadel July 2023 Letter, at 2,5. Under the Proposed Amendment, the Participants must submit Rule 19b–4 filings that include a discussion of the budget that was used to calculate the Fee

need for independent review of costs,[598] but believes the Participants have reasonably explained why they chose not to include an independent cost review mechanism for budgeted CAT costs for the reasons stated in the Notice.[599] As discussed above, the Participants continue to have incentives to contain costs that are within their control as a result of, among other things, the transparency of the budget and Rule 19b–4 process, the one-third allocation of costs to Participants, and the direct pass-through prohibition.[600] In addition, the Participants' and Plan Processor's efforts to reduce the CAT budget in recent years, and continued analysis and development of proposals to modify CAT NMS Plan requirements in an effort to reduce CAT operating costs, demonstrate a sustained commitment to cost control even in the absence of an independent cost-review mechanism.[601] Going forward, in connection with its comprehensive review of the CAT, the Commission encourages CAT LLC to collaborate with industry and investigate the potential benefits and drawbacks of a potential third-party or independent review of CAT costs.

As discussed above, the Commission does not believe that a complete, preemptive prohibition on any form of pass-through is necessary to maintain adequate incentives and commitment to cost control during the two-year interim period in which the Proposed Amendment is in effect.[602] Unlike the funding model vacated by the Eleventh Circuit, the Proposed Amendment prohibits direct pass-through, and while the Proposed Amendment does not affirmatively prohibit other forms of pass-through, the Commission has made no determination that it would be permissible for any Participant to indirectly pass through its share of CAT costs.[603] Rather, as discussed above, any

such attempts would be subject to the Section 19(b) fee filing process, and to the extent the Participants fail to control costs, their ability to demonstrate that a proposed fee is reasonable and consistent with the Exchange Act may be compromised. Industry Members may also raise any concerns about the amounts allocated for each category in a particular budget when fee filings are submitted for Prospective CAT fees. The Section 19(b)(2) rule filing process provides an opportunity for public comments and will allow commenters to raise concerns if they believe fees, including CAT Fees, are not reasonable and equitably allocated, would result in unfair discrimination, or would impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act. Moreover, as regulator of the Participants, the Commission oversees and enforces compliance with the Plan, as well as consistency of any fees with statutory and regulatory standards.[604]

The Participants would be required to describe each line item in the fee filings for Industry Member CAT Fees and the Historical CAT Assessment, including the reasons for changes in each line item from the prior CAT fee filing, and would have to provide sufficient detail to demonstrate the budget or Historical CAT Costs (as applicable) is reasonable and appropriate.[605] While the above obligations and controls are sufficient, other cost discipline mechanisms proposed by CAT LLC would provide beneficial cost transparency, which would help keep fees and costs reasonable.[606] For example, (1) Section 9.2(a) of the CAT NMS Plan requires CAT LLC to make public an audited balance sheet, income statement, statement of cash flows and statement of changes in equity, and requires the Operating Committee to maintain a system of accounting established and administered in accordance with GAAP and to prepare financial statements or information supplied to the Participants in accordance with GAAP; [607] (2) CAT LLC publicly provides the annual operating budget and updates to the budget on the CAT NMS Plan website and also has held webinars about CAT costs and alternative funding models; (3) involvement by CAT LLC and FINRA CAT in efforts to reduce CAT costs

through CAT working groups and review of options to lower costly needs and obtain services in a cost-effective manner; and (4) Commission oversight of CAT funding through attendance at Operating Committee, Subcommittee and working group meetings and review of the Proposed Amendment and any associated CAT fees.[608] Additionally, the specification of the items required to be included in the operating budget is appropriate in that it will help the Commission, Industry Members and others evaluate CAT costs for purposes of commenting on CAT fees when they are proposed under Section 19(b) of the Exchange Act.[609] This additional detail should provide sufficient information about the budget for the Commission to determine whether such proposed fees are reasonable, and obviate the need for a separate Commission approval of the CAT budget, as suggested by commenters.[610] Additionally, the Commission understands that technology costs account for more than 90% of the CAT budget [611] and thus believes that it is appropriate for the CAT NMS Plan to require the Participants to separate such costs into costs for cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs.[612]

The Commission acknowledges the enhancements a commenter suggests in a comment letter for the 2023 Funding Model Amendment to reduce CAT operating costs by modifying the technical specifications (*e.g.,* by moving certain timelines to T+2 from T+1) and streamlining the reporting submission process (*e.g.,* implementing further data validation),[613] but such suggestions are better addressed in the context of a separate Plan amendment that could solicit public comment on and explore

---

Rate. At such time the Commission, Industry Members and the public will have an opportunity analyze the budget. This Order, which approves the Funding Model, does not weigh-in on the budgets or the resulting Fee Rates.

[598] *See, supra* note 583. *See also* Citadel July 2023 Letter, at 8, 26, 27.

[599] *See* Notice, at 90 FR 44934.

[600] *See supra* notes 236–242, and accompanying text.

[601] *See supra* note 591 (stating that the CAT budget has been reduced from approximately $249 million at the beginning of 2025 to approximately $188 million as of November 7, 2025).

[602] *See* supra notes 236–242, and accompanying text.

[603] *See* supra Part III.A.2. By contrast, the Eleventh Circuit interpreted certain specific language in the 2023 Funding Model Amendment Approval Order as allowing the Participants to shift all of the costs of CAT onto broker-dealers. 147 F.4th at 1272, 1276 (citing 88 FR 62684 n.1135 and 62636).

[604] *See* 17 CFR 242.608(b)(2), (c), (d); 17 CFR 242.613(h).

[605] *See* proposed Section 11.3(a)(iii)(B); proposed Section 11.3(b)(iii)(B)(II).

[606] *See* Notice, 90 FR 44939–40.

[607] *See* CAT NMS Plan, at Section 9.2(a). Section 9.2(a) states that unaudited statements shall be subject to year-end adjustments and may not include footnotes.

[608] *See* Notice, 90 FR at 44940. CAT LLC also lists the following as cost-control mechanisms: (1) CAT LLC must operate on a break-even basis, in which fees would be used to recover costs and a reserve, and a surplus would be treated as an operational reserve to offset future fees (*see* CAT NMS Plan, at Section 11.1(c)); (2) CAT LLC qualifies as a Section 501(c)(6) business league, which means it is not organized for profit and no part of its net earnings can inure to the benefit of any private shareholder or individual (26 U.S.C. 501(c)(6)). *Id.* at 44939–40.

[609] 15 U.S.C. 78s(b).

[610] *See* proposed Section 11.1(a)(i); proposed Section 11.3(a)(iii)(B) (requiring the information to be provided in the Industry Member CAT Fee filings submitted by the Participants to be of sufficient detail to demonstrate that the budget for the upcoming year, or part of year as applicable, is reasonable and appropriate).

[611] *See* Notice, 90 FR at 44914–15.

[612] *Id.* at 44914.

[613] *See* Citadel July 2023 Letter, at 33–35.

such amendments more fully.[614] The commenter also suggests that the CAT Operating Committee and the Commission stop making any changes to the CAT.[615] The Commission disagrees that the changes cited by the commenter are new CAT NMS Plan requirements; indeed the relevant Commission orders granting exemptive relief discuss the various requirements under the CAT NMS Plan that form the basis of the relief granted.[616] Furthermore, any amendments to the requirements in the CAT NMS Plan must be filed with the Commission and published for notice and comment and generally shall not become effective unless approved by the Commission.[617] Regarding the suggested enhancements to improve CAT transparency, the CAT NMS Plan and Rules 608 and 613 of Regulation NMS provide for sufficient advance notice of material changes to the CAT system and related costs. Changes to the CAT NMS Plan must be filed with the Commission as an NMS plan amendment pursuant to Rule 608 of Regulation NMS and therefore be subject to notice and comment, and, pursuant to Rule 613, the Commission shall consider, in determining to approve the amendment, the impact of CAT NMS Plan amendments on efficiency, competition and capital formation.[618] Additionally, Section 6.9 of the CAT NMS Plan requires a Supermajority Vote of the CAT Operating Committee in order to make Material Amendments [619] to the Technical Specifications. Section 6.9, however, does not provide unfettered discretion to the CAT Operating Committee to make changes to the CAT system; any amendments to the CAT Technical Specifications must be

consistent with the CAT NMS Plan. If the CAT Operating Committee or the Commission wish to impose additional requirements that are not contemplated by the CAT NMS Plan, such requirements must be proposed through an amendment to the CAT NMS Plan, filed under Rule 608 of Regulation NMS, which must be published for notice and comment.[620] The Commission agrees with the commenter that all CAT operating budgets should remain published on the CAT NMS Plan website, as they have been since 2022, and understands that CAT LLC will continue to do so in the future.[621] Therefore, the Commission does not believe it is necessary to add an explicit requirement to this effect.

The use of budgeted CAT costs is appropriate to determine the Fee Rate because it ties the Fee Rate to the costs that the CAT will likely incur during the relevant period which are also the Prospective CAT Costs that will need to be apportioned among the Participants and CAT Executing Brokers.[622] Should the use of budgeted costs result in a budget surplus, that surplus would translate to lower fees in the coming year because there would be a lower requirement for reserves.[623] Also, using budgeted costs to determine the Fee Rate facilitates financial stability, allowing CAT LLC to collect fees before bills become payable.[624]

The requirements that the Operating Committee approve a ''reasonable'' operating budget for CAT LLC,[625] that fees, costs and expenses be ''reasonable'' and that they be ''reasonably budgeted to be incurred by or for the Company in connection with the development, implementation and operation of the CAT as set forth in the annual operating budget approved by the Operating Committee'' [626] is appropriate in the public interest.[627] The existing CAT NMS Plan did not include such language, potentially providing the Participants full discretion to pass along to Industry Members costs that are not reasonable. Such costs could have included costs that were incurred due to

Participant mismanagement, costs that were inflated or costs that should reasonably be allocated to only the Participants. Requiring these costs to be reasonable and reasonably budgeted imposes discipline on CAT spending, and the Commission, Industry Members and others will be able to review budget information during the rule filing process under Section 19(b) of the Exchange Act.

c. Reserve

CAT LLC proposed to add a requirement to Section 11.1(a)(i) of the CAT NMS Plan that the budget shall include ''a reserve and such other cost categories as reasonably determined by the Operating Committee to be included in the budget.'' [628] CAT LLC also proposed to add paragraph (ii) to Section 11.1(a) of the CAT NMS Plan to state that ''[f]or the reserve referenced in paragraph (a)(i) of this Section, the budget will include an amount reasonably necessary to allow the Company to maintain a reserve of not more than 25% of the annual budget.'' [629] Moreover, CAT LLC would calculate the reserve based on the amount of the budget other than the reserve.[630] In addition, proposed subparagraph (ii) of Section 11.1(a) of the CAT NMS Plan would state that ''[t]o the extent collected CAT fees exceed CAT costs, including the reserve of 25% of the annual budget, such surplus will be used to offset future fees.'' [631] Proposed Section 11.1(a)(ii) of the CAT NMS Plan provides that ''[f]or the avoidance of doubt, the Company will only include an amount for the reserve in the annual budget if the Company does not have a sufficient reserve (which shall be up to but not more than 25% of the annual budget).'' [632] CAT LLC states that following the expiration of the Eleventh Circuit's stay of its mandate, CAT operations must be funded through the limited operational reserve, which is currently estimated to be exhausted in August 2026.[633]

---

[614] For example, the Commission has received a proposed CAT NMS Plan amendment that would, among other things, move the timing of the availability of certain data to regulatory users from T+1 to T+2. *See* Securities Exchange Act Release No. 104504 (Dec. 23, 2025), 90 FR 61506 (Dec. 31, 2025).

[615] *See* Citadel July 2023 Letter, at 33–35.

[616] *See* Securities Exchange Act Release No. 97350 (May 18, 2023), 88 FR 33655 (May 24, 2023); Securities Exchange Act Release No. 90689 (Dec.16, 2020), 85 FR 83667 (Dec. 22, 2020); Securities Exchange Act Release No. 90688 (Dec. 16, 2020), 85 FR 83634 (Dec. 22, 2020).

[617] *See* Rule 608(b)(1); 17 CFR 242.608(b)(1). However, a plan amendment can be put into effect upon filing with the Commission if it is designated as solely administrative, technical or ministerial. *See* Rule 608(b)(3).

[618] Rule 613(a)(5); 17 CFR 242.613(a)(5).

[619] The CAT NMS Plan defines a ''Material Amendment'' as an amendment to the Technical Specifications that ''would require a Participant or an Industry Member to engage in significant changes to the coding necessary to submit information to the Central Repository pursuant to this Agreement or if it is required to safeguard the security or confidentiality of the CAT Data.'' *See* CAT NMS Plan, at Section 6.9(c).

[620] *See* Rule 608(b)(1); 17 CFR 242.608(b)(1).

[621] *See* CAT LLC May 2023 Response Letter, at 10–11.

[622] *See* Notice, 90 FR at 44914.

[623] *See infra* Part III.A.5.c. (Reserve).

[624] *See id.*

[625] *See* proposed Section 11.1(a).

[626] *See* proposed Section 11.3(a)(i)(C).

[627] CAT LLC has previously stated that it provides annual budget and quarterly updates to the public. *See* CAT LLC May 2023 Response Letter, at 11. *See also* CAT Financial and Operating Budget, CAT, *available at: https://www.catnmsplan.com/cat-financial-and-operating-budget* (linking financial and operating budget documents from April 6, 2022 to December 11, 2025).

[628] *See* proposed Section 11.1(a)(i).

[629] *See* proposed Section 11.1(a)(ii).

[630] Specifically, proposed Section 11.1(a)(ii) of the CAT NMS Plan would state that ''[f]or the avoidance of doubt, the calculation of the amount of the reserve would exclude the amount of the reserve from the budget.''

[631] *Id.*

[632] *Id.*

[633] *See* CAT LLC December 2025 Response Letter, at 13. CAT LLC states that it should not be assumed that any Participant will voluntarily agree to loan funds to the Company once the operational reserve is exhausted, and that, absent Commission action to approve a viable funding model for the CAT, there is significant uncertainty regarding the continued operation of the CAT and the Company's ability to continue as a going concern. *Id.*

Three commenters object to the Participants' intent to fund CAT through the reserves built up in 2024 and 2025 under the now-vacated funding model.[634] One of these commenters states that the Eleventh Circuit's decision means that all provisions governing the 2023 funding model, including the one governing reserve funds, are invalid and no longer in effect, and so Participants are subject to the same funding obligations as they were prior to the Commission's approval of the 2023 Funding Model Amendment.[635] This commenter states that CAT LLC is now prohibited from using the reserves in any manner to fund the CAT, and the reserve was not intended for use by the Participants or the SEC as a way to avoid addressing the lack of a proper funding model.[636] The commenter also states that all that is left regarding reserves after the Eleventh Circuit's vacatur of the 2023 Funding Model Amendment is a provision in Article XI of the CAT NMS Plan that states "[a]ny surplus of the Company's revenues over its expenses shall be treated as an operational reserve to offset future fees," and that there are no "future fees" to "offset" unless and until the Commission approves a new and lawful funding model.[637]

The three commenters also object to the size of the reserve already collected by CAT LLC.[638] These commenters state that the level of the reserve indicates that CAT LLC collected more fees from Industry Members than the funding model permitted even while the 2023 funding model was still in effect.[639] One

commenter states that the 2023 Funding Model Amendment capped the reserve at 25% of CAT LLC's annual budget, meaning that the reserve of more than $125 million is more than double the amount permitted by the funding model, which was a cap of roughly $62.2 million based on CAT LLC's estimated 2025 budget of $248.8 million at the beginning of the year (a budget estimate that has decreased down to an estimated $182 million).[640] Another commenter states that a lack of Commission oversight has resulted in "disastrous consequences under the unlawful 2023 Order," allowing CAT LLC to "improperly" over-collect fees to fund the reserve at an amount "far beyond" the 25% limit over the course of 2025.[641] One commenter states that the Proposed Amendment allows for the establishment and maintenance of a substantial reserve, but does not establish adequate Commission oversight to prevent over-collection or to ensure that reserves are used solely to offset future fees consistent with the CAT NMS Plan.[642]

One commenter states that this apparent overcollection must be remedied before the reserve can be spent down, and calls for the Proposed Amendment to be disapproved due to the lack of safeguards preventing CAT LLC from over-collecting again in the future.[643] In addition, the commenter states that CAT LLC should freeze the reserve fund and hold the funds in escrow for the benefit of CAT reporters that contributed CAT fees to the reserve fund.[644] The commenter states that if CAT LLC should fail to do so, the Commission should order CAT LLC to do so.[645] The other commenter states

that CAT LLC is "unlawfully spending down the excess reserve" to fund operations in 2026, rather than "offset future fees" as the CAT NMS Plan requires, in the absence of any new funding model that establishes new broker-dealer fees.[646] This commenter states that the SROs should "in no case obtain a windfall from the reserve—whether as profit or otherwise," and that the SROs are avoiding the need to fund the CAT themselves and "makes a mockery of the Eleventh Circuit's decision to vacate the 2023 Order, as broker-dealers and their customers effectively continue to fund the CAT throughout 2026 as if the 2023 Order remains in place."[647] This commenter states that the Proposed Amendment does not provide for any Commission oversight to ensure that the 25% limit in the Proposed Amendment is enforced or to approve how collected reserve amounts are ultimately spent by the SROs.[648]

CAT LLC responds to the SIFMA December 2025 Letter by stating that the letter is based on a mistaken reading of the Eleventh Circuit's opinion and the CAT NMS Plan, which did not address the reserve at all, and that use of reserve funds to fund CAT costs is fully consistent with the CAT NMS Plan.[649]

CAT LLC states that the Eleventh Circuit's decision did not vacate, let alone address, existing provisions of the CAT NMS Plan governing the use of a reserve for the prudent operation of CAT.[650] CAT LLC states that the original CAT NMS Plan adopted in 2016 included provisions that permit the creation of a reserve and the use of that reserve for the prudent operation of the Company, and those provisions remain in effect following the Eleventh Circuit opinion.[651] CAT LLC also states that the SIFMA December 2025 Letter mischaracterizes those pre-existing provisions regarding reserve funds, stating that Section 11.1(a) of the CAT NMS Plan requires the Operating Committee to approve an annual budget to "include the projected costs of the

---

[634] *See* Letter to Vanessa Countryman, Secretary, Commission, from Katie Kolchin, CFA, Managing Director, Head of Equity & Options Market Structure and Gerald O'Hara, Vice President & Assistant General Counsel, SIFMA, dated Dec. 19, 2025 ("SIFMA December 2025 Letter"), at 2; Citadel January 2026 Letter, at 7–8; ASA February 2026 Letter, at 5. *See also* Citadel July 2025, at 26 (objecting to the requirement that Industry Members "fund an additional 25% reserve over budgeted amounts each year."). The Citadel January 2026 Letter was submitted after CAT LLC responded to the SIFMA December 2025 Letter in the CAT LLC January 2026 Response Letter.

[635] *See* SIFMA December 2025 Letter, at 2.

[636] *Id.* at 3–4.

[637] *Id.* at 4. *See also* Citadel January 2026 Letter, at 8 (stating that the CAT NMS Plan requires reserve funds to be used as an offset of *fees,* and not *expenses,* and that there is no way to interpret the word "fees" as also encompassing the costs and expenses incurred in operating the CAT) (emphasis added).

[638] *See* SIFMA December 2025 Letter, at 4; Citadel January 2026 Letter, at 7; ASA February 2026 Letter, at 5.

[639] *See* SIFMA December 2025 Letter, at 4; Citadel January 2026 Letter, at 7; ASA February 2026 Letter, at 5 (stating that "[e]xperience under the prior framework shows that reserves can rapidly exceed stated limits and be used to fund CAT operations in the absence of a Commission-approved funding model").

[640] *See* SIFMA December 2025 Letter, at 4.

[641] *See* Citadel January 2026 Letter, at 7 (stating that CAT LLC's 2026 budget disclosed a reserve amount of approximately $120 million to start the year, which is nearly double the amount that was allowed under the 2023 Funding Model Order based on CAT LLC's original 2025 budget of $248.8 million). This commenter states that over the course of 2025, CAT LLC collected tens of millions more in fees than even the 2023 Funding Model Order allowed. *Id.*

[642] *See* ASA February 2026, at 5.

[643] *See* SIFMA December 2025 Letter, at 4.

[644] *Id.* at 5. The commenter states that it recommends that the Commission work with CAT LLC to ensure it holds the reserve funds in escrow until the Commission can complete its comprehensive review of the CAT. *Id.* The commenter states that there are a number of potential long-term solutions for handling the improperly collected funds, but that those solutions could be undercut by allowing CAT LLC to proceed with its plan to spend away the reserve even before the Commission has a chance to decide how to proceed with the Proposed Amendment. *Id.*

[645] *Id. See also* Letter to Vanessa Countryman, Secretary, Commission, from Stephen John Berger, Managing Director, Global Head of Government & Regulatory Policy, Citadel Securities LLC, dated

---

January 15, 2026 (petition for rulemaking to require CAT LLC to obtain Commission approval before spending reserve funds and directing CAT LLC to return the reserve funds to Industry Members in full or, in the alternative, return "excess" reserve funds in proportion to the amounts paid).

[646] *See* Citadel January 2026 Letter, at 7–8.

[647] *Id.* at 8.

[648] *Id.* at 7. This commenter states that any limit on the size of a reserve must be monitored and enforced to prevent the SROs from once again over-collecting fees with abandon. *Id.* at 8.

[649] *See* CAT LLC January 2026 Response Letter, at 2.

[650] *Id.* at 3.

[651] *Id.* at 3 (citing SIFMA December 2025 Letter, at 4).

Company, including the costs of developing and operating the CAT for the upcoming year, and the sources of all revenues to cover such costs, as well as the funding of any reserve that the Operating Committee reasonably deems appropriate for prudent operation of the Company,'' which means the original CAT NMS Plan contemplated the use of a reserve for the prudent operation of the CAT, and this provision both was unaltered by any funding model and remains in effect.[652] CAT LLC states that the interpretation of ''future fees'' in Section 11.1(c) ignores the clear intent and purpose of the reserve provisions, which are designed to ensure that any revenue surplus would go toward funding future CAT costs.[653]

CAT LLC also disagrees with the statement that CAT LLC ''over-collected'' fees in contravention of the 2023 funding model. CAT LLC states that 2023 funding model contemplated the possibility of a surplus reserve exceeding 25% of the budget and that such surplus would be used to offset future fees incurred by CAT, in Section 11.1(a)(ii) (which was vacated by the Eleventh Circuit opinion).[654] CAT LLC explains that in 2025 the Operating Committee established two different CAT fees, CAT Fee 2025–1, based on the initial 2025 operating budget of approximately $249 million and set at $0.000022 per executed equivalent share, and CAT Fee 2025–2, set at a substantially reduced fee rate of $0.000009 per executed equivalent share beginning with transactions in July 2025, based on a May 2025 budget of approximately $228 million.[655] CAT LLC states that the amount of the surplus reserve was primarily driven by (i) the collection of CAT fees in excess of the budgeted CAT costs for 2024 and 2025 as a result of the greater actual executed equivalent share volume than the projected executed equivalent share volume for CAT Fees 2024–1 and 2025–1, and (ii) a reduction in anticipated budgeted costs associated with the implementation of certain cost savings measures approved by the SEC pertaining to the processing of options market maker quotes and the storage of certain data.[656] Accordingly, CAT LLC states that the surplus reserve resulted from greater volumes than initially projected and the material cost savings CAT LLC achieved in 2025.[657]

CAT LLC states that the limited operational reserve is the only source of funding to support CAT's ongoing operations and prohibiting the use of the reserve would imperil the sustained operation of the CAT, and, relatedly the ability of regulators to use the CAT to oversee the markets.[658] CAT LLC states while that the CAT NMS Plan provides that no Participant shall be obligated to contribute capital or make loans to the Company if it does not agree to do so.[659] CAT LLC states that prior to the 2023 Funding Model Amendment the CAT was funded entirely by voluntary, interest-free loans from the Participants, but that there should be no presumption that every Participant will voluntarily agree to loan funds to the Company if the operational reserve is frozen.[660]

The Commission does not agree that the Participants are prohibited by either the currently-operative plan provisions or the Eleventh Circuit's decision from using CAT reserve funds for the funding of the CAT after the vacatur of the 2023 Funding Model Order, or that the Participants should be prohibited from using these funds prior to the receipt of the first CAT fees from Industry Members pursuant to the approval of the Proposed Amendment today. With the vacatur of the 2023 Funding Model Order the CAT NMS Plan reverted back to original provisions relating to funding and reserves, and as CAT LLC notes, Section 11.1(a) and 11.1(c) of the CAT NMS Plan explicitly contemplate the funding of a reserve necessary for the prudent operation of CAT LLC and that surpluses are to be treated as an operational reserve to offset future fees instead of distributed to the Participants as profits or otherwise refunded to Participants and/or Industry Members.[661]

The Proposed Amendment providing that the annual operating budget include a reserve of not more than 25% of the annual budget is appropriate.[662] Because the CAT is a critical regulatory tool/system, the CAT needs to have a stable funding source to build financial stability to support the Company as a going concern.[663] Funding for the CAT, as noted in Section 11.1(b), is the responsibility of the Participants and

the industry.[664] Because CAT fees are charged based on the budget, which is based on anticipated volume, it is appropriate to have a reserve on hand to prevent a shortfall in the event there is an unexpectedly high volume in a given year. A reserve would help to assure that the CAT has sufficient resources to cover costs should there be unanticipated costs or costs that are higher than expected. CAT LLC also noted difficulty in predicting variable CAT costs in concluding to cap the reserve at 25%.[665]

Additionally, CAT LLC explained that CAT fees will be collected approximately three months after trading activity on which a CAT fee is based, or 25% of the year.[666] CAT LLC stated that the reserve would be available to address funding needs related to this three-month delay.[667] No commenter stated that they thought anything higher than a 25% reserve was necessary and no commenter provided an alternative solution to make sure that CAT remains funded and able to pay its bills. The Commission therefore believes that a reserve of no more than 25% is appropriate based on the factors listed by CAT LLC.

In addition, the Commission recognizes that if CAT fees exceed CAT costs, including the reserve, the surplus will be used to offset future fees, and that a reserve will only be included in the annual budget on which the fees are based if CAT LLC does not have a sufficient reserve, which would be limited to 25% of the annual budget.[668] The Commission also recognizes that the Company must operate on a break-even basis and that any surpluses would be treated as an operational reserve to offset future fees and not be distributed to Participants as profits.[669] The Commission further recognizes that proposed Section 11.1(a)(ii) states that CAT LLC will only include an amount for the reserve in the annual budget if the Company does not have a sufficient reserve; therefore, the Participants would not be collecting additional fees if CAT LLC already has a reserve of 25% of the annual budget.[670] Furthermore, the reserve would be calculated by CAT LLC based on the amount of the budget other than the reserve because the

---

[652] *Id.* at 4.

[653] *Id.*

[654] *Id.*

[655] *Id.*

[656] *Id.* (citing Securities Exchange Act Release 103387 (July 3, 2025), 90 FR 30274, 30288 (July 9, 2025) (implementing CAT Fee 2025–1)).

[657] *Id.*

---

[658] *Id.* at 2

[659] *Id.* (citing Section 3.8(a) of the CAT NMS Plan and quoting, ''[e]xcept as may be determined by the unanimous vote of all the Participants or as may be required by applicable law, no Participant shall be obligated to contribute capital or make loans to the Company.'')

[660] *Id.*

[661] *See* CAT LLC January 2026 Response Letter, at 4.

[662] *See* Notice, 90 FR at 44936.

[663] *See* CAT NMS Plan, at Section 11.2(f).

---

[664] *Id.* at Section 11.1(b).

[665] *See* Notice, 90 FR at 44915.

[666] *Id.* at 44915–16.

[667] *Id.* at 44916.

[668] *Id. See also* proposed Section 11.1(a)(ii).

[669] The CAT NMS Plan requires that a surplus of the Company's revenues over its expenses be treated as an operational reserve to offset future fees. *See* CAT NMS Plan, at Section 11.1(c).

[670] *See* Notice, 90 FR at 44915. *See also* proposed Section 11.1(a)(ii).

reserve is meant to fund CAT LLC to pay its bills if necessary.[671] These requirements should obviate the need for a refund mechanism.

The Commission acknowledges the concern from the commenter that believes that CAT LLC ''over collected'' CAT fees and built up a reserve greater than 25% of the CAT budget.[672] However, as explained by the Participants, the amount of the surplus of the reserve was the collection of CAT fees in excess of the budgeted CAT costs for 2024 and 2025 as a result of the greater actual executed equivalent share volume than the projected executed equivalent share volume for CAT Fees 2024–1 and 2025–1, and a reduction in anticipated budgeted costs associated with the implementation of certain cost savings measures approved by the SEC pertaining to the processing of options market maker quotes and the storage of certain data.[673] It is possible that with continued cost savings measures and optimizations that the estimated annual budget for CAT continues to fall and reserve levels remain at times above 25% re-assessed estimate annual budget figures, but importantly none of the reserve funds or any excess funds exceeding 25% are permitted to be used except for the funding of the CAT. The Proposed Amendment, as well as the 2023 Funding Model Amendment, specifically contemplate the possibly that the reserve exceeds 25%, and both mandate that to the extent that collected CAT fees exclude CAT costs, including the reserve of 25% of the annual budget, such surplus shall be used to offset future fees.[674] Thus, the existence of sufficient reserves will result in reduced fees for CAT reporters until such excess is extinguished. It is the Commission's view that establishing a reserve is an appropriate way to ensure that future funding is secured.

d. Fee Filings Under Section 19(b) of the Exchange Act for Industry Member CAT Fees

CAT LLC described the information that Participants would be required to include in their fee filings to be made pursuant to Section 19(b) of the Exchange Act and Rule 19b–4 thereunder for Industry Member CAT Fees in proposed paragraph (B) of proposed Section 11.3(a)(iii) of the CAT

NMS Plan.[675] Specifically, such filings would be required to include with regard to the CAT Fee: (A) the Fee Rate; (B) the budget for the upcoming year (or remainder of the year, as applicable), including a brief description of each line item in the budget, including (1) technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs, a reserve and/or such other categories as reasonably determined by the Operating Committee to be included in the budget and the reason for changes in each such line item from the prior CAT Fee filing;[676] (C) a discussion of how the budget is reconciled to the collected fees; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the year (or remainder of the year, as applicable), and a description of the calculation of the projection. This detail would describe how the Fee Rate is calculated and explain how the budget used in the calculation is reconciled to the collected fees.[677] In addition, CAT LLC proposed to state that the budgeted CAT costs described in the fee filings must provide sufficient detail to demonstrate that the CAT budget used in calculating the CAT Fees is reasonable and appropriate.[678]

The collection of CAT Fees from Industry Members is subject to Section 11.6 of the CAT NMS Plan regarding the Financial Accountability Milestones.[679] Accordingly, CAT LLC proposed to state that Participants will not make fee

filings pursuant to Section 19(b) of the Exchange Act[680] regarding CAT Fees until the Financial Accountability Milestone related to Period 4 described in Section 11.6 of the CAT NMS Plan has been satisfied.[681]

In comments submitted for the 2023 Funding Model Amendment, one commenter objected to how the Proposed Amendment addressed the Financial Accountability Amendments Period 4[682] expenses.[683] The commenter states that if full implementation does not occur by September 27, 2023, the Operating Committee cannot recover from Industry Members any expenses related to Period 4.[684] The commenter explains that the 2023 Funding Model Amendment states that costs incurred during Period 4 may be allocated to Industry Members and that the Operating Committee had requested exemptive relief to extend the deadline for full implementation until August 31, 2024, which would allow the Participants to recover all Period 4 expenses from Industry Members.[685] The commenter states that the expenses related to Period 4 would likely total more than $400 million, and expresses the belief that this amount may be allocated in its entirety to Industry Members if the terms of the CAT NMS Plan are not enforced.[686]

The commenter asserts that this issue is ''highly relevant to the Commission's analysis of the 2023 Funding Proposal''[687] and recommended three alternatives for the Commission to address the matter: (1) to state that relevant financial accountability provisions will be enforced as written and permit the Operating Committee to allocate Period 4 expenses only to the extent permitted by the CAT NMS Plan (reduced by 75%, and by 100% if full implementation does not occur by September 27, 2023);[688] (2) defer judgment and provide that Period 4 expenses cannot be allocated to Industry Members;[689] or (3) defer judgment and permit the Operating Committee to allocate Period 4 expenses to Industry Members and analyze the potential

---

[671] *See* Notice, 90 FR at 44915. *See also* proposed Section 11.1(a)(ii).

[672] *See* SIFMA December 2025 Letter.

[673] *See* CAT LLC January 2026 Response Letter, at 5.

[674] *See* proposed Section 11.1(a)(ii) of the CAT NMS Plan.

[675] CAT LLC stated that it expected the fee filings required to be made by the Participants pursuant to Section 19(b) of the Exchange Act with regard to CAT Fees to be filed pursuant to Section 19(b)(3)(A) of the Exchange Act and Rule 19b–4(f)(2) thereunder. CAT LLC further stated that in accordance with Section 19(b)(3)(A) of the Exchange Act and Rule 19b–4(f)(2) thereunder, such fee filings would be effective upon filing. *See* Notice, 90 FR at 44919, n.43. Pursuant to Section 19(b)(3)(A) and Rule 19b–4(f)(2), a proposed rule change can take effect upon filing with the Commission if designated by the SRO as establishing or changing a due, fee, or other charge imposed by the SRO. 15 U.S.C. 78s(b), 15 U.S.C. 78s(b)(3)(A), 17 CFR 240.19b–4(f)(2).

[676] CAT LLC stated that it intends to include any other categories as reasonably determined by the Operation Committee. Accordingly, this provision refers to ''such other categories as reasonably determined by the Operating Committee to be included in the budget.'' *See* Notice, 90 FR at 44920 n.44.

[677] As a practical matter, the fee filing would provide the exact fee per executed equivalent share to be paid for the CAT Fees, by multiplying the Fee Rate by one-third and describing the relevant number of decimal places for the fee. *See* Notice, 90 FR at 44920 n.40.

[678] *See* proposed Section 11.3(a)(iii)(B).

[679] *See* CAT NMS Plan, at Section 11.6.

[680] 15 U.S.C. 78s(b).

[681] *See* proposed Section 11.3(a)(iii)(C); *see also* CAT NMS Plan, at Section 11.6(a)(i)(D).

[682] *See* CAT NMS Plan, at Section 11.6.

[683] *See* Citadel July 2023 Letter, at 24.

[684] *Id.*

[685] *Id.* at 24–25. The commenter further observed that the Commission has made no determination regarding the Participants' compliance or non-compliance with the Financial Accountability Amendments in Section 11.6 of the CAT NMS Plan would be enforced.

[686] *Id.* at 25.

[687] *Id.*

[688] *See* Citadel July 2023 Letter, at 25.

[689] *Id.*

impact of allocating all Period 4 costs to Industry Members on market efficiency, competition and capital formation.[690] The commenter urges the Commission to conduct this analysis before waiting for a subsequent fee filing, stating that once the Commission approves an allocation methodology, ''the CAT Operating Committee would simply apply that approved methodology to the costs incurred during a specific time period.'' [691]

In a response letter submitted for the 2023 Funding Model Amendment, and in response to the commenter's criticism that the Proposed Amendment does not adequately address the Period 4 expenses,[692] CAT LLC states that it recognizes the applicability of the Financial Accountability Milestones to the collection of CAT Fees and Historical CAT Assessments.[693] CAT LLC states that the Participants will not file CAT fee filings until they believe any applicable Financial Accountability Milestone has been satisfied, and noted that the Commission has not made a determination regarding the Participants' satisfaction of the Financial Accountability Milestones.[694]

In comment letters submitted for the Proposed Amendment, the commenter also states that the Commission must independently validate SRO assertions regarding various dates by which they assert that specific Financial Accountability Milestones were met.[695] The commenter states that the SROs assert that ''Full Implementation of CAT NMS Plan Requirements'' was achieved in July 2024, but that this is in reliance on various exemptive orders issued by the Commission.[696] In addition, the commenter states that belated exemptive relief related to the reporting of responses to electronic requests for quotes granted in May 2024 cannot retroactively bring the SROs into compliance with an earlier Financial Accountability Milestone, which would mean no historical fees could be collected.[697] This commenter characterizes the granting of an extension of Financial Accountability Milestone deadlines after those deadlines have already passed as a

''major policy change'' from the Commission's rationale in establishing the Financial Accountability Milestones, particularly because doing so retroactively imposes significant financial burdens on broker-dealers and their customers.[698]

Another commenter states that the Proposed Amendment relies on unverified claims that the Financial Accountability Milestones have been met, and that historical CAT costs are properly recoverable from broker-dealers.[699] This commenter states that the Commission has not independently verified FAM compliance, instead relying on SRO self-certifications and exemptive relief issued years after certain milestones passed, and that such exemptive orders issued long after a milestone deadline cannot retroactively cure noncompliance so as to justify the allocation of hundreds of millions of dollars in historical costs to broker-dealers and their customers.[700]

CAT LLC states that the Financial Accountability milestone related to Period 4 described in Section 11.6 of the CAT NMS Plan is ''Full Implementation of CAT NMS Plan Requirements,'' which is defined, in relevant part, to ''be considered complete as of the date identified in a Quarterly Progress Report meeting the requirements of Section 6.6(c)'' of the CAT NMS Plan.[701] CAT LLC states that in Quarterly Progress Report dated July 29, 2024, the Participants identified July 15, 2024, as the date on which the ''Full Implementation of CAT NMS Plan Requirements'' milestone was satisfied.[702] CAT LLC states that the Participants subsequently filed fee filings implementing CAT Fee 2024–1 to cover Prospective CAT Costs for the period beginning on July 16, 2024, and ending on December 31, 2024, and that those fee filings became effective immediately upon filing and were neither rejected nor suspended by the Commission.[703]

CAT LLC also states that the commenter's argument that the Financial Accountability Milestones have not been satisfied because CAT LLC currently relies on SEC exemptive relief from certain CAT NMS Plan requirements is similar to an argument made in connection with Participant fee filings implementing Historical CAT

Assessment 1.[704] CAT LLC states that it discussed in detail in CAT LLC's response to comments related to Historical CAT Assessment 1, dated June 13, 2024, that CAT LLC's reliance on SEC exemptive relief does not affect the conclusion that each of the Financial Accountability Milestones has been satisfied.[705] CAT LLC also previously stated in a comment letter for the 2023 Funding Model Amendment that it recognizes the applicability of the Financial Accountability Milestones to the collection of CAT Fees and Historical CAT Assessments.[706] CAT LLC previously stated that the Participants would not file CAT fee filings until they believe any applicable Financial Accountability Milestone has been satisfied, and noted that at the time of the 2023 Funding Model Amendment, the Commission has not made a determination regarding the Participants' satisfaction of the Financial Accountability Milestones.[707]

In the CAT LLC Historical CAT Assessment 1 Response Letter, CAT LLC stated that CAT LLC has satisfied the Financial Accountability Milestones for Periods 1 through 3, and CAT LLC details why it believes exemptive relief granted by the Commission and Executing Broker reporting does not affect the conclusion that the Financial Accountability Milestones for Periods 1 through 3 were satisfied in a timely fashion.[708] In particular, CAT LLC points out that in relevant exemptive relief orders relating to the reporting of electronic responses for quotes that are not immediately actionable and relating to certain verbal floor activity and unstructured verbal and electronic upstairs activity, the Commission stated that to the extent that the Participants are availing themselves of exemptive relief from a CAT NMS Plan requirement, such requirement shall not be included in the requirements for the Financial Accountability Milestones, provided that any conditions of the exemption are satisfied.[709]

---

[690] *Id.*

[691] *Id.* at 26.

[692] *Id.* at 24.

[693] *See* CAT LLC July 2023 Response Letter, at 30.

[694] *Id.*

[695] *See* Citadel October 2025 Letter, at 11–13. The commenter states that the Proposed Amendment provides the only opportunity for the Commission to scrutinize and clearly document SRO compliance with the Financial Accountability Milestones. *Id.* at 12. *See also* Citadel January 2026 Letter, at 6–7.

[696] *See* Citadel October 2025 Letter, at 12.

[697] *Id.* at 12–13; Citadel January 2026 Letter, at 6–7.

[698] *See* Citadel January 2026 Letter, at 7.

[699] *See* ASA February 2026 Letter, at 4.

[700] *See id.* at 4–5.

[701] *See* CAT LLC December 2025 Response Letter, at 11 (citing Section 1.1 of the CAT NMS Plan).

[702] *See id.*

[703] *See id.*

[704] *See id.* (citing Citadel October 2025 Letter, at 12).

[705] *Id.* (citing Letter to Vanessa Countryman, Secretary, Commission from Brandon Becker, CAT NMS Plan Operating Committee Chair, dated June 13, 2024 (''CAT LLC Historical CAT Assessment 1 Response Letter''), at 32–36, *available at: https:// catnmsplan.com/sites/default/files/2024-07/ CAT%20LLC-Response-to-Comments-Historical-CAT-Assessment-1-%286.13.2024%29.pdf*).

[706] *See* CAT LLC July 2023 Response Letter, at 30.

[707] *Id.*

[708] *See* CAT LLC Historical CAT Assessment 1 Response Letter, at 32–34.

[709] *See* CAT LLC Historical CAT Assessment 1 Response Letter, at 32–34 (citing Securities Exchange Act Release No. 100181 (May 20, 2024), 89 FR 45715 n.11 (May 23, 2024) and Securities

In response, the commenter states that the CAT Operating Committee points to the SROs self-certifying compliance with the Financial Accountability Milestones in a ''Quarterly Progress Report'' provided to the Commission that invoked Commission exemptive relief, but that the Commission has never independently concluded—in the various exemptive orders or otherwise—that it is in the public interest to permit the SROs to allocate hundreds of millions of CAT costs to broker-dealers and their customers even though they have failed to comply with specific CAT NMS Plan requirements and the express terms of the Financial Accountability Milestones.[710] This commenter states that the Commission must decide now whether the Financial Accountability Milestones have been satisfied before giving the green light for immediately effective CAT fees under a new funding model.[711] This commenter states that the Eleventh Circuit's decision shows that review at the fee-filing stage is insufficient because those filings take effect immediately upon filing and the Commission's assessment of those filings are not subject to judicial review or challenge.[712]

One commenter states that the Proposed Amendment does not mention the millions of dollars of extra fees that broker-dealers and their customers ''were unlawfully compelled to pay to FINRA under the 2023 funding order as an explicit SRO pass-through,'' and that these unlawful payments must be accounted for in any funding model.[713] Another commenter states that the Commission should consider reimbursing broker-dealers for funds they have collectively been forced to contribute to the CAT, and provides a list of possible mechanisms for reimbursement including direct reimbursement from a Commission administered fund, an offset or waiver or other regulatory fees, or Congressional appropriations.[714]

CAT LLC states that it is not aware of any precedent, and the commenters do not cite any precedent that suggests that fees paid pursuant to an immediately effective fee filing must be reimbursed if the fee is later invalidated.[715] CAT LLC states that CAT fees that have been paid to date by Industry Members were paid pursuant to validly adopted Participant fee filings that became effective immediately upon filing under Section 19(b)(3)(A) of the Exchange Act, and CAT LLC further notes that the Participants also paid CAT fees under the Executed Shares Model.[716]

The proposed process for implementing CAT Fees related to Prospective CAT Costs for Industry Members is appropriate. Under the Executed Share Model, the Participants would be required to submit fee filings pursuant to Section 19(b) of the Exchange Act to change the Fee Rates for Industry Members twice a year, once at the beginning and once during the year.[717] It is appropriate to accompany each Fee Rate change with a Section 19(b) fee filing because it would provide notice to Industry Members and the public of the Fee Rate change and permit such entities to provide comment on the change.

In addition to the budget information already provided by the Participants on the CAT website, the detail provided in the fee filings for the budget would provide transparency into the budget as it would describe the line items of the budget and any changes to the budget and allow the public the ability to comment on the budget.[718] The fee filings must discuss how the budget is reconciled to collected fees, which would provide the public an opportunity to comment on the effectiveness of the reconciliation.[719] The Executed Share Model establishes the framework for Industry Member CAT fees; details of the Budgeted CAT Costs will be provided in the Section 19(b) fee filings submitted by the Participants.

As stated by the Participants, the Proposed Amendment acknowledges that the Participants are prohibited from submitting Exchange Act filings regarding Prospective CAT Fees until the Financial Accountability Milestone related to Period 4 described in Section 11.6 of the CAT NMS Plan has been satisfied.[720] This is an appropriate approach for addressing how fee filings will be handled in conjunction with a determination of the Participants' compliance with the Financial Accountability Milestones. Under existing Section 11.6 of the CAT NMS Plan, the Participants will not be able to recover the full costs of the CAT for a period if the relevant Financial Accountability Milestone has not been satisfied.[721]

The Commission acknowledges the concerns raised and suggestions offered by the commenter regarding the Financial Accountability Milestones, but the Commission is not making a finding on the satisfaction of the Period 4 Financial Accountability Milestone or of other Financial Accountability Milestones in this order, nor is such a finding required. This filing merely establishes the framework under which costs will be allocated, not the amount to be allocated. Proposed Sections 11.3(a)(iii)(C) and (b)(iii)(B)(III) of the CAT NMS Plan state that the Participants are not able to submit filings to recover Prospective CAT Fees or Historical CAT Assessments to recover Period 4 expenses until the Period 4 Milestone has been satisfied.

The Participants have previously filed and implemented several fee filings in connection with the CAT, for both Prospective CAT fees and Historical CAT fees,[722] and prior to the vacatur of the 2023 Funding Model Amendment, CAT LLC had collected or was collecting such CAT fees.[723] These filings were all subject to notice and comment, and subject to significant comments, and reviewed by the Commission for consistency with applicable statutory standards under the Exchange Act, including being reasonable, equitable and not unfairly discriminatory.[724] Any new fee filings would be subject to the Financial Accountability Milestones, and the question of compliance will impact how much can be recovered under the applicable framework.

The Commission also does not believe it is necessary or appropriate to require the Proposed Amendment address CAT fees already collected by the SROs. Previously collected fees from broker-dealers were collected through SRO rules that were subject to the Commission's Rule 19(b) filing process and were effective and operative on SRO rulebooks, and which were filed pursuant to the approved 2023 Funding Model Order prior to the Eleventh Circuit's vacatur. These rule filings are not at issue in this order. As discussed

---

Exchange Act Release No. 89051 (June 11, 2024), 85 FR 36631, 36633 (June 17, 2020)).

[710] See Citadel January 2026 Letter, at 6.

[711] See id.

[712] See id. at 6 n.26 and n.28.

[713] See Citadel October 2025 Letter, at 10.

[714] See ASA October 2025 Letter, at 3–4; ASA February 2026 Letter, at 3.

[715] See CAT LLC December 2025 Response Letter, at 12.

[716] See id.

[717] See proposed Section 11.3(a)(i)(A)(I) and (II).

[718] See proposed Section 11.3(a)(iii)(B).

[719] Id.

[720] See proposed Section 11.3(a)(iii)(C).

[721] See CAT NMS Plan, at Section 11.6.

[722] See Notice, 90 FR at 44911 n.12 and 13.

[723] Id. at 44911. As noted above, see note 26, the fee filings submitted prior to the vacatur of the 2023 Funding Model Amendment are no longer in effect, and the Commission anticipates that CAT LLC will establish new prospective CAT Fees and Historical CAT Assessment(s) after approval of the Proposed Amendment, as modified by the Commission.

[724] See Section 6(b)(4); Section 15A(b)(5); Section 6(b)(5); Section 15A(b)(6). 15 U.S.C. 78f(b)(4); 15 U.S.C. 78f(b)(6); 15 U.S.C. 78o–3(b)(5); 15 U.S.C. 78o–3(b)(6).

above in Part III.5.c., the Commission believes that using reserve funds for the ongoing operation of the CAT for the duration between the vacatur of the 2023 Funding Model Order and today is appropriate. Future fees collected by broker-dealers will be collected pursuant to similar SRO rules, permitted by approval of the Proposed Amendment today. Any new fee filings to implement new CAT fees pursuant to the Proposed Amendment would be subject to the same applicable statutory standards under the Exchange Act as the previous filings.

e. Participant CAT Fees for Prospective CAT Costs

CAT LLC proposed to describe the Participant CAT Fees related to Prospective CAT Costs in proposed Section 11.3(a)(ii) of the CAT NMS Plan. Specifically, under proposed Section 11.3(a)(ii)(A) of the CAT NMS Plan, each Participant that is a national securities exchange will be required to pay the CAT Fee for each transaction in Eligible Securities executed on the exchange in the prior month based on CAT Data. Each Participant that is a national securities association will be required to pay the CAT Fee for each transaction in Eligible Securities executed otherwise than on an exchange in the prior month based on CAT Data.[725] The CAT Fee for each transaction in Eligible Securities will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Fee Rate determined pursuant to proposed Section 11.3(a)(i).[726]

CAT LLC also proposed Section 11.3(a)(ii)(B) of the CAT NMS Plan to provide that Participants would only be required to pay CAT Fees when Industry Members are required to pay CAT Fees. CAT Fees charged to Industry Members become effective in accordance with the requirements of Section 19(b) of the Exchange Act.[727] In contrast, CAT Fees charged to Participants are implemented via an approval of the CAT Fees by the Operating Committee in accordance with the requirements of the CAT NMS Plan.[728] Specifically, to implement the Participant CAT fees, CAT LLC proposed to add the Proposed Participant Fee Schedule, entitled ''Consolidated Audit Trail Funding Fees,'' to Appendix B of the CAT NMS Plan. Proposed Paragraph (a) stated that

''[e]ach Participant shall pay the CAT Fee set forth in Section 11.3(a) of the CAT NMS Plan to Consolidated Audit Trail, LLC in the manner prescribed by Consolidated Audit Trail, LLC on a monthly basis based on the Participant's transactions in Eligible Securities in the prior month.''[729] Because each Participant would be required to pay a CAT Fee once a Fee Rate has been established by the Operating Committee, and because of the time and burden required, CAT LLC stated that it would not submit an amendment to the CAT NMS Plan every time the Fee Rate is established or adjusted.[730]

It is appropriate to require that each Participant pay a CAT Fee related to Prospective CAT Costs for each transaction in the prior month based on CAT Data.[731] The CAT NMS Plan requires the Participants to contribute to the funding of the CAT.[732] Additionally, as CAT LLC explained, the Executed Share Model recognizes the Participants (as market regulators) as one of the three parties who have primary roles in a transaction,[733] so it is appropriate for a transaction-based funding model to assess a CAT Fee upon the Participants.

The Commission also believes it is appropriate that proposed Section 11.3(a)(ii)(B) provides that the Participants would be required to pay CAT Fees only when Industry Members are required to pay CAT Fees. The CAT Fees charged to Participants would be implemented through an approval of the CAT Fees by the Operating Committee and not through a plan amendment submitted each time the Fee Rate changes,[734] while CAT Fees charged to Industry Members may only become effective in accordance with the requirements of Section 19(b) of the Exchange Act.[735] However, both Participants and Industry Members would be subject to the same Fee Rate[736] so it is appropriate to provide that Participants would be required to pay the Participant CAT Fee once CAT Fees based on the Fee Rate are effective for Industry Members.

The Proposed Participant Fee Schedule is appropriate. As the Proposed Participant Fee Schedule requires each Participant to pay the CAT Fee detailed in Section 11.3(a) of the CAT NMS Plan on a monthly basis,

based on the Participant's transactions in Eligible Securities in the prior month, in the manner prescribed by CAT LLC,[737] the proposed fee schedule is appropriate because it imposes the Executed Share Model's Participant CAT Fee obligation on the Participants by specifically requiring the Participants to pay a CAT Fee in accordance with the Executed Share Model. The requirement in the Proposed Participant Fee Schedule clearly sets forth how the Participants will calculate their monthly CAT Fee obligation, and therefore the Commission does not believe that it is necessary for the Participants to submit an amendment to the CAT NMS Plan each time the Fee Rate changes; the formula for calculating fees will be constant although the Fee Rate that would be applied, which is objectively determined, will change only following a Participant fee filing under section 19(b) of the Exchange Act.[738] This approach is appropriate in this circumstance because the CAT NMS Plan sets forth the Executed Share Model, the Participants are required to pay CAT Fees pursuant to the CAT NMS Plan and the same Fee Rate that would apply to Industry Members would apply to Participants.[739]

6. Historical CAT Assessment

a. Calculation of Historical CAT Assessment

Under the Executed Share Model, Past CAT Costs will be recovered from CEBBs and CEBSs through Historical CAT Assessments.[740] Pursuant to proposed Section 11.3(b) of the CAT NMS Plan the Operating Committee will establish one or more Historical CAT Assessments depending upon the timing of any approval of the Proposed Amendment and the completion of the Financial Accountability Milestones.[741] In establishing a Historical CAT

---

[725] See proposed Section 11.3(a)(ii)(A).

[726] Id.

[727] See proposed Section 11.3(a)(i)(A)(I) and (II); see also 15 U.S.C. 78s(b).

[728] See Notice, 90 FR at 44919.

[729] See id. at 44923.

[730] See id. at 44932–33.

[731] See proposed Section 11.3(a)(ii).

[732] See CAT NMS Plan, at Section 11.1(b), Section 11.3(a).

[733] See Notice, 90 FR at 44928.

[734] Id. at 44932–33.

[735] See proposed Section 11.3(a)(i)(A). See also 15 U.S.C. 78s(b).

[736] See proposed Section 11.3(a)(ii)(A) and (B).

---

[737] See Notice, 90 FR at 44923.

[738] See id. at 44916–17.

[739] See proposed Section 11.3(a)(ii)(A) and (B).

[740] See Notice, 90 FR at 44920; see also proposed Section 11.3(b).

[741] See proposed Section 11.3(b)(iii). See Notice, 90 FR at 44920 n.47; see also CAT NMS Plan, at Section 11.6. To date, there has been one Historical CAT Assessment referred to as Historical CAT Assessment 1. As noted above, see note 26, Historical CAT Assessment 1 is no longer in effect and the Commission anticipates that CAT LLC will establish a new Historical CAT Assessment after approval of the Proposed Amendment, as modified by the Commission. See Notice, 90 FR at 44920 n.47 (citing Securities Exchange Act Rel. No. 100936 (Sept. 5, 2024), 89 FR 74430 (Sept. 22, 2024) (BOX Exchange LLC filing for Historical CAT Assessment 1). CAT LLC states that there may be one or more additional Historical CAT Assessments related to CAT costs incurred prior to the completion of the fourth and final Financial Accountability Milestone in July 2024. See Notice, 90 FR at 44920 n.47.

Assessment, the Operating Committee will determine a ''Historical Recovery Period''[742] and calculate a ''Historical Fee Rate''[743] for that Historical Recovery Period. Then, for each month in which a Historical CAT Assessment is in effect, each CEBB and each CEBS will pay a fee (the Historical CAT Assessment) for each transaction in Eligible Securities executed by the CEBB or CEBS from the prior month as set forth in CAT Data, where the Historical CAT Assessment for each transaction will be calculated by multiplying the number of executed equivalent shares in the transaction by one-third and by the Historical Fee Rate reasonably determined pursuant to proposed Section 11.3(b)(i).[744]

The actual amount of Past CAT Costs to be recovered through the Historical CAT

Assessments would be reduced by an amount of excluded costs.[745] The resulting amount would be defined as ''Historical CAT Costs'' in proposed Section 11.3(b)(i)(C) of the CAT NMS Plan. Proposed Section 11.3(b)(i)(C) states that ''[t]he Operating Committee will reasonably determine the Historical CAT Costs sought to be recovered by each Historical CAT Assessment, where the Historical CAT Costs will be Past CAT Costs minus Past CAT Costs reasonably excluded from Historical CAT Costs by the Operating Committee.''[746] Industry Members would not be assessed a Historical CAT Assessment to recover such excluded costs.[747]

In a comment letter submitted in response to the 2023 Funding Model Amendment, a commenter objects to the method of calculating the Historical CAT Assessment using current transaction activity.[748] This commenter states that the Proposed Amendment lacked a clear mechanism for Industry Members to pass-on historical costs to other market participants.[749] The commenter states, ''[i]t appears challenging for the CAT Operating Committee to allocate historical costs in a way that is directly tied to historical activity, which makes it more difficult for Industry Members to pass-on these costs to other market participants.''[750]

This commenter also objects to the allocation of Past CAT Costs to Industry Members,[751] stating that it would be inappropriate to allocate any costs related to Thesys Technologies, LLC's role as the plan processor, including the costs of transitioning to a new plan processor, or the Operating Committee's costs of litigation against the Commission.[752] The commenter expresses concern about a lack of transparency into Historical CAT Costs and the size of such costs, stating that the historical costs are excessive and inconsistent with the CAT NMS Plan.[753] The commenter states that a lack of transparency into historical costs raises questions about whether Industry Members would be allocated costs for the period when Thesys Technologies, LLC was the plan processor, noting that the Proposed Amendment only intended to exclude $64 million in costs related to the ''failed engagement of Thesys,'' when the costs were much higher;[754] whether Industry Members would be allocated costs related to litigation between the Operating Committee and the Commission;[755] and whether Industry Members would be allocated costs related to repeated filing of prior funding models.[756] The

commenter states that, without knowing the total amount of Historical CAT Costs, or basic information about such costs, the Commission cannot determine whether Historical CAT Costs are reasonable and cannot assess the impact of the proposed allocation on market liquidity, efficiency and competition.[757] For example, the commenter states that the CAT Operating Committee has not assessed ''whether trading activity may decline or bid-offer spreads may widen.''[758] The commenter states that the CAT Operating Committee ''recklessly argues'' that the proposed allocation of Historical CAT Costs is not concerning due to the existence of higher transaction-based fees.[759] In addition, the commenter states that Industry Members have borne nearly all of the total CAT-related costs due to ''a near-constant barrage'' of changes to technical specifications.[760] The commenter recommends not allocating any historical costs to Industry Members.[761]

In response to the commenter that states that Industry Members are bearing almost all of the CAT-related costs,[762] CAT LLC states that the commenter was conflating the Industry Members' internal costs to comply with CAT reporting requirements with the direct costs of the CAT.[763] CAT LLC states that the Proposed Amendment is intended to address the funding of the direct costs of the CAT and not Participants and Industry Members' compliance costs.[764]

CAT LLC provides a comparison of Historical CAT Costs to Prospective CAT Costs, demonstrating that the $233 million 2023 CAT budget is approximately 45% of the $518 million in Historical CAT Costs (through 2022).[765] CAT LLC stated that it expects to propose a fee rate for the Historical CAT Assessment that would be similar to or smaller than other transaction-based fees, and provided examples in which CEBBs and CEBSs would be assessed less than 1/1000 of a penny per executed equivalent share.[766] CAT LLC

---

[742] The Historical Recovery Period would be used to calculate the Historical Fee Rate for a Historical CAT Assessment. Proposed Section 11.3(b)(i)(D) of the CAT NMS Plan provides the Operating Committee with the discretion to reasonably establish the length of the Historical Recovery Period as long as no such period is less than 24 months and more than five years. *See infra* Part III.A.6.b.

[743] The Historical Fee Rate is the fee rate used to calculate the Historical CAT Assessment. *See infra* Part III.A.6.c.

[744] *See* proposed Section 11.3(b)(iii)(A).

[745] CAT LLC states that the excluded costs are: (i) $14,749,362 of costs related to the termination of the relationship with the Initial Plan Processor; (ii) $48,874,937 in CAT costs incurred from November 15, 2017 through November 15, 2018, and (iii) $19,628,791 in costs paid to the Initial Plan Processor from November 16, 2018 through February 2019 when the relationship with the Initial Plan Processor was completed. *See* Letter to Vanessa Countryman, Secretary, Commission, from Robert Walley, Chair, CAT NMS Plan Operating Committee, dated Feb. 24, 2026 (''CAT LLC February 2026 Response Letter''), at 3 n.7. CAT LLC states that the Participants ''are responsible for 100% of these costs.'' *Id.*

[746] *See* proposed Section 11.3(b)(i)(C).

[747] *See* Notice, 90 FR at 44935. According to the Proposed Amendment, ''[e]ach Historical CAT Assessment will seek to recover from CAT Executing Brokers two-thirds of Historical CAT Costs incurred during the period covered by the

Historical CAT Assessment.'' Proposed Section 11.3(b)(i)(C). The Historical CAT Costs would be Past CAT Costs minus the excluded costs. *Id.*

[748] *See* Citadel July 2023 Letter, at 24, 32. *See also* 2023 Funding Model Order, at 62660.

[749] *See* Citadel July 2023 Letter, at 24.

[750] *Id.* at 32.

[751] *See* Citadel July 2023 Letter, at 3, 23, 24, 31, 32.

[752] *See* Citadel July 2023 Letter, at 31.

[753] *Id.* at 23.

[754] *See* Citadel July 2023 Letter, at 23. *See also id.* at 23, n.100; *id.* at 8 (stating that ''missteps'' by the Operating Committee related to the hiring of the initial plan processor and the hiring of FINRA CAT to replace the initial plan processor resulted in ''wasted expenditures'' of more than $100 million). *See also* Citadel August 2023 Letter, at 7.

[755] *See* Citadel July 2023 Letter, at 23. *See also* Citadel August 2023 Letter, at 7.

[756] *See* Citadel July 2023 Letter, at 24. *See also* Citadel August 2023 Letter, at 7.

[757] *See* Citadel August 2023 Letter, at 7.

[758] *Id.*

[759] *Id.*

[760] *See* Citadel July 2023 Letter, at 31. The commenter notes that in 2016, the Commission estimated that broker-dealers would incur 90% of total CAT-related costs, even if not allocated any costs for building and operating the CAT. The commenter stated that updates to these estimates would show that this figure would underestimate their cost burdens. *See id.*

[761] *Id.* at 3, 31, 32.

[762] *See* Citadel July 2023 Letter, at 31.

[763] *See* CAT LLC July 2023 Response Letter, at 16.

[764] *Id.*

[765] *Id.* at 17.

[766] *Id.* at 18.

notes that broker-dealers are currently charged other transaction-based fees that are higher than the proposed CAT fees.[767]

In a response to commenters on the 2023 Funding Model Amendment that object to the allocation to Industry Members of Historical CAT Costs related to the initial Plan Processor,[768] CAT LLC stated that the Historical CAT Costs to be allocated to Industry Members would not include two categories of costs related to the initial Plan Processor: $48,874,937 in CAT costs incurred from November 15, 2017 through November 15, 2018, and $14,749,362 in costs related to the termination of the initial Plan Processor.[769] CAT LLC stated that the Participants would remain responsible for these costs.[770]

In the Commission's view, the proposed recovery of Past CAT Costs via the Historical CAT Assessment is appropriate, and it is appropriate to require that each CEBB and CEBS pay a Historical CAT Assessment for each transaction in the prior month based on CAT Data.[771] First, current Industry Members are actively reporting to the CAT and therefore receive the benefits from the CAT. The CAT provides more effective oversight of market activity, which could increase investor confidence, resulting in expanded investment opportunities and increased trading activity.[772] Second, it would be difficult to impose fees on Industry Members for their activity in the past because some Industry Members may no longer be in business and such Industry Members would not have taken into consideration the Historical CAT Assessment when entering into the past transactions.[773] In this case, the Commission understands, from CAT LLC's analysis of Industry Members, that there is "substantial continuity" among the largest Industry Members, going back to 2020,[774] and thus it is likely that the Industry Members responsible for substantial transaction activity in 2020 (and perhaps earlier, beyond the scope of CAT LLC's analysis) would also be responsible for substantial transaction activity in 2023,

mitigating concerns that current Industry Members would be responsible for CAT fees for the past transaction activity of non-operational Industry Members.

Additionally, requiring CAT Executing Brokers to pay Historical CAT Assessments is appropriate because the Participants have thus far paid all Past CAT Costs and the CAT NMS Plan contemplates that both Industry Members and Participants would fund the Company.[775] Furthermore, it is appropriate, in the Commission's view, for the Participants to exclude certain costs from the Past CAT Costs to be recovered from Industry Members.[776] CAT LLC also proposes to require the Operating Committee, in determining fees on Participants and Industry Members, to take into account fees, costs and expenses (including legal and consulting fees) reasonably incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT.[777]

In the Commission's view, requiring the Operating Committee to take into account fees, costs and expenses (including legal and consulting fees) *reasonably* incurred by the Participants on behalf of the Company prior to the Effective Date in connection with the creation and implementation of the CAT, when determining fees for Participants and Industry Members, will constrain the Operating Committee from assessing fees based on costs and expenses that are not reasonable. Further, the proposed exclusion of the excluded costs from Past CAT Costs is appropriate in the Commission's view because it would not require all costs incurred by the Participants to be recovered from Industry Members through the Historical CAT Assessment, specifically excluding those costs related to the delay in the start of reporting to the CAT and costs related to the conclusion of the relationship with the Initial Plan Processor.[778]

Finally, the Proposed Amendment sets forth a process that the Commission believes will offer an appropriate level of transparency into Historical CAT Costs. In response to a commenter to the 2023 Funding Model Amendment that objects to the level of transparency provided about the total amount of Historical CAT Costs, and basic

information about such costs, and stated that, as a result, the Commission cannot determine whether Historical CAT Costs are reasonable and cannot assess the impact of the proposed allocation on market liquidity, efficiency and competition,[779] as discussed in Part III.A.6.e. herein, the Section 19(b) fee filings to be filed with the Commission by the Participants to impose the Historical CAT Assessment on Industry Members must include detailed information on the Historical CAT Costs, including the amount and type of Historical CAT Costs, and will allow the public the ability to comment on the Historical CAT Costs.[780] In addition to addressing all relevant statutory requirements, including the requirements that the fees are reasonable, equitably allocated, not unfairly discriminatory, and do not unduly burden competition,[781] these proposed Section 19(b) fee filings must contain "sufficient detail to demonstrate that such costs are reasonable and appropriate,"[782] which would provide the public and the Commission the detail needed to evaluate the Historical CAT Assessments. Once the proposed Section 19(b) fee filings are filed by the Participants, the Commission will review them for consistency with the Exchange Act and the CAT NMS Plan.

In response to the comment to the 2023 Funding Model Amendment that states that the CAT Operating Committee has not assessed "whether trading activity may decline or bid-offer spreads may widen,"[783] and in response to the comment that the CAT Operating Committee "recklessly argues" that the proposed allocation of Historical CAT Costs is not concerning due to the existence of higher transaction-based fees,[784] as stated above, the Proposed Amendment does not approve *per se* the amount of the Historical CAT Costs; it sets forth the model but leaves the amount and description of the Historical CAT Costs for the Section 19(b) fee filings. The Commission recognizes, however, that the Participants have disclosed the amount of the Historical CAT Costs in the 2023 Funding Model Amendment.[785] While such Historical

---

[767] *Id.* at 18–19.

[768] *See* Citadel July 2023 Letter, at 23, 31; 2023 Funding Model Order, at 62662.

[769] *See* CAT LLC July 2023 Response Letter, at 19.

[770] *Id.*

[771] *See* proposed Section 11.3(a)(ii)(A) and (iii)(A).

[772] *See* CAT NMS Plan Approval Order, at 81 FR at 84993.

[773] *See* Notice, 90 FR at 44935.

[774] *Id.* at 44936, n.110 (stating that there has been substantial continuity in the largest Industry Members over time and providing statistics about the continuity).

---

[775] *See, e.g.,* CAT NMS Plan, at Section 11.1(b), Section 11.1(c), Section 11.2(b), Section 11.3.

[776] *See* Notice, 90 FR at 44921.

[777] *See* proposed Section 11.1(c) (emphasis added).

[778] *See* Notice, 90 FR at 44935. *See also* note 745 (describing what CAT LLC previously identified as excluded costs).

---

[779] *See* Citadel August 2023 Letter, at 7.

[780] *See* proposed Section 11.3(b)(iii)(B)(II).

[781] 15 U.S.C. 78f(b)(4), 15 U.S.C. 78o–3(b)(5); 15 U.S.C. 78f(b)(5), 15 U.S.C. 78o–3(b)(6); 15 U.S.C. 78f(b)(8), 15 U.S.C. 78o–3(b)(9).

[782] *See* proposed Section 11.3(b)(iii)(B)(II).

[783] *See* Citadel August 2023 Letter, at 7.

[784] *Id.*

[785] *See* 2023 Funding Model Amendment, 88 FR at 17110–11 (providing Historical CAT Costs prior to 2022). CAT LLC also provided updated Historical CAT Costs through 2022. *See* CAT LLC July 2023 Response Letter, at 17.

CAT Costs are not being approved by the Commission at this time, the Commission understands that such amounts provide an indication of what might be charged. In this regard, the Commission notes the Participants included in Exhibit C to the 2023 Funding Model Amendment a chart setting forth an example Historical CAT Assessment, for illustrative purposes only, that each CAT Executing Broker would pay based on its transactions in Eligible Securities in December 2022 related to CAT costs from prior to 2022. The chart indicated that the Historical Fee Rate for the assumed December 2022 period was $0.0000417950 per executed equivalent share. Accordingly, the Commission believes that any potential impact on trading activity or bid-ask spreads would likely be limited.

b. Historical Recovery Period

The ''Historical Recovery Period'' would be used to calculate the Historical Fee Rate for a Historical CAT Assessment.[786] Proposed Section 11.3(b)(i)(D) of the CAT NMS Plan provides the Operating Committee with the discretion to reasonably establish the length of the Historical Recovery Period as long as no such period is less than 24 months and more than five years. CAT LLC analyzed potential recovery periods and determined that the Historical Fee Rate calculated using the proposed Historical Recovery Period of two to five years would be reasonable for Industry Members even if they had to pay both the ongoing CAT Fee and the Historical Fee Assessment simultaneously.[787] Additionally, in determining the range for the Historical Recovery Period, CAT LLC ''sought to weigh the need for a reasonable Historical Fee Rate that spreads the Historical CAT Costs over an appropriate amount of time and the need to repay the loan notes to the Participants in a timely fashion.''[788] In the Commission's view, it is appropriate for the Operating Committee to establish the length of the Historical Recovery Period to be no less than 24 months and no more than five years. According to the Participants, ''[t]he length of the Historical Recovery Period used in calculating each Historical Fee Rate will be reasonably established by the Operating Committee based on the amount of the Historical CAT Costs to be recovered by the Historical CAT

Assessment.''[789] The Operating Committee is authorized by the CAT NMS Plan to establish the funding of CAT LLC, including the fees to be paid by Participants and Industry Members.[790] Because the Historical Recovery Period is used in the calculation of Historical CAT Assessments to recover costs incurred to fund the CAT, the Commission views it as appropriate for the Operating Committee to determine a reasonable length of time for the Historical Recovery Period since the Operating Committee has authority over CAT funding pursuant to the Plan.

c. Historical Fee Rate

The Historical Fee Rate would be used to calculate Historical CAT Assessments. The Operating Committee will calculate the Historical Fee Rate for each Historical CAT Assessment by dividing the Historical CAT Costs for each Historical CAT Assessment by the reasonably projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period.[791] Additionally, proposed Section 11.3(b)(i)(A) states that once the Operating Committee has approved a Historical Fee Rate, the Participants will be required to file with the Commission, pursuant to Section 19(b) of the Exchange Act,[792] the Historical CAT Assessment to be charged to Industry Members using the Historical Fee Rate.[793] Industry Members would be required to pay such Historical CAT Assessment using such Historical Fee Rate once such Historical CAT Assessment is in effect in accordance with Section 19(b) of the Exchange Act.[794]

Proposed Section 11.3(b)(i)(E) of the CAT NMS Plan provides that ''[t]he Operating Committee shall reasonably determine the projected total executed equivalent share volume of all transactions in Eligible Securities for each Historical Recovery Period based on the executed equivalent share volume of all transactions in Eligible

Securities for the prior twelve months.''[795] CAT LLC would allow the Operating Committee to base its projected total executed equivalent share volume on the prior twelve months, but to use its discretion to analyze the likely volume for the upcoming year.[796] Participants would be required to describe the calculation of the projection in their fee filings submitted to the Commission, pursuant to Section 19(b) of the Exchange Act, to implement the Historical CAT Assessments on Industry Members.[797]

The calculation of the Historical Fee Rate by dividing Historical CAT Costs by the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period[798] is appropriate. First, it is appropriate for the Historical Fee Rate to be based on Historical CAT Costs. The Proposed Amendment defines Historical CAT Costs as Past CAT Costs minus the Past CAT Costs reasonably excluded from Historical CAT Costs by the Operating Committee[799] (e.g., the excluded costs).[800] It is appropriate to use the Historical CAT Costs related to a Historical CAT Assessment to calculate the Historical Fee Rate used to calculate the Historical CAT Assessment because the Participants are seeking to recover the Historical CAT Costs through the Historical CAT Assessment.[801] The use of Historical CAT Costs is appropriate to determine the Historical Fee Rate because it ties the Historical Fee Rate to the costs that the CAT has incurred and will be apportioned among the CAT Executing Brokers for recovery. Second, it is appropriate to use the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period to calculate the Historical Fee Rate because this would provide the likely volume for the Historical Recovery Period to be used as the denominator, similar to the manner in which the Fee Rate for Prospective CAT Fees would be calculated. This proposed projection of total executed equivalent share volume based on the prior twelve months is appropriate because it balances the use of data that is sufficiently long to avoid short term fluctuations while providing data close in time to the calculation of the Fee Rate or Historical Fee Rate.[802]

---

[786] See proposed Section 11.3(b)(i)(D)(I).

[787] See Notice, 90 FR at 44921. CAT LLC acknowledged that the Historical CAT Assessment would need to be calculated using up-to-date Historical CAT Costs and executed equivalent share volume. Id.

[788] Id. at 44921.

[789] Id.

[790] See CAT NMS Plan, at Section 11.1(b).

[791] See proposed Section 11.3(b)(i)(A). Proposed Section 11.3(b)(i)(B) provides that the executed equivalent shares used to calculate the Historical CAT Assessment would be counted in the same manner as executed equivalent shares used to calculate CAT Fees related to Prospective CAT Costs.

[792] 15 U.S.C. 78s(b).

[793] See proposed Section 11.3(b)(i)(A).

[794] Id.; see also 15 U.S.C. 78s(b); see infra Part III.A.6.e. (Historical CAT Assessment—Fee Filings under Section 19(b) of the Exchange Act for Industry Member CAT Fees) for a discussion of Section 19(b) filing requirements.

[795] See proposed Section 11.3(b)(i)(E).

[796] See Notice, 90 FR at 44918.

[797] See proposed Section 11.3(b)(iii)(B)(II).

[798] See proposed Section 11.3(b)(i)(A).

[799] See proposed Section 11.3(b)(i)(C).

[800] See Notice, 90 FR at 44935.

[801] See proposed Section 11.3(b)(i)(C).

[802] See Notice, 90 FR at 44922.

Additionally, it is appropriate for CAT LLC to permit the Operating Committee to use its discretion to analyze the likely volume for the upcoming year.[803] This would allow the Operating Committee to use its judgment when estimating projected total executed equivalent share volume if the volume over the prior twelve months was unusual or otherwise unfit to serve as the basis of a future volume estimate. Furthermore, since the Participants would be required to describe the calculation of the projected total executed equivalent share volume in the fee filings submitted to the Commission, pursuant to Section 19(b) of the Exchange Act, to implement the Historical CAT Assessments on Industry Members, the public will have an opportunity to review the projection and provide comment.[804]

d. Length of Time Historical CAT Assessment Would Be in Effect

Proposed Section 11.3(b)(i)(D)(II) of the CAT NMS Plan would describe the length of time that a Historical CAT Assessment would be in effect. This period of time may be longer or shorter than the Historical Recovery Period used to calculate the Historical Fee Rate for a Historical CAT Assessment. Each Historical CAT Assessment calculated using the Historical Fee Rate would remain in effect until all Historical CAT Costs for that Historical CAT Assessment are collected.[805] CAT LLC stated that "[a]ny Historical CAT Assessment would remain in effect until the relevant Historical CAT Costs are recovered, whether that time is shorter or longer than the Historical Recovery Period used in calculating the Historical Fee Rate." [806] The length of time that the Historical CAT Assessment would be in effect would depend "on the amount of the Historical CAT Assessments collected based on the actual volume during the time that the Historical CAT Assessment is in effect." [807]

In the Commission's view, it is appropriate for Industry Members to be charged a Historical CAT Assessment until all Historical CAT Costs for the Historical CAT Assessment are collected. The Commission understands that the amount of Historical CAT Costs collected will vary depending on how the actual volume compares to the estimated volume. To the extent the actual volume exceeds the estimated volume, a Historical CAT Assessment

would be collected faster and thus would be in effect for a shorter period. Similarly, to the extent the actual volume is less than the estimated volume, the Historical CAT Assessment would be collected slower and thus would be in effect for a longer period.

e. Fee Filings Under Section 19(b) of the Exchange Act for Industry Member CAT Fees

Once the Operating Committee has approved a Historical Fee Rate, the Participants shall be required to file with the Commission, pursuant to Section 19(b) of the Exchange Act,[808] such Historical CAT Assessment to be charged Industry Members calculated using such Historical Fee Rate.[809] CAT LLC proposes to provide additional details regarding the fee filings to be filed by the Participants regarding each Historical CAT Assessment pursuant to Section 19(b) of the Exchange Act in proposed Section 11.3(b)(iii)(B) of the CAT NMS Plan. Specifically, this provision would describe that fee filings would be required for each Historical CAT Assessment, the content of such fee filings, and the effect of the Financial Accountability Milestones described in Section 11.6 of the CAT NMS Plan on the fee filings.[810]

Proposed Section 11.3(b)(iii)(B)(I) of the CAT NMS Plan would state that "Participants will be required to file with the SEC pursuant to Section 19(b) of the Exchange Act a filing for each Historical CAT Assessment." [811] CAT LLC proposes to provide additional detail about the information that Participants would be required to include in the filings for the Historical CAT Assessments in proposed Section 11.3(b)(iii)(B)(II). The proposed paragraph sets forth the information about the Historical CAT Assessments that should be included in the fee filings required to be made by the Participants pursuant to Section 19(b) of the Exchange Act.[812] Specifically, such filings would be required to include: (A) the Historical Fee Rate; (B) a brief description of the amount and type of Historical CAT Costs, including (1) the technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs; (C) the Historical

Recovery Period and the reasons for its length; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period, and a description of the calculation of the projection.[813]

In addition, CAT LLC proposes to clarify that the Historical CAT Costs described in the fee filings must provide sufficient detail to demonstrate that such costs are reasonable and appropriate.[814] Therefore, CAT LLC proposes to add the following sentence to proposed Section 11.3(b)(iii)(B)(II) of the CAT NMS Plan: "The information provided in this Section would be provided with sufficient detail to demonstrate that the Historical CAT Costs are reasonable and appropriate." [815]

Proposed Section 11.3(b)(iii)(B)(III) provides that the Participants will not make CAT fee filings pursuant to Section 19(b) of the Exchange Act [816] regarding a Historical CAT Assessment until any applicable Financial Accountability Milestone has been satisfied. This provision is appropriate as it takes into account existing requirements set forth in Section 11.6 of the CAT NMS Plan that prevent the Participants from recovering fees related to any given Financial Accountability Milestone until that Financial Accountability Milestone has been achieved.[817]

The Commission emphasizes that the fee filings filed with the Commission, pursuant to Section 19(b) of the Exchange Act,[818] to implement each Historical CAT Assessment on Industry Members will need to provide sufficient

---

[803] *Id.*
[804] *See* proposed Section 11.3(b)(iii)(B)(II).
[805] *See* proposed Section 11.3(b)(i)(D)(II).
[806] *See* Notice, 90 FR at 44921.
[807] *Id.*

[808] 15 U.S.C. 78s(b).
[809] *See* proposed Section 11.3(b)(i)(A).
[810] *See* proposed Section 11.3(b)(iii)(B)(I), (II), (III).
[811] *See* proposed Section 11.3(b)(iii)(B)(II).
[812] 15 U.S.C. 78s(b).

[813] *See* proposed Section 11.3(b)(iii)(B)(II).
[814] *Id.*
[815] *Id.*
[816] 15 U.S.C. 78s(b).
[817] *See, e.g.,* Section 11.6(a)(iv) ("The Participants will only be permitted to collect Post-Amendment Industry Member Fees for Period 1, Period 2, Period 3, or Period 4 at the end of each respective Period."). Section 11.6 of the CAT NMS Plan is designed to reduce the amount of fees, costs, and expenses that the Participants may recover from Industry Members if the Participants miss the target deadlines established by that Section. To the extent that the Participants miss a target deadline established by Section 11.6, the Participants would be responsible for paying a larger amount of CAT-related fees, costs, and expenses on their own. The Commission expects that the portion of these fees, costs, and expenses that is attributable to for-profit national securities exchanges would likely be paid out of their existing profits, whereas the portion of these fees, costs, and expenses that is attributable to non-profit national securities associations like FINRA would likely be paid out of past revenue or existing fees. The Commission would evaluate any such new or existing fees in accordance with Section 6(b)(4) and Section 15A(b)(5) of the Exchange Act. 15 U.S.C. 78f(b)(4); 15 U.S.C. 78o–3(b)(5).
[818] 15 U.S.C. 78s(b).

information to enable the Commission to make a determination on whether and when the Participants have satisfied each of the Financial Accountability Milestones—questions that the Commission is not deciding herein. This Order only approves the establishment of the framework by which the Participants will propose Historical CAT Assessments to be charged to Industry Members.[819]

In the Commission's view, the proposed requirement for the Participants to file fee filings with the Commission, pursuant to Section 19(b) of the Exchange Act,[820] to implement each Historical Fee Assessment on Industry Members is appropriate. The detail provided in the fee filings for the Historical CAT Assessment would provide transparency into the Past CAT Costs as it would describe the amount and type of Historical CAT Costs and allow the public the ability to comment on the Historical CAT Costs.[821] The fee filings must contain sufficient detail to demonstrate that the fees are consistent with the Exchange Act, including that such costs are reasonable and appropriate,[822] and provide the public with the detail needed to evaluate the Historical CAT Assessments for comment.

The Proposed Amendment offers an appropriate level of transparency into the Past CAT Costs used for the Historical CAT Assessment so that the industry and the public will be able to understand and assess the Past CAT Costs and the Historical Fee Rate. The Proposed Amendment requires the Section 19(b) fee filings to be submitted to the Commission by the Participants to establish the Historical CAT Assessments for Industry Members to contain the following information: ''(A) the Historical Fee Rate; (B) a brief description of the amount and type of Historical CAT Costs, including (1) the technology line items of cloud hosting services, operating fees, CAIS operating fees, change request fees and capitalized developed technology costs, (2) legal, (3) consulting, (4) insurance, (5) professional and administration, and (6) public relations costs; (C) the Historical Recovery Period and the reasons for its length; and (D) the projected total executed equivalent share volume of all transactions in Eligible Securities for the Historical Recovery Period, and a

description of the calculation of the projection.'' [823] CAT LLC explained that this information ''would provide Industry Members and other interested parties with a clear understanding of the calculation of each Historical CAT Assessment and its relationship to Historical CAT Costs.'' [824] In the Commission's view, the detail provided in the fee filings for the Historical CAT Assessment would provide transparency into the Past CAT Costs as the filings would describe the amount and type of Historical CAT Costs and allow the public the ability to comment on the Historical CAT Costs.[825] Additionally, pursuant to the Proposed Amendment being approved, the fee filings will also need to contain ''sufficient detail to demonstrate that such costs are reasonable and appropriate,'' [826] which would provide the public and the Commission the detail needed to evaluate the Historical CAT Assessments for consistency with the Exchange Act and the CAT NMS Plan.

### f. Past CAT Costs and Participants

Proposed Section 11.3(b)(ii) of the CAT NMS Plan would clarify that the Participants would not be required to pay the Historical CAT Assessment as the Participants previously have paid all Past CAT Costs. It would state that, ''[b]ecause Participants previously have paid Past CAT Costs via loans to the Company, Participants would not be required to pay any Historical CAT Assessment.'' [827] In addition, proposed Section 11.3(b)(ii) of the CAT NMS Plan would state that the Historical CAT fees collected from Industry Members would be allocated to Participants for repayment of the outstanding loan notes of the Participants to the Company on a pro rata basis; such fees would not be allocated to Participants based on the executed equivalent share volume of transactions in Eligible Securities.[828] Specifically, proposed Section 11.3(b)(ii) of the CAT NMS Plan would state that ''[i]n lieu of a Historical CAT Assessment, the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans.'' [829] Furthermore, proposed

Section 11.3(b)(ii) of the CAT NMS Plan would emphasize that ''[t]he Historical CAT Assessment is designed to recover two-thirds of the Historical CAT Costs.'' [830]

The proposed allocation of the Historical CAT Assessment solely to CEBSs and CEBBs, and ultimately Industry Members, is appropriate. The Historical CAT Assessment will still be divided into thirds.[831] CAT LLC stated that the Participants' one-third share of Historical CAT Costs and such other additional Past CAT Costs as reasonably determined by the Operating Committee ''will be paid by the cancellation of loans made to the Company on a pro rata basis based on the outstanding loan amounts due under the loans'' and that the Participants will also be 100% responsible for any excluded costs.[832] CAT LLC explained that the terms of the loan agreements between CAT LLC and the Participants dictate that repayment of the notes will be on a pro rata basis.[833] The pro rata basis for cancelling the loans is appropriate because repayment of the loans made by the Participants is required pro rata per the loan agreements between the Participants and CAT LLC.[834] The CAT NMS Plan permits the Participants to seek recovery of CAT costs from Industry Members, which includes Past CAT Costs.[835] However, similar to cancelling the loans, the Executed Share Model would require the Participants to pay CAT fees related to Prospective CAT Costs.[836]

### 7. Calculation Information; Billing and Collection of CAT Fees

CAT LLC proposed to provide Participants and CAT Executing Brokers with details regarding the calculation of their CAT Fees upon request.[837] Specifically, CAT LLC proposed to add Section 11.3(a)(iv)(A) to the CAT NMS Plan to provide that ''[d]etails regarding the calculation of a Participant or CAT Executing Brokers' CAT Fees will be provided upon request to such Participant or CAT Executing Broker.'' [838] Similarly, for the Historical CAT Assessment, under proposed Section 11.3(b)(iv)(A), ''at minimum, such details would include each CAT Executing Broker's executed equivalent share volume and corresponding

---

[819] The Commission does not believe it could determine whether the Historical CAT Costs associated with a Financial Accountability Milestone are ''reasonable or appropriate'' under Section 11.3(b)(iii)(B)(II) without such information.

[820] 15 U.S.C. 78s(b).

[821] *See* proposed Section 11.3(b)(iii)(B)(II).

[822] *Id.*

[823] *See* proposed Section 11.3(b)(iii)(B)(II).

[824] *See* Notice, 90 FR at 44923.

[825] *See* proposed Section 11.3(b)(iii)(B)(II).

[826] *Id.*

[827] *See* proposed Section 11.3(b)(ii).

[828] *See* Notice, 90 FR at 44922.

[829] *See* proposed Section 11.3(b)(ii).

[830] *Id.*

[831] *Id.*

[832] *See* Notice, 90 FR at 44929.

[833] *Id.* at 44933.

[834] *Id.*

[835] *See* CAT NMS Plan, at Section 11.1(b), Section 11.3(b).

[836] *See* proposed Section 11.3(a)(ii).

[837] *See* Notice, 90 FR at 44920.

[838] *See* proposed Section 11.3(a)(iv)(A).

fee.'' [839] In both cases, the new sections require that these details be separated by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.[840] Additionally, for each CAT Fee and Historical CAT Assessment, at a minimum, CAT LLC will make publicly available the aggregate executed equivalent share volume and corresponding aggregate fee also by (1) Listed Options, NMS Stocks and OTC Equity Securities, (2) by transactions executed on each exchange and transactions executed otherwise than on an exchange, and (3) by buy-side transactions and sell-side transactions.[841] The Commission understands that the publicly available aggregate statistics will be made available by CAT LLC on a monthly basis with each invoice.

CAT LLC stated that consistent with Section 11.1(d) of the CAT NMS Plan, it will adopt policies, procedures and practices regarding the billing and collection of fees Section 11.4 of the CAT NMS Plan.[842] In addition, pursuant to Section 11.4 of the CAT NMS Plan, CAT LLC will establish a system for the collection of CAT fees from Participants and Industry Members.[843] Under Section 11.4 of the CAT NMS Plan, the Participants must require each Industry Member to pay all applicable fees authorized under this Article XI within thirty (30) days after receipt of an invoice or other notice indicating payment is due (unless a longer payment period is otherwise indicated). If an Industry Member fails to pay any such fee when due, such Industry Member shall pay interest on the outstanding balance from such due date until such fee is paid at a per annum rate equal to the lesser of: (a) the Prime Rate plus 300 basis points; or (b) the maximum rate permitted by applicable law.[844]

Similarly, as set forth in Section 3.7(b) of the CAT NMS Plan, each Participant must pay all fees or other amounts required to be paid under the Plan within thirty (30) days after receipt of an invoice or other notice indicating payment is due (unless a longer payment period is otherwise indicated) (''Payment Date''). The Participant shall

pay interest on the outstanding balance from the Payment Date until such fee or amount is paid at a per annum rate equal to the lesser of: (i) the Prime Rate plus 300 basis points; or (ii) the maximum rate permitted by applicable law.[845] The Commission did not receive any objections to nor any comments regarding the calculation of this interest rate.

The proposed provision to Participants and CAT Executing Brokers with details regarding the calculation of their CAT Fees upon request is appropriate. In the Commission's view, providing CAT Execution Brokers information regarding the calculation of their CAT Fees will aid in transparency and permit CAT Execution Brokers to confirm the accuracy of their invoices for CAT Fees. The publication of the aggregate executed equivalent share volume and aggregate fee is appropriate because it would allow Participants and CAT Executing Brokers a high-level validation of executed volume and fees.

8. Additional Changes From Original Funding Model

CAT LLC proposed to delete the term ''Execution Venue'' and its definition from Section 1.1 of the CAT NMS Plan, explaining that this term is not relevant in the Executed Share Model.[846] Section 1.1 of the existing CAT NMS Plan defined ''Execution Venue'' to mean ''a Participant or an alternative trading system ('ATS') (as defined in Rule 300 of Regulation ATS) that operates pursuant to Rule 301 of Regulation ATS (excluding any such ATS that does not execute orders).'' The Original Funding Model would have imposed fees based on market share to CAT Reporters that are Execution Venues, including ATSs, and fees based on message traffic for Industry Members' non-ATS activities.[847] In contrast, the Executed Share Model does not use the term ''Execution Venue,'' as the Executed Share Model imposes fees based on the executed equivalent shares of transactions in Eligible Securities for three categories of CAT Reporters: Participants, CEBBs and CEBSs.[848]

CAT LLC also proposed to amend Section 11.2(c) and Section 11.3(a) and (b) of the CAT NMS Plan to require

Participants and CAT Executing Brokers to pay CAT fees based on the number of executed equivalent shares in a transaction in Eligible Securities instead of based on market share and message traffic.[849]

First, CAT LLC proposed to delete subparagraphs (i) and (ii) of Section 11.2(c) and replace these subparagraphs with the requirement that the fee structure in which the fees charged to ''Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities.'' [850] The deleted provisions would have required the Operating Committee, in establishing the funding of the Company, to seek to establish a tiered fee structure in which the fees charged to: (i) CAT Reporters that are Execution Venues, including ATSs, are based upon the level of market share and (ii) Industry Members' non-ATS activities are based upon message traffic.

Second, CAT LLC proposed to amend Sections 11.3(a) and 11.3(b) of the CAT NMS Plan to remove detail regarding fixed fees and fee tiers for market share and message traffic by Participants and Execution Venue ATSs under the Original Funding Model.[851] Section 11.3(a) currently describes the fixed CAT fees to be paid by Participants and Execution Venue ATSs based on market share and Section 11.3(b) currently describes the fixed CAT fees to be paid by Industry Members (other than Execution Venue ATSs) based on message traffic.[852] The text in these sections would be replaced with proposed Sections 11.3(a) and (b), which, as discussed above, would describe the calculation and application of the CAT Fees related to Prospective CAT Costs and the Historical CAT Assessments. These proposed changes to Sections 11.3(a) and (b) would also replace references to ''fixed fees'' with ''fees'' instead. CAT LLC explained that the concept of fixed fees is not relevant in the Executed Share Model.[853]

CAT LLC also proposed to amend Sections 11.1(d), 11.2(c), 11.3(a) and 11.3(b) of the CAT NMS Plan to eliminate tiered fees and related concepts because the Executed Share Model does not utilize tiering.[854] First, CAT LLC proposed to remove a reference to the ''assignment of tiers'' from Section 11.1(d). CAT LLC also proposed to remove two sentences from

---

[839] *See* proposed Section 11.3(b)(iv)(A).

[840] *See* proposed Section 11.3(a)(iv)(A); proposed Section 11.3(b)(iv)(A)

[841] *See* proposed Section 11.3(a)(iv)(B); proposed Section 11.3(b)(iv)(B).

[842] *See* Notice, 90 FR at 44925.

[843] *Id.* at 44926.

[844] *See* CAT NMS Plan, at Section 11.4.

[845] *Id.* at Section 3.7(b). If any such remaining outstanding balance is not paid within thirty (30) days after the Payment Date, the Participants shall file an amendment to this Agreement requesting the termination of the participation in the Company of such Participant, and its right to any Company Interest, with the Commission.

[846] *See* Notice, 90 FR at 44923–24.

[847] *See* CAT NMS Plan, at Section 11.3(a)(i) and (ii); Section 11.3(b).

[848] *See* proposed Section 11.3(a)(ii) and (iii); proposed Section 11.3(b)(iii).

[849] *See* Notice, 90 FR at 44924–25.

[850] *See* proposed Section 11.2(c).

[851] *See* Notice, 90 FR at 44925.

[852] *See* CAT NMS Plan, at Section 11.3(a) and (b).

[853] *See* Notice, 90 FR at 44925.

[854] *Id.* at 44924–25.

Section 11.1(d) permitting the Operating Committee to change the tier assigned to any Person. Second, CAT LLC proposed to amend Section 11.2(c) to delete a reference to a tiered fee structure (specifically, deleting the word "tiered") so that CAT fees would not be tiered under the Executed Share Model. Third, CAT LLC proposed to delete subparagraph (iii) of Section 11.2(c), which required the Operating Committee, in establishing the funding of the Company, to seek to establish a fee structure in which the fees charged to CAT Reporters with the most CAT-related activity (measured by market share and/or message traffic, as applicable) are generally comparable (where, for these comparability purposes, the tiered fee structure takes into consideration affiliates between or among CAT Reporters, whether Execution Venues and/or Industry Members).[855] CAT LLC explained that this comparability provision was a factor used to determine the tiers for Industry Members and Execution Venues under the Original Funding Model, but that it is no longer necessary since the proposed Executed Share Model would not use a tiered fee structure.[856] Finally, as discussed above, CAT LLC proposed to amend Sections 11.3(a) and (b) to replace the language with proposed Sections 11.3(a) and (b), which would describe the calculation and application of the CAT Fees related to Prospective CAT Costs and the Historical CAT Assessments. CAT LLC states that such proposed changes would remove the references to tiers in Sections 11.3(a)(i) and (ii) and 11.3(b).[857]

In addition, CAT LLC proposed to amend the CAT funding principles to clarify that CAT Fees and the Historical CAT Assessments are intended to be cost-based fees.[858] Specifically, CAT LLC proposed to amend the funding principle set forth in Section 11.2(c) by making a specific reference to "the costs of the CAT." Proposed Section 11.2(c) would state, "[i]n establishing the funding of the Company, the Operating Committee shall seek . . . to establish a fee structure in which the fees charged to Participants and Industry Members are based upon the executed equivalent share volume of transactions in Eligible Securities, *and the costs of the CAT* (emphasis added)."[859]

In the Commission's view, the proposed deletion of the term

"Execution Venue" from the CAT NMS Plan is appropriate because the term is no longer relevant to the CAT NMS Plan. The proposed Executed Share Model does not impose fees on Execution Venues and would instead impose fees on Participants and CAT Executing Brokers (and, ultimately, Industry Members) and therefore it is appropriate to delete the term.

Additionally, it is appropriate to amend Section 11.2(c) and Section 11.3(a) and (b) of the CAT NMS Plan to reflect the proposed use of the number of executed equivalent shares in transactions in Eligible Securities in calculating CAT fees. These changes are appropriate because, unlike the Original Funding Model, the proposed Executed Share Model would not use message traffic, or a tiered fee structure.

Further, the proposed elimination of tiered fees and related concepts from the CAT NMS Plan and the proposed replacement of "fixed fees" with references to "fees" in the CAT NMS Plan are appropriate. The Original Funding Model would use a tiered fee structure of fixed fees; however, the proposed Executed Share Model would require each Participant and CAT Executing Broker to pay a CAT fee based on its transactions in Eligible Securities.[860] CAT LLC explained that "[t]he proposed non-tiering approach is simpler and more objective to administer than the tiering approach"[861] and that removing tiers "eliminates a variety of subjective analyses and judgments from the model and simplifies the determination of CAT fees."[862] Additionally, the Proposed Amendment would replace the concept of "fixed fees" with "fees" because CAT fees will vary in accordance with the number of executed equivalent shares in a transaction.[863] The proposed elimination of tiered fees and related concepts from the CAT NMS Plan and the proposed replacement of "fixed fees" with references to "fees" in the CAT NMS Plan are appropriate because these changes conform the CAT NMS Plan funding model to the proposed Executed Share Model.

Additionally, the Proposed Amendment would amend Section 11.2(c) to make clear that the fee structure established by the Operating Committee to charge fees to Participants and Industry Members would also be based on the costs of the CAT.[864] CAT

LLC explained that the change clarifies that the CAT fees are cost-based fees designed to recover the cost of the creation, implementation and operation of the CAT.[865] These proposed changes are appropriate because they would update language in the Original Funding Model to reflect the operation of the proposed Executed Share Model.

9. Other Comments

a. Rule 613 and the CAT NMS Plan

In comment letters submitted for the 2023 Funding Model Amendment, a commenter states that changes and cost overruns have changed the structure of the CAT from what was contemplated by Rule 613.[866] The commenter believes that the Operating Committee and the Commission have engaged in ad-hoc discussions to interpret what the Plan requires "without adequate notice to Industry Members or due consideration of the costs and benefits associated with such interpretations."[867] The commenter states that the Commission has not regularly assessed whether costs resulting from a specific interpretation of Rule 613 and the CAT NMS Plan outweigh benefits.[868] The commenter requests that the Commission revisit its assumptions from the CAT NMS Plan Approval Order[869] due to inaccurate cost estimates, a failure to retire duplicative systems, impracticality of technology requirements, a lack of effective governance, and a lack of processes to consider requests to add more data.[870]

In a response letter submitted for the 2023 Funding Model Amendment, CAT LLC states that the CAT was implemented in accordance with Rule 613 and the CAT NMS Plan and that the CAT NMS Plan permits the recovery of costs incurred in the creation, implementation and maintenance of the CAT.[871]

CAT LLC also responds to comments that raised concerns about the Commission's interpretations of CAT NMS Plan requirements that were not related to the funding model and the costs and benefits of those interpretations.[872] CAT LLC states that the Proposed Amendment is not the appropriate forum to resolve

---

[855] *Id.* at 44925.

[856] *Id.*

[857] *Id.* at 44924–25.

[858] *Id.* at 44924.

[859] Proposed Section 11.2(c).

[860] *See* proposed Section 11.3(a)(ii)(A), (a)(iii)(A), (b)(iii)(A).

[861] *See* Notice, 90 FR at 44925.

[862] *Id.*

[863] *Id.* at 44925.

[864] *See* proposed Section 11.2(c) (". . . fees charged to Participants and Industry Members are

based upon the executed equivalent share volume of transactions in Eligible Securities, *and the costs of the CAT.*" (emphasis added)).

[865] *See* Notice, 90 FR at 44924.

[866] *See* Citadel July 2023 Letter, at 7.

[867] *Id.* at 6.

[868] *Id.*

[869] *See* CAT NMS Plan Approval Order.

[870] *See* Citadel July 2023 Letter, at 5.

[871] *See* CAT LLC July 2023 Response Letter, at 28.

[872] *See* Citadel July 2023 Letter, at 32–34.

interpretive questions.[873] CAT LLC also states that, for proposed changes to the CAT NMS Plan, the Participants are following the process in Rule 608 for plan amendments and noted that material changes to the CAT system would require an amendment to the CAT NMS Plan,[874] but not a material change to a technology contract as the CAT NMS Plan permits the Operating Committee to enter into, modify or terminate a material contract.[875]

The CAT NMS Plan is consistent with Rule 613, and the Commission does not believe that any changes have been made that are inconsistent with the Plan as approved in 2016, as amended in 2020.[876] Rule 608 and Rule 613 of Regulation NMS provide advance notice of material changes to the CAT system and related costs by requiring changes to the CAT NMS Plan to be filed with the Commission as an NMS plan amendment pursuant to Rule 608 of Regulation NMS and thereby be subject to notice and comment, and Rule 613 requires that the Commission consider, in determining to approve a CAT NMS Plan amendment, the impact of the amendment on efficiency, competition and capital formation.[877] Section 6.9 of the CAT NMS Plan does not provide unfettered discretion to the CAT Operating Committee to make Material Amendments to the CAT system. If the CAT Operating Committee or the Commission wish to impose additional requirements to the CAT NMS Plan, such requirements must be proposed through an amendment to the CAT NMS Plan, filed under Rule 608 of Regulation NMS. Such amendments must be published for notice and comment.[878] Additionally, Rule 613(a)(5) of Regulation NMS [879] requires the Commission to consider, in determining whether to approve an amendment to the CAT NMS Plan, the impact of the amendment on efficiency, competition and capital formation; therefore, this Order contains an analysis of the Proposed Amendment's impact on efficiency, competition, and capital formation.

b. Lawfulness of the CAT

In approving a modified version of the Proposed Amendment as a temporary funding model, the Commission is not reconsidering or revisiting the decision to establish a consolidated audit trail or to approve the CAT NMS Plan. The Commission is, however, separately in the process of a comprehensive reassessment of the CAT. Several commenters on the Proposed Amendment argue that the CAT itself contravenes the Fourth Amendment and the Appropriations Clause, and exceeds the Commission's statutory authority. The Commission has taken the position elsewhere, however, that the commenters' specific constitutional and statutory objections are inconsistent with current judicial precedent, and they thus do not preclude the Commission from approving a temporary funding model to govern while the Commission engages in that review.[880] The Commission takes seriously these comments animated by fundamental concerns about the CAT's current structure, and they will inform the Commission's consideration of potential reforms in the context of its ongoing, comprehensive reassessment of the CAT.

c. Governance

In comments submitted for the 2023 Funding Model Amendment, a commenter states that the CAT governance structure is flawed because exchange groups with multiple affiliated exchanges have ''significant influence'' over the Operating Committee and can ''dictate many CAT-related decisions'' such as the allocation of CAT costs.[881] The commenter further states that Industry Members lack representation on the Operating Committee; therefore, they cannot vote on the design, implementation or funding of CAT.[882] The commenter states that the governance structure results in the allocation of all CAT costs to Industry Members.[883] Additionally, the commenter believes the governance structure permits the Operating Committee to provide minimal information on the costs to be allocated to Industry Members,[884] stating that the financial information that has been provided by the Operating Committee through audited financial statements and an annual financial and operating budget is disclosed in broad categories and lacks detail about the key drivers of the costs, and that the annual financial and operating budget does not predict costs accurately.[885] Based on this lack of detail, the commenter states that market participants cannot assess whether total CAT costs are reasonable and cannot suggest cost-saving alternatives and must rely on the Operating Committee to contain the budget.[886] The commenter states, ''[i]t is clearly inequitable to compel Industry Members to provide a blank check to fund these spiraling costs in perpetuity, without any governance role or any plan to contain overall costs,'' [887] and that allocating all CAT costs to firms without representation ''marginalize[s] cost-related considerations.'' [888] The commenter also states that the governance structure does not require the Operating Committee or the Commission to assess whether the costs of a specific interpretation of the Plan outweigh any benefits.[889]

The commenter recommends the following enhancements to improve CAT governance: (1) each exchange group and national securities association should have one vote on the Operating Committee, but will have a second vote if ''the exchange group or national securities association has a market center or centers that trade more than 15 percent of consolidated equity and options market share;'' [890] (2) all actions related to funding by the Operating Committee should be authorized by supermajority vote; [891] and (3) Industry Members should have voting representation on the Operating Committee commensurate with the costs allocated to them.[892] The commenter states that if industry representation cannot be achieved through an NMS

[873] *See* CAT LLC July 2023 Response Letter, at 29.

[874] *Id.*

[875] *Id.* at 30 (citing to Section 4.3 of the CAT NMS Plan).

[876] The examples provided in a comment letter submitted in the context of the 2023 Funding Model Amendment provided examples of changes that the commenter states was requested by the Commission. *See* Citadel July 2023 Letter, at 33–35. *See also* 2023 Funding Model Order, at 62671 n.921 (discussing other examples raised by other commenters in the context of the 2023 Funding Model Amendment). The Commission believes that these were included in the CAT NMS Plan approved by the Commission in 2016. *See* Securities Exchange Act Release No. 95234 (July 8, 2022), 87 FR 42247 (July 14, 2022).

[877] *See* Rule 613(a)(5); 17 CFR 242.613(a)(5).

[878] *See* Rule 608(a)(1); 17 CFR 242.608(a)(1).

[879] *See* 17 CFR 242.613(a)(5).

[880] *See, e.g.,* SEC's Opposition to Petitioners' Motion for Stay and Injunctive Relief at 11–13, *Am. Secs. Ass'n* v. *SEC,* No. 23–13396 (11th Cir. Sept. 30, 2024); SEC Defendants' Motion to Dismiss and Opposition to Plaintiff's Preliminary-Injunction Motion at 37–47, 53–55 *Davidson* v. *Gensler,* No. 6:24–cv–00197 (W.D. Tex. July 12, 2024); 2023 Funding Model Order, at 62672–73, *vacated on other grounds by Am. Secs. Ass'n,* 147 F.4th 1264; cf. *Nasdaq Stock Mkt. LLC* v. *SEC,* 38 F.4th 1126, 1131 (D.C. Cir. 2022).

[881] *See* Citadel July 2023 Letter, at 5, 6.

[882] *Id.* at 6.

[883] *See id.*

[884] *Id.*

[885] *Id.* at 6–7; *id.* at n.14.

[886] *See* Citadel July 2023 Letter, at 7.

[887] *Id.* at 2. *See also id.* at 23 (stating Section 6(b)(4), Section 6(b)(5) and Section 6(b)(8) of the Exchange Act do not allow a private entity to require Industry Members to provide a blank check in perpetuity because this is not an equitable allocation of reasonable fees and would greatly harm market competition, efficiency and liquidity).

[888] *Id.* at 7.

[889] *Id.*

[890] *See* Citadel July 2023 Letter, at 34.

[891] *Id.* at 3, 34.

[892] *Id.*

plan, the plan is not an appropriate vehicle for CAT governance.[893]

In response to comments objecting to a lack of Industry Member voting representation on the Operating Committee and suggesting their inclusion based on the proportion of costs allocated to them,[894] CAT LLC states that the addition of Industry Member voting representation is not consistent with the Exchange Act.[895] CAT LLC states that ''allowing Industry Members to control CAT LLC as commenters suggest could adversely affect the regulatory objectives of the CAT''[896] as Industry Members ''have no statutory obligation to protect investors or to act in the public interest, nor do they have any regulatory obligation to operate the CAT System in a manner that is consistent with the Rule 613 and the CAT NMS Plan.''[897] CAT LLC states that Industry Members can provide input through Plan amendments and fee filings and the CAT Advisory Committee.[898]

In response to a comment suggesting changes to the allocation of Participant voting rights,[899] CAT LLC states that this issue is beyond the scope of the CAT funding model. CAT LLC also responds to the commenter's suggestion that all funding actions by the Operating Committee require a supermajority vote by stating that it disagreed with the suggestion because all Operating Committee actions relate in a way to CAT costs; therefore, imposing a supermajority requirement could undermine governance.[900]

Commenters raise a number of governance concerns that the Commission expects to consider as part of its comprehensive review of the CAT. But the Commission does not believe that modification of SRO and Industry Member voting rights, which the Commission considered when it approved the CAT NMS Plan, is within the scope of the Proposed Amendment.[901] Furthermore, in response to those comments suggesting the addition of Industry Members as voting members on the operating committee, we note that—in vacating the Order Approving the CT Plan—the D.C. Circuit concluded that the inclusion of non-SRO representation on the operating committee of the CT Plan was inconsistent with Section 11A of the Exchange Act.[902] Industry Members do have an opportunity to attend meetings of the Operating Committee through the CAT Advisory Committee. According to Section 4.13(d) of the CAT NMS Plan, ''[m]embers of the Advisory Committee shall have the right to attend meetings of the Operating Committee or any Subcommittee, to receive information concerning the operation of the Central Repository (subject to Section 4.13(e)), and to submit their views to the Operating Committee or any Subcommittee on matters pursuant to [the CAT NMS Plan] prior to a decision by the Operating Committee on such matters.[903]

### d. FINRA Constitutionality

One commenter states that FINRA's regulatory authority over broker-dealers is unconstitutional, either because FINRA violates the private non-delegation doctrine as a private entity, or the Appointments Clause if FINRA is considered a government entity.[904] This commenter states that the constitutional problems with FINRA require rejecting the Proposed Amendment for a number of reasons, including that the Proposed Amendment depends on the authority and involvement of an unlawful entity, including FINRA's role in the operation of CAT and calculation of proposed fees, and the probability that at least one court will hold FINRA to be unlawful.[905]

CAT LLC states that this comment appears to be based on a misunderstanding regarding the entity that serves as the current Plan Processor, which is FINRA CAT, LLC, a separate legal entity that is a subsidiary of FINRA.[906] In response, the commenter states that CAT LLC did not dispute that its operations are dependent on FINRA, defend FINRA's constitutionality, or otherwise address ''the substantial probability that one of the many constitutional challenges to that self-regulatory organization's exercise of regulatory authority will succeed.''[907] This commenter states that FINRA itself has a ''central and indispensable role in operating the CAT,'' regardless of the ''nominal distinction'' between FINRA and its subsidiary, and so because FINRA is unconstitutional, so too is the exercise of FINRA's authority by a FINRA subsidiary that FINRA may supervise and control.[908] This commenter also states that delegation to a subsidiary cannot solve FINRA's own constitutional dilemma, and that either delegation ''exacerbates the private non-delegation problem'' if FINRA is a private entity, or is in contravention of the Appointments Clause if FINRA is a governmental entity.[909]

The Commission does not believe it would be appropriate to disapprove the Proposed Amendment on the basis that a court, in the future, could potentially determine that FINRA CAT's parent entity FINRA violates the constitution. In any event, the Commission has ''follow[ed] the lead set by the courts'' and has rejected private non-delegation and Appointments Clause challenges to FINRA's structure and operations.[910]

### IV. Efficiency, Competition, and Capital Formation

In determining whether to approve a proposed amendment, and whether such amendment is in the public interest, Rule 613 requires the Commission to consider the potential effects of the proposed amendment on efficiency, competition, and capital formation.[911] In its analysis, the Commission has reviewed the statements about such effects put forth by the Participants and commenters and independently analyzed the likely effects of the Proposed Amendment on efficiency, competition, and capital formation.[912] A commenter stated that

---

[893] *See* Citadel July Letter, at 34. In response, CAT LLC stats that this comment is outside the scope of the Proposed Amendment. *See* CAT LLC July 2023 Response Letter, at 31, n.144.

[894] *See* Citadel July 2023 Letter, at 34; 2023 Funding Model Order, at 62675 n.1012 (citing other comment letters submitted for the 2023 Funding Model Amendment).

[895] *See* CAT LLC July 2023 Response Letter, at 21.

[896] *Id.*

[897] *Id.*

[898] *Id.*

[899] *See* Citadel July 2023 Letter, at 34.

[900] *See* CAT LLC July 2023 Response Letter, at 21–22.

[901] *See* CAT NMS Plan Approval Order, 81 FR at 84728–30.

[902] *See The NASDAQ Stock Market LLC et al.* v. *SEC,* Case No. 21–1167, D.C. Cir. (July 5, 2022); 15 U.S.C. 78k–1.

[903] *See* CAT NMS Plan, at Section 4.13. *See also* 17 CFR 242.613(b)(7).

[904] *See* AmFree Letter, at 2–4.

[905] *Id.* at 4–6.

[906] *See* CAT LLC December 2025 Response Letter, at 13.

[907] *See* Letter to Vanessa Countryman, Secretary, Commission, from Gentry Collins, CEO, AmFree Chamber, dated March 5, 2026 (''AmFree March 2026 Letter''), at 1.

[908] *Id.* at 2.

[909] *Id.*

[910] *In re Robbi J. Jones,* Exchange Act Rel. No. 104273, 2025 WL 3419593, at * 15–16 (Nov. 28, 2025), *pet'n pending* (5th Cir. 25–60703); *see also, e.g., Oklahoma* v. *United States,* 163 F.4th 294, 307 (6th Cir. 2025) (''In case after case, the federal courts have upheld [the SEC–SRO scheme]''). In *Alpine Sec. Corp.* v. *FINRA,* 121 F.4th 1314, 1339 (D.C. Cir. 2024), the D.C. Circuit found a likely private non-delegation violation ''only to the extent'' that FINRA sought to expel a broker-dealer from membership ''with no opportunity for SEC review.'' But the court explained that its opinion was ''limited to expulsion orders issued in expedited proceedings,'' *id.* at 1330, which are not at issue here.

[911] 17 CFR 242.613(a)(5).

[912] *See* Citadel October 2025 Letter, at 4 (noting that it is the Commission's responsibility to

Continued

the Commission should update its economic analysis of the CAT NMS Plan to reflect the actual costs of operating CAT.[913] In analyzing the potential impacts of the Proposed Amendment on efficiency, competition, and capital formation, the Commission has incorporated up-to-date information on the costs of building and operating the CAT in addition to other information learned since the CAT NMS Plan Approval Order. For the purposes of this analysis, the effects of the Proposed Amendment—which include replacing certain provisions of the CAT NMS Plan and providing detail not previously included in the CAT NMS Plan—are therefore measured against this updated economic baseline.[914] The updated baseline is used by the Commission to conduct an analysis of the Proposed Amendment in light of issues raised in the Notice and public comments, as well as the Eleventh Circuit opinion vacating the 2023 Funding Model Order and remanding the matter to the Commission for further proceedings consistent with its opinion.

Based on its analysis, the Commission believes that the Proposed Amendment will involve efficiency gains along some dimensions but will likely also involve tradeoffs against other forms of efficiency. The Proposed Amendment could negatively alter the competitive

position of particular competitors, though the CAT fees [915] associated with the Proposed Amendment are unlikely to be large enough to affect overall competition. The Proposed Amendment should result in insignificant effects on capital formation.[916] Also, while the Executed Share Model might change which investors ultimately bear CAT costs, the Executed Share Model might not change the total costs borne by investors relative to the Original Funding Model. These effects are discussed in Part IV.C.2, Part IV.D.2, Part IV.E, and Part IV.B, respectively.[917]

The Commission is modifying the Proposed Amendment to provide for a two-year limitation on collecting funds from Industry Members under this funding model.[918] If there is no further action, *i.e.,* another CAT NMS Plan amendment, either submitted by the Participants and approved by the SEC or initiated by Commission rulemaking, then the Participants would not be able to obtain funding for the CAT after March 31, 2028. As a result, the effects discussed below are temporary and limited to the period the Executed Share Model is in effect. By being limited to a given time period, the effects will not be as large economically as they would be if not time limited.

Further, some of the economic effects may be altered by the temporary nature

of the Executed Share Model as modified. For example, it may affect efficiency of how costs are recovered, if Industry Members and Participants make different cost recovery decisions because of the temporary nature. The sunset may also affect the incentives of Industry Members and Participants to limit their burdens on CAT and reduce CAT costs. If there are costs associated with reducing their burden on CAT, Industry Members and Participants may be less willing to incur those costs if the Executed Share Model is only temporary.

*A. Realized Costs To Build and Operate the CAT*

The CAT NMS Plan Economic Analysis from 2016 divided the analysis of CAT cost estimates into: (i) costs of building and operating the Central Repository, (ii) costs of data reporting and surveillance performed by Participants, and (iii) costs of data reporting by broker-dealers.[919]

The costs to build [920] and operate the Central Repository—the latter including technology costs such as cloud hosting services costs, as well as general and administrative costs such as legal and insurance costs—are distributed to Participants and to Industry Members by the Executed Share Model. The initial costs to operate the Central Repository have proven to be higher with respect to what was estimated in the 2016 Economic Analysis,[921] and the operating costs increased by more than 30 percent, in constant dollars, between 2021 and 2024.[922] Because of these cost trends, commenters have stated that the Commission should document the current CAT budget, explain why actual costs were higher than the estimates in the 2016 Economic Analysis, and update its estimates of the future

---

independently weigh the costs and benefits of the Proposed Amendment and determine its impact on efficiency, competition, and capital formation); *see also, e.g.,* Citadel July 2023 Letter, at 2, 11, 12–13, 15–16 (stating that the Participants' analysis of an earlier version of the executed share model was lacking, and stating that it would negatively affect efficiency, competition, and capital formation). The Commission has independently analyzed the Proposed Amendment using information from the Participants and commenters as well as additional information as indicated.

[913] *See* Citadel October 2025 Letter, at 4–8; Citadel January 2026 Letter, at 2–3. The same commenter also stated that the Commission had not analyzed the economic effects of allocating a large portion of the costs of operating the CAT to Industry Members and their customers. *See* Citadel October 2025 Letter, at 6 (citing to a table summarizing CAT operating costs). The Commission analyzed the effects of CAT costs being borne by Industry Members in 2016. *See, e.g.,* CAT NMS Plan Approval Order, 81 FR at 84878–82. This discussion will also update that analysis based on the Proposed Amendment.

[914] Some of the conclusions of the Proposed Amendment on Efficiency, Competition, and Capital Formation provided by the Participants are assessed relative to alternatives rather than the baseline the Commission used in the analysis herein.

[915] In this discussion of efficiency, competition, and capital formation, the term "CAT fees" means those costs charged by the plan processor, CAT LLC, to Participants and Industry Members according to a funding model. For the Executed Share Model in the Proposed Amendment, the two categories of CAT fees are CAT Fees and Historical CAT Assessments.

[916] *See supra* Part III for a discussion of why the Commission is approving the Proposed Amendment.

[917] A commenter stated that the Commission should also consider, as part of its analysis of economic effects, certain alternatives to the Proposed Amendment, including minimum and maximum fee levels, calibrations to fees for market makers, and adjustments to the split between Participants and Industry Members. *See* Citadel October 2025 Letter, at 8; *see also* Citadel August 2023 Letter, at 5 (suggesting alternatives to prior version of the Executed Share Model). As discussed above, each of these alternatives would have strengths and weaknesses. *See supra* Part III.A.2. Given the potential distortions that could occur with these alternatives and the time-limited nature of the Proposed Amendment, the Commission does not believe that the existence of the alternatives calls into question the Proposed Amendment's satisfaction of the approval standard in 17 CFR 242.608(b)(2), or otherwise warrant a departure from the policy choices made by the Participants.

[918] *See supra* Part III.A.

[919] *See* CAT NMS Plan Approval Order, 81 FR at 84853.

[920] The build cost primarily involved development of the technology of the CAT system. *See https://www.catnmsplan.com/audited-financial-statements* for detailed accounting treatments of Developed Technology for annual financial statements. *See also infra* Table 1 and the associated discussion.

[921] Specifically, see the discussion in *infra* Part IV.A.1.c on the comparison of realized costs for the five years following the selection of the Plan Processor and those estimated in 2016.

[922] See Table 3 in *infra* Part IV.A.1.c.

trajectory of the CAT budget.[923] The following discussion addresses those topics within the context of helping to establish the baseline for the economic effects of the Proposed Amendment.

1. Costs To Build and Operate the Central Repository

While the build costs of the Central Repository fell within the range that was estimated in 2016, the operating costs of the Central Repository increased rapidly, especially since CAT reporting started,[924] and were high in comparison to those estimated in the CAT NMS Plan Notice and the CAT NMS Plan Approval Order.[925] The 2016 estimates were partial estimates that were subject to significant uncertainty, as the Commission acknowledged at the time. The growth in operating costs, however, has been slower than the growth of the market as measured by trade transaction volume and message traffic. The costs to build and operate the Central Repository peaked in 2024, and they have

significantly declined since 2024 as a result of Commission and Participant actions. For example, the Plan Processor's cloud hosting costs, which represent the majority of operating costs, have declined significantly since 2024—the costs to build and operate the Central Repository in 2026 could be close to two thirds of those in 2024.

a. 2016 Cost Estimates

The CAT NMS Plan Notice and the CAT NMS Plan Approval Order discussed how the actual costs could differ from the Commission's 2016 cost estimates because those estimates were based on the information available at the time, with uncertainties surrounding the implementation costs,[926] and did not include all cost drivers. Also, the economic effects of the Plan depended to some extent on decisions that would be made after the approval of the Plan.[927]

The preliminary estimates in the CAT NMS Plan Notice were based on the bids of the final six Shortlisted Bidders.[928] Subsequently, the Participants narrowed the number of bidders to three.[929] Based on this new range of bids, and a change in the number of Participants,[930] the Commission estimated that the range of costs to build the Central Repository was $37.5 million to $65 million, and the range of annual operating costs was $36.5 million to $55 million.[931] The Commission explained[932] at the time that these cost estimates for the Central Repository did not include Quote Sent Time reporting by Option Market

Makers and the capture of Allocation Time in Allocation Reports.[933] In addition, the Participants clarified that the costs in the bids did not include other expenses that might be incurred such as insurance, operating reserves, or third-party costs such as accounting and legal expenses.

In the CAT NMS Plan Notice, the Commission stated that there was significant uncertainty surrounding the actual implementation costs of the CAT because the methodology and limitations in the data used to develop these cost estimates could result in estimates that would differ significantly from actual costs.[934] In particular, some of the actual economic effects of the Plan depended on decisions that would be made after the approval of the Plan, such as governance provisions in the Plan related to the operation and the administration of the CAT.[935]

b. Realized Costs To Build and Operate the Central Repository

The cost to build the Central Repository over the period 2019–2025 was close to the upper bound of the range of build cost estimated in 2016. The total costs to build and operate the Central Repository over the period 2019–2023, the five years following the selection of the Plan Processor, exceeded the upper bound of the 2016 estimates, although not by a large magnitude, when expressed in constant dollars.[936] Below, we discuss the evolution of costs over time in 2016 constant dollars (henceforth, 2016

---

[923] *See* Citadel October 2025 Letter, at 4–5; *see also* SIFMA October 2025 Letter, at 2–3 (suggesting analysis of the current and future trajectory of the CAT budget); ASA October 2025 Letter, at 3 (requesting a comprehensive analysis of how CAT costs increased ''out of control''); Citadel January 2026 Letter, at 2–3; ASA February 2026 Letter, at 2. Some of the analyses suggested by commenters would require review of individual CAT LLC invoices by the Commission. *See* Citadel October 2025 Letter, at 4 (documentation of number of Industry Members billed by Participants), 6 (evaluation of invoices to consider differences in CAT costs for equity and options trading activity), 6–7 (analysis of retail investor trading activity using invoices), 7 (analysis of percentage of CAT costs borne by largest market makers based on proprietary trading activity using invoices); *see also* Citadel January 2026 Letter, at 3 (analysis of how fees were actually allocated under the 2023 Funding Model Amendment to evaluate the effect on market makers and retail investors); ASA February 2026 Letter, at 4 (similar). The Commission has responded below to each of these suggestions either by analyzing the potential effects raised by the commenter with other data or through qualitative discussion of the economic effects. In addition, to the analysis in this order, the Commission is conducting a comprehensive review of the CAT. *See supra* note 37 and accompanying text.

[924] Year 2021 is the first full year of CAT reporting. Reporting started in the middle of 2020—equities reporting on June 22, 2020, and options on July 20, 2020 (*see* Statement, Update on the Consolidated Audit Trail: Data Security and Implementation Progress, *https://www.sec.gov/newsroom/speeches-statements/clayton-kimmel-redfearn-nms-cat-2020-08-21*).

[925] *See* Table 1 in *infra* Part IV.A.1.b and Table 3 in *infra* Part IV.A.1.c.

[926] *See* CAT NMS Plan Approval Order, 81 FR at 84863.

[927] *See* CAT NMS Plan Approval Order, 81 FR at 84854–6.

[928] *See* CAT NMS Plan Notice, 81 FR at 30710. At the time of the CAT NMS Plan Notice, the Bidders' implementation cost estimates range from $30 million to $91.6 million; the estimated annual costs to operate and maintain the Central Repository range from $27 million to $135 million. Note that all the estimates in the CAT NMS Plan Notice and the CAT NMS Plan Approval Order were in current—that is, in 2016 dollars. All the monetary values in this baseline, therefore, are converted to constant 2016 dollars. *See infra* Tables 1 and 2.

[929] *See* CAT NMS Plan Approval Order, 81 FR at 84854.

[930] Twenty-one Participants at the time of the revised estimates. *See id.* at 84856.

[931] *See id.* at 84854.

[932] *See id.*

[933] An analysis of CAT Data showed that, in the first quarter of 2024, OQ events accounted for approximately 72 percent of all options-related events and 63 percent of all events in CAT. Further analysis of options trades associated with options market maker quotes in Listed Options showed that a substantial portion of all options trades, approximately 20 percent, was associated with options market maker quotes. *See* CAT NMS Plan Approval Order, 89 FR at 103044–5. The annual shares of options market maker quotes in infra Table 4 are consistent with these findings.

[934] *See* CAT NMS Plan Approval Order, 81 FR at 84852.

[935] *See id.* at 84804. The Commission continued to believe, however, that it was using its best judgment to assess available information and data to provide analysis and estimates of the costs of the CAT NMS Plan. *See id.* at 84863.

[936] *See infra* Table 6. *See infra* Table 1 for details on conversion to constant dollars. *See* Table 3 in *infra* Part IV.A.1 for a detailed discussion of the comparison to the 2016 estimates.

**13460** Federal Register / Vol. 91, No. 53 / Thursday, March 19, 2026 / Notices

dollars), to account for inflation over time.[937]

Table 1 presents the build costs and the total operating costs of the Central Repository by year in 2016 dollars. The total build costs from April 2019 to September 2025 was $58.6 million in 2016 dollars. The total ongoing costs increased by $17.1 million (in 2016 dollars) between 2021 and 2025.[938]

### TABLE 1—BUILD AND TOTAL ONGOING OPERATING COSTS OF THE CENTRAL REPOSITORY

[In millions of 2016 dollars]

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|
| Capitalized Developed Technology costs ........................... | .......... | .......... | .......... | 13.8 | 17.4 | 9.4 | 5.4 | 3.6 | 5.1 | 3.9 |
| Total ongoing operating costs (Technology + General & Administrative) ................................................................ | 4.1 | 8.4 | 10.7 | 35.9 | 87.2 | 126.1 | 150.8 | 148.6 | 168.0 | 143.2 |

**Notes:** (1) Sources: CAT LLC February 2026 Response Letter at 3 and Exhibit A; 2024 and 2025 total ongoing operating costs are from *https://www.catnmsplan.com/cat-financial-and-operating-budget*. The underlying numbers for quarters 3 and 4 of 2024, and 2025, of the Financial Statements are estimates as of July 2024, and November 2025, respectively. (2) The total ongoing operating costs include total technology costs, total general and administrative costs, as well as software license fees for 2024 onwards. (3) The 2025 estimate for Capitalized Developed Technology costs (build costs) cover Jan 1–Sept 30. (4) Conversion to constant dollar was done using U.S. Bureau of Economic Analysis, Gross Domestic Product: Implicit Price Deflator [GDPDEF], retrieved from FRED, Federal Reserve Bank of St. Louis, *https://fred.stlouisfed.org/series/GDPDEF*.

Table 2 presents a broad breakdown of the main operating cost components of the Plan Processor, as reported by FINRA CAT, for the period 2021–2025.[939] Since 2021, the first full year of CAT reporting,[940] cloud hosting services costs have accounted for 66 to 75 percent of total ongoing operating costs, while general and administrative costs have accounted for 5 to 7 percent of total ongoing operating costs.[941] Data are unavailable to further disaggregate the cost items in Table 2 into certain subcategories, such as a subcategory for the usage-related costs for data requests made by the Commission or Participants.[942]

### TABLE 2—MAIN COMPONENTS OF OPERATING COSTS OF THE CENTRAL REPOSITORY

[In millions of 2016 dollars]

| | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| Total Technology costs ............................................................. | 117.5 | 142.5 | 140.5 | 154.5 | 133.1 |
| Cloud hosting services costs ............................................. | 88.9 | 112.9 | 102.9 | 116.7 | 93.9 |
| Total General and Administrative costs ................................... | 8.6 | 8.2 | 8.1 | 9.4 | 7.2 |

**Notes:** (1) Sources: *https://www.catnmsplan.com/cat-financial-and-operating-budget*. The underlying numbers for quarters 3 and 4 of 2024, and 2025, of the Financial Statements are estimates as of July 2024, and November 2025, respectively. (2) Conversion to constant dollar was done using U.S. Bureau of Economic Analysis, Gross Domestic Product: Implicit Price Deflator [GDPDEF], retrieved from FRED, Federal Reserve Bank of St. Louis, *https://fred.stlouisfed.org/series/GDPDEF*. (3) Cloud hosting service costs are a component of Total Technology Costs. As reported in Table 1, the total ongoing operating costs include total technology costs, total general and administrative costs, as well as software license fees for 2024 onwards.

Technology costs, which accounted for 93 percent of the total ongoing costs in 2021, increased by $15.6 million between 2021 and 2025 (a 13 percent increase). General and Administrative costs, which accounted for only 7 percent of total ongoing costs in 2021, declined by $1.4 million between 2021 and 2025 (a 16 percent decrease). Table 3 shows that, the total ongoing operating costs increased by 14 percent over the period 2021–25, with technology costs growing by 13 percent and general and administrative costs shrinking by 16 percent.[943]

---

[937] To illustrate the relevance of using constant dollars, consider the impairment loss of $75,205,874 that was recorded for the year ended December 31, 2019. If, (a) all of the impairment loss is included as part of the developed technology costs, (b) developed technology costs are aggregated without accounting for accumulated amortization, and (c) all the developed technology cost figures, impairment loss, etc., are expressed in current instead of constant dollars, then we arrive at a total build cost figure, over the period 2017–2023, that is approximately eight times the lower bound estimate (*i.e.,* $37.5 million) of the build cost, and approximately five times the upper bound estimate (*i.e.,* $65 million) of the build cost. When the cost components are treated correctly, and expressed in constant dollars, the realized build costs are close to the upper limit of the range estimated in 2016. *See https://www.catnmsplan.com/audited-financial-statements* for financial statements prior to 2022 and *https://www.catnmsplan.com/cat-financial-and-operating-budget* for 2022 and later.

[938] The first full year of reporting is 2021. *See supra* note 924. Also, note that Table 1 uses the latest publicly available update for the full years of 2024 and 2025. The financial statements are being updated periodically. For example, the CAT LLC February 2026 Response Letter at 3 updates that in the second half of 2025, CAT AWS cloud fees totaled $45.8 million (excluding a $1.95 million workload credit), which is $35.2 million in 2016 dollars. This indicates that when the full year of 2025 cost numbers are updated next, the cost growth numbers between 2021 and 2025 could be even smaller than those calculated in Table 3.

[939] *See* notes to Table 2; *see also* Citadel October 2025 Letter, at 4 (requesting documentation of current CAT budget); Citadel January 2026 Letter, at 2–3; ASA February 2026 Letter, at 2.

[940] *See supra* note 924.

[941] The CAT NMS Plan Notice discussed that while the Plan identified the major cost drivers (*see infra* note 946 and surrounding discussion) it did not present information on how sensitive these cost estimate are to each of these factors. *See* CAT NMS Plan Notice, 81 FR at 30710.

[942] *See* Citadel October 2025 Letter, at 4 (requesting detailed data on usage-related costs).

[943] If inflation is not accounted for and growth rates of CAT costs are calculated using costs at current dollars, then we would arrive at the following incorrect growth estimates over the period 2021–2025: technology costs (31 percent), general and administrative costs (−4 percent) and total ongoing operating costs (32 percent).

## TABLE 3—GROWTH IN THE OPERATING COSTS OF THE CENTRAL REPOSITORY

[In 2016 dollars]

| | (a) | (b) | (c) | (d) |
|---|---|---|---|---|
| | Total growth (percent) | | Average annual growth (percent) | |
| | 2021–2025 | 2021–2024 | 2021–2025 | 2021–2024 |
| Total Technology Costs | 13.3 | 31.5 | 3.2 | 9.6 |
| Cloud hosting services | 5.6 | 31.3 | 1.4 | 9.5 |
| Total General and Administrative | −16.3 | 9.3 | −4.3 | 3.0 |
| Total ongoing operating costs | 13.6 | 33.2 | 3.2 | 10.0 |
| Total costs of the Central Repository | 8.6 | 27.7 | 2.1 | 8.5 |

**Notes:** (1) Total growths are calculated as rates of change between the respective years. The average annual growth rates are geometric averages of the rates of change between two consecutive years. (2) Total ongoing operating costs growth, and total costs of the Central Repository growth numbers are derived from Table 1 and the rest of the growth numbers are derived from Table 2. (3) The underlying numbers for quarters 3 and 4 of 2024, and 2025, of the Financial Statements are estimates as of July 2024, and November 2025, respectively.

Total ongoing operating costs of the Central Repository started to decline after peaking in 2024; they grew by 33 percent between 2021 and 2024, as cloud hosting services costs grew by 31 percent.[944] Cloud hosting services costs declined by 20 percent between 2024 and 2025 (see Table 2), leading to a decline of 14 percent in total technology costs from 2024 to 2025.[945]

c. Growth of the Market Relative to Costs of the Central Repository

In the CAT NMS Plan Notice, the major cost drivers identified by bidders were: (1) transactional volume, (2) technical environments, (3) likely future growth in transactional volumes, (4) data archival requirements, and (5) user support/help desk resource requirements.[946] Technology costs—comprised primarily of compute and storage costs—dominate the operating costs of the Central Repository.[947] In addition, the CAT must process and store extremely large data volumes within specific timeframes, and these processes have been operational in a market environment of increasing message traffic.[948] In analyzing the growth in costs of the Central Repository the evolution of message traffic, thus, could be relevant. We, therefore, compare evolution of the operating costs of the Central Repository with the evolution of the market where, for analytical completeness, the latter is measured by both transaction volumes and message traffic.

Since 2021, the beginning of the first full year of CAT reporting, the Central Repository's operating costs have increased. During the same time, message traffic and trading activities in equity and options markets have also increased. Tables 1 and 3 (above) show that the total ongoing operating costs of the Central Repository grew by 33 percent between 2021 and 2024 and decreased by 15 percent between 2024 and 2025. In contrast, between 2021 and 2025, total message traffic grew by 193 percent for equities and 176 percent for options (Table 4).[949]

## TABLE 4—DAILY AVERAGE MESSAGE TRAFFIC (IN BILLIONS): 2021–2025

| | Equities | | | Options | |
|---|---|---|---|---|---|
| | Industry members | Exchanges | Total | OMM quotes | Total |
| *Levels (billion):* | | | | | |
| 2021 | 19 | 9 | 27 | 135 | 175 |
| 2022 | 40 | 13 | 53 | 211 | 258 |
| 2023 | 32 | 10 | 42 | 222 | 269 |
| 2024 | 37 | 11 | 48 | 259 | 336 |
| 2025 | 62 | 17 | 79 | 362 | 483 |
| *Total growth (percent):* | | | | | |

[944] If inflation is not accounted for and growth rates of CAT costs are calculated using costs at current dollars, then we would arrive at the following incorrect growth estimates over the period 2021–2024: technology costs (49 percent), cloud hosting services costs (49 percent), general and administrative (24 percent), and total ongoing operating costs (51 percent).

[945] In addition to the realized costs to build and operate the Central Repository, commenters stated that as part of its updated baseline, the Commission should also document CAT Reporters' reporting costs with new surveys. *See* Citadel October 2025 Letter, at 5–6; SIFMA October 2025 Letter, at 2–3. CAT Reporter costs and the distribution of those costs are not affected by the Proposed Amendment. Commenters also stated that the Commission should determine the cost savings for Industry Members associated with reduced use of the EBS system. *See* Citadel October 2025 Letter, at 5–6; Citadel January 2026 Letter, at 3; ASA February 2026 Letter, at 4. The Commission acknowledges

that the EBS system is still used by regulators, and that any cost savings from fewer EBS requests are unlikely to fully offset the costs to CAT Reporters. In 2024, the Commission made 5,109 EBS data requests resulting in 201,605 letters to Industry Members, compared to 3,722 requests made in 2014 that resulted in 194,696 letters. CAIS Amendment Approval Order, *supra* note 238, at 2187–88. And the number of requests is likely to increase further because of the recent amendments to the CAT NMS Plan regarding CAIS. *See id.* However, since 2014, the process whereby Industry Members respond to EBS requests has become increasingly automated and it is likely that the fixed costs directly attributable to the request and response process are lower today, although the Commission lacks data on those costs.

[946] *See* CAT NMS Plan Notice, 81 FR at 30710.

[947] *See* Tables 1 and 2 and *see infra* Part IV.C.1.b.

[948] *See supra* note 236 and surrounding discussions including those about the 2025 Cost

Savings Amendment. Furthermore, see discussion of options market maker quotes and the impacts of the CAT cost cutting measures in *infra* Part IV.A.2.

[949] Message traffic in equities (options) markets between 2021 and 2024 grew by 78 percent (92 percent) and continued to grow in the subsequent year. Between 2022 and 2023, the message traffic declined in the equity market and stagnated in the Options market, a pattern of change that is consistent with a small decline in cloud hosting services costs observed between 2022 and 2023 in Table 2. A commenter stated that the Commission should document the number of quotation messages, subdivided by equities and options. *See* Citadel October 2025 Letter, at 4. Table 4 includes only the latter because complete equities message traffic is informative of the growth in CAT costs, while equities quotation messages could refer to multiple things that are impracticable to calculate and would not meaningfully impact this analysis.

TABLE 4—DAILY AVERAGE MESSAGE TRAFFIC (IN BILLIONS): 2021–2025—Continued

| | Equities | | | Options | |
|---|---|---|---|---|---|
| | Industry members | Exchanges | Total | OMM quotes | Total |
| 2021–2025 ........................................... | 226 | 89 | 193 | 168 | 176 |
| 2021–2024 ........................................... | 95 | 22 | 78 | 92 | 92 |
| 2021–2023 ........................................... | 68 | 11 | 56 | 64 | 54 |
| 2023–2025 ........................................... | 94 | 70 | 88 | 63 | 80 |

**Notes:** (1) Source: Consolidate Audit Trail. (2) Complete information for the entire equity market are available from the beginning of Q2 of 2021. Year 2025 estimates include the first two quarters. (3) Options market maker (OMM) quotes account for quote events. (4) Total growths are calculated as rates of change between the respective years.

Growth in trading activities in equity and options markets also exceeded the growth in costs of the Central Repository. Table 5 shows that the number of shares (contracts) traded in the equity (options) market increased by 70 percent (54 percent) between 2021 and 2025.[950] In contrast, cloud hosting services costs for CAT over the same period increased by only 6 percent.[951]

TABLE 5—TRADING ACTIVITIES IN THE EQUITY AND OPTIONS MARKETS, 2021–2025

| | Equity | Options |
|---|---|---|
| | Number of shares traded (billion) | Number of contracts traded (million) |
| *Levels:* | | |
| 2021 ............................................................................................................... | 10 | 78 |
| 2022 ............................................................................................................... | 12 | 84 |
| 2023 ............................................................................................................... | 11 | 88 |
| 2024 ............................................................................................................... | 12 | 99 |
| 2025 ............................................................................................................... | 17 | 120 |
| *Total Growth (percent):* | | |
| 2021–2025 ..................................................................................................... | 70 | 54 |
| 2021–2024 ..................................................................................................... | 20 | 27 |
| 2021–2023 ..................................................................................................... | 10 | 13 |
| 2023–2025 ..................................................................................................... | 55 | 36 |

**Notes:** (1) Equity market information is obtained from daily SIP data, options market information obtained from the relevant CAT table. (2) Year 2025 estimates include the first two quarters. (3) Total Growths are calculated as rates of change between the respective years.

Figure 1 summarizes graphically the trends in total ongoing operating costs of the Central Repository, the message traffic and trade transactions in the market, shown in Tables 1, 4, and 5.[952] We observe a large drop in these costs between 2024 and 2025 that goes against the trends in both message traffic and transactions volume. This is consistent with the assessment of a commenter that changes made to the CAT regarding options market maker quotes may have caused a change of direction in these cost trends;[953] however, the evolution of these costs, over the period 2021–24, while different from those of equity and options message traffic, is aligned with the evolution of number of shares traded in both Equities and Options markets, undermining the same commenter's assertion that cost overruns cannot be attributed to market volume because these costs could be linked to the unanticipated increases in market volume over the period 2021–24.

**BILLING CODE 8011–01–P**

---

[950] A commenter stated that the Commission should document the number of executed shares, subdivided by equities and options. *See* Citadel October 2025 Letter, at 4.

[951] *See* column (a) of Table 3.

[952] The analysis presented in Figure 1 and the prior tables that Figure 1 summarizes is consistent with the analyses of CAT cost trends that were suggested by commenters. *See* Citadel October 2025 Letter, at 4–5; SIFMA October 2025 Letter, at 2–3.

[953] See Citadel, January 30, 2026, at 2, stating, ''Simply attributing those cost overruns to an unanticipated increase in market volume is not accurate or sufficient, as we are now witnessing the CAT budget start to decrease as a result of addressing certain key cost drivers (such as options market maker quotes and data retention requirements), despite the persistence of record trading volumes.'' Also see infra Part IV.A.2 for a discussion of various cost reduction measures.

**Figure 1**

## Total Ongoing Operating Costs of the Central Repository, Message Traffic, and Trade Transactions: 2021-2025



Notes: (a) Data from Tables 1, 4 and 5 used. (b) Logarithms of values taken to adjust for differences in units of magnitudes. (c) Number of shares in Options market are calculated by multiplying the number of contracts with 100.

BILLING CODE 8011–01–C

Table 6 presents the total net costs of building and operating CAT in 2016 dollars. CAT NMS Plan Approval Order presented the range for the total cost estimate for the five years following the selection of the Plan Processor to be $159.8 million to $538.7 million in 2016 dollars.[954] Table 6 shows that the net

[954] *See* CAT NMS Plan Approval Order, 81 FR at 84987. Note that this range included the combined build and annual recurring costs. Bidders had provided an estimate of annual recurring operating and maintenance costs for the five-year period following the selection of the Plan Processor ranging from a low of $135 million to a high of $465 million, and an estimate of the annual peak year costs (*i.e.,* cost for the year during which it will cost the most to operate the CAT) ranging from $27 million to $110 million (*see* CAT NMS Plan Approval Order, 81 FR at 84986). Also, On February 26, 2019, FINRA CAT, LLC ("FINRA CAT"), an affiliate of FINRA, formally took over as the Plan Processor; *see* Financial Statement for the Years

total costs over the period 2019–2023 was $566 million in 2016 dollars, which is 5 percent higher than the upper limit of the 2016 estimate.

Ending Dec. 31, 2019 and 2018, CAT LLC, at 9 (*https://www.catnmsplan.com/sites/default/files/ 2021-08/CAT-NMS-LLC-2019-and-2018-Financial-Statements.pdf*).

TABLE 6—TOTAL CAT COSTS IN 2016 DOLLARS

| Year | Capitalized developed technology costs | Total ongoing operating costs | Thesys costs to build the CAT for which a full impairment loss was recorded in 2019 | Excluded costs | Net costs |
|---|---|---|---|---|---|
| 2016 | | 4.1 | | | 4.1 |
| 2017 | | 8.4 | 27.6 | | 36.0 |
| 2018 | | 10.7 | 45.2 | (46.9) | 9.0 |
| 2019 | 13.8 | 35.9 | | (21.1) | 28.6 |
| 2020 | 17.4 | 87.2 | | (11.3) | 93.3 |
| 2021 | 9.4 | 126.1 | | | 135.5 |
| 2022 | 5.4 | 150.8 | | | 156.2 |
| 2023 | 3.6 | 148.6 | | | 152.2 |
| 2019–2023 | 49.6 | 548.6 | 0.0 | (32.4) | 565.8 |
| 2024 | 5.1 | 168.0 | | | 173.1 |
| 2025 | 3.9 | 143.2 | | | 147.1 |
| 2016–2025 | 58.6 | 883.0 | 72.8 | (79.3) | 935.1 |

**Notes:** (1) This table features the ongoing operating costs and build costs are from Table 1 that summarized the information in CAT LLC February 2026 Response Letter at 3 and Exhibit A as well as the CAT LLC financial statements. (2) The 2024 and 2025 total ongoing operating costs are from *https://www.catnmsplan.com/cat-financial-and-operating-budget*. The underlying numbers for quarters 3 and 4 of 2024, and 2025, of the Financial Statements are estimates as of July 2024, and November 2025, respectively. (3) The 2025 estimate for Capitalized Developed Technology costs (Build costs) cover Jan 1–Sept 30. (4) Conversion to constant dollar was done using U.S. Bureau of Economic Analysis, Gross Domestic Product: Implicit Price Deflator [GDPDEF], retrieved from FRED, Federal Reserve Bank of St. Louis, *https://fred.stlouisfed.org/series/GDPDEF*.

2. Cost Reduction Measures and Projected Costs

The costs of the Central Repository have been declining since 2024 and are expected to continue to decline through 2026.[955] As Table 7 shows, the total build and ongoing operating costs of the Central Repository reduced by 15 percent from 2024 to 2025 (in 2016 dollars) and are expected to reduce by another 20 percent between 2025 and 2026, to $117–118 million (in 2016 dollars).[956] In contrast, by every measure presented in Tables 4 and 5, the equities and options markets increased by at least 21 percent from 2024 to 2025, and some predict they will continue growing in 2026.[957]

A series of regulatory measures to cut CAT costs have been approved by the Commission, with other measures under consideration.[958] To illustrate the impact of the approved cost reduction measures since 2024, when the costs peaked, Table 7 presents projected costs for 2025 and 2026 without accounting for all the approved cost reduction measures since 2024. In the absence of these cost reduction measures, the total ongoing operating costs of the Central Repository could be $188 million in 2025 and $204 million in 2026 (all in 2016 dollars).

TABLE 7—PROJECTED AND REALIZED TOTAL ONGOING OPERATING COSTS OF THE CENTRAL REPOSITORY

| Year | Scenario | Costs to build and operate the Central Repository (in millions of 2016 $) |
|---|---|---|
| 2024 | (1) Realized costs [a] | 173 |
| 2025 | (2) Projected costs without any cost reduction measure [b] | 188 |
| | (3) Realized costs [c] | 147 |
| 2026 | (4) Projected costs without any cost reduction measure [d] | 204 |
| | (5) Projected costs after accounting for all cost reduction measures [e] | 117–118 |

[a] *See* Table 2 for a detailed description of the cost numbers.

[b] The average growth rate of total costs of the Central Repository between 2021 and 2024 (column (d) of Table 3) is applied to scenario (1). No cost saving Amendment or Exemptive Reliefs since 2024 are applied.

[c] *See* Table 2 for a detailed description of the cost numbers. The build cost applied to Jan 1-Sept 30 period.

[d] The average growth rate of total costs of the Central Repository between 2021 and 2024 (column (d) of Table 3) is applied to scenario (2). No cost saving Amendment or Exemptive Reliefs since 2024 are applied.

---

[955] *See* Table 7 for details. Commenters suggested that the Commission analyze the current and future trajectory of CAT operating costs. *See* SIFMA October 2025 Letter, at 2–3; Citadel October 2025 Letter, at 4–5; Citadel January 2026 Letter, at 2–3; ASA February 2026 Letter, at 3–4.

[956] *See* 2025 Cost Savings Amendment.

[957] See, for example, 2026 market outlook by Goldman Sachs (*https://www.goldmansachs.com/insights/articles/the-sp-500-expected-to-rally-12-this-year*) and J. P. Morgan (*https://www.jpmorgan.com/insights/global-research/outlook/market-outlook#section-header#1*).

[958] As explained above, the Commission is conducting a comprehensive review of the CAT. *See supra* note 37 and accompanying text. A commenter suggested that the Commission should consider design alternatives to reduce the costs of operating the CAT. *See* Citadel October 2025 Letter, at 5. Consideration of such alternatives that would affect aspects of the CAT NMS Plan other than the funding model are beyond the scope of this order, but an appropriate topic for the Commission's comprehensive review.

e The 2026 estimates are from the 2026 budget estimated in December 2025 (*https://www.catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf*). Conversion to constant dollar was done using U.S. Bureau of Economic Analysis, Gross Domestic Product: Implicit Price Deflator [GDPDEF], retrieved from FRED, Federal Reserve Bank of St. Louis, *https://fred.stlouisfed.org/series/GDPDEF*. The 2026 value is projected from the values of the two previous years. The CAIS Amendment is incorporated the following way: it will result in savings of $7 to $9 million in its first year but will cost $4.5 to $5.5 million to implement. Because the preliminary implementation schedule estimated that it could take twelve or more months to implement the CAIS Amendment, we assume that all implementation fees will be paid in 2026 but that the $2 to $4 million in cloud savings will not be achieved in 2026. We adjusted the 2026 budgeted costs using the lower range of cost savings to get $5 million in cost savings and then subtracted the high range in implementation costs of $5.5 million to adjust the 2026 cost upward by $0.5 million. This, thus, accounts for all approved cost savings measures since 2024. *See* CAIS Amendment Approval Order.

The realized and projected costs of 2025 presented in Table 7 help demonstrate the effects of the cost saving amendments that were approved in December 2024.[959] There was a reduction in costs of $26 million (2016 dollars), which was larger than the $16 million in cost saving that the Participants had estimated in their Proposed Amendment.[960] Table 7 also projects that in 2026 the total build and ongoing operating costs of the Central Repository, after applying all the cost reduction measures, could be 32 percent lower from their 2024 level. These cost projections are based on the Participants' cost savings estimates,[961] and the realized costs of 2026 could be different. One commenter stated that CAT costs might yet rise in 2026 for several reasons,[962] including increased costs from Commission and SRO rules, such as the recent amendment of Exchange Act Rule 612 or the approval of new equities and options

exchanges.[963] We expect that the scale of the countervailing factors identified by the commenter will be small relative to our projected cost savings estimates, so that they at most will mitigate the projected cost savings rather than reverse them.

*B. Magnitude of CAT Fees Borne by Industry and Investors*

Based on the 2026 CAT budget and simplifying assumptions, the Commission estimates that, assuming—solely for the sake of this analysis—that all Participants are able to recover their costs by increasing non-CAT fees paid by Industry Members,[964] Industry Members could be responsible for CAT costs of $156.9 million in 2026, $146.4 million in 2027, and $143.4 million in 2028.[965] Under that assumption, if Industry Members are able to pass through or otherwise recover their costs from investors, then investors could be incurring these costs each year. CAT fees will be assessed on a per share traded basis, and billions of shares are traded each year, so the cost on a per share basis is small and smaller than other transaction costs and regulatory fees,[966] on average. Millions of investors trade shares each year, so the cost per investor will also be small, on average. Certain investors, such as firms engaged in proprietary trading, could incur higher total annual costs due to their volume of shares traded; these firms' quotations, message traffic, and trades also are a key driver of total CAT costs each year.

Table 8 shows estimated CAT costs and charges to Industry Members and FINRA under the Executed Share Model for the next three years. The table starts with the 2026 budget and uses it to project potential costs in 2027 and 2028.

It presents three alternative projections based on past growth trends in CAT costs—the four-year rolling average annual growth rates over the periods 2021 to 2024 (8.5 percent) for projection (A); 2022 to 2025 (−2 percent) for projection (B); and 2023 to 2026 (−8.2 percent) for projection (C). The discussion that follows focuses on projection (B) because, relative to the other two projections, it is influenced less by periods when CAT was not fully implemented and by future costs control measures that may require additional action by the Participants and Commission.[967] However, all three projections are subject to uncertainty and the actual costs may differ.

The 2026 budget calls for $156.4 million in costs but does not account for the recently approved CAIS Amendment[968] or a pending proposed amendment that could also result in significant cost savings.[969] After adjusting for the CAIS Amendment, the estimated costs are $156.9 million for 2026, which is $0.5 million higher than the 2026 budget. This increase reflects the one-time implementation costs of the CAIS Amendment in 2026 ($5.5 million) and some, but not all, of the expected cost savings in 2026 ($5

[959] *See* Securities Exchange Act Release No. 101901 (Dec. 12, 2024), 89 FR 103033 (Dec. 18, 2024) (''2024 CAT Cost Savings Amendment''). Although exemptive relief regarding the continued collection of certain personally identifiable information was also in effect for much of 2025, it was not expected to result in any cost savings. *See* Securities Exchange Act Release No. 102386 (Feb. 10, 2025), 90 FR 9642, 9645–46 (Feb. 14, 2025).

[960] The Participants' 2024 estimate presented cost savings of $21 million in 2024 dollars (*See* FR 89, No. 243, December 18, 2024). Conversion to 2016 dollars uses the same method described in Table 1. The Commission approved an exemptive relief in September 2025 (The 2025 Exemptive Order: FR 90, No. 189, October 2, 2025). While this exemptive relief was not applicable for most of 2025, it may have also contributed to the cost reduction between 2024 and 2025.

[961] For Participants' cost savings estimates from the CAIS Amendment *see* CAIS Amendment Approval Order, 91 FR at 2171–79 and 2186–87. Also, *see* the 2026 budget estimated in December 2025 (*https://www.catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf*).

[962] *See* Citadel October 2025 Letter, at 5. Another commenter stated that the Commission should also consider the potential increases in the costs of cybersecurity and security breaches since 2016. *See* SIFMA October 2025 Letter, at 2. Unlike the future events that could affect the drivers of CAT costs, cybersecurity cost developments since 2016 are already incorporated into the current CAT operational budget, and therefore into this analysis of projected CAT costs. In addition, the 2025 CAIS Amendment reduces the risks of a breach—and the corresponding cybersecurity costs of protecting against a breach—by removing certain sensitive data from the CAT. *See* CAIS Amendment Approval Order, 91 FR at 2193.

[963] *See, e.g.,* Securities Exchange Act Release No. 101070 (Dec. 9, 2024), 89 FR 81620, 81722–23 (Oct. 8, 2024) (''Tick Size Final Rule'') (estimating that CAT costs would increase by an estimated $4.1 million per year due to increased equity message traffic associated with the smaller tick size in amended Rule 612); Securities Exchange Act Release No. 104146 (Sept. 30, 2025), 90 FR 47880 (Oct. 2, 2025) (approving Form S–1 of the Texas Stock Exchange LLC).

[964] *See supra* Part III.A.2 for a discussion of the statutory limits that exist on pass throughs.

[965] These CAT costs are in 2025 dollars. *See* also *infra* Table 8.

[966] *See infra* Table 9.

[967] Focusing on projection (B) means we are not using the costs from 2021 or 2026. We are not using 2021 because CAT was early in the build process in 2021. Thus, of the years analyzed, 2021 costs are the least reflective of the costs of a fully implemented CAT. We are not using 2026 because the change in costs from 2024 to 2026 reflects significant cost savings measures, making projection (C) the least sustainable absent future action by the Participants and Commission. This leaves us with the period 2022 through 2025, which incorporates some cost increases resulting from later CAT implementation phases and some cost control measures. We use the rolling average geometric growth rate, which we compute using this formula $((1 + ((\text{year 2 costs} - \text{year 1 costs})/(\text{year 1 costs}))) \times (1 + ((\text{year 3 costs} - \text{year 2 costs})/(\text{year 2 costs}))) \times (1 + ((\text{year 4 costs} - \text{years 3 costs})/(\text{year 3 costs}))))^{(1/3)}$.

[968] The costs are from the 2026 budget estimated in December 2025 (*https://www.catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf*). Unlike in Table 7, Table 8 is estimated in December 2025 dollars because the purpose is to project the potential costs to be borne by Industry Members or investors rather than to compare budgeted costs to the 2016 estimates, as is the purpose of Table 7. Accounting for inflation as described in supra Table 1, $156.4 million in 2026 is equivalent to approximately $117.6 million in 2016.

[969] *See* 2025 Cost Savings Amendment, 90 FR at 61509.

**13466** **Federal Register** / Vol. 91, No. 53 / Thursday, March 19, 2026 / Notices

million).[970] In each of 2027 and 2028, the CAIS Amendment is expected to save $7 million in costs per year (with no additional implementation costs). The adjustment to the 2027 and 2028 estimates reflects all of the cost savings ($7 million per year) and none of the implementation costs. As a result, as shown in Table 8 (under the projection (B) for 2027 and 2028), using constant December 2025 dollars, we estimate CAT costs of $156.9 million in 2026, $146.4 million in 2027, and $143.4 million in 2028.

Two thirds of the estimated costs in 2026, 2027, and 2028 would be charged as CAT Fees to Industry Members under the Executed Share Model. As shown in Table 8 (using constant December 2025 dollars and projection (B) costs for 2027 and 2028), Industry Members' share of aggregate CAT Fees could thus be $104.6 million in 2026, $97.6 million in 2027, and $95.6 million in 2028.[971] These aggregate CAT Fees will likely be shared across about 500 Industry Members,[972] with the bulk of these CAT Fees borne by market makers. Indeed, because CAT Fees will be charged to CEBB and CEBS, they will be charged to fewer Industry Members than under the Original Funding Model. Market makers could be charged a large share of the CAT Fees, because most off-exchange trades involve a market maker on one side, and many exchange trades do as well.[973]

Market makers trade for their own accounts and are the buyer or the seller for approximately 20 percent to 25 percent of executed dollar volume in equities.[974] The top ten market makers account for about 82 percent of this volume.[975] Based on this volume share, as shown in Table 8, market makers would be charged about $23.9 million to $26.2 million, with the top ten market makers being charged $19.6 million to $21.5 million per year.[976] These estimates do not account for the market maker being the executing broker for a customer account, either when they are the executing broker on the other side of the trade or when another broker-dealer represents the other side. If market makers represent customers as executing broker as often as they trade for their own accounts, then the market makers' aggregate assessments would be twice our prior estimates, thus $47.8 million to $52.4 million.[977] Effectively, these estimates assume that market makers are representing customers on one side of a trade only when trading for their own account on the other. Additionally, market makers may also represent customers on one side of a trade when another broker-dealer represents the other side. If this occurs as often as market makers trade for their own account, market makers' aggregate assessments would be $71.7 to $78.6 million.[978]

TABLE 8—ESTIMATED FINRA AND INDUSTRY MEMBER SHARES OF CAT COSTS FOR 2026–2028

[In millions of 2025 dollars]

| | 2026 | 2027 Projections | | | 2028 Projections | | |
|---|---|---|---|---|---|---|---|
| | | (A) | (B) | (C) | (A) | (B) | (C) |
| Budget [a] | $156.4 | $169.8 | $153.4 | $143.6 | $184.3 | $150.4 | $131.8 |
| CAIS Adjustment [b] | −0.5 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 | 7.0 |
| Estimated Annual Costs | 156.9 | 162.8 | 146.4 | 136.6 | 177.3 | 143.4 | 124.8 |
| IM Share [c] | 104.6 | 108.5 | 97.6 | 91.1 | 118.2 | 95.6 | 83.2 |
| MM Account Share [d] | 26.2 | 27.2 | 24.4 | 22.8 | 29.6 | 23.9 | 20.8 |
| Share of Top 10 MM Account Shares [e] | 21.5 | 22.3 | 20.1 | 18.7 | 24.3 | 19.6 | 17.1 |
| MM Account + Other Side [f] | 52.4 | 54.4 | 48.8 | 45.6 | 59.2 | 47.8 | 41.6 |
| MM Account + Other Side + Customers [g] | 78.6 | 81.6 | 73.2 | 68.4 | 88.8 | 71.7 | 62.4 |
| FINRA Share [h] | 13.9 | 14.4 | 13.0 | 12.1 | 15.7 | 12.7 | 11.0 |
| IM+FINRA | 118.5 | 122.9 | 110.6 | 103.2 | 133.9 | 108.3 | 94.2 |

[a] The 2026 estimate is based on the 2026 budget estimated in December 2025 that includes the total ongoing operating costs as well as capitalized developed technology costs (*https://www.catnmsplan.com/sites/default/files/2025-12/12.08.25-CAT-LLC-2026-Financial_and_Operating_Budget.pdf*). Projections (A), (B), and (C) reflect alternative projections for CAT costs in 2027 and 2028, based on average annual growth rates in CAT costs over different historical periods: projection (A): 8.5% (2021–2024); projection (B): −2% (2022–2025); projection (C): −8.2% (2023–2026). The estimate does not include any potential savings from a pending proposed amendment. See 2025 Cost Savings Amendment, 90 FR at 61509.

[970] The 2026 budget estimate does not reflect savings from the CAIS Amendment, which was approved in January 2026. *See supra* note 238. The CAIS Amendment will result in savings of $7 to $9 million in its first year but will cost $4.5 to $5.5 million to implement. Because the preliminary implementation schedule estimated that it could take twelve or more months to implement, the estimated 2026 CAT costs assume that all implementation fees will be paid in 2026 but that the $2 to $4 million in cloud savings will not be achieved in 2026. The 2026 budgeted costs are adjusted using the lower range of cost savings to get $5 million in cost savings and the high range in implementation costs of $5.5 million to adjust the 2026 cost upward by $0.5 million.

[971] The range of aggregate annual CAT fees is two-thirds of the estimated annual CAT costs, as detailed in Table 8.

[972] See CAT LLC February 2026 Response Letter, at 1–2.

[973] *See, e.g.,* Citadel July 2023 Letter, at 2, Citadel August 2023 Letter, at 4; Citadel October 2025 Letter, at 7.

[974] Based on 2024 CAT data where the account buyer or selling was indicated to be a market making account. This estimate is based on OTC and NMS equities. As such, it could be higher if the estimates also included options, where natural buyers and sellers are less likely to interact directly.

[975] *Id.* When accounting for options, the concentration of the top ten market makers could be higher or lower depending on whether the largest options market makers differ from the largest equities market makers.

[976] *See* note d in Table 8. In Table 8, we are using the 2026 costs and the 2027 and 2028 costs under projection (B). For market makers ("MM Account Share" row), the $23.9 million is projected for 2028 and the $26.2 million is for 2026. For 2027, the corresponding amount would be $24.4 million. For the top ten market makers ("Share of Top Ten MM Account Shares" row), the $19.6 million is projected for 2028 and the $21.5 million is for 2026. For 2027, the corresponding amount would be $20.1 million.

[977] Specifically, we obtain $47.8 million and $52.4 million by multiplying by two our earlier estimates of $23.9 million and $26.2 million.

[978] Specifically, we obtain $71.7 million and $78.6 million by multiplying by three our earlier estimates of $23.9 million and $26.2 million. Alternatively, we also get to $71.7 million by summing up our estimates of $23.9 million and $47.8 million, and we get $78.6 million by summing our prior estimates of $26.2 million and $52.4 million. These estimates are in the same ballpark as a resulting burden implied by the commenter who stated that the top 10 (20) Industry Members would be allocated 50 percent (70 percent) of the fees under the Executed Share Model. *See* Citadel July 2023 Letter, at 19.

ᵇ The CAIS Amendment will result in savings of $7 to $9 million in its first year but will cost $4.5 to $5.5 million to implement. Because the preliminary implementation schedule estimated that it could take twelve or more months to implement the CAIS Amendment, we assume that all implementation fees will be paid in 2026 but that the $2 to $4 million in cloud savings will not be achieved until 2027. We adjusted the 2026 budgeted costs using the lower range of cost savings to get $5 million in cost savings and then subtracted the high range in implementation costs of $5.5 million to adjust the 2026 cost upward by $0.5 million. The costs for 2027 and 2028 were adjusted downward by the low range of the cost savings from the CAIS Amendment.

ᶜ The IM Share is the Industry Member share of 2/3rd of CAT Costs.

ᵈ Using 25 percent as the market maker account share of the IM Share.

ᵉ The Share of the Top 10 Market Makers is estimated as the estimated cost for all market makers multiplied by 0.25 (or 25 percent), representing the executed volume in market making accounts, and multiplied by 0.82 (or 82 percent), which is the share of the top ten market makers in the total executed volume in market making accounts. The estimates of executed volume in market making accounts is from CAT data for 2024.

ᶠ Accounting for a market maker customer on the other side of every market maker trade.

ᵍ Accounting for market makers acting as executing broker for customer trades when the other side is not a market maker. This assumes that they do this as often as they trade.

ʰ FINRA's share is estimated as one third of the June 2025 OTC or off-exchange executed equivalent share as given in the Notice. See Notice at 44932.

Table 8 also provides an estimate of the FINRA share of the aggregate CAT costs and the sum of the Industry Member and FINRA shares. The Proposed Amendment prohibits the Participants, which include FINRA, from establishing new fees to directly pass those fees through to Industry Members. However, while the Proposed Amendment prohibits Participants from establishing new fees to pass through CAT Fees directly, the Proposed Amendment does not prohibit the Participants from seeking to recover their share of CAT costs from their members indirectly, such as through increases in other fees they charge to their members, during the two-year interim period.[979] Typically, businesses raise prices when faced with increases in costs, and CAT Fees represent costs.[980] Like every business, the Participants need to recover their costs to remain viable.[981]

As discussed above, should a Participant, including FINRA, seek to recover its share of costs indirectly through other fee increases, the Participant, as an SRO, would be subject to the Section 19(b) fee filing process and have to establish that any proposed fees are reasonable, equitable, and not unfairly discriminatory—and the Commission has made no determination as to whether any future fees by FINRA or any other Participant that would indirectly pass through their share of

CAT costs would be permissible.[982] In the event that FINRA seeks to recover its share of CAT costs indirectly through increases in member fees and it is able to make the statutorily required showing, then 100 percent of its share of CAT costs would ultimately be borne by Industry Members. In that scenario, Industry Members would bear 79 percent of CAT costs during the two-year interim period in which the Proposed Amendment is in effect.[983] Under this scenario, as shown in Table 8 (in row ''IM+FINRA Share''), Industry Members would bear costs of $118.5 million in 2026, $110.6 million in 2027, and $108.3 million in 2028. In the event that all the Participants (and not just FINRA) seek to recover their share of CAT costs indirectly through increases in member fees and meet the statutory requirements to do so, then the Industry Members would effectively bear 100 percent of CAT costs during the two-year interim period, but for any costs they can themselves pass through to investors.

In the event that all Participants recover their costs, how they choose to recover their costs would determine which specific Industry Members would bear those costs.[984] For instance, should

FINRA recover its costs by raising its membership fees, then FINRA members who are not CAT reporters would bear CAT costs.[985] Hence, the set of affected Industry Members would be broader than the 500 Industry Members expected to be directly affected under the Executed Share Model. Under a scenario where all exchanges recover the costs of CAT Fees by increasing average access fees and/or reducing rebates, the costs of CAT would be passed through to CEBBs and CEBSs because these are the members who are receiving the rebates or paying the access fees. Which CEBBs and CEBS would bear what costs would depend on how the exchanges amend their access fee and rebate tiers. Some exchange access fee tiers are set at the access fee cap and, thus, cannot be increased.[986] Accordingly, CEBBs and CEBSs paying the highest access fees would not experience a fee increase and would not bear additional CAT costs under the scenario considered here.

Industry Members are not prohibited by the CAT NMS Plan from passing through CAT Fees directly to their customers,[987] and where Industry Members can do so they will likely pass on their CAT costs to their customers, who may be investors or other broker-dealers. Ultimately, even when the Industry Members pass through their fees to other broker-dealers, those other broker-dealers will likely, to the extent permitted, recover their costs from their own customers, until the costs are ultimately borne by investors. When

---

[979] Several commenters stated that the Proposed Amendment does not address Participants raising existing fees. See, e.g., Citadel October 2025 Letter, at 9; FINRA October 2025 Letter, at 10–11.

[980] Given FINRA's non-profit status, the Commission recognizes that CAT Fees would be an expense that FINRA would need to recover in some manner despite the commitment by FINRA to not establish any CAT recovery fees during the temporary funding model. See FINRA January 2026 Letter, at 3.

[981] The Participants as well as Industry Members typically have several sources of revenue. For example, Participants generate revenues through market data fees. The Participants may be able to recover their CAT costs by including them in their market data fees provided that any increases in such fees would be subject to the Section 19(b) fee filing process.

[982] See supra note 49 and associated text.

[983] This results from dividing the FINRA allocation (around 37 percent) by three (to account for its share of each off-exchange or OTC Executed Equivalent Share) and then adding the Industry Member share, 66.66 percent (i.e., two thirds), to the result (39.7% ×1/3 + 66.66% = 79%). This estimate ignores what Industry Members would pass to investors. The 39.7 percent comes from the June 2025 equivalent share volumes from the Notice at 44932. The remaining 60.3 percent is executed on exchanges. Several commenters expressed concerns about Industry Members paying 67–80 percent of CAT fees, assuming 100 percent FINRA cost recovery. See, e.g., Citadel July 2023 Letter, at 16, 21, 22, AmFree Letter, at 6; SIFMA October 2025 Letter, at 3; Citadel October 2025 Letter, at 9; Citadel January 2026 Letter, at 3, 5.

[984] Commenters stated that the Commission should consider the economic effects of this potential distribution. See, e.g., Citadel July 2023 Letter, at 16, 21, 22, AmFree Letter, at 6; SIFMA October 2025 Letter, at 3; Citadel October 2025 Letter, at 9; Citadel January 2026 Letter, at 3, 5. How Participants recover their costs has implications for

other economic effects as well. For example, see infra note 1087 and the discussion of transaction fees in infra Part IV.D.2.a.

[985] See FINRA October 2025 Letter, at 11.

[986] See Tick Size Final Rule, 89 FR at 81694, Table 4. Currently, access fees are capped at $0.0030, but this cap will be declining to $0.0010 in November 2026.

[987] There are limitations on the fees that a broker-dealer may charge its customers, see, e.g., FINRA Rule 2121, but those restrictions do not meaningfully limit Industry Members' ability to pass through CAT fees because the per share magnitude of those fees is so small. See Table 9.

internalizers and market makers trade on their own account (*i.e.,* proprietary trading), however, they are their own customer. In this instance, they could seek to recover the cost of paying CAT Fees indirectly, either by charging higher transaction costs (*e.g.,* less price improvement or higher effective spreads) for trades in which they have (external) customers or by altering their prices on certain services they offer to their customers.[988] These higher costs or prices would ultimately be borne by investors.

CAT costs that are ultimately borne by investors will be spread among millions of investors. In 2024, an average of over 7.4 million customer accounts entered equity orders per week, of which nearly 6.9 million were from individual investor accounts, which includes retail investors and other non-institutional investors.[989] The total number of individual investors who are likely to bear the costs of CAT is likely significantly higher because many individual investors trade much less than weekly. Further, because some investors trade options but not equities, the total number of investors bearing CAT costs is even larger. As another measure of the number of investors, during the fourth quarter of 2025, 35.8 million unique CCIDs traded equities only, 0.5 million traded options only, and 2.3 million traded both equities and options.[990] One commenter raised

concerns related to outsized allocations to transactions for retail investors, due to those retail investors trading low-priced NMS stocks.[991] The trading by individuals who trade stock directly is not nearly as concentrated as market making but displays some concentration. The top 10,000 individual investors per week account for about 75 percent of equity traded share volume and the top 100 account for about 25 percent of equity traded share volume among individual account types.[992] Therefore, while CAT costs will be spread among millions of individuals, individual investors with higher equity traded share volumes will bear higher costs.

The Commission acknowledges that individual investors could bear CAT costs both directly, by trading in equities and options, and indirectly, as investors in institutional vehicles. Specifically, many individuals invest primarily or exclusively through institutional vehicles, such as mutual funds and pension funds, that invest on behalf of individuals. In 2024, institutional trading accounted for an average of 26 percent of share trading volume per week in equities.[993] Over 125 million retail investors invest in registered funds[994] and even more

investors are pension fund beneficiaries only. These individuals would thus bear CAT costs indirectly through their investments in institutional vehicles, which would likely experience pass through or higher fees from Industry Members, to the extent permitted.

The CAT costs borne by investors, either directly through Industry Members or via their institutional investments, would likely be related to trading activity and borne on a per share traded basis. Customers who receive directly passed through CAT Fees would likely face costs per share traded. In trading with market makers or other liquidity providers, individual and institutional investors, in aggregate, would likely pay a higher average transaction cost per share. While Industry Members might recover their CAT costs in other ways, the CAT costs are likely to be borne more by those investors who trade more or who invest in institutions that trade more. Therefore, concentration in trading activity by individual investors will translate into some individual investors bearing greater CAT costs because they trade more, but such CAT costs will still be borne on a per share traded basis.

Because individuals will likely bear fees on a per share basis, an examination of the magnitude of CAT costs that individuals may likely bear should focus on how a per share fee compares to other costs of trading. A focus on aggregate CAT costs obscures the way costs are distributed across Industry Members and investors, and conflates increases based on increased trading activity with operational inefficiency. Contrary to the suggestion of a commenter,[995] focusing on the economic effects of the Proposed Amendment on a per share basis most accurately reflects how those costs will be experienced by those that ultimately bear them.

Table 9 provides a comparison of the Historical Fee Rate and the CAT Fee Rate to other costs of execution and shows that CAT Fees per share are relatively small.[996] When the Historical Fee Rate and the CAT Fee Rate are added together, the combined rate ($0.0000073 to $0.000016) is far less than the average transaction costs, as measured by effective half-spread ($0.0066) paid to market makers and

---

[988] A commenter stated that fees charged on proprietary trading cannot be directly passed through but could be recovered from other market participants through higher trading spreads. *See* Citadel October 2025 Letter, at 7; Citadel July 2023 Letter, at 19–20; *see also* Citadel August 2023 Letter, at 3; *see also* CAT LLC July 2023 Response Letter, at 9–10. *See* also CAT LLC February 2026 Response Letter, at 1–2

[989] Based on 2024 CAT data on the weekly number of new orders entered by customer account holder type for NMS equities. New orders are defined as Industry Member Equity New Order (MENO) event messages that are at the beginning of a CAT lifecycle (*i.e.,* order originations). Customer accounts are defined as the count of unique CCIDs or combinations of CCIDs within an account holder type. Account holder type represents the type of beneficial owner of the account for which the order was received or originated. Individual customers are defined as an account that does not meet the definition of "institution" as defined in FINRA Rule 4512(c) and is also not a proprietary account (see Section 4.1., pg. 52 and Appendix G: Data Dictionary, pg. 452 of *https:// www.catnmsplan.com/sites/default/files/2026-02/ 02.13.26_CAT_Reporting_Technical_ Specifications_for_Industry_Members_v4.1.0r14_ CLEAN.pdf*).

[990] The number of CCIDs associated with trades in the CAT are a measure of the number of unique market participants who may ultimately bear a portion of the CAT costs. *See* Citadel October 2025 Letter, at 4; Citadel January 2026 Letter, at 2; ASA October 2025 Letter, at 3; ASA February 2026 Letter, at 2. This count is broader than individual investors because it includes market makers and other Industry Members trading on their own

account, as well as institutional investors. The count of CCIDs for equity trades includes both OTC and NMS equities. And for trades with multiple CCIDs listed, each unique CCID was included in the count.

[991] *See* Citadel July 2023 Letter, at 20; Citadel October 2025 Letter, at 6–7. This commenter states that trades in stocks with sub $1 prices account for 33 percent of retail NMS stock trading and that rounding fractional shares to 1 share further increases the share of CAT costs charged to retail transactions. *See also* Citadel August 2023 Letter, at 4.

[992] Based on 2024 CAT data on the weekly percent of NMS and OTC equity trade share volume among individual account holders for orders that originated during 2024. Individual investors are defined as the unique account holder CCIDs or combinations of CCIDs across individual accounts. Individual customers are accounts that do not meet the definition of "institution" as defined in FINRA Rule 4512(c) and is also not a proprietary account (*see* Section 4.1., pg. 52 and Appendix G: Data Dictionary, pg. 452 of *https:// www.catnmsplan.com/sites/default/files/2026-02/ 02.13.26_CAT_Reporting_Technical_ Specifications_for_Industry_Members_v4.1.0r14_ CLEAN.pdf*).

[993] Based on 2024 CAT data on weekly trade share volume by the account holder type at order origination for NMS and OTC equities. Account holder type represents the type of beneficial owner of the account for which the order was received or originated. Institutional customers are defined as an institutional account as defined in FINRA Rule 4512(c) (*see* Section 4.1., pg. 52 and Appendix G: Data Dictionary, pg. 452 of *https:// www.catnmsplan.com/sites/default/files/2026-02/ 02.13.26_CAT_Reporting_Technical_ Specifications_for_Industry_Members_v4.1.0r14_ CLEAN.pdf*).

[994] The 2025 Investment Company Fact book (available at *222.ici.org/system/files/2025-05/2025-*

*factbook.pdf*) reports that 126.8 million U.S. individuals owned mutual funds in 2025.

[995] See Citadel October 2025 Letter, at 8.

[996] This analysis assumes that the future Historical Fee Rate and CAT Fee Rate will be comparable to what was charged from February 18, 2020, to May 13, 2025.

other liquidity providers.[997] At the low end of the ranges, the combined rate is about 900 times smaller than the effective half-spread; at the high end of the ranges, the combined rate is over 400 times smaller than the effective half-spread. This measure of average transaction cost does not take make/take fees into account, which are paid to an exchange rather than a market maker, but make/take fees are still more than 50 times larger than the combined rate for CAT fees.

The Commission does not expect the CAT Fees on a per share basis to increase to the point where they would become more meaningful relative to other costs of execution. Even if CAT costs increase 10.4 percent per year,[998] the per share fees will still be orders of magnitude smaller than other costs of execution and will likely grow at a slower rate than CAT costs.[999] Further, the 10.4 percent estimate likely overestimates the potential cost increases going forward. This rate is based on the overall cost trends from 2021 to 2024, which started before CAT was fully implemented when operating expenses were not fully realized.[1000] Finally, the Commission and Participants are focused on improving the cost-effectiveness of CAT,[1001] which should help prevent significant cost increases.

TABLE 9—FEE RATES COMPARED TO OTHER COSTS OF EXECUTION AND REGULATORY FEES

| Cost | Low | | High | |
|---|---|---|---|---|
| | Fee | Comparison | Fee | Comparison |
| Historical Fee Rate | $0.0000043 | n/a | $0.0000043 | n/a |
| CAT Fee Rate | $0.000003 | n/a | $0.0000117 | n/a |
| Combined Rate | $0.0000073 | n/a | $0.0000160 | n/a |
| Effective Half Spread | $0.0066 | 904.1 | $0.0066 | 412.5 |
| Make/Take Fees | $0.0004 | 54.8 | $0.0030 | 187.5 |
| Section 31 Fees | $0.00007 | 9.6 | $0.00072 | 45.0 |
| FINRA TAF Fees | $0.000119 (equities) | 16.3 | $0.000166 (equities) | 10.4 |
| | $0.00002 (options) | 2.7 | $0.0000279 (options) | 1.7 |
| ORF Fees | $0.000015 | 2.1 | $0.000029 | 1.8 |

This table compares actual CAT fees to other fees per share. The Comparison column gives the ratio of the comparison cost divided by the sum of the Historical Fee Rate and the CAT Fee Rate, so it measures how many times larger the comparison cost is than the combined CAT fees or what fraction the comparison cost is if the comparison cost is smaller than the CAT fees. The CAT Fee Rates are from *www.catnmsplan.com/cat-fee-alerts* and are the total fee rates divided by three to indicate the fee rates allocated to each party of a transaction. The Combined CAT Fee Rate is the sum of the Historical CAT Fee Rate and the CAT Fee Rate. Section 31 Fees are from *sec.gov* from February 18, 2020, to May 13, 2025, converted to per share rates using trade size percentiles for the high and low ranges. Specifically, the lower end of the rate comes from the 25th percentile trade sizes of $670 and 51 shares from the fourth quarter of 2025. The higher end of this range comes from the 75th percentile trade sizes of $4,670 and share trade size of 180 from the fourth quarter of 2025. Section 31 Fees are charged on sale transactions only. The average share-weighted effective half-spread for Q2 of 2025 was $0.0066 (see supra note 997). The example Make/Take fees are from Nasdaq (following the CAT LLC July 2023 Response Letter; see *https://www.nasdaqtrader.com/Trader.aspx?id= PriceListTrading2).* The example FINRA Trading Activity Fees (TAF) were effective July 10, 2017—December 31, 2021, for the low end and January 1, 2024—December 31, 2025, for the high end *(https://www.finra.org/rules-guidance/rulebooks/corporate-organization/section-1-member-reg- ulatory-fees).* FINRA TAFs are charged for sale transactions. The options FINRA TAFs are per contract divided by 100, for a rough approximation of equivalent shares. The example ORF Fees are per contract from MEMX and BOX divided by 100, for a rough approximation of equivalent shares. The low end is the MEMX ORF fee and the high end is the BOX ORF fee, that were effective on February 17, 2026.

Also, CAT fee rates are smaller than other regulatory fees. Examples of other regulatory fees include Section 31 fees, FINRA Trading Activity Fees (TAF), and ORF fees. Table 9 shows that these other regulatory fees tend to be smaller than the costs of execution, but the CAT fee rates are still smaller than these other regulatory fees. The CAT fee rates are about 9 to 45 times smaller than the Section 31 fees charged between 2020 and May 2025. For equities, the CAT fee rates are about 10 to 16 times smaller than FINRA TAFs during the time periods July 10, 2017 to December 31, 2021 and January 1, 2024 and December 31, 2025. While for options, the CAT fee rates are between 1.74 times to 2.73 times smaller than FINRA TAFs fee rates during the same time period. CAT fee rates are about half the ORF fees.

Despite the small per share fees, the Commission recognizes that such fees can aggregate to a large annual cost for investors who trade at a high frequency, such as market makers and high frequency proprietary trading firms. In 2024, 469 firms that had either market making or proprietary trading accounts accounted for 99.5 percent of all orders entered in the CAT but fewer than 45 percent of equity traded share volume. When focusing on firms with proprietary trading accounts (that may also have market making accounts), 449 firms accounted for 96.5 percent of

---

[997] Effective half spread captures the costs that investors pay for their order to execute against a market maker or standing limit order. This is the average share-weighted effective spread across stocks in the highest share volume decile in the second quarter of 2025. The average effective spread was calculated for each stock by equally weighting each day, and then the weighted average effective spread was calculated by weighting each stock's spread by their share volume. Less liquid stocks have higher effective spreads, making the CAT fees even smaller relative to transaction costs.

[998] *See supra* note 967.

[999] The per share fees depend not only on the CAT costs but also on the number of executed equivalent shares traded. Estimating annual growth rates in shares and contracts traded from the volume numbers in Table 4 yields geometric averages of 14.2 percent growth in shares executed and 11.4 percent growth in contracts executed. In addition, once the historical costs are covered, CAT LLC will no longer collect the Historical Assessment, so total CAT Fees will decline by the Historical Fee Rate.

[1000] *See supra* note 967.

[1001] The Commission is currently engaged in a comprehensive review of the CAT which is intended to include an examination of CAT costs. *See supra* note 31. Further, CAT LLC states that it supports the Commission's announced comprehensive review as well as its broader efforts to ensure the CAT achieves its intended regulatory purposes in a cost-effective manner. *See supra* note 34.

[1002] The number of orders entered is based on 2024 CAT data on the number of new equity orders entered by firms who had market making and/or other proprietary accounts. New orders are defined as Industry Member Equity New Order (MENO) event messages that are at the beginning of a CAT lifecycle (*i.e.,* order originations). Firms are defined at the CRD level. The traded share volume includes volume that may not have had a corresponding MENO entered (*i.e.* internalizations, *see https:// catnmsplan.com/faq#B41*). For more details on account holder types, see Appendix G: Data Dictionary, pg. 452 of *https:// www.catnmsplan.com/sites/default/files/2026-02/ 02.13.26_CAT_Reporting_Technical_ Specifications_for_Industry_Members_v4.1.0r14_ CLEAN.pdf).*

equity orders entered and around 31 percent of equity traded share volume. Therefore, in the aggregate, while these firms may bear larger CAT costs, these firms' activities (*e.g.,* quotations, message traffic, or trades) also represent a larger portion of the cost burdens on the CAT system.[1002]

*C. Efficiency*

1. Baseline

In the CAT NMS Plan Approval Order, the Commission identified certain elements of the Original Funding Model that could have negative implications for efficiency and also stated that the significant uncertainty in the Original Funding Model could also have implications for efficiency.[1003] In consideration of the comment letters submitted in response to the Executed Share Model, the Commission recognizes that the Original Funding Model would have also resulted in additional inefficiencies. Overall, the Original Funding Model could have resulted in likely insignificant reductions in operational efficiencies, skewed incentives for efficiency, and reductions in market efficiencies.

a. Operational Efficiency

The tiered structure of the Original Funding Model would have led to uncertainties affecting operational efficiencies of Industry Members and Participants. In particular, Industry Members would not have known their per-message cost until the end of the month, though they would have charged their customers in real time, creating an inefficiency. In particular, the Original Funding Model would have charged flat fees to Industry Members and Participants in the same tiers ("Original CAT Fees"). Thus, Industry Members with message traffic near the top of the tier would have paid lower fees per message than Industry Members in the same tier but with lower message traffic. Likewise, Participants near the top of their market share tiers would have paid lower fees per executed share. Even if Industry Members and Participants could predict which tier they would be in, passing-through fees, or planning for cost recovery, would involve Industry Members and Participants charging based on expected per-message or per-share Original CAT Fees rather than actual per-message or per-share Original CAT Fees, which could have been higher or lower than expected. This uncertainty creates an operational

inefficiency in structuring the fee pass-through.[1004]

Also, charging Industry Members a flat fee that depends on their message traffic could result in Industry Members, who generally earn revenue only for executed orders,[1005] getting charged for orders that do not get executed. This could have resulted in certain Industry Members paying more in Original CAT Fees than they generated in revenue from transactions. Further, some Industry Members would have found passing through fees only to those customers whose orders were executed operationally more efficient by increasing existing fees (or reducing incentives such as payment for order flow). These situations would have resulted in executed orders subsidizing the burdens of message traffic (assuming message traffic is the only cost driver).[1006]

Complexities associated with creating tiers in the Original Funding Model would also have created operational inefficiencies. To ensure that the CAT NMS Plan covered its costs with the tiered fees, the creation of the fee schedule would have involved deciding on the number of tiers, estimating how many Industry Members would qualify for each tier, estimating how much to charge each tier, and then justifying each decision. The potential for disagreements resulting from the complexity and the challenges in drafting justifications for such complex decisions could have involved a cumbersome and inefficient fee setting experience.

b. Incentive Effects

The Original Funding Model would not have perfectly aligned fees with the costs imposed on CAT, limiting the incentives for cost efficiency. Because fees to be charged by CAT are based on cost recovery, aligning such fees with burdens on CAT could promote efficiency by creating incentives to limit costs. First, the uncertainty in the allocations across Participants or Industry Members meant that the Original Funding Model would have created the risk that such allocations were less than perfectly aligned with costs, creating inefficiencies. Further, any pass-throughs to Participants'

members or to the customers of Industry Members could have dampened the incentives for cost efficiency. The Original Funding Model created incentives for Industry Members to limit costs by limiting their unnecessary message traffic.[1007] However, the tiered structure of the Original Funding Model would have weakened these incentives for Industry Members who were not close to a tier cutoff. Finally, because the allocations across equities or options impact how fees aligned with costs, the Original Funding Model risked inefficiencies because it was not designed to dynamically adjust to the relative burdens of linkage processing and storage costs.

The CAT NMS Plan Approval Order recognized that the CAT Funding model could alter the incentives of both Participants and Industry Members to limit their burdens on CAT.[1008] Participants can influence their burdens on CAT and the overall costs of CAT through their voting participation on the CAT Operating Committee. They also influence CAT burdens through business decisions such as how many order types to offer. Unlike Participants, Industry Members cannot influence costs through their voting,[1009] so their influence depends largely on their non-voting participation on the CAT Advisory Committee and on how their reporting affects CAT costs. For example, Industry Members can control the burdens they place on CAT through policies for reporting data on time that do not need to be corrected and through the complexity of how they report their activity.[1010]

The CAT NMS Plan Approval Order recognized that the Original Funding Model had the potential to result in a lack of incentives for Participants to seek efficient ways to achieve the regulatory objectives of CAT.[1011] In particular, the Original Funding Model did not specify the allocation between Industry Members and Participants and the CAT NMS Plan Approval Order recognized a risk that if the allocation skewed too heavily toward Industry Members, the Participants could have lower incentive to limit costs. If the Original CAT Fees would have offset CAT costs without the Participants

---

[1003] *See* CAT NMS Plan Approval Order, 81 FR at 84882.

[1004] Both the CAT Adopting Release and the CAT NMS Plan Approval Order discussed that the Industry Members and the Participants may pass through their CAT costs, including CAT fees. *See supra* note 47.

[1005] *See* Notice, 90 FR at 44927.

[1006] While message traffic is a major cost driver, it is not the only cost driver and the lifecycle linkages are another major cost driver, especially in the equity markets (*see* discussion in Part IV.C.2.b.iii).

[1007] *See id.* CAT NMS Plan Approval Order, 81 FR at 84881.

[1008] *See id.* CAT NMS Plan Approval Order, 81 FR at 84737, 84880, 84881, and 84892. *See also* CAT NMS Plan Notice at 30748, 30766, 30767, and 330769.

[1009] *See* Citadel October 2025 Letter, at 8.

[1010] The CAT technical specifications allow for discretion in how Industry Members report the activity associated with many scenarios.

[1011] *See* CAT NMS Plan Approval Order, 81 FR at 84737 and 84892.

internalizing those CAT costs, Participants could lack the incentive to limit costs. Thus, a lower allocation to Participants could reduce Participants' incentives to limit CAT costs.

The incentives of Participants and Industry Members to limit costs could also have been reduced because they could pass-through their costs. The ability for Participants and Industry Members to pass through fees could reduce incentive effects of the Original Funding Model, but Participants and Industry Members would still have had some incentives to limit costs. In the CAT NMS Plan Approval Order, the Commission recognized that FINRA and the other Participants could pass through their CAT fees to their members.[1012] Such pass-throughs could take several forms. The Commission understands that Participants, including FINRA, have many revenue sources, which may include transaction fees, data fees, connectivity fees, listing fees, and regulatory fees. In fact, because the Original Funding Model charged Participants based on their market share, the most direct way for Participants to pass through the costs would have been to increase fees related to their market share—their transaction fees, which are based on a fee schedule set pre-trade. Because the per volume CAT fee would have been unknown at the time the Participants had to file the transaction fees for such volume, the Participants would have internalized the risk of the pass-through fees not covering their Original CAT Fees. Likewise, Industry Members who pass-through their Original CAT Fees would have had reduced incentives to limit CAT costs, but the inability to structure their pass-through to perfectly align with Original CAT Fees would have forced some internalization of costs. This partial internalization preserves some incentives to control costs, but such incentives are weaker than if fees were fully borne.

While the Original Funding Model would have set fees for Industry Members based on their message traffic, the efficiency benefits were likely minimal. First, its tiered structure would have dampened the incentives to reduce the costs of CAT by reducing unnecessary message traffic. In particular, the Original Funding Model would have assigned Industry Members to tiers based on their message traffic. Within a tier, however, all Industry Members would have been charged the same flat fee. Thus, an additional message would have been free in terms of CAT costs unless it put the Industry

Member into a higher tier. So, only those Industry Members close to a cutoff would have had the incentive to reduce message traffic, and Industry Members who expected to be in the top tier would have had no incentive to reduce unnecessary message traffic. Further, Industry Members cannot reduce message traffic without altering how they handle customer orders, which could be counter to their duties, or reducing liquidity, which could reduce market efficiency. Therefore, absent evidence of significant unnecessary message traffic, the efficiency incentives of basing Original CAT Fees on message traffic are unlikely to have been significant.

In addition, since the approval of the CAT NMS Plan, additional information about the cost drivers has been made public and suggest that message traffic is not the only cost driver. In particular, the Participants, in a response letter, report that for the second half of 2025, 29 percent of CAT costs are from the "Linker," 34 percent from storage, and 25 percent from "Data Processing."[1013] In addition, in 2025, 65 percent of total operating costs of the Central Repository are the processing and storage of CAT data in the cloud.[1014] The "Linker" costs are the costs to link order messages across a lifecycle.[1015] Linking order messages across a lifecycle involves looking across four days of data, so the linker costs are likely related to message traffic. In 2021, Participant message traffic involved in linkage processing was much larger than Industry Member message traffic,[1016] but has likely declined since the removal of options market maker quotes from linkage processing.[1017] However, the Commission understands that complexity of the order lifecycles is a cost driver within the linkage processing, and certain order handling practices of Industry Members, such as the use of riskless principal transactions, involve more complex linkages than other order handling practices.

The Original Funding Model did not indicate how Original CAT Fees would

be allocated to equities versus options, but this allocation decision would have had an effect on efficiency. The options markets account for the vast majority of message traffic, but most of the options market message traffic is on-exchange message traffic (mostly market maker quotes).[1018] However, option market maker quotes likely do not have complex order lifecycles that would drive the costs of the linkage processing. Indeed, the Commission understands that the linkage processing of equities orders is generally more complex than the linkage processing of options orders, especially after the 2024 CAT Cost Savings Amendment, which suspended linkage processing and reduced storage costs for options market maker quotes.[1019] Further, the storage costs for options market maker quotes declined further under the September 2025 Exemptive Order.[1020] For the Original Funding Model to successfully match Original CAT Fees with cost burdens, it would have likely needed a complex algorithm to allocate costs across equities and options that dynamically accounted for linkage processing and storage costs.

The increase in the costs to build and operate the CAT since the CAT NMS Plan Approval Order does not alter the direction of the economic incentives described above, but the incentives to be cost efficient could be stronger when costs are higher.

### c. Market Efficiency

The Original Funding Model could have resulted in market inefficiencies, though these inefficiencies were unlikely to be significant.[1021] Several of

[1012] *Id.* at 84853.

[1013] See CAT LLC February 2026 Response Letter, at 3.

[1014] For the 2025 estimates *see* Consolidated Audit Trail, LLC, 2025 Financial and Operating Budget, dated Dec. 12, 2025, *available at:* 12.22.25_CAT-LLC-2025-Finacial_and_Operating-Budget.pdf. Also *see supra* note 938.

[1015] *Id. See also* CAT NMS Plan Approval Order, 81 FR at 85024–5 (discussing linkage requirements).

[1016] See Consolidated Audit Trail Industry Webinar: CAT Costs, dated Sept. 21, 2021, *available at: https://catnmsplan.com/sites/default/files/2021-09/09.21.21-CAT-Costs_0.pdf,* at 8.

[1017] See 2024 CAT Cost Savings Amendment, 89 FR at 103034–38.

[1018] Because options market makers do not report many of their quotes to CAT, instead sending a quote-sent time stamp to options exchanges that is included in the exchanges' CAT data, additional option market maker quotes increase the message traffic of Participants rather than option market makers and are, thus, not counted in the message traffic of Industry Members in the Original Funding Model. *See* CAT NMS Plan Approval Order, 81 FR at 84873.

[1019] According to the 2024 CAT Cost Savings Amendment, options market maker quotes in Listed Options will no longer be subject to any requirement to link and create an order lifecycle, and will not undergo any linkage validation, linkage feedback, or lifecycle enrichment processing; in addition, options market maker quotes in Listed Options would be accessible through BDSQL and Direct Read interfaces only, which is related to a reduced storage footprint for options market maker quotes in Listed Options. *See* 2024 CAT Cost Savings Amendment, 89 FR at 103034–38.

[1020] The September 2025 Exemptive Order further allows the Participants to delete options market maker quote data altogether after one year form the CAT system. *See* September 2025 Exemptive Order, *supra* note 239, 90 FR at 47858.

[1021] See CAT NMS Plan Approval Order, 81 FR at 84879.

these inefficiencies derive from the fact that the Original Funding Model would have charged Industry Members a flat fee according to a tiered fee schedule. Message traffic would have determined an Industry Member's tier. Because providing liquidity, including but not restricted to market making, involves more potential message traffic, the Original Funding Model could have discouraged liquidity provision. Discouraging liquidity provision could have reduced liquidity, particularly in less liquid securities, potentially reducing market efficiency. The tiered nature of the Original Funding Model would have reduced the potential reduction in liquidity by flattening the fees, but this could have created its own distortions and, thus, inefficiencies if Industry Members altered activity to avoid qualifying for a higher tier.[1022] The Commission concluded in the CAT NMS Plan Approval Order that any changes in behavior were unlikely except in those Industry Members near a fee-tier cutoff point, and, therefore, these behavior changes would have likely not had a significant effect on market quality or efficiency.[1023]

The Commission acknowledged in the CAT NMS Plan Approval Order and the CAT NMS Plan Notice that it was possible that some or most of the costs of the CAT will be passed onto investors.[1024] This may have further decreased the incentives for Industry Members to alter their behavior to avoid qualifying for a higher tier.

The increased costs since the CAT NMS Plan Approval Order would likely have increased these effects on market efficiency under the Original Funding Model, but these effects would have remained limited. The tiered structure would still have dampened the impact on liquidity, even with the increased costs. The increased costs could have led to greater cost differences across tiers, which could have strengthened any distortions created by Industry Members near tier cut-offs. This effect would likely have remained limited in terms of the volume of activity affected,

and its magnitude cannot be quantified because the Original Funding Model did not specify the tier cut-offs.

2. Analysis of the Proposed Amendment

The Participants provided an analysis of efficiency in the Notice. In particular, the Participants state that, ''By providing for the financial viability of the CAT, the [Executed Share Model] would allow the CAT to provide its intended benefits. For example, the CAT is intended to provide significant improvements in efficiency related to how regulatory data is collected and used. In addition, the CAT could result in improvements in market efficiency by deterring violative activity.'' [1025]

The Commission considered whether the Executed Share Model promotes efficiency along several dimensions: operational efficiency, incentive alignment, and market efficiency. In this analysis, the Commission considered both how the Executed Share Model differs from the Original Funding Model and the additional details in the Executed Share Model not previously included in the CAT NMS Plan. In the analysis below, the Commission explains that the Executed Share Model itself will promote operational efficiency and market efficiency, trade off some efficiencies associated with aligning fees with CAT costs against others and create some efficiency-improving incentives at the expense of others. The analysis also recognizes below that some commenters stated that the Executed Share Model is less efficient than it could be.

a. Operational Efficiency

The Executed Share Model presents some operational efficiency improvements over the Original Funding Model, although other alternatives may be more efficient in some ways. The Executed Share Model could improve efficiency over the Original Funding Model by enabling Participants and Industry Members to know their fees in advance of their activity and by reducing the complexity of the fees. However, it is not clear that the Executed Share Model presents an operational efficiency improvement over the Original Funding Model with respect to precision of estimates of expected total fees to be collected.

CAT LLC states that charging the executing brokers as specified in the Executed Share Model is an efficient way for CAT LLC to bill Participants and Industry Members as it is simple, straightforward, and in-line with

existing fee and business models.[1026] They also acknowledge that certain Industry Members will have to develop processes to collect pass-through CAT fees from clients and describe that the Plan Processor plans to make available trade-by-trade data to CAT Executing Brokers for each CAT bill, which will facilitate the passing-through of CAT fees.[1027]

Relative to the Original Funding Model, Industry Members and Participants will be better able to observe their fee per activity under the Executed Share Model, in this case their fee per share transacted in advance. Under the Original Funding Model, Industry Members would only have learned about their fees per message after the end of the month and Participants would have learned their fees per share after the end of the month.[1028] Under the Executed Share Model, both Participants and Industry Members [1029] can estimate in advance the fees charged on each potential transaction, thus enabling them to create fee schedules for transactions or other services that better reflect their costs, resulting in operational efficiencies. In response to commenters who expressed concerns about the costs for them to pass-through fees,[1030] the Commission understands that such Industry Members generally have arrangements with broker-dealers customers for services based on executed shares and these arrangements could include charges to cover various fees.[1031]

The fact that the Proposed Amendment prohibits the Participants from directly passing their CAT costs through to members introduces operational inefficiencies. If CAT costs are not passed through directly on a per transaction basis, and the Participants seek to recover CAT costs through other cost recovery mechanisms,[1032] the

---

[1022] *See* Part IV.C.1.b for a discussion of the incentives of Industry Members near the tier cutoffs.

[1023] *Id.* at 84879.

[1024] *See, e.g.,* CAT NMS Plan Approval Order, 81 FR at 84863: ''. . . the Commission acknowledged in the Notice and continues to believe that it is possible that some or most of the costs of CAT will be passed on to investors.''; CAT NMS Plan Approval Order, 81 FR at 84881: ''. . . could still result in costs that are passed on to investors because . . .''; CAT NMS Plan Notice, 81 FR at 30729 for a discussion whether broker-dealers will pass on the costs of CAT to investors; and CAT NMS Plan Notice, 81 FR at 30737 where the Commission asks whether and to what degree the costs of CAT will be passed onto investors.

[1025] *See* Notice, 90 FR at 44937.

[1026] *See* CAT LLC July 2023 Response Letter, at 3–4.

[1027] *See id.,* at 9–10.

[1028] *See supra* Part IV.A.1.a for a discussion of how the per-message fees would have varied within the flat-fee tiers of the Original Funding Model.

[1029] *See* Notice, 90 FR at 44928 where CAT LLC stated that Industry Member ''that do not directly pass-through their CAT fees may account for and recover such fees as part of their overall business costs when considering and establishing other revenue-generating sources.''

[1030] *See, e.g.,* Citadel July 2023 Letter, at 20, 24; Citadel August 2023 Letter, at 5–6. One commenter also focused specifically on the ability for Industry Members to pass through Historical CAT Assessments, *see* Citadel July 2023 Letter, at 20, 24, but those fees would also have a fixed rate charged to future executed shares, so passing those fees through would still represent an efficiency improvement over the Original Funding Model.

[1031] *See* CAT LLC July 2023 Response Letter, at 9, 34.

[1032] *See* Part IV.B.

amount they recover through those other mechanisms might not match exactly their CAT assessment over time; it could be higher or lower. A deviation between the recovered CAT assessment and the actual CAT assessment incurred would introduce operational inefficiencies.

As discussed above, Industry Members are not prohibited by the CAT NMS Plan from passing through CAT fees directly to their customers.[1033] Therefore, certain Industry Members may be able to avoid the operational inefficiencies described above when recovering CAT costs through some other cost recovery mechanism. This is not the case for all Industry Members and all CAT costs. For example, internalizers and market makers cannot pass on CAT fees incurred on their proprietary trading directly to customers. Also, if FINRA chooses to recover its CAT costs indirectly through member fees, it may not be possible for a broker-dealer to identify how much it is paying in CAT costs and therefore to tie those CAT costs to particular trades to then directly pass them on as a trade execution fee to a customer. In addition, FINRA members who are not CAT reporters do not generate revenues relating to any CAT costs they will pay through an indirect pass through of CAT costs by FINRA as member fees. Those FINRA members would have to find a way to recoup those CAT costs as general business costs through other means, which results in an operational inefficiency.

The Executed Share Model reduces the complexities of the Original Funding Model, improving operational efficiency. However, while the Executed Share Model specifies the per share fees to be paid by Participants and Industry Members, it may not increase the precision in estimating the total fees to be collected as the number of shares traded are not known a priori, thus creating uncertainty in its impact on operational efficiency. The Executed Share Model will not involve designing a tiered structure that estimates how many Industry Members and Participants will qualify for each tier based on projections of each's message traffic or market share, coming up with cutoffs and flat fees in each tier to cover projected costs, and justifying each projection model, tier cutoff, and flat fee. Instead, the Executed Share Model involves estimating future volume, dividing budgeted costs by the estimated future volume, and justifying the estimated future volume model and budgeted costs. Thus, the Executed

Share Model will be much less complex for Participants to implement. However, because the Executed Share Model involves estimating future volume and the Commission has observed significant fluctuations in volume, the fees actually collected in the Executed Share Model will not necessarily match the budgeted costs. Because the Original Funding Model had similar uncertainties, the Commission cannot determine if this inefficiency is more or less severe for the Executed Share Model.

The Commission recognizes the inefficiencies associated with invoicing CEBBs and CEBSs directly rather than using clearing brokers to collect fees. Because the Original Funding Model allowed for but did not specify the use of clearing brokers, this inefficiency is not relative to the baseline but is relative to an alternative. The industry's current practice is to collect certain regulatory fees from the sell-side clearing broker-dealer, so there would be certain efficiencies from using a similar process. However, collecting CAT fees from clearing broker-dealers could introduce inefficiencies as well. The Proposed Amendment requires the collection of CAT fees from both the buy and sell side of the transaction, but because current industry practice does not involve clearing broker-dealers collecting fees from the buy-side of the transaction, if the Proposed Amendment required the collection of CAT fees from both the buy and sell side of the transaction from clearing brokers, it might require implementation by clearing broker-dealers. Unlike clearing firms that may simply clear a trade on behalf of the executing broker, executing brokers may be better positioned to pass through their CAT fees from both the buy and sell side because they are always parties to a transaction. In responding to comments on an earlier version of the Executed Share Model, CAT LLC states that charging clearing brokers would be less efficient than charging executing brokers because it would require linking executed shares to clearing brokers.[1034] CAT LLC also stated that it planned to provide trade-by-trade billing information to executing brokers and training on using that information to facilitate pass-through of costs, which would also increase operational efficiency for Industry Members.[1035] The feasibility of charging executing brokers has been demonstrated by the collection of CAT fees under the 2023 Funding Model

Amendment; CAT LLC states that it has observed very few issues with executing brokers being able to pay invoices, and 99% of CAT fees have been paid on time.[1036]

b. Incentive Effects

The Commission recognizes the potential for the Executed Share Model to affect incentives and, therefore, either improve or harm efficiency. Aligning fees with costs promotes economic efficiency because Industry Members and Participants bear the costs they directly or indirectly impose on CAT NMS, creating the incentive to limit costs.[1037] The Executed Share Model presents a risk the CAT fees will not align with the burdens on CAT, which dampens the incentives to limit costs and promote efficiency. The primary sources of these risks are in: (i) the allocation between Participants and Industry Members, (ii) the ability to pass-through or recover the costs of CAT fees, (iii) the structure of the Executed Share Model, and (iv) the allocation to options relative to equities. While the prohibition on Participants directly passing through their CAT fees to their members incentivizes the Participants to limit the costs of CAT, they could still seek to recover their CAT fees through other cost recovery mechanisms, subject to statutory requirements, which could limit any increase in their incentives to limit the costs of CAT as compared to the Original Funding Model. Nonetheless, the Commission concludes that any changes in incentives and inefficiencies resulting from a change in the alignment of costs and burdens is minor because the CAT fees are significantly smaller per share than other execution costs.[1038]

---

[1033] *See* Part IV.B.

[1034] *See* CAT LLC July 2023 Response Letter, at 3.

[1035] *See id.* at 5.

[1036] *See* Notice, 90 FR at 44928.

[1037] One commenter stated that the Commission lacks an incentive to control CAT costs because it does not have an obligation to fund the CAT. *See* SIFMA October 2025 Letter, at 4. The Commission oversees and enforces the Participants' compliance with the CAT NMS Plan, as well as consistency of any fees by Participants with statutory and regulatory standards. *See* 17 CFR 242.608(b)(2), (c), (d); 17 CFR 242.613(h). In particular, fees, including CAT Fees, must be reasonable and equitably allocated, not result in unfair discrimination, or not impose any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Exchange Act. *See* 15 U.S.C. 78s(b)(2)(C)(i); *see also* 15 U.S.C. 78f(b), 78k–1(c)(1). These legal obligations are alternative sources of incentives. Indeed, the Commission has approved multiple measures to reduce CAT costs and is engaged in a comprehensive review of the CAT.

[1038] *See supra* Part IV.B. for a discussion of the magnitude of CAT fees and Table 9 for a comparison of CAT fees to other transaction costs and regulatory fees.

**13474** **Federal Register** / Vol. 91, No. 53 / Thursday, March 19, 2026 / Notices

i. Allocation to Participants and Industry Members and Their Cost Recovery

The Executed Share Model allocates costs to Participants and Industry Members, both of whom contribute to the costs of CAT. However, despite the prohibition on passing-through fees, the Commission expects that Participants might still seek to cover their costs through other mechanisms.[1039] Industry Members will also likely attempt to pass-through their CAT fees or otherwise recover these costs. Notably, the risk that they will not be able to cover their costs completely could discipline both Participants and Industry Members to seek to limit the burdens they impose on CAT. Finally, the allocation in the Executed Share Model trades off incentives to inefficiently spend too much against incentives to inefficiently spend too little.

The Executed Share Model presents a risk, as the Original Funding Model did,[1040] that Participants might not be allocated enough of the costs to have the incentive to seek efficient ways to achieve the regulatory objectives of CAT. While the Executed Share Model specifies an allocation that was unknown in the Original Funding Model, several commenters question whether the allocation provides Participants with incentives to seek efficiency.[1041] Further, while the Proposed Amendment prohibits Participants from passing through their CAT fees directly, some commenters stated that the ability for Participants to recover their CAT costs lessens Participants' incentive to control costs.[1042] Commenters also expressed concern with rising CAT costs to illustrate the magnitude of this potential inefficiency,[1043] stating that they do not have enough transparency on cost drivers to assess whether CAT costs are reasonable,[1044] that the Proposed Amendment has no mechanism to control or limit the budget,[1045] and that Industry Members lack control over CAT costs.[1046]

The fact that FINRA is expected to be the heaviest regulatory user of CAT suggests that FINRA being responsible for a large proportion of CAT costs promotes efficiency, though FINRA's control over costs could be limited, suggesting inefficiency in a high allocation.[1047] Data usage contributes to CAT costs. Query tools, for example, account for 3 percent of CAT costs and some cloud hosting costs reflect costs to query CAT data and process it for regulatory usage. Indeed, FINRA has stated that it is not opposed to fees based on regulatory usage.[1048] However, FINRA's limited voting power on the Operating Committee might restrict its influence on issues affecting CAT costs,[1049] such as the execution of reporting requirements that implement the CAT NMS Plan.

The Participants have stated that the transparency and level of detail in the fee filings will impose a discipline on the Participants to justify the costs of CAT.[1050] For example, separating Historical CAT Costs from Prospective CAT Costs allows Industry Members more insight into the sources of CAT costs underlying the fees and to allow Industry Members to comment on the size of such fees. The Participants have

explained that increases in CAT costs are attributable, in large part, to factors outside of their control, including market developments.[1051] For example, at the adoption of the CAT NMS Plan in 2016, the Commission estimated that the CAT would receive 58 billion records per day, but the Participants state that during the second half of 2025, quarters 3 and 4, the CAT receives an average of 793 billion and 704 billion records per day, respectively.[1052] The Commission agrees that a primary driver of the increase in CAT costs has been increases in trading activity, which is outside of the control of the Participants,[1053] and makes it difficult to estimate future costs. Nevertheless, the Commission has included its own projections of future operating costs based on prior growth in trading activity and recent cost reduction measures.[1054]

The Participants also disagree that they are not incentivized to manage costs with a one-third allocation. They state that currently, there is a strong incentive to manage costs while paying 100 percent of the costs and that incentive will continue with a one-third allocation. They state that CAT costs are substantial and they will continue to receive critical review.[1055]

Further, the Participants state that the complexity and diversity of Industry Members' chosen business models and order handling practices contributes substantially to CAT costs because they result in increased processing and storage costs.[1056] In contrast, the Participants state that exchange features are not nearly as diverse as the ways in which Industry Members execute

---

[1039] *See supra Part IV.B and* Part IV.C.2.a. The SROs need to have adequate funding to fulfill their statutory obligations.

[1040] *See supra* Part IV.C.1.b.

[1041] *See, e.g.,* Citadel 2025 Letter, at 8 (referencing statements by Commissioners Peirce and Uyeda).

[1042] *See, e.g.,* Citadel July 2023 Letter, at 16, 22; Citadel October 2025 Letter, at 8.

[1043] *See, e.g.,* Citadel July 2023 Letter, at 2, 5, 7–9, 23, 26–27; Citadel August 2023 Letter, at 7–8. One commenter pointed out that CAT costs typically exceed the budget by 20 percent. *See* Citadel July 2023 Letter, at 8–9, n.21; Citadel August 2023 Letter, at 7. The Commission recognizes that CAT operating costs have exceeded the cost estimates in the CAT NMS Plan Approval Order with the total net costs of building and operating the CAT for an initial five year period falling just outside the range of the 2016 estimate. See discussion of cost increases in Part IV.A.1 and the impact of recent amendments on the costs to operate the CAT in Part IV.A.2.

[1044] *See, e.g.,* Citadel July 2023 Letter, at 2, 6–7, 13–14, & nn.63, 64; Citadel August 2023 Letter, at 6–7.

[1045] *See, e.g.,* Citadel August 2023 Letter, at 7.

[1046] *See* Citadel October 2025 Letter, at 8 n.33.

[1047] *See supra* note 379 and surrounding discussion. *But see* FINRA April 2023 Letter, at 7 ("[I]t is unclear . . . how the outsized allocation to FINRA is based on the extent to which FINRA participates in and benefits from the markets. In addition, this rationale conflates the costs to create and operate CAT with the usage of CAT data.") Note that FINRA's allocation in the Original Funding Model (about 50 percent for Participants' share of the costs allocated to equities) could have been the same or greater than the allocation in the Executed Share Model, calculated based on volume for November 2025.

[1048] *See* FINRA April 2023 Letter, at 8, referencing comment letters from 2021 and 2022.

[1049] FINRA discusses its limited voting power in FINRA April 2023 Letter, at 4 and FINRA June 2023 Letter, at 8.

[1050] *See also,* CAT LLC December 18, 2025 Response Letter incorporating by reference CAT LLC May 2023 Response Letter, at 10–11, which discussed other efforts to manage the costs of CAT. The Participants provide a more comprehensive response about cost management efforts. *See* CAT LLC July 2023 Response Letter, at 19–20. They state that Industry Members will have ample opportunity to comment, there will be quarterly budget information and financials, there is Commission oversight, and the Participants have ongoing cost discipline efforts through a cost management group and other efforts. For more details of the activities of the cost management group, *see* CAT LLC July 2023 Response Letter, at 22–26.

[1051] *See, e.g.,* Letter to Vanessa Countryman, Secretary, Commission, from Robert Walley, Chair, CAT NMS Plan Operating Committee, dated Dec. 17, 2025, at 22–23 (cited by CAT LLC December 2025 Response Letter, at 7, in support of the Proposed Amendment), *available at https:// catnmsplan.com/sites/default/files/2025-12/LLC-Proposed-CAT-NMS-Plan-Amendment-2025-Cost-Savings-Amendment-12.17.25.pdf* (explaining how, despite the implementation of optimizations that have significantly decreased the per-unit costs, data storage costs are remain significant component of CAT costs because needs in 2025 were much larger than anticipated in 2016).

[1052] *See* CAT LLC February 2026 Response Letter, at 3. The same letter, at 3, reports that in the second half of 2025, the total inbound event volume was 95.75 trillion records, with an average monthly inbound event volume of 16 trillion events. *See also* Citadel October 2025 Letter, at 4 (requesting documentation of the updated number of CAT records created each day).

[1053] *See supra* Part IV.A.1.c (explaining how the growth in message traffic has far exceeded the growth in CAT operating costs).

[1054] *See supra* Part IV.A.2.

[1055] *See* CAT LLC July 2023 Response Letter, at 22.

[1056] *See* CAT LLC July 2023 Response Letter, at 7.

trades.[1057] In addition, Industry Members have customers that create CAT costs related to FDIDs, CCIDs, and CAIS, while Participants do not.[1058] Further, the Participants state that ''Industry Members have far more late data and corrections than Participants'' and that ''[t]he linker costs related to late data and corrections are significant.'' [1059] The Commission believes that Industry Members being responsible for a significant proportion of CAT costs promotes efficiency. This is particularly valid for message traffic and late data and corrections, which is something Industry Members can directly control to reduce overall CAT costs. However, the Commission also recognizes that any Participant cost recovery that results in Industry Members who are not CAT Reporters bearing the costs of CAT would reduce the incentives to limit costs.[1060]

The Commission recognizes that, to the extent either Participants or Industry Members are able to recover the costs of paying CAT fees and Participants are able to satisfy the statutory requirements to do so, that could lessen their incentives to limit the CAT costs they control. As discussed above,[1061] the Commission believes that under the Proposed Amendment, the Participants will continue to have countervailing incentives to contain the costs that are within their control. In addition, the Participants may not be able to or may choose not to recover all of their share of CAT costs through transaction fees.[1062] As a result, Participants who cannot or chose not to adjust their transaction fee schedules will either internalize some of their share of CAT costs or recoup them through fees other than transaction fees.[1063]

Further, several other factors also suggest that Participants will have some incentive to control costs. First, Participants have recently undertaken a series of measures to bring down costs.[1064] Second, Participants' attempts to recover their costs from CAT fees might not match exactly their CAT assessment over time. The recovery could be higher or lower.[1065] The risk that Participants will fail to recover all of the costs of their CAT fees is greater when costs are increasing.[1066]

Finally, the Executed Share Model alters the incentives to inefficiently spend too little. Being responsible for CAT costs (or having to internalize CAT costs they do not pass through) is unlikely to result in Participants having the incentive to under-spend on regulatory tools.[1067] Any such under-spending would not reduce the Participants' self-regulatory duties and could result in inefficiencies in their own regulatory costs.

ii. Structure of the Funding Model

Basing Industry Member fees on share volume rather than message traffic could reduce efficiency relative to the Original Funding Model, but the efficiency benefits of the Original Funding Model would have been dampened by its tiered structure. Further, the Executed Share Model could also have some efficiency improvements over the Original Funding Model. Nonetheless, the Commission recognizes additional inefficiencies related to the burden of orders of different sizes and the rounding of fractional shares, both of which affect the distribution of any Industry Member pass-throughs. Finally, the separation of Historical Assessments from CAT Fees creates clarity to strengthen the incentives from CAT Fees.

The Executed Share Model could create inefficiencies relative to the message-traffic-based Original Funding Model. While the shares executed are related to CAT cost drivers, executed shares could be less related to CAT cost drivers than message traffic. However, the Executed Share Model solves the incentive efficiency of the tiered structure in the Original Funding Model.[1068] Further, the Commission recognizes that, based on the breadth of CAT costs, it is not feasible to calculate the cost burden on CAT of each CAT Reporter,[1069] making it infeasible for any Funding Model to exactly match fees with burdens on CAT.

Indeed, the Executed Share Model could result in Participants or Industry Members paying different fees across transactions despite potential similarities in cost. For example, Participants or Industry Members will be charged ten times the fee for a 1,000 share transaction than for a 100 share transaction. While 1,000 share transactions may, on average, have a higher burden on CAT than a 100 share transaction because such transactions are more likely to involve more messages and more complex lifecycles, the burden of a 1,000 share transaction on CAT versus a 100 share transaction is unlikely to be ten times higher.

One commenter raised other potential inefficiencies related to outsized allocations to transactions for retail investors associated with those retail investors trading low-priced NMS stocks.[1070] The Commission recognizes that such an allocation could discourage brokers from servicing retail investors if they cannot recover all CAT costs from investors and/or that retail investors could be paying for a large portion of CAT costs. This is consistent with the analysis in the CAT NMS Plan Approval Order where the Commission recognized that retail investors were likely to bear costs for CAT.[1071] However, the small magnitude of the per share CAT fees will mitigate the likelihood that brokers will be discouraged from servicing retail investors.[1072]

Unlike the Prospective CAT Fees, the Historical Assessments in the Executed Share Model do not provide much incentive for efficiency because the costs were incurred in the past and future action cannot change them. However, by separating Historical CAT Assessments from CAT Fees, the Executed Share Model could allow Industry Members and Participants to more clearly assess how their own

---

[1057] See supra notes 152–154.

[1058] See supra note 156.

[1059] See supra note 155.

[1060] See FINRA October 2025 Letter, at 11–12, which points out that increasing FINRA membership fees could increase fees for FINRA members that are not CAT Reporters.

[1061] See supra Part III.A.2.

[1062] Some of the equity exchange Participants who already charge transaction access fees at the maximum level allowed but regulation, which prevents them from increasing their transaction fees to efficiently pass through all their CAT fees to their members. See Securities Exchange Act Release No. 96494 (Dec. 14, 2022), 87 FR 80266, tbl.5 (Dec. 29, 2022). While exchanges charge several tiers of fees, they will not be able to raise the fees that already match the fee cap.

[1063] If Participants internalize some of their share of CAT costs, those costs are part of the costs to run their business and they will recoup those costs in ways they recoup other general business costs.

[1064] See supra Part III.A.2 for a discussion of these measures and notes 237 and 238 for examples.

[1065] See supra Part IV.C.2.a.

[1066] See supra Part III.A.2.

[1067] The Participants state that they seek to reduce costs ''without adversely affecting the regulatory goals of the CAT.'' See CAT LLC July 2023 Response Letter, at 22.

[1068] See supra Part IV.C.1.c for further discussion of the inefficiencies of the Original Funding Model.

[1069] See Notice, 90 FR at 44927 (''In light of the many inter-related cost drivers of the CAT (e.g., storage, message traffic, processing), determining the precise cost burden imposed by each individual CAT Reporter on CAT is not feasible.''). See also CAT LLC July 2023 Response Letter, at 34, where the Participants describe that it is difficult to determine the precise cost burden imposed by each individual CAT reporter. They state that increased trading activity impacts message traffic, data processing, storage, and other factors and, thus, correlate with cost burdens and that Industry Member activity is generally for the purpose of transacting.

[1070] See supra notes 312–316.

[1071] See, e.g., CAT NMS Plan Approval Order, 81 FR at 84863, 84881, 84888, and 84893 for examples of statements on investors bearing the costs of CAT.

[1072] See supra Table 9 and related discussion.

actions could affect the Prospective CAT Costs and their CAT Fees to promote improvements to efficiency relative to the Original Funding Model.

### iii. Allocation to Options and Equities

One commenter states that equities market participants will contribute ''far more'' under the Executed Share Model than options markets.[1073] If the Executed Share Model over-allocates fees to equity market transactions relative to options market or OTC equity transactions, it will create inefficiency by artificially inflating equity transaction costs while artificially decreasing options and OTC transaction costs. Because the Original Funding Model did not specify the allocation to options versus equities, the Executed Share Model resolves this uncertainty. However, the Commission has mixed information on whether the Executed Share Model will, indeed, over-allocate fees to the equity markets. Some commenters stated that equity trading volume creates a relatively low burden relative to options activity.[1074] The Commission disagrees with this statement. In November 2025, equities (NMS and OTC) account for approximately 74 percent of the equivalent share volume while options account for approximately 26 percent.[1075] On the other hand, an analysis of the CAT data from the second quarter of 2025 shows that equities account for 14 percent of message traffic while options account for 86 percent. The message traffic in the options market is driven by options market quotes, which are reported by options exchanges and which are not subject to linkage processing and are stored for a shorter duration than other CAT data. If processing and storing CAT messages is a primary cost driver and assuming that option and equity messages are equally burdensome, an allocation aligning fees to costs would assess approximately 14 percent of the fees on Participants and Industry Members in the equities markets, suggesting that the Executed Share Model allocation of approximately 74 percent of the fees over-allocates fees to equities. However, this assumption is likely incorrect.

In fact, equity order linking complexity likely accounts for higher costs than option order linking complexity, suggesting that the higher allocation of CAT fees to equity market Participants and Industry Members could promote efficiency. The linkage processing costs of CAT are approximately 85 percent of the non-CAIS storage costs.[1076] The Commission estimated that roughly 96 percent of CAT Participant message traffic and 75 percent of total options message traffic is comprised of options market maker quotes.[1077] While option market maker quotes account for such a large fraction of message traffic and, thus, immediate storage costs, option market maker quotes involve lower linkage costs than other messages and are stored for a shorter duration. Indeed, the equities market accounted for about 99.5 percent of the number of linkages processed and the number of options linkages processed was about 0.14 percent of the number of options messages reported, reflecting no linkage processing for options market maker quotes.[1078] Additionally, the Commission understands that equities linkages can be more complex, and thus more costly to process, than are options messages. As a result, options trading volume creates a relatively low burden relative to equity activity when it comes to linkage costs. Options trading volume does create a larger burden relative to equity activity in terms of storage costs. But, the 2024 CAT Cost Savings Amendment and the September 2025 Exemptive Order reduced the storage duration of option market maker quotes relative to equities message traffic.[1079]

Together, these reduced the burden of the options market on CAT relative to the burden of the equities market on CAT.

### c. Market Efficiency

The Executed Share Model will exert opposing effects on market efficiency but, overall, will have a minimal effect on market efficiency. The Executed Share Model improves upon the disincentives for market making in the Original Funding Model potentially increasing market efficiency. However, the approach to invoice only CEBB and CEBS could result in fewer Industry Members being charged CAT fees with the charges predominantly on market makers, increasing transaction costs and reducing market efficiency. The magnitude of increased transaction costs from these market maker pass-throughs and any additional pass-throughs or cost recovery is minimal, even when considering the cost increases since 2016. Finally, the Executed Share Model could promote market efficiency by eliminating potential distortions that could have been caused by the Original Funding Model.

The Executed Share Model eliminates the disincentives to provide liquidity associated with the Original Funding Model that could have resulted in market inefficiencies, including removing the potential for distortions near the tier cutoffs.[1080] Instead of paying higher fees with more message traffic, which would discourage liquidity providing activity,[1081] the Executed Share Model charges a fee for each Executed Equivalent Share. Because market making and other liquidity providing activity tends to have a high ratio of message traffic to transactions, the Executed Share Model could be more favorable towards providing liquidity than the Original Funding Model. Promoting liquidity provision promotes market efficiency. However, because the Original Funding Model addressed this disincentive in its tier structure, the Commission cannot be certain that the reduction of this disincentive would have a significant effect on market efficiency.

Even though the process of charging fees to CEBB and CEBS concentrates the CAT fees with market makers, this process is unlikely to harm market efficiency because the CAT fees per

---

[1073] *See* Citadel October 2025 Letter, at 6.

[1074] *See* FINRA April 2023 Letter, at note 23; *see also* Citadel August 2023 Letter, at 4; Citadel October 2025 Letter, at 6 (citing FINRA April 2023 Letter).

[1075] Calculated using the CAT fee billing trade summary from *https://www.catnmsplan.com/billing-trade-summaries.* Option contract volume is multiplied by 100 and OTC volume is divided by 100 to establish rough estimates of equivalent share volume to reported equity transactions.

[1076] *See supra* note 1013 and accompanying text for a discussion of cost drivers. ''Linker'' accounts for 29 percent of CAT costs while non-CAIS storage accounts for 34 percent. Data processing costs are 25 percent.

[1077] CAT data from the second quarter of 2025; *see id.* If processing and storing CAT messages is a primary cost driver, options exchanges' collective 9 percent share of CAT costs, compared to equity exchanges' 12 percent share and FINRA's 12 percent share, may also appear to inefficiently over-allocate the Participants' share of CAT costs to equity exchanges (note that these share calculations are based on executed equivalent share volumes in November 2025 (*see id*); the underling information used for FINRA share in supra Table 8 is from June 2025).

[1078] Based on November 2025 CAT data containing statistics for validations and linkage for files submitted to FINRA CAT, the equities market accounted for 1.84 trillion linkages processed on 3.17 trillion messages reported while the options market accounted for 9.80 billion linkages processed on 7.15 trillion messages reported. Most options market maker quotes have only two events in their CAT Lifecycle (*i.e.,* quote and quote cancelation) and don't require linkage to other CAT events.

[1079] The Participants estimated from the 2024 Cost Savings Amendment a $21 million overall cost

---

savings in 2024 dollars. *See* 2024 Cost Savings Amendment, *supra* note 237, at 103045–46. From the September 2025 Exemptive Order, the cloud hosting savings is expected to be $34–47 million in 2025 dollars. *See* September 2025 Exemptive Order, *supra* note 239.

[1080] *See supra* Part IV.C.1.c.

[1081] *Id.*

share are small. In charging fees to CEBB and CEBS, the fees will be charged to fewer Industry Members than under the Original Funding Model and market makers could be charged a large proportion of those fees.[1082] Most off-exchange trades involve a market maker on one side and many exchange trades do as well. As such, market makers are likely to be either the CEBB or CEBS on many off-exchange trades and will thus be charged on most executed shares. Because market makers do not have customers to whom they can pass through fees, they could seek to recover the cost of paying CAT fees either by charging higher transaction costs (less price improvement/higher effective spreads) or altering their prices on other services.[1083] If they charge higher transaction costs, the higher costs will be borne by investors. However, any increase in transaction costs is unlikely to be greater than the CAT fees, which are many times smaller than current effective half spreads.[1084] This means that market makers could recover costs by increasing effective spreads marginally on average but do not need to increase them on every trade. As CAT fees are predominantly charged to market makers, this is unlikely to significantly reduce liquidity and market efficiency, though to the extent that some CAT costs will likely be borne by investors this could marginally reduce market efficiency.

However, the Proposed Amendment does not change the aggregate amount of CAT fees charged across all Industry Members and Participants,[1085] which is based on the actual costs of building and operating the CAT. It also does not change that investors could bear all those CAT costs. The Proposed Amendment covers the allocation of CAT fees for operating the CAT among Participants and Industry Members, and it prohibits Participants from passing through CAT fees directly.[1086] As explained above, under the Proposed Amendment, Participants may still seek to recover their costs from their members through other cost recovery mechanisms,[1087] and the Proposed

Amendment does not regulate whether Industry Members may pass through their CAT fees to their customers (*i.e.,* investors). Accordingly, investors may still bear the costs of CAT under the Executed Share Model, as they might also have under the Original Funding Model.

The Executed Share Model could change which investors ultimately bear CAT costs.[1088] One commenter suggests that retail investors will bear a disproportionate size of the CAT costs because they tend to trade low-priced NMS stocks.[1089] The Commission recognized in the analysis in the CAT NMS Plan Approval Order that retail investors were likely to bear costs for CAT.[1090] The trading by individuals who trade stock directly is somewhat concentrated, with the top 10,000 individual investors per week accounting for about 75 percent of equity traded share volume.[1091] This concentration in trading activity by individual investors will translate into concentration in which investors will bear more CAT costs, but the costs will still be borne, on average, on a per share traded basis. That per share cost to individual investors is orders of magnitude smaller than other costs of execution and will likely grow at a slower rate than CAT costs.[1092]

Further, the elimination of the tiered structure in the funding model promotes market efficiency by removing the potential distortions around the tier cutoffs. However, the Commission previously concluded that the effect of behavior changes around the tier cutoffs on market efficiency was likely not significant.[1093] As a result, the removal of tiers promotes market efficiency, but this is unlikely to significantly improve market efficiency.

*D. Competition*

Several commenters stated that the Proposed Amendments present a burden on competition.[1094] The

Commission analyzed the impact of the Proposed Amendments on the competition for trading services, broker-dealer services, and regulatory services. The Proposed Amendment could negatively alter the competitive position of a few types of competitors for trading services and broker-dealer services, but whether such changes will render these markets less competitive overall is unlikely. Specifically, the Executed Share Model could alter competitive advantages and disadvantages in the competition for trading services. Further, the Executed Share Model could provide competitive advantages to certain broker-dealer business models over others. However, the magnitude of CAT fees borne by competitors is so small as to be inconsequential to advantages, disadvantages, and the overall level of competition.

1. Baseline

In the CAT NMS Plan Approval Order, the Commission identified certain elements of the Original Funding Model that could have negative implications for competition in trading services, broker-dealer services, and regulatory services.[1095] In addition, the Commission stated ''the uncertainty regarding how the [Operating] Committee allocated the fees used to fund the Central Repository could affect the conclusions on competition.'' [1096]

a. Trading Services

The market for trading services, which is served by exchanges, ATSs, and liquidity providers (internalizers and others), relies on competition to supply investors with execution services at efficient prices. These trading venues, which compete to match traders with counterparties, provide a framework for price negotiation and disseminate trading information. The competitors for trading services compete on a number of dimensions, such as transaction fees and execution quality, and some attempt to attract order flow by paying for that order flow or otherwise rebating.

The market for trading services in options and equities currently consists of 26 national securities exchanges, which are all Plan Participants, and off-exchange trading venues including broker-dealer internalizers, which execute substantial volumes of

---

[1082] *See, e.g.,* Citadel July 2023 Letter, at 2, Citadel August 2023 Letter, at 4; Citadel October 2025 Letter, at 7.

[1083] *See* Citadel October 2025 Letter, at 7.

[1084] *See* Table 9.

[1085] However, the Proposed Amendment could alter incentives to limit CAT costs, which could reduce costs overtime. *See supra* Part IV.C.2.b.

[1086] *See supra* Part III.A.2.

[1087] The Commission recognizes that the particular mechanisms used by participants who seek to recover their costs could have implications for market efficiency (or could have other economic effects), though the magnitude of effects on market efficiency would likely be small. For example, if

Participants met the statutory requirements needed to alter their access fee and/or rebate schedules to recover the costs of CAT fees, these changes could alter price efficiency and incentives for liquidity provision. *See* Tick Size Final Rule, 89 FR at 81759–60.

[1088] *See supra* Part IV.B for a discussion of the factors associated with which investors will bear CAT costs.

[1089] *See supra* note 1044.

[1090] *See supra* note 1071 and accompanying text.

[1091] *See supra* note 992 and accompanying text.

[1092] *See* Table 9 and accompanying discussion.

[1093] *See supra* note 1023 and accompanying text.

[1094] *See, e.g.,* Citadel July 2023 Letter, at 1; Citadel October 2025 Letter, at 7. In addition, commentors stated that the Commission should consider whether the Proposed Amendment ''unfairly favors one group of market participants over another'' or ''picks winners and losers.'' *See*

SIFMA October 2025 Letter, at 2–3; Citadel October 2025 Letter, at 6–7. This analysis of competition considers how the executed share model advantages or disadvantages competitors in addition to whether is alters the competitive landscape.

[1095] *See* CAT NMS Plan Approval Order, 81 FR at 84882–84.

[1096] *See id.* at 84882 n.2800.

transactions in equities, and 39 ATSs, which are not Plan Participants.[1097] Aside from trading venues, exchange market makers provide trading services in the securities market. These firms stand ready to buy and sell a security ''on a regular and continuous basis at publicly quoted prices.'' [1098] Exchange market makers quote both buy and sell prices in a security held in inventory, for their own account, for the business purpose of generating a profit from trading with a spread between the sell and buy prices. Off-exchange market makers also stand ready to buy and sell out of their own inventory, but they do not quote buy and sell prices.[1099]

In the Original Funding Model, the portion of fees allocated to the exchanges, FINRA, and ATSs would have been divided among them according to market share of share volume and the portion allocated to Industry Members would have been divided among them according to message traffic, including message traffic sent to and from an ATS.[1100] The Operating Committee would have allocated fees for the equities market and options market separately based on market share in each market. The Commission concluded that the Original Funding Model could have resulted in a competitive advantage for exchanges over ATSs because message traffic to and from an ATS would have generated fee obligations on the broker-dealer that sponsors the ATS, while exchanges would have incurred almost no message traffic fees.[1101] In addition, the Commission recognized uncertainties associated with the allocation of fees that could have affected competition, such as the level of fees at each tier (though the entities in the smallest activity tier would have paid the lowest fees) and whether off-exchange liquidity providers would have paid fees similar to similarly-sized ATSs and exchanges. Finally, the Commission recognized potentially differential fees across market participants, including lower fees for internalizers, which could have affected competition.[1102]

b. Broker-Dealer Services

For simplification, the Commission presents its analysis as if the competition to provide broker-dealer services encompasses one broad market with multiple segments even though, in terms of competition, it actually may be more realistic to think of it as numerous inter-related markets. There are currently approximately 1,000 broker-dealers that are CAT Reporters.[1103] The competition to provide broker-dealer services covers many different markets for a variety of services, including, but not limited to, managing orders for customers and routing them to various trading venues, holding customer funds and securities, handling clearance and settlement of trades, intermediating between customers and carrying/clearing brokers, dealing in government bonds, private placements of securities, and effecting transactions in mutual funds that involve transferring funds directly to the issuer. Some broker-dealers may specialize in just one narrowly defined service, while other broker-dealers may offer diversified services across many different lines of businesses. As such, the competitive dynamics within each of these specific lines of business for broker-dealers is different, depending on the number of broker-dealers that operate in the given segment and the market share that the broker-dealers occupy.

The market for broker-dealer services relies on competition among broker-dealers to provide the services listed above to their customers at efficient levels of quality and quantity. The broker-dealer industry is competitive, with most business concentrated among a small set of large broker-dealers and thousands of small broker-dealers competing for niche or regional segments of the market. Broker-dealers often compete among each other through commission rates, service quality, and service variety and some bundle their services. At present, some broker-dealers specializing in individual investors charge zero commissions and instead cover costs by receiving payment for order flow or charging more for other services. To limit costs and make business more viable, small broker-dealers often contract with larger broker-dealers or service bureaus to handle certain functions, such as clearing and execution, or to update their technology.[1104] Large broker-dealers typically enjoy economies of

scale over small broker-dealers and compete with each other to service the smaller broker-dealers, who are both their competitors and their customers.

The CAT NMS Plan Approval Order described the Original Funding Model as an explicit source of financial obligation for broker-dealers and therefore an important feature to evaluate when considering potential differential effects of the Plan on competition in the market for broker-dealer services.[1105] The Commission understood that the Original Funding Model should have resulted in the smallest broker-dealers paying the lowest fees,[1106] but the Plan did not outline how the magnitudes of fees would have differed across the tiers or whether the smallest broker-dealers would have paid the highest per-message fees. The Commission concluded that, regardless of the differential effects of the CAT NMS Plan Funding Model on small versus large broker-dealers, the CAT NMS Plan Funding Model, in aggregate, would have likely not reduced competition in the overall market for broker-dealer services.[1107]

c. Regulatory Services

In the CAT NMS Plan Approval Order, the Commission considered the effect of the CAT NMS Plan on competition to provide regulatory services.[1108] The 26 SROs compete to provide regulatory services in at least two ways. First, because SROs are responsible for regulating their members and the trading within venues they operate, their regulatory oversight is bundled with the operations of their venues. Consequently, for a broker-dealer, selecting a trading venue also involves being subject to regulatory oversight of the SRO that operates that venue. Second, SROs can provide regulatory services for other SROs through the use of RSAs.[1109] In addition, some regulatory activity is coordinated among SROs through multiparty 17d–2 agreements.[1110] FINRA is the primary provider of contracted regulatory services. Any new competitors for regulatory services would face significant barriers to entry in building up the necessary expertise and technical capabilities.[1111]

[1097] *See* Securities Exchange Act Release No. 61358, 75 FR 3594 (Nov. 23, 2016) at 3598–3560, (for a discussion of the types of trading centers). The number of ATSs includes 34 NMS ATSs from *https://www.sec.gov/divisions/marketreg/form-ats-n-filings.htm* and 5 OTC ATSs.

[1098] *See* SEC, *Market Maker, available at http://www.sec.gov/answers/mktmaker.htm.*

[1099] *See* Securities Exchange Act Release No. 96495 (Dec. 14, 2022), 88 FR, 128, 181 (Jan. 3, 2023).

[1100] *See* CAT NMS Plan Approval Order, 81 FR at 84793.

[1101] *See id.* at 84883.

[1102] *See id.* at 84879.

[1103] *See* Notice, 90 FR at 44936.

[1104] *See* Securities Exchange Act Release No. 63241 (Nov. 3, 2010), 75 FR 69791, 69822 (Nov. 15, 2010) (Risk Management Controls for Brokers or Dealers with Market Access).

[1105] *See* CAT NMS Plan Approval Order, 81 FR at 84885.

[1106] *See id.* at 84884.

[1107] *See id.* at 84887.

[1108] *See id.* at 84887.

[1109] *See supra* note 364 and accompanying text.

[1110] *See* 17 CFR 240.17d–2.

[1111] The Commission stated in the CAT NMS Plan Approval Order that ''CAT may reduce barriers to entry for this market'' while acknowledging other

RSAs are contracts that would not be renegotiated as often as CAT fees would vary, which limits the precision to which FINRA can increase the charges on these agreements as a mechanism to pass through its CAT fees. Since the start of the CAT NMS Plan implementation, the Commission has not observed a change in the competition for regulatory services.

2. Analysis of the Proposed Amendment

a. Trading Services

The Participants state that, ''the [Executed Share Model] would not impose an inappropriate burden on competition,'' adding that transaction-based models for fee recovery are already in place.[1112] The Commission agrees that transaction-based models do offer some efficiency benefits over the Original Funding Model,[1113] but whether the Proposed Amendment provides any marginal competitive advantages and disadvantages is unclear. The effects on these competitors might not affect the overall level of competition because the fees are expected to be relatively small.

The Proposed Amendment may provide a competitive advantage for exchanges over off-exchange trading venues, but this advantage may not be large relative to the level of competition and smaller than it would have been under the Original Funding Model. In particular, the Executed Share Model will allocate higher CAT fee allocations to Industry Members, which includes off-exchange trading venues such as ATSs and internalizers, relative to Participants. For example, if FINRA is able to recover its share of CAT costs, Industry Members could bear 79 percent of CAT costs unless they pass their costs on to their customers.[1114] If other Participants likewise are able to recover their CAT costs, Industry Members could bear 100 percent of CAT costs minus what they pass on to customers. The effect of the resulting CAT costs borne by Industry Members on competition would depend on the form of cost recovery.[1115] Those competitors

that resort to increasing the fees to transact will be at a disadvantage in attracting order flow relative to those who can recover costs another way, because they will be a relatively more expensive place to trade In fact, if the exchanges are able to offset their CAT fees in ways other than increasing transaction fees on exchanges while ATSs and others cannot, the cost to transact on ATSs or directly through broker-dealers will appear to increase more in response to CAT fee allocations, providing exchanges with a competitive advantage.[1116] This is particularly probable for exchanges that do not rely solely on revenues from transaction fees. However, ATSs might be better off relative to exchanges under the Executed Share Model than they would have been under the Original Share Model, which would have also resulted in a competitive disadvantage for ATSs.[1117]

The Executed Share Model could increase the costs of internalization relative to agency order matching (or riskless principal), creating a competitive disadvantage for the internalization model, reversing the competitive advantage internalizers would have had under the Original Funding Model.[1118] When an off-exchange market maker internalizes a trade, it will be charged as both the CEBS and CEBB for the trade and will have a single customer to which to pass-through CAT fees for one side of the trade.- On the other side of the trade, the market maker engages in proprietary trading. Off-exchange venues that engage in order matching have customers on both sides. Because the CAT fees charged on their proprietary trading cannot be passed through,[1119] off-exchange market makers may either absorb the CAT assessments on their proprietary trading or recover them in ways such as by reducing payment for order flow or price improvement.[1120] Any of these alternatives could hurt internalizers competitively and create the incentive to absorb at least some of

their assessments,[1121] thus reducing their profit margins.

More generally, any market makers, whether on exchange or not, will be charged fees for their proprietary trading, and this could create competitive advantages among market makers in certain situations. Unlike off-exchange market makers, on-exchange market makers in equities trade against incoming orders only by being the most competitive liquidity supplier rather than through payment for order flow arrangements. As a result, the only way for on-exchange market makers to recover their costs of paying CAT Fees is to marginally widen their spreads. The Commission recognizes that this likely would result in on-exchange market makers in equities being at a competitive disadvantage to off-exchange market makers in having to absorb the fees or increase their spreads because they do not have other arrangements, such as payment for order flow, that could facilitate other ways of recovering the cost of allocated CAT fees. Because other liquidity providers who post limit orders and quotes to trade would face the same cost, the displayed quotations on exchanges could appear to be less competitive overall but would likely increase marginally—enough to cover CAT assessments.[1122]

When combined, the effects of each of these likely offset such that the actual advantages and disadvantages are unclear and likely to be so small as to be undetectable. For example, the marginal increase in spreads could also help to offset any disadvantage to internalization over riskless-principal because marginally wider spreads could help internalizers avoid reductions in price improvement and payment for order flow. Likewise, a marginal increase in spreads could make exchanges appear less competitive relative to ATSs, offsetting the advantage of exchanges over ATSs.\ discussed above.

In options, however, the Executed Share Model could result in exchange members who bring an order to an exchange experiencing a competitive advantage in price improvement auctions. In particular, because having customers allows them to pass-through their fees to those customers consistent

barriers to entry. *See* CAT NMS Plan Approval Order, 81 FR at 84887 n. 2849 (describing the barriers to entry addressed by CAT). *See also* Securities Exchange Act Release No. 95388 (July 29, 2022), 87 FR 49930, 49961 (Aug. 12, 2022) (describing the barriers to entry of potential new national securities associations more generally).

[1112] *See* Notice, 90 FR at 44937.

[1113] *See supra* Part IV.C.2.b and IV.C.2.c for discussions of efficiency gains associated with basing CAT fees on shares executed rather than message traffic.

[1114] *See* supra note 983 and associated text.

[1115] Commenters stated that the Commission should consider the economic effects of this potential distribution. *See, e.g.,* Citadel July 2023

Letter, at 16, 21, 22, AmFree Letter, at 6; SIFMA October 2025 Letter, at 3; Citadel October 2025 Letter, at 9; Citadel January 2026 Letter, at 3, 5.

[1116] One commenter stated that a prior version of the executed share model would result in off-exchange transactions being assessed higher fees than on-exchange transactions. *See* Citadel July 2023 Letter, at 21.

[1117] *See supra* note 1101 and accompanying text.

[1118] *See supra* note 1102 and accompanying text.

[1119] See supra Part IV.B for a discussion of potential CAT.

[1120] *See* CAT LLC July 2023 Response Letter, at 9–10 and CAT LLC February 2026 Response Letter, at 1–2.

[1121] However, the Participants state that the executing brokers may determine to pass their CAT fees through to their own customers and thus may not absorb the CAT fees. *See* CAT LLC July 2023 Response Letter, at 8–9.

[1122] *See supra* Part IV.C.2.c. for a discussion of how market makers may charge higher transaction costs and the magnitude of a potential increase in transaction costs.

with legal limitations on the fees that they can charge,[1123] options exchange members with customers can bid more competitively in the auctions than can exchange members who do not have customers.

However, the magnitude of changes in any competitive advantages or disadvantages is unlikely to significantly affect order flow because fee differences between competing venues are only one of many factors (such as availability of non-displayed order types and price impact characteristics of transactions on different venues) that broker-dealers consider when choosing how to route their order flow. Further, the Executed Share Model levels the playing field between exchanges and ATSs relative to the Original Funding Model.[1124] In particular, the assessments and any pass-throughs paid by broker-dealers or investors of an execution on an ATS could be similar to those of an execution on an exchange, depending on how (and whether) ATSs and exchanges choose to pass-through their fees. ATSs can choose to pass through their fees directly (to the extent permitted by rules on broker-dealer fees) or recover them in other ways, whereas the Proposed Amendment prohibits the exchanges from passing through their fees directly, though they may seek to recover their costs another way. Further, the magnitude of the CAT fees are small relative to other transaction costs.[1125]

b. Broker-Dealer Services

The Executed Share Model alleviates concerns with the Original Funding Model about the allocation of fees across small and large broker-dealers. In particular, by charging CEBBs and CEBSs based on Executed Equivalent Shares, small broker-dealers are less likely to face CAT fees that are outsized relative to their revenue,[1126] whether they act as executing brokers or are charged pass-throughs by executing brokers. This could reduce barriers to entry.

The efficiency gains in passing through fees from the Executed Share Model will not be evenly distributed across broker-dealer competitive strategies. In particular, where competition has driven commissions to zero, the Executed Share Model Fees are more easily passed through to customers of broker-dealers who offer a wider variety of services than for broker-dealers who do not. Broker-dealers offering a wide variety of services could slightly increase costs of a number of these services (or stop providing services that are low margin), as permitted, to recover their costs of CAT fees. By contrast, broker-dealers that offer fewer additional services have fewer ways to recover their CAT costs because they have fewer ways to distribute their increased operating costs. And broker-dealers offering fewer services are typically charging zero commissions for competitive reasons and they may not choose to or not be able to charge commissions to cover CAT costs. These latter broker-dealers could be at a competitive disadvantage if they have no other option but to absorb such fees or accept reduced payment for order flow as a form of pass-through from executing brokers and then have limited ways to recoup such fees through other sources of revenue. Because more established broker-dealers are more likely to be the ones offering a wider variety of services, this effect could increase barriers to entry.

Further, if FINRA ultimately recovers the costs of paying CAT Fees by raising its membership fees, the majority of broker-dealers bearing CAT costs will not be CAT Reporters.[1127] Because these broker-dealers are not CAT reporters, they likely do not compete against CAT reporters in the facilitation of options and equities trading. However, they may compete against CAT reporters in providing other services. If they do, such a cost recovery could put non-CAT reporters at a competitive disadvantage relative to CAT reporters or non-FINRA members.

One commenter stated that the top 10 (20) Industry Members would be allocated 50 percent (70 percent) of the fees under the Executed Share Model, "unduly burdening competition." [1128] The Commission has considered this concentration and believes that several factors alleviate this concern. In particular, many of these Industry Members will likely pass through much of their fees to client broker-dealers to the extent permitted or may also recover the costs of their CAT assessments in other ways.[1129] In addition, the Industry Members that will be directly charged the most by CAT LLC under the Proposed Amendments likely do not offer all of the same services as broker-dealers who are charged the least or not charged CAT fees by CAT LLC directly at all under the Proposed Amendments. In particular, those charged the least are unlikely to offer the electronic liquidity provision services that drive the CAT costs of those charged the most.[1130] Where they do offer the same services, those charged the most could suffer a competitive disadvantage relative to those charged the least. This disadvantage would matter most in segments of the market where they are not well established if they chose to significantly raise prices in that market segment to recover CAT costs.

c. Regulatory Services

The Commission recognizes that if FINRA were to pass through its CAT fees by increasing its fees for RSAs over time,[1131] FINRA could be less competitive in providing regulatory services.[1132] This could increase the chances either of exchanges conducting more of their own regulatory services or of another SRO attempting to compete with FINRA for RSAs. Indeed, such potential competitors would not have the burden of having to cover CAT fees for off-exchange and OTC volume. However, FINRA will likely not attempt to cover all of their share of CAT costs by increasing what they charge for RSAs, because exchanges may be unwilling either to renegotiate RSAs each time CAT fees change or for the purpose of covering FINRA's CAT fees.

---

[1123] *See supra* note 986.

[1124] *See supra* note 1102 and accompanying text for a discussion of the effect of the Original Funding Model on ATSs.

[1125] *See supra* Part IV.B., Table 9.

[1126] Under the Original Funding Model, broker-dealers in the lowest fee tier could have been charged CAT fees that were large relative to their revenue from trading. *See supra* Part IV.C.1.a.

[1127] *See* FINRA October 2025 Letter, which points out that increasing FINRA membership fees could increase fees for FINRA members that are not CAT Reporters.

[1128] *See* Citadel July 2023 Letter, at 19, Citadel 2025 Letter, at 7, and Citadel 2026 Letter, at 3.

[1129] *See supra* note 987 and accompanying text.

[1130] Broker dealers that compete as electronic liquidity providers in high-volume securities are likely to have the highest executed share volume and thus pay the highest fees. However, these broker-dealers compete against each other in providing this service and thus are likely to be similarly burdened by fees under the amendment. Broker-dealers that pay the lowest or no fees are unlikely to compete in this activity because such activity entails high fixed costs in specialized technology and thus are unlikely to gain a competitive advantage from the amendment.

[1131] Notwithstanding FINRA's commitment to not establish any CAT recovery fees during the temporary funding model (*see* FINRA January 2026 Letter), the Commission recognizes that FINRA's non-profit status may necessitate the increase of other regulatory fees charged by FINRA. The Notice specifically mentions FINRA raising RSA fees to fund its CAT costs. *See* Notice, 90 FR at 44932.

[1132] The Participants state, "[b]y treating each Participant the same, the CAT fees would not become a competitive issue by and among the Participants." *See* Notice, 90 FR at 44931; *see also id.* at 44938, 44943 (similar statements). This conclusion does not seem to address competition to provide regulatory services specifically. However, comments about differences between the role of FINRA and the other Participants warrant considering this competition given FINRA's position in providing RSAs. *See, e.g.,* AmFree Letter, at 6; FINRA April 2023 Letter, at 2–5.

[1133] Further, even with access to CAT, the barriers to entry in competing for RSAs could limit new competitors.

### E. Capital Formation

In the CAT NMS Plan Approval Order, the Commission stated that the Original Funding Model for CAT was not wholly certain and, thus, stated the ''view that there is uncertainty concerning the extent to which investors will bear Plan costs and consequently to what extent Plan costs could affect investors' allocation of capital.'' [1134] The Participants state that they believe the Proposed Amendment would have a positive effect on capital formation due to improvements in investor confidence. [1135] This positive effect is driven by the existing enhancements to surveillance provided by CAT because the Proposed Amendment is designed to maintain the CAT as a going concern financially.

The Commission recognizes that the Proposed Amendment may have negative effects on capital formation if the CAT fees ultimately borne by investors are large enough to affect investors' allocation of capital or if capital constraints of small or mid-sized

broker-dealers significantly hinder innovating to find more efficient ways to service investors. [1136] However, as discussed at length above, the additional costs borne by investors are likely to be and remain small relative to other transaction costs. [1137] While the Executed Share Model might change which investors ultimately bear CAT costs, the Executed Share Model might not change the total costs borne by investors relative to the Original Funding Model as the Commission does not expect the Executed Share Model to increase the magnitude of CAT costs. [1138]

### V. Conclusion

For the reasons discussed, the Commission, pursuant to Section 11A of the Exchange Act, [1139] and Rule 608(b)(2) [1140] thereunder, is approving the Proposed Amendment, as modified by the Commission. Section 11A of the Exchange Act authorizes the Commission, by rule or order, to authorize or require the self-regulatory

organizations to act jointly with respect to matters as to which they share authority under the Exchange Act in planning, developing, operating, or regulating a facility of the national market system. [1141] Rule 608 of Regulation NMS authorizes two or more SROs, acting jointly, to file with the Commission proposed amendments to an effective NMS plan, [1142] and further provides that the Commission shall approve an amendment to an effective NMS plan if it finds that the amendment is necessary or appropriate in the public interest, for the protection of investors and the maintenance of fair and orderly markets, to remove impediments to, and perfect the mechanisms of, a national market system, or otherwise in furtherance of the purposes of the Exchange Act. [1143]

For the reasons set forth above, the Commission finds that the Proposed Amendment, as modified by the Commission, meets the required standard.

*It is therefore ordered,* pursuant to Section 11A of the Exchange Act, [1144] and Rule 608(b)(2) [1145] thereunder, that the Proposed Amendment (File No. 4–698) be, and hereby is, approved.

By the Commission.

**Sherry R. Haywood,**

*Assistant Secretary.*

[FR Doc. 2026–05350 Filed 3–18–26; 8:45 am]

**BILLING CODE 8011–01–P**

---

[1133] Indeed, because RSA agreements are voluntary, FINRA stated that RSA fees would not be ''a reliable source of sustainable CAT funding.'' FINRA October 2025 Letter, at 12. FINRA charges other fees that they could increase, as necessary. For example, FINRA charges Membership Fees and Trading Activity Fees. Raising these other fees would result in inefficiencies, such as would occur if FINRA members who are not CAT Reporters bear CAT costs. *See supra* Part IV.C.2.a & b.i.

[1134] *See* CAT NMS Plan Approval Order, 81 FR at 84893.

[1135] *See* Notice, 90 FR at 44937.

[1136] *See* Citadel October 2025 Letter, at 7 (stating that the amounts used to pay for the CAT could otherwise be deployed to benefit investors, issuers, and the markets). However, the Notice, 90 FR at 44928 discusses that ''CAT fees to not raise new and different issues for CAT Executing Brokers with respect to net capital requirements than other transaction-based fees charged to executing brokers.''

[1137] *See* Part IV.B. for an analysis of the potential magnitude of fees under the Executed Share Model.

[1138] As discussed above, *see supra* Part IV.C.2.b, the Commission does not expect the Executed Share Model to have a significant effect on the incentives to control or reduce costs as compared to the Original Funding Model.

[1139] 15 U.S.C. 78k–1.

[1140] 17 CFR 242.608(b)(2).

[1141] *See* 15 U.S.C. 78k–1(a)(3)(B).

[1142] *See* 17 CFR 242.608.

[1143] *See* 17 CFR 242.608(b)(2).

[1144] 15 U.S.C. 78k–1.

[1145] 17 CFR 242.608(b)(2).

## CERTIFICATE OF SERVICE

I certify that on May 28, 2026, the foregoing Appendix was electronically filed with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 28, 2026

*/s/ J. Michael Connolly*

*Counsel of Record for Petitioner American Securities Association*

Respectfully submitted,

*/s/ Noel J. Francisco*

*Counsel of Record for Petitioner Citadel Securities LLC*