No. 26-10936

# In the United States Court of Appeals for the Eleventh Circuit

———————

AMERICAN SECURITIES ASSOCIATION and CITADEL SECURITIES LLC,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

———————

On Petition for Review of an Order of
the Securities and Exchange Commission
Release No. 34-105003; File No. 4-698

———————

**BRIEF OF *AMICUS CURIAE* AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE IN SUPPORT OF PETITIONERS**

———————

William P. Barr
Jason S. Miyares
Cody L. Reaves*
Brooke Jarrett
TORRIDON LAW PLLC
801 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Tel: (202) 249-6900
creaves@torridonlaw.com
*\*Counsel of Record*

*Counsel for Amicus Curiae*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, *amicus* provides this Certificate of Interested Persons and Corporate Disclosure Statement. To the best of *amicus*'s knowledge, the following persons and entities may have an interest in the outcome of this case:

1. 24X National Exchange LLC, member of Intervenor Consolidated Audit Trail, LLC.

2. American Free Enterprise Chamber of Commerce, Amicus.

3. American Securities Association, Petitioner.

4. ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

5. Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market, LLC; Nasdaq GEMX, LLC; Nasdaq ISE, LLC; Nasdaq MRX, LLC; Nasdaq PHLX, LLC; and Nasdaq Texas, LLC.

6. Barr, William P., Torridon Law PLLC, counsel for amicus American Free Enterprise Chamber of Commerce.

7. Berman, Ari M., Pillsbury Winthrop Shaw Pittman LLP, counsel for Intervenors New York Stock Exchange LLC;, NYSE American LLC; NYSED Arca, Inc.; NYSE National, Inc.; and NYSE Texas, Inc.

C-1 of 8

8.  Borse Dubai Limited, owner of 10% or greater interest in Nasdaq, Inc.

9.  BOX Exchange LLC, member and participant of Consolidated Audit Trail, LLC.

10. Boyle, Gregory, Jenner & Block LLC, counsel for Intervenor Consolidated Audit Trail, LLC.

11. Cboe BYX Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

12. Cboe BZX Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

13. Cboe C2 Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

14. Cboe EDGA Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

15. Cboe EDGX Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

16. Cboe Exchange, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

17. Cboe Global Markets, Inc. (BATS: CBOE), indirect owner of 10% or greater interest in Intervenor Consolidated Audit Trail, LLC, and direct or indirect parent company of Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

18. Citadel Securities GP LLC, parent company of Petitioner Citadel Securities LLC.

19. Citadel Securities LLC, Petitioner.

20. Connolly, J. Michael, Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

21. Consolidated Audit Trail, LLC, Intervenor.

22. Consovoy McCarthy PLLC, counsel for Petitioner American Securities Association.

23. Deutsch, Elizabeth, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

24. Dinkle, Christopher S., Jones Day, counsel for Petitioner Citadel Securities LLC.

25. Financial Industry Regulatory Authority, Inc., member and participant of Intervenor Consolidated Audit Trail, LLC.

26. Francisco, Noel J., Jones Day, counsel for Petitioner Citadel Securities LLC.

27. Gershengorn, Ian Heath, Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

28. Greenwalt III, Paul E., ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

29. Hardin, Tracey A., counsel for Respondent United States Securities and Exchange Commission.

30. Heckendorn, J. Maxwell, ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe C2 Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; and Cboe Exchange, Inc.

31. Intercontinental Exchange, Inc. (NYSE: ICE), indirect parent of NYSE Intervenors.

32. International Securities Exchange Holdings, Inc., sole LLC member of Intervenors Nasdaq GEMX LLC, Nasdaq ISE LLC, and Nasdaq MRX LLC.

33. Investor AB (Nasdaq Stockholm: INVE B), owner of 10% or greater interest in Nasdaq, Inc.

34. Investors' Exchange, LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

35. Jarrett, Brooke, Torridon Law PLLC, counsel for amicus American Free Enterprise Chamber of Commerce.

36. Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

37. Jones Day, counsel for Petitioner Citadel Securities LLC.

38. Kastenberg, Stephen J., Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

39. Lantieri III, Paul, Ballard Spahr LLP, counsel for Intervenors The Nasdaq Stock Market LLC, Nasdaq BX, Inc., Nasdaq GEMX, LLC, Nasdaq ISE, LLC, Nasdaq MRX, LLC, and Nasdaq PHLX LLC.

40. Long-Term Stock Exchange, Inc., member and participant of Intervenor Consolidated Audit Trail, LLC.

41. Lucas, Brinton, Jones Day, counsel for Petitioner Citadel Securities LLC.

42. MacLean, Matthew J., Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

43.  Madigan, Sarah M., Pillsbury Winthrop Shaw Pittman LLP, counsel for Intervenors New York Stock Exchange LLC;, NYSE American LLC; NYSED Arca, Inc.; NYSE National, Inc.; and NYSE Texas, Inc.

44.  Marshall, Jonathan J., Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC.

45.  Matro, Daniel E., counsel for Respondent United States Securities and Exchange Commission.

46.  McGranahan, J. Russell, counsel for Respondent United States Securities and Exchange Commission.

47.  MEMX, LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

48.  Miami International Holdings, Inc. (NYSE: MIAX), indirect owner of 10% or more of interest in Intervenor Consolidated Audit Trail, LLC, and indirect parent company of Miami International Securities Exchange LLC; MIAX Emerald, LLC; MIAX PEARL, LLC; and MIAX Sapphire, LLC

49.  Miami International Securities Exchange LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

50.  MIAX Emerald, LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

51.  MIAX Pearl, LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

52.  MIAX Sapphire, LLC, member and participant of Intervenor Consolidated Audit Trail, LLC.

53.  Miyares, Jason S., Torridon Law PLLC, counsel for amicus American Free Enterprise Chamber of Commerce.

54. Molzberger, Michael, ArentFox Schiff LLP, counsel for Intervenors Cboe BYX Exchange, Inc., Cboe BZX Exchange, Inc., Cboe EDGA Exchange, Inc., Cboe EDGX Exchange, Inc., Cboe C2 Exchange, Inc., and Cboe Exchange, Inc.

55. Montgomery, Sophia W., Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC

56. Nasdaq GEMX, LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

57. Nasdaq, Inc. (Nasdaq: NDAQ), sole owner of LLC interest in The Nasdaq Stock Market LLC and Nasdaq PHLX LLC and parent company of Nasdaq BX, Inc.

58. Nasdaq ISE, LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

59. Nasdaq MRX, LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

60. Nasdaq PHLX LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

61. Nasdaq Texas, LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

62. New York Stock Exchange LLC, Intervenor and member and participant of Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

63. NYSE American LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

64. NYSE Arca, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

65.  NYSE National, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

66.  NYSE Texas, Inc., Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

67.  Oliwenstein, David, Pillsbury Winthrop Shaw Pittman LLP, counsel for Intervenors New York Stock Exchange LLC;, NYSE American LLC; NYSED Arca, Inc.; NYSE National, Inc.; and NYSE Texas, Inc.

68.  Phillips, David, Jones Day, counsel for Petitioner Citadel Securities LLC.

69.  Pillsbury Winthrop Shaw Pittman LLP, counsel for NYSE Intervenors.

70.  Rabbitt, Brian C., Jones Day, counsel for Petitioner Citadel Securities LLC.

71.  Reaves, Cody L., Torridon Law PLLC, counsel for amicus American Free Enterprise Chamber of Commerce.

72.  Templin, Hannah, Jones Day, counsel for Petitioner Citadel Securities LLC

73.  Torridon Law PLLC, counsel for Amicus American Free Enterprise Chamber of Commerce.

74.  The Nasdaq Stock Market LLC, Intervenor and member and participant of Intervenor Consolidated Audit Trail, LLC.

75.  The Vanguard Group, Inc., owner of 10% or greater interest in Nasdaq, Inc.

76.  United States Securities and Exchange Commission, Respondent.

77.   Warnke, Anne S., Jenner & Block LLP, counsel for Intervenor Consolidated Audit Trail, LLC

To the best of *amicus*'s knowledge, no other persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this case or appeal.

The undersigned counsel further certifies that American Free Enterprise Chamber of Commerce ("AmFree") is a chapter 501(c)(6) organization that represents hard-working entrepreneurs and businesses across all sectors.  AmFree's members are vitally interested in the preservation of free markets, innovation, and the continued viability of our republic.  Counsel further certifies that no parent corporation, and no publicly held corporation, has a 10% or greater ownership interest in AmFree.

/s/ *Cody L. Reaves*
Cody L. Reaves

C-8 of 8

# TABLE OF CONTENTS

INTEREST AND IDENTITY OF *AMICUS CURIAE* ............................... 1

STATEMENT OF THE ISSUES.............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ...................................................................................... 4

I.    The SEC Lacks Statutory Authority to Adopt the Order................ 4

    A.    There Is No Statutory Authorization for the CAT. ................ 4

    B.    Under the Major Questions Doctrine, the Order Must Be Vacated. ................................................................................ 9

II.    The Order Must Be Struck Down Because It Violates the Administrative Procedure Act. ..................................................... 15

    A.    Because FINRA Is Unconstitutional, the Order Is Contrary to Law and Violates the APA. ............................... 17

        1.    FINRA Wields Substantial Executive Power and Therefore Must Be Subject to Presidential Control Through Appointment and Removal. .......................... 18

        2.    FINRA Is Unconstitutional Under the Private Nondelegation Doctrine. .............................................. 24

        3.    Because FINRA Is Unconstitutional, The Order Must Be Vacated. ....................................................... 27

    B.    The SEC Acted Arbitrarily and Capriciously In Failing To Adequately Consider FINRA's Constitutionally Suspect Status.................................................................... 28

CONCLUSION .................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Fair Bd. Recruitment v. SEC,*
  125 F.4th 159 (5th Cir. 2024) ........................................................5

*Alpine Secs. Corp. v. FINRA,*
  No. 23-cv-1506 (D.D.C. Apr. 23, 2026) ..........................................26

*Alpine Securities Corp. v. FINRA,*
  121 F.4th 1314 (D.C. Cir. 2024), *cert. denied,* 145 S. Ct.
  2751 (2025).............................................................. 24, 25, 26, 31

*Am. Sec. Ass'n v. SEC,*
  147 F. 4th 1264 (11th Cir. 2025) .....................................................2

*Ass'n of Am. R.R. v. Dep't of Transp.,*
  721 F.3d 666 (D.C. Cir. 2013) .......................................................24

*Bell Atl. Tel. Cos. v. FCC,*
  24 F.3d 1441 (D.C. Cir. 1994) .........................................................8

*Biden v. Nebraska,*
  600 U.S. 477 (2023).................................................................. 9, 10

*Black v. SEC,*
  No. 23-cv-709 (W.D.N.C. Mar. 24, 2026) .........................................28

*Boustead Secs., LLC v. FINRA,*
  No. 26-cv-360 (D. Del. Apr. 1, 2026).............................................28

*Buckley v. Valeo,*
  424 U.S. 1 (1976).......................................................................20

*C.f. Collins v. Yellen,*
  594 U.S. 220 (2021)....................................................................27

*Chamber of Com. of U.S. v. SEC,*
  412 F.3d 133 (D.C. Cir. 2005) .......................................................32

ii

*City of Arlington v. FCC,*
  569 U.S. 290 (2013)......................................................................4

*FEC v. Cruz,*
  596 U.S. 289 (2022)......................................................................4

*Freytag v. Commissioner of Internal Revenue,*
  501 U.S. 868 (1991)....................................................................20

*Genuine Parts Co. v. EPA,*
  890 F.3d 304 (D.C. Cir. 2018) ....................................................31

*Horsehead Res. Dev. Co. v. Browner,*
  16 F.3d 1246 (D.C. Cir. 1994) ....................................................31

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935)....................................................................22

*Learning Res., Inc. v. Trump,*
  146 S. Ct. 628 (2026).......................................................... 3, 14, 15

*Lucia v. SEC,*
  585 U.S. 237 (2018)............................................................ 18, 19, 20

*McDonnell v. United States,*
  579 U.S. 550 (2016)....................................................................13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)......................................................................30

*Myers v. United States,*
  272 U.S. 52 (1926)................................................................ 21, 22

*Nasdaq Stock Mkt. LLC v. SEC,*
  38 F.4th 1126 (D.C. Cir. 2022).....................................................5

*Nat. Res. Def. Council v. EPA,*
  755 F.3d 1010 (D.C. Cir. 2014) ...................................................30

*Nat'l Cable Television Ass'n, Inc. v. United States,*
  415 U.S. 336 (1974).......................................................................8

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,*
595 U.S. 109 (2022)..................................................................13

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982)..................................................................19

*Oklahoma v. United States,*
163 F.4th 249 (6th Cir. 2025) ...............................................31

*Oklahoma v. United States,*
163 F.4th 294 (6th Cir. 2025) ...............................................24

*Protect Our Communities Found. v. LaCounte,*
939 F.3d 1029 (9th Cir. 2019)................................................28

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020)........................................... 17, 21, 22, 29

*Standard Inv. Chartered, Inc. v. NASD,*
637 F.3d 112 (2d Cir. 2011) ...................................................21

*Trump v. Slaughter,*
No. 25-332 (Sept. 22, 2025)....................................................22

*Trump v. Wilcox,*
145 S. Ct. 1415 (2025)............................................................29

*Utility Air Regulatory Group v. EPA,*
573 U.S. 302 (2014)..................................................................10

*West Virginia v. EPA,*
597 U.S. 697 (2022)................................................... 3, 9, 14

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001)..................................................................15

**Rules and Statutes**

5 U.S.C. § 706(2)(A)..................................................................28

15 U.S.C. § 78ee(a) .....................................................................8

iv

15 U.S.C. § 78f(b) ............................................................................ 7

15 U.S.C. § 78k-1(a)(1)(C)(i)–(iv) ................................................. 5

15 U.S.C. § 78k-1(a)(2) ............................................................. 5, 15

15 U.S.C. § 78k-1(a)(3)(B) ....................................................... 6, 15

15 U.S.C. § 78o-3(b)(2) .......................................................... 19, 21

15 U.S.C. § 78o(a)(1) ..................................................................... 21

15 U.S.C. § 78o(b)(1) .................................................................... 21

15 U.S.C. § 78q(a)(1) ..................................................................... 12

15 U.S.C. § 78s(h)(4) ..................................................................... 23

FINRA Rule 8210(a) ...................................................................... 19

FINRA Rules 9110–9291 ............................................................... 20

FINRA Rule 9211 ..................................................................... 19, 20

FINRA Rule 9216(a)(1) .................................................................. 20

**Other Authorities**

17 C.F.R. § 240.17a-25 .................................................................. 12

75 Fed. Reg. 32556 (June 8, 2010) ......................................... 6, 7, 12

77 Fed. Reg. 45722 (Aug. 1, 2012) ............................................. 7, 27

81 Fed. Reg. 30614 (May 17, 2016) ................................................ 6

81 Fed. Reg. 84801 (Nov. 23, 2016) ................................... 4, 7, 9, 16

88 Fed. Reg. 62628 (Sept. 12, 2023) ...................................... 1, 3, 9

88 Fed. Reg. 77128 (Nov. 8, 2023) .................................................. 7

90 Fed. Reg. 44910 (Sept. 17, 2025) ....................................... 16, 27

91 Fed. Reg. 13410 (Mar. 19, 2026) ........................................................2

*Cattywampus: Statement on the CAT Concept Release* (Apr. 16, 2026), https://perma.cc/3B6P-SNSW ..................................... 10, 13

FINRA, *Enforcement,* perma.cc/347X-6L2S ...........................................20

FINRA Manual, Plan of Allocation and Delegation of Functions by FINRA to Subsidiaries, § I, https://perma.cc/3GWP-KAJK...........................................................16

FINRA, *Office of Hearing Officers*, perma.cc/24KC-RFVZ......................19

FINRA, *Rulemaking Process*, perma.cc/W7X3-R7RR ............................20

*Implementation and Cybersecurity Protocols on the Consolidated Audit Trail: Hearing Before the Subcomm. on Capital Mkts., Sec. & Inv. of the H. Comm. on Fin. Servs.,* 115th Cong. (Nov. 30, 2017) (testimony of Tyler Gellasch, Exec. Dir., Healthy Mkts. Ass'n), https://perma.cc/A9RU-89HM. ..........................................................12

Joel Hasbrouck et al., *New York Stock Exchange Systems and Trading Procedures* 16 (NYSE Working Paper No. 93-01, 1993), http://tinyurl.com/5entwjx7 ...............................................11

Paul G. Mahoney, *The Exchange as Regulator*, 83 Va. L. Rev. 1453, 1459–62 (1997) ........................................................................11

*SEC Comm'r Hester Pierce, Statement in Response to Release No. 34-88890,* File No. S7-13-19 (May 15, 2020), https://perma.cc/D43V-4U2S ....................................................... 7, 12

U.S. Const. art. II, § 2, cl. 2................................................................18

## INTEREST AND IDENTITY OF *AMICUS CURIAE*[1]

Formed in 2022, the American Free Enterprise Chamber of Commerce ("AmFree") is a chapter 501(c)(6) organization that represents hard-working entrepreneurs and businesses across all sectors. AmFree's members are vitally interested in the preservation of free markets, innovation, and the continued viability of our Republic.

## STATEMENT OF THE ISSUES

Whether the Consolidated Audit Trail Order should be set aside because it exceeds the agency's statutory authority and violates the APA.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Consolidated Audit Trail (CAT) is an unprecedented financial surveillance system. It relies on the Financial Industry Regulatory Authority (FINRA) to sweep up data on every transaction in the American securities market for the instantaneous review of the U.S. Securities and Exchange Commission ("SEC"). Last July, this Court

---

[1] Counsel for *amicus curiae* states pursuant to Fed. R. App. P. 29(a)(4)(E) that (1) no party's counsel authored the brief in whole or part; (2) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (3) no person other than *amicus* or his counsel contributed money intended to fund preparing or submitting the brief. All parties have consented to the filing of this brief pursuant to Fed. R. App. P. 29(a)(2).

1

vacated the SEC's 2023 CAT funding order, 88 Fed. Reg. 62628 (Sept. 12, 2023), holding that the order—which allowed self-regulatory organization (SROs) to pass 100% of costs to broker-dealers they serve—violated the Administrative Procedure Act because it provided "no reasoned justification" for allowing this 100% pass through. *Am. Sec. Ass'n v. SEC*, 147 F. 4th 1264, 1274–75 (11th Cir. 2025).

The SEC has now issued a revised CAT funding order that it concedes is "substantively identical" to the funding order this Court vacated in 2023, again imposing a tax on broker-dealers to pay for hundreds of millions of dollars of the CAT's costs and allowing SROs to pass the costs allocated to them onto broker-dealers. 91 Fed. Reg. 13410, 13415 (Mar. 19, 2026) (the "Order"). That alone should doom the Order. But beyond this fatal flaw, the Court should also vacate the Order because the SEC lacks statutory authorization to adopt the Order and because the Order violates the APA twice over.

*First*, the Order should be vacated because both the CAT itself and the funding mechanism adopted in the Order exceed the authority Congress conferred on the SEC. This is apparent from the plain language of the statute the SEC cites as its source of authority for the Order,

Section 11A of the Exchange Act, which merely authorizes the SEC to facilitate the creation of a national market system, not a massive surveillance system. The Supreme Court has long made clear that where an agency claims an extraordinary delegation of power from Congress to resolve a question of deep "economic and political significance", the major questions doctrine applies and requires that the government point to "clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 721, 723 (2022) (quotation omitted); *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 641–42 (2026) (quotation omitted). The SEC concedes that there is no "express authorization for CAT by Congress," 88 Fed. Reg. at 62673, and that concession is dispositive.

*Second*, the CAT and the Order are inextricably intertwined with FINRA, the quasi-government, quasi-private SRO that collects and feeds the transaction data to the CAT and both calculates and collects the CAT fees from broker-dealers. But FINRA is unconstitutional. To the extent FINRA is a public entity, none of its officers are appointed or removeable by the President, in violation of Article II of the Constitution. And to the extent it is a private entity, it violates the nondelegation doctrine, which prohibits the delegation of the executive authority FINRA exercises over

3

broker-dealers to private entities unless those entities are adequately supervised by a governmental body. Because FINRA is unconstitutional, the Order—which requires FINRA to take action in furtherance of its unconstitutional authority—cannot stand. At the very least, the SEC acted arbitrarily and capriciously by failing to adequately consider FINRA's constitutionally suspect status in adopting the Order. For these reasons, the Order must be vacated.

## ARGUMENT

## I.　The SEC Lacks Statutory Authority to Adopt the Order.

The Order must be vacated because both the CAT itself and the funding mechanism adopted in the Order exceed the authority Congress conferred on the SEC.

### A.　There Is No Statutory Authorization for the CAT.

"[T]he question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC,* 569 U.S. 290, 297 (2013); *see also FEC v. Cruz,* 596 U.S. 289, 301 (2022) ("An agency, after all, literally has no power to act—including under its own regulations—unless and until Congress authorizes it to do so by statute.") (quotation omitted).

4

The SEC claims that Section 11A of the Exchange Act, enacted in 1975, provides the authority to order the creation of the CAT and adopt the Order. *See* Order at 13410 & n.2, 13481; 81 Fed. Reg. 84696, 84726–27 (Nov. 23, 2016). Section 11A confers on the SEC a limited power to facilitate the creation of a national market system that furthers the objectives of "promot[ing] [inter-exchange] competition in the market for securities transactions," and "reduc[ing] the transaction costs associated with executing a securities trade." *See All. for Fair Bd. Recruitment v. SEC,* 125 F.4th 159, 173–74, 177 (5th Cir. 2024) (en banc); *see also Nasdaq Stock Mkt. LLC v. SEC,* 38 F.4th 1126, 1131 (D.C. Cir. 2022) (describing establishment of a national market system to "distribute market data economically and equally and to promote fair competition among all market participants") (quotation omitted).

Specifically, Section 11A directs the SEC "to use its authority … to facilitate the establishment of a national market system for securities … in accordance with" specified "findings and to carry out [specified] objectives." 15 U.S.C. § 78k-1(a)(2). The objectives include assuring "economically efficient execution of securities transactions," promoting "fair competition" among market participants, increasing "availability to

5

brokers, dealers, and investors of information with respect to quotations for and transactions in securities," and aiding the best execution of [investors'] orders. *Id.* § 78k-1(a)(1)(C)(i)–(iv). Section 11A further authorizes the SEC to "require self-regulatory organizations [SROs] to act jointly with respect to matters as to which they share authority under this chapter in planning, developing, operating, or regulating a national market system." *Id.* § 78k-1(a)(3)(B). A plain reading of the statutory text reveals that the SEC has far exceeded the scope of its authority in both creating and funding the CAT.

*First*, far from creating a system that merely increases efficiency and information flow between market participants, the CAT is an unprecedented surveillance system meant to provide the SEC easier access to investors' personal information and aid in the SEC's enforcement efforts. *See* 75 Fed. Reg. 32556, 32564 (June 8, 2010); 81 Fed. Reg. 30614, 30614–16 (May 17, 2016). As the SEC has stated,

> [t]he goal of Rule 613 was to create a modernized audit trail system that would provide regulators with timely access to a comprehensive set of trading data, thus enabling regulators to more efficiently and effectively analyze and reconstruct market events, monitor market behavior, conduct market analysis to support regulatory decisions, and perform surveillance, investigation, and enforcement activities.

6

88 Fed. Reg. 77128 (Nov. 8, 2023).[2]  Indeed, SEC Commissioner Hester Pierce has stated that the claimed "value of the CAT's comprehensive, real-time database [is] as an enforcement tool."  *Statement of Hester M. Pierce in Response to Release No. 34-88890; File No. S7-13-19* (May 15, 2020), https://perma.cc/D43V-4U2S.  But Section 11A makes no mention of aiding the SEC in its enforcement activities or providing the SEC with unfettered access to investor and trade information.  Because the CAT itself is *ultra vires*, the Order must be vacated.

Second, the SEC—under the guise of Section 11A and 15 U.S.C. § 78f(b)—compelled SROs to develop and fund the CAT for the SEC's use by essentially putting in place a tax on every share traded on the U.S. equities and options markets, and then permitting the Participants to pass on their share of the tax to the broker-dealers by allowing the Participants to increase their existing fees.  Order at 13413.  This scheme

---

[2] *See also* 81 Fed. Reg. at 84839 (explaining that improvements in data qualities resulting from the CAT would "significantly improve the efficiency and efficacy of enforcement investigations."); 75 Fed. Reg. at 32595 (explaining that the CAT allows the SEC to access trading records "directly from [a] central repository" for use in "complex enforcement inquires and investigation"); 77 Fed. Reg. 45722, 45727, 45730 (Aug. 1, 2012) (stating it will use CAT to "fulfill its statutory mission" and "perform surveillance and investigations").

finds no authority in those provisions.  Indeed, Section 11A is entirely silent on how the national market system, even if the CAT could qualify as such (and it does not), would be funded.  And, Section 78f(b)(4) merely requires SROs to "provide for the equitable allocation of reasonable dues, fees, and other charges among [their] members and issuers" as a condition of their registration as national securities exchanges.

Congress holds the taxing power, and courts do not "allow agencies to use statutory silence or ambiguity" to create new taxes.  *Bell Atl. Tel. Cos. v. FCC,* 24 F.3d 1441, 1445 (D.C. Cir. 1994); *see also Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 338, 341 (1974) (statute permitting the FCC to impose a "fee, charge, or price" was limited to only certain transactions because otherwise the statute would take the "agency far from its customary orbit and put[ ] it in search of revenue in the manner of an Appropriations Committee of the House"). And while Congress has permitted the SEC to "collect transaction fees and assessments that are designed to recover the costs to the Government of the annual appropriation to the Commission by Congress," 15 U.S.C. § 78ee(a), the SEC did not receive an annual appropriation from Congress to create the CAT.

### B. Under the Major Questions Doctrine, the Order Must Be Vacated.

Even if the language of Section 11A were ambiguous as to whether the CAT and the Order are within the SEC's statutory authority (and it is not), the Order must nevertheless be vacated because the major questions doctrine applies. Under the major questions doctrine, when an agency claims the power to make decisions of vast "economic and political significance," it "must point to clear congressional authorization for the power it claims." *West Virginia*, 597 U.S. at 721, 723 (quotation omitted). Yet the SEC acknowledges that it cannot show "express authorization for CAT by Congress." 88 Fed. Reg. at 62673. This is fatal.

The economic scope of the CAT is "staggering by any measure." *Biden v. Nebraska*, 600 U.S. 477, 502 (2023). The CAT has required over $1 billion to develop and operate so far. Order at 13464. And the SEC estimates that approximately $150 million per year will be required to operate the CAT. *Id.* at 13466. On top of these costs are the costs of complying with the system's requirements, which the SEC estimated in 2016 to be "approximately $2.4 billion in initial aggregate implementation costs and recurring annual costs of $1.7 billion." 81 Fed. Reg. at 84801.

9

The CAT is also of substantial political significance.  Through the CAT, the SEC is assuming the power to create an unprecedented government surveillance program.  This has, of course, resulted in "earnest and profound debate." *Nebraska*, 600 U.S. at 504.  Senators, attorneys general, civil liberties groups, industry organizations, and nearly half the states have submitted letters to the SEC and *amicus* briefs to this Court expressing their concern regarding the risks to Americans' privacy, security, and liberty.  *See, e.g.*, Case No. 23-13396, ECF Nos. 51, 61, 65, 67, 69, 74, 75, 90, 91, 135.  As Commissioner Pierce recently noted, the "premise underlying the CAT … should trouble all of us."  *Cattywampus: Statement on the CAT Concept Release* (Apr. 16, 2026),  https://perma.cc/3B6P-SNSW.    Simply  put,  "a  reasonable interpreter would [not] expect" Congress to "pawn[]" such a "big-time policy call[] . . . off to another branch." *Nebraska*, 600 U.S. at 515 (Barrett, J., concurring).

Moreover, the major questions doctrine applies "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy." *Utility Air Regulatory Group v. EPA,* 573 U.S. 302, 324 (2014) (quotation omitted).

Here, the SEC has never adopted anything remotely like the CAT or the Order since the Exchange Act was enacted.  Rather, for its entire history, the SEC used a fundamentally different enforcement approach: the SEC was required to obtain information from private market participants to conduct its investigations, meaning the SEC had to develop credible theories of misconduct, as well as the relevant timelines, *before* launching full-scale investigations.

Well before the federal securities laws were enacted, the NYSE and other exchanges conducted self-oversight and enforced internal anti-fraud rules. *See* Paul G. Mahoney, *The Exchange as Regulator*, 83 Va. L. Rev. 1453, 1459–62 (1997).  To aid the SROs in their internal governance, resolution of trade disputes, and (after the enactment of the federal securities laws) law enforcement, the SROs developed "audit trails," *i.e.*, trading records identifying the time, size, and brokers involved in each trade.  *See* Joel Hasbrouck et al., *New York Stock Exchange Systems and Trading Procedures* 16 (NYSE Working Paper No. 93-01, 1993), http://tinyurl.com/5entwjx7.

Rather than having "direct access" to audit trail data, the SEC could make data "requests" to SROs to provide data concerning

11

"narrowly-focused enforcement investigations." 75 Fed. Reg. at 32558, 32566–67. While federal law required SROs and other private market participants to comply with these requests (*see* 15 U.S.C. § 78q(a)(1); 17 C.F.R. § 240.17a-25), the SEC had to "know what it want[ed] to investigate before starting." *Implementation and Cybersecurity Protocols on the Consolidated Audit Trail: Hearing Before the Subcomm. on Capital Mkts., Sec. & Inv. of the H. Comm. on Fin. Servs.,* 115th Cong. (Nov. 30, 2017) (testimony of Tyler Gellasch, Exec. Dir., Healthy Mkts. Ass'n), https://perma.cc/A9RU-89HM. As a practical matter, the SEC needed to at least "identify suspicious trading activity" or other conduct suggesting wrongdoing and stake out the relevant timeline for investigation *before* it could ever access sensitive private data. *SEC Comm'r Hester Pierce, Statement in Response to Release No. 34-88890; File No. S7-13-19*, at n.2 (May 15, 2020), https://perma.cc/D43V-4U2S.

The benefits of this hybrid arrangement were numerous and significant. The requirement that the SEC develop reasonable suspicion to investigate particular trades *before* obtaining detailed information meant the SEC could not engage in "arbitrary and discriminatory enforcement" by first picking their target, then searching for anything

that could be construed as suspicious. *McDonnell v. United States,* 579 U.S. 550, 576 (2016) (quotation omitted).  Further, the fact that the SEC had to ask SROs to provide information served as a potential check both because market participants could push back against overbroad requests and notice to market participants brought much-needed sunlight to the SEC's actions.

The CAT turns this long-standing system on its head.  Indeed, just last month, Commissioner Pierce stated that the "premise underlying the CAT" was "that the government has the right to monitor every purchase and sale decision without suspicion of wrongdoing."  *Cattywampus: Statement on the CAT Concept Release* (Apr. 16, 2026), https://perma.cc/3B6P-SNSW.  That the SEC is relying on a nearly-fifty-year-old statute as its supposed authority is a "telling indication" that the mandate to create and fund the CAT extends beyond the agency's legitimate reach.  *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,* 595 U.S. 109, 119 (2022) (applying major questions doctrine to vaccine mandate where "lack of historical precedent" for vaccine mandates "coupled with the breadth of authority"

13

claimed indicated the mandate was beyond the agency's legitimate reach).

Finally, the Supreme Court has long expressed "reluctan[ce] to read into ambiguous statutory text" extraordinary delegations of Congress's powers. *West Virginia*, 597 U.S. at 723. In these "major questions" cases, the statutory text might "[a]s a matter of definitional possibilities" be read to delegate the power, but "context," including "not just other language within the statute, but constitutional structure and common sense," counsels "skepticism." *See Learning Res.*, 146 S. Ct. at 639 (Roberts, C.J.) (quotation omitted). As Chief Justice Roberts explained just months ago, "[t]hese considerations apply with particular force where … the purported delegation involves the core congressional power of the purse." *Learning Res.*, 146 S. Ct. at 639 (Roberts, C.J.).

Here, both in mandating the creation of the CAT and through the Order, the SEC upends constitutional structure and claims for itself the power of the purse. The SEC did not obtain appropriation for the CAT from Congress. Instead, the SEC performed an end-run around Congress and outsourced the unappropriated expense for the CAT to SROs. And now, pursuant to the Order, the SEC will fund the CAT via a new

14

transaction tax on SROs and broker-dealers.  Of course, to the extent this tax gets passed on to the broker-dealer's customers, it eventually becomes a transaction tax on the investing public.

The SEC's authority under Section 11A to "facilitate the establishment of a national market system" and authorize or require SROs to "act jointly … in … regulating a national market system" falls far short of the clear congressional authorization required by the major questions doctrine.  15 U.S.C. § 78k-1(a)(2), (a)(3)(B)*; see Learning Res.*, 146 S. Ct. at 642-44 (noting the government's concession that the SEC "cannot tax the trading of securities, even though it is expressly authorized to 'regulate the trading of … securities,'" and that "the Government cannot identify any statute in which the power to regulate includes the power to tax").  Particularly when the core congressional power of the purse is in question, Congress "does not … hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

## II.    The Order Must Be Struck Down Because It Violates the Administrative Procedure Act.

FINRA has a central, dual role in the Order.  First, FINRA is the largest SRO involved in operating the CAT.  Order at 13429-30.  Under

the Order, approximately 40% of the SROs' share of CAT costs—at least before they are passed on to broker-dealers—are allocated to FINRA.  *Id.* at 13431.  Second, FINRA, through its subsidiary FINRA CAT LLC ("FINRA CAT"), acts as the Plan Processor.[3]  As set forth in the Joint Industry Plan, approved in 2016, the Plan Processor is charged with, among other things, "implement[ing] policies, procedures, and control structures related to the CAT system" and overseeing the Central Repository, which receives, consolidates, and retains all CAT Data.  81 Fed. Reg. at 84704.  Moreover, FINRA, through FINRA CAT, is responsible for calculating the CAT fees and submitting invoices to the executing broker for the seller and the buyer in an eligible transaction. *Id.* at 13414.  The data used both to identify eligible transactions for which a CAT fee would be collected and to calculate fee rate is to be supplied principally by FINRA.  *Id.* (citing 90 Fed. Reg. at 44913); 90 Fed. Reg. 44910, 44939 (Sept. 17, 2025).

---

[3] *See* FINRA Manual, Plan of Allocation and Delegation of Functions by FINRA to Subsidiaries, § I, https://perma.cc/3GWP-KAJK (providing that FINRA has "ultimate responsibility" for FINRA CAT's operations, including with respect to the CAT).

But FINRA is unconstitutional.  Thus, the Order violates the APA in two ways. First, because the Order relies on FINRA to wield its unconstitutional authority to operate the CAT, it is unlawful and must be set aside pursuant to the APA.  Second, in failing to adequately consider FINRA's constitutionally suspect status, and account for the impact of future court decisions finding FINRA unconstitutional, the SEC acted arbitrarily and capriciously in adopting the Order.

## A. Because FINRA Is Unconstitutional, the Order Is Contrary to Law and Violates the APA.

FINRA faces an insuperable constitutional dilemma.  To the extent FINRA is a public entity, none of its officers are appointed or removeable by the President, in violation of the Appointments clause.  And to the extent it is a private entity, it violates the nondelegation doctrine, which prohibits the delegation of the executive authority FINRA exercises over broker-dealers to private entities unless those entities are adequately supervised by a governmental body.  Either way, FINRA's current role in regulating the financial industry is unconstitutional.

17

### 1.     FINRA Wields Substantial Executive Power and Therefore Must Be Subject to Presidential Control Through Appointment and Removal.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, §§ 1, 3). The Appointments Clause requires all "Officers of the United States" to be appointed in a specific manner. U.S. Const. art. II, § 2, cl. 2. Principal officers must be nominated by the President and confirmed by the Senate; "inferior" officers, in turn, must be appointed by the President, a court, or certain heads of executive departments who are themselves directly accountable to the President. *Id.*

As the Supreme Court has explained, "Officers of the United States" subject to the Appointments Clause are those who occupy "continuing" positions in which they exercise "significant authority pursuant to the laws of the United States." *Lucia v. SEC,* 585 U.S. 237, 245 (2018). A person's status as an officer subject to the Appointments Clause thus turns on his actual *function* and *authority* rather than the mere *label* that Congress may choose to give him, or that he has chosen to give himself.

18

*See Free Enter. Fund,* 561 U.S. at 484, 510 (members of private nonprofit corporation Public Company Accounting Oversight Board were "Officers of the United States" because they "exercis[ed] significant authority pursuant to the laws of the United States").

None of FINRA's officers are appointed in accordance with the Appointments Clause.[4] Like the members of the Board in *Free Enterprise Fund,* FINRA's CEO, Governors, and Hearing Officers are "Officers of the United States" because they exercise "significant authority pursuant to the laws of the United States" in several different respects. *Id.*

*First,* FINRA "enforce[s] compliance" with the provisions of the Securities Exchange Act and the SEC's implementing regulations, as well as FINRA's own regulations and the regulations of other SROs (which have the force and effect of federal law), by commencing investigations, bringing charges against broker-dealers and their

---

[4] Governors who serve on its Board are elected by FINRA's membership or, in the case of Public Governors, appointed by the Board itself. *See* FINRA, Bylaws of the Corporation, art. VII, §§ 5, 13. Similarly, FINRA's CEO—who has broad responsibility for supervising the "management and administration" of its operations—is appointed by the Board. *See id.*, art. VIII, § 1. And FINRA's Hearing Officers are employees of the Authority who report directly to FINRA's CEO. *See* FINRA, *Office of Hearing Officers*, perma.cc/24KC-RFVZ (last visited May 28, 2026).

19

associated persons, and prosecuting cases in FINRA's in-house tribunals. 15 U.S.C. § 78o-3(b)(2); *see* FINRA Rules 8210(a), 9211. "[T]he enforcement of federal law" is a core executive power. *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

*Second,* FINRA also promulgates rules for all broker-dealers that have the force and effect of law, determines which of those rules (and other provisions) to prioritize for enforcement, and (more often than not) chooses the terms on which they will resolve enforcement cases brought by their staff. *See* FINRA, *Rulemaking Process*, perma.cc/W7X3-R7RR (last visited May 28, 2026); FINRA, *Enforcement*, perma.cc/347X-6L2S (last visited May 28, 2026); FINRA Rules 9211(a), 9216(a)(1). In these respects, FINRA's CEO and Governors function much like heads of an independent agency such as the SEC. *See Buckley v. Valeo,* 424 U.S. 1, 126 (1976) (FEC Commissioners are "at the very least . . . 'inferior Officers'").

*Third,* FINRA's CEO and Governors supervise and hear appeals from Hearing Officers who perform functions materially identical to those of the ALJs deemed officers in *Lucia* and the special trial judges deemed officers in *Freytag v. Commissioner of Internal Revenue,* 501 U.S.

20

868, 891–92 (1991)—like taking testimony, conducting trials, and deciding issues that have the force of law. *See Lucia,* 585 U.S. at 246–48; *see also* FINRA Rules 9110–9291 (setting forth procedures for FINRA disciplinary hearings).

*Fourth,* FINRA's broad authority to perform these core executive functions comes directly from federal law, which mandates that FINRA enforce not only its own rules but federal securities laws as a condition of being an SRO. *See* 15 U.S.C. § 78o(a)(1), (b)(1) (requiring broker-dealers to join an SRO); *id.* § 78o-3(b)(2) (requiring FINRA, as an SRO, to perform these functions).

*Finally*, FINRA, its officers, and its employees—like federal employees—"are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011). Indeed, FINRA enjoys this immunity because its functions are "intimately intertwined with the regulatory powers delegated to [FINRA] by the SEC." *Id.* at 116.

Moreover, Article II gives the President not only the power to appoint officers but also "the general administrative control of those

21

executing the laws," which requires the "power of removing those for whom he cannot continue to be responsible." *Myers v. United States,* 272 U.S. 52, 117, 163–64 (1926); *see Seila Law*, 591 U.S. at 228. If anything, the removal power is even more important and extensive than the appointment power: The appointment power applies only to "Officers of the United States," while the removal power extends to anyone who plays a significant role in "executing the laws." *See Myers,* 272 U.S. at 163–64.

The Supreme Court has recognized "only two exceptions to the President's unrestricted removal power"—"one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 204, 219. Neither exception saves FINRA. The first exception does not apply because FINRA exercises substantial executive power, most notably with respect to its enforcement authority.[5] And the second exception does not apply because, even if FINRA could be characterized as consisting solely of

---

[5] There is good reason to think that this exception, which comes from *Humphrey's Executor v. United States*, 295 U.S. 602, 628 (1935), may soon exit stage left. *See* Order on Application for Stay, *Trump v. Slaughter*, No. 25-332 (Sept. 22, 2025) (directing the parties to brief "whether *Humphrey's Executor* … should be overruled").

"inferior" officers, FINRA has expansive regulatory duties over the entire broker-dealer industry and wields vast policymaking and administrative authority.

Finally, even if the Constitution somehow allowed FINRA to be subject to a *single* layer of removal protection, it would not allow the *double* layer of removal protection that FINRA's Governors and Hearing Officers enjoy. In *Free Enterprise Fund,* the Supreme Court struck down the "good cause" removal restrictions on the PCAOB's members because the Commissioners of the SEC—which the Court assumed to be an independent agency—were, in turn, protected by their own "good cause" removal restrictions. 561 U.S. at 486–87, 495–98.

The same is true here. The SEC is the only entity that can remove FINRA Governors, while FINRA's Hearing Officers can be removed only by its Governors or the SEC. *See* 15 U.S.C. § 78s(h)(4); FINRA, Bylaws of the Corporation, art. VIII, § 6. And the Commission's removal authority is limited in the same way: The SEC can remove these officials only if they have "willfully violated" an applicable law or regulation, "willfully abused [their] authority," or "failed to enforce compliance" with an applicable law or regulation "without reasonable justification or

23

excuse." 15 U.S.C. § 78s(h)(4). Accordingly, this case involves the same unconstitutional attempt to "shelter the bureaucracy behind two layers of good-cause tenure," that the Supreme Court rejected in *Free Enterprise Fund*. 561 U.S. at 496.

### 2. FINRA Is Unconstitutional Under the Private Nondelegation Doctrine.

"Federal lawmakers cannot delegate regulatory authority to a private entity." *Ass'n of Am. R.R. v. Dep't of Transp.,* 721 F.3d 666, 670 (D.C. Cir. 2013). Thus, "if a private entity creates the law or retains full discretion over any regulations" promulgated under it, that is "an unconstitutional exercise of federal power." *Oklahoma v. United States*, 163 F.4th 294, 229 (6th Cir. 2025). However, "Congress may formalize the role of private parties in proposing regulations so long as that role is merely 'as an aid' to a government agency," *Am. R.R.,* 721 F.3d at 671, *i.e.,* if the private entity "function[s] subordinately to" the agency, and the agency "has authority and surveillance over the activities of" the private entity, *Adkins,* 310 U.S. at 399.

As explained, FINRA exercises substantial federal power over broker-dealers and may take a wide array of regulatory actions without prior SEC oversight. Accordingly, FINRA is the "principal decisionmaker

24

in the use of federal power" for "brokers required (by statute) to join a securities association." *Alpine Securities Corp. v. FINRA*, 121 F.4th 1314, 1344 (D.C. Cir. 2024) (Walker, J., concurring in the judgement part and dissenting in part) (quotation omitted), *cert. denied*, 145 S. Ct. 2751 (2025). The SEC, however, lacks the critical degree of control over FINRA and its exercise of that power. While the Commission may eventually reverse sanctions that FINRA imposes, that relief "does not negate the vast array of powers that FINRA exercises before the matter even reaches the SEC." *Id.* at 1345 (Walker, J., concurring in the judgement part and dissenting in part).

The D.C. Circuit's decision in *Alpine Securities Corp.* is instructive. In that case, the D.C. Circuit preliminarily enjoined an expedited proceeding to expel the plaintiffs from FINRA membership, concluding that the expulsion would likely violate the private nondelegation doctrine. *Id.* at 1324–28. Rejecting the argument that the SEC's authority to stay the effectiveness of an expulsion order constituted sufficient SEC supervision, *id.* at 1327, the Court concluded that "[t]he result of this regulatory scheme is that FINRA can, without any SEC review of its decision on the merits, effectively decide who can trade

25

securities under federal law," which "falls short of what the private nondelegation doctrine requires: an accountable government actor that 'retains the discretion to approve, disapprove, or modify' FINRA's delegated decisions." *Id.* at 1328.

In his partial concurrence and dissent, Judge Walker explained that he would have gone even further and enjoined the expulsion proceeding entirely:

> FINRA relies on a Goldilocks defense. It is too much like a private entity for Article II's strictures, yet too much like the government for the private nondelegation doctrine to apply. But FINRA "cannot have its cake and eat it too." Its split identity fails to provide the accountability required by our Constitution. When federal law empowers officials to decide a company's fate, they must be Officers of the United States, selected through the Constitution's Appointments Clause and properly removable by the President.

*Id.* at 1351 (Walker, J.).[6]

---

[6] Following the D.C. Circuit's opinion, FINRA amended its rules to stay the effectiveness of expulsions in expedited proceedings until the time for filing an application for review with the SEC has expired or until the SEC completes its review." *See* Mem. Op. at 19, *Alpine Secs. Corp. v. FINRA*, No. 23-cv-1506 (D.D.C. Apr. 23, 2026) (quotation omitted). Plaintiffs amended their complaint, and the district court granted FINRA's motion to dismiss. *See id.* at 44–45. Plaintiffs filed their notice of appeal. *Alpine Secs. Corp. v. FINRA*, No. 23-cv-1506, ECF 116 (D.D.C. May 11, 2026).

### 3. Because FINRA Is Unconstitutional, The Order Must Be Vacated.

No matter whether FINRA is a public or private entity, the Order is unlawful because the CAT and the Order depend on FINRA's unconstitutional exercise of authority.

The CAT relies on the transaction-level data that FINRA supplies. *See* 77 Fed. Reg. at 45729. And this data is further used to calculate the CAT fees and the overall fee rate that is charged under the Order. 90 Fed. Reg. at 44939. But FINRA compels that reporting by virtue of its substantial and unconstitutional regulatory authority over broker-dealers, including its ability to take enforcement actions, levy fines, and expel broker-dealers from the securities industry. Even more, FINRA collects fees from broker-dealers pursuant to its unconstitutional authority. Yet the Order permits FINRA to raise its existing fees even further to pass along its substantial share of the CAT budget to its members. Order at 13413.

If FINRA is a government entity, its officials are improperly appointed, which renders all FINRA actions—like operating the CAT— *void ab initio. C.f. Collins v. Yellen*, 594 U.S. 220, 257–58 (2021). Moreover, under the APA, an agency action is invalid if it is "not in

accordance with law," 5 U.S.C. § 706(2)(A), nor can it "sanction[] unlawful conduct by third parties." *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1043 (9th Cir. 2019). Because FINRA is unlawful under the Constitution, the CAT and the Order are unlawful too.

**B.    The SEC Acted Arbitrarily and Capriciously In Failing To Adequately Consider FINRA's Constitutionally Suspect Status.**

FINRA is facing constitutional attacks nationwide. Just last month, another plaintiff filed suit against FINRA seeking declaratory and injunctive relief to prevent FINRA from continuing, or giving effect to, an enforcement proceeding because FINRA violates the private nondelegation doctrine and the Appointments Clause. *See* Complaint ¶¶ 5–7, *Boustead Secs., LLC v. FINRA*, No. 26-cv-360, ECF 1 (D. Del. Apr. 1, 2026).[7] And the Supreme Court has repeatedly and recently

---

[7] A federal court in North Carolina recently dismissed a challenge to FINRA's constitutionality on jurisdictional grounds, but noted that it found "the entirety of Judge Walker's concurrence in part and dissent in part in [*Alpine*] persuasive," and recognized that "Congress requires FINRA to enforce both its own rules and federal securities law, without adequate control by the President. That arrangement violates the Constitution." *See* Mem. & Order, at 18–19, *Black v. SEC*, No. 23-cv-709, ECF 85 (W.D.N.C. Mar. 24, 2026) (quotation omitted).

underscored that Article II requires that those wielding Executive power be accountable to the President—the core principle underlying constitutional challenges facing FINRA. *See Seila Law*, 591 U.S. at 219; *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025).

Nevertheless, the Order creates a system entirely reliant on FINRA's ability to continue operating as it presently does—which it cannot do if it is unconstitutional. But even a temporary pause in FINRA's ability to supply transactional data would prevent CAT LLC from both (i) collecting the data necessary to surveil the complete equities and future markets, and (ii) calculating the proposed CAT fees. Moreover, if FINRA is no longer permitted to collect fees from broker-dealers based on its coercive scheme, it is unclear how the CAT could function given the outsized portion of the CAT budget allocated to FINRA. *See* Order at 13430 (noting FINRA's objection that it bears "a disproportionate share of CAT costs" despite its status as a "non-profit, member-funded" association). Indeed, should a court find that FINRA's officers were unlawfully appointed, thus rendering every FINRA action void, the CAT would cease operation.

An agency rule is arbitrary and capricious if the agency (i) "entirely failed to consider an important aspect of the problem," (ii) "offered an explanation for its decision that runs counter to the evidence before the agency," or (iii) offered an explanation that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And agencies have a "duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule." *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1023 (D.C. Cir. 2014) (quotation omitted).

Here, the SEC merely waved away concerns regarding the constitutionality of FINRA. *First*, the SEC stated, without citation to any legal authority, that "[t]he Commission does not believe it would be appropriate to disapprove the Proposed Amendment on the basis that a court, in the future, could potentially determine that FINRA CAT's parent entity FINRA violates the Constitution." Order at 13457. *Second*, the SEC noted that it has "followed the lead set by courts" and rejected private nondelegation and Appointments Clause challenges to FINRA's structure. *Id.*

30

Its authority for this second point, however, makes clear that the SEC has failed to engage in reasoned decision-making concerning FINRA's constitutionally suspect status. *See id.* (citing *In re Robbi J. Jones*, Exchange Act Rel. No. 104273, 2025 WL 3419593, at \*15–16 (Nov. 28, 2025) (Commission decision currently on appeal in the Fifth Circuit); *Oklahoma v. United States*, 163 F.4th 249 (6th Cir. 2025) (one of three cases in a circuit split between the Fifth, Sixth, and Eighth Circuits concerning whether the Horseracing Integrity and Safety Authority violates the private nondelegation doctrine); and *Alpine*, 121 F.4th at 1339 (discussed *supra*).

This superficial discussion is inadequate. The constitutionality and continued existence of FINRA with its current powers and capacities is a key assumption underlying the Order. Yet the SEC performed virtually no analysis as to whether that assumption was correct. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir. 2018) (finding that, while an agency "is not required to discuss every item of fact or opinion included in the submissions it receives in response to a Notice of Proposed Rulemaking, it must respond to those comments which, if true, would require a change in the proposed rule"); *Horsehead Res. Dev. Co. v.*

31

*Browner,* 16 F.3d 1246, 1269 (D.C. Cir. 1994) ("[S]peculation is an inadequate replacement for the agency's duty to undertake an examination of the relevant data and reasoned analysis.").

So too, the SEC failed to perform any analysis regarding the impact on the CAT and its funding if FINRA could no longer collect or pay fees. Nor did it consider alternatives to relying on FINRA for both the CAT's data and a substantial portion of its funding. *See* Order at 13431 (acknowledging that "there could be other methodologies for allocating costs," but stating they would be "significantly more complex"); *see also Chamber of Com. of U.S. v. SEC,* 412 F.3d 133, 145 (D.C. Cir. 2005) (granting in part petition for review because "the disclosure alternative was neither frivolous nor out of bounds and the Commission therefore had an obligation to consider it"). Because the SEC acted arbitrarily and capriciously in adopting the Order, which relies on an unconstitutional actor, the Order must be vacated.

## CONCLUSION

The Court should vacate the Order.

32

May 28, 2026                              Respectfully submitted,

                                          /s/ *Cody L. Reaves*

                                          William P. Barr
                                          Jason S. Miyares
                                          Cody L. Reaves*
                                          Brooke Jarrett
                                          TORRIDON LAW PLLC
                                          801 17th Street, N.W., Suite 1100
                                          Washington, D.C. 20006
                                          Tel: (202) 249-6900
                                          wbarr@torridonlaw.com
                                          jmiyares@torridonlaw.com
                                          creaves@torridonlaw.com
                                          bjarrett@torridonlaw.com
                                          *Counsel of Record*

                                          *Counsel for Amicus Curiae*

33

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 29(b)(4) because it contains 6,448 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(b)(1).

This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2016 word processing system in 14-point Century Schoolbook font.

/s/ *Cody L. Reaves*
Cody L. Reaves

# CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on May 28, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Cody L. Reaves*
Cody L. Reaves