## No. 26-10936

# United States Court of Appeals
*for the*
# Eleventh Circuit

▶▶◀◀

AMERICAN SECURITIES ASSOCIATION AND CITADEL SECURITIES LLC,

*Petitioners,*

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

CONSOLIDATED AUDIT TRAIL LLC; THE NASDAQ STOCK MARKET, LLC, ET AL.,

*Intervenors.*

PETITION FOR REVIEW OF AN ORDER OF THE SECURITIES AND EXCHANGE COMMISSION
RELEASE NO. 34-105003; FILE NO. 4-698

**BRIEF OF SENATOR TOM COTTON AND 11 OTHER MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS**

DAVID A. NABORS
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
2601 Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
davidnabors@quinnemanuel.com

CHRISTOPHER G. MICHEL
ZACHARY J. LUSTBADER
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
555 13th St. NW, Suite 600
Washington, D.C. 20004
(202) 538-8000
christophermichel@quinnemanuel.com
zachlustbader@quinnemanuel.com

JOHN F. BASH
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
300 W. 6th St., Suite 2010
Austin, TX 78701
(737) 667-6100
johnbash@quinnemanuel.com

*Counsel for Amici Curiae*

May 28, 2026

## COMPLETE LIST OF *AMICI CURIAE*

The following is a full list of *amici*:

### United States Senate

Tom Cotton (AR)
Bill Hagerty (TN)
John Kennedy (LA)
Tim Scott (SC)

### United States House of Representatives

French Hill (AR-02)
Don Bacon (NE-02)
Troy Downing (MT-02)
Scott Fitzgerald (WI-05)
Barry Loudermilk (GA-11)
Marlin Stutzman (IN-03)
Randy Weber (TX-14)
Steve Womack (AR-03)

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

**<u>Certificate of Interested Persons</u>**

Pursuant to Eleventh Circuit Rule 26.1-1 through 26.1-3, the undersigned counsel hereby certify that, to the best of their knowledge, the Certificates of Interested Persons set forth in the Opening Brief of Petitioners and other briefs filed by *amici curiae* are complete and correct, subject to the following additions:

1.  Bash, John F. (Quinn Emanuel Urquhart & Sullivan, LLP): counsel for *amici curiae*

2.  Lustbader, Zachary J. (Quinn Emanuel Urquhart & Sullivan, LLP): counsel for *amici curiae*

3.  Michel, Christopher G. (Quinn Emanuel Urquhart & Sullivan, LLP): counsel for *amici curiae*

4.  Nabors, David A. (Quinn Emanuel Urquhart & Sullivan, LLP): counsel for *amici curiae*

5.  Quinn Emanuel Urquhart & Sullivan, LLP: counsel for *amici curiae*

6.  Senator Tom Cotton: *amicus curiae*

7.  Senator Bill Hagerty: *amicus curiae*

8.  Senator John Kennedy: *amicus curiae*

9.  Senator Tim Scott: *amicus curiae*

10. Representative French Hill: *amicus curiae*

C-1

11.    Representative Don Bacon: *amicus curiae*

12.    Representative Troy Downing: *amicus curiae*

13.    Representative Scott Fitzgerald: *amicus curiae*

14.    Representative Barry Loudermilk: *amicus curiae*

15.    Representative Marlin Stutzman: *amicus curiae*

16.    Representative Randy Weber: *amicus curiae*

17.    Representative Steve Womack: *amicus curiae*

## <u>Corporate Disclosure Statement</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2, the undersigned counsel certifies that the *amici curiae*—Senator Tom Cotton and the 11 other Members of the United States Congress—are individuals. Thus, they have no parent corporations or stock.  With respect to the other individuals and entities specifically named in this certificate, none has a parent corporation and no publicly held corporation owns 10 percent or more of their stock.

*     *     *

The undersigned will enter all updated information into the Court's web-based CIP contemporaneously with this Certificate of Interested Persons and Corporate Disclosure Statement.

<u>/s/ Christopher G. Michel</u><br>Christopher G.  Michel

C-3

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ...............................................................C-1

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICI CURIAE*..................................................................1

STATEMENT OF THE ISSUE ....................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................2

STATUTORY BACKGROUND....................................................................4

ARGUMENT..............................................................................................7

I.     THE MAJOR QUESTIONS DOCTRINE FORECLOSES THE
     SEC'S ADOPTION OF THE CAT ........................................................8

     A.    The Major Questions Doctrine Safeguards Congress's Article I
          Prerogatives .........................................................................8

     B.    The CAT Presents Major Questions That Require Clear
          Congressional Approval.......................................................11

     C.    Congress Did Not Authorize The CAT With The Clarity
          Required By The Major Questions Doctrine ..................................17

II.    THE CAT'S FUNDING MODEL CIRCUMVENTS CONGRESS'S
     AUTHORITY ..................................................................................19

     A.    The Funding Model Raises Questions Under The Taxing
          Clause.................................................................................20

     B.    The Funding Model Raises Questions Under The
          Appropriations Clause ..........................................................22

CONCLUSION .........................................................................................25

CERTIFICATE OF COMPLIANCE...............................................................26

CERTIFICATE OF SERVICE.......................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Secs. Ass'n v. SEC*,
147 F.4th 1264 (11th Cir. 2025)......................................................................... 1, 7

*Bell Atl. Tel. Cos. v. FCC*,
24 F.3d 1441 (D.C. Cir. 1994) ........................................................... 20, 21

*Biden v. Nebraska*,
600 U.S. 477 (2023)............................................. 1, 2, 3, 10, 11, 13, 14, 17, 19, 21

*CFPB v. All Am. Check Cashing, Inc.*,
33 F.4th 218 (5th Cir. 2022) ...............................................................................22

*CFPB v. Cmty. Fin. Serv. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024).............................................................................................23

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000).............................................................................................10

*Fletcher v. Peck*,
10 U.S. 87 (1810)...................................................................................................9

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010).............................................................................................16

*King v. Burwell*,
576 U.S. 473 (2015).............................................................................................15

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026) ........................................................... 3, 8, 19, 20, 21

*MCI Telecomms. Corp. v. AT&T Co.*,
512 U.S. 218 (1994).............................................................................................15

*Nasdaq Stock Mkt. LLC v. SEC*,
34 F.4th 1105 (D.C. Cir. 2022) ............................................................................5

*Nasdaq Stock Mkt. LLC v. SEC*,
38 F.4th 1126 (D.C. Cir. 2022) ............................................................................5

*Nat'l Cable Television Ass'n, Inc. v. United States*,
  415 U.S. 336 (1974)........................................................................21

*NFIB v. OSHA*,
  595 U.S. 109 (2022) (per curiam) ..............................3, 10, 11, 12, 18, 19

*OPM v. Richmond*,
  496 U.S. 414 (1990)................................................................... 22, 24

*Skinner v. Mid-America Pipeline Co.*,
  490 U.S. 212 (1989)........................................................................20

*U.S. Dep't of Navy v. Federal Lab. Rel. Auth.*,
  665 F.3d 1339 (D.C. Cir. 2012) ................................................... 22, 24

*United States v. Jacobs*,
  306 U.S. 363 (1939)........................................................................20

*United States v. Jones*,
  565 U.S. 400 (2012)........................................................................14

*Util. Air Regul. Grp. (UARG) v. EPA*,
  573 U.S. 302 (2014)................................................................ 9, 11, 12

*Weissman v. Nat'l Ass'n of Secs. Dealers, Inc.*,
  500 F.3d 1293 (11th Cir. 2007) (en banc)..............................................4

*West Virginia v. EPA*,
  597 U.S. 697 (2022)...................................... 1, 3, 8, 9, 10, 11, 14, 17

*Whitman v. American Trucking Ass'ns*,
  531 U.S. 457 (2001).......................................................................21

## Constitutional Provisions

U.S. Const. art. I, § 1............................................................... 2, 9, 17

U.S. Const. art. I, § 8...................................................................2, 20

U.S. Const. art. I, § 9......................................................................22

## Statutes and Rules

15 U.S.C. § 78f(b)...........................................................................21

iii

15 U.S.C. § 78k-1(a) ........................................................................ 4, 6, 15

15 U.S.C. § 78ee(a) ................................................................................... 23

Cyber Incident Reporting for Critical Infrastructure Act of 2022, Pub. L.
     No. 117-103, 136 Stat. 1038 ............................................................. 16

Financial Services Modernization Act of 1999, Pub. L. No. 106-102, 113
     Stat. 1338 ......................................................................................... 16

Health Insurance Portability and Accountability Act (HIPAA), Pub. L.
     No. 104-191, 110 Stat. 1936 (1996) .................................................. 16

National Defense Authorization Act for Fiscal Year 2024, Pub. L. No.
     118-31 (2024) .................................................................................... 16

State and Local Government Cybersecurity Act of 2021, Pub. L. No.
     117-150, 136 Stat. 1295 .................................................................... 16

17 C.F.R. § 242.614(a)(1)(i)(B) ............................................................... 15

70 Fed. Reg. 37496 (June 29, 2005) ........................................................... 5

75 Fed. Reg. 32556 (June 8, 2010) ...................................................... 23, 24

77 Fed. Reg. 45722 (Aug. 1, 2012) ........................................................... 24

81 Fed. Reg. 30614 (May 17, 2016) ............................................................ 6

86 Fed. Reg. 18596 (Apr. 9, 2021) .............................................................. 5

88 Fed. Reg. 62628 (Sept. 12, 2023) ................................... 3, 6, 17, 20, 23

91 Fed. Reg. 13410 (Mar. 19, 2026) ..................................................... 7, 12

Fed. R. App. P. 29 ....................................................................................... 1

## Other Authorities

A. Weinstein et al., *SEC Had a Fraught Cyber Record Before X Account
     Was Hacked,* BLOOMBERG LAW (Jan. 11, 2024) .................................. 17

American Customer Information Protection Act, H.R. 4785, 115th
     Congress (2018) ................................................................................ 18

American Customer Information Protection Act, H.R. 4785, Report 115-663, 115th Congress (2018)..............................................................................18

FISA Reform and Reauthorization Act of 2023, H.R. 6611, 118th Congress (2023)..........................................................................................13

Letter from Arkansas Att'y Gen. T. Griffin et al., to Sen. Schumer (Aug. 15, 2023) .........................................................................................13

Letter from R. Newman and K. Ruane, ACLU, to SEC Chair Clayton (Dec. 16, 2019)......................................................................................13

Letter from Sen. Kennedy et al., to SEC Chair Clayton (July 24, 2019)....................13

Protecting Investors' Personally Identifiable Information Act, H.R. 2039, 117th Congress (2021) .........................................................................18

Protecting Investors' Personally Identifiable Information Act, H.R. 4551, 118th Congress (2023) .........................................................................18

Protecting Investors' Personally Identifiable Information Act, H.R. 1483, 119th Congress (2025) .........................................................................18

SEC, *Statement of Hester M. Peirce in Response to Release No. 34-88890*, File No. S7-13-19 (May 15, 2020) ..................................................... 11, 12

Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363 (1986)..........................................................................10

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are Senator Tom Cotton and 11 other Members of Congress. They have an interest in this case because it implicates the interpretation of an important federal statute, the proper separation of powers between Congress and the Executive, matters of congressional taxation and spending and oversight responsibilities, and significant questions of federal policy in the area of financial regulation. Senator Cotton and other Members of Congress have filed amicus briefs in other cases implicating similar questions, including *Biden v. Nebraska*, 600 U.S. 477 (2023), and *West Virginia v. EPA*, 597 U.S. 697 (2022). Senator Cotton and other Members of Congress also filed an amicus brief in support of petitioners' previous petition in this Court. *See American Secs. Ass'n v. SEC*, 147 F.4th 1264 (11th Cir. 2025).

## STATEMENT OF THE ISSUE

Whether Congress authorized the Securities and Exchange Commission (SEC or Commission) to create and fund a vast new financial tracking system—the Consolidated Audit Trail (CAT)—to provide the Commission's enforcement officials with extensive personal information about investors and their transactions, at those investors' own multi-billion-dollar expense.

---

[1]   All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29, *amici* state that no counsel for a party authored this brief in whole or in part and that no person other than *amici* or their counsel made a monetary contribution to its preparation or submission.

1

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

"The question here is not whether something should be done; it is who has the authority to do it." *Biden v. Nebraska*, 600 U.S. 477, 501 (2023). The CAT is a comprehensive financial surveillance system that will track, collect, and store sensitive data on every transaction and investor in American securities markets. Creating such an elaborate and intrusive structure involved significant policy judgments on questions of individual liberty, personal privacy, national security, and law enforcement. Funding the CAT involved a host of separate major decisions about how to allocate the $1 billion cost of the system to date and the expected $150 million annual cost of operating it moving forward. In our constitutional system, there is a body charged with making such weighty national policy choices, particularly in the areas of taxes and spending—the United States Congress, which is elected by and accountable to the American people.

But the CAT was not created by Congress. It was proposed in 2012 and adopted in 2016 by the SEC, operating on a limited delegation of authority in a statute enacted almost 50 years ago that did not remotely contemplate the creation of a surveillance tool like the CAT. That approach violates fundamental separation-of-powers principles. Under the Constitution, "[a]ll legislative Powers," including the powers to "lay and collect Taxes" and appropriate funds for the operation of Executive Branch agencies, reside in Congress. U.S. Const. art. I, §§ 1, 8. The basic

2

premise of that allocation of authority is that Congress, drawing on its direct mandate from the people, will "make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). That is especially so when policy decisions implicate "Congress's most important authorities," including "its control of the purse." *Nebraska*, 600 U.S. at 505.

Accordingly, as the Supreme Court has long made clear, administrative agencies may resolve "question[s] of deep economic and political significance" only on a showing of "clear congressional authorization." *Id.* at 506 (cleaned up). That foundational principle—often called the major questions doctrine, *see Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 639 (2026) (plurality)—applies to this case and resolves it. The CAT involves questions of deep economic and political significance by any measure; it will cost billions of dollars and fundamentally transform the government's relationship to tens of millions of American investors, with widespread ramifications for privacy and national security. Yet the SEC has conceded, as it must, that it cannot show "express authorization for CAT by Congress." 88 Fed. Reg. 62628, 62673 (Sept. 12, 2023). This Court should accordingly vacate the SEC's rule and return the decision-making power in this area to where it belongs: with Members of Congress "chosen by the people through democratic processes." *NFIB v. OSHA*, 595 U.S. 109, 120 (2022) (per curiam).

3

## STATUTORY BACKGROUND

The key statutory provision in this case is Securities Exchange Act § 11A, 15 U.S.C. § 78k-1(a), which Congress enacted in 1975. In the statute, Congress directed the SEC "to use its authority … to facilitate the establishment of a national market system for securities … in accordance with" specified "findings and to carry out [specified] objectives." *Id.* § 78k-1(a)(2). The findings include the need to "preserve[] and strengthen[]" the securities markets—"an important national asset"—and the fact that "[n]ew data processing and communications techniques create the opportunity for more efficient and effective market operations." *Id.* § 78k-1(a)(1)(A)–(B). The specified objectives include ensuring "economically efficient execution of securities transactions," promoting "fair competition" among market participants, and increasing "availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities," *id.* § 78k-1(a)(1)(C)(i)–(iii). To carry out the statutory directive, Congress authorized the SEC to "require self-regulatory organizations [SROs] to act jointly with respect to matters as to which they share authority under this chapter in planning, developing, operating, or regulating a national market system." *Id.* § 78k-1(a)(3)(B).[2]

---

[2] SROs are separately vested "with a variety of adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws; promulgating and enforcing rules governing the conduct of [their] members; and listing and de-listing stock offerings." *Weissman v. Nat'l Ass'n of Secs. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007) (en banc).

In short, Section 11A authorizes the SEC to develop "a national market system to 'distribute market data economically and equally and to promote fair competition among all market participants.'" *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1131 (D.C. Cir. 2022). That statutory authorization confers on the Commission an important but limited power, and for most of the past half-century the SEC has treated it as such. With the advent of digitized trading, for example, the Commission in 2005 adopted a regulation—known as Regulation NMS—"to promote the availability of securities market data to investors and other market participants." *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1106 (D.C. Cir. 2022). Regulation NMS updated existing "Market Data Rules" by creating a mechanism for "consolidating, distributing, and displaying market information" to participants in the equities and options markets. 70 Fed. Reg. 37496, 37496 (June 29, 2005).

Regulation NMS pertained only to a relatively cabined set of data, including pricing, size, bids, offers, and shares. *See Nasdaq*, 34 F.4th at 1106. Market participants who wanted more detailed data had to subscribe to a proprietary data service. *Id.* at 1106–07. Over time, those proprietary data services evolved to be "vastly more useful to investors than the more affordable [Regulation NMS] data feeds." *Id.* at 1107. The SEC responded by adopting a rule on Market Data Infrastructure, which "expand[ed] the content of NMS information that is required to be collected, consolidated, and disseminated." 86 Fed. Reg. 18596, 18596 (Apr.

5

9, 2021) (codified as 17 C.F.R. pts. 240, 242, 249).  The upshot of the rule was to provide to all market participants data that was formerly only available to proprietary subscribers—a targeted regulatory measure that directly implements Section 11A's authorization to expand "the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities." 15 U.S.C. § 78k-1(a)(1)(C)(iii).

The SEC action at issue here, however, is anything but targeted, and it reaches far beyond the scope of regulation authorized by the statute.  In creating the CAT in 2016, the SEC invoked Section 11A to develop a tool of unprecedented scope and intrusiveness—administered by a brand new corporate entity—that does not increase the flow of information "to brokers, dealers, and investors" or promote the "economically efficient execution of securities transactions" but instead suctions up vast quantities of sensitive information for enforcement use *by the SEC*.  *Id.* (a)(1)(C)(i), (iii); *see* 81 Fed. Reg. 30614, 30614–16 (May 17, 2016).  The Commission thus gifted itself a new surveillance apparatus that has no foundation in the authorization provided by Congress in Section 11A.

In 2023, the SEC took a further leap away from its statutory authorization by creating a perpetual funding system (the "Executed Share Model") that as a practical matter imposes the entire bill for the CAT on broker-dealers and (in turn) investors. *See* 88 Fed. Reg. at 62630, 62682.  Congress, however, said nothing about such a

6

funding mechanism in Section 11A. And because the CAT's funding comes entirely from private sources, it is effectively immune from the congressional oversight process that generally accompanies outlays for government enforcement under our constitutional structure.

This Court vacated the 2023 order. *American Secs. Ass'n v. SEC*, 147 F.4th 1264 (11th Cir. 2025). Because the Court "resolve[d] th[e] appeal on administrative law grounds," it declined to decide petitioners' "challenge to the CAT's lawfulness" and did not resolve whether the CAT or its funding exceeded the SEC's statutory authority. *Id.* at 1274. The SEC then issued the "substantively identical" order at issue here, purportedly resolving those administrative law concerns and again imposing a tax on market participants to fund the CAT. 91 Fed. Reg. 13410, 13415 (Mar. 19, 2026) ("Order").

## ARGUMENT

This Court should resolve the questions it reserved in 2025, grant the petition, and set aside the order under review. Both the CAT itself and the SEC's funding mechanism exceed the authority that Congress conferred on the Commission and undermine important separation of powers principles—in particular Congress's power of the purse. If anything resembling the CAT is to be imposed on American investors and markets, the direction to do so must come from the body that the Constitution entrusts with such decisions: the United States Congress.

7

I.    **THE MAJOR QUESTIONS DOCTRINE FORECLOSES THE SEC'S ADOPTION OF THE CAT**

As the Supreme Court has long made clear, decisions of major economic and political significance must be made by Congress, which is elected by and accountable to the American people. Here, the SEC all but admits that Congress did not clearly confer on the agency authority to adopt the CAT. Under a straightforward application of the major questions doctrine, the SEC therefore had no power to do so, and the order under review must be set aside.

A.    **The Major Questions Doctrine Safeguards Congress's Article I Prerogatives**

The major questions doctrine rests on "both separation of powers principles and a practical understanding of legislative intent." *West Virginia*, 597 U.S. at 723. By requiring "clear congressional authorization" for economically and politically significant administrative agency actions, the doctrine protects Congress's constitutional responsibility and prerogative to resolve the "basic and consequential tradeoffs" underlying major federal regulatory policy decisions. *Id.* at 730, 732. When "the Government claim[s] broad, expansive power on an uncertain statutory basis," courts must review that claim with "skepticism" even if "the statutory text might as a matter of definitional possibilities" be "read to delegate the asserted power." *Learning Res.*, 146 S. Ct. at 639 (plurality) (citation and brackets omitted).

8

The foundation of the major questions doctrine is the Constitution's vesting of "[a]ll [federal] legislative Powers … in Congress." U.S. Const. art. I, § 1. Simply put, it is Congress's job—and not anyone else's—"to prescribe general rules for the government of society." *Fletcher v. Peck*, 10 U.S. 87, 136 (1810); *see, e.g.*, *Util. Air Regul. Grp. (UARG) v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the President, acting at times through agencies … 'faithfully execute[s]' them.").

The Framers allocated power in that way for sound reasons. They believed "that a republic—a thing of the people—would be more likely to enact just laws than a regime administered by a ruling class of largely unaccountable 'ministers.'" *West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring) (quoting The Federalist No. 11, at 85 (C. Rossiter ed. 1961) (A. Hamilton)). And they recognized that, "by vesting the lawmaking power in the people's elected representatives," the Constitution would "ensure 'not only that all power would be derived from the people,' but also 'that those entrusted with it should be kept in dependence on the people.'" *Id.* at 737–38 (quoting The Federalist No. 37, at 227 (J. Madison) (brackets omitted)).

The major questions doctrine reflects those fundamental principles of democratic accountability. By requiring that consequential regulatory policy decisions be traceable to Congress—either through direct resolution in statutory enactments or "clear authorization" for administrative agencies to act pursuant to

Congress's directions, *West Virginia*, 597 U.S. at 732—the doctrine recognizes that such decisions are "the responsibility of those chosen by the people through democratic processes," *NFIB*, 595 U.S. at 120; *see id.* at 124 (Gorsuch, J., concurring) (explaining that the major questions doctrine ensures that "the national government's power to make the laws that govern us remains where Article I of the Constitution says it belongs—with the people's elected representatives").

The major questions doctrine also reflects a "common sense" understanding of how Congress actually operates. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). As the Supreme Court has rightly recognized, "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 597 U.S. at 723; *see also Nebraska*, 600 U.S. at 515 (Barrett, J., concurring) ("Because the Constitution vests Congress with '[a]ll legislative Powers,' Art. I, § 1, a reasonable interpreter would expect it to make the big-time policy calls itself, rather than pawning them off to another branch."); Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370 (1986) ("Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.").

Thus, when an administrative agency asserts authority to make a consequential policy decision in the first instance, the major questions doctrine

10

requires courts to view the agency's claim with "skepticism"—and demands that the agency make a showing of "clear congressional authorization" in order to proceed. *West Virginia*, 597 U.S. at 732.  Simply put, if Congress has not clearly authorized an administrative agency to make a major policy choice, the agency has no authority to do so.  *See NFIB*, 595 U.S. at 117 ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

### B.    The CAT Presents Major Questions That Require Clear Congressional Approval

The major questions doctrine applies where (among other circumstances) an agency claims authority to resolve a question of "vast economic and political significance," particularly when doing so exceeds the agency's expertise.  *UARG*, 573 U.S. at 324 (cleaned up).  The SEC's creation and funding of the CAT implicate all of those concerns.  The CAT has massive economic consequences.  It involves sensitive political determinations involving privacy and national security.  And resolving many of those questions is far beyond the SEC's expertise.  Such decisions are instead "ones that Congress would likely have intended for itself."  *West Virginia*, 597 U.S. at 730.

#### 1.    *The CAT has massive economic consequences*

The economic scope of the CAT "is staggering by any measure."  *Nebraska*, 600 U.S. at 502.  The SEC's stated intent is to "collect and store every equity and option trade and quote, from every account at every broker, by every investor."  SEC,

11

*Statement of Hester M. Peirce in Response to Release No. 34-88890*, File No. S7-13-19 (May 15, 2020) ("Peirce Response"), http://tinyurl.com/ys2pu43h.  The CAT now accumulates nearly 800 billion records *per day*.  Order at 13474.  The fiscal ramifications of the CAT are equally profound.  The CAT has already cost roughly $1 billion to date, and its maintenance costs hover at an estimated roughly $150 million annually, suggesting that a fully operational CAT will cost billions of dollars in perpetuity.  *See* Order at 13464, 13466.  Compliance efforts by private entities will cost billions more.  *See* Pet. Br. 24-25.  The SEC, moreover, has never adopted anything resembling the CAT in the nearly 50 years since Section 11A was enacted.  "When," as is true here, "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" the major questions doctrine applies.  *UARG*, 573 U.S. at 324.

### 2.    *The CAT implicates matters of great political significance*

In creating the CAT, the SEC has also assumed authority to resolve sensitive political issues regarding the role of the federal government's surveillance capabilities and the extent of its digital footprint.  As Commissioner Peirce noted, the CAT's "deeper problem[s]" include "the significant costs that a comprehensive surveillance tool of this type presents to Americans' liberty and privacy."  Peirce Response.  Such "a significant encroachment into the lives … of a vast number of" Americans triggers major questions doctrine scrutiny.  *NFIB*, 595 U.S. at 117.

Unsurprisingly, the CAT has prompted "earnest and profound debate," *Nebraska*, 600 U.S. at 504, across the political spectrum.  For example, several Republican Senators sent a letter to the SEC to document their concerns about foreign intelligence risks, "call[ing] on the SEC to put the security of the American people first and end its policy of putting the [personally identifiable information (PII)] of every American saver and retiree into the largest single database of market-sensitive information in history."  Letter from Sen. Kennedy et al., to SEC Chair Clayton (July 24, 2019), https://perma.cc/FF8H-CKDG.  The attorneys general of eight states similarly warned that the "CAT's collection of retail investors' PII poses a clear threat to the security of every American investor."  Letter from Arkansas Att'y Gen. T. Griffin et al., to Sen. Schumer (Aug. 15, 2023), https://arkansasag.gov/wp-content/uploads/2023-08-15-Arkansas-AG-Letter-Supporting-Investor-PII-Protections.pdf.  And the American Civil Liberties Union (ACLU) has warned "that the CAT will pose significant risks to the privacy of millions of investors."  Letter from R. Newman and K. Ruane, ACLU, to SEC Chair Clayton (Dec. 16, 2019), https://perma.cc/2V77-6ER7.  That reaction is no surprise: Questions of personal privacy—such as Foreign Intelligence Surveillance Act reauthorization—frequently provoke sharp debate in Congress.  *See, e.g.*, FISA Reform and Reauthorization Act of 2023, H.R. 6611, 118th Congress (2023)

13

(reauthorizing the Foreign Intelligence Surveillance Act with reforms to protect civil liberties and keep pace with terrorism and narcotics trafficking threats).

When such a broad range of elected officials and advocacy organizations raise their voices against the diverse risks the CAT imposes on the American people, federal courts should ensure that "Congress meant to confer such authority" to the Commission. *West Virginia*, 597 U.S. at 721 (cleaned up); *cf. United States v. Jones*, 565 U.S. 400, 429 (2012) (Alito, J., concurring in the judgment) ("In circumstances involving dramatic technological change, the best solution to privacy concerns may be legislative."); *id.* at 416–17 (Sotomayor, J., concurring) ("I would also consider the appropriateness of entrusting to the Executive, *in the absence of any oversight from a coordinate branch*, a tool so amenable to misuse, especially in light of the Fourth Amendment's goal to curb arbitrary exercises of police power and prevent a too permeating police surveillance" (emphasis added; cleaned up)).

Indeed, the SEC's creation of the CAT is in some respects even more politically significant than the regulatory actions to which the Supreme Court has previously applied the major questions doctrine. In many of those cases, the Court took issue with agencies *extending* the reach of an already existent and congressionally authorized regulatory structure. *See, e.g.*, *West Virginia*, 597 U.S. at 706; *Nebraska*, 600 U.S. at 494. By contrast, the SEC in designing the CAT has *created* a vast new surveillance enterprise headed by a newly created company that

14

Congress never even suggested.  Such an innovation surely triggers major questions scrutiny.  *See, e.g.*, *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 234 (1994) (applying such scrutiny where an agency action amounted to "effectively the introduction of a whole new regime").

### 3.    *The SEC lacks relevant expertise to resolve many key questions*

By appointing itself the custodian of every American securities investor's personal data—with attendant implications for Americans' personal liberty, national security, and the risk of cybercrime—the SEC has far exceeded its professed expertise.  The SEC regulates financial markets, and its only statutory mandate relevant here is to "facilitate the establishment of a national market system for securities."  15 U.S.C. § 78k-1(a)(2).  The types of market data that the SEC has authority to collect and distribute for a national market system—such as order size and price of trading securities—are intended for "dissemination to any person" in the markets, not the highly personalized and private data collected by the CAT.  17 C.F.R. § 242.614(a)(1)(i)(B).  The stark contrast between the SEC's narrow range of authority and the magnitude of the issues presented by the CAT makes "it … especially unlikely that Congress would have delegated" decisions on these issues to the SEC, "which has no expertise in crafting" policies governing personal privacy, individual liberty, national security, or cybercrime.  *King v. Burwell*, 576 U.S. 473, 486 (2015).  "This is not a case for the [SEC]."  *Id.*

In sharp contrast, Congress has repeatedly navigated—and is entrusted to decide—sensitive issues involving financial and personal privacy of the kind that the SEC arrogated to itself in creating the CAT. *See, e.g.*, Financial Services Modernization Act of 1999, Pub. L. No. 106-102, 113 Stat. 1338 (requiring financial institutions to explain how they share and protect customers' personal information); Health Insurance Portability and Accountability Act (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (1996) (protecting against unauthorized disclosure of patients' personal information); National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31 (2024) (providing for military cyber operations, cybersecurity cooperation with foreign allies, and enhanced cybersecurity of critical infrastructure); Cyber Incident Reporting for Critical Infrastructure Act of 2022, Pub. L. No. 117-103, 136 Stat. 1038 (collecting, aggregating, and analyzing cyber incidents to protect critical infrastructure); State and Local Government Cybersecurity Act of 2021, Pub. L. No. 117-150, 136 Stat. 1295 (increasing cyber security cooperation between federal, local, state, and tribal governments).

The SEC's structure and track record, moreover, provide little reason for confidence in its ability to address such sensitive subjects outside its lane of expertise.   The SEC is run by a board of unelected commissioners who are assumed to be removable by the President only for cause. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 487 (2010).   And that lack of accountability is compounded by the

16

insulation the SEC has provided itself by creating the CAT LLC governance structure. To make matters worse, the SEC has experienced several cyber-attacks resulting in the loss of confidential investor data. *See, e.g.*, A. Weinstein et al., *SEC Had a Fraught Cyber Record Before X Account Was Hacked*, BLOOMBERG LAW (Jan. 11, 2024). That is all the more reason to require clear authorization from Congress before entrusting such delicate matters to the SEC.

**C.    Congress Did Not Authorize The CAT With The Clarity Required By The Major Questions Doctrine**

Because the SEC's creation of the CAT implicates the major questions doctrine, the agency must "point to clear congressional authorization" to justify the program. *Nebraska*, 600 U.S. at 506 (citation omitted). But the SEC all but concedes that it cannot meet that test. The Commission acknowledges—as it must— that it cannot show "express authorization for CAT by Congress." 88 Fed. Reg. at 62673. That admission should end this case. Transforming Congress's directive to "facilitate the establishment of a national market system" into a license to mandate the creation of a national surveillance system that tracks every transaction and investor in the federal securities markets would amount to "'a fundamental revision of the statute, changing it from one sort of scheme of regulation' into an entirely different kind." *West Virginia*, 597 U.S. at 728 (alterations adopted). Only Congress enjoys such "legislative powers." U.S. Const. art. I, § 1.

In exercising those legislative powers, moreover, Congress has debated the CAT and the major policy questions it raises multiple times since 2018—but it has conspicuously declined to adopt anything resembling the CAT. *See, e.g.*, Protecting Investors' Personally Identifiable Information Act, H.R. 1483, 119th Congress (2025), S. 658, 119th Congress (2025); Protecting Investors' Personally Identifiable Information Act, H.R. 4551, 118th Congress (2023), S. 2230, 118th Congress (2023); Protecting Investors' Personally Identifiable Information Act, H.R. 2039, 117th Congress (2021), S. 1209 117th Congress (2021); American Customer Information Protection Act, H.R. 4785, 115th Congress (2018). The House Committee on Financial Services even passed the 2018 bill to the full House of Representatives and issued a formal report. *See* American Customer Information Protection Act, H.R. 4785, Report 115-663, 115th Congress (2018). There, the Committee found: "Ultimately, this bill will help ensure the CAT can be completed more efficiently … as it will reduce the likelihood of it being targeted by hackers in an effort to steal PII." *Id.* at 4. It based these largely findings on the statements of former SEC Chair Jay Clayton that the "Commission staff is currently conducting an evaluation of our needs for personally identifiable information ('PII') in the CAT." *Id.* Although the bill ultimately did not receive a vote, Congress has clearly shown an appetite to engage in the CAT debate directly—and has declined to authorize it. *See, e.g.*, *NFIB*, 595 U.S. at 119 (noting that Congress had debated but

18

declined to pass an employer vaccine mandate, and rejecting OSHA's adoption of such a mandate under the major questions doctrine).

Finally, the novelty of the CAT weighs heavily against a finding of clear congressional authorization.  "It is telling that" the SEC, in the "half century of [Section 11A's] existence, has never before adopted a broad … regulation of this kind." *Id.* "This 'lack of historical precedent,' coupled with the breadth of authority that the [SEC] now claims, is a 'telling indication' that the mandate extends beyond the agency's legitimate reach." *Id.* at 119–20.  The Supreme Court has rightly "pumped the brakes" in such circumstances, *Nebraska*, 600 U.S. at 519 (Barrett, J., concurring), and this Court should too.

## II.    THE CAT'S FUNDING MODEL CIRCUMVENTS CONGRESS'S AUTHORITY

Although the lack of statutory authorization for the CAT provides sufficient reason to grant the petition for review, that is not the only flaw underlying the SEC's action.  The CAT's Executed Share Model funding mechanism is separately unlawful. It constitutes an effort to evade the vitally important process of congressional taxation, appropriations, and oversight without statutory authorization.  Because the major questions doctrine "appl[ies] with particular force where, as here, the purported delegation involves the core congressional power of the purse," the SEC's assertion of authority requires "clear congressional authorization." *Learning Res.*, 146 S. Ct. at 639, 642 (plurality).

19

### A.    The Funding Model Raises Questions Under The Taxing Clause

The Executed Share Model slashes a crucial strain of Congress's power of the purse: its exclusive "Power To lay and collect Taxes." U.S. Const. art. I, § 8, cl. 1. "No more essential or important power has been conferred upon the Congress," *United States v. Jacobs*, 306 U.S. 363, 370 (1939); accordingly, agency collections of revenue are permissible only "if Congress *clearly* delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority," *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 219 (1989) (emphasis added). After all, the taxing power is "both a 'power to destroy' and a power 'necessary to the existence and prosperity of a nation'"—and it is *Congress's* power. *Learning Res.*, 146 S. Ct. at 638. The courts thus do not lightly "allow agencies to use statutory silence or ambiguity" to create new taxes—let alone a new multibillion-dollar tax program in perpetuity. *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1445 (D.C. Cir. 1994).

The SEC charges well beyond that settled limitation here. Its Executed Share Model will fund transaction-by-transaction government surveillance of more than a hundred million Americans at a cost of more than $150 million per year. As noted, the SEC has conceded that this colossal fiscal undertaking lacks "express authorization." 88 Fed. Reg. at 62673. And the Government has already, in another case, "concede[d] … that the Securities and Exchange Commission cannot tax the

20

trading of securities, even though it is expressly authorized to 'regulate the trading of … securities.'" *Learning Res.*, 146 S. Ct. at 643 (citation omitted).

The SEC has claimed to find sufficient authorization to fund the CAT in a nebulous combination of Section 11A and 15 U.S.C. § 78f(b). But those statutes, alone or combined, do not suffice. As discussed, Section 11A simply authorizes the SEC to "facilitate the establishment of a national market system for securities." And Subparagraph 78f(b)(4) requires SROs to "provide for the equitable allocation of reasonable dues, fees, and other charges among its members and issuers" as a condition of registration as a national securities exchange. Those statutes, plainly read, do not amount to *clear* congressional authorization for the SEC to operate and fund the CAT in the shadows. And especially when "Congress's most important authorities" are at stake, *Nebraska*, 600 U.S. at 505, Congress "does not … hide elephants"—or CATs—"in mouseholes," *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). "Where administrative interpretation of a statute" raises such grave constitutional concerns, "use of a narrowing construction prevents executive encroachment on Congress's exclusive powers to raise revenue, and to appropriate funds." *Bell Atl.*, 24 F.3d at 1445 (citations omitted); *see, e.g.*, *Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 341 (1974) (construing statute permitting the FCC to charge a "fee, charge, or price" to permit only specific types of transactions because the alternative would carry the "agency far from its

21

customary orbit and put[] it in search of revenue in the manner of an Appropriations Committee of the House").

**B.     The Funding Model Raises Questions Under The Appropriations Clause**

The Appropriations Clause provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  A "bulwark of the Constitution's separation of powers," *U.S. Dep't of Navy v. Federal Lab. Rel. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.), the Appropriations Clause speaks an "explicit and straightforward command": "[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *OPM v. Richmond*, 496 U.S. 414, 424 (1990).

Congress's control of the federal purse was essential to the Constitution's ultimate ratification.  Congressional power over public monies was "critical to dispelling the Anti-Federalist fears that a strong national government, and particularly an energetic unitary executive, would invite tyranny and oppression of the states."  *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 229 (5th Cir. 2022) (en banc) (Jones, J., concurring).  Federalists, and James Madison in particular, underscored that the "'purse is in the hands of the representatives of the people' who 'have the appropriation of all moneys.'"  *Id.* (citation omitted).

By statute, the SEC must participate in Congress's annual appropriations process.  Congress has permitted the SEC to "collect transaction fees and

assessments that are designed to recover the costs to the Government of the annual appropriation to Congress." 15 U.S.C. § 78ee(a). In other words, Congress exerts control over the SEC's budget and priorities at the front end while allowing the SEC to recover amounts *that Congress has already appropriated* on the back end. But the SEC did not follow that well-established process in developing the CAT. Instead, it commandeered SROs to develop and fund a multibillion-dollar surveillance system that the SEC openly acknowledges it will use as its own. That violates the Constitution's command that spending be authorized by "a law that authorizes expenditures from a specified source of public money for designated purposes." *CFPB v. Cmty. Fin. Serv. Ass'n of Am., Ltd.*, 601 U.S. 416, 424 (2024).

The SEC suggests that its novel funding scheme—the Executed Share Model—lets it off the Appropriations Clause hook. According to the SEC, the Clause does not apply to the CAT because it is a "self-regulatory initiative" funded by private parties. 88 Fed. Reg. at 62672. But that contention misrepresents both the true nature of the CAT and the proper scope of the Appropriations Clause.

As an initial matter, in authorizing the CAT, the SEC proclaimed that it will access, use, and control the CAT without limit. The SEC ordered the development of the CAT for its own benefit, in the process dictating that it will have "unfettered" and "direct[] access" to the CAT's data, including "access to all systems of the central repository," "in real time." 75 Fed. Reg. 32556, 32567, 32581 (June 8, 2010);

23

77 Fed. Reg. 45722, 45775 (Aug. 1, 2012). In turn, the SEC declared that it will use this unprecedented power to "perform its regulatory and oversight responsibilities pursuant to the federal securities laws," 75 Fed. Reg. at 32581, "fulfill its statutory mission," 77 Fed. Reg. at 45727, and "perform surveillance and investigations," *id.* at 45730. Driving the point home, the SEC rejected alternative proposals to ensure that "it will have more regulatory authority over the central repository." *Id.* at 45755.

The SEC has thus left no doubt that the CAT is a *government* surveillance program. And that fact dispels any notion that the SEC may both concoct this massive scheme *and* excuse itself from regular appropriations scrutiny. It is no answer that the CAT's funds will not be literally drawn from the Treasury Department. The Appropriations Clause's reference to "the Treasury" encompasses both the funds held by the Executive Department later created by Congress and all other "public money," including "taxes raised from the people as well as revenues arising from other sources." *OPM*, 496 U.S. at 427 (citation omitted). Were it otherwise, the Executive Branch could evade the requirements of congressional authorization and regular accountability to Congress by requisitioning private parties to fund controversial law enforcement initiatives of any size. That is not the system the Framers devised. *See Dep't of Navy*, 665 F.3d at 1348 (explaining that "an agency cannot use the device of a contract, grant, or agreement to accomplish a purpose it could not do by direct expenditure").

## CONCLUSION

*Amici* respectfully urge the Court to vacate the order on review.


Dated: May 28, 2026

Respectfully submitted,

DAVID A. NABORS
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
2601 Bayshore Drive, Suite 1550
Miami, Florida 33133
(305) 402-4880
davidnabors@quinnemanuel.com

CHRISTOPHER G. MICHEL
ZACHARY J. LUSTBADER
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
555 13th St. NW
Washington, D.C. 20004
(202) 538-8000
christophermichel@quinnemanuel.com
zachlustbader@quinnemanuel.com

JOHN F. BASH
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
300 W. 6th St., Suite 2010
Austin, TX 78701
(737) 667-6100
johnbash@quinnemanuel.com

*Counsel for Amici Curiae*

25

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the length limit requirements of Fed. R. App. P. 29(a)(5) because it contains 5,720 words (based on the Microsoft Word word-count function) excluding the parts exempted by Fed. R. App. P. 32(f).

2.      This brief complies with typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type.

Dated: May 28, 2026

*/s/ Christopher G. Michel*
Christopher G. Michel

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2026, the foregoing was filed electronically with the Clerk of the Court using the Court's CM/ECF system. Service will be effectuated to all parties and counsel of record in this matter who are registered with the Court's CM/ECF system.

Dated: May 28, 2026

*/s/ Christopher G. Michel*
Christopher G. Michel
