No. 26-10936

# In the United States Court of Appeals for the Eleventh Circuit

---

AMERICAN SECURITIES ASSOCIATION, CITADEL SECURITIES LLC,
PETITIONERS

*v.*

U.S. SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

CONSOLIDATED AUDIT TRAIL, LLC, THE NASDAQ STOCK
MARKET, LLC, ET AL.,
INTERVENORS

---

*ON PETITION FOR REVIEW OF AN ORDER
OF THE SECURITIES AND EXCHANGE COMMISSION (RELEASE NO. 26-10936)*

---

**BRIEF OF AMICUS CURIAE SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION IN SUPPORT OF THE PETITION FOR REVIEW
AND MOTION FOR A STAY**

---

WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*

LORIN L. REISNER
ERIC E. STERN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*
  *(212) 373-3000*
  *lreisner@paulweiss.com*

*No. 26-10936, American Securities Association v. U.S. Securities and Exchange Commission*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, amicus curiae Securities Industry and Financial Markets Association provides the following list of interested persons:

- 24X National Exchange LLC, *member of intervenor Consolidated Audit Trail, LLC*

- American Securities Association, *petitioner*

- ArentFox Schiff, LLP, *counsel for intervenors Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; Cboe C2 Exchange, Inc.; and Cboe Exchange, Inc.*

- Ballard Spahr, LLP, *counsel for intervenors The NASDAQ Stock Market LLC, NASDAQ GEMX, LLC; NASDAQ ISE, LLC; NASDAQ MRX, LLC; NASDAQ PHLX, LLC; and NASDAQ Texas, LLC*

- Berman, Ari M., *counsel for NYSE intervenors*

- Borse Dubai Limited, *owner of 10% or greater interest in NASDAQ, Inc.*

- BOX Exchange LLC, *member of intervenor Consolidated Audit Trail, LLC*

- Boyle, Gregory, *counsel for intervenor Consolidated Audit Trail, LLC*

- Cboe BYX Exchange, Inc., *intervenor*

C-1 of 7

*No. 26-10936, American Securities Association* v. *U.S. Securities and Exchange Commission*

- Cboe BZX Exchange, Inc., *intervenor*

- Cboe C2 Exchange, Inc., *intervenor*

- Cboe EDGA Exchange, Inc., *intervenor*

- Cboe EDGX Exchange, Inc., *intervenor*

- Cboe Exchange, Inc., *intervenor*

- Cboe Global Markets, Inc. (BATS: CBOE), *indirect owner of 10% or greater interest in intervenor Consolidated Audit Trail, LLC, and direct or indirect parent company of Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; Cboe C2 Exchange, Inc.; and Cboe Exchange, Inc.*

- Citadel Securities GP LLC, *parent company of petitioner Citadel Securities LLC*

- Citadel Securities LLC, *petitioner*

- Connolly, John Michael, *counsel for petitioner American Securities Association*

- Consolidated Audit Trail, LLC, *intervenor*

- Consovoy McCarthy, PLLC, *counsel for petitioner American Securities Association*

- Deutsch, Elizabeth B., *counsel for intervenor Consolidated Audit Trail, LLC*

- Dinkel, Christopher S., *counsel for Petitioner Citadel Securities LLC*

*No. 26-10936, American Securities Association* v. *U.S. Securities and Exchange Commission*

- Financial Industry Regulatory Authority, Inc., *member of intervenor Consolidated Audit Trail, LLC*

- Francisco, Noel J., *counsel for petitioner Citadel Securities LLC*

- Gershengorn, Ian Heath, *counsel for intervenor Consolidated Audit Trail, LLC*

- Greenwalt, Paul, III, *counsel for intervenors Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; Cboe C2 Exchange, Inc.; and Cboe Exchange, Inc.*

- Heckendom, J. Maxwell, *counsel for intervenors Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; Cboe C2 Exchange, Inc.; and Cboe Exchange, Inc.*

- Investors' Exchange, LLC, *member of intervenor Consolidated Audit Trail, LLC*

- Jenner & Block LLP, *counsel for intervenor Consolidated Audit Trail, LLC*

- Jones Day, *counsel for petitioner Citadel Securities LLC*

- Kastenberg, Stephen J., *counsel for intervenors The NASDAQ Stock Market LLC; NASDAQ GEMX, LLC; NASDAQ ISE, LLC; NASDAQ MRX, LLC; NASDAQ PHLX, LLC; and NASDAQ Texas, LLC*

*No. 26-10936, American Securities Association v. U.S. Securities and Exchange Commission*

- Lantieri III, Paul, *Ballard Spahr LLP, Counsel for Intervenors The NASDAQ Stock Market LLC, NASDAQ GEMX, LLC, NASDAQ ISE, LLC, NASDAQ MRX, LLC, NASDAQ PHLX, LLC, and NASDAQ Texas, LLC*

- Long-Term Stock Exchange, Inc., *member of intervenor Consolidated Audit Trail, LLC*

- Lucas, Brinton, *counsel for petitioner Citadel Securities LLC*

- MacLean, Matthew J., *counsel for NYSE intervenors*

- Madigan, Sarah M., *counsel for NYSE intervenors*

- Marshall, Jonathan J., *counsel for intervenor Consolidated Audit Trail, LLC*

- Matro, Daniel E., *counsel for respondent Securities and Exchange Commission*

- MEMX LLC, *member of intervenor Consolidated Audit Trail, LLC*

- Miami International Securities Exchange LLC, *member of intervenor Consolidated Audit Trail, LLC*

- MIAX Emerald, LLC, *member of intervenor Consolidated Audit Trail, LLC*

- MIAX PEARL, LLC, *member of intervenor Consolidated Audit Trail, LLC*

*No. 26-10936, American Securities Association v. U.S. Securities and Exchange Commission*

- MIAX Sapphire, LLC, *member of intervenor Consolidated Audit Trail, LLC*

- Molzberger, Michael, *counsel for intervenors Cboe BYX Exchange, Inc.; Cboe BZX Exchange, Inc.; Cboe EDGA Exchange, Inc.; Cboe EDGX Exchange, Inc.; Cboe C2 Exchange, Inc.; and Cboe Exchange, Inc.*

- Montgomery, Sophia W., *counsel for intervenor Consolidated Audit Trail, LLC*

- NASDAQ GEMX, LLC, *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- NASDAQ ISE, LLC, *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- NASDAQ MRX, LLC, *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- NASDAQ PHLX, LLC, *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- NASDAQ Texas, LLC, *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- New York Stock Exchange LLC, *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- NYSE American, LLC, *intervenor and member of intervenor Consolidated Audit Trail, LLC*

*No. 26-10936, American Securities Association v. U.S. Securities and Exchange Commission*

- NYSE Arca, Inc., *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- NYSE National, Inc., *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- NYSE Texas, Inc., *intervenor and member of intervenor Consolidated Audit Trail, LLC*

- Oliwenstein, David, *counsel for NYSE Intervenors*

- Paul, Weiss, Rifkind, Wharton & Garrison, LLP, *counsel for amicus curiae Securities Industry and Financial Markets Association*

- Phillips, David, *counsel for petitioner Citadel Securities LLC*

- Pillsbury Winthrop Shaw Pittman, LLP, *counsel for NYSE intervenors*

- Rabbitt, Brian C., *counsel for petitioner Citadel Securities LLC*

- Reisner, Lorin L., *counsel for amicus curiae Securities Industry and Financial Markets Association*

- Securities Industry and Financial Markets Association, *amicus curiae*

- Stern, Eric E., *counsel for amicus curiae Securities Industry and Financial Markets Association*

- Templin, Hannah, *counsel for petitioner Citadel Securities LLC*

- The Nasdaq Stock Market LLC, *member of intervenor Consolidated Audit Trail, LLC*

- United States Securities and Exchange Commission, *respondent*

*No. 26-10936, American Securities Association v. U.S. Securities and Exchange Commission*

- Warnke, Anne S., *counsel for intervenor Consolidated Audit Trail, LLC*

Amicus curiae Securities Industry and Financial Markets Association has no parent corporation, and no publicly held company owns 10% or more of its stock.

/s/ Lorin L. Reisner
LORIN L. REISNER

# TABLE OF CONTENTS

Page

Table of contents..................................................................................... i

Table of citations.................................................................................... ii

Interest of amicus curiae ...................................................................... iv

Statement of the issues ..........................................................................1

Summary of argument ............................................................................2

Argument..................................................................................................4

I.    The Securities and Exchange Commission's 2026 funding order for the Consolidated Audit Trail is invalid, arbitrary, and capricious ...........................................................................6

    A.    Allocation of two-thirds—and potentially all—of the CAT costs to broker-dealers is contrary to law and arbitrary and capricious..........................................................8

        1.    The Commission's allocation of enormous costs to broker-dealers is inequitable and unreasonable............................................................8

        2.    The Commission failed to justify deviating from its previous policy of cost-sharing between CAT participants and broker-dealers ........14

    B.    The Commission failed to consider the negative effects of broker-dealer-only funding...................................20

II.    The 2026 order should be stayed pending review .........................21

    A.    Irreparable harm to industry members is likely to result absent a stay ...........................................................22

    B.    A stay would not hinder the CAT's continued functioning ..........................................................................25

Conclusion...............................................................................................26

(i)

# TABLE OF CITATIONS

## CASES

Page

*Alabama Power Co.* v. *OSHA*, 89 F.3d 740 (11th Cir. 1996)...............................6

*American Securities Ass'n* v. *SEC*,
    147 F.4th 1264 (11th Cir. 2025) ...........................1-4, 6–7, 8, 11, 17, 19–21, 25

*BNSF Railway Co.* v. *Federal Railroad Administration*,
    62 F.4th 905 (5th Cir. 2023) .........................................................................9, 14

*Environmental Defense Center* v. *Bureau of Ocean Energy
    Management*, 36 F.4th 850 (9th Cir. 2022),
    *cert. denied*, 143 S. Ct. 2582 (2023) ...................................................................14

*Environmental Health Trust* v. *FCC*, 9 F.4th 893 (D.C. Cir. 2021)................14

*Ohio* v. *EPA*, 603 U.S. 279 (2024)....................................................................22

*Exxon Co., U.S.A.* v. *FERC*, 182 F.3d 30 (D.C. Cir. 1999)................................9

*Gateway Radiology Consultants, P.A., In re*,
    983 F.3d 1239 (11th Cir. 2020)...........................................................................6

*Judulang* v. *Holder*, 565 U.S. 42 (2011) .............................................................14

*Odebrecht Construction, Inc.* v. *Secretary, Florida Department
    of Transportation*, 715 F.3d 1268 (11th Cir. 2013) .......................................24

*Philip Morris USA Inc.* v. *Scott*, 561 U.S. 1301 (2010)....................................24

*Mine Workers* v. *Mine Safety & Health Administration*,
    626 F.3d 84 (D.C. Cir. 2010) ............................................................................14

*Weissman* v. *National Ass'n of Securities Dealers, Inc.*,
    500 F.3d 1293 (11th Cir. 2007)........................................................................23

(ii)

# STATUTES AND RULE

Page

Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ........................ 1, 3-4, 6, 11

    5 U.S.C. § 706(2)(A) ....................................................................................6

Securities Exchange Act of 1934, 15 U.S.C. 78a *et seq.*...............................1, 3, 4

    15 U.S.C. § 78f(b)(4) .......................................................8, 10, 16, 18

    15 U.S.C. § 78o-3(b)(2)........................................................................26

    15 U.S.C. § 78o-3(b)(5)........................................................8, 10, 16, 18

17 C.F.R. § 242.613(a)(1)(vii)(D) ...................................................................26

# MISCELLANEOUS

81 Fed. Reg. 30,614 (May 17, 2016) ..........................................................18

81 Fed. Reg. 84,696 (Nov. 23, 2016) ...........................................12, 18, 26

88 Fed. Reg. 62,628 (Sept. 12, 2023) ............................................1, 7, 15

89 Fed. Reg. 11,153 (Feb. 13, 2024) .........................................................15

91 Fed. Reg. 13,410 (Mar. 19, 2026)...........................1, 7, 9, 11, 12–21, 23, 25–26

Letter from Marcia E. Asquith, Corporate Secretary and Executive
    Vice President, FINRA, to Vanessa Countryman, Secretary, SEC
    (Apr. 11, 2023) <tinyurl.com/FINRA-2023-Letter>....................................16

Letter from Brandon Becker to Vanessa Countryman, Secretary,
    SEC (June 13, 2024) <tinyurl.com/28dc58p2> .............................................24

Letter from Ellen Greene and Joseph Corcoran, Managing
    Directors, SIFMA, to Vanessa Countryman, Secretary, SEC
    (June 22, 2022) <tinyurl.com/SIFMA-June-Letter>......................12, 13, 14

Page

Miscellaneous—continued:

Letter from Ellen Greene and Joseph Corcoran, Managing
Directors, SIFMA, to Vanessa Countryman, Secretary, SEC
(Jan. 12, 2023) <tinyurl.com/SIFMA-January-Letter> ............................20

Letter from Ellen Greene and Joseph Corcoran, Managing
Directors, SIFMA, to Vanessa Countryman, Secretary, SEC
(May 2, 2023) <tinyurl.com/May-Letter> .............................................11, 16

Letter from Ellen Greene and Joseph Corcoran, Managing
Directors, SIFMA, to Vanessa Countryman, Secretary, SEC
(June 5, 2023) <tinyurl.com/June-2023-Letter> ........................................11

Letter from Katie Kolchin and Joseph Corcoran, Managing
Directors, SIFMA, to Vanessa Countryman, Secretary, SEC
(Oct. 21, 2025) <tinyurl.com/SIFMA-Oct-2025-Letter> ...........................13

Letter from Joanna Mallers, Secretary, FIA Principal Traders
Group, to Vanessa Countryman, Secretary, SEC
(July 14, 2023) <tinyurl.com/FIA-Letter>..................................................18

## INTEREST OF AMICUS CURIAE

Amicus curiae Securities Industry and Financial Markets Association (SIFMA) is the leading trade association for broker-dealers, investment banks, and asset managers operating in the United States and global capital markets. On behalf of industry members and their one million employees, SIFMA advocates on legislation, regulation, and business policy affecting retail and institutional investors, equity and fixed-income markets, and related products and services.

Amicus has a direct interest in this litigation because the amendments to the National Market System Plan for the Consolidated Audit Trail (CAT) will subject amicus or its members to significant, escalating, and largely uncontrolled fees.[1]

---

[1] Amicus states that no counsel for any party authored this brief in whole or in part; no counsel or party contributed money intended to fund the preparation or submission of this brief; and no person other than amicus curiae or its counsel contributed money intended to fund its preparation or submission. Petitioners, respondent, the Cboe intervenors, and the Nasdaq intervenors have consented to the filing of this brief. Intervenor Consolidated Audit Trail, LLC, opposes the filing of the portion of this brief addressing the stay motion. Counsel for amicus was unable to obtain the NYSE intervenors' position.

## STATEMENT OF THE ISSUES

1.    Whether the Securities and Exchange Commission's 2026 order approving the funding model for the Consolidated Audit Trail (CAT), 91 Fed. Reg. 13,410 (Mar. 19, 2026), is contrary to the Securities Exchange Act of 1934 and arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act for substantially the same reasons that led this Court to vacate the SEC's 2023 order that approved a nearly identical allocation of CAT costs, 88 Fed. Reg. 62,628 (Sept. 12, 2023).  *See American Securities Ass'n* v. *SEC*, 147 F.4th 1264 (2025).

2.    Whether the Commission's 2026 order is contrary to the Exchange Act and is arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act because it imposes massive financial costs on broker-dealers and investors without affording them any genuine role in establishing the CAT's budget that the Commission expects to be around $150 million per year.

3.    Whether, absent a stay of the 2026 order, there would be irreparable harm and unfairness to broker-dealers based on the payment of CAT fees that would be unrecoverable following an anticipated ruling that the proposed CAT fees are unlawful and improper.

4.    Whether, if a stay were granted, the CAT would continue functioning in the interim because the self-regulatory organizations are obligated to (and must in fact) keep the CAT operational.

## SUMMARY OF ARGUMENT

This case concerns a 2026 order of the Securities and Exchange Commission (SEC) approving a proposal to fund the CAT. The CAT is a novel and colossal system for the identification and collection of data on every transaction of equities and exchange-listed options across all markets in the United States. It was designed by various self-regulatory organizations, almost all of which are securities exchanges. Those organizations, known as the "participants," proposed to shift the majority of CAT costs to broker-dealers and their investors and customers. In particular, the funding proposal assigned two-thirds of CAT costs to broker-dealers and one-third to the participants that submitted the proposal.

The 2026 order is substantively identical to the Commission's 2023 CAT funding order that this Court vacated in *American Securities Ass'n* v. *SEC*, 147 F.4th 1264 (11th Cir. 2025). There, the Court held that the Commission had failed to justify its decision to allow the participants to pass along their costs for the CAT to broker-dealers. That decision, the Court explained, departed from the Commission's previous plan of ensuring that the participants and broker-dealers shared the costs. The Court also held that the Commission failed to consider the free-rider problem created by allowing the participants, which manage and control the CAT, to avoid paying any of the CAT's costs.

The Commission's 2026 order did not fix those flaws. The Commission gave only superficial consideration to commenters' objections, and it

2

substantially adopted the participants' proposal without providing the required justification. Because the amendments are contrary to the requirements of the Securities Exchange Act of 1934 and are arbitrary and capricious, the petition for review should be granted and the Commission's order set aside in its entirety. In the interim, a stay is warranted to prevent irreparable harm to broker-dealers from the current CAT funding order.

I.     The Commission's 2026 order violates the Administrative Procedure Act because its allocation of costs and its economic analysis are arbitrary and capricious. The Commission's order inequitably and unjustifiably imposes massive costs on broker-dealers (and investors) without offering reasoned justification for its policy choices of imposing two-thirds of CAT costs on broker-dealers (and investors) and permitting imposition of the remaining one-third of CAT costs on broker-dealers (and investors). In addition, the 2026 order is unlawful for having neglected "to consider an important aspect of the problem" when it "failed to consider the effects of potential broker-dealer-only funding" and the "classic free-rider problem" it presents. *American Securities Ass'n*, 147 F.4th at 1275.

II.     A stay of the 2026 order pending appeal is amply warranted. Absent a stay, irreparable harm to industry members is likely to result because broker-dealers would be required to make hundreds of millions of dollars of payments to the participants, which are likely to be unrecoverable even if the

3

challenge to the order prevails. And if the order were to be stayed, the CAT would continue functioning in the interim because the participants are obligated under the SEC-approved plan governing the CAT to operate the CAT.

## ARGUMENT

The Commission's 2026 order contravenes the Securities Exchange Act of 1934 and is arbitrary and capricious under the Administrative Procedure Act—for reasons the Court is already familiar with. In the order, the Commission allocated two-thirds of the costs of the CAT to broker-dealers and only one-third to the self-regulatory organizations that manage the CAT. In addition, the 2026 order allows the participants to increase fees for their members, which allows the self-regulatory organizations to pass through their CAT costs to broker-dealers already paying two-thirds of the total CAT costs. The 2026 order thus allows broker-dealers to be saddled with 100% of the costs for a system over which the participants exercise complete control.

If that approach sounds similar, it is because it is. In the 2026 order, the Commission simply promulgated a funding plan that it admits is substantively identical to the plan in the 2023 order that this Court vacated as arbitrary and capricious in *American Securities Ass'n* v. *SEC*, 147 F.4th 1264 (2025). There, the Court explained that the "allowance for self-regulatory organizations to pass through 100% of their CAT costs" was "inconsistent" with the Commission's prior orders concerning the CAT, which contemplated "both self-

4

regulatory organizations and broker-dealers fund[ing] the CAT." *Id.* at 1274–75. But the Commission failed to "provide a reasoned explanation for the change," as it was required to do. *Id.* at 1275. The Court also invalidated the 2023 order on the independent ground that the Commission "failed to consider the effects of potential broker-dealer-only funding." *Id.* In particular, the Court observed that "the self-regulatory organizations that govern the CAT now have little incentive to keep CAT costs down when they are free to pass along all of those costs to their broker-dealer members," which "creates the potential for a classic free-rider problem that the Commission only acknowledge[d] in passing." *Id.*

The Commission's present attempt to reimpose the same funding plan fares no better than its first attempt. The Commission's decision permitting broker-dealers to be saddled with up to 100% of CAT costs as part of a two-year CAT funding plan is unlawful, arbitrary, and capricious because the Commission again failed to provide reasoned justification for imposing that unfair financial burden on broker-dealers (who have had no meaningful participation in the CAT budget process) and abandoning the Commission's long-standing policy for the participants to share CAT costs with broker-dealers. In addition, the Commission again failed to "consider the effects of potential broker-dealer-only funding," including the "classic free-rider problem" it presents. *Id.*

For those reasons, the Commission's order should be vacated as invalid, arbitrary, and capricious under the Administrative Procedure Act. And as petitioners have requested, the Commission's 2026 order should be stayed pending review to prevent irreparable harm to broker-dealers in the interim.

I.   **THE SECURITIES AND EXCHANGE COMMISSION'S CAT FUNDING ORDER IS INVALID, ARBITRARY, AND CAPRICIOUS**

An agency order should be set aside by the reviewing court if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary-and-capricious standard, the Commission is obligated to act reasonably and reasonably explain its action; an order is unlawful if it "entirely fail[s] to consider an important aspect of the problem," "offer[s] an explanation for its decision that runs counter to the evidence before the agency," or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1262 (11th Cir. 2020) (citation omitted). The Commission is also obligated to "determine whether the benefits expected from [the order] bear a reasonable relationship to the costs." *Alabama Power Co.* v. *OSHA*, 89 F.3d 740, 746 (11th Cir. 1996) (citation omitted).

The Commission's order approving a new CAT funding plan is invalid, arbitrary, and capricious for substantially the same reasons that led this Court to vacate the Commission's prior CAT funding order. *American Securities*

*Ass'n*, 147 F.4th at 1273–78; 88 Fed. Reg. 62,628 (Sept. 12, 2023). Like the 2023 order, the 2026 order permits imposition of 100% of CAT costs on broker-dealers. As the Commission acknowledges, the model approved in the 2026 order is "in most material respects identical to the funding model approved in the 2023 Funding Model Order," 91 Fed. Reg. 13,414, except that it prohibits participants from "directly passing through the one-third share of CAT costs that the Plan allocates" to participants. *Id*. at 13,413. The order leaves "open the possibility," however, that "the Participants could propose to recover their share of costs from Industry Members indirectly by increasing existing fees" on industry members. *Id*.

Just as with the 2023 order struck down by this Court, the SEC's choice to permit up to 100% of CAT costs to be imposed on broker-dealers "constitutes a major CAT policy change" for which the Commission must articulate "good reasons for changing its positions." *American Securities Ass'n*, 147 F.4th at 1274–75 (internal quotation marks omitted). The Commission's attempt to permit participants to do indirectly what the vacated 2023 order allowed them to do directly cannot sidestep this Court's requirement that the Commission must provide "reasoned justifications" for deviating from its long-standing cost-sharing policy for CAT costs. In addition, the 2026 order is unlawful because it fails to consider the "classic free-rider problem" of passing on massive CAT costs to broker-dealers who are not involved in budget-

7

related decisions or implementation of the CAT plan.  *American Securities Ass'n*, 147 F.4th at 1275–76.

### A. Allocation Of Two-Thirds—And Potentially All—Of CAT Costs To Broker-Dealers Is Contrary To Law And Arbitrary And Capricious

The 2026 order is contrary to the Exchange Act and arbitrary and capricious because it unreasonably assigns two-thirds of CAT costs to broker-dealers (and effectively assigns them up to 100%, when the participants' share of costs is passed through to broker-dealers).  That allocation of fees is fundamentally inequitable and thus violates the Exchange Act's requirement that the Commission must "provide for the equitable allocation of reasonable dues, fees, and other charges."  15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5).  It is also arbitrary and capricious because it is based on insufficient analysis and fails adequately to consider reasonable alternatives.  Whether directly or indirectly, the 2026 order permits all CAT costs to be imposed on broker-dealers, which reflects a Commission policy choice that has been made without reasoned justification.  The order is thus unlawful and should be set aside.

#### 1. The Commission's Allocation Of Enormous Costs To Broker-Dealers Is Inequitable And Unreasonable

a.    The Commission's principal justification for allocating two-thirds of the costs to broker-dealers appears to be that there are "three parties who have primary roles related to transactions reportable to CAT—the buyer,

8

seller, and market regulator." 91 Fed. Reg. 13,421. But that observation proves nothing about how costs should be allocated. The CAT's massive and escalating costs are the result of the participants' choices and the Commission's demands, not the number of parties involved in every transaction. *See* SIFMA Br. 5–8, 19, *American Securities Ass'n, supra* (No. 23-13396) (Dkt. 61). In effect, the Commission offered a superficial observation, and imposed hundreds of millions of dollars in costs based on that observation. That "paucity of reasoning," *BNSF Railway Co.* v. *Federal Railroad Administration*, 62 F.4th 905, 911 (5th Cir. 2023), satisfies neither the Exchange Act nor the arbitrary-and-capricious standard.

Similarly flawed and without reason is the Commission's assertion that its two-thirds allocation would be "transparent, would be relatively easy to calculate and administer, and is designed not to have an impact on market activity because it is neutral as to the location and manner of execution." 91 Fed. Reg. 13,424. That logic at best justifies allocating *some* fixed percentage of costs to broker-dealers and to participants. But other fixed-percentage allocations aside from the SEC's proposed one-third/two-thirds division would be just as transparent, administrable, and neutral. And in any event, the "goals of administrative efficiency and objectivity do not free the agency from the requirement" of an equitable, reasoned allocation of costs. *Exxon Co., U.S.A.* v. *FERC*, 182 F.3d 30, 42 (D.C. Cir. 1999).

b.    It is unsurprising that the Commission failed to justify its express two-thirds allocation of CAT costs to broker-dealers in the 2026 order: that allocation cannot be squared with the Exchange Act and is fundamentally arbitrary and capricious.

*First*, the Commission's allocation inequitably saddles broker-dealers with the significant majority of the enormous CAT costs even though broker-dealers bear no responsibility (or ability to) keep these costs in check.  A fundamental component of any "equitable allocation" of fees, 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5), is consideration of responsibility for the underlying costs of the CAT.  Here, the Commission did not even attempt to suggest that broker-dealers bore two-thirds of the responsibility for CAT costs.

Nor could it have.  The participants are responsible for well more than one-third of CAT costs.  They, along with the Commission, have "designed and imposed on [broker-dealers] a multitude of reports, fields, and data" obligations, and after broker-dealers submit data to the CAT, the data are processed by the CAT for use by regulators.  *See, e.g.*, Letter from Ellen Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 5 (June 22, 2022) <tinyurl.com/SIFMA-June-Letter> (SIFMA 2022 Letter).  It is thus the participants who "directly control . . . the CAT System."  *Id.*; *see also* Letter from Ellen Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 6–

7 (May 2, 2023) <tinyurl.com/SIFMA-2023-Letter> (SIFMA 2023 Letter). The Commission's imposition of enormous costs on broker-dealers despite their lack of any meaningful role in setting CAT costs is quintessentially unlawful, arbitrary, and capricious.

*Second*, broker-dealers are charged with funding nearly all of the CAT costs despite their lack of proportionate benefits. In approving the new CAT funding plan, the Commission asserted that the allocation "constitutes a reasonable and equitable allocation of costs among the primary parties that participate in and benefit from such trading activity and the market oversight CAT enables." 91 Fed. Reg. 13,412. But the Commission did not explain how broker-dealers receive two-thirds of the benefits of the CAT when, as commenters have noted, the participants and other regulators are the ones that benefit from CAT data. *See, e.g.*, Letter from Ellen Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 8 (June 5, 2023) <tinyurl.com/June-2023-Letter>; SIFMA 2022 Letter 5. Generic statements that broker-dealers "benefit from . . . the market oversight CAT enables," 91 Fed. Reg. 13,421–22, and that broker-dealers "receive [] benefits from the CAT," *id.* at 13,450, do not meet the Administrative Procedure Act's requirements that agency action be "reasonable and reasonably explained." *American Securities Ass'n*, 147 F.4th at 1277 (citation omitted).

11

*Third*, the Commission failed to consider the costs for broker-dealers to comply with the CAT when determining an equitable and reasonable sharing of the costs incurred by participants to develop the CAT. Broker-dealers have spent billions of dollars to comply with CAT requirements; even the Commission recognized the enormous amount of these compliance costs in 2016 when it anticipated that broker-dealers would be compelled to spend *$1.5 billion* annually to comply with the CAT's "ongoing data reporting" requirements. 81 Fed. Reg. 84,859–60 (Nov. 23, 2016). In particular, broker-dealers have had to "develop[] internal systems capable of reporting order and transaction data to the CAT and workable reporting specifications for the CAT" in order to comply with the CAT's onerous "technical specifications and reporting scenarios," which spanned 1,642 pages as of 2022. SIFMA 2022 Letter 4–5 & n.9. Although broker-dealers do not seek reimbursement for those enormous costs, such compliance expenses are relevant for the Commission's determination of how to "fairly and reasonably share[]" the participants' costs "incurred . . . on behalf of the [CAT]" among the participants and broker-dealers. 91 Fed. Reg. 13,424. Those compliance costs incurred by broker-dealers are a further reason that charging broker-dealers two-thirds (and possibly up to 100%) of CAT costs is grossly inequitable.

The Commission erroneously said it could ignore consideration of broker-dealers' compliance costs altogether because "the purpose of the funding

12

model is to provide a framework for the recovery of a different set of costs—those incurred by the Participants' in developing and maintaining the CAT system." 91 Fed. Reg. 13,424.  That may be the purpose of the funding model, but stating that fact does nothing to explain why a fair and reasonable allocation of the CAT costs could not—or should not—take into account the significantly greater burden incurred by broker-dealers than by the participants. *See* 91 Fed. Reg. 13,424;  SIFMA 2022 Letter 4.

c.    In addition to adopting an inequitable allocation and failing sufficiently to justify it, the Commission failed to adequately consider alternatives proposed by commenters.  For example, SIFMA proposed several alternative funding models, including making broker-dealers responsible for the costs associated with initial ingestion of data into the CAT system and making participants responsible for all subsequent costs, which are exclusively within their control.  *See* Letter from Katie Kolchin and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 1, 3–5 (Oct. 21, 2025) <tinyurl.com/SIFMA-Oct-2025-Letter>; SIFMA 2022 Letter 5–6.  The Commission dismissed all of those alternatives without any substantive reasoning.

The Commission remarked that "there may be multiple reasonable approaches," 91 Fed. Reg. 13,421, and that each alternative "has relative strengths and weaknesses," *id*. at 13,424.  But those generic statements do not

13

suffice. *See, e.g.*, *Environmental Health Trust* v. *FCC*, 9 F.4th 893, 905 (D.C. Cir. 2021); *Mine Workers* v. *Mine Safety & Health Administration*, 626 F.3d 84, 87 (D.C. Cir. 2010). An agency must articulate the basis of its reasoning, and here, the agency has "barely articulated any basis at all." *BNSF Railway*, 62 F.4th at 911. Although agencies need not consider "infinite, unfeasible, or impractical alternatives," they must consider "reasonable ones." *Environmental Defense Center* v. *Bureau of Ocean Energy Management*, 36 F.4th 850, 877 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2582 (2023). And here, the Commission itself noted that the alternatives proposed by commenters were "reasonable," 91 Fed. Reg. 13,421, yet it failed to consider those alternatives.

To be sure, the Commission stated that each of the proposed alternatives had "potential weaknesses" and that, because the funding model was being approved for a limited two-year period, no further analysis was warranted. 91 Fed. Reg. 13,424, 13,465. But that is simply an abdication of the Commission's regulatory responsibility to make "policy choices" itself in favor of deferring to "the policy choices made by the Participants." *Id.* at 13,424–25. A CAT funding plan in effect for only a short term, lasting for only two years, still reflects a setting of policy, for which the Commission "must provide a reasoned explanation for its action." *Judulang* v. *Holder*, 565 U.S. 42, 45 (2011). The Commission failed to satisfy that "unwavering" requirement. *Id.*

14

### 2. The Commission Failed To Justify Deviating From Its Previous Policy Of Cost-Sharing Between CAT Participants And Broker-Dealers

Even if the Commission had provided sufficient support for the express two-thirds allocation to broker-dealers, the 2026 order would still be unlawful for another reason. The Commission failed adequately to consider the near-certainty that the participants will pass through their own share of costs to broker-dealers—or to justify how that outcome would deviate from prior Commission orders that called for cost-sharing between participants and broker-dealers. Notably, FINRA already sought to pass its share of costs under the 2023 order through to broker-dealers, turning the formal two-thirds allocation into at least a four-fifths allocation, *see* 89 Fed. Reg. 11,153 (Feb. 13, 2024), and invariably will need to pass on such costs once again here, *see* 91 Fed. Reg. 13,467 & n.980.

Just as with the 2023 order, nothing in the 2026 order would prevent the exchanges from seeking to pass through their share of the costs as well, effectively saddling broker-dealers with 100% of CAT costs. *See* 88 Fed. Reg. 62,636; 91 Fed. Reg. 13,413. The only distinction is that now the Commission is permitting participants to "recover their share of costs from" broker-dealers "indirectly by increasing existing fees." 91 Fed. Reg. 13,413. Because the Commission's order invites such a result, it violates the Exchange Act's requirement of an "equitable allocation of reasonable dues, fees, and other

15

charges." 15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5). And because the Commission failed adequately to address the passing through of costs, as further explained below, the 2026 order is also arbitrary and capricious for this independent reason.

As a nonprofit national securities association, FINRA derives its funding primarily from regulatory fees paid by FINRA members. *See* Letter from Marcia E. Asquith, Corporate Secretary and Executive Vice President, FINRA, to Vanessa Countryman, Secretary, SEC, at 5–6 (Apr. 11, 2023) <tinyurl.com/FINRA-2023-Letter> (FINRA Letter). FINRA thus has no realistic means of funding its share of CAT costs other than by passing those costs along to member broker-dealers. Without doing so, it would have no way of meeting its budget and would risk jeopardizing its regulatory mission. FINRA Letter 7. The allocation of costs to FINRA is accordingly, for all practical purposes, an allocation of costs to broker-dealers. For that reason, the Commission's suggestion that broker-dealers will be limited to two-thirds of CAT costs is illusory. *See* 91 Fed. Reg. 13,415. When FINRA's share of the one-third of costs allocated to participants is passed through to broker-dealers, they will foot over 80% of total CAT costs. *See* SIFMA 2023 Letter 2.

The Commission itself acknowledged that FINRA is likely to pass through its portion of CAT costs. 91 Fed. Reg. 13,467 & n.980. But the Commission's responses to that fact do not justify its decision. The Commission

16

noted that the Exchange Act "expressly contemplates the ability of the Participants to recoup the costs of fulfilling their statutory obligations under the Exchange Act." 91 Fed. Reg. 13,422. It also stated that "businesses raise prices when faced with increases in costs, [] CAT Fees represent costs," and "[l]ike every business, the Participants need to recover their costs to remain viable." *Id.* at 13,467. And although the order includes projections of estimated FINRA and broker-dealer shares of CAT costs for 2026–2028, *id.* at 13,466, the Commission dismissed concern over the impact of such fees on the basis that they are too low on a per-share basis to matter, *id.* at 13,469. That reasoning neither analyzes nor justifies the financial impact on broker-dealers. As such, it offers no rationale for imposing at least 80% of total CAT costs on broker-dealers.

Nor is the problem of passing through costs limited to FINRA. The Commission also failed adequately to justify its decision to permit participants to recoup their limited share of CAT fees by passing on costs "indirectly" through "increasing existing fees." 91 Fed. Reg. 13,413. Such a policy decision wholly ignores this Court's prior recognition that a CAT allocation scheme that potentially saddles broker-dealers with 100% of CAT costs "constitutes a major CAT policy change" for which the Commission must articulate "good reasons for changing its positions." *American Securities Ass'n*, 147 F.4th at 1275 (internal quotation marks omitted). Specifically, the divergence would

17

"render the entire Funding Model meaningless, with [broker-dealers] bearing 100% of CAT costs."  Letter from Joanna Mallers, Secretary, FIA Principal Traders Group, to Vanessa Countryman, Secretary, SEC, at 2 (July 14, 2023) <tinyurl.com/FIA-Letter>.  That result would violate the Exchange Act:  because broker-dealers would effectively shoulder the entire burden of the CAT, fees would not be allocated equitably.  15 U.S.C. §§ 78f(b)(4), 78o-3(b)(5).  And it would eliminate the already limited incentive for participants to rein in the spiraling CAT budget.

The Commission did not grapple with the equities or reasonableness of burdening broker-dealers with up to 100% of CAT costs or offering a "reasoned justification" for deviating from longstanding Commission precedent.  *See*, *e.g.*, 81 Fed. Reg. 84,793, 84,795 (Nov. 23, 2016); 81 Fed. Reg. 30,710 (May 17, 2016).  Instead, the Commission obfuscated the issues by suggesting that it "mak[es] no determination that it would be permissible [for participants to] recover costs in any particular instance."  91 Fed. Reg. 13,413.  The Commission contends that it "cannot" consider the fairness or reasonableness of "any future attempt by a Participant to indirectly pass through its share of CAT costs," because any such "future" attempt by participants is "hypothetical" with "unknown . . . costs in an unknown manner under unknown circumstances."  *Id.*

18

The Commission now also insists—as it did previously before this Court, *see American Securities Ass'n*, 147 F.4th at 1276—that the Exchange Act will protect broker-dealers from future inequitable self-regulatory organization fee filings.  In particular, the Commission stated that, "[t]o the extent a Participant were to seek to offset the CAT costs it incurs by raising the rates of its other member fees, any such indirect pass-through fees" would be subject to "the rule filing process under Section 19(b)(2) of the Act." 91 Fed. Reg. 13,413.  The Commission contends that the Section 19(b)(2) process would give the Commission an opportunity to determine whether proposed fees are "reasonable, equitable, and not unfairly discriminatory." *Id.*

But in *American Securities Ass'n*, this Court squarely rejected the Commission's identical arguments, ruling that "[t]he Commission's *post hoc* review of fee filings is insufficient." 147 F.4th at 1276.  Here, *post hoc* review of participants' CAT cost pass-throughs will be even less protective of broker-dealers than under the 2023 order.  Because participants will "seek[] to recover their share of CAT costs from their members indirectly, such as through increases in other fees they charge to their members," the Commission would need to engage in far deeper analysis to determine whether the indirect pass-throughs are "reasonable, equitable, and not unfairly discriminatory." 91 Fed. Reg. 13,447, 13,467.

19

\*    \*    \*    \*    \*

In light of the participants' role in creating and exacerbating the complexities of the CAT, the Commission should have rejected the allocation of at least two-thirds (and up to 100%) of costs to broker-dealers. The Commission instead failed sufficiently to grapple with the issue of responsibility for costs and adopted its allocation based on the entirely superficial and unsupported assertion that "dividing the costs evenly among the three parties who have primary roles related to the transaction is a reasonable method of determining the initial allocation of CAT costs." 91 Fed. Reg. 13,432. In doing so, the Commission failed to comply with the Exchange Act and acted in an arbitrary and capricious manner.[2]

### B. The Commission Failed To Consider The Negative Effects Of Broker-Dealer-Only Funding

The 2026 order is unlawful for the further reason that the Commission failed to adequately "consider an important aspect of the problem": "potential broker-dealer-only funding" and the "classic free-rider problem" it presents. *American Securities Ass'n*, 147 F.4th at 1275. As this Court has already observed, "those entities who could be paying for much of the CAT would not be

---

[2] The inequity and arbitrariness of the fee allocation is heightened with respect to the collection of historical CAT fees, because a funding model based on current trading volume bears no relationship to responsibility for past costs and provides no incentive for efficiency. *See, e.g.*, Letter from Ellen Greene and Joseph Corcoran, Managing Directors, SIFMA, to Vanessa Countryman, Secretary, SEC, at 6 (Jan. 12, 2023) <tinyurl.com/SIFMA-January-Letter>.

20

involved in budget-related decisions or implementation of the plan," *Id.* at 1276. Accordingly, the participants "that govern the CAT [would] have little incentive to keep CAT costs down when they are free to pass along all of those costs to their broker-dealer members." *Id.* at 1275. Those factors, equally present whether the participants' fees are passed on directly or indirectly, "create[] the potential for a classic free-rider problem," *id.*, because under either plan the enormous CAT costs would still be imposed on broker-dealers without a meaningful role in setting the costs.

To be sure, the Commission acknowledged this Court's concern over broker-dealer-only funding. *See, e.g.*, 91 Fed. Reg. 13,411, 13,413. But the Commission's order lacks any substantive consideration of the free-rider problem that form of funding creates. *See American Securities Ass'n*, 147 F.4th at 1275–1276. Indeed, the Commission recognized that participants will remain able to recoup their share of the fees from broker-dealers, largely eliminating their incentives to restrain costs. 91 Fed. Reg. 13,424. And the Commission also acknowledged that broker-dealers will continue to lack "voting representation" or other direct power over the CAT budget that could allow for control of costs. *Id.* at 13,457. The Commission declined to further analyze or propose changes to the economically unjustifiable incentive structure created by the participants' control of the budget, deeming it not "within the scope" of the proceeding. *Id.* The Commission's approval of the CAT funding order without

21

meaningful consideration of the "classic free-rider problem" it presents renders the Commission's approval of the 2026 order arbitrary and capricious.

## II.    THE 2026 ORDER SHOULD BE STAYED PENDING REVIEW

Petitioners have moved for a stay of the SEC's 2026 order pending this Court's review, and a stay is amply warranted here.  When assessing whether to stay an agency order pending appeal, courts ask "(1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies."  *Ohio* v. *EPA*, 603 U.S. 279, 291 (2024).  Irreparable harm to broker-dealers is likely to result absent a stay because broker-dealers will be required to transfer hundreds of millions of dollars to the participants based on this defective order and cannot recoup these payments even after a favorable ruling for petitioners on the merits.  By contrast, a stay entails no genuine risk that the CAT would cease operations.

### A.    Irreparable Harm To Industry Members Is Likely To Result Absent A Stay

Without a stay, broker-dealers will be forced to transfer hundreds of millions of dollars to the self-regulatory organizations and those funds will not be returned even if the 2026 order is later held unlawful.

Under the terms of the CAT Reporter Agreement—the standard form agreement that intervenor Consolidated Audit Trail, LLC has with industry

members and participants—"[a]ny fees or other amounts paid by CAT Reporter [*i.e.*, industry members] under this Agreement are nonrefundable." CAT Reporter Agreement <tinyurl.com/CAT-Reporter-Agreement>. Accordingly, if the requested relief is not granted, broker-dealers and investors will be forced to pay hundreds of millions of dollars in likely unrecoverable CAT fees before this Court has an opportunity to resolve petitioners' challenge to the Commission's order.

Under the 2026 order, broker-dealers and investors will be forced to transfer to the participants up to 100% of CAT costs for the 2026-2028 period, costs estimated to be $446.7 million in total and $156.9 million by the end of 2026 alone. 91 Fed. Reg. 13,465–66; CAT FeeAlert 2026-1 at 2 <perma.cc/5MNC-SQE9>. Notably, these are the *SEC's estimates*; the actual number may be much higher. In light of their unique legal protections, however, the participants can be expected to argue that they cannot be compelled to return any such funds to broker-dealers even if this Court were to hold that the 2026 order is unlawful. Courts have determined that self-regulatory organizations have absolute immunity when "they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions," and thus "enjoy the same level of immunity as the government itself" when engaged in those activities. *Weissman* v. *National Ass'n of Securities Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007) (en banc). Accordingly, the

23

participants would almost surely argue that they are immune from any lawsuit seeking to recover improperly assessed CAT fees. The organizations constituting the CAT have confirmed as much: they have expressly stated that "the fees paid for the CAT by [broker-dealers] may not be repaid," even if the CAT "is no longer viable" as a matter of law. Letter from Brandon Becker to Vanessa Countryman, Secretary, SEC, at 45 (June 13, 2024) <tinyurl.com/28dc58p2>; *see also* CAT Reporter Agreement.

The forced and irreversible transfer of hundreds of millions of dollars from broker-dealers to the participants constitutes irreparable harm. For example, in *Philip Morris USA Inc.* v. *Scott*, 561 U.S. 1301 (2010), Justice Scalia, sitting as a Circuit Justice, granted a petition for a stay of a lower court's judgment requiring the defendants to pay over $250 million to fund a court-ordered program. *Id.* at 1301–1302. As Justice Scalia explained, before the Supreme Court would have been "able to consider and resolve applicants' claims, a substantial portion of the fund established by their payment" would have been "irrevocably expended." *Id.* at 1304. "If expenditures cannot be recouped," Justice Scalia concluded, "the resulting loss may be irreparable." *Id.*

This Court also has specifically held that the lack of a monetary remedy against a governmental defendant because of sovereign immunity constitutes irreparable harm. *See Odebrecht Construction, Inc.* v. *Secretary, Florida Department of Transportation*, 715 F.3d 1268, 1289 (11th Cir. 2013). And as this

Court observed, the self-regulatory organizations "are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions," so the unlawful collection of CAT fees would likely leave broker-dealers "without a remedy." *American Securities Ass'n*, 147 F.4th at 1279 (internal quotation marks omitted).

The Court need look no further for confirmation than the participants' conduct concerning the 2023 order. While that order was in effect, the participants compelled broker-dealers to pay hundreds of millions of dollars. They demanded payment even once they knew full well that such collection was made pursuant to an order ruled unlawful by this Court. And just as the American Securities Association, Citadel, and others asserted would be the case, the participants have refused to return those funds collected pursuant to the unlawful order. 91 Fed. Reg. 13,444; *see* Pet. Stay Mot. 11, *American Securities Ass'n* (No. 23-13396) (Dkt. 112-1); SIFMA Stay Br. 5–6, *American Securities Ass'n* (No. 23-13396) (Dkt. 116-2). Accordingly, this Court should grant the relief requested by petitioners to maintain the status quo so as to prevent broker-dealers (and investors) from suffering irreparable harm.

### B.     A Stay Would Not Hinder The CAT's Continued Functioning

The Commission will face no cognizable injury from a continuation of the status quo. A stay would have no impact on the Commission's budget. *See* Pet. Stay Mot. 12–13. In addition, the CAT can and will continue to function

with support from the participants—as it has from 2016 to 2024—without a final funding plan in place. That is because the participants are required to develop and maintain the CAT in the absence of another approved CAT funding model.

The 2026 order, set to expire in March 2028, rests on the premise that, absent a short-term stop-gap funding measure, the CAT might cease to function. The Commission notes that the participants "caution[ed] that it should not be assumed" that they "will voluntarily agree to loan funds" to fund the CAT. 91 Fed. Reg. 13,412 (internal quotation marks omitted). The Commission explains that, as a consequence, the 2026 order was necessary because a "defined funding source is needed to ensure [the CAT's] continued existence and funding" and to avoid "a potentially destabilizing" scenario. *Id.*

The Commission's fears are unfounded for two reasons. *First*, the Exchange Act requires the self-regulatory organizations "[to] carry out the purposes of the Exchange Act, the rules and regulations thereunder, and the rules of the exchange or association." 81 Fed. Reg. 84,794 n.1736 (citing 15 U.S.C. §§ 78f(b)(1), 78o-3(b)(2)). And even the Commission previously has recognized that the participants are required, under that framework, to "maintain the CAT" and "fund" required maintenance. Recitals, LLC Agreement of Consolidated Audit Trail, LLC (Mar. 16, 2026) <perma.cc/5XJ9-H5RX>; 17 C.F.R. § 242.613(a)(1)(vii)(D). Those legal obligations—coupled with the history of

26

the participants fulfilling their mandates—provide no basis for the Commission, or this Court, to infer that the CAT would cease functioning. *Second*, Consolidated Audit Trail, LLC, has reserves sufficient to fund total CAT expenses through the end of 2026. *See* Consolidated Audit Trail, LLC 2026 Financial and Operating Budget 1 (Mar. 31, 2026) <tinyurl.com/03312026-CAT-2026-Budget>. And because this Court has ordered expedited briefing and directed the Clerk's Office to schedule oral argument for as soon as possible after August 2026, *see* Dkt. 47-2, it is highly possible that this Court will rule on the merits of the petition prior to the exhaustion of the reserves.

## CONCLUSION

The motion for a stay and the petition for review should be granted, and the order of the Securities and Exchange Commission set aside.

Respectfully submitted,

/s/ Lorin L. Reisner

|  |  |
|---|---|
| WILLIAM T. MARKS | LORIN L. REISNER |
| PAUL, WEISS, RIFKIND, | ERIC E. STERN |
|   WHARTON & GARRISON LLP | PAUL, WEISS, RIFKIND, |
|   *2001 K Street, N.W.* |   WHARTON & GARRISON LLP |
|   *Washington, DC 20006* |   *1285 Avenue of the Americas* |
|  |   *New York, NY 10019* |
|  |   *(212) 373-3000* |
|  |   *lreisner@paulweiss.com* |

MAY 28, 2026

27

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Lorin L. Reisner, a member of the Bar of this Court and counsel for amicus curiae Securities Industry and Financial Markets Association, hereby certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), that the attached Brief of Amicus Curiae Securities Industry and Financial Markets Association in Support of Petitioners and Vacatur is proportionately spaced, has a typeface of 14 points or more, and contains 6,332 words.

/s/ Lorin L. Reisner
LORIN L. REISNER

MAY 28, 2026